**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) | Case No. 23-90116 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO MAINTAIN AND ADMINISTER THEIR EXISTING CUSTOMER PROGRAMS AND HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO AND (II) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 2:30 p.m. (prevailing Central Time) on March 16, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on March 16, 2023, at 2:30 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez." Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "submit" to complete your appearance.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is:  c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully state as follows in support of this motion:[2]

### Relief Requested

1.     The Debtors seek entry of an order, substantially in the form attached hereto, (a) authorizing the Debtors to maintain and administer their Customer Programs (as defined herein) and honor certain prepetition obligations to customers in the ordinary course of business and (b) granting related relief.

### Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "<u>Amended Standing Order</u>").  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), Bankruptcy Rules 6003

---

[2]     A detailed description of the Debtors and their business, including the facts and circumstances giving rise to these chapter 11 cases and supporting this motion, is set forth in the *Declaration of David F. DeVoe, Jr. in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith and incorporated herein by reference.  Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration.

and 6004, and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules").

## Background

5.     The Debtors own and/or operate the Bally Sports Regional Sports Networks (the "RSNs"), making them the nation's leading provider of local sports programming.  The Debtors' 19 Bally Sports RSNs serve as the home for 42 MLB, NBA, and NHL teams.  The Debtors also hold joint venture interests in Marquee, the home of the Chicago Cubs, and the YES Network, the local destination for the New York Yankees and Brooklyn Nets.  The RSNs produce approximately 4,500 live local professional telecasts each year in addition to a wide variety of locally produced sports events and programs.

6.     On March 14 and 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have contemporaneously filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Customers

7.     The Debtors primarily have four types of customers: distributors, advertisers (together with their representative third-party advertising agencies and agencies that earn commissions on sales), direct-to-consumer subscribers, and third-party programming suppliers ("Distributors," "Advertisers," "DTC Customers," and "Programming Suppliers," respectively, and collectively, the "Customers").  Historically, the Debtors' two primary sources of revenue have been their relationships with their Distributors and Advertisers.  The Debtors' ability to

maintain Customer relationships without disruption during these chapter 11 cases, including through honoring and paying Customer Program Obligations (defined below), whether incurred or arising prior to or after the Petition Date, in the ordinary course on a postpetition basis, is absolutely essential to preserving and maximizing the value of the Debtors' estates and their business as a going concern.

8.    *Distributors*.  Historically, the Debtors have generated a majority of their annual revenue from distributing their RSNs through multichannel video programming distributors, or "MVPDs," such as AT&T ("U-verse"), Charter Communications, Inc., Comcast Corporation, Cox Communications, Inc., and DIRECTV and virtual MVPDs such as DIRECTV STREAM that serve as intermediaries between the Debtors and consumers.

9.    The Debtors' relationships with the Distributors are documented through distribution agreements (the "Distribution Agreements") between the applicable Debtors and Distributors.  Pursuant to such Distribution Agreements, Distributors generally pay the Debtors monthly licensing fees, based on agreed-upon per-subscriber rates, in exchange for content, which Distributors then serve to residential and/or commercial consumers.  The Debtors have Distribution Agreements with more than 450 Distributors, most of which serve small local markets, but the Debtors derive most of their distribution revenue from a handful of large national Distributors.

10.    *Advertisers*.  The Debtors' second primary source of revenue is their relationships with Advertisers.  That revenue principally comes from Advertisers who purchase live in-game advertising units (i.e., commercial breaks), as well as branded in-game features and elements that are integrated into the Debtors' broadcasts.  Advertisers also buy inventory across other areas of the business, such as non-game programming, and also on the Debtors' digital platforms, such as

4

streaming, omnichannel marketing services, websites, and branded social media content. Approximately 60 percent of the Debtors' in-game advertising sales are for national advertising purchased by advertising agencies that represent the ultimate Advertiser. These national advertising agreements are sourced through third-party commission-based sales agencies Playfly, LLC (a/k/a Home Team Sports) and Sinclair Sports Group ("SSG"). The remaining 40 percent are local advertisers, which purchase advertising only for a particular local market from the Debtors' local sales teams in those markets. The Debtors arrange local advertising through both advertising agencies and direct negotiation with Advertisers.

