## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) | Case No. 23-90116 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES AND OTHER WORKFORCE OBLIGATIONS AND (B) CONTINUE WORKFORCE BENEFITS PROGRAMS AND PAY RELATED OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 2:30 p.m. (prevailing Central Time) on March 16, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on March 16, 2023, at 2:30 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez." Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "submit" to complete your appearance.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully state as follows in support of this motion:[2]

## Relief Requested

1.     The Debtors seek entry of an order, substantially in the form attached hereto, (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages and other workforce obligations and (ii) continue workforce benefits programs in the ordinary course of business and pay related obligations, including payment of certain prepetition obligations related thereto, and (b) granting related relief.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "<u>Amended Standing Order</u>").  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105(a), 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), Bankruptcy

---

[2]     A detailed description of the Debtors and their business, including the facts and circumstances giving rise to these chapter 11 cases and supporting this motion, is set forth in the *Declaration of David F. DeVoe, Jr. in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith and incorporated herein by reference.  Capitalized terms used but not otherwise defined in this motion have the meanings ascribed to them in the First Day Declaration.

Rules 6003 and 6004, and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules").

## Background

5.      The Debtors own and/or operate the Bally Sports Regional Sports Networks (the "RSNs"), making them the nation's leading provider of local sports programming.  The Debtors' 19 Bally Sports RSNs serve as the home for 42 MLB, NBA, and NHL teams.  The Debtors also hold joint venture interests in Marquee, the home of the Chicago Cubs, and the YES Network, the local destination for the New York Yankees and Brooklyn Nets.  The RSNs produce approximately 4,500 live local professional telecasts each year in addition to a wide variety of locally produced sports events and programs.

6.      On March 14 and March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have contemporaneously filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Workforce

7.      As of the Petition Date, the Debtors employ over 600 individuals, the majority of whom are employed on a full-time basis (collectively, the "Regular Employees").  The Regular Employees perform a number of functions for the Debtors, ranging from finance, operations, marketing, engineering, talent, and crew services involved in the production of the RSNs' programming.

8.      Due to the nature of the Debtors' business, the Debtors' labor needs fluctuate throughout the year and across various geographic markets.  Accordingly, to adapt to such changing needs, the Debtors routinely supplement their workforce by employing a varying number of workers on a temporary basis (the "Temporary Workers").  The Temporary Workers perform a variety of functions, including "below-the-line" functions (e.g., technical directors, audio mixers, and camera operators) as well as "above-the-line" functions (e.g., producers, directors, and various "on-air" positions).  As of January 2023, the Debtors employed approximately 1,500 Temporary Workers.  Although the Temporary Workers are employed by the Debtors, substantially all of them are retained through a third-party managed services company.

9.      The Debtors additionally contract with a number of independent contractors either directly or through a third party (the "Independent Contractors").  The Independent Contractors fulfill a variety of roles across the Debtors' business, including as consultants and in above-the-line functions, marketing, process improvement, media operations support, digital design, security, customer interface services for the direct-to-consumer business, and other roles as needed.

10.     As of the Petition Date, certain of the Temporary Workers and Independent Contractors (collectively, the "Represented Employees"), are covered by four collective bargaining agreements (the "CBAs") between the Debtors and various labor unions.  The Debtors request authority to continue to honor all obligations to the Represented Employees under the terms of the CBAs to which the Debtors are parties.[3]

11.     Additionally, the Debtors rely on various staffing agencies and/or consultants (collectively, "Staffing Services") to provide additional non-employee staffing ("Non-Employee

---

[3]     By requesting the authority to honor obligations under the CBAs in this motion, the Debtors are not assuming or otherwise affirming any contracts, agreements, programs, or applicability of law related to the CBAs.  The Debtors reserve all rights with respect to the CBAs.

Staff") as may be required from time to time. As with Temporary Workers and Independent Contractors, the need for such Non-Employee Staff varies throughout the year and across geographical markets. In 2022, the Staffing Services collectively provided the Debtors with approximately 2,250 Non-Employee Staff over the course of the year. The Staffing Services provide Non-Employee Staff for a variety of critical functions, including for production-related work similar to that performed by Temporary Workers.

12.     The Debtors' Regular Employees, Temporary Workers, Independent Contractors, and Non-Employee Staff (collectively, the "Workforce") perform a wide variety of functions critical to the Debtors' operations, the administration of these chapter 11 cases, and the Debtors' successful reorganization. Their skills, knowledge, and understanding of the Debtors' operations are essential to preserving operational stability and efficiency at this critical juncture. The Debtors' Workforce includes highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their Workforce, the Debtors' reorganization efforts will be jeopardized.

13.     Members of the Debtors' Workforce rely on their compensation and benefits to pay their daily living expenses and support their families. If the Debtors were unable to meet and sustain their payroll and benefits obligations, members of the Workforce may be exposed to significant financial constraints. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

14.     In addition to the Debtors' Workforce, the Debtors benefit from certain services provided by workers for which relief is not being sought in this motion. Many of the Debtors' key personnel are employees of the Debtors' ultimate parent, Sinclair Broadcast Group, Inc., and its non-debtor affiliates (collectively, "Sinclair"). For example, the Debtors' payroll, benefits,

information technology services, and certain human resources functions are currently provided through Sinclair.  The Debtors compensate Sinclair for these services pursuant to the Management Services Agreement, or MSA, as described in the First Day Declaration.

## Workforce Compensation and Benefits

15.    To minimize the personal hardship, the Debtors' Workforce would suffer if ordinary course compensation and benefits are not paid when due or as expected, the Debtors seek authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, commissions, expense reimbursements, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, insurance premiums, flex spending account contributions, health savings account contributions, taxes, and 401(k) contributions), health insurance, workers' compensation benefits, paid leave, life and accidental death and dismemberment insurance, short- and long-term disability coverage, and other benefits that the Debtors have historically directly or indirectly provided to the Debtors' Workforce in the ordinary course of business (collectively, the "Compensation and Benefits").  In addition, the Debtors also are seeking to pay all costs incidental to the Compensation and Benefits.

16.    Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Compensation and Benefits programs in the ordinary course of business. Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval.[4]

---

[4]    Certain of the costs summarized elsewhere in this motion, such as those related to the Employee Benefit Plans, are paid by Sinclair and reimbursed by the Debtors pursuant to the Management Services Agreement.  While relief requested with respect to such programs is accordingly not sought in this motion, information concerning

17.     The Debtors estimate that they owe prepetition amounts on account of the Compensation and Benefits in approximately the following amounts:

| Relief Sought | Amount |
|---|---|
| Wage and Salary Obligations | $1,100,000 |
| Temporary Worker Obligations | $2,400,000 |
| Independent Contractor Obligations | $1,400,000 |
| Staffing Services Obligations | $3,000,000 |
| Withholding Obligations | $1,820,000 |
| Reimbursable Expenses | $920,000 |
| Payroll Processing | $33,000 |
| 401(k) Plan | $740,000 |
| Workers' Compensation Program | $32,000 |
| **Total** | **$11,445,000** |

18.     As of the Petition Date, the Debtors do not believe that there are any Regular Employees, Temporary Workers, or Independent Contractors that are owed prepetition Compensation and Benefits in excess of $15,150, the priority expense compensation and benefit cap set forth by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

**I.      Compensation Obligations, Withholding Obligations, Payroll Processing, and Reimbursable Expenses**

**A.      Compensation Obligations**

19.     In the ordinary course of business, the Debtors incur obligations to their Workforce for Wage and Salary Obligations, Commissions, Temporary Worker Obligations, Independent Contractor Obligations, Staffing Services Obligations, Non-Insider Ordinary Course Incentive Programs, and Non-Insider Severance Programs (each, as defined below and collectively, the "Compensation Obligations").

20.     As of the Petition Date, the Debtors estimate that they owe approximately $11.5 million on account of accrued and unpaid Compensation Obligations.   The Debtors

---

those categories of costs is included herein in the interest of providing a full picture of the Debtors' various Workforce programs.

respectfully request authority to pay all Compensation Obligations accrued and outstanding as of the Petition Date, and to continue to pay any Compensation Obligations as they come due in the ordinary course of business.

### 1. Wage and Salary Obligations

21.    The Debtors pay their Regular Employees' wages, salaries, overtime, and other compensation (the "Wage and Salary Obligations") biweekly, on either a salaried or hourly basis. Approximately 430 Regular Employees are salaried, exempt employees, and 170 are hourly, non-exempt employees. The Debtors pay approximately $4.1 million in the aggregate on a biweekly basis, with payment typically occurring on Friday.

22.    Because the majority of Regular Employees are paid in arrears, certain Regular Employees will be owed accrued and unpaid Wage and Salary Obligations as of the Petition Date. Wage and Salary Obligations also may be due and owing as of the Petition Date because of, among other things, (a) potential discrepancies between the amounts paid and the amounts that Regular Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Regular Employees; and (b) the delay between the date when certain payroll checks are issued and the date on which such checks are presented to the Regular Employee's bank for payment.

23.    As of the Petition Date, the Debtors estimate that their Regular Employees are owed an aggregate of approximately $1.1 million on account of accrued Wage and Salary Obligations (excluding Withholding Obligations, Reimbursable Expenses, and Paid Leave Benefits (each as defined below), as well as amounts related to any severance, bonus, or deferred compensation plans) (collectively, the "Unpaid Wage and Salary Obligations") earned before the Petition Date.

### 2. Commissions

24.     In addition to Wage and Salary Obligations, certain Regular Employees are entitled to earn commission-based compensation (the "Commissions"). The Debtors currently pay Commissions to approximately 40 Regular Employees who work in sales and marketing departments. Commissions are generally paid in addition to the Regular Employees' base Wage and Salary Obligations and are based on the percentage of gross revenue logged and posted by the eligible Regular Employee in a fiscal month, subject to certain adjustments.[5] The commission-based pay structure motivates these Regular Employees to achieve desired business results for sales revenues and Commissions constitute part of these Regular Employees' ordinary-course compensation.

25.     Commissions are generally paid one month in arrears. Accordingly, certain Regular Employees may be owed accrued and unpaid Commissions as of the Petition Date (the "Unpaid Commissions"). As of the Petition Date, the Debtors do not believe that there are any Unpaid Commissions.

### 3. Temporary Worker Obligations

26.     The Debtors rely on Temporary Workers in the ordinary course of their business. As of the Petition Date, there are approximately 1,500 such Temporary Workers.

27.     The Debtors employ the Temporary Workers, and are thus responsible for the Temporary Workers' wages, overtime, and other compensation (as well as any required obligations under any relevant CBA, taxes, or similar obligations) (the "Temporary Worker Obligations").

---

[5]     Commissions are subject to various adjustments under contract, and commission rates vary by contract.

28.     The vast majority of the Temporary Workers are hired by the Debtors through XLT Management Services, Inc. ("XLT").  Pursuant to the Debtors' agreements with XLT, XLT is responsible for administering and distributing payroll (as well as making any applicable withholdings or payroll deductions) for any Temporary Workers hired through XLT (the "XLT Temporary Employees") on a weekly basis.  The Debtors pay XLT a monthly advance on or by the first day of each month based on the estimated Temporary Worker Obligations for the XLT Temporary Employees for that month.  By the seventh day of the following month, XLT provides an invoice to each applicable Debtor, with an accounting of the Temporary Worker Obligations for the XLT Temporary Employees for the prior month, against which XLT credits the monthly advance received for that month.  If the result is an outstanding balance due to XLT, the Debtors provide payment within 15 business days of receiving the invoice.  Alternatively, if the result is an overpayment to XLT, then any overpayment is remitted by XLT to the Debtor within 15 business days of the date of the invoice.

29.     On average, the Debtors pay XLT between $4,500,000 and $5,900,000 in advances on a monthly basis for the Temporary Worker Obligations related to the XLT Temporary Employees.  In 2022, the Debtors paid XLT approximately $76.9 million, in the aggregate on account of Temporary Worker Obligations related to the XLT Temporary Employees.

30.     The Debtors also currently employ four Temporary Workers directly (i.e., not through XLT) (the "Non-XLT Temporary Employees").  The Debtors administer and distribute payroll (and make any applicable withholdings or payroll deductions) for any Non-XLT Temporary Employees in the same manner as for Regular Employees.

31.     As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and unpaid Temporary Worker Obligations is approximately $2.4 million.  The Temporary Worker

Obligations may also include true-up obligations payable by the Debtors to XLT to the extent the amount paid by XLT to XLT Temporary Employees exceeds the monthly advance paid by the Debtors to XLT for the month of February.

### 4.    Independent Contractor Obligations

32.    The Debtors rely on Independent Contractors in the ordinary course of their business.  During the 12 months prior to the Petition Date, the Debtors utilized the services of approximately 650 Independent Contractors.

33.    Typically, Independent Contractors submit invoices for their work (the "Independent Contractor Obligations"), and the Debtors pay such invoices through a third-party vendor, XTGlobal, Inc. ("XTGlobal").  Independent Contractor Obligations are paid in accordance with the terms of the agreements governing each respective Independent Contractor's engagement.

34.    In 2022, the Debtors paid approximately $31.5 million on account of Independent Contractor Obligations.  As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and unpaid Independent Contractor Obligations is approximately $1.4 million.

### 5.    Staffing Services Obligations

35.    As noted above, the Debtors also rely on various Staffing Services to provide Non-Employee Staff as may be required, allowing the Debtors to maintain flexibility and quickly adjust to varying labor needs.  For the avoidance of doubt, Non-Employee Staff provided by the Staffing Services are not employees of the Debtors.

36.    The Debtors pay the Staffing Services for services provided by the Non-Employee Staff, as well as certain fees and expenses related to the Staffing Services' coordination and arrangement of staffing services (the "Staffing Services Obligations").  The Staffing Services submit periodic invoices to the Debtors on account of the Staffing Services Obligations, which are

then processed through the Debtors' accounts payable system.  The Staffing Services are responsible for distributing compensation to Non-Employee Staff for services provided to the Debtors.

37.     On average, the Debtors pay approximately $2.1 million per month on account of the Staffing Services Obligations.  In 2022, the Debtors paid approximately $25.4 million on account of Staffing Services Obligations.  As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and unpaid Staffing Services Obligations is approximately $3.0 million.

### 6.     Non-Insider Ordinary Course Incentive Programs

38.     The Debtors maintain certain employee incentive programs in the ordinary course of business to motivate, reward, and retain certain of their non-insider[6] Regular Employees (collectively and as defined below, "Non-Insider Ordinary Course Incentive Programs").  Awards under the Non-Insider Ordinary Course Incentive Programs are distributed entirely at the discretion of the Debtors' management and as set forth in the applicable employment contract.

39.     The Debtors believe that the Non-Insider Ordinary Course Incentive Programs have been critical to maintaining Regular Employee morale and loyalty.  Uncertainty about the continuation of such Non-Insider Ordinary Course Incentive Programs may create instability in the Debtors' Workforce by causing current Regular Employees to seek other employment, or cause potential employees to avoid joining the Debtors, thereby undermining the Debtors' ability to reorganize.  Moreover, the Debtors believe the Non-Insider Ordinary Course Incentive Programs are integral to the Debtors' business operations and align participating Regular Employees'

---

[6]     The relief sought under this motion with respect to the Non-Insider Ordinary Course Incentive Programs does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code).

interests with those of the Debtors generally by linking payments under the Non-Insider Ordinary Course Incentive Programs to the Debtors' financial and operational performance.

40.     In 2022, the Debtors paid approximately $6.1 million on account of Non-Insider Ordinary Course Incentive Programs.  Awards under the Non-Insider Ordinary Course Incentive Programs accrue at the end of each year.  Accordingly, as of the Petition Date, the Debtors do not believe that there are any accrued and unpaid amounts on account  of  the  Non-Insider Ordinary Course Incentive Programs.   Accrued and unpaid amounts may arise, however, upon subsequent true-ups of amounts previously paid pursuant to the Non-Insider Ordinary Course Incentive Programs.  Out of an abundance of caution, the Debtors seek authority to pay any amounts accrued and unpaid on account of the Non-Insider Ordinary Course Incentive Programs.  The Debtors also seek authority to continue, supplement, or modify the Non-Insider Ordinary Course Incentive Programs in the ordinary course of business on a postpetition basis.

### a.     Sales Management Bonus Plan

41.     Certain Regular Employees employed as sales managers for the Debtors (the "Sales Managers") are eligible to receive annual incentive compensation payments for achieving required business results measured against annual sales revenue budgets (the "Sales Management Bonus Plan").  Sales Managers are each assigned a target for total advertising sales for their respective sales teams, who cover assigned geographical territories and/or certain named customer accounts, as applicable.  Sales Managers are entitled to certain additional annual compensation (the "Sales Management Bonus Plan Obligations") if (a) a Sales Manager's assigned team meets or exceeds its respective targeted amount of advertising sales and/or (b) all Sales Managers' sales teams combined meet a combined enterprise-wide targeted amount of advertising sales.  Sales Management Bonus Plan Obligations may increase depending on the amount by which sales

target(s) are exceeded.  If earned, Sales Management Bonus Plan Obligations are paid within 60 days of the close of each calendar year.

42.     As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid Sales Management Bonus Plan Obligations.

### b.     Digital Sales Management Bonus Plan

43.     Certain Regular Employees employed as digital sales managers for the Debtors (the "Digital Sales Managers") are eligible to receive annual incentive compensation payments for achieving required business results measured against annual sales revenue budgets (the "Digital Sales Management Bonus Plan").  Digital Sales Managers are each assigned a target for total digital advertising sales for their respective sales teams.  Digital Sales Managers are entitled to certain additional annual compensation (the "Digital Sales Management Bonus Plan Obligations") if (a) a Digital Sales Manager's assigned team meets or exceeds its respective targeted amount of digital advertising sales and/or (b) all Digital Sales Managers' sales teams combined meet an enterprise-wide targeted amount of digital advertising sales.  Digital Sales Management Bonus Plan Obligations may increase depending on the amount by which digital sales target(s) are exceeded.  If earned, Digital Sales Management Bonus Plan Obligations are paid within 60 days of the close of each calendar year.

44.     As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid Digital Sales Management Bonus Plan Obligations.

### c.     General Manager Bonus Plan

45.     Certain Regular Employees that are employed as general managers for the Debtors ("General Managers") are eligible to receive annual incentive compensation payments for achieving required business results (the "General Manager Bonus Plan").  General Managers are responsible for managing each of the Debtors' individual RSNs.  General Managers' primary goals

are to, among other things, effectively lead their respective RSN in connection with developing and maintaining relationships with team partners, maximizing revenue, growing audience reach on the RSN's linear and digital platforms, and managing and engaging staff to consistently deliver live game coverage, studio programming, and digital content.  General Managers are entitled to annual incentive compensation ("GM Bonus Obligations") based on annual targeted advertising sales.  If earned, GM Bonus Obligations are paid within 60 days of the close of each calendar year.

46.      As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid GM Bonus Plan Obligations.

### d.      Annual Discretionary Bonuses

47.      In addition to the other Non-Insider Ordinary Course Incentive Programs discussed above, and in the ordinary course of business, the Debtors pay annual discretionary bonuses to certain Regular Employees every January with respect to the previous year (the "Annual Discretionary Bonuses").  The Debtors determine whether to award Annual Discretionary Bonuses in their discretion based on factors such as achievement of performance targets, length of employment, and other business justifications.   The Debtors' ability to award Annual Discretionary Bonuses is critical to the Debtors' ability to attract and retain essential employees to continue their operations in the ordinary course of business.  This ability to attract talent is even more critical as the Debtors seek to establish their operations as a separate, standalone company with the overlay of these chapter 11 cases.

48.      The Debtors paid approximately $3.2 million on account of Annual Discretionary Bonuses to non-insider Regular Employees for 2022.  As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid obligations on account of Annual Discretionary Bonuses.   The Debtors seek authority to continue paying Annual Discretionary Bonuses to

non-insider Regular Employees on a postpetition basis in the ordinary course of business consistent with their prepetition practices.

### 7. Non-Insider Severance Programs

49.     In the ordinary course of business, the Debtors offer severance packages (the "Non-Insider Severance Programs") to certain non-insider[7] Regular Employees upon the occurrence of certain events, including termination by the Debtors not for "cause," or voluntary resignation of the Regular Employee.  The terms of such Regular Employees' respective Non-Insider Severance Programs vary and may be determined by such Regular Employee's separate employment agreement and/or any severance arrangement executed at the time of separation.

50.     The Debtors believe that the Non-Insider Severance Programs have been critical to maintaining Regular Employee morale and loyalty.  Uncertainty about the Debtors' ability to continue such Non-Insider Severance Programs may create instability in the Debtors' Workforce by causing current Regular Employees to seek other employment, or cause potential employees to avoid joining the Debtors, and undermine the Debtors' ability to reorganize.  Moreover, as a condition to receiving benefits under the Non-Insider Severance Programs, the Debtors typically require that each such Regular Employee execute a release agreement releasing any current and future claims against the Debtors.

51.     As of the Petition Date, the Debtors do not believe that any amounts are due and owing on account of the Non-Insider Severance Programs.  The Debtors seek authority to continue the Non-Insider Severance Programs on a postpetition basis in the ordinary course of business consistent with their prepetition practices.

---

[7]     The relief sought under this motion with respect to the Non-Insider Severance Programs does not include the payment of any obligations owed to "insiders."  The Debtors reserve all rights to seek separate authority with respect to such parties and reserve all rights with respect to the "insider" status of such parties.

**B.**     **Withholding Obligations**

52.     In the ordinary course of business, the Debtors incur obligations on account of Payroll Deductions and Payroll Taxes (each as defined below and collectively, the "Withholding Obligations").  In 2022, the Debtors incurred a monthly average of approximately $3.4 million of Withholding Obligations.  As of the Petition Date, the Debtors estimate that they have accrued approximately $1.8 million of Withholding Obligations.  The Debtors respectfully request authority to honor and pay all Withholding Obligations accrued and outstanding as of the Petition Date, and to continue to pay any Withholding Obligations as they come due in the ordinary course of business.

**1.**     **Payroll Deductions**

53.     During each applicable payroll period, the Debtors deduct certain amounts from Regular Employee and Non-XLT Temporary Employee gross earnings, including garnishments, child support, and deductions related to various Employee Benefits Programs (defined below) (collectively, the "Payroll Deductions").  The Debtors then remit the Payroll Deductions to the various appropriate third-party recipients.  The Debtors retain only those Payroll Deductions related to an individual employee's applicable share of health care benefits and insurance premiums.

54.     On average, the Debtors' Payroll Deductions are approximately $700,000 per month.  As of the Petition Date, the Debtors estimate that approximately $420,000 in Payroll Deductions have not yet been remitted to the appropriate third-party recipient(s).  By this motion, to the extent any Payroll Deductions collected prepetition are in the Debtors' possession as of the Petition Date, the Debtors seek authority to remit any such Payroll Deductions to the appropriate third party.

### 2.     Payroll Taxes

55.     In addition to the Payroll Deductions, certain federal and state laws require that the Debtors withhold amounts from Regular Employees' and Non-XLT Temporary Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "Withholding Taxes"). The Debtors must then match the Withholding Taxes from their own funds and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes," and together with the Withholding Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and remitted to the appropriate federal, state, and local taxing authorities in accordance with the remittance intervals and deadlines established by those taxing authorities.[8]

56.     On average, the Payroll Taxes total approximately $2.7 million per month. As of the Petition Date, the Debtors estimate that they owe approximately $1.4 million on account of accrued and unremitted prepetition Payroll Taxes.

57.     By this motion, to the extent any Payroll Taxes collected prepetition are in the Debtors' possession as of the Petition Date, the Debtors seek authority to remit any such Payroll Taxes to the appropriate third party.

### C.     Reimbursable Expenses

58.     Prior to the Petition Date and in the ordinary course of business, the Debtors reimbursed certain members of their Workforce for pre-approved expenses incurred on behalf of the Debtors within the scope of their employment (the "Reimbursable Expenses"). Reimbursable

---

[8]     Payroll taxes also arise with respect to XLT Temporary Employees. As previously noted, however, XLT as payroll administrator for the XLT Temporary Employees makes any applicable withholdings deductions. Additionally, the Debtors' ordinary course payments to XLT cover any employer payroll taxes with respect to the XLT Temporary Employees and are not remitted by the Debtors to the applicable taxing authorities directly.

Expenses may include, among other expenses, certain travel-related expenses (such as air travel, meal allowances, and car mileage allowances) and business-related entertainment expenses.

59.     To be reimbursed for Reimbursable Expenses, Regular Employees and Non-XLT Temporary Employees generally submit an expense report using designated expense management software for review.[9]  If the expense report is approved, the Debtors pay the reimbursable amount through their ordinary payroll system.

60.     XLT Temporary Employees may request reimbursement for any Reimbursable Expenses through XLT.  Approved amounts on account of Reimbursable Expenses are included in XLT's monthly invoices to the Debtors, and XLT distributes reimbursements to the XLT Temporary Employees.

61.     Independent Contractors may also request reimbursement for Reimbursable Expenses from the Debtors.  The process for submitting such a request, and the method of distributing any related reimbursement, is generally determined by the applicable agreement with the respective Independent Contractor.

62.     To the extent that Non-Employee Staff incur any Reimbursable Expenses in the course of their work for the Debtors, the Staffing Services may request repayment of such Reimbursable Expenses from the Debtors.  Whether the Staffing Service includes such amounts in invoices or submits separate reimbursement request, and the method of distributing any related reimbursement, is generally determined by the applicable agreement with the respective Staffing Service.

---

[9]     The Debtors use an expense management system through Concur Technologies, Inc. to help track and process claims for Reimbursable Expenses.  Administrative fees for the use of this software are initially paid by Sinclair and subject to reimbursement by the Debtors pursuant to the Management Services Agreement.

63.     Certain Regular Employees are authorized to use corporate credit cards ("Corporate Cards"), issued by American Express ("Amex") to pay for Reimbursable Expenses as they arise.  In general, the Debtors remit payment directly to Amex for Reimbursable Expenses charged to Corporate Cards.  However, Sinclair may occasionally remit payment to Amex on behalf of the Debtors, and the Debtors reimburse Sinclair for such amounts pursuant to the Management Services Agreement.  The Debtors request authority under this motion to directly remit payment for any Reimbursable Expenses charged to Corporate Cards by their Regular Employees, as needed and consistent with historical practice, to the extent that such Reimbursable Expenses are not otherwise paid by Sinclair and reimbursed by the Debtors pursuant to the Management Services Agreement.

64.     The Debtors' Workforce incurs Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed by the Debtors.  Accordingly, the Debtors' inability to reimburse Reimbursable Expenses could impose a hardship on their Workforce where individuals have incurred obligations for the Debtors' benefit.

65.     In 2022, the Debtors paid a monthly average of approximately $920,000 on account of Reimbursable Expenses.  As of the Petition Date, the Debtors estimate that they owe approximately $800,000 on account of Reimbursable Expenses.  The Debtors will not seek to pay any outstanding Reimbursable Expenses or fees related thereto in advance of the date they come due.

### 1.     Other Expenses

66.     The Debtors, in their discretion, may offer certain full-time Regular Employees reimbursement for other special expenses, such as pre-approved Relocation Expenses or tuition expenses through the Tuition Reimbursement Program (each as defined herein).

### a.  Relocation Expense Reimbursement

67.    In their discretion, the Debtors may from time to time offer certain full-time Regular Employees reimbursement for approved relocation expenses and/or offer the use of a relocation management service ("Relocation Expenses").   In 2022, the Debtors reimbursed approximately $170,000 on account of Relocation Expenses.  As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid Relocation Expenses.

### b.  Tuition Reimbursement Plan

68.    The Debtors offer full-time Regular Employees the opportunity to apply to have certain tuition payments reimbursed for education pursued during their employment (the "Tuition Reimbursement Plan"), subject to the following conditions:   (a) the Regular Employee is employed by the Debtors while taking the course for which reimbursement is requested; (b) the Regular Employee has completed at least one year of employment *prior to* enrollment in the course; (c) the course is directly related to the area of work in which the Regular Employee is employed by the Debtors, or is in the best interest of the Debtors, as determined by the Debtors in their discretion, or related to the media industry; (d) the Regular Employee completes and submits the Debtors' required application for each course and receives the appropriate approvals[10] *prior to* enrollment in the course; and (e) the Regular Employee receives a letter grade of a "C" or better in the course.  The amount of reimbursement available to a Regular Employee who meets these requirements varies based on such Regular Employee's performance in the course.  No reimbursement is available under the Tuition Reimbursement Plan for pass/fail courses, testing or other course fees, books, or room and board.  In the event that a Regular

---

[10]    Approval is required from the Regular Employee's assigned General Manager and Vice President, and such approval is based on, among other things, established available budgets.

Employee receives a reimbursement under the Tuition Reimbursement Plan, but either voluntarily resigns or is terminated within 24 months of receiving this benefit, such reimbursement must be repaid to the Debtors and may be deducted from any remaining salary that is due at time of termination of employment.

69.     As of the Petition Date, the Debtors do not believe that there are any accrued or unpaid obligations under the Tuition Reimbursement Plan.  The Debtors seek authority to continue to honor obligations on account of the Tuition Reimbursement Plan in the ordinary course of business on a postpetition basis.

### D.     Payroll Processing

70.     The Debtors' payroll is processed by Sinclair pursuant to the Management Services Agreement.  Additionally, the Debtors incur certain administrative processing fees related to their payment of compensation.  Specifically, the Debtors incur fees payable to each of (a) ADP, LLC ("ADP") with respect to compensation paid to Regular Employees and Non-XLT Temporary Employees, (b) fees payable to XLT in connection with compensation paid to XLT Temporary Employees, and (c) XTGlobal in connection with compensation paid to Independent Contractors. Fees payable to XTGlobal are initially paid by Sinclair on behalf of the Debtors.  The Debtors subsequently reimburse Sinclair for such fees pursuant to the Management Services Agreement. Payroll processing fees payable to XLT are included in the monthly advance submitted to XLT on account of Temporary Worker Obligations for the XLT Temporary Employees for that month, as further described herein.

71.     Fees payable to ADP for payroll processing services, which include remittance, reporting of Payroll Taxes, and other administrative functions, are paid monthly by the Debtors. As of the Petition Date, the Debtors believe that they owe approximately $33,000 on account of

accrued and unpaid amounts to ADP.  The Debtors seek authority to continue to pay ADP in the ordinary course of business on a postpetition basis.

## II.      Non-Employee Director Compensation

72.      The Debtors maintain a board of directors consisting of three non-employees, the Debtors' Chief Executive Officer, and Sinclair Broadcast Group, Inc.'s Chief Executive Officer (each in such capacity, a "Director").  Each of the three non-employee Directors are paid a quarterly cash retainer, while the other Directors do not receive compensation for their service as Directors.

73.      As of the Petition Date, the Debtors do not owe any unpaid accrued amounts to any non-employee Director and seek to continue to pay non-employee Director compensation in the ordinary course of business on a postpetition basis.

## III.     Employee Benefit Programs

74.      The Debtors offer full-time Regular Employees (excluding Represented Employees) who work an average of 30 hours or more per week and have been employed by the Debtors for more than 30 days ("Eligible Employees") a comprehensive employee benefits package (collectively, and as described in more detail below, the "Employee Benefits Programs") consisting of:

- medical and prescription plans;
- a dental plan;
- a vision plan;
- flexible spending accounts;
- health savings accounts;
- life and accidental death and dismemberment insurance;
- disability benefits;
- business travel accident insurance;
- paid time-off;
- a 401(k) plan; and
- other benefit plans and programs.

75.     Except as otherwise provided below, the Employee Benefits Programs are provided, and initially paid for, by Sinclair.  Pursuant to the Management Services Agreement, the Debtors compensate Sinclair with a monthly fee of approximately $450,000 ("<u>Monthly Benefits Fees</u>") for these services, as calculated on a cost-per-Eligible Employee basis.  Accordingly, the Employee Benefits Programs are largely covered by the Management Services Agreement, and the Debtors do not seek relief related to those programs in this motion except as otherwise provided below.  Out of an abundance of caution, however, and in the interest of disclosure, information related to the Employee Benefits Programs, including descriptions of costs and payments, is set forth in this motion.

### A.    Health Benefit Plans

76.     The Debtors offer Eligible Employees the opportunity to participate in several health benefit plans, including medical and prescription drug, dental, and vision plans, and certain other benefits (collectively, the "<u>Health Benefit Plans</u>").

77.     The Debtors' share of third-party administrator or other administrative costs for the Health Benefit Plans and certain premiums for the Debtors' stop-loss insurance for the Medical Plans (as defined herein) are covered by the Monthly Benefits Fees.

### 1.    Medical and Prescription Plans

78.     Eligible Employees and their dependents may elect to receive medical benefits through one of several self-funded medical plan options (collectively, the "<u>Medical Plans</u>"). Sinclair engages CareFirst Administrators, an independent licensee of the Blue Cross and Blue Shield Association, as third-party administrator, which allows the Medical Plans to utilize the Blue Cross/Blue Shield Network of providers.  Under their self-insured retention arrangement, the Debtors are responsible for the first $450,000 of each claim and rely on a stop-loss insurance policy with HM Life to pay claims in excess of $450,000.  The Eligible Employees can choose one of the

following Medical Plans: (a) the Preferred Provider Organization Plan (available in several options) or (b) the Consumer Driven Health Plan (the "CDHP").  Approximately 450 Eligible Employees of the Debtors and approximately 590 dependents of Eligible Employees are covered under the Medical Plans.  The cost of the Medical Plans is deducted each payroll period from each participating Eligible Employee's total pay and constitutes a Payroll Deduction.

79.     The Debtors are obligated to pay claims under the Medical Plans.  Because of the nature of a self-funded plan, it is impossible to predict the amount of claims the Debtors will be required to pay for any given period.

### 2.     Dental Plan

80.     The Debtors offer Eligible Employees and their dependents optional dental plans (the "Dental Plans").  The Dental Plans are administered by Sinclair and claims are processed by Delta Dental of Pennsylvania.  Eligible Employees may choose from several plans, each of which are funded in part by payroll deductions from participating Eligible Employees and in part by the Debtors.

81.     Approximately 450 Eligible Employees of the Debtors and approximately 610 dependents of Eligible Employees of the Debtors are covered under the Dental Plans.

### 3.     Vision Plan

82.     The Debtors offer Eligible Employees and their dependents optional vision insurance (the "Vision Plan").  The Vision Plan is administered by Sinclair and the claims processor is Vision Service Plan.  Approximately 400 Eligible Employees of the Debtors and 580 dependents of Eligible Employees of the Debtors are covered under the Vision Plan.

### 4.     Health Savings Account

83.     The Debtors offer Eligible Employees who have chosen to participate in the CDHP the ability to open and utilize a tax-free health savings account (an "HSA") administered by HSA

Bank, Inc.   Participating Eligible Employees may fund their HSA from their personal bank account, by pretax payroll deductions deposited on their behalf, or by writing a check and depositing it in the HSA.  The money deposited into the HSA is tax deductible, accrues interest on a tax-free or tax-deferred basis, and can be used by participating Eligible Employees tax-free to pay for qualified expenses for medical, dental, and vision care.

### 5.    Flexible Spending Account Programs

84.    The Debtors offer Eligible Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts ("FSAs") administered by Businessolver's MyChoice Accounts.  There are three types of FSAs available:  Health Care FSA, Dependent Care FSA, and Adoption Assistance Spending Account (collectively, the "Flexible Spending Account Programs).  Participating Eligible Employees can contribute up to $3,050 annually to the Health Care FSA, which allows Eligible Employees to use funds to pay certain medical, dental, vision, and prescription drug expenses incurred that are not covered by the Health Benefit Plans or other coverage the Eligible Employee may have.  Participating Eligible Employees can contribute up to $5,000 annually to the Dependent Care FSA, which allows such Eligible Employees to use funds to pay for qualified dependent care expenses, such as daycare and elder care, and before- or after-school care programs.  The Adoption Assistance Spending Account can be used to assist with expenses related to adoption.  As of the Petition Date, approximately 35 Eligible Employees participate in the Health Care FSA and approximately 35 Eligible Employees participate in the Dependent Care FSA.

### 6.    COBRA

85.    The Debtors also provide certain benefits to Eligible Employees after their termination, retirement, or disability leave, including without limitation benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").   Pursuant to

prepetition separation agreements, two former employees and one dependent receive subsidized COBRA coverage.  The subsidized COBRA premiums, and any administration fees related to COBRA, are initially paid for by Sinclair and are covered under the Monthly Benefits Fees.

### B.    Insurance and Disability Benefits

#### 1.    Life and AD&D Insurance

86.    The Debtors provide Eligible Employees with group life and accidental death and dismemberment insurance (collectively, "Life and AD&D Insurance"), administered by Lincoln Financial Group.  The Debtors offer Life and AD&D Insurance at one and a half times an Eligible Employee's base salary (up to $200,000) starting on the first day of the month following 30 days of employment.  Eligible Employees and their dependents also have the option to purchase additional levels of coverage.[11]  Approximately 530 Eligible Employees participate in the Life and AD&D Insurance.

#### 2.    Business Travel and Accident Insurance

87.    The Debtors provide Eligible Employees with business travel and accident insurance, administered by Cigna ("Business Travel and Accident Insurance"), which provides an additional benefit to an Eligible Employee's beneficiaries if an Eligible Employee were to be seriously injured while travelling on business.  The Debtors offer Business Travel and Accident Insurance at three times an Eligible Employee's base salary (up to $100,000).

#### 3.    Disability Benefits

88.    The Debtors provide Eligible Employees with both short-term disability benefits (the "Short-Term Disability Benefits") and long-term disability benefits (the "Long-Term

---

[11]    Eligible Employees may elect to enroll in supplemental and dependent life insurance, up to a maximum of $500,000 of additional life insurance for the Eligible Employee, $250,000 for the Eligible Employee's spouse, and $10,000 for the Eligible Employee's children, at an additional cost to the Eligible Employee.

Disability Benefits," and together with the Short-Term Disability Benefits, the "Disability Benefits") pursuant to group policies issued and administered by Lincoln Financial Group.

89.     Under the Short-Term Disability Benefits program, Eligible Employees receive 60 percent of their adjusted base benefit rate (or 80 percent, if the disability is maternity-related), for a period of up to 90 days.  Following the period of Short-Term Disability Benefits, Eligible Employees are eligible to receive Long-Term Disability Benefits.  In general, under the Long-Term Disability Benefits program, Eligible Employees receive 66.67 percent of their adjusted base benefit rate, up to $15,000 per month, until such time as the Eligible Employee is no longer disabled or has reached the age at which they can receive unreduced Social Security benefits.  Many Eligible Employees rely on the Disability Benefits as their sole form of wage-loss relief should they be unable to work in the future.

90.     As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Disability Benefits.  As such, the Debtors seek authority to continue to provide the Disability Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

### 4.     Supplemental Long-Term Disability Insurance

91.     The Debtors offer certain Eligible Employees supplemental long-term disability insurance ("Supplemental Long-Term Disability Insurance"), provided by Standard Insurance Company.  Approximately 530 Eligible Employees participate in the Supplemental Long-Term Disability Insurance program.  The Debtors pay approximately $4,675 per month on account of fees and premiums for the Supplemental Long-Term Disability Insurance.

92.     As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Supplemental Long-Term Disability Insurance.  As such, the Debtors seek authority

to continue to provide the Supplemental Long-Term Disability Insurance on a postpetition basis in the ordinary course of business and consistent with past practices.

### C.    401(k) Plan

93.    The Debtors offer Eligible Employees the opportunity to participate in a 401(k) plan (the "401(k) Plan"), administered by Empower Retirement, that generally provides for automatic pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. Each participating Eligible Employee's 401(k) contributions are deducted automatically from each paycheck (the "401(k) Deductions"). Each month, approximately $670,000 in the aggregate is deducted from participating Eligible Employees' paychecks in the aggregate on account of the 401(k) Deductions. The 401(k) Deductions are remitted to Empower Retirement on a biweekly basis. The 401(k) Deductions are held in trust by Sinclair and, as such, the Debtors do not believe the 401(k) Deductions constitute property of the Debtors' estates.

94.    The Debtors also provide certain annual matching contributions (the "401(k) Matching Contributions") for participating Eligible Employees who have been employed by the Debtors for over one year. More specifically, the Debtors make a "safe harbor" matching contribution equal to 100 percent of the first three percent of contributions made by the Eligible Employee plus 50 percent up to the next two percent, with a maximum match of four percent for qualifying Eligible Employees who contribute five percent or more.

95.    The 401(k) Matching Contributions are calculated and paid based on the contributions made by the Eligible Employee in the previous calendar year and are 100 percent vested at the time of payment. In 2022, the Debtors contributed $2 million in 401(k) Matching Contributions for 2021. In 2023, the Debtors contributed $2.2 million in 401(k) Matching Contributions for 2022.

96.     Many Eligible Employees' retirement savings consist solely of their 401(k) Plan, and many Eligible Employees choose to participate in the 401(k) Plan because of the 401(k) Matching Contributions.  Thus, the Debtors believe that continuing the 401(k) Plan and the 401(k) Matching Contributions is essential to maintaining employee morale.

97.     Accordingly, the Debtors seek the authority to (a) pay any accrued and unpaid amounts owed on account of the 401(k) Plan, including prepetition 401(k) administrative fees and 401(k) Matching Contributions, (b) remit any unpaid prepetition 401(k) Deductions, and (c) continue the 401(k) Plan and 401(k) Matching Contributions on a postpetition basis in the ordinary course of business and consistent with past practices.

**D.     Deferred Compensation Plan**

98.     The Debtors offer certain Eligible Employees the opportunity to participate in a deferred compensation benefit plan (the "Deferred Compensation Plan").  The Deferred Compensation Plan is a voluntary program that allows participants to set aside eligible compensation in a tax deferred vehicle for retirement or other life purposes.  Currently, five Eligible Employees participate in the Deferred Compensation Plan.

99.     The Debtors pay approximately $1,200 annually on account of the administration of the Deferred Compensation Plan.  The Debtors also provide certain matching contributions (the  Deferred Compensation Matching Contributions") for participating Eligible Employees, subject to a vesting schedule.  Contributions made pursuant to the Deferred Compensation Plan are held in trust by Sinclair, and the Debtors do not consider them to constitute assets or liabilities of the Debtors' estates.

100.     As of the Petition Date, the Debtors do not believe they owe any amounts on account of the administration of the Deferred Compensation Plan or the Deferred Compensation Matching Contributions.  As such, the Debtors seek authority to continue to provide the Deferred

Compensation Plan on a postpetition basis in the ordinary course of business and consistent with past practices.

### E.     Paid Leave Benefits

101.     The Debtors offer several paid time-off benefits for Eligible Employees, including vacation, personal time off, sick time, holidays, voting, jury duty, military service, parental leave, and bereavement leave (collectively, "Paid Leave Benefits").  When an Eligible Employee elects to use Paid Leave Benefits, the Eligible Employee is generally paid at the applicable regular hourly or salary rate.[12]

102.     Eligible Employees accrue vacation time ("Vacation Time") based on the amount of time employed by the Debtors, in accordance with the chart below:

| Years of Service | Vacation Time per Year | Hours Earned per Pay Period |
|---|---|---|
| Between 1-10 years | 15 days (120 hours) | 4.62 |
| Over 10 years | 20 days (160 hours) | 6.15 |

103.     Vacation Time is capped at 180 hours for Eligible Employees who have been employed with the Debtors for ten years or less, and 240 hours for Eligible Employees who have been employed with the Debtors for over ten years.  Once an Eligible Employee reaches the applicable cap, no additional Vacation Time may accrue.  Upon an Eligible Employee's termination or resignation, the Debtors will pay such Eligible Employee for any accrued but unused Vacation Time, subject to certain conditions and in accordance with applicable state law.

104.     Additionally, Eligible Employees who have been employed by the Debtors for at least three months receive 16 personal leave hours ("Personal Time") each year.  Except as

---

[12]     With respect to leave related to military service and/or training, however, the Eligible Employee may receive an amount equal to the difference between his/her salary and/or commission earnings and the military pay received during the leave period, provided the military pay is lower than such Eligible Employee's wages, salary, or commission.

required by applicable state law, Personal Time does not carry over from the previous year and the Debtors do not pay for accrued and unused Personal Time upon termination or resignation of the Eligible Employee.

105.     As of the Petition Date, the Debtors believe they have approximately $4.5 million in accrued Paid Leave Benefits.  In the fourth quarter of 2022, the Debtors paid Eligible Employees approximately $62,000 on account of Paid Leave Benefits upon such employees' termination or resignation.

106.     The Debtors believe that the continuation of the Paid Leave Benefits in accordance with prior practice is essential to maintaining morale during the Debtors' reorganization.

107.     The Debtors anticipate that Eligible Employees will utilize any accrued Paid Leave Benefits in the ordinary course of business, and Paid Leave Benefits obligations will not create any material increase in cash flow requirements beyond the Debtors' typical payroll obligations. The Debtors seek authority to continue to honor obligations on account of Paid Leave Benefits, including to cash out accrued benefits at termination, if or when such amounts come due in the ordinary course of business on a postpetition basis, to the extent required by applicable law and consistent with past practices.

**F.     Supplemental Employee Benefits Programs**

**1.     Employee Assistance Program**

108.     The Debtors provide to Regular Employees and dependents, an employee assistance plan (the "Employee Assistance Plan").  This program offers a variety of employee assistance services, all of which are provided at no cost to the Regular Employees.  The services include financial planning, life services, and counseling in most areas.

### 2. Employee Stock Purchase Program

109.    The Debtors maintain an employee stock purchase plan (the "<u>Employee Stock Purchase Program</u>") pursuant to which all individuals employed by Sinclair or the Debtors, including the Debtors' full- or part-time Regular Employees and Temporary Employees, for a period of one year or more have the opportunity to purchase shares of Sinclair common stock at a discounted rate by designating a certain portion (between one and 20 percent) of their compensation (inclusive of salaries, wages, and commissions) during certain offering periods. For each participating Regular Employee or Temporary Employee (each, an "<u>ESPP Participant</u>"), a specified amount is withheld from payroll and retained by the Debtors until the end of the quarter, at which time the stock is purchased at a 15 percent discount to the closing stock price on the first or the last day of the quarter, whichever price was lower.

110.    The Debtors currently anticipate that, upon their emergence from bankruptcy, individuals employed by the Debtors will no longer be eligible to participate in the Employee Stock Purchase Program. Out of an abundance of caution, the Debtors seek to continue the Employee Stock Purchase Program in the ordinary course of business and consistent with past practices.

## IV.    Workers' Compensation Program

111.    The Debtors maintain workers' compensation insurance for their Workforce at the statutorily required levels for each state in which they have employees (collectively, and as described herein, the "<u>Workers' Compensation Program</u>"). As part of the Workers' Compensation Program, the Debtors maintain a workers' compensation insurance policy with The Hartford (the "<u>Workers' Compensation Insurance Policy</u>").

112.    The Debtors must continue claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether liabilities

are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.  There are currently three active open claims under the Workers' Compensation Program.  To the extent that any of the Debtors' Workforce assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit any such claims to proceed.  For the avoidance of doubt, this requested modification of the automatic stay pertains solely to claims made under the Workers' Compensation Program.

113.    Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process.  As of the Petition Date, the Debtors estimate that there are approximately $32,000 in accrued and unpaid Workers' Compensation Program obligations related to the open claims under the Workers' Compensation Program.[13]  The Debtors request authority to (a) pay prepetition amounts due on account of the Workers' Compensation Program in the ordinary course and consistent with past practice, (b) continue the Workers' Compensation Program in the ordinary course of business, and (c) to the extent applicable, modify the automatic stay solely to allow members of the Workforce to assert claims under the Workers' Compensation Program.

---

[13]    The Debtors may later identify additional accrued or unpaid obligations related to open claims under the Workers' Compensation Program upon receipt of further information or subsequent litigation that may be commenced related to such claims.

**Basis for Relief**

I.    **Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits**

    A.    **Certain Compensation and Benefits Are Entitled to Priority Treatment**

114.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Compensation and Benefits owed to employees to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual and (b) contributions to an employee benefit plan).  Thus, granting the relief sought herein should only affect the timing of certain payments to such employees, and should not negatively affect recoveries for general unsecured creditors.  Indeed, the Debtors submit that payment of the Compensation and Benefits at this time enhances value for the benefit of all interested parties.

    B.    **Payment of Certain Compensation and Benefits Is Required By Law**

115.    The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities.  These amounts principally represent employee earnings that governments, employees, and judicial authorities have designated for deduction from employees' paychecks.  Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from employees' paychecks on another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d).  Further, federal and state laws require the Debtors to withhold certain tax payments from employees' paychecks and to pay such amounts to the appropriate taxing authority.  *See* 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell* v. *Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor

35

and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196

(6th Cir. 1988) (noting that individual officers of a company may be held personally liable for

failure to pay trust fund taxes); *In re Chabrand*, 301 B.R. 468, 475–81 (Bankr. S.D. Tex. 2003)

(same).  Because the Withholding Obligations may not be property of the Debtors' estates, the

Debtors request that the Court authorize them to transmit the Withholding Obligations on account

of employees to the proper parties in the ordinary course of business.

116.     Similarly, state laws require the Debtors to maintain the Workers' Compensation

Program.  If the Debtors fail to maintain the Workers' Compensation Program, state laws may

prohibit the Debtors from operating in those states.  Payment of all Workers' Compensation

Program amounts is therefore crucial to the Debtors' continued operations and the success of the

Debtors' ongoing chapter 11 process.

**II.     The Bankruptcy Code Permits the Court to Authorize the Debtors to Pay the Compensation and Benefits Where Such Payments Are Necessary to Protect and Preserve the Estate**

117.     Courts have recognized that it is appropriate to authorize the payment of prepetition

obligations where necessary to protect and preserve the estate, including an operating business's

going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002);

*see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a

Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to

facilitate the rehabilitation of the debtor is not a novel concept.").  In doing so, these courts

acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy

Code support the payment of prepetition claims as provided herein.

118.     Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval,

to pay prepetition obligations where a sound business purpose exists for doing so.  *See Ionosphere*

*Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor

to honor prepetition claims where supported by an appropriate business justification).   Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the pre-plan satisfaction of a prepetition claim."  *In re CoServ, L.L.C.*, 273 B.R. at 499.

119.    Section 105(a) of the Bankruptcy Code and the "doctrine of necessity" permit the bankruptcy court to exercise its broad grant of equitable powers to authorize the payment of prepetition obligations when such payment is essential to the continued operation of the debtor's business.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. at 497 (finding that section 105 of the Bankruptcy Code provides the authority for a debtor in possession to pay prepetition claims); *In re CEI Roofing, Inc.*, 315 B.R. 50, 56 (Bankr. N.D. Tex. 2004); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2004).

120.    The above-referenced sections of the Bankruptcy Code empower the Court to authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.").

121.    Here, the Debtors' payment of the Compensation and Benefits is necessary to their continued and uninterrupted operations during these chapter 11 cases.  The majority of the Debtors' Workforce rely exclusively on the Compensation and Benefits to satisfy their daily living expenses.   Consequently, the Debtors' Workforce will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Compensation and Benefits.  Additionally, continuing ordinary course benefits will help maintain Workforce morale

and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors'
ongoing business operations.

122.    Moreover, the Debtors' Workforce provides the Debtors with services necessary to
conduct the Debtors' business, and the Debtors believe that absent the payment of the
Compensation and Benefits owed to such employees, the Debtors may experience employee
turnover and instability at this critical time in these chapter 11 cases.  The television production
and broadcasting industry is a highly specialized business that requires unique technical expertise.
As such, a significant portion of the value of the Debtors' business is tied to their Workforce,
which cannot be replaced without significant efforts—which efforts may not be successful given
the overhang of these chapter 11 cases.  The Debtors therefore believe that payment of the
prepetition obligations with respect to the Compensation and Benefits is a necessary and critical
element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood
of retention of their Workforce as the Debtors seek to operate their business without disruption in
these chapter 11 cases.

123.    The Debtors submit that the circumstances of these chapter 11 cases warrant
granting the requested relief, and that doing so is in the best interests of the Debtors, their estates,
their creditors, and all other parties in interest, and therefore should be granted.  Accordingly, the
Debtors respectfully request that the Court authorize the Debtors to pay and continue the
Compensation and Benefits in the ordinary course of business and consistent with past practice
and pay prepetition claims related thereto.

**III.    The Non-Insider Ordinary Course Incentive Programs Are Reasonable and a Sound
Exercise of the Debtors' Business Judgment**

124.    The Debtors further request that they be allowed to continue to honor the
Non-Insider Ordinary Course Incentive Programs in the ordinary course of business.  The Debtors

submit that the Non-Insider Ordinary Course Incentive Programs should be reviewed under section 363(c)(1) of the Bankruptcy Code rather than section 503(c) of the Bankruptcy Code because the Non-Insider Ordinary Course Incentive Programs are simply preexisting programs that the Debtors have maintained in the ordinary course and seek to continue on a postpetition basis, and no insiders are part of the Non-Insider Ordinary Course Incentive Programs. *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012).

125.    The Debtors submit that continuing to maintain the Non-Insider Ordinary Course Incentive Programs for non-insiders is a sound exercise of their business judgment and in the best interests of the estates.  Importantly, the Non-Insider Ordinary Course Incentive Programs are a material component of the Debtors' overall Compensation and Benefits package and are intended to incentivize employees in the ordinary course of the Debtors' operations.  Indeed, the ability to offer these programs is critical to recruiting talent necessary to successfully run the Debtors' business.  The Debtors utilize the Non-Insider Ordinary Course Incentive Programs to drive eligible employees to attain superior performance goals.  The Debtors believe that it is necessary to continue these programs for non-insiders on a postpetition basis to incentivize performance that exceeds expectations and to attract new employees as the Debtors seek to establish their own separate, standalone business.  Accordingly, the Debtors respectfully request that the Court authorize, but not direct, the Debtors to continue the Non-Insider Ordinary Course Incentive Programs in the ordinary course of business, including payment of prepetition obligations related thereto, if any.

## IV.    A Limited Waiver of the Automatic Stay to Allow the Workers' Compensation Program to Proceed Is Appropriate in This Case

126.    Section 362 of the Bankruptcy Code permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  11 U.S.C. § 362(d)(1).

127.     The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their covered employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum.  The Debtors believe that cause exists to modify the automatic stay because staying such workers' compensation claims could have a detrimental effect on the financial well-being and morale of employees.  In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

128.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein.  Accordingly, the Debtors believe that there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made.  Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

### Emergency Consideration

129.     Pursuant to Local Rule 9013-1, the Debtors respectfully request emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  As set forth in this motion, the Debtors

believe an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors'

operations and that any delay in granting the relief requested could hinder the Debtors' operations

and cause irreparable harm.  Failure to obtain the requested relief during the first 21 days of these

chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil

the Debtors' restructuring efforts.  Accordingly, the Debtors respectfully request that the Court

grant the relief requested in this motion on an emergency basis.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

130.    The Debtors request that the Court enter an order providing that notice of the relief

requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to

exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

131.    Nothing contained herein or any actions taken pursuant to such relief requested is

intended to be or should be construed as:  (a) an implication or admission as to the amount of, basis

for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable

nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute

any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or

admission that any particular claim is of a type specified or defined in this motion or any order

granting the relief requested by this motion or a finding that any particular claim is an

administrative expense claim or other priority claim; (e) a request or authorization to assume,

adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code;

(f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security

interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of

the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other

applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or

(i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

## <u>Notice</u>

134.    The Debtors will provide notice of this motion to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agents under the Debtors' prepetition credit facilities and counsel thereto; (d) the indenture trustees under the Debtors' prepetition indentures and counsel thereto; (e) counsel to the Ad Hoc First Lien Group; (f) counsel to the Ad Hoc Secured Group; (g) counsel to the Ad Hoc Crossholder Group; (h) Sinclair and its counsel; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the state attorneys general for states in which the Debtors conduct business; (l) the Securities and Exchange Commission; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.


*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the proposed orders, substantially in the forms attached hereto, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

March 15, 2023

Respectfully submitted,

By: */s/ John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Bryan L. Rochelle (TX Bar No. 24107979)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
brochelle@porterhedges.com

- and -

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Andrew Goldman (*pro hac vice* pending)
Benjamin Loveland (*pro hac vice* pending)
Lauren R. Lifland (*pro hac vice* pending)
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
andrew.goldman@wilmerhale.com
benjamin.loveland@wilmerhale.com
lauren.lifland@wilmerhale.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Brian S. Hermann (*pro hac vice* pending)
Andrew M. Parlen (*pro hac vice* pending)
Joseph M. Graham (*pro hac vice* pending)
Alice Nofzinger (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
bhermann@paulweiss.com
aparlen@paulweiss.com
jgraham@paulweiss.com
anofzinger@paulweiss.com

*Proposed Section 327(e) Counsel to the Debtors and Debtors in Possession*

*Proposed Section 327(a) Counsel to the Debtors and Debtors in Possession*

**Certificate of Accuracy**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.  This statement is made pursuant to Local Rule 9013-1(i).

*/s/ John F. Higgins*
John F. Higgins

**Certificate of Service**

I certify that on March 15, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins