## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) Case No. 23-90116 (CML) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF DAVID F. DEVOE, JR.
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, David F. DeVoe, Jr., hereby declare, under penalty of perjury, the following to the best of my information, knowledge, and belief:

1.      I am the Chief Operating Officer for debtor Diamond Sports Group, LLC ("DSG") and the Chief Financial Officer for each of the above-captioned debtors and debtors in possession (collectively, "Diamond").  On March 14 and March 15, 2023 (the "Petition Date"), the Diamond entities filed voluntary petitions for relief with the United States Bankruptcy Court for the Southern District of Texas (the "Court") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), thereby commencing the above-captioned chapter 11 cases.  Each Diamond entity intends to operate its business and manage its property as a debtor in possession during the pendency of these chapter 11 cases.

2.      I am currently responsible for overseeing the operations and finance functions at Diamond, and I have been actively engaged in Diamond's ongoing creditor and league discussions described more fully below.  I joined Diamond in my current roles in February 2023, and before

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/DSG.  The Debtors' service address for purposes of these chapter 11 cases is:  c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

that I worked with Diamond in a consultant role starting in September 2022. Prior to joining Diamond, I provided consulting and advisory services to media and technology businesses through DFD Capital & Advisory, LLC, and was also an Executive Vice President at Twenty-First Century Fox overseeing finance, corporate development, and various global operations functions. Previously, I was Chief Financial Officer for several companies, including Fox Entertainment Group, News America Marketing, and TV Guide. When working at Ernst & Young, I earned my license as a Certified Public Accountant. I hold a B.B.A. from the University of Notre Dame.

3.      I am over the age of 18. In my capacities as Chief Operating Officer and Chief Financial Officer, I am generally familiar with Diamond's day-to-day operations, business and financial affairs, and books and records, as well as Diamond's restructuring efforts. I am authorized to submit this declaration in support of Diamond's voluntary petitions for relief and first-day motions (the "First Day Motions").

4.      Except as otherwise indicated, the facts set forth in this declaration are based on my personal knowledge, my review of relevant documents, information provided to me by Diamond's employees and personnel, my experience, knowledge, and information concerning Diamond's operations and financial condition, and/or my discussions with Diamond's officers and advisors, including professionals at Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), Porter Hedges LLP ("Porter Hedges"), Moelis & Company LLC ("Moelis"), LionTree Advisors LLC ("LionTree"), and AlixPartners, LLP ("AlixPartners"). If called upon to testify, I would testify competently to the facts set forth in this declaration.

## Introduction

5.      Diamond is the leading provider of local sports programming in the United States. Diamond has 19 regional sports networks, or "RSNs," in markets spanning the United States,

operating under the Bally Sports tradename.  The Bally RSNs broadcast Major League Baseball, National Basketball Association, and National Hockey League games for 42 teams in those markets as well as three additional teams through its joint venture partnerships.  Diamond is an important part of the local sports ecosystem in its markets, broadcasting approximately 4,500 local professional sports games annually.  Diamond has commenced these cases to implement a balance sheet restructuring and operational initiatives to ensure that millions of local sports fans can continue to watch their favorite teams' live games and related programming on Diamond's platforms.

6.      Diamond's RSN programming has traditionally been delivered by multichannel video programming distributors ("MVPDs") via cable and satellite, or "linear," broadcast.  But in recent years, traditional MVPDS across the industry have been impacted by many Americans "cutting the cord" on their MVPD subscriptions ("cord-cutters"), or never subscribing to MVPDs in the first place ("cord-nevers"), and instead watching television programming through streaming services.  Diamond is acutely aware of consumers' changing preferences and now also delivers its programming through virtual multichannel video programming distributors ("vMVPDs") such as DIRECTV STREAM and FuboTV.  Separately, Diamond is transforming its historic business to offer direct-to-consumer ("DTC") programming on Bally Sports+, its new streaming service, which is available to meet the needs of sports fans in its markets and to enable Diamond's league and team partners to reach cord-cutters and cord-nevers.

7.      Today, Diamond is a business in transition.  In addition to successfully broadening the distribution of local sports broadcasts through vMVPDs and DTC, Diamond hopes to further develop its Bally Sports+ service by acquiring additional digital rights to offer a deeper, more integrated fan experience on a single platform.  But Diamond currently faces three key challenges

to fully transforming its business:  (i) its significant debt load; (ii) negative impacts to revenue associated with cord-cutting and continually increasing sports rights payments; and (iii) the need to secure streaming and expanded digital rights for its DTC product to broaden distribution reach and ensure that Diamond has the greatest flexibility to market and distribute its DTC product. Given these challenges, Diamond and its advisors began to consider the best path forward to enable Diamond to execute on its strategic vision.  After evaluating all options, Diamond concluded that utilizing chapter 11 protection and the tools of chapter 11 was its best available path to position Diamond for future success and ensure that it could make decisions with respect to its operations with the protections of the automatic stay in place.

8.      As noted above, Diamond has a significant debt burden.  In August 2019, Diamond's business was acquired by Sinclair Broadcast Group, Inc. ("Sinclair") from Disney (as defined herein) for an aggregate purchase price of approximately $10.6 billion, including the incurrence by Diamond of $8.2 billion of indebtedness, consisting of $3.3 billion in secured term loans, $3.1 billion of secured notes, and $1.8 billion of unsecured notes.  This debt would require Diamond to pay approximately $650 million in debt service in 2023, a substantial drain on cash.

9.      Additionally, MVPDs—Diamond's traditional primary source of revenue—have experienced significant subscriber losses due to unprecedented levels of cord-cutting over the past several years.  The MVPDs' loss of subscribers has resulted in a substantial reduction in distribution fees paid to Diamond.  Moreover, Diamond has lost carriage with certain of its MVPDs and vMVPDs since 2019.  These impacts have driven reduced distribution revenue for Diamond while, at the same time, Diamond continues to pay substantial sums to its team and league partners under its sports broadcast rights agreements.  This decline in revenue, together with its sizable debt

service obligations, has significantly impacted Diamond's ability to invest in changing its business model to best serve sports fans.

10.     It is my understanding that throughout 2021, Diamond engaged in discussions with certain holders of its funded indebtedness for a significant capital infusion to, among other things, continue developing its DTC business.  These discussions ultimately resulted in certain creditors providing Diamond with $635 million in new-money financing in March 2022.  In connection with this transaction, Diamond's governance structure was modified in May 2022, including changes to Diamond's board of managers that resulted in the appointment of a majority of independent managers.

11.     I understand that during this period, Diamond also engaged in negotiations with its league and team partners to, among other things, continue to update its rights agreements for the DTC model.  The negotiations culminated in late 2021 and early 2022 with Diamond announcing that it had secured renewals of its agreements with the NBA and NHL regarding extended market and digital rights, enabling Diamond to offer streaming content, including live games, on a DTC basis for all NBA and NHL teams that are carried by Diamond's RSNs.  Pursuant to agreements with its team partners, Diamond also offers games on a DTC basis for five of the 14 MLB teams in its portfolio.  In September 2022, Diamond officially launched Bally Sports+ widely across its RSN markets to distribute its DTC content to its customers.

12.     Despite the significant strides Diamond made in both developing its DTC offerings and raising capital for continued investment in Diamond's go-forward business, it became increasingly clear through the fall and winter of 2022 that Diamond's capital structure was no longer sustainable.  For one, this expensive capital structure limited Diamond's ability to obtain the additional rights necessary to provide a more integrated product to consumers from its league

and team partners given their concerns about Diamond's viability.  Diamond and its creditor constituents also recognized the current challenges facing Diamond and others in the RSN industry.  In particular, Diamond pays its team and league partners large rights payments that are generally fixed amounts while the fees paid by MVPDs to Diamond are variable and have substantially declined due to the significant change in consumer preferences impacting the traditional cable and satellite television industry.  This structure places significant risk on Diamond and its funded-debt creditors and is no longer a workable economic model in a fast-evolving market environment.  After thoroughly evaluating all options, Diamond determined that it first needed to engage with its creditors and Sinclair regarding a balance sheet solution that would enable Diamond to position its business for future growth and success.

13.    Diamond has made substantial progress on its restructuring initiatives.  To date, Diamond has reached agreement with majorities of its second lien and unsecured lenders on the key terms of a balance-sheet deleveraging, including equitizing more than $8 billion in prepetition debt.  These commitments are documented in a restructuring support agreement (the "RSA") signed by Diamond, 34 percent of Diamond's first lien lenders, 69 percent of Diamond's second lien lenders, and 57 percent of Diamond's unsecured noteholders.  A copy of the RSA is attached hereto as **Exhibit B**.

14.    In connection with this deleveraging, Diamond, the Consenting Creditors, and Sinclair are working to document the proposed terms of the parties' agreement pursuant to which Sinclair has agreed to provide transition services to Diamond while it stands up its own administrative functions.  Diamond hopes to document this proposed agreement in the very near term.  Additionally, a majority of first lien lenders have agreed to Diamond's consensual use of cash collateral during the chapter 11 cases, as reflected in the proposed cash collateral order.

15.     With these commitments in place, Diamond has engaged in negotiations with its league and team partners to obtain, among other things, additional DTC streaming rights and other digital rights to enable Bally Sports+ to provide fans with the optimal game watching experience. Although Diamond has made substantial progress toward this goal with certain partners, the discussions with the leagues and teams on the terms of Diamond's restructuring and business plan remain ongoing.

16.     Diamond has therefore entered into these prearranged chapter 11 cases with an RSA with a significant number of its funded debt creditors.  Diamond believes that the restructuring transactions documented in the RSA and in the potential amendments adding Sinclair to the RSA will position Diamond to continue as a going-concern, maximize the value of its business for the benefit of all stakeholders, and enable it to continue serving local sports fans across the United States.  With the RSA serving as the backbone for its path forward, Diamond expects to use the time and tools afforded by chapter 11 to further develop and implement its go-forward business plan.

17.     The remainder of this declaration has been organized into three sections.  **Part I** describes Diamond's organizational structure, business operations, management arrangements, and prepetition capital structure.  **Part II** describes the events and circumstances preceding the commencement of these chapter 11 cases, including negotiation of the RSA and the proposed restructuring transactions.   Finally, **Part III** summarizes the relief requested in, and facts supporting, each of the First Day Motions.

## I.     General Background

### A.     Diamond's History

18.     Diamond owns and/or operates the Bally RSNs, making it the nation's leading provider of local sports programming and owner of the largest collection of RSNs in the United

States.  The 19 Bally RSNs serve as the broadcast home for 42 MLB, NBA, and NHL teams.  The Bally RSNs produce approximately 4,500 live local professional telecasts each year in addition to a wide variety of locally produced sports events and programs and reach more than 40 million subscribers.  Diamond also owns a 50 percent interest in Marquee Sports Network ("Marquee"), the broadcast home of the Chicago Cubs, and a 20 percent interest in the YES Network ("YES"), the local broadcast network for the New York Yankees and Brooklyn Nets.

19.     All of Diamond's operations are conducted by direct and indirect subsidiaries of Debtor DSG.   DSG's parent, non-debtor Diamond Sports Intermediate Holdings, LLC ("Holdings"), is a holding company that is a wholly-owned indirect subsidiary of Sinclair.  A simplified organizational chart is provided below, and a chart illustrating Diamond's complete organizational structure as of the Petition Date is attached as **Exhibit A** to this declaration.



20.     Diamond's predecessors were originally subsidiaries of Twenty-First Century Fox, Inc. ("Fox") and operated their RSNs as the "Fox Sports" RSNs.  In 2019, following The Walt Disney Company's ("Disney") acquisition of Fox, Sinclair acquired the Diamond RSN business from Disney for approximately $10.6 billion.  Sinclair funded the 2019 acquisition through a combination of third-party debt incurred by DSG, a capital contribution by Sinclair, and a preferred equity offering at a Sinclair-controlled indirect parent company of Holdings.  The acquisition closed on August 23, 2019.

21.     Since the 2019 acquisition, Sinclair, through its subsidiary, Sinclair Television Group, Inc. ("STG"), has provided services to Diamond pursuant to a management services agreement, dated as of August 23, 2019 (as amended, modified, or supplemented from time to time, the "MSA").  Pursuant to the MSA, STG and certain of its affiliates provide Diamond with various managerial, operational, and administrative services, including sales and marketing, legal and business affairs, finance and accounting, IT support, payroll, employee benefits, and insurance, that are critical to Diamond's day-to-day business operations.

22.     In November 2020, Sinclair, DSG, and Bally's Corporation ("Bally's"), a global gaming, hospitality, and entertainment company, entered into a long-term strategic partnership. Pursuant to such partnership, in March 2021, Diamond rebranded its majority-owned RSNs with the "Bally Sports" name, such as Bally Sports Southwest, Bally Sports North, and Bally Sports South.  As part of this partnership, DSG receives annual naming rights payments and certain advertising commitments from Bally's.

23.     Diamond was formerly controlled, managed, and operated by Sinclair and its affiliates, but it has been managed independently since May 2022 as a result of the March 2022 Transactions (as defined herein), as discussed in further detail below.

B.  **Diamond's Business**

24.     Diamond's business primarily consists of the operation of RSNs, including the production and distribution of live sports and related programming for telecast, streaming, and advertising sales.  Diamond's business historically has been reliant on MVPDs to reach consumers (i.e., television programming delivered through cable and satellite providers).  Since the 2019 acquisition, however, and to address cord-cutting, Diamond has expanded its product offerings through the launch of its DTC products to give customers direct access and greater freedom, choice, and flexibility for viewing sports games.

25.     Diamond's DTC products include its "TV Everywhere" product, which is available in the Bally Sports app or on the MVPDs' own apps, and its Bally Sports+ platform, which was launched in September 2022 to allow sports fans to obtain streaming content via direct subscription.  Bally Sports+ enables anyone to access live local sports content from anywhere, whether or not they subscribe to a traditional cable or satellite television bundle.  Diamond believes this functionality is vitally important to the future of local sports viewing in the United States. Moreover, Diamond believes that Bally Sports+ will offer a deep and engaging sports-viewing experience.  As discussed further below, Diamond's relationships with its team and league partners remain critical to the further expansion and development of Diamond's DTC offerings.

(a)     **Diamond's RSN Portfolio**

26.     Diamond's RSN portfolio consists of three types of RSNs:

a.      13 Bally RSNs operated by Diamond;

b.      6 Bally RSNs operated by non-debtor entities in which Diamond owns a majority interest and an MLB team holds a minority interest (such non-debtor entities, the "Bally JVs"); and

c.      2 non-Bally RSNs, Marquee and YES, operated by non-debtor entities in which Diamond owns an interest (such

non-debtor entities, the "Non-Bally JVs", and together with the Bally JVs, the "JVs").

27.     The RSNs are organized by region, with each RSN airing the games of major league sports teams for which such RSN has rights within that region.  The broad geographic scope of the RSNs is illustrated below:



**(b)     Telecast Rights**

28.     Diamond and the JVs, including YES and Marquee, have exclusive multi-year rights agreements to air the games of 16 MLB teams, 17 NBA teams, and 12 NHL teams on the RSNs.  Generally, under the rights agreements, the teams grant the applicable Diamond or JV entity the exclusive right to telecast all local games (that are not selected for exclusive national telecast) within a specified territory in exchange for annual payments to the teams.  The specified

territory generally includes the city where the team's arena is located and the surrounding area. Most of the Diamond and Bally JV entities that operate the Bally RSNs have rights agreements with at least one MLB and one NBA or NHL team, which allows the applicable RSN to provide year-round live sports offerings to sports fans.

29.     The below chart summarizes the teams and Diamond or JV entities that are party to the rights agreements associated with the RSNs:

| Rights Agreements | | | | |
| --- | --- | --- | --- | --- |
| **RSN** | **Diamond or JV Entity** | **MLB** | **NBA** | **NHL** |
| | | **Team** | **Team** | **Team** |
| **Bally Sports Arizona** | Diamond Sports Net Arizona, LLC |  |  |  |
| **Bally Sports Detroit** | Diamond Sports Net Detroit, LLC |  |  |  |
| **Bally Sports Florida** | Diamond Sports Net Florida 2, LLC |  |  |  |
| **Bally Sports Sun** | Diamond Sports Sun, LLC |  |  |  |
| **Bally Sports Indiana Bally Sports Kansas City** | Diamond Sports Kansas City, LLC |  |  | |
| **Bally Sports Midwest** | Diamond Sports Net St. Louis, LLC |  | |  |
| **Bally Sports North Bally Sports Wisconsin** | Diamond Sports Net North, LLC |  |  |  |
| **Bally Sports Ohio** | Diamond Sports Net Ohio, LLC | |  |  |
| | Diamond Sports Net Cincinnati, LLC |  | | |
| **Bally Sports Great Lakes** | Diamond Ohio Holdings II, LLC |  | | |

| Rights Agreements | | | | |
|---|---|---|---|---|
| **RSN** | **Diamond or JV Entity** | **MLB** | **NBA** | **NHL** |
| | | **Team** | **Team** | **Team** |
| **Bally Sports San Diego[2]** | RSNCO, LLC | SD | | |
| **Bally Sports SoCal** | Diamond Sports Net West 2, LLC | | CLIPPERS | Ducks |
| **Bally Sports West** | Diamond Sports Net West, LLC | A | | LA Kings |
| **Bally Sports South[3]** | SportSouth Network, LLC | | | Hurricanes / Predators |
| **Bally Sports Southeast** | SportSouth Network II, LLC | Braves | Hawks / Hornets / Memphis Grizzlies | |
| **Bally Sports Southwest** | ARC Holding Ltd. | Texas Rangers | Mavericks / San Antonio Spurs | Stars |
| **Bally Sports New Orleans** | | | New Orleans | |
| **Bally Sports Oklahoma** | | | Thunder OKC | |
| **Marquee** | Marquee Sports Network, LLC | Cubs | | |
| **YES** | Red Seam Holdings LLC | Yankees | Nets Brooklyn | |

30.     The team rights agreements expire between 2023 and 2035 (with an average remaining length of six years) for MLB teams, 2023 and 2030 (with an average remaining length of three years) for NBA teams, and 2023 and 2030 (with an average remaining length of two years) for NHL teams.  As discussed below, Diamond also has agreements with its league partners that provide Diamond access to certain digital rights.

---

[2]     Bally Sports San Diego also airs Los Angeles Clippers and Anaheim Ducks games.

[3]     Bally Sports South also airs Atlanta Braves games.

31.     In addition to their agreements with MLB, NBA, and NHL teams, certain Diamond and JV entities are parties to rights agreements that allow them to telecast other content, such as Major League Soccer, certain National Football League teams' pre-season games, certain college and high school sports games, World Poker Tour events, and horse racing.  The RSNs round out their on-air programming with content obtained through individual, short-term agreements for particular events or television series and with their own self-produced content.

### (c)     Distribution Agreements and Advertising

32.     Diamond has historically generated the majority of its revenue from distributing its RSNs through MVPDs such as AT&T, Charter Communications, Inc., Comcast Corporation, Cox Communications, Inc., and DIRECTV, and vMVPDs such as DIRECTV STREAM and FuboTV (the MVPDs and vMVPDs together, "Distributors").[4]

33.     Pursuant to Diamond's agreements with the Distributors (the "Distribution Agreements"), the Distributors pay Diamond monthly licensing fees in exchange for content from the Bally RSNs, which the Distributors then provide to residential and/or commercial consumers.

34.     The Distribution Agreements generally require the RSNs to meet certain thresholds (e.g., a minimum number of telecasts per year).  In the event the RSNs fail to meet the thresholds, the Distribution Agreements contain fee reduction, rebate, refund, and/or termination provisions in favor of the Distributors.

35.     Since 2019, the number of Diamond's subscribers has declined by approximately 22 million, or 35 percent.  These declines have been driven by, among other things, changes in consumer behavior, including through cord-cutting, and losses of Distributors in recent years.

---

[4]     Diamond derives most of its distribution revenue from a handful of large national Distributors, but Diamond has Distribution Agreements with hundreds of Distributors, most of which serve small local markets.

36. The sale of advertising on the RSNs is historically Diamond's secondary source of revenue. Diamond generates advertising revenue primarily from the sale of advertising spots and impressions within RSN programming. The term of Diamond's advertising arrangements are generally less than one year. Under certain of its advertising arrangements, Diamond provides audience ratings guarantees. In the event of a shortfall, Diamond will deliver additional advertising to the applicable advertisers until the ratings shortfall is settled.

### (d) DTC Rights

37. Diamond has been actively pursuing a DTC strategy to give customers direct access and greater freedom, choice, and flexibility in terms of the content they want to receive and how they receive it. Debtor Diamond Digital Group, LLC is engaged in the development and commercialization of Diamond's DTC initiatives, including the Bally Sports+ platform.

38. Diamond and the Bally JVs currently monetize DTC rights for all of the NBA and NHL teams and five of the MLB teams with which they have telecast agreements.[5] These rights allow Diamond and the Bally JVs to stream content from these teams through "TV Everywhere" and Bally Sports+.

### (e) Other Business

39. In addition to Diamond's RSN business described above, Diamond is also engaged in the following:

> a. Debtor Diamond College Sports, LLC operates a national programming service with three distinct regional feeds comprised of collegiate and high school events and sports programming primarily repurposed from the RSNs.

> b. Debtor Diamond Mobile Holdings, LLC holds Diamond's minority investment interest in the Mobile Television Group, a company that provides mobile units, broadcast

---

[5] The five MLB teams that have granted DTC rights to Diamond and the JVs are the Detroit Tigers, the Kansas City Royals, the Milwaukee Brewers, the Miami Marlins, and the Tampa Bay Rays.

equipment, and engineering time to Diamond and third-party content providers.

**C.     Management and Operation of Diamond and the JVs**

**(a)     Current Governance**

40.     Prior to May 2022, Diamond was controlled, managed, and operated by Sinclair, including through its affiliates and appointees.  As a result of the March 2022 Transactions, as described more fully below, DSG's board of managers (the "DSG Board") was reconstituted in May 2022 to consist of a majority of independent managers.  As a result, management of DSG has since been vested in a board of managers that is independent from Sinclair.

41.     Since May 2022, the DSG Board has consisted of five members:  Randy Freer, David Preschlack, Maryann Turcke, Robert Whitsitt, and Christopher Ripley.  Mr. Freer serves as the Chairman of the Board.  On December 5, 2022, the DSG Board appointed Mr. Preschlack as DSG's Chief Executive Officer.  On September 22, 2022, I was retained as a consultant to the DSG Board and was subsequently appointed as DSG's Chief Operating Officer and Diamond's Chief Financial Officer.  On February 13, 2023, Mr. Eric Ratchman was appointed as President of Distribution and Business Development.  On March 8, 2023, Ms. Meredith Powers was appointed as DSG's Chief Human Resources Officer.

**(b)     Governance and Management of the Bally JVs**

42.     Diamond generally controls the day-to-day governance and management of the Bally JVs, with the minority owners generally having consent rights over certain transactions. Diamond also provides technical and overhead services to certain of the Bally JVs pursuant to contractual arrangements with those Bally JVs.

43.     The minority owners of the Bally JVs are entities affiliated with the Cincinnati Reds, the Kansas City Royals, the Los Angeles Angels, the Miami Marlins, the San Diego Padres,

and the St. Louis Cardinals.  Diamond has also entered into a binding term sheet with the Milwaukee Brewers with respect to a joint venture with that team.

(c)      <strong>Governance and Management of the Non-Bally JVs</strong>

44.    Since 2019, Debtor Sports Network, LLC has been a 50 percent joint venture partner with the Chicago Cubs in Marquee Sports Network, LLC, which owns and operates Marquee.

45.    Also since 2019, Debtor Sports Network II, LLC has owned a 20 percent investment interest in Red Seam Holdings LLC, which is a joint venture among Sports Network II, LLC, the New York Yankees, and other joint venture partners.  Red Seam Holdings LLC, through its indirect wholly-owned subsidiary, owns and operates YES.

46.    Affiliates of Sinclair provide management services to each of the Non-Bally JVs through separate management services agreements.

<strong>D.    Prepetition Capital Structure</strong>

(a)      <strong>Funded Indebtedness</strong>

47.    As of the Petition Date, Diamond has approximately $8.845 billion in aggregate principal amount of funded debt obligations outstanding.  The following table summarizes Diamond's funded indebtedness outstanding as of the Petition Date and the obligations of its

17

non-debtor affiliate, Diamond Sports Finance SPV, LLC, under the AR Loan Facility (as defined below):[6]

| Agreement[7] | Principal Amount Outstanding[8] | Interest Period | Next Interest Payment Date | Maturity Date |
|---|---|---|---|---|
| **Secured Funded Debt** | | | | |
| First Lien Credit Agreement, dated as of March 1, 2022 (the "First Lien Credit Agreement") | $630.2 million of term loans (the "First Lien Loans") | 3-month | April 10, 2023 | May 25, 2026 |
| Second Lien Credit Agreement, dated as of March 1, 2022 (the "Second Lien Credit Agreement") | $227.5 million of revolving loans (the "Second Lien RCF Loans") | 3-month | April 18, 2023 | May 25, 2026 |
| | $3.189 billion of term loans (the "Second Lien Term Loans") | 3-month | April 10, 2023 | August 24, 2026 |
| Indenture, dated as of March 1, 2022 (the "Second Lien Indenture") | $3.040 billion of 5.375% Senior Secured Second Lien Notes due 2026 (the "Second Lien Notes") | February 15 and August 15 of each year | February 15, 2023 (past due) | August 15, 2026 |
| Third Lien Credit Agreement, dated as of August 23, 2019 (the "Third Lien Credit Agreement") | $4.1 million of term loans (the "Third Lien Term Loans") | 3-month | April 10, 2023 | August 24, 2026 |
| Indenture, dated as of August 2, 2019 (the "Third Lien Indenture") | $10.2 million of 5.375% Senior Secured Notes due 2026 (the "Third Lien Notes") | February 15 and August 15 of each year | February 15, 2023 (past due) | August 15, 2026 |

---

[6]   The following description of the Debtors' funded indebtedness is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

[7]   All agreements listed are as amended, restated, supplemented, or otherwise modified from time to time, including (but not limited to), with respect to the Third Lien Credit Agreement (as defined below), pursuant to that certain First Amendment dated as of December 20, 2019, and that certain Second Amendment dated as of March 1, 2022, and, with respect to the Third Lien Indenture (as defined below), pursuant to that certain Supplemental Indenture No. 4 dated as of March 1, 2022.

[8]   All amounts approximate as of the Petition Date.

| Agreement[7] | Principal Amount Outstanding[8] | Interest Period | Next Interest Payment Date | Maturity Date |
|---|---|---|---|---|
| **Unsecured Funded Debt** | | | | |
| Indenture, dated as of August 2, 2019 (the "Unsecured Notes Indenture") | $1.744 billion of 6.625% Senior Notes due 2027 (the "Unsecured Notes") | February 15 and August 15 of each year | February 15, 2023 (past due) | August 15, 2027 |
| **AR Loan Facility** | | | | |
| Amended and Restated Loan and Security Agreement, dated as of June 25, 2021 | $192.5 million of revolving loans | 1-month | March 22, 2023 | December 22, 2024 |

48.     DSG is the borrower under the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Third Lien Credit Agreement.  DSG and non-debtor Diamond Sports Finance Company are the issuers under the Second Lien Indenture, the Third Lien Indenture, and the Unsecured Notes Indenture.  As described further below, non-debtor Diamond Sports Finance Company SPV, LLC is the borrower under the AR Loan Facility (as defined below).

49.     The obligations under the First Lien Credit Agreement, the Second Lien Credit Agreement, the Second Lien Indenture, and the Unsecured Notes Indenture are guaranteed by Holdings and all of its wholly-owned subsidiaries except Diamond Sports Finance SPV, LLC (the "Guarantors").  The obligations under the Third Lien Credit Agreement and Third Lien Indenture are guaranteed by all of the Guarantors except Debtor Diamond Gaming Services, LLC.

50.     The obligations under the First Lien Credit Agreement are secured by first-priority liens on substantially all of the assets of DSG, Holdings, and the Guarantors (subject to certain customary exclusions), including Diamond's equity in the Bally JVs (the "Collateral").  The obligations under the Second Lien Credit Agreement and the Second Lien Indenture are secured by second-priority liens on the Collateral that rank *pari passu* with each other.  The obligations

under the Third Lien Credit Agreement and Third Lien Indenture are secured by third-priority liens on all of the Collateral except for the assets of Debtor Diamond Gaming Services, LLC; those liens also rank *pari passu* with each other.

51.     The respective rights and interests of the lenders and noteholders under the First Lien Credit Agreement, the Second Lien Credit Agreement, the Second Lien Indenture, the Third Lien Credit Agreement, and the Third Lien Indenture are governed by three intercreditor agreements, each dated March 1, 2022 (collectively, the "Intercreditor Agreements").  Among other things, the Intercreditor Agreements set forth the parties' respective rights and interests relating to their rights to the Collateral, their ability to exercise remedies in connection with an event of default, and their relative rights and obligations in the event of a chapter 11 filing by Diamond.  I understand that pursuant to the Intercreditor Agreements, the liens securing the obligations under the Third Lien Credit Agreement and the Third Lien Notes are subordinate to any liens securing the obligations under the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Second Lien Notes and the liens securing the obligations under the Second Lien Credit Agreement and the Second Lien Notes are subordinate to any liens securing the obligations under the First Lien Credit Agreement.

### (b)     Equity Ownership

52.     Non-debtor Holdings, an indirect subsidiary of Sinclair that is controlled by Sinclair, holds 100 percent of the equity interests in Debtor DSG.  Each of the other Diamond entities is a direct or indirect wholly-owned subsidiary of DSG.

### E.     Diamond Sports Finance SPV, LLC AR Loan Facility

53.     In addition to the loans and notes described above, Diamond also has a program in place (the "Receivables Program") with respect to accounts receivable (the "Receivables").  The

Receivables Program has two essential aspects:  the AR Purchase Agreement and the AR Loan Facility, each defined and described below.

54.     Under a Purchase and Sale Agreement, dated as of September 23, 2020 (as amended and modified, the "AR Purchase Agreement"), certain of the Diamond entities (the "Originators") sell Receivables to Diamond Sports Finance SPV, LLC ("DSPV"), a non-debtor special-purpose entity, for cash used to meet Diamond's liquidity needs.  Such purchases and sales from the Originators to DSPV are intended to be true sales and absolute assignments of the Receivables.

55.     In addition, under an Amended and Restated Loan and Security Agreement, dated as of June 25, 2021 (the revolving credit facility thereunder, the "AR Loan Facility"), DSPV borrows from Sinclair to fund DSPV's purchase of Receivables from the Originators.  Sinclair's commitment under the AR Loan Facility is approximately $216,472,114, and the availability under the AR Loan Facility at any time is limited by DSPV's borrowing base calculated based on, among other factors, the outstanding balance and collectability of the Receivables held by DSPV.

56.     The AR Loan Facility is secured by substantially all of the assets of DSPV, including the Receivables and the cash proceeds therefrom.  Diamond does not guarantee the obligations under the AR Loan Facility, and the secured parties under the AR Loan Facility do not have recourse to Diamond except in limited circumstances for indemnification obligations.

## II.    Key Events Leading to the Chapter 11 Cases

### A.    Challenges Facing Diamond's Business

#### (a)    Changing Industry Business Model

57.     Since Sinclair's 2019 acquisition of Diamond, Diamond's business has faced material challenges driven in large part by a fundamental market shift away from traditional cable and satellite television.  Under the established linear television model, various channels are

packaged, or "bundled," together as part of each consumer's cable or satellite subscription.  These bundles typically include RSNs, which consumers pay for through their subscription fees to MVPDs, with the MVPDs in turn paying carriage fees to the RSNs.  Prior to cord-cutting, when cable and satellite subscriptions were the primary means of accessing television programming, this model was highly profitable—RSNs earned increasing carriage fees from MVPDs driven by higher annual rates while subscriber levels remained stable.  Accordingly, RSNs were able to share a portion of increasing distribution revenue with professional sports teams and paid increasing fees to acquire sports broadcasting rights.

58.     As new digital platforms emerged, however, consumers began cutting the cord on traditional linear television and/or paring down large bundles.  This has affected Distributors' willingness to continue contracting with Diamond, thus eroding Diamond's distribution revenue streams.  For example, Diamond lost carriage with Hulu + Live TV, YouTube TV, DISH Network, and DISH's wholly-owned subsidiary, Sling TV, over the course of 2019 and 2020.  Coupled with increased subscriber loss, or "churn," at Diamond's remaining Distributors, these events collectively drove an approximate $810 million, or 22.6 percent, decline in revenue from 2019 to 2022 (exclusive of the impact of any accrued rebates and related adjustments).

59.     Given Diamond's historical reliance on traditional MVPDs to generate distribution revenue, this industry trend towards cord-cutting has significantly impacted Diamond's business.  As a result, certain rights fee arrangements that were first agreed to years ago have become uneconomic due to the changed broadcasting model, putting significant pressure on Diamond's ability to pay teams the rights fees under these agreements.  These challenges are not unique to Diamond—they are being faced industry-wide, and in particular in the RSN business.  Just recently, Warner Bros. Discovery, the parent company of AT&T Sports Networks, announced that

it intends to exit the RSN business, citing insufficient cash to pay upcoming rights fees to its six MLB, NBA, and NHL teams.

### (b)    Development of DTC Business

60.    As noted above, in response to the significant headwinds facing the traditional television broadcasting industry, Diamond has implemented digital initiatives designed to develop and expand consumer access to live local sports through its DTC platforms.  Currently, Diamond monetizes DTC rights for 16 NBA teams, 12 NHL teams, and 5 MLB teams.  Additionally, Diamond is actively seeking to expand its portfolio of digital rights to increase the scope and flexibility of its Bally Sports+ service, including to capture in-game highlights and pay-per-game transactions.

61.    It is my understanding that despite Diamond's advancements in developing its DTC initiatives throughout 2021, Diamond continued to face adverse market conditions, including increases in cord-cutting and subscriber churn.  Accordingly, in late 2021, Diamond began exploring options to enable it to execute on its strategic vision and position itself for future success.

### B.    March 2022 Transactions

62.    It is my understanding that beginning in January 2021, Diamond engaged with certain lenders and holders of its secured and unsecured funded debt obligations regarding potential financing and recapitalization transactions to provide Diamond with additional liquidity to bolster operations, reassure counterparties of Diamond's viability, and enable Diamond to continue actively pursuing its DTC strategy.  On January 13, 2022, Diamond entered into a Transaction Support Agreement with certain of its secured lenders and noteholders to implement refinancing and recapitalization transactions.  On March 1, 2022, Diamond closed on these transactions (the "March 2022 Transactions"), which resulted in (a) Diamond receiving $635 million of new-money financing through the First Lien Loans and (b) the exchange of DSG's

then-existing first lien credit agreement and note obligations for the Second Lien Loans and Second Lien Notes (including the exchange of DSG's then-existing revolving credit facility into the Second Lien RCF Loans).  The obligations owed to lenders and noteholders that did not participate in the March 2022 Transactions became the Third Lien Loans and Third Lien Notes. The March 2022 Transactions did not affect the Unsecured Notes.  In connection with the March 2022 Transactions, DSG also redeemed approximately all of its then-outstanding (approximately $31 million in principal amount) 12.75% Senior Secured Notes due 2026.  WilmerHale and Moelis represented Diamond in connection with the March 2022 Transactions.

63.    As noted above, as a result of the March 2022 Transactions, the DSG Board was reconstituted in May 2022 to consist of a majority of independent managers, with two of the independent managers selected by the lenders under the First Lien Credit Agreement, one independent manager mutually selected by such lenders and Sinclair, and one independent manager and Sinclair's Chief Executive Officer selected by Sinclair to serve on the DSG Board. In addition, as a result of the transition to independent management after the March 2022 Transactions, Diamond's financial statements were deconsolidated from Sinclair's beginning with the quarterly financial statements for the first quarter of 2022.

### C.    Retention of Professionals

64.    Following the March 2022 Transactions, Diamond continued to face greater than expected subscriber churn and emerging macroeconomic headwinds.  As a result of these market conditions, Diamond determined that it was prudent to engage restructuring advisors to assess all potential strategic alternatives to address Diamond's increasingly unsustainable capital structure.

65.    In May 2022, the new DSG Board retained Paul, Weiss to assist principally with restructuring matters.   In September 2022, Diamond engaged Moelis and LionTree as its investment bankers to provide financial advice and analysis in connection with potential strategic

transactions.   In December 2022, Paul, Weiss was asked to broaden its mandate to include representing Diamond, alongside WilmerHale, in connection with Diamond's strategic and corporate transactional matters, including a potential restructuring.   Diamond subsequently engaged AlixPartners as its financial advisor and Porter Hedges as its Texas counsel in January 2023.

> **D.**    **Establishment of the Conflicts Committee and the Claims Analysis Subcommittee**

66.    In December 2022, as Diamond's focus turned toward evaluating potential strategic alternatives, the DSG Board determined that it was appropriate and in DSG's best interest to establish a conflicts committee of the DSG Board (the "Conflicts Committee") to evaluate transactions, agreements, disputes, and other matters involving DSG and any of its subsidiaries (the "Company Group"), on the one hand, and Sinclair and its subsidiaries and affiliates (other than the Company Group) (the "Sinclair Group"), on the other hand (the foregoing, collectively, the "Related Party Matters").   The DSG Board appointed Ms. Turcke and Messrs. Freer, Preschlack, and Whitsitt, all of whom are independent of Sinclair, to serve on the Conflicts Committee.

67.    The DSG Board delegated to the Conflicts Committee, among other things, the full authority of the Board with respect to any Related Party Matter that is exclusively between the Company Group and the Sinclair Group.   The Conflicts Committee subsequently determined it was desirable and in the best interests of the Company Group to establish a special subcommittee of the Conflicts Committee (the "Claims Analysis Subcommittee") empowered to, among other things, conduct a detailed investigation of potential legal claims of any nature that may be brought by the Company Group against third parties, including the Sinclair Group.   The Claims Analysis Subcommittee was established on January 28, 2023, and consists of Ms. Turcke and Mr. Freer,

with Ms. Turcke serving as Chairperson of the Subcommittee. Prior to the Petition Date, the Claims Analysis Subcommittee commenced a detailed investigation into potential claims against Sinclair, which I understand remains ongoing.

        **E.**      **Prepetition Engagement with Creditors, Sinclair, and the Leagues**

      68.     In the fall of 2022, Diamond and its advisors began discussions with certain of Diamond's key stakeholders regarding potential strategic alternatives that would enable Diamond to delever its balance sheet and position its business for future growth through expansion of its DTC offerings. To facilitate these discussions, in November 2022, certain members of an ad hoc group of Diamond's secured lenders represented by Gibson Dunn & Crutcher LLP and Evercore Inc. (the "Ad Hoc Secured Group") and an ad hoc group of crossholders of Diamond's secured and unsecured debt represented by Paul Hastings LLP and PJT Partners, Inc. (the "Ad Hoc Crossholder Group") executed non-disclosure agreements with Diamond. In February 2023, certain of Diamond's first-lien lenders formed an ad hoc group represented by Kramer Levin Naftalis & Frankel LLP and Centerview Partners LLC (the "Ad Hoc First Lien Group," and together with the Ad Hoc Secured Group and the Ad Hoc Crossholder Group, the "Ad Hoc Groups").

      69.     Since the fall of 2022, Diamond has facilitated negotiations among its stakeholders, including the Ad Hoc Secured Group, the Ad Hoc Crossholder Group, and Sinclair, regarding Diamond's go-forward business, capital structure, and ownership. In early January, these negotiations resulted in a deal in principle among those ad hoc groups and Sinclair on the key terms of a restructuring of Diamond's balance sheet and a separation of Diamond's business from Sinclair.

      70.     Concurrently, Diamond engaged with each of the MLB, NBA, and NHL regarding its potential restructuring and what that could mean for Diamond's operations, and in particular

the continued build out of its DTC business.  In addition to discussions with the leagues, Diamond also held discussions with certain of its individual team partners.  Diamond has made progress in certain of these negotiations to date and continues to work with the leagues and teams to reach agreements to optimize its business going forward.

71.     On January 11, 2023, as negotiations continued, Diamond drew the full amount of its Second Lien RCF Loans, raising approximately $227.5 million in additional liquidity.   On February 15, 2023, to preserve its financial flexibility and provide its stakeholders with additional time to coalesce around a go-forward business plan, Diamond elected to enter the 30-day grace period with respect to the approximately $140 million cash interest payments scheduled to be paid on its prepetition secured and unsecured notes.  Additionally, on February 22, 2023, to facilitate continued access to the AR Loan Facility, Diamond and Sinclair entered into a waiver of specified defaults under that facility related to the February 15th notes interest payment.

72.     Diamond has also been reviewing its rights payments and considering its options with respect to its obligations to its team partners.  Diamond has kept its organized creditors informed on these discussions as the DSG Board has made decisions on whether to enter the payment grace period with respect to any rights agreement.  On March 1, 2023, as stakeholder negotiations continued, Diamond elected to enter the grace period with respect to a rights fee payment due under its rights agreement with the Arizona Diamondbacks.  Diamond similarly did not make a payment to Raycom on February 28 with respect to the rights to broadcast Atlantic Coast Conference college sporting events on certain RSNs.  Diamond has made all other payments to its team partners and has continued to operate its business as usual.

73.     On March 11, 2023, Rangers Baseball LLC ("Rangers"), the owner and operator of the Texas Rangers MLB team, delivered a "Notice of Default and Termination" (the "Termination

Notice") related to that certain Telecast Rights Agreement (the "Rangers Agreement"), dated as of August 11, 2010, by and between the Rangers and Debtor ARC Holding, Ltd. ("ARC Holdings"). In the Termination Notice, the Rangers asserted that an event of default on account of ARC Holdings' alleged insolvency had occurred under the Rangers Agreement. The Rangers purported to terminate the Rangers Agreement, effective March 15, 2023, unless certain conditions were met. ARC Holdings has never missed a payment to the Rangers and made a substantial payment to the Rangers in February pursuant to the Rangers Agreement. ARC Holdings and Diamond dispute the Rangers' assertions in the Termination Notice and are prepared to take all legal actions to protect ARC Holdings' rights under the Rangers Agreement, which Diamond maintains remains in effect.

### F. Negotiations Regarding the RSA

74. On March 15, 2023, following extensive, good-faith, and arm's-length negotiations, Diamond and members of the Ad Hoc Secured Group and the Ad Hoc Crossholder Group (together, the "Consenting Creditors") executed the RSA, which memorialized the parties' agreement on the key terms of transactions (the "Restructuring Transactions") to be implemented through prearranged chapter 11 cases. The Restructuring Transactions are set forth in the RSA and the term sheet attached thereto (the "Restructuring Term Sheet").[9] Pursuant to the RSA and subject to the conditions specified therein, the Consenting Creditors have agreed, among other things, to support the Restructuring Transactions and vote in favor of a chapter 11 plan of reorganization (the "Plan") consistent with the Restructuring Term Sheet. The Restructuring Transactions contemplate, among other things, a substantial deleveraging of Diamond's balance

---

[9] The following description of the Restructuring Transactions is for informational purposes only and is qualified in its entirety by reference to the RSA and the Restructuring Term Sheet.

sheet and the separation of the Diamond business from Sinclair.  Moreover, Diamond and the Consenting Creditors are working to document the proposed terms of an agreement with Sinclair pursuant to which Sinclair will provide certain transition services to reorganized Diamond and will continue to be the lender under the AR Loan Facility as part of the Receivables Program until the date that facility can be replaced or July 15, 2023.  The proposed agreement with Sinclair is subject to final documentation and there are no guarantees the agreement will be finalized.

(a)     **Balance Sheet Restructuring**

75.     The Restructuring Transactions contemplated by the RSA will reduce Diamond's funded debt obligations by over $8 billion, which will significantly reduce reorganized Diamond's annual interest expense.  The RSA provides that the First Lien Loans will be unimpaired, and the Second Lien Debt[10] and the Unsecured Funded Debt[11] will be fully equitized in exchange for new equity and/or new warrants issued by the reorganized company.  The Consenting Creditors' obligations under the RSA are conditioned on, among other things, reaching agreement with Diamond on the reorganized company's go-forward business plan and on go-forward governance. The delevered capital structure contemplated by the RSA will position reorganized Diamond well to continue investing in and expanding its DTC offerings for long-term growth following its emergence from these chapter 11 cases.

---

[10]   "Second Lien Debt" means, collectively, the Second Lien RCF Loans, the Second Lien Term Loans, and the Second Lien Notes.

[11]   "Unsecured Funded Debt" means, collectively, the Third Lien Term Loans, the Third Lien Notes, and the Unsecured Notes.

(b)    **RSA Milestones**

76.    The RSA contemplates the following timeline for implementation of the Restructuring Transactions:

| Deadline | Milestone |
|----------|-----------|
| March 16, 2023 | Filing of chapter 11 petitions |
| March 20, 2023 | Entry of an order approving the Cash Collateral Motion on an interim basis |
| May 1, 2023 | Entry of an order approving the Cash Collateral Motion on a final basis |
| August 1, 2023 | Diamond and Required Consenting Creditors (as defined in the RSA) to have agreed upon Diamond's go-forward business plan |
| September 1, 2023 | Diamond and the Required Consenting Creditors to reach agreement on a governance term sheet<br><br>Filing of the Plan, the disclosure statement for the Plan, and solicitation materials for the Plan |
| October 6, 2023 | Entry of an order approving the disclosure statement for the Plan |
| December 1, 2023 | Entry of an order confirming the Plan |
| December 31, 2023 | Consummation of the Plan |

Failure to meet such milestones may give rise to certain termination rights in favor of the Consenting Creditors under the RSA.

77.    Given the substantial benefits of the Restructuring Transactions, I believe that the proposed Restructuring Transactions currently represent the best available path forward to right-size Diamond's balance sheet and position Diamond for future success following these chapter 11 cases.  I further believe that reaching consensus on the Restructuring Transactions prior to commencing these chapter 11 cases was critical to ensuring a smooth landing in chapter 11 and providing Diamond with a plan on which to build additional stakeholder support for Diamond's restructuring, which will maximize the value of Diamond's estates and its going-concern business. Moreover, I understand that Diamond's obligations under the RSA are subject to a fiduciary out,

thus ensuring that Diamond is able to continue considering all unsolicited offers during these chapter 11 cases.

**G.      Negotiations Regarding the Use of Cash Collateral**

78.      While Diamond negotiated the RSA, it simultaneously engaged in discussions with the Ad Hoc Groups and other first lien lenders regarding the consensual use of cash collateral during the pendency of these chapter 11 cases. Without access to cash collateral, Diamond would not have the means to continue operating its business or fund the administrative costs of these chapter 11 cases. Diamond sought to obtain the consent of lenders representing a majority of its first lien loans regarding the use of cash collateral to avoid a contested fight before this Court on that issue at the outset of the chapter 11 cases.

79.      As set forth more fully in the Cash Collateral Motion,[12] lenders constituting the requisite majority of first lien lenders have agreed to Diamond's consensual use of cash collateral in compliance with an approved initial budget (the "Budget"), subject to certain permitted variances, and the applicable milestones. Diamond, with the assistance of its advisors, developed the initial Budget governing the use of cash collateral in connection with negotiations with the Ad Hoc Groups and other first lien lenders. As reflected in the Budget, as of the Petition Date, Diamond and the non-debtor Bally JVs collectively hold approximately $426.6 million of cash on hand, of which approximately $115.0 million is held at the non-debtor Bally JVs. In addition to cash on hand, to the extent that the agreement with Sinclair is reached and subject to Court approval, Diamond's continued access to the Receivables Program will further facilitate its ability to manage its liquidity needs under the Budget, and the cash received by Diamond from

---

[12]   "Cash Collateral Motion" means the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors' Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, filed contemporaneously herewith.

performance of the Receivables Program is an important part of ensuring that the Diamond has sufficient cash on hand to meet its day-to-day obligations.

80.     After taking into account the projected costs of the chapter 11 cases and anticipated revenues to be generated by Diamond's ordinary course operations, I believe the use of cash collateral and, if achievable, continuance of the Receivables Program will allow Diamond to continue to operate its business and administer these chapter 11 cases without having to seek debtor-in-possession financing at this time.   I believe this structure provides Diamond with sufficient flexibility to continue to operate its business in the ordinary course and pursue a value-maximizing restructuring transaction.

81.     Without access to cash collateral as contemplated by the Cash Collateral Motion, I believe Diamond's ability to continue operating the RSNs on an uninterrupted basis and utilize the chapter 11 cases to pursue a value-maximizing restructuring transaction would be immediately jeopardized.  Accordingly, I believe that the arrangement for the consensual use of cash collateral contemplated under the Cash Collateral Motion and related orders is in the best interests of Diamond and its stakeholders.  Diamond's consensual use of cash collateral in accordance with the approved Budget provides it sufficient means to continue operations, implement a comprehensive restructuring transaction, fund the administrative costs of these chapter 11 cases, and avoid the cost, delay, and risk associated with a contested cash collateral dispute at the outset of these chapter 11 cases.  Because Diamond's access to cash collateral is critical to its continued business operations and the success of these chapter 11 cases, I believe the relief requested in the Cash Collateral Motion is necessary and appropriate to avoid immediate and irreparable harm to Diamond's estates, and should be approved by the Court.

### III.     First Day Motions

82.     Contemporaneously herewith, Diamond has filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize Diamond's business operations, facilitate the efficient administration of these chapter 11 cases, and expedite Diamond's swift and smooth restructuring, including:

     a.   *Joint Administration Motion;*

     b.   *Designation of Complex Chapter 11 Bankruptcy Case;*

     c.   *Claims Agent Retention Application*;

     d.   *Creditor Matrix Motion*;

     e.   *Schedules/SOFAs Extension Motion*;

     f.   *Critical Vendors/Foreign Vendors/503(b)(9) Claimants Motion*;

     g.   *Customer Programs Motion*;

     h.   *Wages Motion*;

     i.   *Utilities Motion*;

     j.   *Taxes Motion*;

     k.   *Cash Management Motion*; and

     l.   *Cash Collateral Motion*

83.     I have reviewed and consulted with Diamond's advisors regarding each of the First Day Motions and understand each of the First Day Motions and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference. In addition, to the extent that an agreement is reached with Sinclair and such motions are filed, the factual statements in the motions requesting authority to (i) to enter into and perform under the

Receivables Program, as may be modified, and (ii) continue performance obligations under the MSA, are true and accurate and incorporated herein by reference.

84.     As a result of my first-hand knowledge, and through my review of various materials and information and discussions with other members of Diamond's management and advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by Diamond in the First Day Motions, (b) the need for Diamond to continue to operate effectively while working to maximize the value of its assets for the benefit of all stakeholders, and (c) the immediate and irreparable harm to which Diamond would be exposed upon the commencement of these chapter 11 cases unless the limited relief requested in the First Day Motions is granted without delay.

85.     The relief requested in the First Day Motions was carefully tailored to ensure that Diamond's immediate operational needs are met so that its ordinary course day-to-day operations remain uninterrupted, and that Diamond suffers no immediate and irreparable harm at the start of these chapter 11 cases.   In developing the First Day Motions, Diamond's management and professionals remained cognizant of the limitations imposed on a debtor in possession and, in consideration of those limitations, Diamond narrowed the relief requested at the outset of these chapter 11 cases to those matters that require urgent relief to sustain its immediate operations and preserve value during the pendency of these chapter 11 cases.   It is my opinion that Diamond would suffer immediate and irreparable harm if the relief requested in the First Day Motions is not granted.   Accordingly, for the reasons set forth herein and in each respective First Day Motion, I believe the Court should grant the relief requested in each of the First Day Motions.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 15, 2023
        New York, New York

                                    /s/ David F. DeVoe, Jr.
                                    David F. DeVoe, Jr.
                                    Chief Operating Officer, Diamond Sports Group, LLC
                                    Chief Financial Officer, Diamond Sports Group, LLC
                                    and its wholly-owned subsidiaries