## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DIAMOND SPORTS GROUP, LLC, *et al.*, | ) | Case No. 23-90116 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## EMERGENCY MOTION OF AZPB LIMITED PARTNERSHIP
## TO COMPEL DEBTORS TO PERFORM UNDER THE TELECAST RIGHTS
## AGREEMENT, OR, IN THE ALTERNATIVE, TO COMPEL ASSUMPTION
## OR REJECTION OF THE TELECAST RIGHTS AGREEMENT AND RELIEF
## FROM THE AUTOMATIC STAY

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 2:00 P.M. (CENTRAL TIME) ON APRIL 13, 2023.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON APRIL 13, 2023, AT 2:00 P.M. (CENTRAL TIME). YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

AZPB Limited Partnership, a Delaware limited partnership, dba Arizona Diamondbacks ("Diamondbacks") submit this *Motion to Compel Payment* ("Motion"). This Motion seeks entry of an order, substantially in the form attached hereto as Exhibit A ("Order"), pursuant to §§ 105(a), 361, 362(d), 363(e), and 503 of the U.S. Bankruptcy Code ("Code") to compel the above-captioned Debtors (collectively, "Debtors") to perform under their Amended and Restated Telecast Rights Agreement, dated January 9, 2015 (including all exhibits and attachments thereto and as may be amended, supplemented, or modified from time to time) ("TRA") with the Diamondbacks, including, among other things, to continue to produce and broadcast all games in accordance with the TRA, and pay all outstanding and unpaid prepetition and postpetition Annual Rights Fee, Marketing Fees, and ancillary fees (collectively, "TRA Fees") as and when due. In the alternative, they seek to compel the Debtors to assume or reject the TRA and pay all TRA Fees through such date, and, to the extent necessary, grant the Diamondbacks relief from the automatic stay to issue default notices and exercise their remedies under the TRA. In support of this Motion, the Diamondbacks respectfully state as follows:

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the Southern District of Texas ("Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b).

2.      Venue is proper pursuant to §§ 1408 and 1409.

3.      The basis for the relief requested herein are Code §§ 105(a), 361, 362(d), 363(e), 503(a), 503(b)(1)(A), and 507(a)(2).

4.      The Diamondbacks confirm their consent for this Court to enter a final order in connection with this Motion, should it be later determined that the Court could not.

**Preliminary Statement**

5.      The Debtors are the responsible parties for broadcasting Major League Baseball ("MLB") games to fans in their geographic area. Harris Declaration.[1] ¶ 10. On March 30, 2023, the MLB season started. *Id.* The Diamondbacks have already played multiple games on March 30-31, 2023, and April 1-4, 2023. *Id.* Their first home game is on April 6. Regular season games are scheduled on most days through October 1, 2023. *Id.*

6.      Because of the Debtors' bankruptcy, it is uncertain how, when, or if the Debtors will continue to produce and broadcast the Diamondbacks' games and whether fans will be able to view those games.  Harris Declaration ¶ 11.

7.      The TRA covers the Diamondbacks' preseason and their typical 162-game regular season, which are broadcast live by Debtor Diamond Sports Net Arizona, LLC[2] ("Diamond Arizona") on the Arizona regional sports network. *Id.* ¶ 12. On average, each season, five to ten percent of the Diamondbacks' regular season games are selected by MLB's national broadcast partners for exclusive nationwide broadcasts. *Id.*

8.      The remaining games are broadcast by Diamond Arizona in the Diamondbacks' home television territory ("Territory").[3] *Id.* ¶ 13. Other Debtors serve as the regional sports networks for other MLB clubs. *Id.*

9.      Under the TRA, the Diamondbacks grant Diamond Arizona the exclusive right to telecast their games and associated pre- and post-game programming within the Territory. *Id.* ¶ 14. In exchange, Diamond Arizona pays the Diamondbacks a periodic fee. *Id.*

10.     The Diamondbacks earn a significant portion of their total revenues from the TRA with Diamond Arizona. *Id.* ¶ 15.

---

[1] Simultaneous with the filing of this Motion, the Diamondbacks filed the *Declaration of Thomas M. Harris* in support of the Motion ("Harris Declaration").
[2] The Debtor in Case No. 23-90115.
[3] The Territory, as defined in Exhibit "A" to the TRA consists of ███████████████████████████████

11.     As of the filing of this Motion, Diamond Arizona has not fully performed under the TRA, which has caused substantial uncertainty for the Diamondbacks and for MLB fans in the Territory who will not know if they will be able to watch their games. *Id.* ¶ 16.

**Relief Requested**

12.     The Diamondbacks seek the Court to either (a) compel the Debtors within seven (7) days of the entry of the Order to make payments to the Diamondbacks in accordance with the TRA, including all outstanding and unpaid amounts; (b) to require the Debtors to assume the TRA and pay all TRA Fees due; or (c) reject the TRA and pay all TRA Fees through the date of rejection. The Diamondbacks also seek relief from the automatic stay to permit them to send default notices and exercise their remedies under the TRA.

**Facts Specific to Relief Requested**

13.     On January 9, 2015, the Diamondbacks, as licensor, and Fox Sports Net Arizona, LLC ("Fox"), as licensee, entered into the TRA. Harris Declaration ¶ 17.

14.     In August 2019, the Debtors acquired Fox's interest in the TRA in a leveraged buyout. *Declaration of David F. Devoe, Jr. in Support of Chapter 11 Petitions and First Day Motions* ("Debtors' Declaration") ¶ 8.

15.     The TRA provides Diamond Arizona with the right to telecast and/or cause the telecast of (1) all available regular season Diamondbacks' games not selected for exclusive telecast by an MLB Telecaster;[4] and (2) up to ten pre-season games not otherwise selected for exclusive telecast by an MLB Telecaster, in the Territory, as modified from time-to-time ("Telecast Rights"). Harris Declaration ¶ 18. The Debtors have the exclusive rights to broadcast the games in the Territory, subject only to the delineated exceptions in Section 3(e) of the TRA, including, but not limited to the rights of any other MLB team with rights to broadcast in the Territory. *Id.*

---

[4] MLB Telecaster is given the meaning as ascribed to such term in the TRA.

16.    The Diamondbacks typically play a 162-game regular season schedule. Diamond Arizona typically broadcasts about 150 of those games. Diamond Arizona is guaranteed the broadcast rights to ███ games. *Id.* ¶ 19. If fewer than ███ games are available to Diamond Arizona, then the Annual Rights Fees, described below, are reduced on a per-game basis. *Id.* Diamond Arizona pays nothing additional for broadcasting more than ███ games. *Id.*

17.    The term of the TRA is from January 1, 2016 until December 31, ███ ("Term"). *Id.* ¶ 20.

18.    In exchange for the Telecast Rights, Diamond Arizona is to pay the following rights fees to the Diamondbacks in ███████ installments on ██████████ of each ██████████ of the Term ("Annual Rights Fees"):



*Id* ¶ 21.

19.    The first Annual Rights Fee for the 2023 season became due on March 1, 2023 ("March 2023 Payment"). *Id.* ¶ 22.

20.     The Debtors chose not to make the March 2023 Payment. Debtors' Declaration ¶ 72.

21.     Failure to make the March 2023 Payment was a default under the TRA and the Diamondbacks sent written notice of that default to the Debtors on March 1, 2023. Harris Declaration ¶ 23.

22.     The TRA also provides for the Debtors to make marketing fee payments ("Marketing Fee Payment") and ancillary fees payments to the Diamondbacks, which include promotional rights and other services. The Marketing Fee is comprised of various elements that are earned outside of baseball game broadcasts, but are generally earned pro rata over the course of the baseball season. A Marketing Fee Payment was due March 1, 2023, for $▮▮▮▮▮ (jointly with the March 2023 Payment, the "March 2023 Payments"). *Id.* ¶ 24

23.     On March 14 and March 15, 2023 ("Petition Date"), the Debtors filed their voluntary petitions in these cases. *Id.* ¶ 25.

24.     The Debtors failed to make the March 2023 Payments and have made no payments under the TRA to the Diamondbacks since this bankruptcy case began. *Id.* ¶ 26.

25.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Code.

26.     The Diamondbacks' regular season began on March 30, 2023. Diamond Arizona has broadcasted 6 regular season games from the Petition Date through April 4, 2023. Harris Declaration ¶ 27. The Diamondbacks have provided and are providing services to the Debtors postpetition, for which payments have accrued and are due, but for which the Debtors are not paying. *Id.*

27.     As detailed in the Debtors' Declaration, the Debtors' "traditional primary source of revenue" comes from "multichannel video programming distributors ('MVPDs') via cable and satellite, or 'linear,' broadcast." Debtors' Declaration ¶¶ 6, 9.

28.     Diamond Arizona broadcasts games of professional sports teams in baseball, basketball, and hockey. Harris Declaration ¶ 29. The regular seasons for basketball and hockey

are about to end. *Id.* Diamond Arizona has limited first round postseason broadcast rights for basketball, and the hockey team is not participating in the post season. *Id.* By April 30, 2023, Diamond Arizona's ability to provide major league broadcasts to MVPDs is entirely dependent on the Diamondbacks' broadcast rights. *Id.*

29.    The Debtors' secondary source of revenue is mainly advertising within the broadcasts. Debtors' Declaration ¶ 36. The advertising arrangements require audience rating guarantees. *Id.* The ability of a regional sports network to provide MLB broadcasts is essential to maintaining ratings. Harris Declaration ¶ 30.

30.    The Debtors admit that they made the intentional decision not to pay the Diamondbacks. Debtors' Declaration ¶ 72. Before the Diamondbacks could terminate for nonpayment,[5] the Debtors filed the petitions initiating these bankruptcy case. Harris Declaration ¶ 31.

31.    By filing these bankruptcy cases, the Debtors made the conscious decision to not pay the Diamondbacks, while continuing to exploit the benefits of the Diamondbacks' postpetition services ***at no cost to the Debtors***. Harris Declaration ¶ 32.

32.    The Debtors have funded obligations of approximately $8.845 billion. Debtors' Declaration ¶ 47. Over $6 billion is allegedly secured by "all of the assets." *Id.* ¶ 50.

33.    The *Interim Order (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secure Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief*, entered by this Court on March 16, 2023, [Docket No. 145], gives the Prepetition First Lien Secured Parties, the Prepetition Second Lien Notes Secured Parties, and Professional Fees[6] priority over all other administrative claims. *Id.* at 31, 39, and 42.

---

[5] What the Debtors describe as the "grace period." *Id.*
[6] These capitalized terms in this paragraph shall have the same meanings ascribed to them as in the Interim Cash Collateral Order.

## Argument

### I.    THE DIAMONDBACKS ARE ENTITLED TO IMMEDIATE PAYMENT OF THE TRA FEES

34.    The Diamondbacks were due TRA Fees before the opening of the MLB season this year. The Diamondbacks have since played several games. Thus far, Diamond Arizona has continued to broadcast the games, but *without* payment to the Diamondbacks, and *with* the Debtors being paid and receiving the full benefits of broadcasting the Diamondbacks' games. Every time a Diamondbacks' game is broadcast, they lose $▮▮▮▮▮[7] that Diamond Arizona *should* have paid. Once a game is broadcast, the value is gone because the value is in the simultaneous airing of the game.

35.    The Debtors' *Emergency Motion on Cash Collateral* ("Cash Collateral Motion") [Docket No. 25] evidences that they have a cash position of at least $426.6 million, *plus* incoming revenue from their ordinary course operations. Cash Collateral Motion at 3 ¶ 6. The "ordinary course operations" that the Debtors refer to, *is this broadcasting of games*, including those of the Diamondbacks.

### II.    COURTS HAVE ADDRESSED THE INEQUITY OF PERMITTING A DEBTOR TO RETAIN POSTPETITION BENEFITS WITHOUT COMPENSATION WHERE PAYMENT WAS DUE PREPETITION

36.    MLB, the Cleveland Guardians Baseball Company, LLC, and the Minnesota Twins, LLC have filed a separate *Emergency Joint Motion of Major League Baseball and Certain Major League Clubs to Compel Debtors to Perform under the Telecast Rights Agreements, or, in the Alternative to Compel Assumption or Rejection of the Telecast Rights Agreements* on April 5, 2023 [Docket No. 280] ("MLB Motion").

37.    The MLB Motion asserts that Code § 503 provides for the allowance and payment of administrative expenses incurred by a debtor during a bankruptcy case.  The rationale underlying Code § 503 is straightforward:  *third parties will not provide products or services essential for a debtor to operate its business if they will not be compensated in full*.

---

[7] ▮▮th of the Annual Rights Fee.

Instead, "[s]ection 503 requires that such claims be given priority, therefore inducing third parties to extend credit and enhancing the likelihood of a successful reorganization." *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992) (*quoting In re Coastal Carriers Corp.*, 128 B.R. 400, 403 (Bankr. D. Md. 1991)). Consequently, where a "debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984). The Diamondbacks join in the MLB Motion and the relief it requests concerning payments that become due *postpetition*. As discussed below, the considerations that mandate approval of the MLB Motion also require that the Diamondbacks receive payment for the valuable postpetition rights they are presently providing to the Debtors.

38.     Two courts are known to have considered the use of intellectual property postpetition based on prepetition contracts. Both courts held that the continued use of the intellectual property prior to rejection of the executory contract gave rise to an administrative claim under § 503(b)(1)(A). The court in *In re Beverage Canners Int'l,* 255 B.R. 89 (S.D. Fla. 2000) considered the debtor's postpetition, pre-rejection use of a trademark. *Id.* at 91-92. The court awarded an administrative claim for the full amount required by the contract during the period of postpetition use. *Id.* at 94-96. It expressly rejected any attempt to equate "benefit" with "profit" by the debtor. *Id.* n. 3.

39.     *In re Home Interiors & Gifts, Inc.,* 2008 WL 4772102 (N.D. Tex. 2008) followed the *Beverage Canners* decision. *Home Interiors* at *6. In *Home Interiors*, the court considered the pre and post-rejection use of trademarks licensed to the debtor. *Id.* The court analogized it to the allowance of administrative claims of landlords under § 503(b)(1)(A) before the 1984 amendment of § 365(d). *Id.* at *7. The court found the price freely negotiated prepetition by the parties to presumptively establish the amount of the administrative claim. *Id.* *9-10. Before and after rejection, the court calculated the administrative claim based on the agreed rate and the debtor's actual use of the trademarks. *Id.* at 10-13.

9

40.     The Debtors are forcing the Diamondbacks to fund their business. Their payment to the Diamondbacks was due about 30 days before the start of the regular season. The Debtors intentionally withheld that payment but still exercise the right and benefit to broadcast the Diamondbacks' games *entirely postpetition.* Postpetition broadcasts of the Diamondbacks' games are the essential business of Diamond Arizona. Without the right to broadcast the Diamondbacks' games *played exclusively postpetition,* Diamond Arizona will be severely and materially impacted financially and will have a difficult path to survive. There would be no primary source of revenue from MVPDs and no secondary source from advertising. With the conclusion of the regular seasons for basketball and hockey, the Diamondbacks are the only major league product that Diamond Arizona has to broadcast. The Debtors must be compelled to compensate the Diamondbacks for the Debtors' postpetition broadcast of the Diamondbacks' games.

41.     The Diamondbacks have provided and are providing services to the Debtors postpetition, for which payments have accrued and are due. Section 503 requires the Debtors to pay for their obligations, for using the Diamondbacks' services arising under the TRA. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) (debtor must pay for the reasonable value of services it continues to receive under a contract while it is deciding to reject or assume it); *Matter of Whistler Energy II, L.L.C.*, 931 F.3d 432, 443 (5th Cir. 2019) (the knowing and voluntary post-petition acceptance of goods or services requires paying the full and ordinary costs of such goods and services, explaining that when a debtor accepts services from a third party without paying for them, the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority) (internal citations omitted). There is no question that the Debtors are directly benefiting from the TRA. This Court should not permit the Debtors to escape their payments, which leaves the Diamondbacks to bear the burden of costs and expenses, and the use of their services without compensation, in a seemingly administratively insolvent estate.

42.     Pursuant to Code § 363(e), the Diamondbacks have an interest in their "property" being used by the Debtors, and upon this request, the Court shall prohibit the use, as necessary, to provide adequate protection of the Diamondbacks' interest. Adequate protection payments are required to prevent the Diamondbacks from being "forced to, in effect, extend credit to the estate by continuing to perform on the contract postpetition. *In re El Paso Refinery, L.P.,* 220 B.R. 37, 45 (W.D. Tex. 1998).

43.     Simply deferring payments to the Diamondbacks for their postpetition games does not provide it adequate protection. Section 361(3) makes clear that adequate protection may not take the form of a deferred administrative claim. The extensive debt secured by all of the Debtors' assets and prior grant of *three* levels of superpriority claims require advance or contemporaneous payment if the Debtors wish to continue to broadcast the Diamondbacks games.

### III.     AN ADMINISTRATIVE EXPENSE CLAIM IS NOT AN ADEQUATE REMEDY

44.     The usual remedy in this type of situation might be to allow a creditor with a prepetition claim to have an administrative expense claim. The Cash Collateral Motion describes the summary of material terms for the use of cash collateral and the structure of carve-outs and allocations of superpriority administrative expense claims granted to the Debtors' professionals and other secured creditors. Cash Collateral Motion at 6 ¶ 12. But because of that structure, as stated in the Cash Collateral Motion, it may impair the value of other administrative claims in this bankruptcy case. All of the Debtors' assets are encumbered by secured creditors and now, superpriority administrative expense claims.

45.     The Code establishes a priority scheme for administrative expenses where they share the same but here, they have been shifted. Providing administrative expense claims to benefit lenders is generally acceptable so long as it is not at the expense of other creditors. And, altering the priority scheme requires justification and consent of the affected creditors. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) (the court rejected plans that endorsed

11

priority skipping in the absence of clear congressional intent); *In re Kitty Hawk, Inc.*, 255 B.R. 428, 435-436 (Bankr. N.D. Tex. 2000) (When Congress has intended to alter the general priority scheme, it has done so explicitly. . . the priority scheme of section 507 does not allow a debtor to unilaterally modify or terminate its obligations) (internal citations omitted). As a general rule, bankruptcy courts may not alter the statutory priorities. *In re Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1495–96 (11th Cir.1992) ("Section 507 of the Bankruptcy Code fixes the priority order of claims and expenses against the bankruptcy estate. Creditors within a given class are to be treated equally, and bankruptcy courts may not create their own rules of superpriority within a single class") (citations omitted); *In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1094 (9th Cir. 1991) ("To [pay certain pre-petition unsecured claims in full while other remain unpaid] would impermissibly violate the priority scheme of the Bankruptcy Code"); *In re FCX, Inc.*, 60 B.R. 405, 409–11 (E.D.N.C.1986) (court cannot alter distribution priorities absent inequitable conduct by claimant); *In re Baldwin–United Corporation, D.H.*, 43 B.R. 443, 457 (S.D. Ohio 1984) ("It is ... beyond travail that the most significant policy in bankruptcy jurisprudence is equality of treatment of like-situated creditors").

46.     Here, the entire risk of this bankruptcy not working is being transferred to the Diamondbacks (and other vendors) as they continue to provide postpetition services. The Diamondbacks should not be forced to provide their services without compensation while the Debtors benefit from the revenue of the Diamondbacks' provision of services, *and*, the Diamondbacks incur all of the risk and burden. Because of this dichotomy, the lack of unencumbered assets, and the prior grants of superpriority claims to other creditors, an administrative expense claim is an inadequate remedy here.

47.     Alternatively, the Diamondbacks seek allowance of an administrative expense claim to be paid immediately, on a per-game basis for games that have been and will be broadcast. Pursuant to Code § 503(a), "[a]n entity may timely file a request for payment of an administrative expense." Code § 503(a). Bankruptcy courts can require the payment of administrative expenses on an immediate and continuing basis. *In re ATP Oil & Gas Corp.*,

2014 WL 1047818, at *10 (citing *In re HQ Global Holdings, Inc.*, 282 B.R. at 173); *cf.* BLR 4002-1(f) (prohibiting a debtor from "incur[ing] administrative and priority expenses unless funds are reasonably expected to be generated to pay them"). Therefore, if the Debtors cannot afford to pay the TRA Fees as an administrative expense, they must not continue to broadcast games and reap the benefits from those broadcasts.

48.     The Bankruptcy Local Rules for the Court ("Local Rules") also make clear that the TRA Fees must be paid as and when they become due under the TRA. *See* BLR 4002-1(h) ("The debtor must pay on a current basis all obligations incurred by it in operating its business."). The Local Rules serve as a protective measure to ensure compliance with the Code's requirement that all administrative expenses be paid in full in cash to confirm a plan (absent some other agreement by claims holders). Code § 1129(a)(9)(A). If a debtor cannot satisfy its administrative expenses in full in cash, then the alternative to chapter 11, is liquidation in chapter 7. As such, judges on this Court have stressed the importance of the rules. *See* Transcript of Motions Hearing Before the Honorable Marvin Isgur 14:24-15:3, *In re Francis' Drilling Fluids, Ltd.*, No. 18-35441 (S.D. Tex. Nov. 3, 2018), ECF No. 150 ("What I will require in any case is that the administrative costs . . . have to be paid on a current basis. So if there isn't money to do that, the case is closed down.").

## IV.     THE DIAMONDBACKS MEET THE STANDARDS OF A CRITICAL VENDOR

49.     The Diamondbacks are providing essential services to Diamond Arizona. Harris Declaration ¶ 28. For example, the Diamondbacks directly incur the cost of and provide access, for electricity, on-air talent, and labor in connection with the telecasts. *Id.* If the Diamondbacks do not provide the labor or call the game, there are no major league sports for Diamond Arizona to broadcast. *Id.* Further, the Diamondbacks provide production truck pads to vendors of Diamond Arizona and permit it access and priority to the team's locker room, players, coaches, etc., which adds to the broadcasting services being telecast. *Id.* They also provide travel on the team's charter planes for road games. *Id.*

50.     Code § 105(a) and the "doctrine of necessity" permit the bankruptcy court to exercise its broad grant of equitable powers to authorize the payment of prepetition obligations when such payment is essential to the continued operation of the debtor's business. *See, e.g., In re CoServ, L.L.C.*, 273 B.R. at 497 (finding that § 105 provides the authority for a debtor in possession to pay prepetition claims); *In re CEI Roofing, Inc.*, 315 B.R. 50, 56 (Bankr. N.D. Tex. 2004); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2004).

51.     Section 363(b) of the Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs,* 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). There are several provisions within the Code that justify critical vendor motions. *In re Williams*, 616 B.R. 690, 695 (Bankr. N.D. Tex. 2020) (citing *e.g.*, §§ 363(b)(1), 105(a)). On March 15, 2023, the Debtors filed a motion for entry of an order authorizing them to pay claims of critical vendors ("Critical Vendor Motion") [Docket No. 10].

52.     "Factors to be considered in determining whether to allow critical vendor payments are (1) it must be critical that the debtor deal with the claimant, (2) unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim, and (3) there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim." *In re CoServ, LLC,* 273 B.R. 487, 498 (Bankr. N.D. Tex. 2002) (internal citations omitted).

53.     The Diamondbacks meet all of the requirements of a "critical vendor" because if the Diamondbacks stop providing those services, Diamond Arizona will have limited content to broadcast and likely lose all revenue from the Territory. Further, the services that the Diamondbacks provide are unique, and there is no substitute for the Diamondbacks' games. Finally, the Diamondbacks see no reason to continue to work with Diamond Arizona without

the Debtors making the March 2023 Payments and there is no practical alternative. Harris Declaration ¶ 33.

54.     Under the Cash Collateral Motion, the Debtors can make the March 2023 Payments to the Diamondbacks.

## V.     ALTERNATIVELY, THE COURT SHOULD ORDER THE DEBTOR TO ASSUME OR REJECT THE TRA

55.     Alternatively, the Court should require the Debtors to immediately elect to either assume or reject the TRA pursuant to Code § 365 so that the Diamondbacks can know their position in this bankruptcy case and move to immediately identify other broadcasting services if the Debtors do not desire to move forward with them.

56.     The MLB Motion to Compel at 19 § II, requests the immediate assumption or rejection of the agreements described in the MLB Motion.  Those arguments and that request applies equally to the TRA between Diamond Arizona and the Diamondbacks. The Diamondbacks incorporate Section II of the MLB Motion by reference, and request that the Court compel the Debtors to assume or reject the TRA with the Diamondbacks.

## VI.     THE DIAMONDBACKS SHOULD BE GRANTED RELIEF FROM THE AUTOMATIC STAY TO ENFORCE THEIR RIGHTS

57.     Relief from the automatic stay for "cause," as permitted under Code § 362(d), must be determined on a case-by-case basis, on its own facts, while balancing the interests of the estate and the creditor.  *Reitnauer* v. *Tex. Exotic Feline Found., Inc.* (*In re Reitnauer*), 152 F.3d 341, 343 n.4 (5th Cir. 1998) and *In re Mosher*, 578 B.R. 765, 772 (Bankr. S.D. Tex. 2017). The factors, as set out by the *Mosher* Court: (i) interference with the bankruptcy, (ii) good or bad faith of the debtor, (iii) injury to the debtor and other creditors if the stay is modified, (iv) injury to the movant if the stay is not modified, and (v) the proportionality of the harms from modifying or continuing the stay, favor the Diamondbacks' case. *In re Mosher*, 578 B.R. at 772. Diamond Arizona has not made its March 2023 Payments but continues to enjoy the Diamondbacks' services postpetition. By doing so, Diamond Arizona is not acting in good faith, and instead, is acting to the detriment

15

of the Diamondbacks. The TRA Fees are a large part of the Diamondbacks' revenues and nonpayment will cause them harm. Bearing this financial burden is neither just nor proportionate to any harm the Debtors may incur by lifting the stay for the purposes stated herein. Lifting the stay will permit the Diamondbacks to terminate the TRA unless the defaults are cured.

58.     The Diamondbacks request the right to terminate the TRA, as provided for therein, if the Debtors fail to cure or make timely payment. The Diamondbacks also request relief from the automatic stay so that they can provide future notices if TRA Fees are not timely paid. The Diamondbacks also join in the MLB's Motion regarding stay relief at 19 § III, to the extent applicable and analogous to the Diamondbacks.

## Joinder to other Objections and Motions to Compel

59.     To the extent consistent with this Motion, the Diamondbacks join in any other opposition to the Debtors' Cash Collateral Motion and other Motions to Compel payment for the use of property and services connected to other telecast rights agreements, specifically those associated with the MLB and other MLB teams.

## Emergency Consideration

60.     The Diamondbacks request emergency consideration of this Motion pursuant to Bankruptcy Rule 9013 and Local Rule 9013-1.  The TRA payments are essential to the cash flow needs of the Diamondbacks. The Debtors should not be permitted to continue to exploit the Diamondbacks' telecast rights to generate substantial revenue unless they make immediate payment of the overdue pre and postpetition TRA Payments owed to the Diamondbacks for the use of such rights. Considering that the Debtors only recently filed bankruptcy, have had their first day and other motions heard on an expedited basis, and have since made it clear to the Diamondbacks that they do not intend to make the TRA Payments, this was the earliest opportunity the Diamondbacks had to file this Motion. Accordingly, the Diamondbacks submit that an emergency hearing should be scheduled to consider entry of the Order. The

Diamondbacks submit that a hearing on this Motion should be scheduled at the same time as the Debtors' Cash Collateral Motion and the MLB Motion since they are interrelated.

## Notice

61.     Notice of this Motion has been provided to (a) counsel for the Debtors, (b) the Office of the United States Trustee for the Southern District of Texas, (c) counsel to the Committee, (d) any other party that has requested notice pursuant to Bankruptcy Rule 2002, and (e) any other party entitled to notice pursuant to Local Rule 9013-1(d).  The Diamondbacks submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## Conclusion

WHEREFORE, the Diamondbacks request that the Court schedule an emergency hearing on this Motion and grant the relief requested herein and enter the proposed orders accompanying this Motion. The Diamondbacks additionally request such other and further relief as to which it may show it is justly entitled.

DATED April 6, 2023.
Phoenix, Arizona.

Respectfully submitted,

**GRAY REED**

By:/s/ *Micheal W. Bishop*
Micheal W. Bishop (Texas Bar No. 02354860)
Amber M. Carson (Texas Bar No. 24075610)
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:(214) 954-4135
Facsimile: (214) 953-1332
Email: mbishop@grayreed.com
Email: acarson@grayreed.com
*Local Counsel for AZPB Limited Partnership
dba Arizona Diamondbacks*

-and-

17

**GALLAGHER & KENNEDY, P.A.**

By: */s/ Kortney K. Otten*
Dale C. Schian (admitted *pro hac vice*)
Kortney K. Otten (admitted *pro hac vice*)
2575 E. Camelback Road, Suite 1100
Phoenix, AZ 85016
Telephone: (602) 530-8000
Facsimile: (602)530-8500
Email: dale.schian@gknet.com
Email: kortney.otten@gknet.com
*Attorneys for AZPB Limited Partnership*
*dba Arizona Diamondbacks*

**<u>Certificate of Service</u>**

I certify that on <u>April 6, 2023</u>, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas and via the means indicated to the persons listed in Exhibit B.

*/s/ Micheal W. Bishop*
Micheal W. Bishop

19