IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | Case No. 23-90116 (CML) |
| Debtors. | (Jointly Administered) |

**LIMITED OBJECTION OF MAJOR LEAGUE BASEBALL AND CERTAIN MAJOR LEAGUE BASEBALL CLUBS TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**
**(Related to Docket No. 25)**

AZPB Limited Partnership, Atlanta National League Baseball Club, LLC,

Cleveland Guardians Baseball Company, LLC, Detroit Tigers, Inc., Milwaukee Brewers

Baseball Club, Limited Partnership, Minnesota Twins, LLC, Rays Baseball Club, LLC and

Rangers Baseball LLC (each, with certain of its affiliates, a "Club" and collectively, the "Clubs")

and the Office of the Commissioner of Baseball d/b/a Major League Baseball ("MLB"), by and

through their undersigned counsel, hereby file this limited objection (the "Objection") to the

*Debtors Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors'*

*Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay,*

*(IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 25] (the "Motion"),[2]

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Motion.

4887-4131-6187 v.5

including to the Debtors' attempted waiver of (i) their right to surcharge the prepetition lenders'

collateral under section 506(c) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the

"Bankruptcy Code") and (ii)  the "equities of the case" exception under section 552(b) of the

Bankruptcy Code.  In support of the Objection, MLB and the Clubs respectfully state as follows:

## Background

1.     Since the commencement of these chapter 11 cases on March 14 and 15,

2023 (the "Petition Date"), the Debtors have continued to operate the Bally Sports Regional

Sports Networks (the "RSNs"), but have not been operating in the ordinary course of business.

Rather than paying all of their contractual obligations to the Clubs for the sports programming

that is the very basis of the Debtors' business, they are choosing to prefer certain creditors over

others.  MLB and the Clubs object to the Debtors' request to use existing Cash Collateral if the

Budget does not include payment obligations to the Clubs.[3]  In addition, MLB and the Clubs

request that, for so long as the Telecast Rights Agreements (as defined below) have not been

assumed or rejected, the Debtors deliver to MLB and the Clubs all reporting materials to be

delivered to the Prepetition Secured Parties (including Variance Reports, information on Actual

Cash Receipts, Information Forecasts, Proposed Budgets) (the "Reporting Materials").

2.     Each Club is party to a telecast rights agreements (collectively, and

together with related ancillary agreements, the "Telecast Rights Agreements") with a Debtor that

serves as its respective RSN (each, a "Debtor RSN" and collectively, the "Debtor RSNs")

pursuant to which each Club granted, among other things, the exclusive rights to the Debtor RSN

to broadcast the Club's games and associated pre- and post-game programming within a certain

---

[3]     At the Interim Hearing, counsel for the Debtors noted that the Budget included ordinary course payments for all
of their sports team partners, *other than the Clubs*. *See* Mar. 16 Hr'g Tr. 31:19-13:23.

geographic territory for a set number of MLB seasons (the "Telecast Rights") in exchange for the payment of rights fees (the "Telecast Rights Fees").

3.      While the Debtor RSNs have continued to utilize all of their contractual Telecast Rights from the Clubs, the Debtors are not paying all of the contractual Telecast Rights Fees.  *See Emergency Joint Motion of Major League Baseball and Certain Major League Baseball Clubs to Compel Performance under Telecast Rights Agreements, or, in the Alternative, to Compel Assumption or Rejection of Telecast Rights Agreements and for Relief from the Automatic* Stay [D.I. 279] (the "Motion to Compel").  The continued use and monetization of the Clubs' Telecast Rights is central to the Debtors' business and their going-concern value.  Critical to the Debtors' continued viability is the fact that if they fail to broadcast the Clubs' games, they may be in breach of, or be subject to significant economic consequences under, their key revenue-generating agreements with multichannel video programming distributors ("MVPDs").  Notwithstanding how crucial the Telecast Rights are to the Debtors' business, the Debtors have chosen to not pay some of the postpetition Telecast Rights Fees.  In fact, the Debtors have already missed several installments of postpetition Telecast Rights Fees owed to two separate Clubs, which is why MLB and certain of the Clubs filed the Motion to Compel on April 5, 2023.

4.      The Telecast Rights Fees represent an administrative expense of the Debtors' estate and must be paid as and when due; the failure to pay these administrative expenses on an immediate and timely basis means the Clubs are at risk if the Debtors are administratively insolvent.  The Debtors have stated that they have sufficient cash to pay the Clubs the Telecast Rights Fees for the duration of these chapter 11 cases, and yet they have elected to default on some of their payment obligations.  The fact remains that unsecured administrative claims are presently junior to nearly $7.1 billion of prepetition funded secured

debt.  *See Declaration of David DeVoe in Support of Chapter 11 Petitions and First Day Relief* ¶

47, [D.I. 26].  In addition, the Debtors project that they will spend approximately $20 million on

restructuring professionals in the first 13 weeks of these chapter 11 cases alone.  *See* Exhibit 1 to

the Interim Order.  What's more, despite the professional expenses having an equal priority as

the Telecast Rights Fees, the Debtors' own professionals are unwilling to be content with

administrative claim priority; they expressly negotiated lien subordination to protect their fees

from potential administrative insolvency and give them functional priority over the Clubs whose

Telecast Rights Fees are unpaid.  *See* Interim Order ¶6 ("Each of the Prepetition Liens, Adequate

Protection Liens, and Adequate Protection Superpriority Claims shall be subject and subordinate

to payment of the Carve Out").

5.      Against this backdrop, MLB and the Clubs object to the relief requested in

the Motion, which inappropriately favors certain unsecured administrative creditors (*e.g.*, the

restructuring professionals) over the similarly situated and mission critical Clubs.  The Clubs

also request that all Reporting Materials be delivered to MLB and the Clubs for so long as the

Telecast Rights Agreements have not been assumed or rejected.

6.      Further, it is the understanding of MLB and the Clubs that the Debtors'

requested relief does not preclude later arguments that post-petition revenues earned by the

Debtors are not captured by the prepetition liens of the Prepetition Secured Parties.  MLB and

the Clubs believe that such post-petition revenues are generated as the result of the Debtors' own

post-petition efforts and with the use of estate resources and are therefore excluded from

prepetition liens by virtue of section 552(a) of the Bankruptcy Code.  Nonetheless and for the

avoidance of doubt, MLB and the Clubs request inclusion of language in the final order

clarifying that all parties' rights in connection with the extent of liens pursuant to section 552 of the Bankruptcy Code are reserved.

7.    Finally, by permitting the Debtors to waive their right to surcharge the interests of the Prepetition Secured Parties in the Cash Collateral, the risk of administrative insolvency is improperly shifted to the Clubs and other non-restructuring professional administrative contractual counterparties.  The section 506(c) and section 552(b) waivers are nothing more than a transfer of value from administrative claimants to the Prepetition Secured Parties.  The section 506(c) waiver would permit the Debtors to continue to collect revenue from their MVPDs while refusing to pay the Telecast Rights Fees to the Clubs, and would permit the Prepetition Secured Parties to continue by way of adequate protection payments to extract value from new cash that is generated from the Clubs' Telecast Rights.  Revenue generated by the Debtor RSNs after the Petition Date may not constitute Cash Collateral and may not be subject to the liens of the Prepetition Secured Parties, and the section 552(b) waiver would eliminate MLB and the Clubs' rights with respect to these issues.  The Debtors' requested section 506(c) and section 552(b) waivers should be denied until such time as MLB and the Clubs are assured that all postpetition Telecast Rights Fees will be paid in full as and when they become due.

**Objection**

I.    **The Debtors' Right to Surcharge Under Section 506(c) Should Not Be Waived.**

8.    Section 506(c) of the Bankruptcy Code allows a debtor to charge the costs of preserving or disposing of a secured lender's collateral to the collateral itself.  11 U.S.C. § 506(c).  This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured recoveries.  *See In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of

preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

9.    The Debtors are using the Telecast Rights for the direct benefit of the Prepetition Secured Parties—they are broadcasting the Clubs' games and receiving payments from the MVPDs, advertisers and other third parties in connection with such broadcasts.  The Debtors are an organization that broadcasts *sports* programming via a group of regional *sports* networks.  Without the sports, there is no sports programming to broadcast.  The Debtors simply must pay for the single input that creates revenue for their business.  Accordingly, the Telecast Rights Fees are the necessary (and reasonable) cost for the preservation of the Cash Collateral, as well as the entirety of the Debtors' estates.  Without the ability to utilize the Telecast Rights, the Debtors and the Prepetition Secured Parties would generate little to no revenue, and the Debtors would cease to be a going concern.  As such, the Prepetition Secured Parties should be required to fund the expenses associated with the use of the Telecast Rights, rather than escape responsibility for Telecast Rights Fees through inappropriate waivers of sections 506(c).

10.    The section 506(c) waiver materially increases the risk that the costs of these chapter 11 cases are borne by unsecured and administrative claimants rather than the Prepetition Secured Parties.  The proposed Final Order waives critical rights, contravening the essential purposes of section 506(c) of the Bankruptcy Code.  *See Southwest Sec., FSB* v. *Segner* (*In re Domistyle, Inc.*), 811 F.3d 691, 696-97 (5th Cir. 2015) (providing that "the purpose of . . . 506(c) . . . is to prevent a windfall to the secured creditor at the expense of the estate" and that "[5th Circuit] case law administering Section 506(c) has emphasized the unfairness of requiring 'the general estate and unsecured creditors . . . to bear the cost of protecting what is not theirs,' an inequity that can be avoided by surcharge") (internal citation omitted);  *Kivitz v. CIT*

*Group/Sales Finance, Inc.*, 272 B.R. 332, 334 (D. Md. 2000) ("The reason for the rule is that unsecured creditors should not be required to bear the cost of protecting property that is not theirs and to require the secured party to bear the cost of preserving or disposing of its own collateral."); *IRS* v. *Boatmen's First Nat'l Bank,* 5 F.3d 1157, 1159 (8th Cir. 1993) ("when a secured creditor agrees to the continued operation of a business for the purpose of increasing the ultimate gain in the event of a reorganization or liquidation, the necessary administrative expenses. . . incurred during the continued operation directly benefitted the creditor and were thus recoverable under Section 506(c)").

11.     Where a prepetition secured lender seeks a section 506(c) waiver in the context of a cash collateral order, the prepetition secured lender is realizing the substantial benefit of disposing of its prepetition collateral through the bankruptcy process but refuses to move forward without circumventing section 506(c)—the congressional mandate that a secured lender's collateral may, in certain instances, serve as a backstop for costs of the collateral realization process. *See* 124 Cong. Rec. 32,398 (1978) (stating that when a debtor in possession "expends money to provide for the reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral, the. . . debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party"). Thus, a section 506(c) waiver in a cash collateral order contravenes the plain language and purpose of section 506(c) and unfairly places the risk of administrative insolvency on postpetition trade creditors and other administrative claimants (except the professionals, who obtained a carve out to protect themselves from this very risk). Some courts have further held that 506(c) waivers in cash collateral orders are unenforceable. *See In re Brown Bros., Inc.*, 136 B.R. 470, 474 (Bankr. W.D. Mich. 1991) ("Such a provision is not enforceable in light of the

congressional mandate that a trustee have the authority to use a portion of secured collateral for its preservation or proper disposal").

12.     In any event, the Prepetition Secured Parties are not providing enough of a benefit to the estate to warrant such a waiver.  The Prepetition Secured Parties are only consenting to the Debtors' continued use of Cash Collateral to operate the business, and thus protect their own interest in the Debtors' collateral.  Without more, the section 506(c) waiver is inappropriate.  *See, e.g. In re Tailored Brands, Inc.*, Case No. 20-33900 (MI) [D.I. 512] (Bankr. S.D. Tex., Sept. 2, 2020) (noting benefits and concessions to the debtors' estate made by the DIP lenders and prepetition secured parties, including postpetition financing, lien subordination to Carve Out, and payment of prepetition claims and expenses, as reason for granting 506(c) waiver); *see also Procedures for Complex Cases in the Southern District of Texas* ¶ 8 (noting that if a financing motion seeks to include any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law, there must be an accompanying reason why such provision should be approved).

13.     Recognizing the importance of these principles, the Debtors claim that "existing cash, together with cash generated from operations, will be sufficient to operate their business, continue paying their ordinary course debts as they come due, and enable the Debtors to pursue a value-maximizing restructuring transaction for the benefit of their stakeholders" (Motion, ¶ 20), and "[e]ntry of the Interim Order will permit the Debtors to immediately access liquidity that is critical to preserve their business as a going concern and set the stage for a successful reorganization." (Motion, ¶ 9).  At present, however, there is no evidentiary support for these assertions, and it is not clear if the Debtors can provide such support.  To date, the Debtors have already chosen to not pay multiple installments of Telecast Rights Fees to the

Clubs.  In 2023, the Debtors owe the Clubs millions upon millions of dollars in respect of

Telecast Rights Fees and other expenses .  Absent evidentiary support to demonstrate that the

Debtors can and will pay all of the postpetition Telecast Rights Fees as and when they become

due, the Debtors' request for the section 506(c) waiver should be denied.

II.      **The Order Should Clarify that Rights are Reserved with Respect to Whether or Not Post-Petition Revenues Are Captured by Prepetition Liens, and the "Equities of the Case" Exception Under Section 552 Should Not Be Waived with Respect to the Prepetition Secured Parties.**

14.     MLB and the Clubs understand that the Debtors' requested relief would

not preclude later arguments that post-petition revenues earned by the Debtors are excluded from

the prepetition liens of the Prepetition Secured Parties by section 552(a) of the Bankruptcy Code.

Nonetheless and for the avoidance of doubt, MLB and the Clubs request inclusion of language in

the final order clarifying that all parties' rights in connection with the extent of prepetition liens

pursuant to section 552 of the Bankruptcy Code are reserved.

15.     MLB and the Clubs further submit that the "equities of the case" waiver

proposed by the Debtors is unwarranted at this time. The purpose of the equities of the case

exception is to "prevent secured creditors from receiving windfalls and to allow bankruptcy

courts broad discretion in balancing the interests of secured creditors against the general policy

of the Bankruptcy Code." *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 409 (Bankr. N.D. Tex.

2003) (quoting *In re Patio & Porch Sys., Inc.*, 194 B.R. 569, 575 (Bankr. D. Md. 1996)); *see also*

*Delbridge* v. *Prod. Credit Ass'n & Fed. Land Bank*, 104 B.R. 824, 826 (E.D. Mich. 1989)) ("The

purpose of the equity exception is to prevent a secured creditor from reaping benefits from

collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of

other assets of the estate . . . to cause the appreciated value." (citing S. Rep. No. 989, 95th Cong.,

2d Sess. 91, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5877)).

16.     Here, if these chapter 11 cases later convert to chapter 7, the Prepetition Secured Parties will be positioned to receive the very windfall that Congress intended the "equities of the case" exception to alleviate.  Under such circumstances, the Prepetition Secured Parties would be able to argue that cash generated from the exclusive intellectual property (*i.e.*, the broadcast rights) granted by the Clubs to the Debtors postpetition and used by the Debtors postpetition is subject to the liens of the Prepetition Secured Parties.  Instead, the "equities of the case" exception exists to allow the Court to order that such cash generated using the Clubs' postpetition rights is not subject to the liens of the Prepetition Secured Parties.  Therefore, a waiver of the equities of the case exception in these cases is inappropriate and should not be granted.

## Reservation of Rights

17.     MLB and the Clubs reserve all rights (i) to amend and/or supplement this Objection, raise any additional objections at the hearing on the Motion, and cross-examine the Debtors' witnesses regarding the relief in the Motion,[4] (ii) regarding the allowance of their administrative expense claims that arise during the pendency of these chapter 11 cases, (iii) regarding the Debtors' decision to assume or reject the Telecast Rights Agreements and (iv) to challenge whether revenue generated by the Debtor RSNs constitutes Cash Collateral or is otherwise subject to liens of the Prepetition Secured Parties pursuant to section 552(b) of the Bankruptcy Code.

## Conclusion

---

[4]     MLB and the Clubs also reserve all rights with respect to the Monthly JV Settlement, the Combined Payments, and any use of cash held by non-Debtors entities as Cash Collateral.

WHEREFORE, for the reasons stated herein, MLB and the Clubs respectfully request that the Court:  (i) require the Budget approved in connection with the Final Order to include a sufficient reserve for the payment of the Telecast Rights Fees, (ii) deny the waiver of sections 506(c) of the Bankruptcy Code, (iii) deny the "equities of the case" waiver under section 552(B) of the Bankruptcy Code, (iv) require the Debtors to provide MLB and the Clubs the Reporting Materials consistent with the Prepetition Secured Parties for so long as the Telecast Rights Agreements have not been assumed or rejected and (v) grant such other and further relief as the Court deems just and proper.

Dated: April 10, 2023
    Houston, Texas

**BRACEWELL LLP**

_/s/ William A. (Trey) Wood III_
William A. (Trey) Wood (Texas Bar No. 21916050)
711 Louisiana St., Suite 2300
Houston, Texas 77002
Telephone: (713) 221-1166
Facsimile: (713) 221-1212
E-mail: trey.wood@bracewell.com

Mark Dendinger (admitted _pro hac vice_)
CityPlace I, 34th Floor, 185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 256-8541
Facsimile: (800) 404-3970
E-mail:  mark.dendinger@bracewell.com

-and-

**SULLIVAN & CROMWELL LLP**
James L. Bromley (admitted _pro hac vice_)
Alexa J. Kranzley (admitted _pro hac vice_)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: bromleyj@sullcrom.com
       kranzleya@sullcrom.com

Counsel for:
Office of the Commissioner of Baseball
AZPB Limited Partnership
Atlanta National League Baseball Club, LLC
Cleveland Guardians Baseball Company, LLC
Detroit Tigers, Inc.
Milwaukee Brewers Baseball Club, Limited Partnership
Minnesota Twins, LLC
Rays Baseball Club, LLC
Rangers Baseball LLC

**<u>Certificate of Service</u>**

I certify that on April 10, 2023, I caused a copy of the foregoing document to be

served by the Electronic Case Filing System for the United States Bankruptcy Court for the

Southern District of Texas.

*/s/ William A. (Trey) Wood III*
William A. (Trey) Wood III