**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | § | Case No. 23-90116 (CML) |
| Debtors. | § | (Jointly Administered) |

**REPLY OF CLEVELAND GUARDIANS BASEBALL COMPANY, LLC IN SUPPORT OF EMERGENCY JOINT MOTION OF MAJOR LEAGUE BASEBALL AND CERTAIN MAJOR LEAGUE BASEBALL CLUBS TO COMPEL PERFORMANCE UNDER TELECAST RIGHTS AGREEMENTS, OR, IN THE ALTERNATIVE, TO COMPEL ASSUMPTION OR REJECTION OF TELECAST RIGHTS AGREEMENTS AND FOR RELIEF FROM THE AUTOMATIC STAY**

Cleveland Guardians Baseball Company, LLC (the "Guardians") submits this reply (this "Reply") in support of the *Emergency Joint Motion of Major League Baseball and Certain Major League Baseball Clubs to Compel Performance Under Telecast Rights Agreements, or, in the Alternative, to Compel Assumption or Rejection of Telecast Rights Agreements and for Relief From the Automatic Stay* (Docket No. 279) (the "Motion").[2] In support of this Reply, the Guardians respectfully state as follows:

1. The Debtors' Objection[3] to the Motion is yet another attempt by the Debtors to air grievances against MLB and distract attention from the straightforward issue before the Court:

---

1 A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

2 Capitalized terms used but not defined herein have the meanings given to them in the Motion.

3 As used herein, "Objection" means the *Debtors' Omnibus Objection to (I) Emergency Joint Motion of Major League Baseball and Certain Major League Baseball Clubs to Compel Performance Under Telecast*

whether the Debtors must pay the contract rate for the rights they are using every day during these cases to broadcast Guardians games and those of the other movant Clubs. That issue—the only one now before the Court—is straightforward because so little is in dispute. The Debtors do not dispute ***any*** of the following:

- that the Guardians' Telecast Rights Agreement (the "Telecast Rights Agreement")[4] is valid and enforceable;
- that Debtor Diamond Ohio Holdings II, LLC ("Diamond Ohio") is using the Guardians' intellectual property obtained via the Telecast Rights Agreement to broadcast Guardians games;
- that Diamond Ohio generates substantially all of its operating revenue from its exploitation of such intellectual property;
- that the Debtors are not administratively insolvent and, indeed, have been paying Telecast Rights Fees as and when due to other similarly situated Clubs; or
- that the claims payable as a result of the Debtors' postpetition use of intellectual property under the Telecast Rights Agreement are administrative expense claims.

2. The status of the telecast rights governed by the Telecast Rights Agreement is not in dispute, either.

- 

*Rights Agreements, or, in the Alternative, to Compel Assumption or Rejection of Telecast Rights Agreements and for Relief From the Automatic Stay; (II) Emergency Motion of AZPB Limited Partnership to Compel Debtors to Perform Under the Telecast Rights Agreement, or, in the Alternative, to Compel Assumption or Rejection of the Telecast Rights Agreement and Relief From the Automatic Stay; and (III) Rangers Baseball Express LLC's Joinder to Major League Baseball and Certain Major League Baseball Clubs' Limited Objection to the Debtors' Emergency Motion to Use Cash Collateral and Motion to Compel Performance* (Docket No. 409).

[4] A copy of the Telecast Rights Agreement is attached as Exhibit A to the *Second Declaration of Richard Dorffer in Support of Emergency Joint Motion of Major League Baseball and Certain Major League Baseball Clubs to Compel Performance Under Telecast Rights Agreements, or, in the Alternative, to Compel Assumption or Rejection of Telecast Rights Agreements and for Relief from the Automatic Stay*, filed contemporaneously herewith.



[redacted]

[redacted]

[redacted]

[redacted]

3. The Debtors commenced these cases with an aggressive strategy in search of a legal justification. The Debtors devised, and their lenders invested in, a business plan that, according to the Debtors, depends on the Debtors obtaining assets they do not own—a license to stream Guardians games (and games of the other movant Clubs) using the Debtors' direct-to-consumer application.[6] After repeatedly failing to successfully negotiate with MLB a commercial agreement to access the DTC Rights they want and purport to need, the Debtors pivoted to Plan B. They filed for bankruptcy intending to withhold payment of Telecast Rights Fees and Ancillary Fees due certain Clubs, including the Guardians, while continuing to reap the benefits of the Telecast Rights Agreements.

4. The Debtors' strategy in these cases amounts to an effort to extort what the Debtors were unable to freely negotiate: MLB's consent to allow the Debtors to license DTC Rights from the Guardians and the other movant Clubs. Diamond Ohio's conduct is particularly egregious here. Diamond Ohio is a single-club RSN; its only live broadcasts are of Guardians

---

[5] Excerpts of the DeVoe deposition transcript cited herein are attached hereto as Exhibit A.

[6] [redacted]

games.  So why are the Guardians suffering from gamesmanship by the Debtors?

5. That contingency is what Diamond Ohio bargained for. From the outset, Diamond Ohio knew that it might never obtain those rights and, thus, that contingency has been "priced into" and accounted for in the payment structure that the parties negotiated in 2012. Nothing has changed since that time, and the value to Diamond Ohio of receiving the Guardians' unique intellectual property remains the same.

6. Nevertheless, from the outset of these cases, the Debtors' strategy was to pay the Guardians and the other movant Clubs as little as possible for as long as possible to exert maximum pressure on MLB—not the Guardians—to consent to a license of the DTC Rights the Debtors have made the focal point of this dispute. The motivation is transparent when the Court considers the Debtors' course of conduct in this case. Since filing for bankruptcy, the Debtors apparently have paid ***all*** of their administrative claims in full—including the telecast rights fees for every NHL and NBA team and most MLB teams—except for the payables owed to the

[7]

movant Clubs, to whom the Debtors initially paid ***nothing***. It was only after MLB and the movant Clubs obtained an order from this Court requiring the Debtors to make interim payments to the Clubs and escrow the remainder of the outstanding payables that the movant Clubs received anything in exchange for their valuable rights. And it is only now, after the Debtors were finally forced to acknowledge their obligation[8] under section 503(b) of the Bankruptcy Code, applicable case law[9] and this Court's Bankruptcy Local Rules[10] to pay administrative claims as they come due, that the Debtors sought to provide a justification for their unsupportable post-petition conduct: that paying the contract rate for the intellectual property they are using would somehow result in a "windfall" for the Guardians and the other movant Clubs. Objection ¶ 7.

7. In fact, precisely the opposite is true. *Diamond Ohio has full use of **all** of the rights it bargained for in the Telecast Rights Agreement*—which are exactly the same rights Diamond Ohio has had under the agreement since it was negotiated in 2012. There is no dispute that Diamond Ohio is *actually using* those rights to generate substantially all of its operating income—[redacted][11]—during these cases.

8. Given Diamond Ohio's continuous and ongoing use of these rights during the administrative period, paying the Guardians anything less than the negotiated contract rate would

8 See Objection ¶ 54 n.52.

9 See, e.g., NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531 (1984) ("If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services[.]") (citation omitted).

10 See BLR 4002-1(h) ("The debtor must pay on a current basis all obligations incurred by it in operating its business.").

11 [redacted]

effectively force the Guardians to act as an involuntary lender to the estates until the Telecast Rights Agreement is assumed or rejected. Preventing this kind of inequitable outcome is the reason why section 503(b) of the Bankruptcy Code provides for the payment of the "actual, necessary costs and expenses of preserving the estate;" why chapter 11 debtors pay operating administrative claims as and when due as a matter of course, particularly where—as here—the product being supplied is unique; and why the Bankruptcy Local Rules of this Court require debtors to pay administrative claims "on a current basis." If there is any risk of a "windfall" in this matter, it is already being realized by Diamond Ohio, who has failed to pay the contract rate for the [REDACTED] use of the Guardians' intellectual property prior to assumption or rejection of the Telecast Rights Agreement.

9. Diamond Ohio cannot overcome the presumption that it is required to pay the contract rate under the Telecast Rights Agreement for property it is using during the period prior to assumption or rejection, for three reasons:

- *First*, the Debtors' contention that Diamond Ohio is not receiving the full benefit of the Telecast Rights Agreement[12] is wrong, because Diamond Ohio today has all of the rights it bargained for under such agreement, [REDACTED]

- *Second*, the Debtors' argument and evidence regarding cord-cutting and a declining subscriber base for linear cable television[13] is irrelevant to the Court's determination of whether the contract rate is reasonable, because, as above, Diamond Ohio has full use of the rights it bargained for in the Telecast Rights Agreement and is actually and continuously using those rights every day during the period prior to assumption or rejection. Even if the Court lends credence to the Debtors' assertions regarding generalized business difficulties, the Debtors' argument still fails as to the Guardians, because [REDACTED]

---

12 Objection ¶¶ 6, 22.

13 Objection ¶¶ 12, 74-75.

[redacted]

- *Third*, the assertions in the Objection [redacted] fall far short of the compelling evidence required to overcome the presumption that the contract rate applies, because [redacted]

***The Debtors Have Full Use of All of the Rights They Bargained For in the Telecast Rights Agreement.***

10. After announcing at the first day hearing that the estates were flush with cash and had an agreement with their secured lenders for the consensual use of cash collateral,[18] the Debtors likely expected that they would have difficulty justifying the nonpayment or underpayment of certain Clubs' administrative expenses while paying those of other similarly situated Clubs in full. In the Objection, the Debtors attempt to solve this problem by asserting that they already own the Guardians' (and other movant Clubs') DTC Rights, and that MLB is

14 DeVoe Dep. Tr. 113:19-114:16.

15 As used herein, "Debtors' Expert Report" refers to the *Declaration of Leo J. Hindery, Jr. in Support of Debtors' Objection to (I) Emergency Joint Motion of Major League Baseball and Certain Major League Baseball Clubs to Compel Performance Under Telecast Rights Agreements, or, in the Alternative, to Compel Assumption or Rejection of Telecast Rights Agreements and for Relief From the Automatic Stay; (II) Emergency Motion of AZPB Limited Partnership to Compel Debtors to Perform Under the Telecast Rights Agreement, or, in the Alternative, to Compel Assumption or Rejection of the Telecast Rights Agreement and Relief From the Automatic Stay; and (III) Rangers Baseball Express LLC's Joinder to Major League Baseball and Certain Major League Baseball Clubs' Limited Objection to the Debtors' Emergency Motion to Use Cash Collateral and Motion to Compel Performance*. Excerpts of Debtors' Expert Report cited herein are attached hereto as Exhibit B.

16 [redacted]

17 Debtors' Expert Report ¶ 64, Ex. 16.

18 3/16/23 Hr'g Tr. 30:15-18 (Mr. Hermann: "[T]his company has a lot of cash. We don't need a DIP. We don't have a DIP. We are blessed with a lot of cash, and that cash is collateral of the first lien lenders."); Id. at 36:4-11 (Mr. Hermann: "But as I said, we have a lot of cash. We have about $426 million of cash. You don't see that many debtors with that much cash, so that's a good thing. We don't need DIP financing. We can live on existing cash, and we will continue to generate cash throughout the case. And as I mentioned, we have the consensual use of our cash collateral, so I think we're in pretty good shape in terms of liquidity for the foreseeable future.").

wrongfully preventing the Debtors from using those rights, which, the Debtors claim, has left them without use of all of the rights they bargained for. Objection ¶¶ 3, 64-69.

11. The Debtors' assertion that they presently own the Guardian's DTC Rights is wrong and it is belied by the plain language in the Telecast Rights Agreement. Specifically, with respect to DTC Rights, Diamond Ohio holds today exactly what was bargained for in the Telecast Rights Agreement at the outset—and exactly the same thing the Debtors have held since they acquired the Guardians' RSN:

12.



[redacted]

13. The highlighted language makes plain that, at the time the Telecast Rights Agreement was executed in December 2012, the parties understood that: [redacted] as further outlined in the reply brief filed by MLB and certain movant Clubs.[20]

14. [redacted] Thus, with respect to DTC Rights, Diamond Ohio today holds *exactly what the parties bargained for in 2012* and what the Debtors bargained for when they acquired Diamond Ohio: [redacted]

---

19 The Cleveland Guardians were known as the Cleveland Indians at the time the Telecast Rights Agreement was executed. In the Telecast Rights Agreement, "Network" refers to Debtor Diamond Ohio (f/k/a RSN Holdco III, LLC).

20 See *Joint Reply of Major League Baseball and Minnesota Twins, LLC to Objections to Motions to Compel and Related Joinders*, filed contemporaneously herewith.

21 See DeVoe Dep. Tr. 113:15-23.



15.

16.

The Debtors currently have, and are using during these cases, ***exactly*** the rights they bargained for in the Telecast Rights Agreement, and nothing less. For these reasons, the Debtors cannot overcome the presumption that they are obligated to pay the Guardians' administrative claims at the contract rate by arguing that they are receiving less than the full suite of rights they bargained for in the Telecast Rights Agreement—because they are not.

17. The B-K of Kansas case on which the Debtors heavily rely is easily distinguishable, because that case involved (a) a contract that terminated prepetition and (b) a contract counterparty that denied valuable consideration to the debtor that the debtor would have been entitled to had the contract not terminated. In re B-K of Kan., Inc., 99 B.R. 446, 448 (D. Kan. 1989). Unlike Diamond Ohio, which has and is currently using ***all*** of the various rights it bargained for in the Telecast Rights Agreement, the debtor in B-K of Kansas had use of only

[22] Excerpts of the Movants' Expert Report cited herein are attached hereto as Exhibit D.

some of the rights it bargained for, because the counterparty refused to provide certain products to the debtor after the parties' agreement terminated. Id. These are not the facts here. Unlike Burger King, the Guardians continue to fully perform under the Telecast Rights Agreement, which remains in full force and effect.

18. To the extent that the legal standard set forth in B-K of Kansas applies to the present dispute, it suggests that to overcome the presumption that the contract rate applies, the Debtors need to show that the Guardians withheld something of value owed to Diamond Ohio under the Telecast Rights Agreement—like the products Burger King refused to provide in B-K of Kansas.

19. This is something the Debtors cannot show for the simple reason that Diamond Ohio currently possesses, and is using, all of the rights to which it is entitled, and all the rights it has ever had, under the Telecast Rights Agreement, as evidenced by the near-daily broadcasts of Guardians games by the Debtors. Nothing between the Guardians and Diamond Ohio has changed, except for the Debtors' strategy.

***The Debtors' Business Difficulties Are Not Relevant to the Reasonableness of the Contract Rate and Cannot Overcome the Presumption That the Contract Rate Applies.***

20. The Debtors' secondary argument—that the agreed-upon contract rate for Telecast Rights Fees and Ancillary Fees in the Telecast Rights Agreement is unreasonable because linear broadcasting is not as profitable for the Debtors as it once was[23]—also fails. Objection ¶ 74. As described above, Diamond Ohio has full use of all of the rights for which it bargained in the Telecast Rights Agreement. Diamond cannot even argue that [redacted]

[23] See Objection ¶¶ 12-14, 70-74.

[REDACTED] This is insufficient to overcome the presumption that the contract price is reasonable.

21. The Debtors do not dispute that the contract rate "will carry a presumption of reasonableness unless the objector introduces convincing evidence to the contrary." In re Acis Capital Mgmt., L.P., No. 18-30264-SGJ-11, 2019 Bankr. LEXIS 1833, at *15 (Bankr. N.D. Tex. May 2, 2019). The Objection relies on generalities regarding the alleged decline of linear cable subscribers[25] and cites various press articles regarding MLB's reported interest in direct-to-consumer streaming. Even if these arguments were relevant to the Court's determination of whether the contract rate should apply (which they are not), these arguments fall far short of overcoming the presumption that the price terms of the Telecast Rights Agreement—negotiated by the parties at arm's length—are reasonable.

22. The test for determining whether the presumptive contract rate is reasonable is not whether debtor profited by some defined percentage from the use of contracted rights during the administrative period, but whether the debtor had "full use" of all of the benefits bargained for in the contract. See, e.g., In re Shreyas Hospitality, LLC, No. 09-70523, 2010 WL 2836751, at *5 (Bankr. C.D. Ill. July 15, 2010) (allowed administrative expense claim "in the amount of the Debtor's contractual obligation to [claimant] for the time period in question"). "'Benefit' in the context of an administrative expense claim is akin to 'use' not 'profit.'" Id. (citing In re Patient Education Media, Inc., 221 B.R. 97, 103 (Bankr. S.D.N.Y. 1998)). Thus, where a debtor "made a voluntary, arms-length agreement with [claimant] which set the value and price to be paid for the benefits to be received," and the "Debtor had full use of all such benefits during the

24 See Debtors' Expert Report ¶ 65.

25 See Objection ¶ 12.

Chapter 11," the debtor "received the full benefit of its bargain and [claimant] should be compensated accordingly." Id. (internal citation omitted). A claimant "need not prove that the Debtor actually profited from the use of the [agreement]." Id.

23. The Beverage Canners case illustrates why the Debtors' arguments fail. Beverage Canners stands for the proposition that, where a debtor has "full use" of intellectual property under a contract and makes "continuous and ongoing" use of that property during the administrative period, the estate receives an "actual, necessary" benefit as contemplated in section 503(b)(1)(A) of the Bankruptcy Code, which the debtor must pay at the contract rate as an administrative expense. See In re Beverage Canners Int'l Corp., 255 B.R. 89, 93 (Bankr. S.D. Fla. 2000). In this analysis, the debtor's actual profit is irrelevant, as is evidence of the debtor's business challenges. What matters, according to Beverage Canners, is whether the debtor has full use of the intellectual property rights it bargained for, and whether it is actually and continually using such rights, during the period prior to assumption or rejection. See id. at 93-94.[26]

24. The Debtors attempt to distinguish Beverage Canners by pointing out that the debtors in that case provided no evidence to rebut the presumption that the contract rate applied. Objection ¶¶ 76-77. While this is true, the Debtors intentionally omit language in the opinion that undercuts their argument. Specifically, the opinion states that "[t]he Debtors propounded no

---

[26] The Beverage Canners court ruled that "[n]o … proration is appropriate or necessary in the instant case, as the Debtors made continuous and ongoing use of the Trademarks from the commencement of the case until the Rejection Date. The Debtors' argument that there was no resulting benefit defines 'benefit' too narrowly, as it excludes the Debtors' bargained for opportunity for increased sales arising from the use, not any specific sales necessarily arising therefrom." Id. at 94. In other words, that a debtor failed to profit from the use of intellectual property has no bearing on the amount it must pay for that use. "It logically follows," the court explained, "that if a debtor makes full use of the services provided under a contract, the benefit to the debtor is the entire bargained for value pursuant to such agreement." Id. at 93. In Beverage Canners, "[t]he simple fact [was] that the Debtors accepted full performance from Nature upon the utilization of the Trademarks." Id. at 95. "As such," the court held, "they must compensate Nature for this use by paying the full amount of the agreed upon minimum royalty." Id.

evidence to rebut the presumption that the value received was the minimum royalty provided in the Agreement ***and it is unlikely that any such evidence could have been offered***." Beverage Canners, 255 B.R. at 93 (emphasis added). This is because "[t]he Debtors knowingly and willingly accepted full performance under the contract by continuing to display the Trademarks after the commencement of the case ***and Nature is entitled to be paid for this use regardless of the impact on the Debtors' sales of bottled water***." Id. at 93-94 (emphasis added).[27] Section 365 of the Bankruptcy Code gives the Debtors powerful tools to assume or reject executory contracts—but, as the Beverage Canners court explained, these powers do not include the ability to reap the benefits of an executory contract prior to assumption or rejection without paying for those benefits. It concluded: "If the Debtors escape the burden of an administrative expense, they would in effect gain whatever benefit remained inherent in the use of the Trademarks … and would not have to pay for the use. This Court can not allow section 503 of the Code to be manipulated in order to achieve such a result." Id.

25. Beverage Canners is not anomalous. In the Home Interiors case, Judge Houser was presented with similar facts and expressly adopted the analytical framework and reasoning set forth in Beverage Canners. See Meredith Corp. v. Home Interiors & Gifts, Inc. (In re Home Interiors & Gifts, Inc.), Adv. Proc. No. 08-03125-BJH, 2008 WL 4772102, at **6-7 (Bankr. N.D. Tex. Oct. 9, 2008). In Home Interiors, the debtors were in the business of selling home decor products to decorating consultants for resale to end customers. Id. at *1. Prepetition, the debtor entered into an agreement with Meredith Corporation under which the debtor licensed the right to affix trademarks owned by Meredith (referred to as the "BHG

---

27 The court further explained that "[i]t is also worth noting that 'benefit' does not mean 'profit', and it is therefore unnecessary for profit to be proven in order for an administrative priority to be warranted for the postpetition use of another's property by a debtor." Beverage Canners, 255 B.R. at 94 n.3.

Marks") to the goods it sold, in exchange for periodic royalty payments. Id. at *2. After filing for bankruptcy, the debtor continued to sell products bearing the BHG Marks but did not pay Meredith for such use. Id. Meredith filed an application for payment of the unpaid amounts as administrative expenses. Id. at *3. The debtor objected, asserting, among other things, that the actual economic benefit it received from the intellectual property it licensed from Meredith was less than the amount of royalty payments it was required to make under the contract. Id. at *7 n.6.

26. Following Beverage Canners, Judge Houser rejected the debtor's arguments and granted Meredith's application for payment of administrative expenses. Home Interiors, 2008 WL 4772102, at *8. Judge Houser explained that:

> HIG's post-petition sale and distribution of products bearing the BHG Marks qualifies as an 'actual' and 'necessary' expense of preserving HIG's bankruptcy estate under section 503(b)(1)(A). From this Court's perspective, HIG chose to take advantage of its rights under the License Agreement by selling and distributing products bearing the BHG Marks post-petition, and the HIG bankruptcy estate benefitted from such post-petition use.

Id. at *7. "Under these facts," the court continued, "'[i]f the Debtor escape[s] the burden of an administrative expense, [it] would in effect gain whatever benefit remained inherent in the use of the Trademarks ... and would not have to pay for the use.'" Id. (quoting Beverage Canners, 255 B.R. at 95). Judge Houser concluded that "[t]his Court agrees with the Beverage Canners court when it held that it 'can not allow Section 503 of the Code to be manipulated in order to achieve such a result.'" Id. (quoting same).

27. The Home Interiors court also specifically rejected the debtor's argument that it should not be required to pay Meredith the contract rate for postpetition use of the trademarks because the debtor's actual use of the trademarks postpetition did not generate income equal to the royalty payments required under the contract. According to Judge Houser:

> the Court rejects HIG's argument that it did not actually receive $1,100,000 in benefits from its post-petition use of the BHG Marks and therefore, Meredith's administrative expense claim should be limited or disallowed. Regardless of the actual dollars and cents that HIG received from the post-petition promotion, sale, and distribution of products bearing the BHG Marks, HIG had the right to use the BHG Marks pursuant to the terms of the License Agreement in an unfettered manner postpetition.

Home Interiors, 2008 WL 4772102, at *7 n.6.

28. The Debtors urge the Court to ignore Beverage Canners and Home Interiors and instead focus on cases decided outside of the context of intellectual property licenses. Objection ¶¶ 69-73. None of the cases the Debtors reply upon in the Objection involved unique intellectual property rights, and those cases are inapposite for various additional reasons. For example, the agreement at issue in Continental was an aircraft lease. In re Cont'l Airlines, Inc., 146 B.R. 520, 523 (Bankr. D. Del. 1992). Unlike the license of the Guardians' unique intellectual property, a market exists for aircraft leases, and the Continental court had the benefit of having "recently approved ten 'lease-outs' (leases of aircraft from Continental) of similar aircraft from Continental to Delta at $75,000/month." Id. at 529. No such valuation is possible or appropriate here, where the Guardians' intellectual property and home broadcast territory are unique, as is each Guardians game broadcast by Diamond Ohio. This dissimilarity with Continental is underscored by [REDACTED]

29. Sharon Steel and Wheeling-Pittsburgh are similarly inapposite, because both cases involved utility contracts for the supply of fungible commodities—natural gas and electricity, respectively—that are available and replaceable in a clear public market. Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 37 (3d Cir. 1989); Wheeling-Pittsburgh Steel Corp. v. W. Penn Pwr. Co. (In re Wheeling-Pittsburgh Steel Corp.),

122 B.R. 29, 31 (Bankr. W.D. Pa. 1990). In Sharon Steel, the bankruptcy court determined that the debtor was not required to honor the contract rate for the natural gas it used during the case because the Pennsylvania Public Utility Commission (the "PUC") established natural gas rate schedules, and the applicable rate charged to similarly situated industrial users pursuant to the PUC's schedules had dropped below the rate set forth in the parties' agreement. Sharon Steel, 872 F.2d at 37-38. In Wheeling-Pittsburgh, after the debtor rejected its electricity supply agreement, the debtor and its electric utility entered into a new contract with a new agreed-upon rate. The court determined that this new rate would apply to the pre-rejection period because the parties' contemporaneous agreement evidenced that the new rate was "the appropriate measure of the reasonable value of the electric utility service provided to the Debtor during the Postpetition Period." Wheeling-Pittsburgh, 122 B.R. at 32. The facts of Sharon Steel and Wheeling-Pittsburgh are plainly dissimilar from those presented here, where the property the Debtors are using is unique, not fungible; where contract amounts are not established pursuant to state law; and where the parties have not entered into a new pricing agreement during the bankruptcy cases. Here, the Telecast Rights Agreement provides the Guardians' RSN its sole source of revenue.

30. Finally, the cases cited by the Debtors involving employment contracts feature egregious facts not present here. In ID Liquidation One, the court found that postpetition compensation of $3.85 million under the debtors' employment agreement with their CEO was unreasonable, in part because the CEO was an insider who signed his own employment agreement for both sides. In re ID Liquidation One, LLC, 503 B.R. 392, 400 (Bankr. D. Del. 2013). Both Bartley Lindsay and Cook Inlet involved employment contracts providing for obviously excessive payments that were many multiples higher than what other employees of the

debtor working in similar positions were paid. Boruff v. Cook Inlet Energy LLC (In re Cook Inlet Energy LLC), 583 B.R. 494, 497-98 (B.A.P. 9th Cir. 2018) (debtor's former executive chairman sought postpetition compensation of more than $252,000 when other directors were paid "less than $15,000"); Stahl v. Bartley Lindsay Co. (In re Bartley Lindsay Co.), 137 B.R. 305, 310 (D. Minn. 1991) (holding management consultant compensation of "over $16,000 per week" was unreasonable when debtor "was a relatively small company" and debtor's former president and CEO earned less than $4,500 per week). No such egregious facts have been alleged here, and these cases say nothing about what is reasonable in the context of a license of unique intellectual property.

***The Debtors Have Produced No Evidence, Much Less Convincing Evidence, That the Contract Rate Should Not Apply to the Guardians' Intellectual Property.***

31. Even if the Debtors' argument regarding cord-cutting and their own business difficulties were relevant here (which it is not), the argument still fails as to the Guardians, because, [redacted]

32. [redacted]



[redacted]

33. The Debtors cite no statute, case or other authority suggesting that a debtor should be able to use the property of a third party under a [redacted] contract, prior to assumption or rejection, without paying the contract rate because [redacted] The Telecast Rights Agreement does not guaranty that Diamond Ohio will achieve any particular profit margin (or that Diamond Ohio will profit under the Telecast Rights Agreement at all). Rather, the pricing terms of the Telecast Rights Agreement, which were negotiated at arm's length in the open market, reflect the assumptions and risks both parties considered when the Telecast Rights Agreement was executed in 2012.

34. [redacted]

---

[28] E.g., Debtors' Expert Report ¶ 43.

[29] DeVoe Dep. Tr. 130:16-19.

35. The Debtors' cord-cutting argument[30] also fails because it ignores the fact that the Telecast Rights Agreement includes a package of rights that provides significant value to Diamond Ohio beyond the right to broadcast Guardians games via linear cable television channels. [REDACTED] Unlike DTC Rights, Diamond Ohio's license to broadcast Guardians games via streaming MVPDs does not require any MLB consents that have not been granted. Diamond Ohio already has a license under the Telecast Rights Agreement to broadcast Guardians games on streaming MVPD platforms. It is through no fault of the Guardians that the Debtors have proved unable or unwilling to capitalize on the growth of streaming MVPDs. By losing valuable carriage agreements with several such streaming platforms,[32] the Debtors have failed to adequately monetize these rights—but the Debtors' failure to successfully negotiate agreements with MVPD streaming platforms does not diminish the value of the rights themselves.[33]

36. Diamond Ohio's right to air Guardians games does not provide the sole source of value under the Telecast Rights Agreement. The Telecast Rights Agreement also gives Diamond Ohio valuable backend rights (which the Court has recently found to be valuable assets in the

---

30 Objection ¶¶ 12, 74-75.

31 [REDACTED]

32 See *Declaration of David F. DeVoe, Jr. in Support of Chapter 11 Petitions and First Day Motions* (Docket No. 26), at ¶ 58 ("Diamond lost carriage with Hulu + Live TV, YouTube TV, DISH Network, and DISH's wholly-owned subsidiary, Sling TV, over the course of 2019 and 2020.").

33 [REDACTED]

Debtors' dispute with the Phoenix Suns), including, among other things,



The Objection and the Debtors' Expert Report ignore all of these valuable rights that Diamond Ohio currently holds under the Telecast Rights Agreement.

*******

37. In sum, both of the Debtors' arguments fail. *First*, the contention that the Debtors are not receiving the full benefit of the Telecast Rights Agreement is belied by the fact that the Debtors today have exactly the same rights they bargained for and have always had under such agreement, including contingent DTC Rights. *Second*, the evidence the Debtors say they will provide at the hearing on the Motion, regarding cord-cutting and a declining subscriber base for linear cable television, is irrelevant to the Court's determination of whether the contract rate is reasonable, because Diamond Ohio has full use of the rights it bargained for in the Telecast Rights Agreement and is actually and continuously using those rights every day during the administrative period. Moreover, even if the Court determines that evidence of the Debtors' business difficulties is relevant, the Debtors' argument still fails as to the Guardians, because

The Debtors have provided ***no*** evidence—much less "convincing" evidence—sufficient to overcome the presumption that Diamond Ohio should pay the Guardians the contract rate for the intellectual property Diamond Ohio is using every day during the administrative period to keep its business afloat.

38. For all of the foregoing reasons, the Court should overrule the Objection and grant the relief requested in the Motion.

Dated: May 19, 2023

Respectfully Submitted,

/s/ *Oliver S. Zeltner*

Heather Lennox (admitted *pro hac vice*)
Philip M. Oliss (admitted *pro hac vice*)
Oliver S. Zeltner (TX Bar No. 2410400)
Brett W. Bell (admitted *pro hac vice*)
Nick Buchta (admitted *pro hac vice*)
Alexander W. Prunka (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
hlennox@jonesday.com
poliss@jonesday.com
ozeltner@jonesday.com
bbell@jonesday.com
nbuchta@jonesday.com
aprunka@jonesday.com

*ATTORNEYS FOR CLEVELAND GUARDIANS BASEBALL COMPANY, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 19, 2023, a copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Oliver S. Zeltner*
Oliver S. Zeltner