IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) ) ) | Case No. 23-90116 (CML) |
| Debtors. | ) ) ) | (Jointly Administered) **Re: Docket No. 953** |

**LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO DEBTORS' INITIAL MOTION FOR ENTRY OF
AN ORDER EXTENDING THE EXCLUSIVE PERIODS FOR THE FILING
OF A CHAPTER 11 PLAN AND SOLICITATION OF ACCEPTANCES THEREOF**

The Official Committee of Unsecured Creditors (the "Committee") of Diamond Sports Group, LLC, *et al.* (the "Debtors"), by and through its undersigned counsel, hereby submits this limited objection (the "Limited Objection") to the *Debtors' Initial Motion for Entry of an Order Extending the Exclusive Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptances Thereof* [Docket No. 953] (the "Exclusivity Motion").[2] In support of this Limited Objection, the Committee respectfully represents as follows:

**LIMITED OBJECTION**

1. The Committee does not support the Debtors' request for a 120-day extension of their exclusive plan filing and solicitation periods. Among other things, the Debtors are facing significant time constraints to demonstrate to their league and team partners that they will reorganize and be in a position to broadcast games this fall. As the Debtors themselves

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the Exclusivity Motion.

acknowledge, they are now facing a number of rapidly approaching inflection points that will largely determine the trajectory of these cases, and "much work remains to be done"[3] to, among other things, address the "wide range of interrelated issues requiring input and *consensus* from a broad array of parties."[4]  Thus, if the Debtors are going to successfully reorganize, they need to expeditiously file a plan of reorganization and work with all stakeholders to forge consensus on the terms thereof.[5]  Notwithstanding the foregoing, the Debtors' current approach with respect to plan negotiations—focusing solely on accommodating the legal and commercial positions of the ad hoc group of prepetition first lien lenders (the "Ad Hoc First Lien Group")[6]—has left key stakeholders, including the Committee, on the outside looking in.

2.	The time is now for the Debtors to invite other creditor constituencies into the room to promote meaningful and productive plan negotiations.[7]  Granting a blanket 120-day extension of the Exclusivity Periods would hinder, rather than promote, progress towards a confirmable plan. The Committee is concerned that such a lengthy extension would encourage the Debtors to continue to bargain solely with the Ad Hoc First Lien Group at the expense of a broader consensus-building approach.  Given the numerous complex issues that will impact the treatment and rights of unsecured creditors under a chapter 11 plan, it is critical that the Committee, the fiduciary for all unsecured creditors, participate in plan negotiations.  The Debtors are not an appropriate proxy

---

[3]   Exclusivity Motion ¶ 26.

[4]   *Id.* ¶ 32 (emphasis added).

[5]   Although the Exclusivity Motion references the restructuring support agreement (the "Initial RSA") between the Debtors and certain of their funded debt holders executed immediately after the commencement of these cases, the proposed restructuring contemplated thereunder is no longer viable. *See, e.g.,* Exclusivity Motion ¶ 6.

[6]   The Ad Hoc First Lien Group holds approximately $374,531,211.02 of the Debtors' $630,200,000.00 in aggregate principal amount of first lien debt (or 59.43%). *See Amended Verified Statement of the Ad Hoc First Lien Group Pursuant to Bankruptcy Rule 2019* [Docket No. 966].  The Debtors had approximately $9 billion in funded indebtedness as of the commencement of the chapter 11 cases. *See* Exclusivity Motion ¶ 2.

[7]   Although the Debtors recently disclosed to the Committee's professionals the substance of negotiations, the Committee has been excluded from active discussions.

2

to negotiate resolutions of these issues, and continuing down the current two-party path without involving unsecured creditor representatives will likely lead only to a more litigious, expensive and protracted confirmation process.

3.      The Committee submits that a shorter extension of no more than 50 days (*i.e.*, through August 31, 2023) is warranted under these circumstances. Such an extension should, at best, encourage the Debtors to engage with the Committee and other key constituencies in a more inclusive process that will benefit all stakeholders or, at worst, bring the numerous disputed issues that must be resolved in connection with a chapter 11 plan to the fore for resolution through the plan confirmation process. At a minimum, a shorter extension will require the Debtors to accelerate the plan process and "move the case[s] forward."[8]

### A.     *The Debtors Are Running Out of Time to Pursue a Plan of Reorganization.*

4.      The Committee recognizes that the Debtors' efforts to date—including, but not limited to, (i) the commencement of adversary proceedings with respect to certain estate claims against Sinclair, JP Morgan and other third parties[9] and (ii) litigation with MLB and certain clubs— have been key to moving the ball forward in these chapter 11 cases. Moreover, the Committee is pleased that the Debtors have recently engaged with key stakeholders and made progress in developing a viable business plan for the reorganized Debtors. Building consensus on a business

---

[8] *In re Adelphia Commc'ns. Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006) (stating that the primary consideration is whether terminating exclusivity "will move the case forward.").

[9] On July 19, 2023, the Debtors filed (i) a 19-count complaint against Sinclair Broadcast Group, Inc. ("Sinclair") and certain affiliated entities and third parties related to certain prepetition transactions and other conduct negatively affecting the Debtors, in the adversary proceeding captioned *Diamond Sports Group, LLC, et al. v. Sinclair Broadcast Group, Inc., et al.,* Adv. Pro. No. 23-03134 and (ii) a five-count complaint against JPMorgan Chase & Co. and JPMorgan Chase Funding Inc. (collectively, "JP Morgan") related to prepetition distributions made by the Debtors on account of preferred equity units in the adversary proceeding captioned *Diamond Sports Group, LLC v. JPMorgan Chase Funding Inc., et al.,* Adv. Pro. No. 23-03135. Shortly thereafter, the Debtors and the Committee entered into stipulations authorizing the Committee to intervene in the adversary proceedings. *See Stipulation and Agreed Order Authorizing Intervention by the Official Committee of Unsecured Creditors* [Adv. Pro. No. 23-03134, Docket No. 4]; *Stipulation and Agreed Order Authorizing Intervention by the Official Committee of Unsecured Creditors* [Adv. Pro. No. 23-03135, Docket No. 6].

plan is an important initial step in determining which leagues and teams the Debtors will continue to partner with going forward and on what terms. These considerations, in turn, will impact, among other things, the Debtors' RSN footprint, the scope of the Debtors' linear and digital operations and negotiations with distributors regarding carriage agreements. But finalizing a business plan (which many of the Debtors' creditors are unlikely to benefit from) is just one of many issues that must be resolved for the Debtors to achieve a value-maximizing restructuring.

5. Importantly, any chapter 11 plan will need to address a plethora of complex issues as to which the Ad Hoc First Lien Group and unsecured creditors are (or will likely be) diametrically opposed. Such issues include, without limitation, the following:

- Treatment of Default Interest and Make Whole Claims. The prepetition first lien lenders have asserted claims for default interest and "make whole" premiums in excess of $130 million.[10] Such claims have been asserted even though the Debtors incurred the approximately $630 million in aggregate principal amount of prepetition first lien indebtedness approximately one year prior to the Petition Date, when it was clear the first lien indebtedness would never reach its May 2026 maturity. The Committee does not believe the prepetition first lien lenders are entitled to such amounts under the Bankruptcy Code and applicable law, and that any agreement between the Debtors and the Ad Hoc First Lien Group to allow these exorbitant fees will lead to litigation.

- Valuation Issues. The Committee is concerned that the plan negotiated between the Debtors and the Ad Hoc First Lien Group may contemplate an agreed-upon valuation for the Debtors' enterprise, even though the Debtors have yet to finalize their go-forward business plan or undertake a valuation of the Debtors on either an entity-by-entity or consolidated basis.[11] The Debtors' enterprise value will be critical to various plan issues, including, among other things:

---

[10] On July 14, 2023, the administrative and collateral agent under the First Lien Credit Agreement filed a proof of claim in the amount of at least $766,904,835.72, including $132,353,392.82 in respect of amounts purportedly due in respect of make whole claims. *See* Claim No. 290.

[11] The Debtors' enterprise value hinges on numerous unresolved issues (*e.g.*, the Debtors' go-forward RSN footprint, team contract economics, negotiations with MVPDs and vMVPDS, etc.).

4

- o the amount of the prepetition secured creditors' deficiency claims;

- o whether tens of millions of dollars in adequate protection payments[12] to the prepetition first lien lenders should be recharacterized as payments of principal on the first lien indebtedness; and

- o any alleged adequate protection claims for diminution in value of the prepetition secured creditors' interests in collateral.

- **Allocation of Unencumbered Value**. Particularly given the Debtors' significant unencumbered assets, allocation of unencumbered value is a critical plan issue. Such assets include, but are not limited to:

  - o proceeds of estate claims against Sinclair, JP Morgan and other third parties, which seek to recover in excess of $1 billion related to various prepetition transactions;

  - o the Debtors' interests in certain non-Debtor joint ventures, including the YES Network;[13] and

  - o unencumbered cash held at certain non-Debtor joint ventures and Diamond Sports Finance SPV, LLC.

- **Challenges to the Extent and Validity of the Prepetition Secured Claims and Liens**. The Committee has conducted an extensive investigation into the extent and validity of the alleged claims and liens of the prepetition secured parties and has identified multiple viable challenges to the Debtors' stipulations in the Cash Collateral Order with respect to the allowance of such claims and liens at various Debtor entities.[14] The proceeds of the Committee's claims to avoid such claims and liens represent a potentially significant source of value for unsecured creditors and will likely need to be resolved through litigation absent a negotiated resolution.

---

[12] Under the Cash Collateral Order, the Debtors agreed to pay the prepetition first lien lenders contractual interest at the default rate (an all-in interest rate of approximately 15%), resulting in payments of over $80 million in interest from the Petition Date through December 31, 2023. *See Corrected Final Order (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief* [Docket No. 572] (the "Cash Collateral Order").

[13] At the time the Debtors acquired their 20 percent interest in the YES Network (the local broadcast network for the New York Yankees and the Brooklyn Nets) in August 2019, the value of this interest was approximately $346 million, based on a total enterprise value of $3.47 billion. *See* Sinclair Broadcast Group, Inc., Current Report (Form 8-K) at 4 (Nov. 6, 2019).

[14] The Debtors, the Committee and the Ad Hoc First Lien Group have agreed to an extension of the Challenge Period under the Cash Collateral Order to August 16, 2023.

- Litigation Trust Issues.  As noted, proceeds of the Debtors' claims and causes of action against Sinclair, JP Morgan and other third parties represent a potentially significant source of recovery for unsecured creditors.  Accordingly, unsecured creditors have a significant interest in issues related to the formation, funding, mechanics and governance of any litigation trust established to pursue estate causes of action.

- Treatment of Trade Creditors.  As the fiduciary for all unsecured creditors, the Committee must have a voice in the proposed classification and treatment of the Debtors' unsecured trade creditors and vendors essential to the Debtors' ongoing operations.

- Treatment of Intercompany Claims.  The Debtors have over $14 billion of intercompany claims, the treatment of which may have a material impact on recoveries for creditors at the 30 Debtor entities.

6.  Although the Debtors appear to recognize that global engagement among their various stakeholders is necessary to address the foregoing issues,[15] they have inexplicably chosen to exclude the Committee and other parties that they know have a significant interest in plan discussions.  The Committee spent the initial months of these cases getting up to speed on, among other things, the Debtors' business operations as well as the history of negotiations among the Debtors and their major creditor constituencies, and reached out to the Debtors on numerous occasions to facilitate discussions among such constituencies.  Despite such outreach, and notwithstanding the numerous plan-related issues impacting unsecured creditor recoveries, the Committee's requests have been rebuffed.  Indeed, the Debtors have refused the Committee's offers to assist with bringing key stakeholders and contract counterparties together for global negotiations regarding operational and plan-related issues (including through the potential appointment of a judicial mediator) and have stated that they intend to bring the Committee into

---

[15] *See* Exclusivity Motion ¶ 32.

the process only after reaching agreement with their prepetition first lien lenders.[16] As the fiduciary for all unsecured creditors, the Committee has a duty to maximize the value of the estates for unsecured creditors and should not be excluded from participating in negotiations regarding the treatment of unsecured creditors under a chapter 11 plan.

7. The Committee has significant concerns that the Debtors' chosen approach to date—effectively running a plan process for the benefit of the first lien lenders at other creditors' expense—will have the harmful effect of prompting additional litigation rather than garnering support for a plan. Granting the requested 120-day extension of the Exclusivity Periods could result in the continued exclusion of the Committee and other stakeholders from the plan process and threaten the Debtors' ability to successfully reorganize.

### B. The Debtors Have Not Demonstrated "Cause" for a 120-Day Extension of the Exclusivity Periods.

8. Given the facts and circumstances of these cases, the Debtors have not demonstrated "cause" for a 120-day extension of the Exclusivity Periods, and a shorter extension is in the best interests of the Debtors' stakeholders.[17] Of the nine factors courts typically consider when evaluating a request to extend or terminate a debtor's exclusivity periods,[18] most are focused

---

[16] The Committee understands that the Debtors and the Ad Hoc First Lien Group have exchanged drafts of a term sheet setting forth the terms of a chapter 11 plan. Following repeated requests, the Debtors finally agreed to share with the Committee drafts of the term sheet on July 29 and August 1, 2023.

[17] The Bankruptcy Court "may for cause reduce or increase" the initial Exclusivity Periods upon the request of a party in interest and after notice and a hearing. 11 U.S.C. § 1121(d)(1). The party seeking an extension of exclusivity bears the burden of demonstrating cause for such an extension. *In re New Millennium Mgmt., LLC*, No. 13-35719-H3-11, 2014 WL 792115, at *6 (Bankr. S.D. Tex. Feb. 25, 2014) (citing *In re Borders Group, Inc.,* 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011)).

[18] While not an exhaustive or exclusive list, courts often consider the following factors in considering a request either to increase or decrease the exclusive plan filing and solicitation periods: (i) the size and complexity of the case; (ii) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (iii) the existence of good faith progress toward reorganization; (iv) the fact that the debtor is paying its bills as they become due; (v) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (vi) whether the debtor has made progress in negotiations with its creditors; (vii) the amount of time which has elapsed in the case; (viii) whether the debtor is seeking an extension of exclusivity in order to pressure

on whether the debtor is making progress towards formulating a confirmable chapter 11 plan supported by creditors. Contrary to the assertions in the Exclusivity Motion, the Debtors have not made meaningful progress towards a plan of reorganization with any of their constituencies (other than one), which does not justify the prolonged extension requested.

9. The Debtors assert that a four-month extension of the Exclusivity Periods is warranted to afford them "time to run a centralized process and continue to build consensus on a confirmable plan." Exclusivity Motion ¶ 32. As noted, however, the "centralized" plan process run by the Debtors to date has involved only direct negotiations with the Ad Hoc First Lien Group, to the exclusion of the Committee and other stakeholders. Excluding such parties from plan negotiations already underway with other parties does not evidence a good faith attempt to build creditor consensus on a confirmable plan; rather, it suggests the Debtors are focused on building momentum towards a plan that is acceptable to the Ad Hoc First Lien Group that may be leveraged against other stakeholders, including unsecured creditors. Granting a four-month extension of the Exclusivity Periods will only further encourage the Debtors' tactics and embolden the Ad Hoc First Lien Group in its attempts to ensure that the chapter 11 plan maximizes first lien lender recoveries regardless of the consequences for other stakeholders and the future of the reorganized business.

10. The Committee believes that a shorter extension of 50 days strikes the appropriate balance between the Debtors' interest in proposing a chapter 11 plan and ensuring that creditors are not prejudiced by locking in months of counterproductive exclusivity. Such an extension will either incentivize the Debtors to (i) pursue a more inclusive process that may result in further

---

creditors to submit to the debtor's reorganization demands; and (ix) whether an unresolved contingency exists. *See, e.g., In re New Millennium Mgmt., LLC*, 2014 WL 792115, at *6 (Bankr. S.D. Tex. Feb. 25, 2014) (citing *In re GMG Capital Partners III, L.P.,* 503 B.R. 596, 600 (Bankr. S.D.N.Y. 2014); *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996).

extensions or (ii) promptly complete their plan negotiations with the Ad Hoc First Lien Group and propose a chapter 11 plan.  It will also enable the Court and parties in interest to make informed decisions on whether a further extension is warranted and to assess whether other potential paths forward, including the appointment of a judicial mediator, may be appropriate to accelerate the pace of the cases and forge greater consensus on the chapter 11 plan.

## RESERVATION OF RIGHTS

11.  This Limited Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights, claims, defenses and remedies, including the right to amend, modify or supplement this Limited Objection to raise additional objections and to introduce evidence at any hearing relating to the Exclusivity Motion, and without in any way limiting any other rights of the Committee to further respond to the Exclusivity Motion, on any grounds, as may be appropriate.

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court: (i) deny the Debtors' requested 120-day extension of the Exclusivity Periods; (ii) grant a 50-day extension of the Exclusivity Periods (*i.e.*, through August 31, 2023); and (iii) grant such other relief as may be just and proper.

[*The remainder of this page has been left blank intentionally.*]

Dated: August 1, 2023                    Respectfully Submitted,
                                                          **AKIN GUMP STRAUSS HAUER & FELD LLP**

*/s/ Marty L. Brimmage, Jr.*
Marty L. Brimmage, Jr. (State Bar No. 00793386; S.D. Tex. 30464)
2300 N. Field Street, Suite 1800
Dallas, TX 75201-2481
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email: mbrimmage@akingump.com

-and-

Ira S. Dizengoff (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Naomi Moss (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: idizengoff@akingump.com
Email: aqureshi@akingump.com
Email: nmoss@akingump.com

-and-

Scott L. Alberino (admitted *pro hac vice*)
2001 K Street N.W.
Washington, DC 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
Email: salberino@akingump.com

*Counsel to the Official Committee of Unsecured Creditors of Diamond Sports Group, LLC,* et al.

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel to the Committee conferred with counsel to the Debtors in a good faith effort to resolve the Committee's Limited Objection on multiple occasions following the filing of the Exclusivity Motion, including, but not limited to, on July 19, 2023 and August 1, 2023. The dispute remains unresolved.

*/s/ Marty L. Brimmage, Jr.*
Marty L. Brimmage, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that, on August 1, 2023, a true and correct copy of the foregoing was served via email through the Bankruptcy Court's Electronic Case Filing System on the parties that have consented to such service.

*/s/ Marty L. Brimmage, Jr.*
Marty L. Brimmage, Jr.