## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) Case No. 23-90116 (CML) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

## SINCLAIR'S MOTION FOR ENTRY OF AN ORDER COMPELLING ASSUMPTION OR REJECTION OF THE MANAGEMENT SERVICES AGREEMENT

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney**.

**There will be a hearing on this matter on October 2, 2023, at 2:00 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. You may participate at the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez." Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

---

[1] A complete list of each of the debtors in these chapter 11 cases (collectively, the "Debtors" or "Diamond") may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

Sinclair Broadcast Group, LLC ("SBG") and Sinclair Television Group, Inc. ("STG," and together with SBG, "Sinclair") state the following in support of this motion (this "Motion"):

## Relief Requested

1.      Sinclair seeks entry of an order, substantially in the attached form (the "Order"), compelling Diamond Sports Group, LLC ("Diamond" or "DSG"), one of the above-captioned debtors (collectively, the "Debtors"), to immediately assume or reject that certain management services agreement, dated as of August 23, 2019, by and between STG and Diamond (as amended, restated, supplemented, or otherwise modified from time to time, the "Management Services Agreement" or "MSA").[2]

2.      The factual statements in this motion are based on documents filed by the Debtors in their chapter 11 cases, documents attached to this Motion as exhibits, and Sinclair's information and belief.  Sinclair intends to take discovery and submit evidence in support of this Motion at a hearing on this Motion.

## Jurisdiction and Venue

3.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Sinclair confirms its consent to the entry of a final order by the Court in connection with this Motion.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]   A copy of the MSA, including amendments thereto, is attached hereto as **Exhibit A**.  Although by this Motion Sinclair is seeking to compel assumption or rejection of the MSA by order of this Court, the MSA contains a binding arbitration provision with respect to disputes thereunder.  ██████████  Sinclair reserves all rights as to whether disputes under the MSA are more appropriately arbitrated.

5.     The bases for the relief requested herein are sections 105(a), 105(d), 362, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6006, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 9013-1 and 9013-2 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

### Preliminary Statement

6.     Since its acquisition of Diamond in August 2019, Sinclair has provided a wide range of marketing and administrative services to Diamond pursuant to the terms of the MSA. Diamond readily acknowledges that these services have been "critical" to its business.[3]   In exchange for the "critical" services provided by Sinclair, the MSA obligates Diamond to pay Sinclair a base fee and certain incentive fees every month.

7.     In March 2022, in an effort to support Diamond's liquidity needs, Sinclair voluntarily deferred a portion of the contractual MSA fees to which it is entitled until the petition date.  Since the petition date, Diamond has continued to pay the deferred, below-contract rate, under protest from Sinclair.  Currently, more than ***$140 million*** remains unpaid under the MSA for pre- and postpetition services.  Despite the critical nature of these services and despite extensive prepetition conversations between Sinclair and Diamond with respect to go-forward services under the MSA, approximately five months into these chapter 11 cases, Diamond still has not yet engaged with Sinclair regarding any comprehensive restructuring discussions about the MSA (or otherwise), nor has Diamond taken action to assume or reject the MSA, despite Sinclair's repeated requests to engage in such comprehensive discussions.

---

[3]     Complaint ¶ 109, *Diamond Sports Group, LLC v. Sinclair Broadcast Group, Inc., et al.*, Adv. Pro. 23-03134 (the "Adversary Complaint" or "Compl.").

8.     Now, however, Diamond has made its views regarding the MSA crystal clear. According to Diamond's July 19, 2023 Adversary Complaint, the MSA contract rate fees are "extortionate" and "off-market."   Diamond's acerbic Adversary Complaint heavily criticizes Sinclair's performance under the MSA and seeks to avoid Diamond's prior MSA fee payments as alleged fraudulent transfers.  Based on Diamond's allegations, claims, and public statements, there can be no doubt that Diamond intends to reject the MSA.  In fact, Diamond has *already* started transitioning away from Sinclair, and is already incurring substantial professional fees to implement that transition.    Meanwhile, Diamond faces an embedded cure claim in excess of $140 million (and growing monthly) if it decides to assume the MSA.  All of this clearly points to a rejection.  Yet Diamond continues to avoid pulling that trigger so that it can continue to receive "critical" services for well below the MSA contract rates, presumably until its emergence from bankruptcy.   Based on Diamond's own statements at the August 11 status conference, however, emergence—let alone the filing of a chapter 11 plan—is nowhere in sight.

9.     The current situation is untenable.  To be clear, Sinclair is amenable to Diamond's assumption and full cure of the MSA and is willing to negotiate over mutually acceptable post-assumption terms.  However, Sinclair believes that Diamond will never assume the MSA (as its counsel has made abundantly clear), and therefore should be compelled to reject the MSA now for a number of reasons.[4]  *First*, if Diamond truly believes, as it said in its Adversary Complaint, that the MSA is a terrible economic deal for Diamond, assumption of the MSA would be starkly inconsistent with Diamond's fiduciary obligation to maximize estate value.  *Second*, Diamond's apparent plan to continue receiving the benefits of Sinclair's MSA Services for the duration of

---

[4]     At the August 11 status conference, Diamond's counsel stated "We have a management agreement with Sinclair. I don't expect that is going to continue, just given the business reality. . . ."  Tr. of Aug. 11, 2023, H'rg at 9:6-7.

Diamond's chapter 11 case without paying the full contract rate for those services is highly prejudicial to Sinclair.  Indeed, Sinclair is being forced to shoulder the burden and expense of the MSA Services at a significant discount, while effectively subsidizing Diamond's litigation against Sinclair attacking those very same services and seeking over $1.5 billion in damages.  Moreover, Sinclair believes that the costs to the Debtors for a third-party to provide equivalent services will exceed the amounts the Debtors are currently paying Sinclair, meaning that by delaying the inevitable decision on rejection the Debtors are unfairly shifting those costs to Sinclair.  *Third*, and worse still, Diamond is itself in violation of the MSA's anti-solicitation and anti-hiring provisions, as it has recently hired Sinclair's now-former senior director of programmatic monetization, creating an uncurable barrier to the assumption of the MSA.  *Fourth*, Diamond's delaying its rejection while enjoying to the benefits of Sinclair's below-contract rate services is inconsistent with section 503(b) of the Bankruptcy Code, which requires chapter 11 debtors to pay reasonable compensation for postpetition services when due as an administrative expense.

10.     In contrast to the heavy prejudice Sinclair is suffering on a daily basis, Diamond will suffer little or no prejudice in being compelled to assume or reject the MSA now.  The Debtors have repeatedly emphasized that "the separation of the Diamond business from Sinclair" is a key component of their overall restructuring,[5] and Diamond has already undertaken substantial efforts to that end, including building internal capacity to handle functions currently provided by Sinclair under the MSA and lining up replacement providers or arrangements for other MSA services.  In addition, the MSA itself provides for a ninety-day tail period following termination of the MSA for any reason, during which period Sinclair must continue to provide MSA Services, affording

---

[5]     *Declaration of David F. DeVoe, Jr. In Support of Chapter 11 Petitions and First Day Motions* [Docket No. 26] (the "First Day Declaration") ¶ 74.

Diamond ample additional time to further develop its internal capacity to handle current MSA functions and to set up any other necessary replacement arrangements.[6]  This will ensure a smooth transition to the alternative services that Diamond is already lining up.

### Background

11.     Sinclair is a media broadcast company; it is not generally in the business of providing distribution or administrative services to third parties in which it has no economic stake, and certainly not a discount to the contract rate.  And yet when Sinclair acquired the Diamond business from The Walt Disney Company ("Disney") in August 2019 (as a result of Disney's deal to acquire Twenty-First Century Fox, Inc. ("Fox")), Diamond had very few Diamond-only employees, with most of the business being run by Fox employees.  Accordingly, when Sinclair acquired Diamond, Sinclair had to pick up where Fox left off and provide services to or for the benefit of Diamond.  To that end, Sinclair and Diamond entered into the MSA in August 2019 contemporaneously with Sinclair's acquisition of Diamond to ensure continued operation of Diamond's business.

12.     Pursuant to the MSA, Sinclair provides Diamond with "core services" ("Core MSA Services") and may, upon mutual agreement of the parties, provide "supplementary services" ("Supplementary MSA Services"), at additional costs to be agreed upon by the parties.[7] Core MSA Services are further broken down into two broad categories.  First, Sinclair provides "affiliate sales and marketing services," pursuant to which Sinclair markets, promotes, and uses reasonable efforts to sell carriage and other content, programming, and other material acquired or produced by the relevant Diamond regional sports network ("RSN") to distributors.  Second,

---

[6]  ███████████

[7]     Core MSA Services and Supplementary MSA Services are referred to collectively as the "MSA Services."

Sinclair provides Diamond with certain agreed-to "general and administrative services" within the following categories:  legal and business affairs, payroll, finance and accounting, IT support, human resources, and insurance services.

13.     Under the MSA, in exchange for Core MSA Services, Diamond agreed to pay Sinclair: (a) an annual base fee (the "Base Fee") of $4 million per Diamond RSN for the first year, subject to annual four percent increases; plus (b) incentive management fees (the "Incentive Management Fees"), calculated as a percentage of revenue of any new (or renewed) distribution agreement for Diamond RSNs, assuming certain thresholds were met.[8]

14.     In contrast to Core MSA Services, Supplementary MSA Services consists of any additional services on terms and conditions (including supplemental fees) that Sinclair and Diamond mutually agree to in writing in advance.

15.     The MSA, as amended, currently expires on May 25, 2026, subject to earlier termination in certain circumstances.[9]  Importantly, upon termination for any reason, the MSA requires Sinclair to provide, at Diamond's request, up to ninety days of additional general and administrative services (with this provision surviving the expiration or termination of the MSA).[10]

16.     As recited in Diamond's First Day Declaration, in January 2021, Diamond—with Sinclair's support—engaged with certain of its funded debt creditors regarding potential financing and recapitalization transactions to provide Diamond with additional liquidity.  This ultimately led to a recapitalization on March 1, 2022, which among other things, resulted in $635 million in new money financing, a note exchange transaction, and a reconfiguration of the Diamond board.

---

[8]  ███████████

[9]  ████████

[10]  ███████████

Conspicuously absent from the First Day Declaration, however, is any mention of the fact that as of March 1, 2022 – the date of this March 2022 recapitalization—Sinclair sent a letter to Diamond and Diamond's lenders deferring the immediate cash payment of a significant amount of MSA fees for a period of time (the "Deferral Letter").[11]  The Deferral Letter is emblematic of Sinclair's long-standing effort to support Diamond above and beyond its agreed upon contractual obligations, a record that Diamond seeks to erase through its overheated Adversary Complaint, repeated accusatory correspondence, and other filings in these cases.  The Deferral Letter, in fact, was important to Diamond's lenders, as evidenced by, among other things, the fact that the agents for Diamond's prepetition first and second-lien credit facilities signed and were named third-party beneficiaries of the Deferral Letter.

17.    The Deferral Letter contemplates various deferrals of MSA fees (collectively, the "Deferred Fees"), resulting in Diamond generally paying only about one-third of the MSA contract rate on a current basis, with the rest deferred.  Pursuant to the Deferral Letter, Sinclair deferred the base fee for services as well as the ongoing incentive fee for carriage agreements already in place prior to March 2022.  The aggregate deferred MSA fee balance totaled approximately $87.1 million as of the March 14, 2023, petition date (equating to roughly $7.4 million in average monthly deferrals).  The Deferral Letter (which was also negotiated and approved by a majority of Diamond's secured lenders) also provides that: (a) any Deferred Fees shall be included in any cure claim payable in connection with Diamond's assumption of the MSA in bankruptcy; and (b) Sinclair shall be entitled to ███████████ payment" of MSA fees at the MSA contract rate for any MSA Services provided to Diamond during the postpetition period.[12]  In other words, the

---

[11]    A copy of the Deferral Letter is attached hereto as **Exhibit B**.

[12]    ████████████████████████

deferral does not apply to the postpetition period.  Separately, Sinclair and Diamond (but not Diamond's secured lenders) entered into Amendment Number 1 to the MSA to extend the MSA's expiration date from August 23, 2024, to May 25, 2026.

18.     Sinclair's efforts to support Diamond and to engage constructively with Diamond and its creditors were not limited to Sinclair's deferral of certain MSA Fees.  To the contrary, in September 2022, Sinclair began engaging constructively with Diamond and an ad hoc group of Diamond's second-lien lenders and noteholders regarding a financial and operational restructuring of Diamond.  Those efforts culminated in a chapter 11 term sheet, agreed to in principle among principals in December 2022, in which Sinclair agreed, among other things, to:  voluntarily walk away from its equity investment; provide Diamond with continued postpetition financing under an accounts receivable facility with approximately $215 million in total commitments for a portion of the chapter 11 case; waive its Deferred Fees; and continue providing services (plus supplementary transition services) under an amended MSA at a reduced rate, all in exchange for a release of claims by Diamond and other consideration.[13]

19.     In the months following agreement on the term sheet, advisors to Sinclair, Diamond, and Diamond's second-lien creditors actively engaged in converting the term sheet into a three-party restructuring support agreement to be completed and signed prior to a March 15, 2023 filing date.  At the same time, Sinclair personnel continued working around the clock to assist Diamond with diligence and information gathering required to prepare Diamond's first day papers and ensure Diamond's smooth transition into chapter 11.  These services were not required by the MSA, but Sinclair performed them anyway, without seeking compensation.  In the

---

[13]     A copy of this document is attached hereto as **Exhibit C**.

days and weeks prior to the petition date, the parties' advisors were working around the clock to draft and finalize the terms of an RSA implementing the parties' term sheet.

20.     Immediately before Diamond's planned chapter 11 filing, however, Sinclair was informed that Diamond and the second-lien creditors were not going to enter into a restructuring support agreement with Sinclair, but instead were entering into a two-way restructuring support agreement between Diamond and its creditors, leaving Sinclair by the wayside.  The purported reason given for this major re-trade was that there was not enough time to deal with the logistical challenges of obtaining sign off from so many second-lien lenders in the days leading up to the bankruptcy filing—even though the terms of the deal as contained in the parties' term sheet had not changed, the three-way restructuring support agreement was close to completion, and those very same lenders certainly found the time to review, approve, and execute a restructuring support agreement with Diamond alone implementing those parties' portion of the previously tripartite term sheet.

21.     The lenders sought to downplay this change in approach by letting it be known that they just needed some time to regroup and focus on Sinclair issues in short order right after the petition date, and that they would then work to fold Sinclair back into a new three-way restructuring support agreement.

22.     Mr. DeVoe, Diamond's CFO, emphasized the point in his sworn March 15, 2023 First Day Declaration:

> Moreover, Diamond and the Consenting Creditors are working to document the proposed terms of an agreement with Sinclair pursuant to which Sinclair will provide certain transition services to reorganized Diamond and will continue to be the lender under the AR Loan Facility as part of the Receivables Program until the date that facility can be replaced or July 15, 2023.   The proposed agreement with Sinclair is subject to final documentation and there are no guarantees the agreement will be finalized.

23.     At the Debtors' first day hearing on March 16, 2023, Diamond's counsel then told the Court that the Debtors "hoped to fold Sinclair into the RSA" and would "continu[e] the work" to do so.[14]   For its part, Sinclair, believing that the delay was truly an issue of administrative logistics, stated that it was "very supportive of" Diamond and "very hopeful" about finalizing and signing a Sinclair-inclusive RSA "within the next few days or so" after the hearing.[15]   But apparently certain parties had no serious intention of moving forward in such a manner.

24.     Immediately after that first day hearing, to Sinclair's surprise, all efforts toward a Sinclair-inclusive RSA stopped.   Diamond and the other RSA parties provided no substantive explanation to Sinclair of what realistically had changed, but instead simply stopped further RSA finalization discussions.   Since then, despite Sinclair's *repeated* outreaches, requests, and attempts to re-engage through counsel and principals, Diamond has consistently demurred on engaging with Sinclair in any way regarding the prospect of an overall consensual restructuring, as have the other creditor parties to the RSA, the official committee of unsecured creditors (the "Committee"), and the ad hoc first lien lender group.   Instead, Diamond—joined immediately by the Committee— pivoted to an all-out "shoot-first" litigation war on Sinclair, its principals, and others (including against Bally's, one of Diamond's other major business partners and significant revenue sources,

---

[14]    Tr. of Mar. 16, 2023, H'rg at 30:8-11, 36:24-25.

[15]    *Id.* at 60:21-23, 61:7.

and a wasteful and ultimately unsuccessful litigation play against MLB). Diamond is seemingly more focused on litigation than on coming up with an actionable, consensual restructuring plan in which Sinclair could have played a positive role.[16] Even in its recently-filed motion to appoint judicial mediators, the Debtors appear focused on trying to mediate inter-creditor issues among their three organized ad hoc groups and the UCC, with no plan for engaging with the one major stakeholder who has been supportive of Diamond and who has repeatedly expressed its willingness to discuss ways in which it can play a constructive role in Diamond's restructuring.[17]

25.     Consistent with its litigious approach, on or about April 3, 2023, Diamond informed Sinclair that it would not pay the full MSA contract rate for MSA Services provided to Diamond postpetition, in contrast to what the Deferral Letter provides. Currently, the full MSA contract rate is approximately $12.8 million per month, encompassing both core services and incentive fees for carriage agreements that continue to generate value for the estates, but Diamond has been paying only $4.4 million per month for *postpetition* MSA Services. Since the petition date, approximately $37.7 million in MSA contractual amounts remains accrued but unpaid. This is in addition to the approximately $87.1 million of deferred MSA contractual amounts as of the petition date. And Sinclair's unpaid contractual claim for postpetition services continues to grow daily.

---

[16]     Indeed, in their reply with respect to their exclusivity extension motion, the Debtors admit that—now *five months* into these chapter 11 cases—they still have not achieved consensus around their go-forward business plan and are merely "discussing various go-forward business plans with each of these groups and their advisors." *Debtors' Reply in Support of Debtors' Initial Motion for Entry of an Order Extending the Exclusive Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptances Thereof* [Docket No. 1049] (the "Exclusivity Reply") at p. 4. The "steady progress" cited by the Debtors' with respect to these chapter 11 cases appear to center around rejecting certain executory contracts and litigation with a number of parties, including MLB, Sinclair, Bally's, JP Morgan, and others. *Id.* at p. 3.

[17]     *See generally Debtors' Emergency Motion for Entry of an Order (I) Appointing Judicial Mediators and (II) Granting Related Relief* [Docket No. 1049].

26.     Despite Diamond's abrupt shift from prepetition engagement to postpetition attack, Sinclair has continued to support Diamond's restructuring efforts, in the (dashed) hope that once Diamond found its footing in chapter 11, it would pick up restructuring discussions with Sinclair in earnest.  *First*, Sinclair—without resorting to premature litigation and motion practice—continued to perform its obligations and support the Debtors' business under the MSA and support the Debtors throughout the chapter 11 filing, despite Diamond's failure to pay the MSA contract rate.  This often proved challenging, as day-to-day MSA issues that typically would be addressed commercially morphed into costly and contested disputes requiring legal attention, thereby significantly increasing the time and cost required to resolve them.  Nevertheless, Sinclair continued supporting Diamond, both through the ongoing provision of MSA Services and through various accommodations and extra-contractual benefits not required under the MSA.  Just by way of example (and also notably absent from any mention in any of Diamond's filings), Sinclair has provided Diamond its New York office space (leased under Sinclair's name), free rent for space at a number of other Sinclair facilities, and real estate management services without charge.[18]

27.     Another example of Sinclair's support occurred when the Debtors demanded at the last minute that Sinclair provide the Debtors with certain insurance coverage—which Sinclair was not obligated to provide under the MSA—upon the expiration of certain existing insurance policies postpetition, including directors' and officers' liability insurance.  Sinclair did so.  Securing this

---

[18]   Sinclair believes it is under no contractual or legal obligation to continue allowing the Debtors to occupy Sinclair-leased office space.  Upon information and belief, there are no documented leases or sub-leases between Diamond and Sinclair with respect to such arrangements.  Accordingly, the Debtors have no entitlement to continue occupying Sinclair offices.  And even if any of these informal arrangements are considered an "unexpired lease" within the meaning of section 365 of the Bankruptcy Code, the Debtors did not seek to extend the statutory deadline set forth in § 365(d)(4) with respect to these arrangements, and thus those leases would be deemed rejected as of approximately July 14, 2023.  Section 365(d)(4) requires, upon deemed rejection, a debtor-tenant to "immediately surrender that nonresidential real property" to the landlord.  Sinclair reserves all rights to effectuate such surrender in this regard.

insurance coverage for Diamond required Sinclair to reopen underwriting for several material insurance coverage lines and to work with carriers to incorporate Diamond into Sinclair's insurance policies for those coverage lines on an expedited basis.  Without Sinclair's timely accommodation, Diamond would not have been able to obtain insurance coverage across these lines at virtually any price before the expiration of Diamond's prior coverage.  Sinclair has also enabled the continued use of Sinclair's credit card relationships for certain of Diamond's employees, another service that Diamond would have had difficulty obtaining without Sinclair's support.

28.     But while Sinclair has continued to support the Debtors, Diamond has disregarded its own contractual obligations under the MSA.  For instance, despite a clear and material MSA prohibition on Diamond from soliciting and hiring Sinclair employees, Diamond recently hired Sinclair's now-former senior director of programmatic monetization, after having made him an employment offer while he was still a Sinclair employee.  Indeed, Diamond has acknowledged that it is contractually prohibited from soliciting Sinclair employees in the Adversary Complaint.[19] Given this former employee's knowledge of Sinclair's business and operations, Diamond is now in a position to use that information to Sinclair's detriment.[20]  Although, as explained below, Sinclair believes that there is no chance Diamond will assume the MSA, it appears that, should Diamond wish to do so, it cannot assume the MSA because this hiring violation cannot be cured.[21]

---

[19]   Complaint ¶ 242.

[20]   Sinclair has informed Diamond of this violation, but has not provided any notice of breach, mindful of the automatic stay.

[21]   *See* 11 U.S.C § 365(b)(1) (providing that a debtor in possession may not assume an executory contract unless, at the time of such assumption, the debtor "cures, or provides adequate assurance that the [debtor] will promptly cure," any existing default(s) under the contract).

29.     For its part, Diamond has been focused on "the separation of the Diamond business from Sinclair."[22] Even before the petition date, Diamond informed Sinclair that it intended to negotiate major distribution agreements with certain distributors directly on its own, rather than rely on Sinclair's business team who had been leveraging Sinclair's own commercial relationships to achieve better commercial terms for major MVPD agreements than Diamond could achieve on its own.  Predictably, this decision has led to disastrous results.[23]  And since the petition date, Diamond has been building internal capacity to handle functions currently provided by Sinclair under the MSA and has been lining up replacement providers or arrangements for other MSA Services, which Sinclair believes may be for rates exceeding those under the MSA.  Diamond's separation-related efforts continue apace, with the assistance of Diamond's advisors.  For example, the Debtors have hired Deloitte Consulting LLP specifically to help them transition away from Sinclair, pursuant to an engagement letter (and a related change order) under which Deloitte has been or will be paid close to $12 million for transition-and separation-related services provided to Diamond from January 2023 through July 2023.[24]  Moreover, almost daily Diamond requests that Sinclair provide it with various free supplemental transition services, which are well beyond the scope of its obligation to provide core services under the MSA.  And as recently as August 11,

---

[22]   First Day Declaration ¶ 74.

[23]   *See, e.g.*, *Limited Statement of DIRECTV, LLC and Certain Affiliates in Response to Debtors' Initial Motion for Entry of an Order Extending the Exclusive Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptances Thereof* [Docket No. 1028] ("DIRECTV Limited Statement") ¶ 6 ("caution[ing] the Debtors against making any baseline assumptions in their go-forward business plan that any or all MVPDs would agree to 'expand carriage' when their respective existing agreements are up for renewal, especially without addressing the issue of providing immediate rate relief to MVPDs for the loss of teams from their respective RSNs resulting from the Debtors' intentional actions").

[24]   *See* Debtors' *Application for Entry of an Order (I) Authorizing the Retention and Employment of Deloitte Consulting LLP as Consulting Services Provider for the Debtors and Debtors in Possession Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 326] ("Deloitte Consulting Retention Application") ¶¶ 13-15.

Diamond's counsel confirmed at a status hearing that the relationship with Sinclair was going to be no more.[25]  While it is certainly Diamond's prerogative to separate from Sinclair, these costly separation efforts are flatly inconsistent with any future assumption of the MSA—or frankly any attempt to suggest that assumption is a serious consideration.  And by refusing to negotiate with Sinclair on its overall restructuring, Diamond's unilateral transition actions have the potential to seriously jeopardize Sinclair's own business operations.

30.     In addition to continuing to provide services to Diamond under the MSA—despite Diamond's non-compliance with its own obligations—Sinclair has voluntarily assisted the Debtors in their investigation of potential Debtor claims against Sinclair and related parties.  Understanding the Debtors' fiduciary mandate to investigate such matters, even for several months before the petition date, Sinclair fully cooperated in that investigation and made available seven of its key employees to be interviewed by Diamond's counsel and voluntarily provided thousands of documents in response to informal document requests.  After the petition date when Sinclair was informed that restructuring support discussions were over, Sinclair continued to dutifully comply with the Debtors' discovery requests, making available ten key Sinclair employees for deposition (including six  who had previously  been  interviewed)  and  providing  further  thousands  of documents, without the need for any motion practice or court intervention.  And while the Debtors were completing their investigation, Sinclair again sought to engage with the Debtors on multiple occasions to discuss their findings, exchange positions and viewpoints, and to explore efforts at a consensual resolution without the need for costly and time-consuming litigation.  Once again, the Debtors steadfastly refused to engage.  To the surprise of Sinclair and others, the Debtors, apparently inflamed by disputed testimony from the Commissioner of Major League Baseball,

---

[25]   Tr. of Aug. 11, 2023, H'rg at 9:6-7.

spurned Sinclair's attempts at discussion and simply rushed to file their 128-page Adversary Complaint.

31.     Among the Debtors' various claims, they assert an intentional fraudulent transfer claim (Count V) and a constructive fraudulent claim (Count VI) against Sinclair with respect to Diamond's contractual MSA fee payments to Sinclair.[26]   According to the Debtors, the value of the MSA Services and the quantum of the contractual fees under the MSA are not reasonably equivalent.[27]   Thus, the Debtors contend, such payments are avoidable as alleged actual and constructive fraudulent transfers.[28]   Notably, the Debtors do not distinguish between the MSA contract rate and the lower rates the Debtors have been paying since March 2022, apparently considering all such payments to be fraudulent transfers.   The Debtors complain that the lower amounts they have been paying are "excessive," even though for the periods covered in the Deferral Letter they were negotiated by Diamond's currently-retained conflicts counsel and with Diamond's secured lenders.[29]   The Debtors also claim, in a separate count, that Sinclair breached the MSA in various respects and is liable to Diamond in damages in an amount no less than $117 million.[30]

32.     Thus, following the filing of Diamond's Adversary Complaint, Sinclair is now in the untenable position of having to perform under the MSA while also simultaneously being sued for alleged fraudulent transfers and alleged breaches with respect to the very same MSA.   Sinclair

---

[26]   Compl. ¶¶ 277-283 (Count V), 284-291 (Count VI).   Count VII is a claim to recover the alleged fraudulent transfer of contractual MSA payments under Section 550.   Compl. ¶¶ 292-296 (Count VII).

[27]   Compl. ¶¶ 277-291

[28]   *Id.*

[29]   *Id.* at ¶ 244.

[30]   *Id.* ¶¶ 297-307 (Count VIII).

disputes the various heavily-edited and cherry-picked assertions and legal claims in Diamond's Adversary Complaint and will respond in due course.

33.     Simply put, Diamond has clearly, publicly, and emphatically demonstrated that it has no intention of assuming the MSA, even before taking into account the over $140 million that must be paid as part of a cure claim.  Indeed, how could Diamond assume the MSA after stating in its Adversary Complaint that it has "received less than reasonably equivalent value and fair value in exchange for payments made under the MSA, as evidenced by, among other things, the fact that the MSA fees far exceeded both Sinclair's cost to provide the services and comparable fees under similar arrangements"?[31]  Diamond must now reckon with the consequences of its clear, unequivocal declarations and acknowledge that it will never assume the MSA and simply reject it. Instead, Diamond has determined to stay silent and string Sinclair along to get the benefit of discount-rate MSA services for the duration of its chapter 11 case, forcing Sinclair to accrue administrative claims that Diamond does not pay, while Diamond challenges current and past MSA fee payments as unreasonable and avoidable.

34.     Unfortunately from Sinclair's perspective, the Debtors' halting engagement and litigious approach does not inspire confidence in a consensual, value-maximizing restructuring. To the extent the Debtors has engaged at all with Sinclair, it has only been for piecemeal supplemental transition services that Diamond wants—for free—with no meaningful engagement on the broader restructuring.  Instead, the Debtors seem intent on embracing a strategy similar to the one they utilized with the MLB, by failing to make a decision on one of their most material contracts that they know they will reject, seeking to force Sinclair to provide services under that

---

[31]     *Id.* ¶ 281(b); *see also id.* ¶ 288 ("Diamond did not receive reasonably equivalent value or fair consideration from Sinclair in exchange for the MSA Payments.").

contract at below-contract rates for the duration of the Debtors' chapter 11 cases, and launching unnecessary "shoot first" litigation against a major stakeholder, all while refusing any meaningful engagement towards the real purpose of chapter 11, *i.e.*, a consensual, value-maximizing restructuring.

## Argument

35.     Under section 365(d)(2) of the Bankruptcy Code, chapter 11 debtors generally are given until confirmation of a chapter 11 plan to assume or reject executory contracts, but the court may compel a debtor to assume or reject a contract within a shorter period.  A key purpose of this provision, as articulated by Congress, is to "prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate."[32]   By corollary, the provision also supports compelling timely assumption or rejection of a contract that the debtor has effectively committed to assume or to reject.[33]

36.     A range of factors may inform a court's decision to shorten the period for assumption or rejection of an executory contract.[34]  These factors may be grouped into three main

---

[32]  *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1079 (3d Cir. 1992) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978)); *see also In re Mirant Corp.,* 303 B.R. 319, 331 (Bankr. N.D. Tex. 2003) (explaining that if "prompt" assumption or rejection is required for certainty in the movant's business planning, "the court would likely grant such relief").

[33]  *See, e.g., In re Res. Tech. Corp.*, 254 B.R. 215, 227 (Bankr. N.D. Ill. 2000) (concluding that where the debtor's reorganization was premised on the assumption of a specific executory contract, the contract counterparty and other parties in interest were "entitled to know whether [the debtor was] willing and able to effect such an assumption"); *cf. In re Hawker Beechcraft, Inc.*, 483 B.R. 424, 433 (Bankr. S.D.N.Y. 2012) (indicating that where a debtor's future prospects "likely depend" on a particular decision as to the assumption or rejection of a specific contract, that decision should be made "at the earliest possible date"); *In re Travelot Co.*, 286 B.R. 462, 469 (Bankr. S.D. Ga. 2002) (holding that where an executory contract is essential to the debtor's business and the debtor "has all the facts before it" to make an informed assumption or rejection decision, "prolonging the suspense will not serve the purposes of Chapter 11").

[34]  *See, e.g.*, *Hawker Beechcraft.*, 483 B.R. at 429-30; *In re Dana Corp.*, 350 B.R. 144, 147 (Bankr. S.D.N.Y. 2006); *In re Panaco, Inc.*, 2002 WL 31990368, at *4-5 (Bankr. S.D. Tex. Dec. 10, 2002).  These factors include:  (a) the nature of the interests at stake; (b) the balance of the hurt to the litigants; (c) the good to be achieved by compelling assumption or rejection within a shorter time period; (d) the safeguards afforded to the litigants; (e) whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary; (f) the

categories:  (a) the balance of the harm to the parties and the compensability of any injury; (b) the importance of the contract to the debtors' business and reorganization effort—which helps inform whether a debtor has had sufficient time to make an assumption or rejection decision; and (c) the benefit to be achieved by shortening a debtor's assumption or rejection period.[35]  Each of these factors supports Sinclair's requested relief.  Moreover, courts have recognized that where—as here—the debtor has effectively committed itself specifically to assume or to reject a particular contract, there is no legitimate reason to allow the debtor to delay such action.[36]

## I.   DIAMOND HAS EFFECTIVELY COMMITTED TO REJECT THE MSA AND SHOULD NOT BE ALLOWED TO DELAY ITS REJECTION.

37.    By filing its Adversary Complaint against Sinclair, Diamond has effectively committed to reject the MSA in two distinct ways.  Having done so, Diamond should not be allowed to string Sinclair along with respect to Diamond's inevitable rejection of the MSA.  Allowing Diamond to "prolong[] the suspense will not serve the purposes of Chapter 11."[37]

---

debtor's failure or ability to satisfy postpetition obligations; (g) the damage that the nondebtor will suffer beyond the compensation available under the Bankruptcy Code; (h) the importance of the contract to the debtor's business and reorganization; (i) whether the debtor has sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan of reorganization; (j) whether there is a need for judicial determination as to whether an executory contract exists; (k) whether exclusivity has been terminated; and (l) the rehabilitative purpose of chapter 11.  *Hawker Beechcraft*, 483 B.R. at 429 (citing *In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 293 (Bankr. S.D.N.Y. 2003) (collecting factors from across numerous cases)).

[35]   *See, e.g.*, *Hawker Beechcraft*, 483 B.R. at 429-30; *Panaco*, 2002 WL 31990368, at *4-5.

[36]   *See, e.g.*, *Res. Tech.*, 254 B.R. at 227 (concluding that where the debtor's reorganization was premised on the assumption of a specific executory contract, the contract counterparty and other parties in interest were "entitled to know whether [the debtor was] willing and able to effect such an assumption"); *cf. Hawker Beechcraft*, 483 B.R at 433 (indicating that where a debtor's future prospects "likely depend" on a particular decision as to the assumption or rejection of a specific contract, that decision should be made "at the earliest possible date"); *Travelot*, 286 B.R. at 469 (holding that where an executory contract is essential to the debtor's business and the debtor "has all the facts before it" to make an informed assumption or rejection decision, "prolonging the suspense will not serve the purposes of Chapter 11").

[37]   *Travelot*, 286 B.R. at 469.

38.     *First*, Diamond's Adversary Complaint characterizes the MSA fees as "extortionate" and "off-market," and—in line with such characterizations—seeks to avoid Diamond's prior MSA fee payments to Sinclair as alleged fraudulent transfers (even at the below contracted rate).[38]  In so doing, Diamond has effectively foreclosed its assumption of the MSA, leaving rejection as the only available option.[39]  To assume the MSA, Diamond would need to: (a) show a sound business rationale for doing so;[40] (b) make an unavoidable cure payment to Sinclair of more than $140 million; and (c) provide adequate assurances of future performance under the MSA.[41]  Here, Diamond's stated position is that the MSA is a terrible economic deal for Diamond—to such an extent that Diamond's prior MSA fee payments to Sinclair are (purportedly) avoidable as fraudulent transfers.[42]  If Diamond's stated position reflects what it actually believes, Diamond's fiduciary obligations foreclose a decision to assume the MSA (and pay Sinclair the $140 million-plus cure amount)—and so compel a decision to reject it.  The Court should not permit the Debtors to protract their inevitable rejection of the MSA, particularly where such

---

[38]  Comp. ¶¶ 9, 277-291.

[39]  Having filed its Adversary Complaint against Sinclair, Diamond cannot now abandon the various MSA-related assertions in that complaint, which are conclusively binding on Diamond as judicial admissions.  *See, e.g.*, *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983) ("[F]actual assertions in pleadings . . . are considered to be judicial admissions conclusively binding on the party who made them.").

[40]  *See, e.g., In re Pisces Energy, LLC*, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) (Assumption or rejection of an executory contract is governed by "the 'business judgment test,' which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment.").

[41]  11 U.S.C § 365(b)(1) (providing that a debtor in possession may not assume an executory contract unless, at the time of such assumption, the debtor "cures, or provides adequate assurance that the [debtor] will promptly cure," any existing default(s) under the contract).  In Diamond's case, Diamond's solicitation and employment of Sinclair's former senior director of programmatic monetization in violation of the MSA cannot be cured, and Diamond therefore cannot assume the MSA.

[42]  Comp. ¶¶ 287-291.

unwarranted delay prejudices Sinclair (as detailed below). That is precisely what section 365(d)(2) of the Bankruptcy Code is meant to guard against.

39.     *Second*, Diamond's assumption of the MSA would also mandate dismissal of Diamond's fraudulent transfer claims with respect to the MSA, as Diamond's assumption of the MSA would preclude Diamond from seeking to avoid the cure payment as a fraudulent transfer (or otherwise). Under the assumed contract defense, once a debtor assumes a contract, it cannot seek to avoid prepetition payments under that very same contract. As Judge Jernigan explained in *In re Texas Rangers Baseball Partners*:[43]

> While all three of the cases decided within the Fifth Circuit have applied the contract assumption defense in the context of a section 547 preference action, the court believes that the reasoning employed by these courts would also apply in the context of a fraudulent transfer action. In fact, the bankruptcy court in *In re Centrix Fin., LLC*, found that the reasoning supporting the contract assumption defense applies with even greater force to fraudulent conveyance claims. *In Centrix Fin.*, the trustee alleged that the debtor received less than reasonably equivalent value in exchange for the payments under the assumed contract. In finding the contract assumption defense applied to the trustee's fraudulent transfer action, the court failed to comprehend how the Trustee could claim that the estate did not receive reasonably equivalent value for making payments under a contract that, presumably, was valuable enough to the estate to merit assumption and assignment in the first place. As a result, the bankruptcy court in *Centrix Fin.* held that the contract assumption defense acted as a complete bar to not only the trustee's fraudulent transfer claim, but also the exercise of all of the trustee's avoidance powers. This court agrees and finds that the contract assumption defense would bar a trustee's avoidance action, where the contract is assumed by the debtor, either under a confirmed plan or prior order of the court….[44]

40.     Thus, given the assumed contract defense, the Debtors cannot assume the MSA without abandoning three of their counts in the Adversary Complaint seeking to avoid payments

---

[43]   521 B.R. 134 (Bankr. N.D. Tex. 2014).

[44]   *Id.* at 187; *see also In re MPF Holding U.S. LLC*, 2013 WL 3197658, at *15 (Bankr. S.D. Tex. June 21, 2013) (holding that assumption of an executory contract bars subsequent avoidance actions relating to the assumed contract and any payments made in respect of it); *In re Centrix Fin., LLC*, 434 BR 880, 888 (Bankr. D. Colo. 2010) (same); *In re Greater Southeast Community Hosp. Corp. I*, 327 B.R. 26, 37-38 (Bankr. D.D.C. 2005) (same).

under the MSA totaling approximately $430 million.  If Diamond is even remotely considering assuming the MSA, then the Debtors should dismiss those counts now before the parties waste their time and money, and this Court's resources, litigating worthless avoidance actions. Otherwise, the Debtors should end their charade of considering whether to assume or reject the MSA and simply reject the MSA now.[45]

## II.    DIAMOND'S   UNWARRANTED   DELAY   IN   REJECTING   THE   MSA PREJUDICES SINCLAIR.

41.    While Diamond has made clear its intent to reject the MSA, it has not moved to do so.  Instead, Diamond (apparently focused on suing a growing number of its business partners) has determined to continue receiving the benefits of the MSA—comprising various critical operational, managerial, and administrative services provided by Sinclair—without paying the contract rate for those services.  Put less charitably, Diamond has determined to string Sinclair along with respect to the MSA, forcing Sinclair to subsidize Diamond's business and litigation against Sinclair.  Compelling Diamond to reject the MSA now, however, would not prejudice Diamond; it would simply accelerate the realization of one of Diamond's key restructuring goals: "the separation of the Diamond business from Sinclair,"[46] which Diamond has already taken various steps to achieve.

---

[45]    Sinclair also notes that if the Debtors continue merely paying the MSA deferred rate in violation of the Deferral Letter, and then assume the MSA as of an assumed December 31, 2023, exit date, the total cure claim under the MSA would total at least approximately $168 million.  At this point in time and given the circumstances in the Debtors' chapter 11 cases, it seems impossible that the Debtors are seriously considering an assumption that would contemplate a one-time payment on emergence of that magnitude.  If Sinclair is wrong on this point, discovery will certainly bear that out.  Even if the Debtors reject the MSA as of December 31, 2023, they will have incurred approximately $76.5 million of unpaid postpetition MSA Fees that must be paid on emergence as an administrative claim, in addition to the approximately $91.5 million outstanding on account of prepetition MSA Fees.

[46]    First Day Declaration ¶ 74.

42.     The Debtors' undue delay in rejecting the MSA is plainly prejudicial to Sinclair in several respects.  *First*, Diamond is not paying Sinclair the full MSA contract rate for MSA Services provided to Diamond postpetition, despite continuing to receive the full benefits of the MSA Services.[47]  Diamond's position is both practically untenable and contrary to law.  On a practical level, Diamond's position effectively forces Sinclair to subsidize Diamond's business and litigation efforts *against Sinclair* pending Diamond's inevitable rejection of the MSA.  And, as already recognized by this Court in the Debtors' prior litigation with the MLB, if a debtor elects to continue receiving benefits provided under an executory contract, the debtor must pay reasonable compensation for those benefits,[48] with the contract rate being presumed reasonable "unless the debtor introduces *convincing* evidence"[49] that the contract rate is "clearly unreasonable."[50]

43.     As of July 31, 2023, Sinclair's unpaid MSA fees for pre- and postpetition services totaled approximately $146.7 million—approximately $37.7 million of which is on account of

---

[47]   For the March-December 2023 period, the full contract rate is approximately $12 million per month.  The monthly rate paid by Diamond since the petition date is approximately $4.4 million per month.

[48]   *See, e.g.*, *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) (Where a "debtor-in-possession elects to continue receiving benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services."); *accord Matter of Braniff Airways, Inc.*, 783 F.2d 1283, 1285-86 (5th Cir. 1986).

[49]   *Matter of Washington-St. Tammany Elec. Co-op., Inc.*, 111 B.R. 555, 559 (Bankr. E.D. La. 1989) (citing *Braniff*, 783 at 1285 and *In re GHR Energy Corp.*, 41 B.R. 668, 672 (Bankr. D. Mass. 1984)) (emphasis in original).

[50]   *In re Home Interiors Gifts, Inc.*, Case No. 08-31961-11-BJH, Adversary No. 08-03125-BJH, at 18 (Bankr. N.D. Tex. Oct. 9, 2008) (citing *In re Beverage Canners Intern. Corp.*, 255 B.R. 89, 93 (Bankr. S.D. Fla. 2000)).  Diamond may argue that Sinclair is not prejudiced because, as asserted in its Adversary Complaint, Diamond is currently allegedly paying Sinclair in excess of the reasonably equivalent value for Sinclair's services.  While certainly Sinclair would vigorously disagree with that assertion, the disposition of this motion need not devolve into a battle as to the "reasonably equivalent value" of Sinclair's services, which is the subject of Diamond's adversary proceeding.  The mere fact that Sinclair is forced to provide services at significantly less than the contract rate, while suffering the uncertainty from a lawsuit asserting that even the current amounts being paid are excessive, all while Diamond intends to reject the contract, is more than enough prejudice to mandate forcing Diamond to make its decision now.

postpetition services.  That sum will continue to increase by approximately $8.5 million for each additional month of Sinclair's continued performance postpetition.  In light of Diamond's inevitable rejection of the MSA, however, Diamond ultimately will not pay these fees as cure payments, and certainly Diamond will contest any administrative claim for unpaid postpetition fees.  Further, as to Diamond's current postpetition MSA fee payments of approximately $4.4 million per month, Diamond's Adversary Complaint indicates that even these payments are subject to challenge as well.  This uncertainty regarding Sinclair's receipt (or retention) of payment for continuing MSA Services is both prejudicial to Sinclair and contrary to section 365(d)(2)'s policy of reducing uncertainty for the debtor's contract counterparties.  It is also inconsistent with section 503(b) of the Bankruptcy Code.[51]

44.    *Second*, in light of the MSA-related fraudulent transfer and breach of contract claims in Diamond's Adversary Complaint, virtually every aspect of Sinclair's ongoing performance under the MSA is now fraught with litigation risk and second-guessing conducted by the Debtors' advisors, requiring Sinclair to commit significant additional time and resources to navigate and address that risk as an incident of continued performance.

---

[51]    *Home Interiors*, Case No. 08-31961-11-BJH, Adversary No. 08-03125-BJH, at 18 (citing *Beverage Canners*, 255 B.R. at 93).  Diamond may argue that it does not have to pay the full MSA contract rate for MSA Services provided postpetition, on the ground that the restoration of the full MSA contract rate is triggered by Diamond's chapter 11 filing (*see* Deferral Letter, Annex 1), and thus is an unenforceable *ipso facto* provision.  *See* 11 U.S.C. § 365(e)(1).  But that issue, which merely relates to timing of payment, is a red herring. In the first instance, the Bankruptcy Code's invalidation of contractual *ipso facto* provisions does not apply to non-executory contracts such as the Deferral Letter (which does not contain ongoing material obligations on both parties).  *See, e.g.*, *In re General Growth Properties, Inc.*, 451 B.R. 323, 329 (Bankr. S.D.N.Y. 2011).  Even if the cessation of the fee deferral for postpetition services were invalid on *ipso facto* grounds—which it is not—the deferred fee amounts would still have to be paid in full in cash at some point, either: (a) upon assumption, if the MSA were assumed at the expiration of the deferral according to the terms of the Deferral Letter (likely the effective date of a chapter 11 plan with respect to Diamond but at the latest May 25, 2026); or (b) as an administrative claim, if the MSA is rejected.  Given Diamond's clear intent to reject the MSA, the bottom line is that Sinclair continues to be prejudiced by being forced to provide millions of dollars worth of services every month while accruing an ever-growing unpaid administrative claim, with no assurances that Sinclair will actually be paid.

45.     *Third*, if Sinclair is forced to continue to provide MSA Services, it will be providing services to a company who is actively suing Sinclair and which Sinclair (by the Debtors' own admission) likely has no economic stake.[52]  So long as Diamond protracts its inevitable rejection of the MSA, Sinclair's ongoing performance of the MSA drains resources that Sinclair otherwise would allocate to and invest in its actual business.  And the resulting harm to Sinclair's business is not compensable in money damages.

46.     By contrast, the relief requested in this Motion—compelling Diamond to assume or reject the MSA now—does not risk any prejudice to Diamond.  A key goal of the Debtors' chapter 11 cases, in the Debtors' own words, is "the separation of the Diamond business from Sinclair."[53]  In the months since the petition date, the Debtors have actively pursued that goal, building their internal capacity, including hiring a number of employees, to handle various MSA-covered functions and procuring replacement providers or arrangements for other MSA functions. The Debtors also have requested—without offering any additional compensation to Sinclair—Sinclair's assistance with various separation-related matters, including setting up Diamond-specific technology infrastructure, transitioning and partitioning data, and coordinating Diamond-specific vendor arrangements.  But until recently, at least was some uncertainty regarding the ultimate treatment of the MSA.  That changed, however, when Diamond filed its Adversary Complaint against Sinclair, which effectively commits Diamond to rejecting the MSA. And Sinclair expects that discovery will now yield evidence showing that Diamond has, in fact, already decided to reject the MSA but is not moving to do so.

---

[52]    Tr. of Aug. 11, 2023, H'rg at 9:6-7.

[53]    First Day Declaration ¶ 74.

47.     To be sure, Diamond's various separation-related efforts since March 2023 have laid the groundwork for Diamond's rejection of MSA.  Yet the relief requested in this Motion, if granted, would not result in the immediate termination of all MSA services.  The MSA itself requires Sinclair to continue providing general and administrative services, at Diamond's request, for up to ninety days after termination of the MSA for any reason (with this provision surviving termination of the MSA).[54]  Accordingly, if the requested relief is granted, Diamond will still have ample time to procure any other necessary replacement services or arrangements—whether through internal capacities or through contracting with a third party.  Thus, granting the requested relief does not risk the same prejudice to Diamond that denying the requested relief will inflict upon Sinclair.

## III.     THE DEBTORS HAVE HAD SUFFICIENT TIME TO MAKE AN INFORMED DECISION WHETHER TO ASSUME OR REJECT THE MSA.

48.     The MSA is one of the Debtors' most important contracts, and the specific treatment of the MSA is critical to the Debtors' overall restructuring.  From the filing of the Debtors' chapter 11 cases in March 2023, one of the Debtors' key restructuring goals has been "the separation of the Diamond business from Sinclair."[55]  Given the Debtors' reliance on the MSA Services, the Debtors' realization of this goal requires a determination regarding the treatment of the MSA.  Five months later, the Debtors have now taken various steps to separate from Sinclair and requested Sinclair's assistance with a range of additional separation-related matters.  Indeed, the Debtors have paid, or committed themselves to pay, more than $12 million

---

[54]     ███████████████████████████████████████████████████████████████████████████

[55]     First Day Declaration ¶ 74.

in consulting services fees to transition away from Sinclair.[56]  The Debtors' incurring those expenses further demonstrates that they are not seriously considering assuming the MSA.  And to date, the Debtors have not engaged with Sinclair regarding potential MSA modifications to facilitate a consensual, value-maximizing restructuring.  Nor have they engaged with Sinclair regarding a potential Sinclair-inclusive restructuring deal.  Instead, the Debtors have elected litigation and filed the Adversary Complaint, thereby effectively committing to reject the MSA.

49.     The Debtors' actions and statements, including in the Adversary Complaint, demonstrate that the Debtors do not need more time to make a decision regarding assumption or rejection of the MSA.  To the contrary, they have already decided to reject it.  All that remains is for the Debtors to actually move to reject the MSA, or otherwise be compelled to reject it on a timely basis.[57]  Unfortunately, Diamond's undue delay in rejecting the MSA is consistent with a broader pattern of delay and lack of engagement, as further detailed in the objections to Diamond's exclusivity extension motion filed by its stakeholders.[58]

---

[56]   *See, e.g.*, Deloitte Consulting Retention Application ¶¶ 13-15.

[57]   *See, e.g.*, *Hawker Beechcraft*, 483 B.R at 433 (indicating that where a debtor's future prospects "likely depend" on a particular decision as to the assumption or rejection of a specific contract, that decision should be made "at the earliest possible date")

[58]   *See Limited Objection of the Official Committee of Unsecured Creditors to Debtors' Initial Motion for Entry of an Order Extending the Exclusive Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptances Thereof* [Docket No. 1026] (stating that "the Debtors' current approach with respect to plan negotiations . . . has left key stakeholders, including the Committee, on the outside looking in," and "the Debtors are running out of time to pursue a plan of reorganization") (formatting altered); *Limited Objection of the Ad Hoc First Lien Group to Debtors' Initial Motion for Entry of an Order Extending the Exclusive Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptances Thereof* [Docket No. 1027] (identifying a pressing need for "actionable progress" in the Debtors' development of "a viable go-forward business plan and a confirmable chapter 11 plan," and emphasizing that "these cases need to progress on a tighter timeline"); *see also* Limited Statement of DIRECTV ¶ 5 ("To date, there has been little public indication of any meaningful progress in these cases, despite the Debtors' insisting that they have 'made substantial strides.'  Instead, the first four months of these cases have been marked by an expensive, and ultimately pointless, dispute with Major League Baseball and the teams that supply content to the Debtors, enabling them to earn revenue from the MVPDs.") (citation omitted).

**IV.   THE DEBTORS' NEAR-TERM REJECTION OF THE MSA WILL FACILITATE THE DEBTORS' STATED GOAL OF SEPARATING FROM SINCLAIR AND IS BENEFICIAL TO ALL PARTIES IN INTEREST.**

50.     Compelling Diamond's rejection of the MSA now will facilitate the Debtors' stated goal of separating from Sinclair in a way that is fair to both the Debtors and to Sinclair.  Since the petition date, Diamond has already taken various steps to separate from Sinclair.  And given the MSA's built-in option to receive up to ninety-days of post-termination general and administrative services, the requested relief will afford Diamond ample additional time to procure any other necessary replacement services or arrangements—whether through internal capacities or through contracting with a third party.  The requested relief will also provide Sinclair and other parties in interest with needed certainty as to the go-forward Sinclair-Diamond relationship (or lack thereof) and the ultimate treatment of the MSA, while mitigating further prejudice to Sinclair.

*   *   *   *   *

51.     Taken together, section 365(d)(2)'s uncertainty-reduction policy, coupled with the relevant factors articulated in applicable decisional law, all support compelling Diamond's immediate rejection of the MSA.

<strong><u>Reservation of Rights</u></strong>

52.     Sinclair reserves all rights with respect to the MSA and the Debtors' assumption or rejection of the same.

<strong><u>Notice</u></strong>

53.     Notice of this Motion will be provided by email, when available, or by traditional mail to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the Debtors; and (c) the parties listed on the Debtors' master service list.  In light of the nature of the relief requested, no other or further notice need be given.

## **Conclusion**

54.    Sinclair respectfully requests that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

Houston, Texas
August 21, 2023

*/s/  Zack A. Clement*

| **ZACK A. CLEMENT PLLC** | **KIRKLAND & ELLIS LLP** |
|---|---|
| Zack A. Clement (TX Bar No. 04361550) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 3753 Drummond Street | David R. Seligman, P.C. (admitted *pro hac vice*) |
| Houston, Texas 77025 | Jaimie Fedell (admitted *pro hac vice*) |

**ZACK A. CLEMENT PLLC**
Zack A. Clement (TX Bar No. 04361550)
3753 Drummond Street
Houston, Texas 77025
Telephone:        (832) 274-7629
Email:              zack.clement@icloud.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
David R. Seligman, P.C. (admitted *pro hac vice*)
Jaimie Fedell (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:        (312) 862-2200
Email:              david.seligman@kirkland.com
Email:              jaimie.fedell@kirkland.com

*Co-Counsel to Sinclair*

**<u>Certificate of Service</u>**

I certify that on August 21, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Zack A. Clement*
Zack A. Clement