IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | Case No. 23-90116 (CML) |
| Debtors. | (Jointly Administered) |

### JOINT MOTION OF MAJOR LEAGUE BASEBALL AND CERTAIN MAJOR LEAGUE BASEBALL CLUBS TO COMPEL ASSUMPTION OR REJECTION OF TELECAST RIGHTS AGREEMENTS

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within 21 days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within 21 days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Atlanta National League Baseball Club, Inc. (the "Braves"), Cleveland Guardians Baseball Company, LLC (the "Guardians"), Detroit Tigers, Inc. (the "Tigers"), Milwaukee Brewers Baseball Club, L.P. (the "Brewers"), and Rangers Baseball Express LLC[2] (the "Rangers" and each of the Braves, Guardians, Tigers, Brewers and Rangers with certain of their affiliates, a "Club" and collectively, the "Clubs") and the Office of the Commissioner of Baseball d/b/a Major League Baseball ("MLB"), by and through their undersigned counsel, hereby file this joint motion (the "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A (the

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

[2] The Rangers' joinder in the Motion (a) is without prejudice to their rights and remedies with respect to the termination notice the Rangers sent to their telecast rights agreement counterparty and the Debtors prior to the commencement of these chapter 11 cases, including without limitation the stipulated right to request that this Court determine on notice the validity and effect of the termination notice, and (b) shall not be construed as a waiver or relinquishment of such rights and remedies.

4857-0322-9572 v.8

"Order"), pursuant to section 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), to compel the Debtors to immediately assume or reject the Telecast Rights Agreements (as defined below). In support of the Motion, MLB and the Clubs respectfully state as follows:

**Preliminary Statement**

1. When MLB and certain Clubs first appeared before this Court, the 2023 MLB season had only just begun. At that time, MLB and the Clubs highlighted their specific concerns surrounding these chapter 11 cases. Primary among these concerns was the uncertainty with respect to how, when and where the Clubs' games would be produced and telecast for their fans.

2. Seven months—and the entire MLB 2023 regular season—later, the Debtors are no closer to addressing this concern or deciding whether Diamond Sports Group will reorganize or liquidate. The Debtors have requested extensions of exclusivity *twice* and the Debtors continue to shed telecast arrangements with teams across multiple leagues on an ad hoc and unexpected basis. The Debtors and certain non-Debtor affiliates began these chapter 11 cases with telecast arrangements with 14 MLB Clubs. As of the filing of this Motion, this number is down to 12 and will almost certainly drop to 11 at the conclusion of the postseason.

3. From the outset of these cases, MLB and the Clubs have been focused on obtaining certainty from the Debtors regarding the Debtors' plans for their performance under, and treatment of, each of the Clubs' telecast rights agreements (collectively, and together with related ancillary agreements, the "Telecast Rights Agreements"). For the entirety of the 2023 season, the Clubs faced the risk that the Debtors might reject or abandon Telecast Rights Agreements at any time, thus forcing the Clubs and MLB to scramble to telecast games to millions of fans. MLB

-2-

-3-

was, in fact, forced to take over the telecasts of two different Clubs with virtually no notice in the middle of the 2023 season.

4.  On April 5, 2023, MLB and the Clubs sought an order from this Court directing the Debtors to make payments under the Telecast Rights Agreements at the contract rate, or, in the alternative, compelling the Debtors to assume or reject the Telecast Rights Agreements. On June, 1, 2023, the Court ordered the Debtors to make payments under the Telecast Rights Agreements per the contract terms [Dkt. No. 819] and denied the request to compel assumption or rejection without prejudice to seek such relief at a later date. The time has now come for the Court to set an immediate deadline for assumption or rejection.

5.  The Debtors have had nearly seven months to formulate, socialize and propose a plan of reorganization providing for a viable, well-funded, go-forward reorganized business. They have failed to do so. Indeed, the Debtors have made no progress whatsoever. Instead, the Debtors have incurred hundreds of millions of dollars of cash losses, wasted time and estate resources on unnecessary litigation, shut down their Arizona and San Diego RSNs, failed to deliver the business plan required by their cash collateral order, and asked this Court, on an emergency basis, to appoint mediators to help broker an agreement between the Debtors and their creditor constituencies.

6.  Because there is zero evidence that the Debtors have any reorganization prospects or a viable go-forward business plan that provides for the continued telecast of the Clubs' games per the terms of the Telecast Rights Agreements, MLB and the Clubs must formulate alternative plans to ensure the continued telecast of and access to their games for the 2024 season. Preparations for the telecast of a full baseball season require extensive planning and expenditures, and their success depends on the lead time provided. Those preparations have to take place now.

At the moment, MLB and the Clubs can only guess which Clubs the Debtors may continue to support and which may be left without a telecast partner. Merely guessing is not good enough. If the Debtors do not intend to telecast the 2024 MLB games covered by the remaining Telecast Rights Agreements, they must make that intent clear now. The Debtors should be compelled to immediately assume or reject the Telecast Rights Agreements, so that MLB and the Clubs can properly plan for the future.

## Facts Specific to the Relief Requested

7. The details surrounding the Telecast Rights Agreements between the Clubs and the Debtors are well-known to the Court.

8. Producing and telecasting an MLB game requires the coordination of hundreds of employees, contractors and vendors. The distribution of MLB games depends on successful negotiations with cable and satellite distributors as well as local advertisers, many of which have their own complicated contractual arrangements that require delicate navigation. The Debtors' decision to reject some or all of the Telecast Rights Agreements could potentially multiply these efforts by a factor of twelve.

9. The importance of certainty and reliability in MLB telecast relationships was made clear earlier this year, when a certain non-Debtor affiliate elected to breach its Telecast Rights Agreement with the San Diego Padres (the "Padres"), resulting in the mid-season termination of the Padres' Telecast Rights Agreement. The Padres were left without a telecast partner in the middle of the season, jeopardizing their ability to distribute games. Fortunately, MLB and the Padres quickly sprang into action and averted any potential disruption due to scrupulous contingency planning. MLB should not be forced to contingency plan in the dark for the remaining Clubs.

10. Later in the summer, the Debtors elected to reject the Telecast Rights Agreement of the Arizona Diamondbacks (the "Diamondbacks"), once again leaving a Club without a dedicated telecast partner for its games in the middle of the season and with virtually no warning. MLB and the Diamondbacks were again able to avert a loss of telecasts, but only because MLB was able to effectively subsidize the Debtors' breach and expended substantial resources to keep the telecasts up and running.

11. Although MLB was able to successfully step in to ensure continued telecast operations for two Clubs during the 2023 season, that success was not a foregone conclusion. MLB's forethought and investments in anticipation of a potential drop in coverage was sufficient to support two Clubs. But it would present challenges of an entirely different magnitude for MLB to assume operations for up to twelve additional Clubs shortly before or over the course of the 2024 season. In the event the Debtors ultimately reject some or all remaining Telecast Rights Agreements, MLB must negotiate and ultimately enter new arrangements with distributors to ensure the uninterrupted telecast of MLB games. However, MLB's successful negotiation of such distribution agreements is impossible while the Telecast Rights Agreements remain with the Debtors. The economics of these arrangements are complicated and often require months of lead-time to complete. There is simply no way to negotiate these distribution arrangements without certainty as to which and how many Clubs MLB will be required to support for the 2024 season. Without certainty from the Debtors, MLB is left in an untenable situation: invest tens of millions of dollars to further build out its telecast capabilities in the event the Debtors reject additional Clubs' Telecast Rights Agreements without the immediate prospect of distributor revenue to offset these costs, or run the risk of failing to develop a sufficiently robust contingency plan to service every Club that may require MLB to support the telecast of its games.

12. Meanwhile, the Clubs remain bound to exclusive Telecast Rights Agreements with the Debtors with no clarity as to when the Debtors might decide to either assume or reject those agreements. This uncertainty creates significant budgetary, planning and operational challenges for the Clubs, which are currently unable to take meaningful steps to either move forward with the Debtors as broadcast partners or to explore other opportunities.

13. At this point in these proceedings, MLB and the Clubs are entitled to certainty with respect to the Telecast Rights Agreements. MLB and the Clubs are irreparably harmed every day that this certainty is further deferred.

## Relief Requested

14. By this Motion, MLB and the Clubs request entry of the Order, attached hereto as Exhibit A, compelling the Debtors to immediately assume or reject the Telecast Rights Agreements.

## Jurisdiction and Venue

15. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). MLB and the Clubs confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

16. The statutory basis for the relief requested herein is section 365(d)(2) of the Bankruptcy Code.

**Argument**

I. **THE COURT SHOULD REQUIRE THE DEBTORS TO IMMEDIATELY ASSUME OR REJECT THE TELECAST RIGHTS AGREEMENTS**

17. The Debtors should be compelled to immediately assume or reject the Telecast Rights Agreements. While section 365(d)(2) of the Bankruptcy Code generally allows a debtor until confirmation of a chapter 11 plan to assume or reject executory contracts, it also provides that a court may order a debtor to assume or reject a contract within a shorter time frame. Congress intended that this provision would reduce the uncertainty experienced by counterparties to executory contracts that were "left in doubt concerning their status vis-à-vis the estate." H.R. Rep. No. 95-595, at 348 (1977); *see also In re Mirant Corp.*, 303 B.R. 319, 331 (Bankr. N.D. Tex. 2003) (explaining that if "prompt" assumption or rejection is required for certainty in the movant's business planning, "the court would likely grant such relief").

18. Courts consider a range of factors when determining whether to shorten the period in which the debtor must assume or reject the contract. For example, in *In re Panaco*, this Court considered whether the debtor was paying or performing under the contract, whether the debtor's non-performance could damage the non-debtor party beyond compensation available under the Bankruptcy Code, whether the contract was the debtor's primary asset, and whether the debtor had sufficient time to formulate a plan. *In re Panaco, Inc.*, No. 02–37811, 2002 WL 31990368, at *4-5 (Bankr. S.D. Tex. Dec. 10, 2002) (citing *In re Burger Boys, Inc.* 94 F.3d 755, 761 (2d Cir. 1996)). Courts outside this circuit have held that deciding to shorten the period for assumption or rejection is within the court's discretion and should be based on the particular facts of each case, considering a myriad of factors.[3] *See In re Adelphia Communications Corp.,* 291

---

[3] Factors cited by other courts include (i) the nature of the interests at stake; (ii) the balance of the hardships; (iii) the good to be achieved; (iv) the safeguards afforded those litigants; (v) whether the action to be taken supports the purpose of Chapter 11; (vi) the Debtor's failure to or ability to satisfy post-petition obligations; (vii) damage the

-7-

B.R. 283, 293; *Theatre Holding Corp.* v. *Mauro,* 681 F.2d 102, 104-05*; see also Dunes Casino and Hotel*, 63 B.R. 939, 949 (D.N.J. 1986) (quoting *In re Midtown Skating Corp.*, 3 B.R. 194, 198 (Bankr. S.D.N.Y. 1980)). Importantly, courts examine whether chapter 11 debtors who unreasonably delay their decision to assume or reject an executory contract are acting in good faith, asking whether "prolonging the suspense" will "serve the purposes of chapter 11." *See In re Travelot Co.*, 286 B.R. 462, 469 (Bankr. S.D. Ga. 2002).

19. When MLB and certain Clubs previously sought to compel assumption or rejection of the Telecast Rights Agreements, the relief was requested as an alternative resolution to the Debtors' non-payment of the fees due under the applicable Telecast Rights Agreement. *See* Dkt. No. 280. At that time, the Debtors objected to such relief, claiming that MLB and the Clubs were trying to deny them the requisite "breathing spell" afforded to debtors to make decisions about executory contracts. *See* Dkt. No. 409. But the Petition Date was seven months ago and this Court's denial of the initial request for an order compelling assumption or rejection was more than four months ago. The Debtors have had ample time to determine what a go-forward business plan (if any) looks like and whether MLB telecasts are a part of that business plan.

20. They have done neither. Although they have enjoyed chapter 11 protection for nearly seven months, the Debtors still have not put forward a chapter 11 plan, let alone any sort of a business plan. The Debtors have already asked for two extensions of exclusivity to file a chapter 11 plan, and there is no reason to believe more time will serve any productive purpose. For example, the Debtors' non-performance, particularly without warning, would damage MLB and the Clubs beyond the compensation available under the Bankruptcy Code—a delayed

---

non-debtor will suffer; (viii) the importance of the contract to the Debtor's business and reorganization; and (ix) whether Debtor has sufficient time to appraise its financial situation and the value of the assets.

distribution of estate assets cannot make up for the interruption of local game telecasts during the 2024 MLB season. Simply put, maintaining the status quo forces MLB and the Clubs to endure the same uncertainties about the 2024 season that they faced regarding the 2023 season. Immediate assumption or rejection is required for certainty in MLB's and the Clubs' business planning,

21. Furthermore, the current state of uncertainty appears to be manufactured so that the Debtors can exert additional leverage. MLB and the Clubs believe that the Debtors already know which Telecast Rights Agreements they value and which ones they would like to reject, but are refusing to make their decisions official. MLB also understands that the Debtors have recently reached out to certain Clubs indicating that such Clubs are not part of the Debtors' go-forward plans, whatever they may be. But the Debtors have not formally moved to reject the Telecast Rights Agreements for those Clubs, and MLB and the Clubs cannot rely solely on the Debtors' informal outreach. The Debtors' conduct therefore smacks as an attempt to leverage the protections of chapter 11 for improper purposes. There is no question that the Debtors have had sufficient time to reach their decisions, and it is time for them to formally and publicly make their decisions clear.

22. The longer the Debtors are permitted to delay a decision on the Clubs' Telecast Rights Agreement, the more acute the harm is to MLB and the Clubs. At this point, the Debtors are simply keeping MLB and the Clubs in limbo, an approach that supports compelling assumption or rejection. *See Adelphia.,* 291 B.R. 283, 296 (noting that a delay of the decision to assume or reject an executory contract that persists "past the short term" is "unfair and inappropriate" as it would keep the contractual counterparty in limbo). If the Debtors are going to reject some or all of the Telecast Rights Agreements, MLB and the impacted Clubs must make

their own arrangements as soon as possible. Every additional day of delay means another day of uncertainty for the Clubs and the future of local game telecasts.

## Notice

23. Notice of this Motion has been provided to (a) Debtors and counsel to the Debtors, (b) the Office of the United States Trustee for the Southern District of Texas, (c) counsel to the Committee, (d) any other party that has requested notice pursuant to Bankruptcy Rule 2002 and (e) any other party entitled to notice pursuant to Local Rule 9013-1(d). MLB and the Clubs submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## Conclusion

WHEREFORE, for the reasons stated herein, MLB and the Clubs respectfully request that the Court (a) enter the Order, substantially in the form attached hereto as <u>Exhibit A,</u> and (b) grant such other and further relief as is just and proper.

| | |
|---|---|
| Dated: October 11, 2023<br>Houston, Texas | **BRACEWELL LLP**<br><br>*/s/ William A. (Trey) Wood III*<br>William A. (Trey) Wood III (Texas Bar No. 21916050)<br>711 Louisiana St., Suite 2300<br>Houston, Texas 77002<br>Telephone: (713) 221-1166<br>Facsimile: (713) 221-1212<br>E-mail: trey.wood@bracewell.com<br><br>Mark Dendinger (admitted *pro hac vice*)<br>CityPlace I, 34th Floor, 185 Asylum Street<br>Hartford, Connecticut 06103<br>Telephone: (860) 256-8541<br>Facsimile: (800) 404-3970<br>E-mail: mark.dendinger@bracewell.com<br><br>-and-<br><br>**SULLIVAN & CROMWELL LLP**<br>James L. Bromley (admitted pro hac vice)<br>Alexa J. Kranzley (admitted pro hac vice)<br>125 Broad Street<br>New York, NY 10004<br>Telephone: (212) 558-4000<br>Facsimile: (212) 558-3588<br>E-mail:  bromleyj@sullcrom.com<br>           kranzleya@sullcrom.com<br><br>Counsel for:<br>Office of the Commissioner of Baseball<br>Atlanta National League Baseball Club, Inc.<br>Milwaukee Brewers Baseball Club, L.P.<br>Detroit Tigers, Inc. |

-11-

-12-

**JONES DAY**

*/s/ Oliver S. Zeltner*
Heather Lennox (admitted pro hac vice)
Philip M. Oliss (admitted pro hac vice)
Oliver S. Zeltner (TX Bar No. 2410400)
Brett W. Bell (admitted pro hac vice)
Nick Buchta (admitted pro hac vice)
Alexander W. Prunka (admitted pro hac vice)
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Email: hlennox@jonesday.com
         poliss@jonesday.com
         ozeltner@jonesday.com
         bbell@jonesday.com
         nbuchta@jonesday.com
         aprunka@jonesday.com

Counsel for:
Cleveland Guardians Baseball Company, LLC

**WHITE & CASE LLP**

*/s/ Thomas E Lauria*
Thomas E Lauria (Texas Bar No. 11998025)
Laura Femino (admitted pro hac vice)
Samuel Kava (admitted pro hac vice)
200 South Biscayne Blvd., Suite 4900
Miami, Florida
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: tlauria@whitecase.com
      laura.femino@whitecase.com
      sam.kava@whitecase.coms

Glenn M. Kurtz (admitted pro hac vice)
Harrison Denman (admitted pro hac vice)
Camille M. Shepherd (admitted pro hac vice)
Elizabeth C. Stainton (admitted pro hac vice)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: gkurtz@whitecase.com
      harrison.denman@whitecase.com
      camille.shepherd@whitecase.com
      elizabeth.stainton@whitecase.com

Charles Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com


Counsel for:
Rangers Baseball Express LLC

4857-0322-9572 v.8

## Certificate of Service

I certify that on October 11, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ William A. (Trey) Wood III*
William A. (Trey) Wood III

4857-0322-9572 v.8