**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) Case No. 23-90116 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO AND PERFORMANCE UNDER THE COOPERATION AGREEMENT, (II) APPROVING THE TERMS OF THE SETTLEMENTS CONTAINED THEREIN, AND (III) GRANTING RELATED RELIEF**

> **Emergency relief has been requested.  Relief is requested not later than 9:00 a.m. (prevailing Central Time) on November 15, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on November 15, 2023, at 9:00 a.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Lopez's home page.  The meeting code is "JudgeLopez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page.  Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")[2]

respectfully state as follows in support of this motion:

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG.  The Debtors' service address for purposes of these chapter 11 cases is:  c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

[2]   Capitalized terms used but not defined in this motion shall have the meanings ascribed to such terms in the Cooperation Agreement (as defined below).

## Relief Requested

1.      The Debtors seek entry of an order, substantially in the form attached hereto, (a) authorizing the Debtors to enter into and perform under a cooperation agreement with the members of an ad hoc group of first lien lenders (the "First Lien Group"), certain members of an ad hoc group of primarily second lien lenders (the "Second Lien Group," and such members, the "Secured Cooperating Parties"), and the official committee of unsecured creditors (the "UCC") attached hereto as **Exhibit A** (the "Cooperation Agreement"), (b) approving the settlements and compromises contained therein (subject to the terms and conditions contained therein), and (c) granting related relief.

## Preliminary Statement

2.      The Debtors commenced these chapter 11 cases to address their overleveraged balance sheet and with the goal of expanding their direct-to-consumer digital business to offset losses in their traditional cable and satellite broadcast business.  And while the Debtors entered into a restructuring support agreement with certain holders of their debt contemporaneously with the commencement of these cases, that agreement contemplated reaching agreement on a business plan that would leave first lien claims unimpaired.  But the uncertainty created by the rapidly changing cable television ecosystem affecting programming providers like the Debtors, significant losses from contracts with team and league counterparties, and the inability to obtain rights for an expanded digital product to offset those losses left the Debtors with a difficult path forward, and the plan contemplated by that restructuring support agreement not feasible.

3.      Now, after months of negotiations both before and during these cases, including in Court-approved mediation, the Debtors have an actionable path forward in the form of the business plan underlying the Cooperation Agreement.  The Cooperation Agreement contemplates that the

Debtors will continue to operate their business over the course of the 2023–24 seasons for the National Basketball Association (the "NBA") and the National Hockey League (the "NHL") and the 2024 season for Major League Baseball ("MLB") (the "2023–24 Seasons").  Under the Cooperation Agreement, the Debtors plan to reject or otherwise terminate certain team rights agreements that are not part of their business plan, while continuing to generate revenue from the remaining team rights agreements through the 2023–24 Seasons.  This process is designed to allow the Debtors' counterparties, including their team, league, and distributor partners, to smoothly transition operations over the course of those seasons without an abrupt cessation of broadcasting.

4.      The Debtors have worked diligently with the NBA and NHL on implementing this strategy.  The Debtors have reached agreement on modifications to their telecast rights agreements with the NBA and are continuing those discussions with the NHL.[3]  The Debtors project that these modified agreements, together with the other agreements and transactions that are part of the Cooperation Agreement, will allow the Debtors to operate profitably through the 2023–24 Seasons.  The NBA agreement is predicated on approval of the Debtors' entry into the Cooperation Agreement, and the Debtors will obtain the consent of the First Lien Group (which represents the majority of the Debtors' first lien lenders) to make the payments under the NBA agreement upon the effectiveness of the Cooperation Agreement.  No deal similar to the NBA deal currently exists with MLB and its teams.  The Debtors have determined which MLB team agreements they intend to retain through the 2024 MLB season, and which MLB team agreements the Debtors may retain subject to further discussions with the applicable teams, and recently have identified these teams to MLB.

---

[3]      The Debtors have filed a motion seeking authorization to enter into and perform under the agreement with the NBA contemporaneously herewith.

5.      Effectiveness of the Cooperation Agreement is contingent on the Court's authorization for the Debtors to enter into the agreement with the NBA and any similar agreement with the NHL, the resolution of Sinclair's and MLB's motions to compel assumption or rejection of their agreements, amendments to the cash collateral order, and an order extending the Debtors' exclusivity periods.  In addition, the rights and obligations of the Secured Cooperating Parties under the Cooperation Agreement become enforceable only if additional second lien creditors sign on to the agreement, as those rights and obligations are conditioned on execution by parties that collectively hold more than 50% of Second Lien Claims.

6.      As a product of negotiations, including in mediation, among the Debtors, their funded debt creditors, and the UCC, the Cooperation Agreement settles numerous intercreditor disputes through the allocation of administrative expenses and value, including, without limitation, the Debtors' operating assets, accounts receivable, joint venture interests, and litigation claims, between first lien creditors (up to a $629 million recovery cap), on the one hand, and junior creditors, on the other.  These settlements will allow the Debtors to propose a chapter 11 plan that will distribute the proceeds derived from the continued operation of their business, accounts receivable, monetization of certain joint venture interests, and the pursuit of the Debtors' substantial litigation claims against certain parties, including their ultimate parent company, Sinclair Broadcast Group, Inc. ("Sinclair") and certain of Sinclair's affiliates and related individuals, Bally's Corporation, and JPMorgan Chase Funding Inc. ("JPMCFI") and JP Morgan Chase & Co. ("JPMC," and together with JPMCFI, "JPM").  The Cooperation Agreement's proposed settlements will allow the Debtors to continue their wage and benefits programs for employees (including paying bonuses and any severance), and will save the Debtors' estates significant administrative expense by avoiding protracted negotiations and potential litigation with

the Debtors' secured lenders and the UCC, thereby limiting the professional fees the Debtors' estates will incur going forward. The Cooperation Agreement does not foreclose potential alternative transactions, but instead preserves the Debtors' ability to explore potential opportunities that could provide greater value to the Debtors' stakeholders, consistent with the Debtors' fiduciary duties.[4]

7.      In sum, the Cooperation Agreement represents a comprehensive and integrated resolution that efficiently resolves numerous complex intercreditor disputes, many of which likely would otherwise be extensively (and expensively) litigated, provides a path for the Debtors' counterparties to transition operations during the course of the 2023–24 Seasons, and provides assurance to the Debtors' employees. While not every major party in interest is party to the agreement, the Cooperation Agreement is the product of months of negotiations, including successful mediation, among the Debtors, their creditors, commercial counterparties, and other parties in interest, which has informed the Debtors' belief that the Cooperation Agreement represents the best and most actionable path forward at this time. Many of the Debtors' counterparties, including MLB, DIRECTV, and Sinclair, have expressed the need for clarity regarding the Debtors' continued operations, and the Cooperation Agreement provides that clarity.

8.      Time is of the essence to obtain the requested relief. The NBA and NHL seasons commenced recently, and the Debtors' agreement with the NBA requires the Debtors to obtain approval of the Cooperation Agreement within a short timeline so that the NBA and its teams can provide fans with clarity regarding the upcoming season. Delays in obtaining approval of the Cooperation Agreement may give rise to termination rights in favor of the NBA under the NBA

---

[4]     The Cooperation Agreement also provides the UCC with the ability to terminate the Cooperation Agreement in the event it is no longer consistent with the UCC's fiduciary duties to unsecured creditors.

agreement.  Further, absent approval of the Cooperation Agreement, the Debtors' first lien lenders will not permit the payment of the new agreed-upon rights fees under the NBA agreement (and any similar new agreement with the NHL) and may withdraw support for the Debtors' continued operation.  Thus, any delay in authorization to enter into the Cooperation Agreement jeopardizes the Debtors' ability to effectuate the settlements incorporated therein.  Without the resolutions of the complex intercreditor issues incorporated in the Cooperation Agreement, the Debtors and their estates likely will incur significant administrative expenses as a result of additional negotiations and potential litigation with the First Lien Group, the Second Lien Group, and the UCC, thereby diminishing the value of the estates to the detriment of stakeholders.

9.      For the reasons set forth more fully herein, the Debtors respectfully submit that entry into the Cooperation Agreement is a reasonable exercise of their business judgment and the proposed settlements incorporated therein are fair, reasonable, and in the best interest of their estates.  The Debtors therefore request that the Court grant them authority to enter into the Cooperation Agreement and approve the settlements contained therein.

## Jurisdiction and Venue

10.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order").  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12. The bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, and 9019, Rules 2002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas*.

## Background

### I. The Chapter 11 Cases

13. On March 14 and 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On March 15, 2023, the Court entered an order authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On March 27, 2023, the Office of the United States Trustee for the Southern District of Texas appointed the UCC. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

14. On May 9, 2023, the Court entered an order approving the Debtors' use of cash collateral during these chapter 11 cases [Docket No. 572] (the "Cash Collateral Order"), subject to the terms set forth therein. Through amendments and extensions of the use of cash collateral, the Debtors continue to have access to cash collateral subject to certain termination rights possessed by the Majority 1L Lenders. The UCC's Challenge Period under the Cash Collateral Order, pursuant to which it may challenge the Debtors' stipulations in the Cash Collateral Order regarding their prepetition secured debt, has been extended by agreement of the Debtors and the

Majority 1L Lenders through November 30, 2023, and under the Cooperation Agreement to December 29, 2023 (subject to further extension as set forth in the Cooperation Agreement).[5]

## II.      The Debtors' Business

15.      The Debtors are the leading provider of local sports programming in the United States, which operates regional sports networks (the "RSNs") under the Bally Sports trade name across the United States and maintains investments in Marquee Sports Network, LLC ("Marquee") and Red Seam Holdings LLC, which operates the Yankees Entertainment and Sports Network ("YES").  As of the Petition Date, the Debtors and their non-debtor subsidiaries had dozens of key operational counterparties, including, among others, MLB, the NHL, the NBA, 42 professional sports teams in those leagues, and national and local programming distributors, each of which the Debtors contracted with for the purpose of producing and delivering thousands of local professional sports games annually to sports fans located across the United States.

## III.     The Debtors' Business Challenges

16.      The Debtors' business, along with others in the cable television industry and the RSN business, has faced significant pressure over the last decade as the result of changing consumer habits.  Historically, the Debtors have relied on multichannel video programming distributors ("MVPDs") to reach consumers by being part of the traditional cable bundle (i.e., television programming delivered through cable and satellite providers).  But MVPDs are facing unprecedented subscriber loss and corresponding revenue loss as many Americans are "cutting the cord" on their MVPD subscriptions, or never subscribing to MVPDs in the first place, and instead moving to streaming services to access programming content, including live sports

---

[5]     The Cooperation Agreement provides that the Cash Collateral Order will be amended in form and substance satisfactory to the Debtors, the Majority 1L Lenders, and the UCC to effectuate the settlements incorporated in the Cooperation Agreement.

games.  As a result of these changes in consumer habits, MVPDs have lost nearly 25 million customers over the last five years, and Charter Communications, the second largest cable television operator in the United States by subscribers, has described the cable industry ecosystem as "broken."[6]  While the Debtors still earn significant revenue from distribution of their RSNs, this revenue has decreased significantly and faces further erosion in the future.  The Debtors faced significant uncertainty at the outset of these cases as to future carriage of their RSNs by major MVPDs as their three largest distribution contracts were all set to expire within one year of the Petition Date, requiring the Debtors to negotiate extensions of these distribution agreements while operating in chapter 11.

17.     At the same time, the Debtors have long-term contracts with their team and league partners, which obligate the Debtors to pay increasing rights fees over the life of the contracts.  But with rapidly declining revenue, these rights fees have become unsustainable.  And although this evolution in the television marketplace presented an opportunity in the form of expanding the Debtors' digital distribution platform, the Debtors entered these chapter 11 cases without the rights necessary to present a year-round direct-to-consumer product in all of their RSN markets, adding additional uncertainty to the future of their business.  The Debtors therefore have needed rights fee reductions from their team and league partners to develop a go-forward business plan, a matter complicated by the uncertainty around their ongoing MVPD negotiations.  Similar uncertainty and sustained losses led Warner Bros. Discovery Inc., which previously owned another large RSN company, AT&T SportsNet, to announce in February 2023 that it was exiting the market due to insufficient cash to support its RSNs, ultimately shutting down its networks in Houston, Pittsburgh, Colorado, and Utah at the end of September.

---

[6]   Charter Commc'ns, Inc., *The Future of Multichannel Video: Moving Forward, Or Moving On*, Sept. 1, 2023, https://ir.charter.com/static-files/05f899dd-7ef3-40d8-84c1-f16a7acfe318.

**IV.      The Debtors' Business Plan and Chapter 11 Plan Negotiations**

18.      Since well before the commencement of these chapter 11 cases, the Debtors have made every effort to position themselves for the next phase in sports media distribution for the benefit of all of their stakeholders.  For over two years, the Debtors have negotiated with their creditors to substantially deleverage their balance sheet and worked with their league and team partners to secure the package of rights necessary to launch and grow the Debtors' direct-to-consumer business in the face of a rapidly changing cable television ecosystem.  And after months of negotiation prior to the Petition Date, the Debtors signed a restructuring support agreement (the "<u>Prior RSA</u>") shortly after commencing these chapter 11 cases with certain members of the Second Lien Group and an ad hoc group of crossholders of secured and unsecured debt (the "<u>Crossholder Group</u>").  The Prior RSA included the agreement to equitize more than $8 billion of secured and unsecured debt but, as noted above, was predicated on (a) achieving agreement on a business plan, (b) leaving first lien claims unimpaired while equitizing all junior debt, and (c) obtaining agreement on whether any new money financing was necessary to fund the reorganized business and the source of that financing.

19.      The Prior RSA ultimately was not actionable because, among other things, the Debtors and their creditors could not agree on a business plan that left first lien claims unimpaired.[7] This was due, in significant part, to the fact that the Debtors were unable to obtain the necessary rights from MLB to allow for a year-round direct-to-consumer product to help offset declining linear distribution revenue, which was a key part of the Debtors' initial proposed business plan. As a result, the Debtors have been focused on formulating an alternative business plan since early

---

[7]      On the date hereof, the Debtors exercised their fiduciary out under the Prior RSA and terminated that agreement in accordance with its terms.

June, after it became clear that the Debtors would not be able to execute on any plan with MLB regarding direct-to-consumer rights, and have been actively engaged in that process with the ad hoc groups and the UCC during that time.

20.     In connection with this process, and related discussions concerning the formulation of a potential chapter 11 plan, significant intercreditor disputes emerged with respect to the allocation of value of the Debtors' estates among secured and unsecured creditors.  These issues included, among others:

a.     <u>Make Whole Amount</u>:  Whether the first lien lenders are entitled to a make whole amount under the first lien credit agreement, including, among other things, whether such amount became due prior to the Debtors' bankruptcy filings, whether it would be disallowed as "unmatured interest" under section 502(b)(2) of the Bankruptcy Code, and whether it would be payable as a "reasonable fee" under section 506(b)(2) of the Bankruptcy Code if the first lien claims ultimately were oversecured.

b.     <u>Diminution in Value</u>:  Whether any diminution in value of the secured creditors' collateral had occurred as a result of these chapter 11 cases and, if so, the method to determine the extent of any such diminution in value.

c.     <u>Oversecured vs. Undersecured</u>:   Whether the first lien lenders were oversecured and if so, whether (and the rate at which) they would be entitled to postpetition interest.  And, if the first lien lenders were undersecured, the amount of, and method of calculation for, their deficiency claim.

d.     <u>Recharacterization</u>:  Whether adequate protection payments made to the first lien lenders under the Cash Collateral Order should be recharacterized as payments of principal.

e.     <u>Encumbered v. Unencumbered Value</u>:  Whether certain of the Debtors' assets were encumbered by the liens asserted by the Debtors' secured creditors, including, but not limited to:

i.     Whether certain claims asserted in the Debtors' litigation against Sinclair, Bally's Corporation, and JPM constitute general intangibles or were otherwise part of the secured creditors' collateral package, or whether such claims were unencumbered commercial tort claims or avoidance actions.  And, to the extent certain claims in that litigation were part of the secured creditors' collateral package, the method for allocating the value of any judgments or settlements among the counts that are collateral and those that are not.

      ii.    Whether approximately $50 million of cash and any cash proceeds from other accounts receivable held by non-Debtor Diamond Sports Finance SPV, LLC, if and when distributed by that entity to Debtor Diamond Sports Net, LLC, would be encumbered by the liens of the Debtors' secured creditors.

      iii.    Whether the Debtors' secured creditors had valid liens on certain of the Debtors' assets, including Debtor Sports Network, LLC's 50% equity interest in Marquee and certain liens and claims granted in connection with the Debtors' incurrence of new debt in March 2022 and in connection with Sinclair's purchase of the Debtors in August 2019.

    f.    <u>Turnover Provisions</u>:  The impact of turnover provisions in the intercreditor agreement governing the rights of the Debtors' first, second, and third lien creditors on potential plan distributions.

    g.    <u>Allocation of Administrative Costs</u>:  The allocation of the administrative costs of these chapter 11 cases between encumbered and unencumbered assets, including costs related to the Debtors' investigation into prepetition transactions and the costs of administering the estates.

21.    After extensive negotiations with key commercial counterparties and creditors, it became clear to the Debtors that it would be increasingly challenging for parties to reach agreement on a consensual chapter 11 plan without a catalyst.  To break the impasse, on August 15, 2023, the Debtors filed a motion seeking the appointment of Judges Marvin Isgur and David Jones to facilitate the ongoing discussions in a mediation.  On August 17, 2023, the Court entered an order [Docket No. 1087] appointing the judicial mediators to oversee mediation in these chapter 11 cases.[8]

22.    The Debtors, the ad hoc groups, the UCC, Sinclair, and many of the Debtors' key commercial counterparties (including MLB, the NBA, and the NHL) participated in the mediation with the aim of bridging the gap among the parties on key issues, including intercreditor disputes and critical commercial negotiations.  The mediation included extensive negotiations facilitated by the mediators, including term sheets related to multiple chapter 11 plan and business constructs,

---

[8]    Judge Jones ceased his role as mediator upon the announcement of his resignation on October 15, 2023.

numerous videoconferences and telephone calls, and in-person mediation sessions in Washington, D.C. on September 26 and 27, 2023.  Eventually, the Debtors, the UCC, and the First Lien Group reached an agreement in principle to resolve the aforementioned intercreditor issues and move these chapter 11 cases toward a consensual chapter 11 plan in an orderly and efficient manner, which was ultimately joined by the Secured Cooperating Parties and memorialized in the Cooperation Agreement.[9]  The settlement embodied in the Cooperation Agreement provides the Debtors and their creditors, commercial counterparties, and employees with clarity regarding the path forward for the chapter 11 cases, while preserving the Debtors' ability to accept a potential alternative transaction that would provide greater recoveries to creditors.

## V.      The Cooperation Agreement[10]

23.     The Cooperation Agreement is the product of mediation among the Debtors and their stakeholders, and the culmination of months-long, hard-fought, arm's-length commercial negotiations that began long before the commencement of these chapter 11 cases.  As noted above, the Cooperation Agreement contemplates that the Debtors will continue operating a substantial majority of their RSNs through the end of the 2023–24 Seasons.  This process is designed to allow the Debtors and their commercial partners, including teams, leagues, and distributors, to transition operations over the course of the 2023–24 Seasons, ensure continuity for sports fans, and provide for the continuation and funding of bonus, severance, and other wage and benefits programs for the Debtors' employees, all while maximizing recoveries for the Debtors' estates.  Under the

---

[9]    Judge Isgur oversaw the mediation with respect to the intercreditor negotiations that resulted in the settlements contained in the Cooperation Agreement, while Judge Jones primarily focused on commercial negotiations during his involvement in the mediation.  Judge Jones did not participate in the intercreditor negotiations that ultimately resulted in the settlements memorialized in the Cooperation Agreement.

[10]   The summaries of the Cooperation Agreement and the proposed settlement in this motion are qualified in their entirety by the provisions of the Cooperation Agreement and all exhibits thereto.  To the extent anything in this motion is inconsistent with such documents, the terms of such documents shall control.

Cooperation Agreement, the Debtors, the First Lien Group (representing the Majority 1L Lenders under the Cash Collateral Order), the Secured Cooperating Parties, and the UCC have agreed to the following terms and conditions:

| Term | Description |
|---|---|
| **Unsecured Consideration**<br><br>Cooperation Agreement Ex. A | Consideration for all claims other than First Lien Claims:<br><br>• Interest in YES (including any distributions from YES) or the proceeds thereof.<br><br>• Interest in Marquee (including any distributions from Marquee) or the proceeds thereof.<br><br>• 100% of SPV cash, to be used as follows:<br><br>    ○ up to $5 million to be used to fund a convenience class;<br><br>    ○ $25 million to be used to fund Sinclair-Related Litigations;<br><br>    ○ payment of unsecured notes indenture trustee fees and expenses; and<br><br>    ○ funding of unsecured portion of certain administrative expenses as set forth in the "Budget" section below.<br><br>• 85% of all proceeds from the Sinclair-Related Litigations, and remaining Sinclair-Related Litigation proceeds once the $629 million cap for Secured Consideration has been reached.<br><br>• Debtors to waive all trade preference claims.<br><br>• All business value over $629 million cap for Secured Consideration. |
| **Secured Consideration**<br><br>Cooperation Agreement Ex. A | Consideration for First Lien Claims:<br><br>• All business value other than Unsecured Consideration.<br><br>    ○ Includes all cash (other than SPV cash), accounts receivable, value of RSNs, and value of joint ventures other than YES and Marquee.<br><br>• 15% of all proceeds from Sinclair-Related Litigations, subject to the $629 million cap.<br><br>• Continued postpetition interest payments.<br><br>    ○ Pause on payments after December 1, 2023, with payments resuming on May 1, 2024.<br><br>    ○ Interest accrued during the pause will be paid in two equal installments on June 1, 2024, and July 1, 2024.<br><br>Recovery subject to cap of $629 million.<br><br>• Postpetition interest payments for interest accrued from October 1, 2023, onward are counted toward the cap.<br><br>• First Lien Group and agent fees and expenses not included in the cap.<br><br>Secured Consideration resolves all deficiency claims, make-whole claims, diminution-in-value claims, and recharacterization claims. |

| Term | Description |
|------|-------------|
| **Budget**<br><br>Cooperation Agreement Ex. A | Cost Allocations:[11]<br><br>• Severance and other employee-related payments:  80% / 20%<br><br>• Debtors' professional fees (other than as indicated below) after September 30, 2023, through plan confirmation:  60% / 40%<br><br>• Debtors' professional fees (other than as indicated below) after plan confirmation:  100% / 0%<br><br>• Debtors' investment banker fees (including the Restructuring Fees, but excluding other transaction fees): 50% / 50%<br><br>    o Restructuring Fees to be reduced to $20 million.<br><br>• Costs incurred in connection with (i) Sinclair-Related Litigations on or after October 1, 2023, and (ii) unsecured claims reconciliation and administration:  0% / 100%<br><br>• First Lien Group's and UCC's professional fees from September 30, 2023, through the earlier of (i) November 30, 2023, and (ii) entry and effectiveness of the Cooperation Agreement Order:  60% / 40%<br><br>• First Lien Group's professional fees after the earlier of (i) November 30, 2023, and (ii) entry and effectiveness of the Cooperation Agreement Order:  100% / 0%<br><br>• Secured Cooperating Parties' professional fees:[12]  0% / 100%<br><br>• UCC's professional fees after the earlier of (i) November 30, 2023, and (ii) entry and effectiveness of the Cooperation Agreement Order:  0% / 100%<br><br>• Accounts payable and accrued expenses as of September 30, 2023:  0 % / 100%<br><br>• Accounts payable and accrued expenses after September 30, 2023:  100% / 0%<br><br>Unsecured Consideration share of above costs to be satisfied:<br><br>• first, through YES and Marquee proceeds;<br><br>• second, through remaining balance of SPV cash after taking into account $5 million convenience class, $25 million Sinclair-Related Litigations funding, and payment of unsecured notes indenture trustee fees and expenses; and<br><br>• third, to the extent necessary, through Cash Collateral.<br><br>    o Cash Collateral used will be repaid from YES, Marquee, and/or Sinclair-Related Litigations proceeds allocable to unsecured creditors, whichever is received first.<br><br>Advancement/Reimbursement:<br><br>• The Debtors will advance payment on any costs incurred that become due prior to plan confirmation.<br><br>• Upon plan confirmation, the SPV cash (and/or other sources of Unsecured Consideration) will be used to repay any amounts that are allocated to Unsecured |

---

[11]    Allocations are indicated as X% Secured Consideration / Y% Unsecured Consideration.

[12]    Up to an amount to be reasonably agreed between the UCC and the Secured Cooperating Parties and subject to (i) parties that collectively hold more than 50% of Second Lien Claims having become party to the Cooperation Agreement and (ii) each class of Second Lien Claims having accepted the plan.

| Term | Description |
|------|-------------|
| | Consideration in accordance with the above splits that were previously paid from Cash Collateral. |
| **Other Terms**<br><br>Cooperation Agreement Ex. A | • The Debtors will commence the process to market their interests in YES and Marquee upon execution of the Cooperation Agreement.<br><br>• Cash Collateral Order to be amended to permit, among other things, interim distributions to first lien creditors.<br><br>• UCC's challenge deadline extended, subject to limitations on reimbursement of fees and expenses.<br><br>• Upon confirmation of a chapter 11 plan, Sinclair-Related Litigations and assets allocated to Unsecured Consideration shall be transferred to a Liquidation Trust.<br><br>    o Governance of Liquidation Trust to be determined by the UCC, the First Lien Group, and the Secured Cooperating Parties, subject to the consent of the Debtors, not to be unreasonably withheld.<br><br>    o Governance terms to be consistent with the relative economic interests, in each case, of the unsecured and secured creditors in the Liquidation Trust.<br><br>    o Liquidation trustee to be selected by the UCC, the First Lien Group, and the Secured Group, with the consent of the Debtors, not to be unreasonably withheld, and in consultation with the Crossholder Group.<br><br>    o Appointment rights for any governance board to be determined by the UCC, the First Lien Group, and the Secured Group, with the consent of the Debtors, not to be unreasonably withheld, and in consultation with the Crossholder Group.<br><br>• Debtors to appoint a board observer selected by the First Lien Group, the Secured Cooperating Parties, and the UCC.<br><br>    o Selection subject to Debtors' consent, not to be unreasonably withheld.<br><br>    o Board observer to be included in all Conflicts Committee meetings and discussions regarding the Sinclair-Related Litigations.<br><br>• Board compensation to be acceptable to the First Lien Group.<br><br>• Subject to (i) parties that collectively hold more than 50% of Second Lien Claims having become party to the Cooperation Agreement and (ii) each class of Second Lien Claims having accepted the plan, on the effective date of such plan, first lien creditors waive all rights under the Intercreditor Agreement, including on turnover.<br><br>• Recoveries at each Debtor entity TBD; *provided* that nothing in the Cooperation Agreement shall be treated as substantively consolidating the Debtors' estates or any similar remedies, and each of the Debtors, the UCC, and the Secured Cooperating Parties reserves all rights with respect to substantive consolidation, treatment of intercompany claims, and any other issue that may impact the recoveries at each Debtor entity. |

| Term | Description |
|---|---|
| **Effectiveness**<br><br>Cooperation Agreement ¶ 1 | The Cooperation Agreement will become effective as to each party on the date on which all of the following conditions have been satisfied:<br><br>• execution by the Debtors, the Majority 1L Lenders, and the UCC; and<br><br>• the Bankruptcy Court has entered all of the Settlement-Related Orders:<br><br>    o an order authorizing the Debtors to enter into the Cooperation Agreement and approving the Settlement Transaction;<br><br>    o an order authorizing the Debtors to enter into an agreement with the NBA and/or its teams modifying the terms of the relevant telecast rights agreements;<br><br>    o an order authorizing the Debtors to enter into an agreement with the NHL and/or its teams modifying the terms of the relevant telecast rights agreements;<br><br>    o an order denying the Sinclair MSA Motion to Compel or otherwise resolving such motion;<br><br>    o an order amending the Cash Collateral Order;<br><br>    o (A) an order denying the MLB Joint Motion to Compel or otherwise resolving such motion or (B) withdrawal of the MLB Joint Motion to Compel; and<br><br>    o an order extending the Debtors' Exclusivity Periods.<br><br>Secured Cooperating Parties' rights and obligations under the Cooperation Agreement only become enforceable once parties that collectively hold more than 50% of Second Lien Claims have become party to the Cooperation Agreement. |
| **Debtors' Obligations**<br><br>Cooperation Agreement ¶ 2 | The Debtors shall:<br><br>• file a chapter 11 plan to implement the Settlement Transaction that is reasonably acceptable to the Debtors, the Majority 1L Lenders, the Secured Cooperating Parties, and the UCC, by no later than 10 business days following the Effective Date (the "Plan Filing Milestone"); *provided* that, if reasonably necessary, the parties will negotiate an extended Plan Filing Milestone in good faith for a period of no less than 10 calendar days following the Effective Date;<br><br>• timely make all contractually required payments under the MSA on the terms as modified by the MSA Letter Agreement;<br><br>• timely make all contractually required payments under their telecast rights agreements;<br><br>• consult with the Majority 1L Lenders, the Secured Cooperating Parties, and the UCC prior to making any material decision with respect to the Sinclair-Related Litigations;<br><br>• not enter into any settlement with respect to, or amend any complaint filed in, the Sinclair-Related Litigations without the prior written consent of the Majority 1L Lenders, the Secured Cooperating Parties, and the UCC; and<br><br>• provide the other parties with the opportunity to participate in any mediation session (except sessions with third-party commercial counterparties or as otherwise directed by the mediator). |

| Term | Description |
|------|-------------|
| **Cooperation Obligations**<br><br>Cooperation Agreement ¶ 2 | Each party agrees:<br><br>• to cooperate with the other parties in implementing the Settlement Transaction through a chapter 11 plan;<br><br>• to negotiate in good faith the documents necessary to implement the Settlement Transaction (including by participating in mediation);<br><br>• not to support any transaction inconsistent with the terms of the Settlement Transaction;<br><br>• not to engage in any discussions related to any alternative restructuring transaction without notice to the other parties; and<br><br>• to work in good faith to amend the Cooperation Agreement to include customary chapter 11 plan voting and support covenants (which shall not obligate any party to vote until they are provided with a Bankruptcy Court-approved disclosure statement).<br><br>No party shall be obligated to enter into any definitive documentation that is not otherwise acceptable to such party.<br><br>The First Lien Group, the Secured Cooperating Parties, and the UCC will consent to any motion filed by any Debtor to extend its exclusive right to file and/or solicit acceptances of a chapter 11 plan.<br><br>The First Lien Group will approve the payments of MSA fees (on the terms as modified by the MSA Letter Agreement), telecast rights fees, employee salaries, benefits, bonuses, and severance, and ordinary course vendor costs. |
| **Fiduciary Out**<br><br>Cooperation Agreement ¶ 3 | Nothing in the Cooperation Agreement shall require any Debtor (or any governing body thereof) or the UCC (or any of its members) to take any action or to refrain from taking any action with respect to the Settlement Transaction to the extent that it determines in good faith, after consulting with outside counsel, that taking or failing to take such action would be inconsistent with its fiduciary obligations under applicable law.<br><br>• Must give notice within 48 hours after such determination to counsel to the other parties.<br><br>The Debtors and their directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives may:<br><br>• provide access to non-public information concerning the Debtors to any entity that provides an unsolicited alternative restructuring proposal and executes and delivers a reasonable and customary confidentiality or nondisclosure agreement with the Debtors;<br><br>• receive, respond to, and maintain and continue discussions or negotiations with respect to such unsolicited alternative restructuring proposals if the board of directors, board of managers, or similar governing body of such Debtor determines in good faith, upon advice of outside counsel, that failure to take such action would be inconsistent with the fiduciary duties of the members of such board or governing body under applicable law; and<br><br>• enter into or continue discussions or negotiations with any holder of Debtor Claim, any other counterparties, the UCC and/or the U.S. Trustee regarding the Settlement Transaction or any unsolicited alternative restructuring proposal.<br><br>The Debtors or the UCC, as applicable, shall provide information regarding alternative restructuring proposals to the other parties as detailed in the Cooperation Agreement. |

| Term | Description |
|---|---|
| **Termination Rights**<br><br>Cooperation Agreement ¶ 4 | Any party may terminate the Cooperation Agreement[13] upon any of the following events:<br><br>• material breach by any other party that remains uncured for five calendar days;<br><br>• any of the Settlement-Related Orders is modified (without its consent), vacated, or stayed; or<br><br>• the Debtors exercise their fiduciary out.<br><br>The Majority 1L Lenders, the Secured Cooperating Parties, or the UCC may also terminate the Cooperation Agreement upon any of the following events:<br><br>• the Plan Filing Milestone is not achieved; or<br><br>• (A) an order terminating the Debtors' Exclusivity Periods is entered or (B) a motion to further extend the Debtors' Exclusivity Periods is denied.<br><br>The Majority 1L Lenders or the UCC may also terminate the Cooperation Agreement if the UCC exercises its fiduciary out.<br><br>The Majority 1L Lenders may also terminate the Cooperation Agreement upon the following events:<br><br>• the MSA has been terminated and the Debtors have not obtained similar services covered by the MSA from any alternative provider or is unable to otherwise independently operate without disruption;<br><br>• any material telecast rights agreement has been rejected, terminated, or otherwise ceases to be effective (other than as contemplated in the Settlement Transaction); or<br><br>• an order is entered granting a motion to compel the assumption or rejection of any Sports Partner contract or any contract with a Material MVPD that is inconsistent with the Settlement Transaction.<br><br>The UCC may also terminate the Cooperation Agreement if the Debtors or their professionals take any action or fail to take any action in connection with the prosecution of the Sinclair-Related Litigations that has a material adverse effect on such litigations (subject to the limitations in the Cooperation Agreement).<br><br>The Cooperation Agreement shall terminate automatically upon substantial consummation of a Plan. |

24.    The Debtors, the First Lien Group, the Secured Cooperating Parties, and the UCC have agreed to the Cooperation Agreement with the understanding that the Debtors will continue to operate on the terms specified therein—including the Debtors maintaining services under the existing management services agreement with Sinclair's affiliate, or entry into an acceptable replacement arrangement, and continued broadcasting of games for the agreed-upon sports

---

[13]    Only the Debtors and the Majority 1L Lenders may terminate the Cooperation Agreement as to all parties.  The Secured Cooperating Parties and the UCC may only terminate the Cooperation Agreement as to themselves.

teams—and seek confirmation of a chapter 11 plan consistent with the terms thereof as early as practicable.

25.     Finally, under the Cooperation Agreement, the First Lien Group, the Secured Cooperating Parties, and the UCC have agreed to extensions of the Debtors' exclusive periods through the end of the transition process contemplated by the Cooperation Agreement, subject to their respective termination rights under the Cooperation Agreement, which will pave the way for a smooth chapter 11 plan process and minimize administrative costs borne by the Debtors' estates going forward.

## **Basis for Relief**

### I.     **Entry Into and Performance Under the Cooperation Agreement Is a Reasonable Exercise of the Debtors' Business Judgment**

26.     The Bankruptcy Code authorizes the use and disposition of property outside the ordinary course of business with court approval.  11 U.S.C. § 363(b)(1).  Such transactions should be approved when they are supported by a sound business purpose, with deference given to the debtor's business judgment.  *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.C.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." (quoting *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986))); *In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 520 (N.D. Tex. 2019) ("Great judicial deference is given to the Trustee's exercise of business judgment." (quoting *GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005))), *aff'd*, 850 F. App'x 302 (5th Cir. 2021).

27.     The Cooperation Agreement is the culmination of a lengthy, exhaustive, and arm's-length process to determine the final outcome for the Debtors' business and these chapter 11

20

cases, which started well before the Petition Date and ultimately included mediation overseen by Court-appointed judicial mediators.  The Cooperation Agreement will permit the Debtors to continue operations, perform under their modified agreement with the NBA and any similar agreement reached with the NHL, and continue their bonus, severance, and other wage and benefits programs for employees, while allowing their commercial partners, including teams, leagues, and distributors, to transition operations over the course of the 2023–24 Seasons to avoid an abrupt cessation of broadcasting.  The Cooperation Agreement also provides a framework for the resolution of these chapter 11 cases, while allowing the Debtors to explore any potential opportunities that will provide greater value to their stakeholders.

28.     As confirmed by the thorough process run to date, including the mediation, the Debtors believe that the transactions, including the settlements, contained in the Cooperation Agreement represent the best path forward for their business and will maximize value for all of the Debtors' stakeholders, and that their entry into the Cooperation Agreement is a sound exercise of their business judgment.  Accordingly, the Debtors respectfully request the Court authorize their entry into and performance under the Cooperation Agreement as a reasonable exercise of their business judgment.

## II.     The Proposed Settlements Are Fair, Reasonable, and in the Best Interest of the Estates

29.     Bankruptcy Rule 9019 grants the Court authority to approve the settlement of claims and controversies, so long as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See* Fed. R. Bankr. P. 9019(a); *In re Age Refin. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, approval of a compromise is within the sound discretion of the bankruptcy court.  *See, e.g.*, *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602–03 (5th Cir. 1980).

Settlements are considered a "normal part of the process" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated and costly." *Jackson Brewing Co.*, 624 F.2d at 602.

30.     In the Fifth Circuit, bankruptcy courts consider the following factors in determining whether to approve a proposed settlement:

>    a.     the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law;
>
>    b.     the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and
>
>    c.     all other factors bearing on the wisdom of the compromise, including (i) the best interests of creditors and (ii) the extent to which the settlement is the product of arm's-length bargaining.

*See Age Refin. Inc.*, 801 F.3d at 540; *see also Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917–18 (5th Cir. 1995) (stating that the court should consider "the paramount interest of creditors with proper deference to their reasonable views" and the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion").

31.     When evaluating a settlement, the role of the bankruptcy court is not to decide the issues in dispute. *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993) (noting that, in evaluating a settlement, "the bankruptcy court must review the facts supporting a compromise, yet not decide the merits of individual issues"). "Rather, the bankruptcy court determines whether the settlement is fair and equitable as a whole." *Id.* (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

32.     As noted above, the settlements contained in the Cooperation Agreement resolve numerous complex and litigable issues among the Debtors' creditors, including various issues related to, among other things, the first lien lenders' alleged entitlement to make-whole,

postpetition interest, diminution-in-value, and deficiency claims, the recharacterization of adequate protection payments as payments of principal, the scope of the first lien lenders' collateral (including whether that collateral includes claims in the Sinclair-Related Litigations, the SPV cash, and the Debtors' interest in Marquee), the allocation of proceeds of Sinclair-Related Litigations among claims that are first lien lenders' collateral and those that are not, and the allocation of the costs of administering these chapter 11 cases.  The settlements provide parties in interest with certainty on the first lien lenders' allowed claims and the extent of their recovery from the Debtors' assets.  These settlements were reached after months of arm's-length negotiations over these issues, including in the Court-approved mediation.

33.     Subject to the terms of the Cooperation Agreement, the settlements will save the Debtors substantial expense by avoiding protracted negotiations and potential litigation regarding these and other complex issues with their creditors.  The settlements will also reduce administrative costs going forward by fully resolving various litigable issues, including the UCC's challenge rights under the Cash Collateral Order and any future extensions of the Debtors' exclusivity periods by the First Lien Group, the Secured Cooperating Parties, and the UCC.  In addition, the Cooperation Agreement provides the Secured Cooperating Parties with their rights thereunder only if second lien creditors holding more than 50% of Second Lien Claims execute the agreement. Finally, the settlements do not prevent the Debtors from exploring any other opportunities that may provide an even better outcome for these chapter 11 cases and their stakeholders.

34.     As noted above, the settlements contained in the Cooperation Agreement will also permit the Debtors' continued operation and enable the Debtors to perform under their modified agreement with the NBA and any modified agreement reached with the NHL, thereby continuing to generate value for stakeholders.

23

35. Accordingly, the Debtors submit that the settlements contained in the Cooperation Agreement represent a fair and reasonable compromise under Bankruptcy Rule 9019(a) that is in the best interest of the Debtors' estates, and respectfully request that the Court approve the settlements as part of the Cooperation Agreement.

## III. The Cooperation Agreement Complies with Section 1125 of the Bankruptcy Code

36. Section 1125(b) of the Bankruptcy Code provides:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title . . . unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b). Courts have approved support agreements (or the assumption of support agreements) that do not obligate parties to vote until they are provided with a court-approved disclosure statement, and that include termination events that allow parties to withdraw their obligations to vote in favor of a particular plan. *See, e.g.*, *In re Residential Cap., LLC*, 2013 WL 3286198, at *20 (Bankr. S.D.N.Y. June 27, 2013); *see also In re Heritage Org.*, 376 B.R. 783, 789–95 (Bankr. N.D. Tex. 2007) (finding that an agreement to vote for a plan set forth in a term sheet did not constitute a solicitation for an official vote).

37. The Cooperation Agreement is consistent with such precedent, as it only requires that, following the effectiveness of the Cooperation Agreement, the parties will work in good faith to amend the Cooperation Agreement to include customary chapter 11 plan voting and support obligations, which will only become effective upon receipt of a court-approved disclosure statement. In addition, the Cooperation Agreement includes several termination events, and each party to the Cooperation Agreement will be released from its obligations to support the settlements incorporated therein upon termination. Accordingly, the Debtors respectfully submit that the Cooperation Agreement does not violate section 1125(b) of the Bankruptcy Code.

**Emergency Consideration**

38.      Pursuant to Local Rule 9013-1, the Debtors respectfully request emergency consideration of this motion.  The Debtors believe that any delay in granting the relief requested would cause irreparable harm, as any delay in entry of the proposed order may result in creditors withdrawing support for the settlements and the Debtors' efforts to maximize the value of their estates for the benefit of their creditors.  The Debtors believe that the settlements will permit them to effectuate an efficient and orderly resolution to these chapter 11 cases, while minimizing administrative costs and maximizing distributable value to creditors.  The Debtors further believe that their estates would be irreparably harmed if they were to lose the benefits the settlements provide, including certainty from the resolution of certain ongoing disputes among their creditor constituencies.   Accordingly, the Debtors respectfully request that the Court grant the relief requested in this motion on an emergency basis.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

39.      The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

40.      The Debtors will provide notice of this motion to (a) the parties on the Master Service List available on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG, (b) the parties to the Cooperation Agreement, and (c) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the proposed order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

November 6, 2023

Respectfully submitted,

*/s/ John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Bryan L. Rochelle (TX Bar No. 24107979)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
brochelle@porterhedges.com

- and -

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Andrew N. Goldman (admitted *pro hac vice*)
Benjamin W. Loveland (admitted *pro hac vice*)
Lauren R. Lifland (admitted *pro hac vice*)
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
andrew.goldman@wilmerhale.com
benjamin.loveland@wilmerhale.com
lauren.lifland@wilmerhale.com


*Section 327(e) Counsel to the Debtors and Debtors in Possession*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Brian S. Hermann (admitted *pro hac vice*)
Andrew M. Parlen (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Alice Nofzinger (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
bhermann@paulweiss.com
aparlen@paulweiss.com
jgraham@paulweiss.com
anofzinger@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

## Certificate of Accuracy

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.  This statement is made pursuant to Local Rule 9013-1(i).

*/s/ John F. Higgins*
John F. Higgins

## Certificate of Service

I certify that on November 6, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins