IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) Case No. 23-90116 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' OBJECTION TO JOINT MOTION OF MAJOR LEAGUE BASEBALL AND CERTAIN MAJOR LEAGUE BASEBALL CLUBS TO COMPEL ASSUMPTION OR REJECTION OF TELECAST RIGHTS AGREEMENTS**

[Related to Docket No. 1261]

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this objection to the *Joint Motion of Major League Baseball and Certain Major League Baseball Clubs to Compel Assumption or Rejection of Telecast Rights Agreements* [Docket No. 1261] (the "Motion"). The Debtors respectfully state as follows.

**PRELIMINARY STATEMENT**

1. "If the Debtor RSNs wish to continue to use the Clubs' intellectual property to generate revenue during these chapter 11 cases, they must pay for those rights as and when due. Otherwise, the Debtor RSNs should promptly reject their agreements with the Clubs to enable the Clubs to contract with an alternative broadcast partner."[2] That is precisely what the Office of

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

[2] *Emergency Joint Motion of Major League Baseball and Certain Major League Baseball Clubs to Compel Performance Under Telecast Rights Agreements, or, in the Alternative, to Compel Assumption or Rejection of Telecast Rights Agreements and for Relief from the Automatic Stay* [Docket Nos. 279, 280] (the "Initial Motion to Compel") ¶ 6.

the Commissioner of Baseball d/b/a Major League Baseball ("MLB") and certain of its clubs stated the first time they requested the same relief that MLB and certain other clubs (the "Clubs," and together with MLB, the "Movants") now seek through the Motion and what they demanded of the Debtors through the duration of the 2023 MLB season. Since the Court's ruling on the Initial Motion to Compel [Docket No. 819], the Debtors have done just that—they have performed their postpetition payment obligations under the Movants' rights agreements. And, as discussed below, the Debtors do wish to continue broadcasting MLB games for the upcoming 2024 season, and as directed by this Court, the Debtors intend to pay every dollar of fees to the Clubs associated with such broadcasts. Now, however, compliance with the terms of their telecast rights agreement and with this Court's ruling does not seem to be enough for MLB and the Clubs.

2. Through the Motion, the Movants now seek to walk-back their prior position that, so long as the Debtors pay in full, the Clubs are content to have the Debtors continue to broadcast their games. Instead, the Motion renews the same request that this Court previously rejected—a request to compel the Debtors to assume or reject their telecast rights agreements immediately, before the Debtors have even proposed a chapter 11 plan. Unlike in MLB's prior request, the Movants do not focus on their entitlement to the continued payment of rights fees under their telecast rights agreements with the Debtors, nor could they, since the Debtors have paid the Clubs every dollar owed to them since the Petition Date (a reality that the Movants do not even acknowledge in their Motion).

3. Instead, the Movants base their renewed request on a professed desire for "certainty" as to the Debtors' intentions with respect to the broadcast of the Movants' games for the 2024 MLB season. While the Debtors are sympathetic to the Movants' need to prepare for the 2024 MLB season, the 2023 MLB post-season has only just concluded, and the opening day of the

2

2024 MLB pre-season is four months away (not until February 2024), rendering premature the Movants' request to compel assumption or assignment of their telecast rights agreements now. In any event, the Movants' desire for absolute certainty should not be permitted to trump the Debtors' need for adequate time to pursue a viable, value-maximizing path forward for their business and file a chapter 11 plan.

4. The Movants claim uncertainty as to the future of their telecast rights agreements based on a purported lack of progress in these mega-cases. That is far from accurate. While it may be the case that little progress has been made with MLB, after months of negotiations, and with the help of the Court-appointed judicial mediators (the "Mediators"), the Debtors have made significant progress towards a resolution of these cases with other case constituents.

5. From the outset of these cases, the Debtors have had numerous discussions from time to time on a path forward with key parties in interest in these cases, including their funded debt creditors, the official committee of unsecured creditors (the "UCC"), their league and team partners, as well as their content distributors, and each of their respective advisors. Beginning in June 2023, members of each of the Debtors' three ad hoc funded debt creditor groups entered into non-disclosure agreements with the Debtors for the purpose of negotiating a consensual chapter 11 plan. On August 17, 2023, the Court appointed the Mediators [Docket No. 1087] and mediation discussions began in earnest soon after. On September 26 and 27, 2023, the Mediators presided over two days of in-person mediation with the Debtors, the UCC, each of the three funded debt creditor ad hoc groups, MLB, the National Basketball Association (the "NBA"), the National Hockey League (the "NHL"), and the Debtors' parent, Sinclair.[3]

---

[3] MLB, the NBA, and the NHL participated only in the second day of the in-person mediation on September 27, 2023.

3

6. Those mediated negotiations have culminated in an agreement around a framework for an orderly transition of the Debtors' businesses in chapter 11 through the end of the 2023-2024 NBA and National Hockey League seasons and the end of the 2024 Major League Baseball season. This transition framework is embodied in a Cooperation Agreement among the Debtors, the UCC, the ad hoc group of the Debtors' first lien lenders (the "First Lien Group"), and certain members of an ad hoc group of primarily second lien lenders (the "Second Lien Group") which is the subject of an approval motion filed on November 6, 2023.[4]

7. In furtherance of the contemplated transition plan, the Debtors also filed on November 6, a motion seeking approval of an agreement with the NBA that will provide the Debtors with rights fee modifications through the end of the 2023-2024 NBA season.[5] The NHL also remains in discussions with the Debtors related to the Cooperation Agreement. The Debtors project that the Cooperation Agreement and the transactions contemplated thereby will allow them to operate profitably through the end of the 2023-2024 NBA and NHL seasons and the end of the 2024 MLB season.

8. With respect to the Movants (MLB and the Clubs) specifically, the Cooperation Agreement contemplates that the Debtors will continue operating under their rights agreements with at least certain Clubs through at least the 2024 MLB season. The Cooperation Agreement provides for—with the consent of the First Lien Group whose cash collateral funds these cases— the payment in full for all of these retained Clubs for all such broadcasts, at full rates. In addition, the Cooperation Agreement leaves open the possibility that the Debtors will continue operating

---

[4] *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Entry Into and Performance Under the Cooperation Agreement, (II) Approving the Terms of the Settlements Contained Therein, and (III) Granting Related Relief* [Docket No. 1342] (the "Cooperation Agreement Motion").

[5] *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Entry Into and Performance Under the NBA Term Sheet; (II) Authorizing Assumption of Certain NBA Agreements; and (III) Granting Related Relief* [Docket No. 1343] (the "NBA Motion").

under every Club's rights agreement for the 2024 MLB season to the extent the Debtors and particular Clubs that otherwise would not be retained can agree on modified terms sufficient to enable the Debtors to profitably broadcast those Clubs' games. In the absence of such an agreement with those particular Clubs, the Debtors intend to reject or otherwise agree to the termination of those Clubs' telecast rights agreements on or before December 31, 2023, which is materially before the start of the 2024 MLB season. The Debtors have communicated to MLB the identities of the Clubs whose games they intend to continue broadcasting through the 2024 MLB season and the identities of the Clubs that are at risk for rejection or termination by December 31, 2023. The transition plan contemplated by the Cooperation Agreement, together with the Debtors' communications with MLB and the Clubs on these issues, give the Movants what they seek—clarity on their go-forward relationship with the Debtors in advance of the 2024 MLB season.

9. The Cooperation Agreement also resolves a host of intercreditor issues, including the allowance and treatment of the first lien lenders' claims, as well as an allocation of value and administrative expenses among the Debtors' first lien creditors, on the one hand, and their unsecured and undersecured creditors, on the other hand, that will pave the way for the Debtors to propose a chapter 11 plan that will distribute the proceeds derived from the continued operation of the Debtors' business through the transition period or from other potential transactions that could offer a higher recovery or otherwise better path forward for the Debtor and their estates.

10. The Debtors, however, require time to implement the transactions contemplated by the Cooperation Agreement and, ultimately, to propose a chapter 11 plan. As described herein, the Movants have not met their burden to establish cause to cut short the Debtors' time for pursuing these transactions by forcing the Debtors to assume or reject the Clubs' telecast rights agreements

now, particularly in light of the recent progress and developments in these chapter 11 cases. Accordingly, the Court should deny the Motion.

## RELEVANT BACKGROUND

11. The Debtors and certain non-Debtor affiliates own and/or operate the Bally Sports RSNs and are the nation's leading provider of local sports programming, broadcasting professional sports games for the NBA, NHL, and MLB. As of the date the Debtors filed these chapter 11 cases (the "Petition Date"), the Debtors' RSN portfolio aired the games of 14 MLB teams.

12. In April 2023, MLB and certain clubs[6] asked the Court to compel the Debtors to pay the full contractual amounts required under their respective telecast rights agreements, or, alternatively, to compel the Debtors to immediately assume or reject such agreements [Docket Nos. 279, 280, 303, 305, 369, 370]. On June 2, 2023, after the conclusion of a two-day evidentiary hearing, the Court ruled that the Debtors were required to pay the amounts due under their telecast rights agreements with the movant clubs, but the Court declined to compel the Debtors to assume or reject their telecast rights agreements with those clubs [Docket No. 819].

13. Since the Petition Date, the Debtors have rejected their telecast rights agreement with the Arizona Diamondbacks [Docket Nos. 921, 967], and the San Diego Padres terminated their telecast rights agreement with RSNCO, LLC, one of the Debtors' non-debtor, joint venture affiliates (the "JVs"). The Debtors' telecast rights agreement with the Minnesota Twins expired at the conclusion of the 2023 MLB season.

---

[6] The clubs that filed motions or joined in the relief requested were the Minnesota Twins, the Cleveland Guardians, the Arizona Diamondbacks, and the Texas Rangers. MLB's motion to compel was also supported by the Atlanta Braves, the Detroit Tigers, the Milwaukee Brewers, and the Tampa Bay Rays.

14.     Of the remaining 11 MLB clubs in the Debtors' RSN portfolio, six (including the five Movant Clubs) are parties to telecast rights agreements with the Debtors, and the remaining five are parties to telecast rights agreements with non-debtor JVs.

15.     Importantly, the Debtors have paid each of the Movant Clubs ***all postpetition amounts owed under their telecast rights agreements for the 2023 MLB season at the full contract amounts***.  Indeed, all of the remaining 11 clubs, including clubs that are parties to telecast rights agreements with the non-debtor JVs, have been paid in full for the 2023 MLB season.

16.     On October 11, 2023, the Movants filed the Motion, renewing MLB's earlier request that the Court compel the Debtors to immediately assume or reject their telecast rights agreements with the Movant Clubs.

17.     On November 6, 2023, the Debtors filed the Cooperation Agreement Motion and the NBA Motion.

## ARGUMENT

18.     The Movants ask the Court to compel the Debtors to assume or reject their telecast rights agreements immediately.  The Debtors, however, are not required to make assumption or rejection decisions outside of a chapter 11 plan process.  *See* 11 U.S.C. § 365(d)(2).  Although the time period for assumption or rejection may be shortened by the court at a counterparty's request, whether or not to do so, and the ultimate amount of time given, are at the court's discretion.[7]

19.     It is the Movants' burden to show why the time period should be shortened.  *See In re Memory Lane of Bremen*, *LLC*, 535 B.R. 901, 906 (Bankr. N.D. Ga. 2015) (citing *Hawker Beechcraft*, 483 B.R. at 429); *In re Republic Techs. Int'l, LLC*, 267 B.R. 548, 554 (Bankr. N.D.

---

[7] *See In re Panaco, Inc.*, No. 02-37811-H3-11, 2002 WL 31990368, at *5 (Bankr. S.D. Tex. Dec. 10, 2002); *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105 (2d Cir. 1982), *superseded on other grounds by statute*, 11 U.S.C. § 365(d)(3); *In re Hawker Beechcraft, Inc.*, 483 B.R. 424, 429 (Bankr. S.D.N.Y. 2012); *In re Dana Corp.*, 350 B.R. 144, 147 (Bankr. S.D.N.Y. 2006).

7

Ohio 2001). As the Movants acknowledge, courts routinely consider a number of factors in determining whether it is appropriate to shorten the time period for assumption and rejection of executory contracts.[8]

20. The Movants have failed to meet their burden here. Any real analysis of the relevant factors and balancing of the parties' interests demonstrates that the Court should deny the Motion and allow the Debtors time to move forward with the transactions contemplated by the Cooperation Agreement.

21. While courts have noted that the interests of non-debtor counterparties are properly considered in the analysis of whether to shorten the time for assumption or rejection, *see, e.g., In re Kmart Corp.*, 290 B.R. 614, 619 (Bankr. N.D. Ill. 2003), such interests are to be weighed against "the interests of the bankruptcy estate and its creditors." *In re EnCap Golf Holdings, LLC*, No. 08-18581 (NLW), 2008 WL 5955350, at *3 (Bankr. D.N.J. Dec. 24, 2008). Here, that balancing weighs decidedly in favor of the Debtors.

22. Requiring the Debtors to assume or reject the Movants' telecast rights agreements at this critical juncture in their chapter 11 cases would upend the results of months of productive negotiations between the Debtors and many of their key stakeholders, including the First Lien Group, certain members of the Second Lien Group, the UCC, the NBA, the NHL, and certain of

---

[8] Factors that courts have considered include: (i) the nature of each parties' interests at stake; (ii) the balance of harms to the parties; (iii) the "good to be achieved;" (iv) safeguards afforded to the parties; (v) "whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary;" (vi) the debtor's failure or ability to satisfy post-petition obligations; (vii) the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code; (viii) the importance of the contract to the debtor's business and reorganization; (ix) whether the debtor has sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan; (x) whether there is a need for judicial determination as to the existence of an executory contract; (xi) whether exclusivity has been terminated; and (xii) the broad purpose of Chapter 11, which is to permit successful rehabilitation of debtors. *See In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 292-293 (Bankr. S.D.N.Y. 2003) (internal citations omitted) (compiling factors that have been considered by courts). These non-exclusive factors may overlap, and may be afforded more or less weight under the facts and circumstances of each case. An analysis of the factors is a holistic endeavor, and factors will not necessarily be addressed one-by-one. *See e.g., In re Enron Corp.,* 279 B.R. 695, 702-04 (Bankr. S.D.N.Y. 2002).

the Debtors' distribution partners. These negotiations took place with the assistance of the Mediators and resulted in a viable go-forward plan for resolving these complex and contentious cases through the transactions contemplated by the Cooperation Agreement and, ultimately, a chapter 11 plan. Specifically, the relief requested in the Motion would put the Debtors in the untenable position of having to either reject their telecast rights agreements prematurely (without giving the Debtors the ability to generate revenue from or otherwise monetize those agreements during the transition period contemplated by the Cooperation Agreement), or assume those agreements and incur potential damages claims at the conclusion of the transition period (which could impair the Debtors' ability to consummate the transition plan and seek confirmation of a chapter 11 plan). Either result would risk dismantling the entire Cooperation Agreement, which would be massively disruptive to the Debtors and value-destructive for the Debtors' remaining stakeholders.

23. Conversely, the Movants will not be prejudiced if the Motion is denied and the Debtors are permitted to address contract assumption and rejection decisions as part of their chapter 11 plan process. The Movants' sole basis for seeking to curtail the Debtors' time for assuming or rejecting contracts is their concern about certainty in advance of the 2024 MLB season. But one of the hallmarks of the Cooperation Agreement is the clarity it provides to all of the leagues and their respective teams, including MLB and the Clubs. Indeed, the Cooperation Agreement and the Debtors' communications with MLB and the Clubs assuage the Movants' concerns with respect to the 2024 MLB season. The Movants are aware that the Debtors intend to continue broadcasting MLB games for at least certain Clubs for at least the entire 2024 season, and at the full rates required under each's respective telecast rights agreement, in accordance with the Cooperation Agreement. And they are aware that, absent an agreement with the remaining

Clubs, the Debtors intend to reject or otherwise terminate those agreements by the end of calendar year 2023, well in advance of the 2024 MLB season. In this regard, the Cooperation Agreement gives the Movants clarity about the Debtors' intentions with respect to their agreements and is intended to minimize the risk of disruption for sports fans.

24. Moreover, the Movants have no uncertainty with respect to the Debtors' payment of their postpetition fees. As noted above, the Debtors have paid the Movants all amounts owed to them on a postpetition basis for the 2023 MLB season. Where a debtor is current in its post-petition obligations on an executory contract, courts have been uniformly reluctant to compel assumption or rejection earlier than the normal deadline of confirmation. *See In re Physician Health Corp.*, 262 B.R. 290, 294 (Bankr. D. Del. 2001); *In re Wheeling–Pittsburgh Steel Corp.,* 54 B.R. 385, 388 (Bankr. W.D. Pa. 1985) (finding it "significant that [the debtor] is not in post-petition default" of the executory contract at issue); *In re New York Deli, Ltd.*, 41 B.R. 198, 200 (Bankr. D. Haw. 1984) (declining to shorten deadline for assumption or rejection based in part on finding that debtor was paying rent postpetition). Indeed, the entire premise of the Cooperation Agreement is that the Debtors will be able to operate profitably for the next eleven months, thus mitigating the Movants' concerns regarding the Debtors' ability to pay the rights fees owed under their agreements going forward.

25. In short, the Movants' proffered concerns about uncertainty fall short of satisfying their burden to justify shortening the Debtors' time to assume or reject their telecast rights agreements. The recent developments in these chapter 11 cases should assuage the Movants' concerns regarding the Debtors' intentions with respect to their telecast rights agreements, and in any event those concerns are insufficient to outweigh the collective interests of the Debtors and their other stakeholders in pursuing the value maximizing transactions contemplated by the

Cooperation Agreement. *See COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 382 (2d Cir. 2008) (in considering whether to compel assumption or rejection, the court noted that "[t]he interests of the creditors collectively and the bankrupt estate as a whole will not yield easily to the convenience or advantage of one creditor out of many.") (quoting *Pub. Serv. Co. of N.H. v. N.H. Elec. Coop., Inc. (In re Pub. Serv. Co. of N.H.)*, 884 F.2d 11, 14–15 (1st Cir. 1989).

## CONCLUSION

26. For the reasons set forth herein, the Debtors respectfully request that the Court deny the relief requested in the Motion.

*[Remainder of page intentionally left blank]*

Dated:  November 8, 2023  Respectfully submitted,
       Houston, Texas

By:  */s/ John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Bryan L. Rochelle (TX Bar No. 24107979)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
brochelle@porterhedges.com

- and -

**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
Andrew Goldman (admitted *pro hac vice*)
Benjamin Loveland (admitted *pro hac vice*)
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
andrew.goldman@wilmerhale.com
benjamin.loveland@wilmerhale.com

**Certificate of Service**

      I certify that on November 8, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                */s/ John F. Higgins*
                                                John F. Higgins