**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) Case No. 23-90116 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) (Emergency Hearing Requested) |

**EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF DIAMOND SPORTS GROUP, LLC *ET AL.* FOR ENTRY OF AN ORDER (I) SCHEDULING A HEARING ON DIP ELECTION PROCEDURES, (II) COMPELLING THE DEBTORS TO OBTAIN COURT APPROVAL OF DIP ELECTION PROCEDURES AND (III) GRANTING RELATED RELIEF**

> **Emergency relief has been requested.  Relief is requested not later than 4:00 p.m. (prevailing Central Time) on January 26, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on January [__], 2024, at [_]:00 [_].m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002.  Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Lopez's conference room number is 590153.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Lopez's home page.  The meeting code is "JudgeLopez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page.  Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG.  The Debtors' service address for purposes of these chapter 11 cases is:  c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

The Official Committee of Unsecured Creditors (the "Committee") of Diamond Sports Group, LLC, *et al.* (the "Debtors"), appointed in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), by and through its undersigned counsel, hereby submits this *Emergency Motion of the Official Committee of Unsecured Creditors of Diamond Sports Group, LLC* et al. *for Entry of an Order (I) Scheduling a Hearing on DIP Election Procedures, (II) Compelling the Debtors to Obtain Court Approval of DIP Election Procedures and (III) Granting Related Relief* (the "Motion") pursuant to sections 105(a), 363(b) and 1125(b) of title 11 of the United States Code (the "Bankruptcy Code") requesting entry of an order (i) scheduling a hearing on the DIP Election Procedures, (ii) compelling the Debtors to obtain entry of an order approving the DIP Election Procedures prior to commencing syndication of the DIP Facility and (iii) granting related relief.  In support of this Motion, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The Committee is supportive of the Debtors' efforts to pursue a reorganization of their business.  The Committee also recognizes that the path to securing a commitment for the DIP Facility and entering into the RSA was challenging and required difficult negotiations among the Debtors, the First Lien Group, the Crossover Group and Amazon.  Unfortunately, neither the Committee nor any other representative for unsecured creditors was at the bargaining table for these negotiations, and the Committee has been playing catchup and evaluating the merits of the DIP Facility, the RSA, the Sinclair settlement and other related agreements.  As the sole fiduciary representing the interests of all unsecured creditors, including those unsecured creditors who are not DIP Commitment Parties, the Committee has reviewed the DIP Election Procedures and does not believe they are designed with the best interests of unsecured creditors in mind.

2. The DIP Motion[2] does not seek approval of a traditional DIP financing, and the proposed syndication is not a typical syndication. Pursuant to the DIP Motion, the Debtors seek this Court's approval of a "DIP Facility" that serves three primary purposes: (i) funding a $350 million paydown of prepetition first lien claims prior to confirmation of a plan and $100 million of incremental liquidity to support operations, (ii) effectuating a disguised rights offering in connection with an Acceptable Plan[3] that will deliver 90% of the equity interests[4] in the reorganized Debtors (the "Reorganized Equity") to the DIP Commitment Parties and a subset of Junior Funded Debt Creditors (as defined below) in satisfaction of unprecedented DIP fees and premiums and (iii) pledging nearly all unencumbered value of the Debtors (including 80% of the proceeds from the Sinclair settlement) to the DIP Lenders. If an Acceptable Plan is confirmed, the DIP Lenders will own nearly all of the Reorganized Equity. If the Acceptable Plan is not confirmed and the Debtors pursue a wind down of operations, the DIP Lenders will soak up all remaining value from the Debtors' estates. The *right* to participate in the DIP Facility will therefore be the most important right afforded to Junior Funded Debt Creditors in these cases. The *decision* to participate in the DIP Facility will dictate both recoveries and plan treatment for Junior Funded Debt Creditors.

3. Notwithstanding the stakes for Junior Funded Debt Creditors, the Debtors have proposed a set of DIP Election Procedures (attached as Exhibit B to the DIP Motion) that the

---

[2] "DIP Motion" means the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Enter into and Perform Under the DIP Commitment Letter, (B) Obtain Postpetition Financing, (C) Use Proceeds of the DIP Facility to Make the First Lien Paydown, (D) Use Cash Collateral, (E) Grant Liens and Provide Claims with Superpriority Administrative Expense Status, and (F) Grant Adequate Protection to the Prepetition First Lien Secured Parties; (II) Approving the Election Procedures and the DIP Election Forms; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 1659]. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Motion.

[3] "Acceptable Plan" means a chapter 11 plan of reorganization that is consistent with the terms of the RSA.

[4] Subject to dilution on the terms and conditions set forth in the RSA.

3

Committee submits have the effect of (i) limiting participation in the DIP Facility and enhancing recoveries for the DIP Commitment Parties (at the expense of Junior Funded Debt Creditors), (ii) neutralizing creditor scrutiny of the proposed DIP Facility and the restructuring transactions contemplated under the RSA by forcing Junior Funded Debt Creditors to sign the RSA concurrently with making an election to participate in the DIP Facility (in this case, by no later than February 13, 2024 at 5:00 p.m. (prevailing Eastern Time)) and (iii) forcing Junior Funded Debt Creditors to make the most important and consequential decision in these cases with scant and inadequate disclosure.  Making matters worse, there is no legitimate business justification for the Debtors to conduct a pre-closing syndication of the DIP Facility.  Pursuant to the DIP Commitment Letter, the Debtors have a fully committed and backstopped $450 million DIP Facility for which they are seeking approval of backstop fees equal to $67.5 million in cash and even more in Reorganized Equity.  If the DIP Facility is approved and the DIP Commitment Parties stay true to their commitment to backstop the DIP Facility, the Debtors and the estates will not be harmed through a post-closing syndication of the DIP Facility.

4. Under these circumstances, the Debtors should not be permitted to launch what is functionally a rights offering for Reorganized Equity—clearly outside the ordinary course of business—without scrutiny from the Court and other parties in interest.  The Committee is not asking the Court to break new ground.  Debtors routinely seek approval of rights offering procedures in chapter 11 cases and provide parties in interest with notice and an opportunity to be heard on such matters prior to commencement.

5. Accordingly, the Committee requests that the Court require the Debtors to obtain Court approval of the DIP Election Procedures *prior* to commencing the DIP Syndication Process

4

so that parties in interest like the Committee have a meaningful opportunity to raise issues and be heard by the Court on the propriety of such procedures.

## JURISDICTION AND VENUE

6. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, the Committee consents to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

7. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8. The statutory and rule predicates for the relief requested herein are sections 105(a), 363(b) and 1125 of the Bankruptcy Code, Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 9013-1 of this Court's Bankruptcy Local Rules (the "Bankruptcy Local Rules") and Section G of the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

## RELIEF REQUESTED

9. The Committee respectfully requests entry of an order, substantially in the form attached hereto, (i) scheduling a hearing on the DIP Election Procedures, (ii) compelling the Debtors to obtain entry of an order approving the DIP Election Procedures prior to commencing syndication of the DIP Facility and (iii) granting related relief.

## BACKGROUND

I. **Commencement of the Chapter 11 Cases**

10. On March 14, 2023, the Debtors began filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage

their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in these chapter 11 cases.

11. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 28].

12. On March 27, 2023, the United States Trustee for the Southern District of Texas appointed the Committee pursuant to Bankruptcy Code section 1102 [Docket No. 247].[5]

## II. The DIP Facility

13. On January 23, 2024, the Debtors filed the DIP Motion, seeking, among other things, (i) authorization to (a) obtain a subordinated secured superpriority debtor in possession financing facility, consisting of term loans in the aggregate principal amount of $450 million (the "DIP Facility"), (b) grant each of the DIP Secured Parties superpriority administrative expense claims against each Debtor, (c) grant each of the DIP Secured Parties automatically perfected superpriority security interests in and liens on all of the DIP Collateral, including substantially all of the Debtors' previously unencumbered assets, (d) pay all principal, interest, fees and premiums under the DIP Facility and (ii) approval of the DIP Election Procedures. *See* DIP Motion ¶ 1.

14. The proposed DIP Facility is fully backstopped by the DIP Commitment Parties. *See id.* ¶ 27. As consideration for their commitment to backstop the DIP Facility, the DIP Commitment Parties will receive a premium equal to 15% of the full DIP Commitments, or approximately $67.5 million on a cash basis (the "DIP Commitment Premium"). *See* DIP Commitment Letter § 5. In the event the Debtors reorganize under an Acceptable Plan, the DIP

---

[5] The Committee currently is comprised of the following entities: (i) Harte-Hanks Response Management/Austin, Inc.; (ii) Intelsat US LLC; (iii) U.S. Bank Trust Company, National Association, as Indenture Trustee; and (iv) VITAC Corporation.

Commitment Premium will be payable in the form of 45% of the Reorganized Equity. *See* Restructuring Term Sheet, at 8.

15. In addition, all DIP Lenders will receive a multiple on invested capital (the "MOIC") in an amount equal to 40% of the principal amount of DIP Loans, less the aggregate amount of cash interest received by the DIP Lenders. *See* DIP Motion ¶ 32. The DIP MOIC is estimated to total approximately $172 million on a cash basis. In the event the Debtors reorganize under an Acceptable Plan, the MOIC will be payable in the form of 45% of the Reorganized Equity. *See* Restructuring Term Sheet, at 8.

### III. The DIP Election Procedures

16. The DIP Motion contemplates that syndication of the DIP Facility to Junior Funded Debt Creditors (the "DIP Syndication Process") will commence on January 25, 2024, two days after the filing of the DIP Motion. *See* DIP Motion ¶ 31; DIP Election Proc., Annex A. Following commencement of the DIP Syndication Process, Junior Funded Debt Creditors will have thirteen business days in which to elect to participate in the DIP Facility. *See* DIP Election Proc., Annex A.[6]

17. To validly exercise their election rights and participate in the DIP Facility, Junior Funded Debt Creditors must provide: (i) a properly completed and duly executed election form; (ii) properly completed and duly executed signature pages to the RSA and the DIP Credit Agreement; (iii) a duly executed Eligible Holder Certificate; (iv) properly completed and duly executed know-your-customer documentation; and (v) a properly completed and duly executed IRS Form W-9 or an appropriate IRS Form W-8 (collectively, the "Election Documentation"), as applicable, and deliver such documentation to Kroll Restructuring Administration LLC (the

---

[6] The deadline for Junior Funded Debt Creditors to make their elections with respect to participation in the DIP Facility is February 13, 2024 at 5:00 p.m. (prevailing Eastern Time) (the "Election Deadline").

"Syndication Agent")[7] so that the Syndication Agent receives such documentation by no later than the Election Deadline.  *See id.* § 2.  Additionally, Junior Funded Debt Creditors will be required to fund their designated share of the DIP Facility into an escrow account so that such funding is received by the Syndication Agent by the Election Deadline.  *See id.*

## ARGUMENT

18.   The right to participate in the DIP Facility is of critical importance to all Junior Funded Debt Creditors and likely the most important decision each creditor will have to make in these Chapter 11 Cases.  The Committee submits that the DIP Election Procedures should be reviewed by the Court to ensure that they are fair, reasonable and in the best interests of unsecured creditors given the unique facts and circumstances of these Chapter 11 Cases.

19.   The Committee recognizes the benefits that may be obtained by the reorganization contemplated by the RSA and does not believe that scrutiny or modifications of the proposed DIP Election Procedures pose any legitimate risk to the Debtors or their restructuring efforts.  As the only party that has statutory duties to all unsecured creditors, including a duty to participate in any matters relevant to the Debtors' business and the formulation of a chapter 11 plan (see 11 U.S.C. § 1103(c)), the Committee must evaluate the proposed DIP Syndication Process and apprise the Court of matters pertaining to such process that may be prejudicial to unsecured creditors (including Junior Funded Debt Creditors) and/or at odds with the Bankruptcy Code.

---

[7]   Holders of Second Lien Revolving Loans, Second Lien Term Loans, or Third Lien Term Loans are instructed to deliver their Election Documentation directly to the Syndication Agent.  Holders of Second Lien Notes, Third Lien Notes, or Unsecured Notes (collectively, the "Existing Notes") are instructed to deliver their Execution Documentation to their applicable bank, broker, intermediary, securities nominee or agent (each, a "Nominee") in sufficient time to allow their Nominee to deliver such documents to Syndication Agent by the Election Deadline.

I. **The Debtors Must Obtain Court Approval Prior to Commencing the DIP Syndication Process**

20. As an initial matter, the DIP Syndication Process—an essential component of the restructuring transactions—will be conducted outside of the ordinary course of business, and commencement of such process requires the Court's approval after parties in interest are provided with appropriate notice and an opportunity to be heard. *See* 11. U.S.C. § 363(b). While courts may from time to time authorize transactions outside of the ordinary course to proceed on expedited notice, the Debtors have made no such request to the Court, nor do they have any basis on which to do so.

21. In addition, the DIP Facility, which is inextricably linked to the RSA, operates as a disguised debt and equity rights offering. Unlike conventional chapter 11 rights offerings, however, the DIP Facility will not be reviewed by the Court in the context of confirmation nor be accompanied by a disclosure statement or a chapter 11 plan. Instead, the DIP Election Procedures require Junior Funded Debt Creditors to agree to make DIP Loans to the Debtors in order to receive Reorganized Equity without receiving disclosures of the type required under Bankruptcy Code section 1125.

II. **The DIP Election Procedures, as Currently Proposed, are Prejudicial to the Interests of Junior Funded Debt Creditors**

22. Upon approval of the DIP Facility, the Debtors will incur approximately $690 million of DIP Obligations, including in respect of the DIP Commitment Premium and MOIC, which obligations will be secured by substantially all of the Debtors' assets, including 80% of the Sinclair settlement proceeds. In the event the Debtors are unable to consummate an Acceptable Plan and pivot to a wind-down, all DIP Obligations will be payable in full in cash and will materially diminish any sources of recoveries for Junior Funded Debt Creditors that did not participate in the DIP Facility. Conversely, in the event the Debtors are able to successfully

reorganize pursuant to an Acceptable Plan, the DIP Commitment Premium and MOIC will be payable in the form of, among other things, 90% of the Reorganized Equity,[8] entitling the DIP Commitment Parties and DIP Lenders to retain substantially all going concern value creation.[9] Under either scenario, Junior Funded Debt Creditors that participate in the DIP Facility are anticipated to receive substantially higher recoveries than Junior Funded Debt Creditors that do not.

23. Pursuant to the DIP Commitment Letter, the Debtors have the right to syndicate the DIP Facility so long as (i) any Junior Funded Debt Creditor that elects to participate in the DIP Facility becomes a party to the RSA prior to, or concurrently with, its election to participate in the DIP Facility and (ii) the DIP Election Procedures are acceptable to the Required DIP Commitment Parties.[10]  *See* DIP Commitment Letter § 2.  Notwithstanding the Debtors' assertion that these "[DIP] Election Procedures provide a fair and reasonable opportunity to participate in the DIP Facility" (*see* DIP Motion ¶ 30), the Committee has significant concerns.

24. *First*, conducting the proposed DIP Syndication Process prior to the scheduled hearing on the DIP Motion (as currently contemplated) will prevent Junior Funded Debt Creditors from raising legitimate issues or concerns regarding the DIP Motion, the RSA or their treatment under an Acceptable Plan.  Junior Funded Debt Creditors will be faced with a Hobson's choice that must be made on or before February 13, 2024: object to the DIP Facility and forego the opportunity to participate in the DIP Facility and the going concern value of the reorganized

---

[8] Subject to dilution on the terms and conditions set forth in the RSA.

[9] The summary financial projections cleansed by the Debtors in connection with the execution of the RSA forecast significant value creation on a post-emergence basis, which will inure to the benefit of the DIP Lenders.  *See* Diamond Sports Group, LLC, Cleansing Materials (Consolidated Financial Summary) (Jan. 16, 2024) https://mms.businesswire.com/media/20240116883620/en/2001136/1/Diamond_Sports_Group_Cleansing_Materials.pdf?download=1.

[10] The Committee has requested information regarding the identities of the DIP Commitment Parties and their allocations under the DIP Commitment Letter, but the Debtors have refused to share such information.

business; or make an irrevocable decision to participate in the DIP Facility on the terms proposed by the Debtors, without the benefit of adequate information.

25.     *Second*, the DIP Election Procedures require Junior Funded Debt Creditors to join in the RSA as a condition to participating in the DIP Facility.[11]  This condition is coercive and amounts to an improper solicitation of votes on an Acceptable Plan.  As noted above, Junior Funded Debt Creditors that do not participate in the DIP Facility are likely to receive diminished recoveries under any chapter 11 plan, while significant value is syphoned to the DIP Lenders.  Conditioning participation in the DIP Facility upon entry into the RSA leverages Junior Funded Debt Creditors' incentives created by this dynamic as a means to secure their support for an Acceptable Plan.  To the extent Junior Funded Debt Creditors elect to sign the RSA and participate in the DIP Facility, their signatures to the RSAs will be irrevocable (*see* DIP Election Proc. § 2) and they will be obligated to support an Acceptable Plan[12] notwithstanding that the Debtors have not yet filed any chapter 11 plan, disclosure statement or even an initial 13-week cash flow forecast governing the use of proceeds of the DIP Facility.[13]  Requiring such support is prejudicial to all Junior Funded Debt Creditors and violates Bankruptcy Code Section 1125.  If the Debtors wish to commence such a process, they should obtain explicit approval of this Court.

26.     *Third*, the proposed DIP Election Procedures should provide Junior Funded Debt Creditors a longer period of time in which to exercise their rights to participate in the DIP Facility

---

[11] The DIP Election Procedures provide that a Junior Funded Debt Creditor's joinder to the RSA is irrevocable, even if the RSA is subsequently amended prior to the closing date of the DIP Facility.  See DIP Election Proc. § 2.

[12] In fact, the RSA provides that the Debtors can seek to compel specific performance as a remedy in the event a party to the RSA breaches its duty to vote to accept an Acceptable Plan.  *See* RSA § 15.14.

[13] The DIP Motion states that the Debtors will file the initial 13-week cash flow forecast with the Court in advance of the objection deadline with respect to the DIP Motion, which is also the Election Deadline under the DIP Election Procedures.  *See* DIP Motion ¶ 1 n.4; DIP Election Proc., Annex A.

or otherwise attempt to monetize their claims through trades.[14]  As noted above, there is no legitimate business justification for the Debtors to commence the DIP Syndication Process at this juncture or for setting an Election Deadline that will occur weeks before the Debtors are even authorized to borrow under the DIP Facility.  Moreover, Junior Funded Debt Creditors that feel compelled to sell their claims due to the February 13, 2024 Election Deadline will fail to receive the benefits of any improved terms under the DIP Facility that may subsequently be negotiated among parties in interest or imposed by Court order.

## EMERGENCY CONSIDERATION

27. Pursuant to Bankruptcy Local Rule 9013-1, the Committee respectfully requests emergency consideration of the Motion.  As noted herein, the Debtors propose to commence the DIP Syndication Process on January 25, 2024, pursuant to the DIP Election Procedures, which have not been approved by this Court and may cause irreparable harm to Junior Funded Debt Creditors.  If the DIP Syndication Process is permitted to commence at this time and be completed prior to the scheduled hearing on the DIP Motion (as currently contemplated), Junior Funded Debt Creditors may be forced, on the basis of inadequate information, to make an irrevocable decision to participate in the DIP Facility that will preclude them from objecting to the DIP Motion.  Given the Committee's concerns regarding the prejudicial nature of the DIP Election Procedures, the Committee requests that this Motion be heard prior to the proposed commencement of the DIP Syndication Process.

---

[14] The Election Deadline is scheduled to take place thirteen business days after the Debtors commence the DIP Syndication Process.  During this brief window, Junior Funded Debt Creditors wishing to participate in the DIP Facility will be required to: (i) review and analyze the terms of the RSA and the DIP Documents; (ii) determine whether to participate in the DIP Facility; (iii) obtain any required approvals from internal investment committees; (iv) complete the Election Documentation and deliver such documentation to the Syndication Agent; and (v) fund their designated portion of the DIP Facility into an escrow account.  *See* DIP Election Proc. § 2.  Junior Funded Debt Creditors that hold Existing Notes through The Depository Trust Company will face an additional layer of complexity, as they must submit their Election Documentation through their Nominees, potentially leading to administrative delays.

## **CONCLUSION**

For the foregoing reasons, the Committee respectfully requests that the Court enter an order, substantially in the form attached hereto, granting the relief requested herein and granting such other relief as is just and proper.

[*The remainder of this page has been left blank intentionally.*]

Dated: January 25, 2024

Respectfully Submitted,
**AKIN GUMP STRAUSS HAUER & FELD LLP**

*/s/ Marty L. Brimmage, Jr.*
Marty L. Brimmage, Jr. (State Bar No. 00793386; S.D. Tex. 30464)
2300 N. Field Street, Suite 1800
Dallas, TX 75201-2481
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email: mbrimmage@akingump.com

-and-

Ira S. Dizengoff (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Naomi Moss (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: idizengoff@akingump.com
Email: aqureshi@akingump.com
Email: nmoss@akingump.com

-and-

Scott L. Alberino (admitted *pro hac vice*)
2001 K Street N.W.
Washington, DC 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
Email: salberino@akingump.com

*Counsel to the Official Committee of Unsecured Creditors of Diamond Sports Group, LLC,* et al.

## **CERTIFICATE OF ACCURACY**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief. This statement is made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ *Marty L. Brimmage, Jr.*
Marty L. Brimmage, Jr.

## **CERTIFICATE OF SERVICE**

I hereby certify that, on January 25, 2024, a true and correct copy of the foregoing was served via email through the Bankruptcy Court's Electronic Case Filing System on the parties that have consented to such service.

/s/ *Marty L. Brimmage, Jr.*
Marty L. Brimmage, Jr.