11.    *DTC Customers*.  The DTC Customers are subscribers to various offerings on the Debtors' streaming service, Bally Sports+.  The DTC Customers are a relatively small, but rapidly growing source of revenue for the Debtors, and DTC is a key component of the Debtors' long-term business strategy.  The Debtors currently offer monthly and annual subscription options to a variety of streaming content packages that vary by region, which are delivered via web browser or through apps on platforms such as iOS, Android, Roku, and others (the "Streaming Platforms").  The Debtors have agreements with the Streaming Platforms that include, among other things, revenue sharing for in-app purchases.

12.    *Programming Suppliers*.  Programming Suppliers are third-party content producers that enter into various forms of agreement with the Debtors to air the Programming Suppliers' content (the "Programming Agreements").

### Customer Programs and Obligations

13.    Prior to the Petition Date, in the ordinary course of the Debtors' business, the Debtors offered and engaged in certain customer programs and practices with respect to their Distributors, Advertisers, DTC Customers, and Programming Suppliers (collectively,

the "Customer Programs," and the obligations related thereto, the "Customer Program Obligations").[3]

14.     By this motion, the Debtors seek authority (a) to honor any prepetition obligations related to their Customer Programs, (b) out of an abundance of caution, to continue to honor the Customer Programs in the ordinary course of their business on a postpetition basis without disruption, and (c) in furtherance of the same, to permit any party with recoupment rights in respect of prepetition Customer Program Obligations owing by the Debtors to be able to exercise those rights in accordance with applicable contracts and laws.  A description of each of the Customer Programs and estimates of the Debtors' prepetition Customer Program Obligations are set forth below.  The Debtors estimate that, of the prepetition obligations under the Customer Programs, approximately $46.5 million in cash obligations, and certain additional non-cash obligations, remain outstanding.

### A.     Distribution Agreement Obligations

15.     Distributors pay the Debtors a monthly license fee in exchange for content, paid in cash, typically 30 or 45 days after the fee accrues.  The Debtors have Distribution Agreements with more than 450 Distributors as of the Petition Date.

16.     At any given time and from time to time, the Debtors accrue three types of obligations to Distributors: (a) obligations to pass the value of certain savings on content acquisitions along to Distributors ("Costs-Saved Rebates"); (b) refund obligations arising from certain guarantees pursuant to the Distribution Agreements ("Product Guarantee Obligations");

---

[3]     Although this motion is intended to be comprehensive, the Debtors may have inadvertently omitted some Customer Programs.  The Debtors request relief with respect to all Customer Programs and obligations related thereto regardless of whether such Customer Program is specifically identified herein.

and (c) advertising carveout obligations ("<u>Advertising Carveouts</u>," and together with Product Guarantee Obligations, the "<u>Distribution Agreement Obligations</u>").

17.   *Costs-Saved Rebates*.   Certain of the Distribution Agreements provide for Costs-Saved Rebates, which require the Debtors to pass the value of certain costs saved on content acquisition along to the applicable Distributor.   For example, the Debtors could incur a Costs-Saved Rebate where they receive a rebate on an initial content acquisition, or where they save on rights payments due to the cancellation of a corresponding rights agreement.   Costs-Saved Rebates are usually credited to the Distributor's account or, in less common circumstances, paid in cash as a refund.

18.   *Product Guarantee Obligations*.   The Distribution Agreements generally require the RSNs to meet certain content criteria, which may include minimum thresholds for professional event telecasts throughout the year on the RSNs ("<u>Product Guarantees</u>").   The Distribution Agreements contain fee reduction, rebate, refund, and/or termination provisions in the event the applicable RSNs fail to meet those Product Guarantees.   If the Debtors do not meet the Product Guarantees for a given Distributor, the Debtors must issue a refund to that Distributor, calculated pursuant to a formula under the applicable Distribution Agreement.   Product Guarantee Obligations are usually credited to the Distributor's account as a rebate or satisfied through additional event telecasts to make-up the shortfall or, in less common circumstances, paid in cash as a refund.

19.   *Advertising Carveouts*.   The Advertising Carveouts contained in the Distribution Agreements require the Debtors to reserve a certain amount of time in their delivered product for the Distributor to place ads.   In the event of a failure to provide the amount of advertising time

required by the Advertising Carveouts, the Debtors often provide Distributors with make-ups or refunds to cure those shortfalls.

20.     The Debtors estimate that, as of the Petition Date, they have in the aggregate approximately $40.1 million in Product Guarantee Obligations for which the applicable Distributor is entitled to reduce the monthly fee payable to the Debtors under its Distribution Agreement by a specified amount until such amounts have been satisfied.  The Debtors do not believe that they have any other outstanding Distribution Agreement Obligations as of the Petition Date.

### B.     Advertising Obligations

21.     At any given time, the Debtors accrue four types of obligations relating to Advertisers:  (a) commission obligations to third-party advertising agencies that facilitate sales between the Debtors and Advertisers ("Commission Obligations"); (b) performance and crediting obligations arising from prepaid ad sales ("Prepaid Ad Sale Obligations"); (c) make-up performance obligations arising from missed performance metrics ("Make-Good Obligations"); and (d) event tickets and other promotional obligations ("Promotional Obligations," and together with Commission Obligations, Prepaid Ad Sale Obligations, and Make-Good Obligations, the "Advertising Obligations").

22.     *Commission Obligations.*  The Commission Obligations arise in the ordinary course of the Debtors' business when third-party advertising agencies acquire ad sales on the Debtors' behalf in exchange for percentage-based commissions on such sales.  In some cases, the third-party agency receives the associated advertising revenue directly from the end buyer, recovers its percentage-based commission, and subsequently remits the balance of such revenue to the Debtors net of its commission.  In other cases, the end buyer pays the Debtors directly for advertising sold by the third-party agency and the Debtors remit payment to the third-party agency to satisfy the associated Commission Obligation.  In either case, for the purposes of this motion, the Commission

Obligations include those arising from advertisements that third-party advertising agencies (a) sold or caused to be ran prior to the Petition Date and that are payable either before or after the Petition Date and (b) sold prior to the Petition Date and are payable before the Petition Date but will not run until after the Petition Date.   Certain Commission Obligations are subject to satisfaction through recoupment since the associated sales revenue has been collected by the third-party advertising agency in the ordinary course and the third-party advertising agency has the right to net its commissions from those collected revenues.

23.     *Prepaid Ad Sale Obligations*.   The Prepaid Ad Sale Obligations arise in the ordinary course of the Debtors' business when Advertisers pay the Debtors in advance for advertising.   The Debtors record these payments as credits on the Debtors' accounts receivable ledger until the advertisement is aired and an invoice is applied against the payments.   Accordingly, until such time as the Debtors air the advertisement, the Debtors owe a performance obligation to their Advertisers in the amount of the prepayments.   Prepaid Ad Sale Obligations also arise when Advertisers inadvertently overpay the Debtors for an advertisement, and from other account reconciliations.   In the vast majority of these cases, at the Advertiser's request, the Debtors will credit the overpayment to future advertising instead of issuing a cash refund.

24.     *Make-Good Obligations*.   Make-Good Obligations arise in the ordinary course of the Debtors' business when the product into which advertisements are packaged fails to hit designated viewership ratings.   The Debtors discharge Make-Good Obligations by providing additional advertising time until the Advertiser's agreed-upon ratings commitment is hit. Make-Good Obligations are exclusively settled with advertising time and are not repaid in cash.

25.     *Promotional   Obligations*.     The   Debtors   often   provide   event   tickets, meet-and-greets, and other forms of hospitality to Advertisers in the ordinary course of business

to maintain relationships and encourage advertisement sales.  These promotions are sometimes contractual obligations, but more typically, they are provided on a complimentary basis.  In addition to seeking authorization to honor the contractual Promotional Obligations, out of an abundance of caution, the Debtors seek authorization to continue offering complimentary promotional features in the ordinary course.

26.    The Debtors estimate that, as of the Petition Date, they have approximately $5.2 million in accrued but unsatisfied cash or cash-equivalent obligations, and certain additional non-cash obligations, on account of Advertising Obligations.

### C.    DTC Obligations

27.    DTC Customers pay monthly or yearly subscription fees to the Debtors either through a third-party administrator or through an intermediary Streaming Platform.  At any given time and from time to time, the Debtors accrue two categories of obligations in relation to the DTC business:  (a) obligations to continue providing services to DTC Customers ("Subscriber Obligations"); and (b) obligations owed to Streaming Platforms ("Streaming Platform Obligations," and together with Subscriber Obligations, the "DTC Obligations").

28.    *Subscriber Obligations*.  The Debtors incur Subscriber Obligations in the ordinary course of business when DTC Customers prepay for streaming subscriptions, obligating the Debtors to continue providing streaming services throughout the prepaid subscription period. Additionally, in their efforts to promote and maintain their DTC platform, the Debtors provide free trials to prospective DTC Customers, and may provide cash refunds to existing DTC Customers.

29.    *Streaming Platform Obligations*.   The Debtors incur Streaming Platform Obligations when DTC Customers subscribe through a Streaming Platform, which entitles the Streaming Platform to a percentage of the revenue so derived.  The Streaming Platform Obligations are netted out of those revenues before those amounts are remitted to the Debtors, and are not paid

out of the Debtors' cash.  Additionally, the Debtors are obligated to provide advertising carveouts

to the Streaming Platforms that are similar to those provided by the Distribution Agreements.

30.    The Debtors estimate that, as of the Petition Date, they have approximately

$1.2 million in accrued but unsatisfied cash or cash-equivalent obligations, and certain additional

non-cash obligations, on account of DTC Obligations.

**D.    Programming Obligations**

31.    The Debtors incur two forms of Customer obligations under Programming

Agreements:   (a) "Barter Obligations" and (b) "Leased Airtime Obligations" (collectively,

the "Programming Obligations").

32.    *Barter Obligations*.  The Debtors incur Barter Obligations through Programming

Agreements in which the Debtors agree to air the Programming Supplier's content, and split the

corresponding advertising inventory with the Programming Supplier.  The Debtors settle Barter

Obligations through performance (i.e., airing the content).

33.    *Leased Airtime Obligations*.  The Debtors incur Leased Airtime Obligations

through Programming Agreements in which the Debtors agree to air the Programming Supplier's

content in exchange for cash payments.  Like the Barter Obligations, the Debtors settle Leased

Airtime Obligations through performance.

34.    The Debtors estimate that, as of the Petition Date, they do not have any material

unsatisfied cash or cash-equivalent obligations, or any additional non-cash obligations, owing on

account of Programming Obligations.

**<u>Basis for Relief</u>**

35.    The Debtors seek authority to honor and satisfy any claims based on Customer

Programs, whether incurred prepetition or postpetition, in the ordinary course of business.  Courts

have recognized that it is appropriate to authorize the payment of prepetition obligations where

necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."). In doing so, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.[4]

36.     Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the pre-plan satisfaction of a prepetition claim." *In re CoServ, L.L.C.*, 273 B.R. at 499.

37.     Section 105(a) of the Bankruptcy Code and the "doctrine of necessity" permit the bankruptcy court to exercise its broad grant of equitable powers to authorize the payment of prepetition obligations when such payment is essential to the continued operation of the debtor's business. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. at 497 (finding that section 105 of the Bankruptcy Code provides the authority for a debtor in possession to pay prepetition claims); *In*

---

[4]     Because the Debtors engage in transactions related to the Customer Programs on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe such transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and thus do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. The continued performance of the ordinary course transactions in connection with the Debtors' Customer Programs is integral to ensuring the Debtors' ability to operate their business as debtors in possession and maximize the value of their estates.

*re CEI Roofing, Inc.*, 315 B.R. 50, 56 (Bankr. N.D. Tex. 2004); *In re Mirant Corp.*, 296 B.R. 427,

429 (Bankr. N.D. Tex. 2004).

38.     The above-referenced sections of the Bankruptcy Code empower the Court to

authorize the postpetition payment of prepetition claims when the payments are critical to

preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *In re*

*CoServ, L.L.C.*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use

[s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid

of preservation or enhancement of the estate.").

39.     Here, authorizing the Debtors to continue to administer the Customer Programs

without interruption, including paying prepetition claims arising thereunder, during the pendency

of these chapter 11 cases is absolutely critical to preserve the value of the Debtor's assets, by

sustaining customer goodwill and market share.   Indeed, the Distributors, Advertisers, DTC

Customers, and Programming Suppliers are a crucial aspect of the Debtors' business, and any

interruption to the Debtors' relationships with these Customers due to the inability to, for example,

meet their contractual Product Guarantee Obligations or honor their Advertising Obligations, DTC

Obligations, or Programming Obligations, would have substantial negative consequences on the

going-concern value of the Debtors' business.   The commencement of the Debtors' chapter 11

cases is likely to create apprehension on the part of current or potential customers about their

continuing or commencing business with the Debtors.   Any curtailment of the Debtors' ability to

continue the Customer Programs, and the resulting negative public perception from the Debtors'

inability to do so, may enable the Debtors' competitors to take advantage of the Debtors'

reorganization proceedings, causing substantial harm to the Debtors' business, their estates, and

their stakeholders.   Indeed, many of the Customer Program Obligations arise under existing

contracts with the Debtors and their Customers and consist primarily of cash-equivalent or non-cash performance obligations.  The Debtors therefore seek to ensure their Customers of the Debtors' commitment to continued productive relationships.  The Debtors further believe that the substantial benefit conferred on the Debtors' estates—and ultimately their creditors—by the Customer Programs' enhancement of the Debtors' going-concern business value warrants authorizing the Debtors to honor such Customer Programs.

40.     For all of the foregoing reasons, the Debtors submit that the circumstances of these chapter 11 cases warrant granting the requested relief, and that doing so is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest, and therefore should be granted.  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue the Customer Programs and honor prepetition commitments related thereto in the ordinary course of the Debtors' business.

### Processing of Checks and Electronic Funds Transfers Should Be Authorized

41.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein.  Accordingly, the Debtors believe that there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made.  Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**Emergency Consideration**

42.     Pursuant to Local Rule 9013-1, the Debtors respectfully request emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  As set forth in this motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Failure to obtain the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring efforts.  Accordingly, the Debtors respectfully request that the Court grant the relief requested in this motion on an emergency basis.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

43.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

44.     Nothing contained herein or any actions taken pursuant to such relief requested is intended to be or should be construed as:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume,

15

adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

## Notice

45.     The Debtors will provide notice of this motion to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agents under the Debtors' prepetition credit facilities and counsel thereto; (d) the indenture trustees under the Debtors' prepetition indentures and counsel thereto; (e) counsel to the Ad Hoc First Lien Group; (f) counsel to the Ad Hoc Secured Group; (g) counsel to the Ad Hoc Crossholder Group; (h) Sinclair and its counsel; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the state attorneys general for states in which the Debtors conduct business; (l) the Securities and Exchange Commission; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

16

WHEREFORE, the Debtors respectfully request that the Court enter the proposed order, substantially in the form attached hereto, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

March 15, 2023

Respectfully submitted,

By: */s/ John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Bryan L. Rochelle (TX Bar No. 24107979)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
brochelle@porterhedges.com

- and -

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Andrew N. Goldman (*pro hac vice* pending)
Benjamin W. Loveland (*pro hac vice* pending)
Lauren R. Lifland (*pro hac vice* pending)
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
andrew.goldman@wilmerhale.com
benjamin.loveland@wilmerhale.com
lauren.lifland@wilmerhale.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Brian S. Hermann (*pro hac vice* pending)
Andrew M. Parlen (*pro hac vice* pending)
Joseph M. Graham (*pro hac vice* pending)
Alice Nofzinger (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
bhermann@paulweiss.com
aparlen@paulweiss.com
jgraham@paulweiss.com
anofzinger@paulweiss.com

*Proposed Section 327(e) Counsel to the Debtors and Debtors in Possession*

*Proposed Section 327(a) Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Accuracy</u>**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.  This statement is made pursuant to Local Rule 9013-1(i).

*/s/ John F. Higgins*
John F. Higgins


**<u>Certificate of Service</u>**

I certify that on March 15, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins