## Exhibit A

**Amended RSA**

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT*

This AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules attached hereto in accordance with Section 15.02, and as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, this "**Restructuring Support Agreement**" or this "**Agreement**") amends and restates the Original RSA and is made and entered into as of February 26, 2024 (the "**Execution Date**"), by and among the following parties (each, a "**Party**," and collectively, the "**Parties**"):[1]

(i) Diamond Sports Group, LLC, a Delaware limited liability company ("**DSG**"), and each of its direct or indirect subsidiaries that has executed and delivered, or, in the future, executes and delivers, counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties and to counsel to the Consenting Parties (each, a "**Company Party**" and, collectively, the "**Company Parties**");

(ii) the undersigned holders of, or investment advisors, sub-advisors, or managers of holders of, (a) First Lien Claims (the "**Consenting First Lien Creditors**") and (b)(I) Second Lien Revolving Loan Claims, Second Lien Term Loan Claims, and/or Second Lien Notes Claims, (II) Third Lien Term Loan Claims and/or Third Lien Notes Claims, and/or (III) Unsecured Notes Claims (collectively, the "**Consenting Unsecured Creditors**," and together with the Consenting First Lien Creditors, the "**Consenting Creditors**"), in each case that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties and to counsel to the Consenting Parties;

(iii) Amazon.com Services LLC (the "**Strategic Investor**"); and

(iv) the official committee of unsecured creditors appointed by the Office of the United States Trustee in the Chapter 11 Cases (the "**UCC**").

---

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

## *RECITALS*

**WHEREAS**, on March 14 and 15, 2023, the Company Parties commenced the Chapter 11 Cases in the Bankruptcy Court;

**WHEREAS**, the Company Parties, certain Consenting Creditors, and the Strategic Investor entered into that certain Restructuring Support Agreement, dated as of January 16, 2024 (including any schedules and exhibits attached thereto, the "**Original RSA**"), pursuant to which the Company Parties, the Consenting Creditors party thereto, and the Strategic Investor agreed to implement the Restructuring Transactions in accordance with the terms and subject to the conditions set forth in the Original RSA through the consummation of a chapter 11 plan consistent with the terms of the Original RSA;

**WHEREAS**, the parties to the Original RSA and the UCC desire to amend the Original RSA to add the UCC as a party and implement the UCC Settlement (as defined below) among the Parties hereto;

**WHEREAS**, the Company Parties, the Consenting Creditors, the Strategic Investor, and the UCC have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit A** hereto (including all exhibits, annexes, and schedules thereto, the "**Restructuring Term Sheet**" and such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions by, among other things, consummating a chapter 11 plan of reorganization consistent with the terms of this Agreement and otherwise acceptable to the Company Parties and the Required Consenting Parties (such chapter 11 plan, the "**Plan**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.**   *Definitions and Interpretation*.   <u>Definitions</u>.   Capitalized terms used but not defined in this Agreement have the meanings given to such terms in the Restructuring Term Sheet. The following terms shall have the following definitions:

"**Affiliate**" means, with respect to any Person, any other Person controlled by, controlling or under common control with such Person and shall also include any Related Fund of such Person; <u>provided</u>, <u>however</u>, (a) no Consenting Party shall be considered an Affiliate of the Company Parties and (b) none of (i) Sinclair Parent, (ii) current or former employees of Sinclair Parent who

served as directors or managers of any Company Party, or (iii) any shareholders of Sinclair Parent, shall be considered an Affiliate of the Company Parties.  As used in this definition, "<u>control</u>" (including, with its correlative meanings, "<u>controlling</u>," "<u>controlled by</u>," and "<u>under common control with</u>") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract, or otherwise).

"**<u>Agent</u>**" means any administrative agent under the Credit Agreements.

"**<u>Agreement</u>**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached hereto in accordance with <u>Section 15.02</u> (including the Restructuring Term Sheet, which is expressly incorporated herein and made a part of this Agreement).

"**<u>Agreement Effective Date</u>**" means the date on which all of the conditions set forth in <u>Section 2.01</u> have been met.

"**<u>Agreement Effective Period</u>**" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of any Consenting Creditor that becomes a party hereto after the Agreement Effective Date, the date as of which such Consenting Creditor executes and delivers a Joinder or Transfer Agreement to counsel to the Company Parties and counsel to the Consenting Parties) to the Termination Date applicable to such Party.

"**<u>Alternative Restructuring</u>**" means (a) any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, financing (including any debtor-in-possession financing or exit financing), use of cash collateral, liquidation or winding up, tender offer, asset sale, share issuance, recapitalization, plan of reorganization or liquidation, share exchange, business combination, joint venture, partnership, or similar transaction involving any one or more Company Parties or any Affiliates of the Company Parties or the debt, equity, or other interests in any one or more Company Parties or any Affiliates, other than as contemplated by this Agreement, including the Restructuring Term Sheet, or (b) any other transaction involving one or more Company Parties that is an alternative to and/or materially inconsistent with the Restructuring Transactions.

"**<u>Alternative Restructuring Proposal</u>**" means any *bona fide* inquiry, proposal, offer, bid, term sheet, discussion, or agreement (whether in writing or oral) with respect to an Alternative Restructuring.

"**<u>Antitrust Laws</u>**" has the meaning set forth in <u>Section 6.01(a)(v)</u> of this Agreement.

"**<u>Bally's Agreement</u>**" means that certain Commercial Agreement, dated as of November 18, 2020, by and among Bally's Corporation, Sinclair Parent, and DSG.

"**<u>Bankruptcy Code</u>**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**<u>Bankruptcy Court</u>**" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York.

"**Cash Collateral Order**" means the *Corrected Final Order (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief* [Docket No. 572], as may be amended, restated, supplemented, or otherwise modified from time to time.

"**Challenge**" has the meaning set forth in the DIP Order.

"**Challenge Period**" has the meaning set forth in the DIP Order.

"**Chapter 11 Cases**" means the cases commenced by the Company Parties under chapter 11 of the Bankruptcy Code, which are being jointly administered under Case No. 23-90116 (CML) in the Bankruptcy Court.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Commercial Term Sheet**" means that certain binding term sheet memorializing the terms of a commercial agreement between the Company Parties and the Strategic Investor, which is attached as Annex VI to the Convertible B Commitment Letter.

"**Company Claims/Interests**" means any Claim against, or Interest in, a Company Party, including the First Lien Claims, Second Lien Revolving Loan Claims, Second Lien Term Loan Claims, Second Lien Notes Claims, Third Lien Term Loan Claims, Third Lien Notes Claims, Unsecured Notes Claims, and Existing Equity Interests.

"**Company Party(ies)**" has the meaning set forth in the preamble to this Agreement.

"**Company Party Termination Event**" has the meaning set forth in Section 13.02 of this Agreement.

"**Compensation Arrangement**" means any compensation and/or benefits plans, policies, programs, agreements, or arrangements of any Company Party.

"**Compliance-Related Laws**" shall mean all applicable local, state, and federal laws, rules, or regulations relating to (i) combatting bribery or corruption (including, without limitation, the U.S. Foreign Corrupt Practices Act), (ii) terrorism, financial crime or money laundering (including, without limitation, the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957), the Anti-Money Laundering Act of 2020, the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 (as amended), and the Proceeds of Crime Act 2002 (as amended), and any rules and regulations issued with respect to each of the foregoing (including those issued by any Governmental Entity or regulatory authority), and (iii) economic

sanctions, including those administered by the United States government (including the Office of Foreign Assets Control of the U.S. Department of the Treasury).

"**Compliance Restricted Party**" shall mean any Person (i) included on one or more of the Compliance Restricted Party Lists; (ii) located, organized, or ordinarily residing in a jurisdiction that is the subject of country- or territory-wide sanctions; (iii) owned or controlled by, or acting on behalf of, any of the foregoing; or (iv) with whom any Party is otherwise prohibited from dealing under applicable Compliance-Related Laws.

"**Compliance Restricted Party Lists**" shall mean lists of sanctioned or restricted persons maintained by the United Nations, the United Kingdom, the United States, or the European Union, and any other relevant jurisdiction, including but not limited to, the following lists (as amended from time to time): (i) lists administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury (including the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, and the Sectoral Sanctions Identifications List), as amended from time to time; (ii) lists administered by the U.S. Department of Commerce (including, but not limited to, the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List); (iii) the Non-SDN Chinese Military-Industrial Complex Companies List; (iv) the consolidated list of Persons, Groups and Entities Subject to EU Financial Sanctions, as implemented by the EU Common Foreign & Security Policy; and (v) and similar lists of restricted parties maintained by other relevant Governmental Entities.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan.

"**Consent**" means any consent, novation, approval, authorization, qualification, waiver, registration, or notification to be obtained from, filed with, or delivered to any Person.

"**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting First Lien Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Party Termination Event**" has the meaning set forth in Section 13.01 of this Agreement.

"**Consenting Parties**" means the Consenting Creditors, the Initial DIP Commitment Parties, the Strategic Investor, and the UCC.

"**Consenting Parties' Advisors**" means, collectively, the First Lien Group Advisors, the Crossover Group Advisors, the Strategic Investor Advisors, and the UCC Advisors.

"**Consenting Unsecured Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Convertible A Exit Notes**" has the meaning set forth in the Restructuring Term Sheet.

"**Convertible B Exit Notes**" has the meaning set forth in the Restructuring Term Sheet.

"**Convertible B Commitment Letter**" has the meaning set forth in the Restructuring Term Sheet.

"**Cooperation Agreement**" means that certain cooperation agreement, dated November 6, 2023, a copy of which is filed at Docket No. 1342-1, as amended, modified, or supplemented from time to time in accordance with its terms.

"**Cooperation Agreement Order**" means the order approving the Cooperation Agreement [Docket No. 1383].

"**Credit Agreements**" means, collectively, the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Third Lien Credit Agreement.

"**Crossover Group**" means, collectively, the holders of, or investment advisors, sub-advisors, or managers of holders of, First Lien Claims, Second Lien Claims, and Unsecured Funded Debt Claims represented by Paul Hastings LLP and PJT Partners LP.

"**Crossover Group Advisors**" means (a) Paul Hastings LLP, as counsel to the Crossover Group, (b) PJT Partners LP, as financial advisor to the Crossover Group, and (c) such other professionals as may be retained by or on behalf of the Crossover Group, with the consent of the Company Parties.

"**Definitive Documents**" means the documents listed in Section 3.

"**DIP Commitment Letter**" has the meaning set forth in the Restructuring Term Sheet.

"**DIP Commitments**" has the meaning set forth in the DIP Commitment Letter.

"**DIP Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**DIP Loans**" has the meaning set forth in the DIP Term Sheet.

"**DIP Order**" means any order of the Bankruptcy Court approving and governing the DIP Facility, as may be amended, restated, supplemented, or otherwise modified from time to time.

"**DIP Term Sheet**" has the meaning set forth in the Restructuring Term Sheet.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code,

Rule 3018 of the Bankruptcy Rules, and other applicable Law, including all exhibits, annexes, schedules, and supplements thereto, each as may be amended, supplemented, or modified from time to time.

"**Disqualified Party**" means (x) a company that offers products or services in the following categories: e-commerce platform, "big box retail", cloud computing, and video streaming or (y) an Affiliate of a company described in clause (x); provided, however, that "Disqualified Party" shall not include (i) any Investment Fund or (ii) an Affiliate of a company described in clause (x) solely because of its common control by an Investment Fund.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement as a disclosure statement meeting the applicable requirements of the Bankruptcy Code and, to the extent necessary, approving the related Solicitation Materials, which order may be the Confirmation Order.

"**DSG**" has the meaning set forth in the recitals to this Agreement.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Exchange Act**" means the Securities and Exchange Act of 1934, as amended.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Existing Equity Interest**" means any Interest in DSG.

"**Existing Intercreditor Agreement**" means that certain First/Second/Third Lien Intercreditor Agreement, dated as of March 1, 2022, among UMB Bank, N.A. (as successor to Wilmington Savings Fund Society, FSB), as Priority Lien Agent, Wilmington Savings Fund Society, FSB, as Original Second Lien Credit Agreement Agent, U.S. Bank Trust Company, National Association, as Original Second Lien Indenture Trustee, Wilmington Savings Fund Society, FSB, as Original Third Lien Credit Agreement Agent, and U.S. Bank Trust Company, National Association, as Original Third Lien Indenture Trustee, as such agreement, in whole or in part, in one or more instances, may be amended, restated, renewed, extended, supplemented, or otherwise modified from time to time (including any successive amendments, restatements, renewals, and extensions).

"**Exit Term Loans**" has the meaning set forth in the Restructuring Term Sheet.

"**Finance Documents**" means, collectively, (a) the Credit Agreements and the Notes Indentures, and (b) all other documents entered into pursuant to or in connection with the foregoing documents in clause (a) of this definition (including any cash management arrangements and ancillary facilities).

"**First Lien Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of March 1, 2022, by and among Holdings, DSG, as borrower, UMB Bank, N.A. (successor to Wilmington Savings Fund Society, FSB), as administrative agent and collateral agent, and the

other lenders party thereto, as such agreement, in whole or in part, in one or more instances, may be amended, restated, renewed, extended, supplemented, or otherwise modified from time to time (including any successive amendments, restatements, renewals, and extensions).

"**First Lien Group**" means, collectively, the holders of, or investment advisors, sub-advisors, or managers to beneficial holders of, the First Lien Term Loans, Second Lien Term Loans, Second Lien Notes, and Unsecured Notes represented by the First Lien Group Advisors.

"**First Lien Group Advisors**" means (a) Kramer Levin Naftalis & Frankel LLP, as counsel to the First Lien Group, (b) Centerview Partners LLC, as financial advisor to the First Lien Group, (c) Hunton Andrews Kurth LLP, as local counsel to the First Lien Group, and (d) such other professionals as may be retained by or on behalf of the First Lien Group, with the consent of the Company Parties.

"**First Lien Term Loans**" means the loans outstanding under the First Lien Credit Agreement.

"**General Unsecured Claim**" has the meaning set forth in the Restructuring Term Sheet.

"**Go-Forward Trade Claim**" has the meaning set forth in the Restructuring Term Sheet.

"**Governmental Entity**" means any applicable federal, state, local, or foreign government or any agency, bureau, board, commission, court, or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization. For the avoidance of doubt, the term "Governmental Entity" includes any "Governmental Unit" (as such term is defined in section 101(27) of the Bankruptcy Code).

"**Holdings**" means Diamond Sports Intermediate Holdings LLC, a Delaware limited liability company.

"**Initial DIP Commitment Parties**" has the meaning set forth in the DIP Commitment Letter.

"**Interest**" has the meaning set forth in the Restructuring Term Sheet.

"**Investment Fund**" means a *bona fide* investment fund or other investment vehicle, such as a hedge fund, private equity fund, an account, a share trust, an investment trust, an investment company, a pension fund or an insurance company, in each case, the business, operations or assets of which are held for investment purposes and the investments in which are professionally managed.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit B**.

"**Knowledge Parties**" means David Preschlack and David DeVoe, and in the case of each of the foregoing, any of their respective successors.

"**Law(s)**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment (including, for each of the foregoing, applicable Compliance-Related Laws), in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Entity of competent jurisdiction (including the Bankruptcy Court).

"**Litigation Trust Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**Material MVPD**" means each of the Company Parties' six largest MVPDs by subscriber count as of the date of this Agreement.

"**Milestones**" means the dates and deadlines set forth in Section 5.01 of this Agreement, as extended in writing by the Required Consenting Parties (which extension may be via electronic mail of counsel to the applicable Consenting Parties).

"**MVPD**" has the meaning set forth in the Restructuring Term Sheet.

"**NBA Term Sheet**" means that certain Binding Term Sheet, dated as of November 1, 2023, by and among NBA Media Ventures, LLC, DSG, and each of DSG's direct or indirect subsidiaries party thereto.

"**New A/R Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**New A/R Facility Credit Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**New Organizational Documents**" has the meaning set forth in the Restructuring Term Sheet.

"**NHL Term Sheet**" means that certain Binding Term Sheet, dated as of December 14, 2023, by and among National Hockey League, NHL Interactive Cyberenterprises, LLC, NHL Enterprises, L.P., DSG, and each of DSG's direct or indirect subsidiaries party thereto.

"**No Recourse Party**" has the meaning set forth in Section 15.24 of this Agreement.

"**Notes Indentures**" means, collectively, the Second Lien Notes Indenture, the Third Lien Notes Indenture, and the Unsecured Notes Indenture.

"**Notes Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity under the Notes Indentures.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization) or which relate to the internal governance of such Person (such as by-laws or a partnership agreement, or an operating, limited liability company, or members agreement).

"**Original RSA**" has the meaning set forth in the recitals to this Agreement.

"**Outside Date**" means November 30, 2024.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permit(s)**" means any license, permit, registration, authorization, approval, certificate of authority, accreditation, qualification, or similar document or authority issued or granted by any Governmental Entity.

"**Permitted Transferee**" means each transferee of any Claims against a Company Party who meets the requirements of Section 10.01.

"**Person**" means an individual, a partnership, a limited partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Entity, or any legal entity or association.

"**Plan**" has the meaning set forth in the recitals to this Agreement.

"**Plan Effective Date**" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the effective date of the Plan (including the conditions precedent to the consummation of the Restructuring Transactions set forth in this Agreement and in the section of the Restructuring Term Sheet entitled "Conditions Precedent to the Plan Effective Date") have been satisfied or waived in accordance with the Plan.

"**Plan Supplement**" means the compilation of (a) documents and forms and/or term sheets of documents, agreements, schedules, and exhibits to the Plan and (b) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code that shall be filed by the Company Parties with the Bankruptcy Court.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Related Fund**" means, with respect to any Person, any fund, account, or investment vehicle that is controlled, advised, or managed by (a) such Person, (b) an Affiliate of such Person, or (c) the same investment manager, advisor, or subadvisor that controls, advises, or manages such Person or an Affiliate of such investment manager, advisor, or subadvisor.

"**Required Consenting First Lien Creditors**" means, as of the relevant date, Consenting Creditors who own or control more than 50% in aggregate principal amount of the outstanding First Lien Claims owned or controlled by all Consenting Creditors in the aggregate as of such date (such percentage to be determined after giving effect to any *bona fide* unsettled trades as of such date, provided that, and solely to the extent requested by counsel to the Company Parties in writing, such Consenting Creditors with unsettled trades as of such dates shall provide reasonably satisfactory documentation to counsel to the Company Parties evidencing the validity of such

unsettled trades (it being understood and agreed that executed trade confirmations shall be deemed satisfactory documentation)).

"**Required Consenting Parties**" means, as of the relevant date, each of (a) the Required Consenting First Lien Creditors, (b) the Strategic Investor, and (c) the Required DIP Commitment Parties.

"**Required Consenting Unsecured Creditors**" means, as of the relevant date, Consenting Creditors who own or control more than 50% in aggregate principal amount of the outstanding Second Lien Claims and Unsecured Funded Debt Claims, in each case, owned or controlled by all Consenting Creditors in the aggregate as of such date (such percentage to be determined after giving effect to any *bona fide* unsettled trades as of such date, <u>provided</u> that, and solely to the extent requested by counsel to the Company Parties in writing, such Consenting Creditors with unsettled trades as of such dates shall provide reasonably satisfactory documentation to counsel to the Company Parties evidencing the validity of such unsettled trades (it being understood and agreed that executed trade confirmations shall be deemed satisfactory documentation)).

"**Required DIP Commitment Parties**" means, as of the relevant date, Initial DIP Commitment Parties who own or control more than 66.67% in aggregate principal amount of the outstanding DIP Loans and/or DIP Commitments, as applicable, that are owned or controlled by Initial DIP Commitment Parties in the aggregate as of such date (such percentage to be determined after giving effect to any *bona fide* unsettled trades as of such date, provided that, and solely to the extent requested by counsel to the Company Parties in writing, such Consenting Creditors with unsettled trades as of such dates shall provide reasonably satisfactory documentation to counsel to the Company Parties evidencing the validity of such unsettled trades (it being understood and agreed that executed trade confirmations shall be deemed satisfactory documentation)).

"**Required Supermajority Consenting Parties**" means, as of the relevant date, either (a) the Required DIP Commitment Parties and the Strategic Investor or (b) non-defaulting Initial DIP Commitment Parties as of such date whose aggregate DIP Loans and/or DIP Commitments, as applicable, constitute more than 83.33% of the sum of the aggregate DIP Loans and DIP Commitments of all non-defaulting Initial DIP Commitment Parties as of such date.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Second Lien Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of March 1, 2022, by and among Holdings, DSG, as borrower, Wilmington Savings Fund Society, FSB, as collateral agent, JPMorgan Chase Bank, N.A., as Revolving Credit Facility Agent (as defined therein), and the issuing banks and lenders party thereto, as such agreement, in whole or in part, in one or more instances, may be amended, restated, renewed, extended, supplemented, or otherwise modified from time to time (including any successive amendments, restatements, renewals, and extensions).

"**Second Lien Notes**" means the notes issued pursuant to the Second Lien Notes Indenture.

"**Second Lien Notes Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**Second Lien Notes Indenture**" means that certain Indenture, dated as of March 1, 2022, among DSG and Diamond Sports Finance Company, as issuers, the other Grantors party thereto from time to time, and U.S. Bank Trust Company, National Association, as trustee and notes collateral agent, as such indenture, in whole or in part, in one or more instances, may be amended, restated, renewed, extended, supplemented, or otherwise modified from time to time (including any successive amendments, restatements, renewals, and extensions).

"**Second Lien Revolving Loan Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**Second Lien Revolving Loans**" means the revolving credit facility loans outstanding under the Second Lien Credit Agreement.

"**Second Lien Term Loans**" means the term loans outstanding under the Second Lien Credit Agreement.

"**Second Lien Term Loan Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**Separation Cost Cap**" means $45 million.

"**Sinclair Parent**" has the meaning set forth in the Restructuring Term Sheet.

"**Sinclair-Related Litigations**" has the meaning set forth in the Restructuring Term Sheet.

"**Sinclair Settlement**" means the settlement of the Sinclair-Related Litigations as set forth in the settlement term sheet filed at Docket No. 1658-1.

"**Solicitation Materials**" means all materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"**Sports League**" has the meaning set forth in the Restructuring Term Sheet.

"**Standstill Prohibitions**" means, collectively, (i) the investigation of any claims, causes of action, or potential litigation against the Prepetition Secured Parties concerning the Prepetition Claims and the Prepetition Liens (each as defined in the DIP Order), (ii) the preparation of Standing Motions (as defined in the DIP Order) and complaints against the Prepetition Secured Parties, or (iii) any other action outlined in paragraph 32 of the DIP Order with respect to the Prepetition Secured Parties and/or the Prepetition Secured Debt (as defined in the DIP Order).

"**Strategic Investor**" has the meaning set forth in the preamble to this Agreement.

"**Strategic Investor Advisors**" means Latham & Watkins LLP.

"**Superior Proposal**" has the meaning set forth in Section 9.02 of this Agreement.

"**Superior Transaction**" means a transaction that the board of directors, board of managers, or similar governing body of a Company Party determines in good faith, based on the advice of outside counsel: (i) would be in the best interests of the Company, and (ii) would reasonably be expected to be superior for the Company and its creditors in comparison to the Restructuring Transactions contemplated under this Agreement, taking into account factors such as the aggregate consideration offered by and conditionality of the respective transactions.

"**Take Back Term Loans**" has the meaning set forth in the Restructuring Term Sheet.

"**Take Back Exit Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 13.

"**Termination Event**" has the meaning set forth in Section 13.02 of this Agreement.

"**Third Lien Credit Agreement**" means that certain Credit Agreement, dated as of August 23, 2019, by and among Holdings, DSG, as borrower, Wilmington Savings Fund Society, FSB, as collateral agent, and the issuing banks and lenders party thereto, as amended by the First Amendment, dated as of December 20, 2019, and the Second Amendment, dated as of March 1, 2022, as such agreement, in whole or in part, in one or more instances, may be amended, restated, renewed, extended, supplemented, or otherwise modified from time to time (including any successive amendments, restatements, renewals, and extensions).

"**Third Lien Notes**" means the notes issued pursuant to the Third Lien Notes Indenture.

"**Third Lien Notes Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**Third Lien Notes Indenture**" means that certain Indenture, dated as of August 2, 2019, among DSG and Diamond Sports Finance Company, as issuers, the other Grantors party thereto from time to time and U.S. Bank Trust Company, National Association, as indenture trustee, as amended and supplemented by Supplemental Indenture No. 1, dated as of August 23, 2019, by and among the Grantors named therein, and U.S. Bank Trust Company, National Association, Supplemental Indenture No. 2, dated as of December 20, 2019, by and among DSG and Diamond Sports Finance Company, as issuers, the other Grantors named therein, and U.S. Bank Trust Company, National Association, Supplemental Indenture No. 3, dated as of August 23, 2019, by and among the Grantors named therein, and U.S. Bank Trust Company, National Association, and Supplemental Indenture No. 4, dated as of March 1, 2022, by and among DSG and Diamond Sports Finance Company, as issuers, the other Grantors named therein, and U.S. Bank Trust Company, National Association, as such indenture, in whole or in part, in one or more instances, may be amended, restated, renewed, extended, supplemented, or otherwise modified from time to time (including any successive amendments, restatements, renewals, and extensions).

"**Third Lien Term Loans**" means the loans outstanding under the Third Lien Credit Agreement.

"**Third Lien Term Loan Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**Transaction Expenses**" means all reasonable and documented fees, costs, and expenses of each of the First Lien Group Advisors, the Crossover Group Advisors, and the Strategic Investor Advisors, whether incurred before or after the Agreement Effective Date, in connection with the Chapter 11 Cases, negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement (including, for the avoidance of doubt, enforcement through appellate litigation) of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, including any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, and, to the extent applicable, consistent with the Convertible B Commitment Letter and any engagement letters or fee reimbursement letters entered into (i) between the applicable Company Parties, on the one hand, and each First Lien Group Advisor, on the other hand, with respect to the fees, costs, and expenses of such First Lien Group Advisor, or (ii) between the applicable Company Parties, on the one hand, and each Crossover Group Advisor, on the other hand, with respect to the fees, costs, and expenses of such Crossover Group Advisor, in any such case as supplemented or modified by this Agreement.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, loan, grant, hypothecate, participate, donate, or otherwise encumber or dispose of, issue, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions); provided that for purposes of determining the time of a Transfer of a loan where any sale or assignment must be subsequently settled by an Agent, the time of the Transfer is the time of the agreement to sell or assign the loan, not the date of settlement of such transaction.

"**Transfer Agreement**" means a transfer agreement substantially in the form attached to this Agreement as **Exhibit C**. For the avoidance of doubt, any transferee that executes a Transfer Agreement shall be deemed a "Party" under this Agreement as provided therein.

"**UCC**" has the meaning set forth in the preamble to this Agreement.

"**UCC Advisors**" means (a) Akin Gump Strauss Hauer & Feld LLP, as counsel to the UCC, (b) FTI Consulting, Inc., as financial advisor to the UCC, (c) Houlihan Lokey Capital, Inc., as investment banker to the UCC, and (d) Reid Collins & Tsai LLP, as special counsel to the UCC.

"**UCC Settlement**" means the settlement of the UCC's potential objections to the DIP Motion and the restructuring transactions contemplated under the Original RSA, which is incorporated in this Agreement and shall be incorporated in the Plan, the Confirmation Order, and the Definitive Documents, as applicable.

"**UCC Termination Event**" has the meaning set forth in Section 13.03 of this Agreement.

"**Unsecured Funded Debt Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**Unsecured Notes**" means the notes issued pursuant to the Unsecured Notes Indenture.

"**Unsecured Notes Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**Unsecured Notes Indenture**" means that certain Indenture, dated as of August 2, 2019, among Holdings, DSG and Diamond Sports Finance Company, as Issuers, the other guarantors from time to time party thereto, and U.S. Bank Trust Company, National Association, as trustee and notes collateral agent, as such indenture, in whole or in part, in one or more instances, may be amended, restated, renewed, extended, supplemented, or otherwise modified from time to time (including any successive amendments, restatements, renewals, and extensions).

"**YES Interests**" has the meaning set forth in the Restructuring Term Sheet.

1.02.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time; provided that any capitalized terms herein which are defined with reference to another agreement are defined with reference to such other agreement as of the Execution Date, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the Execution Date;

(d)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(e)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(f)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(g)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(h)    the use of "include" or "including" is without limitation, whether stated or not; and

(i)    (i) the phrase "counsel to the Consenting Parties" refers in this Agreement to each counsel specified in Section 15.10 other than counsel specified in Section 15.10(a); (ii) the phrase "counsel to the Company Parties" refers in this Agreement to each counsel specified in Section 15.10(a); (iii) the phrase "counsel to the First Lien Group" refers in this Agreement to counsel specified in Section 15.10(b); (iv) the phrase "counsel to the Crossover Group" refers in this Agreement to counsel specified in Section 15.10(c); (v) the phrase "counsel to the Consenting Creditors" refers in this Agreement to each counsel specified in Section 15.10(b) and

Section 15.10(c); (vi) the phrase "counsel to the Strategic Investor" refers in this Agreement to counsel specified in Section 15.10(d); and (vii) the phrase "counsel to the UCC" refers in this Agreement to counsel specified in Section 15.10(e).

**Section 2.**     *Effectiveness of this Agreement.*

2.01.   This Agreement shall become effective and binding upon each of the parties that has executed and delivered counterpart signature pages to this Agreement on the date on which all of the following conditions have been satisfied or waived by the applicable Party or Parties in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Parties;

(b)     the Strategic Investor shall have executed and delivered a counterpart signature page of this Agreement to counsel to the Company Parties and counsel to the other Consenting Parties;

(c)     counsel to the UCC shall have executed and delivered a counterpart signature page of this Agreement on behalf of the UCC to counsel to the Company Parties, counsel to the Consenting Creditors, and counsel to the Strategic Investor;

(d)     the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties, counsel to the Strategic Investor, and counsel to the UCC:

(i)     the Required Consenting First Lien Lenders; and

(ii)     the Required DIP Commitment Parties; and

(e)     counsel to the Company Parties shall have given notice to counsel to the Consenting Parties in the manner set forth in Section 15.10 hereof (by electronic mail or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2.01 have occurred.

**Section 3.**     *Definitive Documents.*

3.01.   The Definitive Documents governing the Restructuring Transactions shall include this Agreement and all other agreements, instruments, pleadings, orders, forms, questionnaires, and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions, and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Restructuring Transactions.

3.02.   Each of the following Definitive Documents shall be consistent with this Agreement and otherwise in form and substance reasonably acceptable to each of the Company Parties and the Required Consenting Parties:

(a)     the Plan;

(b)      the Plan Supplement and any other documents, schedules, and exhibits to the Plan Supplement; provided that to the extent the other Definitive Documents identified in this Section 3.02 are included in the Plan Supplement, such Definitive Documents shall be subject to the specific approval rights set forth in this Section 3.02 with respect to such Definitive Documents;

(c)      the Confirmation Order;

(d)      an order by the Bankruptcy Court approving this Agreement;

(e)      the Disclosure Statement and any Solicitation Materials;

(f)      the Disclosure Statement Order;

(g)      the New A/R Facility Credit Agreement, if any, and any other agreement, instrument, or document evidencing or governing, or executed and/or delivered in connection with, the New A/R Facility, if any;

(h)      any agreement, instrument, or document evidencing or governing, or executed and/or delivered in connection with, the Take Back Exit Facility and the Take Back Term  Loans issued thereunder, including any intercreditor and subordination agreement(s), security agreement, or other documents or filings necessary or advisable to perfect the security interests securing the Take Back Exit Facility;

(i)      the DIP Order and any agreement, instrument, or document evidencing or governing, or executed and/or delivered in connection with, the DIP Facility;

(j)      any agreement, instrument, or document evidencing or governing, or executed and/or delivered in connection with, the Convertible A Exit Notes, including any intercreditor and subordination agreement(s), security agreement, or other documents or filings necessary or advisable to perfect the security interests securing the Convertible A Exit Notes;

(k)      any agreement, instrument, or document evidencing or governing, or executed and/or delivered in connection with, the Exit Term Loans, including any intercreditor and subordination agreement(s), security agreement, or other documents or filings necessary or advisable to perfect the security interests securing the Exit Term Loans;

(l)      any agreement, instrument, or document evidencing or governing, or executed and/or delivered in connection with, the Convertible B Exit Notes, including any intercreditor and subordination agreement(s), security agreement, or other documents or filings necessary or advisable to perfect the security interests securing the Convertible B Exit Notes;

(m)      an order by the Bankruptcy Court approving the Convertible B Commitment Letter; and

(n)      any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing.

3.03.   Each of the following Definitive Documents shall be consistent with this Agreement and otherwise in form and substance reasonably acceptable to each of the Company Parties, the Required DIP Commitment Parties, and the Strategic Investor:

(a)   the New Organizational Documents;

(b)   any long-form agreement documenting the terms of the Commercial Term Sheet; and

(c)   any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing.

3.04.   Each of the following Definitive Documents shall be consistent with this Agreement and otherwise in form and substance reasonably acceptable to each of the Company Parties, the Required DIP Commitment Parties, and the Required Consenting First Lien Creditors:

(a)   the Litigation Trust Agreement; and

(b)   any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents evidencing or governing, motions, pleadings, and/or agreements executed and/or delivered in connection with, the Litigation Trust.

3.05.   Notwithstanding anything to the contrary in this Agreement, and in addition to any other applicable consent rights of the Parties set forth in Section 3, any provision of any Definitive Document, including the DIP Order, the Plan, and the Confirmation Order, that directly impacts the treatment of or consideration to be provided on account of General Unsecured Claims and/or Go-Forward Trade Claims (including any amendments or modifications to such provisions) shall be consistent with this Agreement (including the Restructuring Term Sheet) and shall be in form and substance reasonably acceptable to the UCC.

3.06.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion, as applicable.   Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall (unless otherwise expressly provided for in this Agreement) contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including the applicable terms of the Restructuring Term Sheet) and, except as otherwise provided above, must be reasonably acceptable to the Company Parties and the Required Consenting Parties.

**Section 4.**   *Restructuring Term Sheet.*

4.01.   The Restructuring Term Sheet is expressly incorporated herein by reference and made a part of this Agreement as if fully set forth herein.   The terms and conditions of the Restructuring Transactions are set forth in the Restructuring Term Sheet; provided that the Restructuring Term Sheet is supplemented by the terms and conditions of this Agreement and the applicable Definitive Documents implementing the Restructuring Transactions.   In the event of

any inconsistencies between the terms of this Agreement and the Restructuring Term Sheet, the Restructuring Term Sheet shall govern.

**Section 5.**     *Milestones.*

5.01.   <u>Milestones</u>.  On and after the Agreement Effective Date, the Company Parties shall implement the Restructuring Transactions in accordance with the following milestones (as any such milestone may be extended in writing by the Required Consenting Parties (which extension may be via electronic mail of counsel to the applicable Consenting Parties)), unless waived in writing by the Required Consenting Parties (which waiver may be via electronic mail of counsel to the applicable Consenting Parties):

(a)     not later than 11:59 p.m., prevailing Eastern Time, on February 27, 2024, the Bankruptcy Court shall have entered each of (i) the DIP Order and (ii) an order approving the Convertible B Commitment Letter, and the Company Parties shall have paid all accrued and unpaid Transaction Expenses as of the Agreement Effective Date for which an invoice has been received by the Company Parties on or before 12:00 p.m., prevailing Eastern Time, on the date that is one Business Day prior to the Agreement Effective Date;

(b)     not later than the earlier to occur of (x) the Closing Date (as defined in the DIP Term Sheet) of the DIP Facility and (y) three Business Days after entry of the DIP Order, the First Lien Paydown (as defined in the DIP Term Sheet) shall have been made;

(c)     not later than 11:59 p.m., prevailing Eastern Time, on March 22, 2024, the Company Parties shall have filed with the Bankruptcy Court each of (i) the Plan, (ii) the Disclosure Statement, and (iii) the motion to approve the Solicitation Materials;

(d)     not later than 11:59 p.m., prevailing Eastern Time, on June 30, 2024, the Bankruptcy Court shall have entered the Confirmation Order; and

(e)     not later than 11:59 p.m. prevailing Eastern Time on August 31, 2024, the Plan Effective Date shall have occurred; <u>provided</u> that, notwithstanding anything to the contrary set forth herein, such date shall automatically be extended by 60 calendar days to the extent necessary to obtain any authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan; <u>provided</u> <u>further</u>, that requests or applications for any such authorizations, consents, regulatory approvals, rulings, or documents are pending on August 31, 2024.

**Section 6.**     ***Commitments of the Consenting Parties***.

6.01.   <u>General Commitments, Forbearances, and Waivers</u>.

(a)     During the Agreement Effective Period, each Consenting Party, on a several and not joint basis, agrees (and in the case of the UCC, subject in all respects to <u>Section 9</u> of this Agreement), including in respect of all of its Company Claims/Interests, to:

(i)     use commercially reasonable efforts and timely take all commercially reasonable actions necessary to support, implement, and consummate the Restructuring

Transactions; <u>provided</u> that no Consenting Party shall be obligated to waive (to the extent waivable by such Consenting Party) any condition to the consummation of any part of the Restructuring Transactions set forth in any Definitive Document, including the conditions precedent to the consummation of the Restructuring Transactions set forth in this Agreement (including in the section of the Restructuring Term Sheet entitled "Conditions Precedent to the Plan Effective Date," solely to the extent such conditions precedent apply to such Consenting Party);

(ii)     negotiate in good faith, execute, and use commercially reasonable efforts to implement the Definitive Documents;

(iii)     use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders; <u>provided</u> that no Consenting Party shall be obligated to amend, modify, or supplement any of the Definitive Documents to obtain such additional support (including any amendment, modification, or supplement that provides for different treatment of any Company Claims/Interests than the treatment provided to such Company Claims/Interests in the Restructuring Term Sheet);

(iv)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, take all commercially reasonable actions necessary to address any such impediment, and to negotiate in good faith with the Company Parties and other Consenting Parties regarding reasonable and appropriate additional or alternative provisions to address any such impediment; <u>provided</u> that notwithstanding this <u>Section 6.01(a)(iv)</u>, no Consenting Party shall be obligated hereunder to take any action to address any such impediment to the extent such action would otherwise be inconsistent with the terms of this Agreement and the Restructuring Term Sheet;

(v)     with respect to the Strategic Investor and the Initial DIP Commitment Parties, respond as promptly as practicable under the circumstances to any inquiries received from any Governmental Entity, person, or other authority enforcing applicable antitrust, competition, trade regulation or similar Laws for additional information or documentation in connection with antitrust, compensation, trade regulation or similar matters (collectively, "<u>**Antitrust Laws**</u>") as applicable to the Restructuring Transactions; and use commercially reasonable efforts to address vacate, modify, reverse, suspend, prevent, eliminate or remove any inquiry, investigation, or action by a Governmental Entity, person, or other authority, pursuant to any applicable Antitrust Laws the existence or outcome of which could reasonably result in an adverse impact to the entitlements of Strategic Investor or the Initial DIP Commitment Parties under this Agreement (for the avoidance of doubt neither the Strategic Investor nor the Initial DIP Commitment Parties, as applicable will be obligated to propose or agree to accept any undertaking or condition, to enter into any consent decree, to make any divestiture, to accept any operational restriction, or take any other action that, in the reasonable judgment of Strategic Investor or the Initial DIP Commitment Parties, as applicable, could be expected to limit the right of Strategic Investor or the Initial DIP Commitment Parties, as applicable, with respect its entitlements under this Agreement);

(vi)     with respect to the Consenting Creditors, give any notice, order, instruction, or direction to the applicable Agent or Notes Trustee necessary to give effect to the Restructuring Transactions; <u>provided</u> that no Consenting Creditors shall be required hereunder to provide such

Agent, Notes Trustee, or any other Person with any indemnities or similar undertakings in connection with taking any such action or incur any fees or expenses in connection therewith;

(vii)    with respect to the Consenting Creditors, give any notice, order, instruction, or direction to the applicable Agent or Notes Trustee necessary to waive the requirement that a Company Party or any Affiliate of any Company Party hold a public investor call under any Credit Agreement, any Notes Indenture, or any Finance Documents;

(viii)   with respect to the Consenting Creditors (to the extent such Consenting Creditors have applicable consent rights under the Cash Collateral Order and/or the DIP Order), approve, and not object to, the specific line items in any budget (including any budget provided for under the Cash Collateral Order or the DIP Order) providing for the making of contractually required payments (as may be modified by agreement between the Company Parties and the applicable Sports League subject to the consent rights set forth herein) under their telecast rights agreements in accordance with the terms of this Agreement; and

(ix)    with respect to the UCC, the UCC Advisors will use commercially reasonable efforts to minimize all fees and expenses (including professional fees) incurred by the UCC Advisors in connection with the Chapter 11 Cases consistent with the UCC's support of the Restructuring Transactions and the UCC's fiduciary duties.

(b)    During the Agreement Effective Period, each Consenting Party, on a several and not joint basis, agrees (and in the case of the UCC, subject in all respects to Section 9 of this Agreement), including in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions in accordance with the terms of this Agreement;

(ii)    seek, solicit, encourage, propose, file, support, consent to, or vote for, or enter into or participate in any discussions, agreements, understandings, or other arrangements with any Person regarding, or pursue or consummate, any Alternative Restructuring; provided, however, that nothing in this Section 6.01(b)(ii) shall prevent any of the Parties or their respective advisors from, subject in all respects to any confidentiality obligations owed to the Company Parties, discussing potential amendments, waivers, or modifications to the Restructuring Term Sheet or Definitive Documentation with any other parties in interest or their respective advisors, subject to consultation with the Company Parties and the Required Consenting Parties or their respective advisors;

(iii)    file any motion, pleading, agreement, instrument, order, form, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement or the Plan;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring Transactions against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code;

(vi)     object to any settlement of the Sinclair-Related Litigations agreed to by the Required DIP Commitment Parties, the Required Consenting First Lien Creditors, and the UCC (including the Sinclair Settlement); and

(vii)     with respect to the UCC, commence any Challenge (subject to Section 6.02(c)).

6.02.   Commitments, Forbearances, and Waivers with Respect to Chapter 11 Cases.

(a)     Subject to the provisions of Section 13.06 of this Agreement, during the Agreement Effective Period, each Consenting Creditor, on a several and not joint basis, agrees that it shall, subject to receipt by such Consenting Creditor of the Disclosure Statement and the other Solicitation Materials, (i) to the extent such Consenting Creditor is entitled to vote to accept or reject the Plan pursuant to its terms, vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials, and not change, withdraw, amend, or revoke (or cause or direct to be changed, withdrawn, amended, or revoked) any such vote, and (ii) regardless of whether such Consenting Creditor is entitled to vote to accept or reject the Plan, agree to provide or opt into, and to not opt out of or object to, releases set forth in the Plan consistent with the terms set forth in this Agreement (including the Restructuring Term Sheet), and not change, withdraw, amend, or revoke (or cause or direct to be changed, withdrawn, amended, or revoked) any such release.

(b)     During the Agreement Effective Period, each Consenting Creditor, in respect of each of its Company Claims/Interests, on a several and not joint basis, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

(c)     The UCC agrees that the Challenge Period shall, upon the Execution Date, be extended until confirmation of a chapter 11 plan (subject to further extension by written agreement of the Debtors and the Majority 1L Lenders (as defined in the DIP Order) or further extension by the Court for cause shown upon a motion filed within the applicable time period), and the UCC shall not seek reimbursement for any fees or expenses in connection with the Standstill Prohibitions from the Execution Date through the  date that is five Business Days prior to the expiration of the UCC's Challenge Period; provided that upon confirmation of the Plan, the UCC's Challenge Period shall expire with prejudice.

**Section 7.     *Additional Provisions Regarding the Consenting Parties' Commitments*.** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Party to consult with any other Consenting Party, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee) or any foreign proceeding related to the Restructuring Transactions;

(b) impair or waive the rights of any Consenting Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Party from enforcing this Agreement or any other Definitive Document, or from asserting or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any other Definitive Document; (d) limit the rights of a Consenting Party under the Chapter 11 Cases or any foreign proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases or any foreign proceeding, in each case, so long as the exercise of any such right is not inconsistent with such Consenting Party's obligations hereunder; (e) limit the ability of a Consenting Party to purchase, sell, or enter into any transactions regarding the Company Claims/Interests, subject to the terms hereof; (f) constitute a waiver or amendment of any term or provision of (i) the Credit Agreements or any of the other Loan Documents (as defined in the Credit Agreements), (ii) the Notes Indentures or any of the other Notes Documents (as defined in the Notes Indentures), or (iii) the Existing Intercreditor Agreement; (g) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under (i) the Credit Agreements or any of the other Loan Documents (as defined in the Credit Agreements), or (ii) the Notes Indentures or any of the other Notes Documents (as defined in the Notes Indentures); (h) require any Consenting Party to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Party; (i) prevent a Consenting Party from taking any action that is required to comply with applicable Law; <u>provided</u> that if any Consenting Party proposes to take any action that is otherwise inconsistent with this Agreement or the Restructuring Transactions to comply with applicable Law, such Consenting Party shall provide, to the extent possible without violating applicable Law, at least five Business Days' advance, written notice to the Parties; (j) prohibit any Consenting Party from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions; (k) except as and to the extent explicitly set forth herein, limit the ability of any Consenting Creditor to enforce the terms of the Existing Intercreditor Agreement (including exercising any rights or remedies available to the Consenting Creditors); or (l) affect the ability of the Strategic Investor to discuss and negotiate with Red Seam Holdings LLC or its members with respect to any necessary consents or amendments from Red Seam Holdings LLC and/or its members to allow for the creation of a direct security interest in the YES Interests and waiver of any applicable rights of first offer or refusal relating to any pledge, foreclosure or transfer of the YES Interests; <u>provided</u> that in all circumstances, the UCC's rights hereunder shall be subject to <u>Section 6.01(a)(ix)</u> of this Agreement.

**Section 8.** *Commitments of the Company Parties*.

8.01.   <u>Affirmative Commitments</u>.  Except as set forth in <u>Section 9</u>, or unless otherwise consented to or waived by the Required Consenting Parties or the UCC, as applicable, during the Agreement Effective Period, the Company Parties agree to:

(a)   support, act in good faith, and take all reasonable actions necessary to implement and consummate the Restructuring Transactions as contemplated by this Agreement and the Restructuring Term Sheet, including (i) subject to <u>Section 8.02(g)</u>, commencing solicitation on the Plan pursuant to the Disclosure Statement and related Solicitation Materials, (ii) using

commercially reasonable efforts to consummate the Restructuring Transactions, (iii) obtaining the Bankruptcy Court's approval of the applicable Definitive Documents, (iv) soliciting the Plan by means of the Disclosure Statement and related Solicitation Materials, and (v) obtaining entry of the Confirmation Order and consummation of the Restructuring Transactions pursuant to the Plan, in each case, in accordance with the applicable Milestones unless waived in accordance with the terms hereof;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, take all steps reasonably necessary to address any such impediment and to negotiate in good faith with the Consenting Parties and the Consenting Parties' Advisors regarding reasonable and appropriate additional or alternative provisions to address any such impediment;

(c)     respond as promptly as practicable under the circumstances to any inquiries received from any Governmental Entity, person, or other authority enforcing applicable antitrust, competition, trade regulation or similar Laws for additional information or documentation in connection with Antitrust Laws as applicable to the Restructuring Transactions; and use commercially reasonable efforts to cooperate with and assist the Strategic Investor or the Initial DIP Commitment Parties in order to address, vacate, modify, reverse, suspend, prevent, eliminate or remove any inquiry, investigation, or action by a Governmental Entity, person, or other authority pursuant to any applicable Antitrust Laws the existence or outcome of which could reasonably result in an adverse impact to the entitlements of Strategic Investor or the Initial DIP Commitment Parties under this Agreement (for the avoidance of doubt, Strategic Investor or the Initial DIP Commitment Parties, as applicable, shall direct and control strategy with respect to any matters arising under Antitrust Laws);

(d)     use commercially reasonable efforts to obtain any and all Permits and Consents that are necessary or advisable for the implementation or consummation of any part of the Restructuring Transactions;

(e)     reasonably consult with the Required Consenting Parties regarding any regulatory or other third-party approvals necessary to implement the Restructuring Transactions, and share copies of any documents filed or submitted to any regulatory or other governmental authority in connection with obtaining any regulatory or other third-party approvals;

(f)     solely to the extent applicable, cooperate with reasonable requests from the Required Consenting Parties (and their respective advisors) for information or documentation relating to the Company Parties' continued compliance with applicable Compliance-Related Laws and the Company Parties' associated compliance policies, procedures, and controls with respect to such Compliance-Related Laws;

(g)     negotiate in good faith, execute, and deliver, and use commercially reasonable efforts to perform their obligations under, and consummate the transactions contemplated by, the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(h)      timely oppose any objections filed with respect to the Bankruptcy Court's approval of any of the Definitive Documents;

(i)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(j)      (i) complete the preparation, as soon as practicable after the Agreement Effective Date, of each of the Definitive Documents (including all motions, applications, orders, agreements, and other documents, each of which, for the avoidance of doubt, shall contain terms and conditions consistent with this Agreement and shall otherwise be in form and substance acceptable in accordance with Section 3 of this Agreement), (ii) provide drafts of the Disclosure Statement, the Plan, any other Solicitation Materials, and each other Definitive Document to, and afford a reasonable opportunity for comment and review of such documents by, the Consenting Parties' Advisors, which opportunity for comment and review shall be not less than two Business Days in advance of any filing, execution, distribution, or use (as applicable) thereof (provided that if delivery of such document at least two Business Days in advance is impossible or impracticable under the circumstances, such document shall be delivered as soon as reasonably practicable), and incorporate any reasonable comments from the Consenting Parties in good faith, consistent with Section 3 of this Agreement, (iii) consistent with Section 3 of this Agreement, consult in good faith with the Consenting Parties' Advisors regarding the form and substance of the Disclosure Statement and other Solicitation Materials, the Plan, and each other Definitive Document, sufficiently in advance of the filing, execution, distribution, or use (as applicable) thereof and not file, execute, distribute, or use (as applicable) the Disclosure Statement, other Solicitation Materials, the Plan, and each other Definitive Document unless such document is consistent with this Agreement and otherwise in form and substance acceptable in accordance with Section 3 of this Agreement, and (iv) negotiate in good faith, execute, perform their obligations under, and consummate the transactions contemplated by, the Definitive Documents to which the respective Company Parties are (or will be) a party; provided that the obligations of the Company Parties under this Section 8.01(j) shall in no way alter or diminish any right expressly provided to any applicable Consenting Party under this Agreement to review, comment on, and/or consent to the form and/or substance of any document in accordance with the terms hereof;

(k)      promptly notify the Consenting Parties' Advisors in writing (electronic mail being sufficient) (and in any event within two Business Days after a Knowledge Party obtains knowledge thereof) of (i) the initiation, institution, or commencement of any proceeding by a Governmental Entity or other Person challenging the validity of the transactions contemplated by this Agreement or any other Definitive Document or seeking to enjoin, restrain, or prohibit this Agreement or any other Definitive Document or the consummation of the transactions contemplated hereby or thereby, (ii) any breach by any of the Company Parties in any respect of any of their obligations, representations, warranties, or covenants set forth in this Agreement, (iii) the happening or existence of any event that shall have given rise to any legal or structural impediment that would prevent the consummation of the Restructuring Transactions or made any of the conditions precedent to any Party's obligations set forth in (or to be set forth in) any of the Definitive Documents (including the conditions precedent to the consummation of the Restructuring Transactions set forth in this Agreement and in the section of the Restructuring Term Sheet entitled "Conditions Precedent to the Plan Effective Date") incapable of being satisfied prior to the Outside Date, (iv) the occurrence of a Termination Event, and/or (v) the receipt of notice from any

Governmental Entity or other Person alleging that the Consent of such Person is or may be required under any Organizational Document, contract, Permit, Law or otherwise in connection with the consummation of any part of the Restructuring Transactions;

(l)      maintain the good standing and legal existence of each Company Party under the Laws of the state or jurisdiction in which it is incorporated, organized, or formed, except to the extent that any failure to maintain such Company Party's good standing arises solely as a result of the filing of the Chapter 11 Cases;

(m)      subject in all respects to the terms of any applicable Confidentiality Agreements(s), applicable Law, and any applicable confidentiality obligations of the Company Parties, provide the Consenting Parties' Advisors and the Strategic Investor with reasonably timely responses to reasonable diligence requests provided by any of the Consenting Parties' Advisors or the Strategic Investor, as applicable, and reasonable requests by any of the Consenting Parties' Advisors or the Strategic Investor for updates with respect to the status of, or proposed steps or measures regarding, any discussions or negotiations with any of the Company Parties' other stakeholders, contract counterparties, or other Persons with material business relations with any of the Company Parties regarding any aspect of the Restructuring Transactions, including Sports Leagues and MVPDs; provided that the Company Parties shall use commercially reasonable efforts to afford the Strategic Investor with the opportunity to participate in any material discussions or negotiations with any of the Sports Leagues or Material MVPDs;

(n)      except as otherwise expressly set forth in this Agreement, use commercially reasonable efforts to (i) conduct their businesses and operations in the ordinary course in a manner that is materially consistent with past practices as may be limited due to the commencement of the Chapter 11 Cases and (ii) preserve intact their business organizations and relationships with third parties (including creditors, lessors, licensors, suppliers, distributors, and customers) and employees in the ordinary course; provided, however, that any actions required to be taken by the Company Parties pursuant to this Agreement to effectuate the Restructuring Transactions in accordance with the terms set forth in this Agreement (including the Restructuring Term Sheet) shall not constitute a breach of the commitment set forth in this Section 8.01(n);

(o)      subject to the Sinclair Settlement and the terms thereof, consult with the Required DIP Commitment Parties, the Required Consenting First Lien Creditors, and the UCC prior to making any material decision with respect to any of the Sinclair-Related Litigations, including but not limited to pursuing additional claims, filing any dispositive motions, and settling any claims asserted in such Sinclair-Related Litigations; provided that the Company Parties shall not enter into any other settlement (other than the Sinclair Settlement) for, or otherwise release, any Claim arising out of any of the Sinclair-Related Litigations, or amend any complaint filed in the Sinclair-Related Litigations, without the prior written consent (electronic mail, either directly or via counsel, being sufficient) of the Required DIP Commitment Parties, the Required Consenting First Lien Creditors, and the UCC (not to be unreasonably withheld, conditioned, or delayed); provided further that the Required DIP Commitment Parties, the Required Consenting First Lien Creditors, and the UCC hereby acknowledge and agree that the Sinclair Settlement has been consented to by such Parties;

(p)      consult with the Required DIP Commitment Parties (or their advisors), the Required Consenting First Lien Creditors (or their advisors), and the Strategic Investor (or its advisors) and keep them reasonably apprised of developments regarding the treatment of material contracts, including with Sports Leagues, Material MVPDs, naming rights or material sponsorship partners, and third parties who make available the Company Parties' direct-to-consumer offerings; provided that the Company Parties shall not materially amend, modify, terminate, or enter into a new agreement in connection with any of the foregoing without the prior written consent (electronic mail from applicable counsel being sufficient) of the Required Supermajority Consenting Parties (not to be unreasonably withheld, conditioned, or delayed); provided further, that the Company Parties shall not amend or modify the NBA Term Sheet or the NHL Term Sheet, or enter into a new agreement with any of the Sports Leagues that is similar to the NBA Term Sheet or the NHL Term Sheet without the prior written consent (electronic mail from applicable counsel being sufficient) of the Required DIP Commitment Parties and the Strategic Investor;

(q)      comply with their commitments, obligations, and covenants (including with respect to the Strategic Investor's rights with respect to approval of matters) under the Commercial Term Sheet or any long-form agreement memorializing the terms thereof (each as if in effect prior to the Plan Effective Date) and the Convertible B Commitment Letter;

(r)      (i) use commercially reasonable efforts to cause the Company Parties to be separated from the Sinclair Parties as soon as practicable after the Execution Date such that the Company Parties can operate from and after the Plan Effective Date on a standalone basis in the ordinary course of business in accordance with the Restructuring Term Sheet, (ii) keep the Initial DIP Commitment Parties (or the advisors thereto), the Required Consenting First Lien Creditors (or the advisors thereto), and the Strategic Investor reasonably informed with respect to the status of the separation of the Company Parties from the Sinclair Parties, including the expenditures projected to be incurred in connection therewith, (iii) cooperate with reasonable requests from the Initial DIP Commitment Parties (or the advisors thereto) and the Strategic Investor for information or documentation relating to the separation of the Company Parties from the Sinclair Parties, including requests for information relating to the budget and actual and projected costs incurred in connection therewith, and (iv) provide the Initial DIP Commitment Parties (or the advisors thereto) and the Strategic Investor with reasonable access to officers or advisors of the Company Parties through a monthly standing call and, as reasonably necessary, periodic update calls as may be reasonably requested by the Initial DIP Commitment Parties and/or the Strategic Investor in connection with the separation of the Company Parties from the Sinclair Parties;

(s)      use commercially reasonable efforts to obtain any necessary consents or amendments from Red Seam Holdings LLC and/or its members to allow for the creation of a direct security interest in the YES Interests and waiver of any applicable rights of first offer or refusal relating to any pledge, foreclosure, or transfer of the YES Interests;

(t)      subject to the terms of the Commercial Term Sheet, and in consultation with the Required DIP Commitment Parties and the Strategic Investor, use commercially reasonable efforts to replace the Bally's Agreement and enter into a new naming rights agreement;

(u)      provide the Strategic Investor with the budget and variance reports provided by the Company Parties under the DIP Order;

(v)      except to the extent permitted by Section 9.02, cease and terminate any ongoing, and refrain from any future, solicitations, discussions, and negotiations with respect to any Alternative Restructuring;

(w)      provide the UCC Advisors with notice of any developments that could materially impact the Company Parties' operations or go-forward business plan and keep them reasonably apprised of developments regarding the treatment of material contracts that may impact contract rejection damages claims; and

(x)      administer the claims reconciliation process and bear all costs thereof (in both the reorganization contemplated by this Agreement (as may be amended, modified, or supplemented in accordance with its terms) and in an orderly wind down or liquidation of the Company Parties) and use reasonable best efforts to reduce or minimize the size of the rejection damages claims pool; provided that the foregoing obligation shall not in any manner restrict, limit, or otherwise alter the Company Parties' ability to make contract assumption or rejection decisions in accordance with their business judgment.

8.02.   Negative Commitments.   Except as set forth in Section 9 or unless otherwise consented to or waived by the Required Consenting Parties (with respect to clauses (a)-(n) of this Section 8.02) or the Required Supermajority Consenting Parties (not to be unreasonably withheld, conditioned, or delayed) (with respect to clauses (o)-(r) of this Section 8.02), during the Agreement Effective Period, each of the Company Parties agrees that it shall not:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede the approval, implementation, and consummation of the Restructuring Transactions;

(c)      (i) execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions that, in whole or in part, is not consistent with this Agreement or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3 hereof, or if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing; or (ii) waive, amend, or modify any of the Definitive Documents, or, if applicable, file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, which waiver, amendment, modification, or filing contains any provision that is not consistent with this Agreement (including the Restructuring Term Sheet) or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3 hereof;

(d)      (i) seek discovery in connection with, prepare, or commence any proceeding or other action that challenges (A) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting Creditors, or (B) the validity, enforceability, or perfection of any lien or other encumbrance securing (or purporting to secure)

any Company Claims/Interests of any of the Consenting Creditors; (ii) otherwise seek to restrict any rights of any of the Consenting Parties; or (iii) support any Person in connection with any of the acts described the foregoing clauses;

(e)      except for with respect to the DIP Facility, the DIP Order, the New A/R Facility, the Convertible A Exit Notes, the Exit Term Loans, the Convertible B Exit Notes, the Take Back Exit Facility, or the Cash Collateral Order, including any increase as set forth in Section 13.01(y) hereof, enter into any contract or agreement with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements;

(f)      except to the extent permitted by Section 9.02 hereof, directly or indirectly, seek, solicit, support, encourage, propose, assist, consent to, vote for, enter into, or participate in any discussions or negotiations, agreements, understandings, or other arrangements with any Person regarding, pursue, or consummate, any Alternative Restructuring or Alternative Restructuring Proposal;

(g)      commence the solicitation with respect to the Plan unless the Disclosure Statement and any other Solicitation Materials are materially consistent with this Agreement and are otherwise in form and substance acceptable in accordance with the terms set forth in Section 3 hereof;

(h)      take or fail to take any action (except to the extent expressly contemplated by this Agreement) if such action or failure to act could cause a change to the tax status of DSG or any of its subsidiaries or be expected to cause, individually or in the aggregate, a material adverse tax consequence to DSG or its subsidiaries;

(i)      amend or change, or propose to amend or change, any of their respective Organizational Documents;

(j)      (i) authorize, create, issue, sell, or grant any additional Interests, or (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Interests;

(k)      consummate the Restructuring Transactions unless each of the applicable conditions to the consummation of such transactions set forth in this Agreement (including the Restructuring Term Sheet) and the other applicable Definitive Documents has been satisfied (or waived by the applicable party or parties, including the Required Consenting Parties);

(l)      Transfer the  YES Interests, whether directly or indirectly, in a manner inconsistent with the Restructuring Transactions;

(m)      Transfer any Interests in the Company Parties in a manner inconsistent with the Restructuring Term Sheet and the Convertible B Commitment Letter;

(n)      Transfer any Interest in any Company Party to any Disqualified Party;

(o)      make, or commit to make, any investment or investments that involve payment in excess of the greater of $2,500,000 or 10% more than the amounts budgeted for investments in the

Company Parties' business plan in the aggregate; <u>provided</u> that any investment in connection with the separation of the Company Parties from the Sinclair Parties after the Execution Date shall be excluded for purposes of determining compliance with this <u>Section 8.02(o)</u>; <u>provided</u> <u>further</u>, that the Company Parties shall provide reasonable advance notice to the First Lien Group Advisors, the Crossover Group Advisors, and the Strategic Investor Advisors before making, or committing to make, any investment or investments that would exceed, or reasonably be expected to exceed, the thresholds set forth in this Section 8.02(o);

(p)     dispose of any assets having a value in excess of $5,000,000 in the aggregate; <u>provided</u> that any settlement or other release of the Sinclair-Related Litigations permitted by <u>Section 8.02(o)</u> shall be excluded for purposes of determining compliance with this <u>Section 8.02(p)</u>; <u>provided</u> <u>further</u>, that the Company Parties shall provide reasonable advance notice to the First Lien Group Advisors, the Crossover Group Advisors, and the Strategic Investor Advisors before making, or committing to make, any disposition of assets having a value in excess of the threshold set forth in this <u>Section 8.02(p)</u>;

(q)     enter into, make any amendment, waiver, supplement, or other change to, or terminate, any contract, transaction, or arrangement (other than an employment agreement or indemnification agreement) between any Company Party or any of their Affiliates, on the one hand, and any director or officer of any Company Party or any of their Affiliates or greater than 5% beneficial owner of any equity interests in any Company Party, on the other hand; or

(r)     materially amend, modify, or terminate any Compensation Arrangements with respect to David Preschlack or David DeVoe, or enter into or adopt any new Compensation Arrangements with respect to David Preschlack or David DeVoe, or enter into or adopt any new Compensation Arrangements in a manner that would cause payment in excess of 10% more than the amounts budgeted for Compensation Arrangements during the Agreement Effective Period in the Company Parties' business plan; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 8.02(r)</u> shall prohibit or otherwise affect any Company Party's right, during the Agreement Effective Period, to (i) negotiate the terms of any new employment agreements or amendments to existing employments agreements or Compensation Arrangements that will become effective on or after the Plan Effective Date, (ii) negotiate the terms of, enter into new employment agreements with respect to, or otherwise hire, engage, or retain (x) a general counsel (or similar role), (y) a head of advertising sales (or similar role), or (z) any other role or position necessary to separate the Company Parties from the Sinclair Parties, or (iii) amend, modify, or terminate any Compensation Arrangements or enter into or adopt any new Compensation Arrangements in connection with the separation of the Company Parties from the Sinclair Parties, and any expenditures related to the foregoing clauses (ii) or (iii) shall not be subject to this <u>Section 8.02(r)</u> in any manner or result in a termination event under <u>Section 13.01(x)</u>; <u>provided</u> <u>further</u>, that clauses (i) through (iii) of the preceding proviso shall not apply to any new employment agreements or amendments to existing employment agreements or Compensation Arrangements with respect to David Preschlack or David DeVoe.

8.03.   <u>Company Representations and Warranties</u>. Each Company Party severally, and not jointly, represents and warrants that the following statements are true and correct as of the date such Company Party executes and delivers this Agreement, except as expressly set forth on its signature page to this Agreement:

(a)     None of the Company Parties is aware of any potential indemnification claims that are contemplated to be assumed by the Restructuring Term Sheet, but are not covered by applicable insurance;

(b)     None of the Company Parties, nor any director, officer, employee or other Person acting on behalf of the Company Parties in the last two years, (i) has violated any Compliance-Related Laws, (ii) is or has been a Compliance Restricted Party, or (iii) has engaged in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Compliance Restricted Party; and

(c)     Each of the Company Parties maintains policies, procedures, and controls reasonably designed to prevent, detect, and deter violations of the Compliance-Related Laws.

## Section 9.     *Additional Provisions Regarding Commitments of the Company Parties and the UCC.*

9.01.   Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require (a) a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with outside counsel, or (b) the UCC, or any of its members, each in its capacity as such, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent that it determines in good faith that taking or failing to take such action would be inconsistent with its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 9.01 shall not be deemed to constitute a breach of this Agreement.   If the board of directors, board of managers, or such similar governing body of any Company Party or the UCC, in compliance with this Section 9.01, determines to take or refrain from taking any action, it shall promptly (but, in any event, within forty-eight hours after such determination) provide written notice to counsel to the Required Consenting Parties (in addition to counsel to the Company Parties and counsel to the UCC, as applicable) of such determination (which notice shall include a reasonable description of the action that such Company Party or the UCC has determined not to take or to not refrain from taking, as well as a reasonably detailed explanation for such determination).

9.02.   Notwithstanding anything to the contrary in this Agreement, each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, agents, and other advisors or representatives shall have the right to: (a) provide access to non-public information concerning any Company Party to any Entity that submits an unsolicited Alternative Restructuring Proposal and executes and delivers a reasonable and customary confidentiality or nondisclosure agreement with the Company Parties; (b) receive, respond to, and maintain and continue discussions or negotiations with respect to such unsolicited Alternative Restructuring Proposals if the board of directors, board of managers, or similar governing body of such Company Party determines in good faith, upon advice of outside counsel, that any such Alternative Restructuring Proposals constitutes or could reasonably be expected to result in a Superior Transaction and the failure of the Company Parties to pursue such Alternative Restructuring Proposal would be inconsistent with the fiduciary duties of the members of such board or governing body under applicable Law (a "**Superior Proposal**"); and (c) enter into or continue discussions or negotiations with any Consenting Party, any official committee and/or the United States Trustee regarding the Restructuring Transactions or any unsolicited Alternative

Restructuring Proposal.  The Company Parties or the UCC, as applicable, shall (i) provide notice of any Alternative Restructuring Proposal to counsel to the other Parties within one Business Day after the time of receiving such Alternative Restructuring Proposal, (ii) provide to counsel to the Consenting Creditors, on a "professional eyes only" basis, and the Strategic Investor (in addition to counsel to the Company Parties and counsel to the UCC, as applicable) (A) a copy of any written Alternative Restructuring Proposal (and notice and a description of any oral Alternative Restructuring Proposal), if not barred under any applicable confidentiality agreement between any Company Party or the UCC, as applicable, and the submitting party or such submitting party otherwise consents or (B) a summary of the material terms thereof, if any Company Party or the UCC, as applicable, is bound by a confidentiality agreement with, or other known contractual or legal obligation of confidentiality to, the submitting party that would prohibit the Company Parties or the UCC from providing counsel to the Consenting Creditors and the Strategic Investor (in addition to counsel to the Company Parties and counsel to the UCC, as applicable) with a copy of any written Alternative Restructuring Proposal, in each case within one Business Day of the Company Parties' or the UCC's (or their respective advisors) receipt of such Alternative Restructuring Proposal, (iii) notify counsel to the Consenting Creditors and the Strategic Investor (in addition to counsel to the Company Parties and counsel to the UCC, as applicable) promptly (and in any event no later than twenty-four hours following such determination) if the board of directors, board of managers, or similar governing body of any Company Party or the UCC determines that an Alternative Restructuring Proposal is a Superior Proposal, and (iv) promptly provide such information to counsel to the Consenting Creditors and the Strategic Investor (in addition to counsel to the Company Parties and counsel to the UCC, as applicable) regarding such discussions or any actions or inaction pursuant to this Section 9.02 (including copies of any materials provided to, or provided by, the Company Parties or the UCC with respect to the applicable Alternative Restructuring) as necessary to keep counsel to the Consenting Creditors and the Strategic Investor (in addition to counsel to the Company Parties and counsel to the UCC, as applicable) reasonably contemporaneously informed as to the status and substance of the foregoing.  On or after the Execution Date, neither the UCC nor any Company Party shall enter into a confidentiality or nondisclosure agreement with any Entity that submits an unsolicited Alternative Restructuring Proposal that bars or restricts such Party from providing a copy of any written Alternative Restructuring Proposal (or notice and a description of any oral Alternative Restructuring Proposal) to counsel to the Consenting Creditors and the Strategic Investor (in addition to counsel to the Company Parties and counsel to the UCC, as applicable).  If as of the Execution Date any Company Party or the UCC is party to an existing applicable confidentiality agreement with any Entity that submits an unsolicited Alternative Restructuring Proposal that bars such Party from providing a copy of any such written Alternative Restructuring Proposal (or notice and a description of any oral Alternative Restructuring Proposal), the Company Parties or the UCC, as applicable, shall use commercially reasonable efforts to obtain the consent of such submitting Entity to provide counsel to the Consenting Creditors and the Strategic Investor (in addition to counsel to the Company Parties and counsel to the UCC, as applicable) a copy of such written Alternative Restructuring Proposal (or notice and a description of any oral Alternative Restructuring Proposal).  If the Company Parties or the UCC determine that an Alternative Restructuring Proposal is a Superior Proposal, the other Parties shall be provided five Business Days after receipt of such notice to propose modifications to the Restructuring Transactions and the Company Parties or the UCC, as applicable, shall engage in good faith in discussions and

negotiations regarding such modifications before terminating this Agreement pursuant to <u>Section 13.02(d)</u> or <u>Section 13.03(i)</u>, respectively.

9.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 10.**    *Transfer of Interests and Securities; Joinder*.

10.01.    During the Agreement Effective Period, except pursuant to the consummation of the Restructuring Transactions, no Consenting Creditor shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Exchange Act) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)    the authorized transferee is either (1) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act), (2) a non-U.S. person in an "offshore transaction" (as defined under Regulation S under the Securities Act), (3) an "accredited investor" (as defined by Rule 501 of the Securities Act), or (4) a Consenting Creditor; and

(b)    either (i) the transferee executes and delivers to counsel to the Company Parties and to counsel to the Consenting Creditors, at, before, or within two Business Days of the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Creditor and the transferor provides notice of such Transfer (including the amount and type of Company Claims/Interests Transferred and the identity of the transferor) to counsel to the Company Parties and to counsel to the Consenting Creditors at, before, or within two Business Days of the time of the proposed Transfer.

10.02.    Upon compliance with the requirements of <u>Section 10.01</u>, (a) the transferee shall be deemed a "Consenting Creditor" and a "Party" under this Agreement, and (b) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.

10.03.    This Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Company Claims/Interests; <u>provided</u> that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Creditor be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Creditors), and (b) such Consenting Creditor must provide written notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties, counsel to the Consenting Creditors, and counsel to the Strategic Investor within five Business Days of such acquisition, in the manner set forth in <u>Section 15.10</u> hereof (by electronic mail or otherwise).

10.04.    This <u>Section 10</u> shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a

Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreement, including any obligation thereunder on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information.

10.05. Notwithstanding Section 10.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Joinder or Transfer Agreement, as applicable, in respect of such Company Claims/Interests if: (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale, assignment, participation, or otherwise) within ten Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee; and (c) the Transfer otherwise is a permitted Transfer under Section 10.01 hereof.  To the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may (x) acquire Company Claims/Interests (i) without such Company Claims/Interests being automatically deemed subject to this Agreement, and (ii) without being required to provide notice of such acquisition to counsel to the Company Parties and to counsel to the Consenting Creditors, and (y) Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Creditor without the requirement that the transferee be a Permitted Transferee.  For the avoidance of doubt, if a Qualified Marketmaker acquires any Company Claims/Interests from a Consenting Creditor and is unable to transfer such Company Claims/Interests within the ten Business Day-period referred to above, the Qualified Marketmaker shall execute and deliver a Transfer Agreement in respect of such Company Claims/Interests.

10.06. Notwithstanding anything to the contrary in this Section 10, the restrictions on Transfer set forth in this Section 10 shall not apply to the grant of any liens or encumbrances on any Company Claims/Interests in favor of a bank or broker-dealer holding custody of such Company Claims/Interests in the ordinary course of business consistent with past practice and which lien or encumbrance is released upon the Transfer of such Company Claims/Interests.

10.07. Any Transfer of Company Claims/Interests in violation of Section 10.01 or Section 10.03, as applicable, shall be void *ab initio*.

10.08. In addition, a Person that owns or controls First Lien Claims, Second Lien Revolving Loan Claims, Second Lien Term Loan Claims, Second Lien Notes Claims, Third Lien Term Loan Claims, Third Lien Notes Claims, or Unsecured Notes Claims may become a party hereto as a Consenting Creditor by executing and delivering to counsel to the Company Parties and counsel to the Consenting Parties a Joinder, in which event such Person shall be deemed to be a Consenting Creditor hereunder to the extent of the Claims against the Company Parties owned and controlled by such Person.

**Section 11.**      ***Representations and Warranties of Consenting Creditors***.   Each Consenting Creditor severally, and not jointly, represents and warrants that the following statements are true and correct as of the date such Consenting Creditor executes and delivers this Agreement, a

Transfer Agreement, or a Joinder, as applicable, except as expressly set forth on its signature page to this Agreement, a Transfer Agreement, or a Joinder, as applicable:

(a)      it (i) is the beneficial or record owner (which shall be deemed to include any *bona fide* unsettled trades, <u>provided</u> that, and solely to the extent requested by counsel to the Company Parties in writing, such non-breaching Consenting Creditors with unsettled trades as of such dates shall provide reasonably satisfactory documentation to counsel to the Company Parties evidencing the validity of such unsettled trades (it being understood and agreed that executed trade confirmations shall be deemed satisfactory documentation)) of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in such Consenting Creditor's signature page to this Agreement, a Transfer Agreement, or a Joinder, as applicable (subject to any Transfer by such Consenting Creditor made after the Agreement Effective Date that is described in a notice delivered pursuant to <u>Section 10.01</u>) and (ii) having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in such Consenting Creditor's signature page to this Agreement, a Transfer Agreement, or a Joinder, as applicable (subject to any Transfer to such Consenting Creditor made after the Agreement Effective Date that is described in a notice delivered pursuant to <u>Section 10.01</u>);

(b)      it has the full power and authority to act on behalf of, vote, and consent to matters concerning, such Company Claims/Interests as contemplated by this Agreement;

(c)      such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Creditor's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Claims and/or Interests as contemplated by this Agreement subject to applicable Law;

(e)      (i) it is either (A) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act), (B) a non-U.S. person in an "offshore transaction" (as defined under Regulation S under the Securities Act), or (C) an "accredited investor" (as defined by Rule 501 of the Securities Act), and (ii) any securities acquired by the Consenting Creditor in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act; and

(f)      it is not a Disqualified Party.

**Section 12.    *Mutual Representations, Warranties, and Covenants*.**  Each of the Parties, on a several and not joint basis, represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement, a Transfer Agreement, or a Joinder, as applicable:

(a)      it is validly existing and in good standing under the Laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by

applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other Person for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its Organizational Documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with any of the other Parties or any other Person that have not been disclosed to all Parties.

**Section 13.**      *Termination Events*.

13.01.   <u>Certain Consenting Party Termination Events</u>.  This Agreement may be terminated (i) as to all Parties, by the Required Consenting Parties, (ii) as to the Strategic Investor, by the Strategic Investor; (iii) as to the Consenting First Lien Creditors, by the Required Consenting First Lien Creditors; or (iv) as to the Consenting Unsecured Creditors, by the Required DIP Commitment Parties, in each case, upon the delivery to counsel to the Company Parties and counsel to the Consenting Parties of a written notice in accordance with <u>Section 15.10</u> upon the occurrence of any of the following events (each, a "**Consenting Party Termination Event**") (<u>provided</u> that only the Required DIP Commitment Parties and/or the Required Consenting First Lien Creditors, as applicable, shall be permitted to terminate this Agreement pursuant to <u>Sections 13.01(i)</u>, <u>(j)</u>, and <u>(v)</u>; <u>provided</u> <u>further</u>, that only the Strategic Investor shall be permitted to terminate this Agreement pursuant to <u>Sections 13.01(x)</u>, <u>(y)</u>, <u>(z)</u>, and <u>(aa)</u>, but if the Strategic Investor exercises any such Consenting Party Termination Event then (A) the Required DIP Commitment Parties shall be able to terminate this Agreement as to the Consenting Unsecured Creditors and (B) the Required Consenting First Lien Creditors shall be able to terminate this Agreement as to the Consenting First Lien Creditors):

(a)      the breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by a Company Party or any Consenting Party of any of the representations, warranties, covenants, or other obligations or agreements of the Company Parties or the Consenting Parties set forth in this Agreement that remains uncured (if susceptible to cure) for five calendar days after such terminating Consenting Party(ies) deliver a written notice in accordance with <u>Section 15.10</u> detailing any such breach; <u>provided</u>, <u>however</u>, that this Agreement may not be terminated pursuant to this <u>Section 13.01(a)</u> if the breach is by any Consenting Creditor and the non-breaching Consenting Creditors continue to hold or control at least (i) 66.67% of the

aggregate principal amount of the First Lien Claims and (ii) 66.67% of the aggregate principal amount of the Unsecured Funded Debt Claims;

(b)    any of the Milestones (as may have been extended with the approval of the Required Consenting Parties) is not achieved, except where such Milestone has been waived by the Required Consenting Parties; provided that the right to terminate this Agreement under this Section 13.01(b) shall not be available to the Required Consenting Parties if the failure of such Milestone to be achieved is caused by, or results from, the material breach by any terminating Consenting Party of its covenants, agreements, or other obligations under this Agreement;

(c)    a Consenting Party identifies material breaches of the representations and warranties with respect to the Compliance-Related Laws (including as set forth in Section 8.01(c));

(d)    the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty days after such terminating Consenting Parties deliver a written notice in accordance with Section 15.10 hereof detailing any such issuance; provided that this termination right may not be exercised by any Consenting Party that sought or requested such ruling or order;

(e)    any Company Party (i) publicly announces, or announces in writing, to any of the Consenting Parties or other holders of Company Claims/Interests, its intention not to support or pursue the Restructuring Transactions or to take any of the actions in sub-clauses (ii)-(iv) of this Section 13.01(e), (ii) takes any action in furtherance of its intention not to support or pursue the Restructuring Transactions, (iii) exercises any right pursuant to Section 9.01; or (iv) breaches any of the covenants, agreements or other obligations set forth in Section 8.02(f);

(f)    the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect or (ii) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by entering an order denying confirmation of the Plan or disallowing a material provision thereof (without the consent of the Required Consenting Parties), unless the order granting such relief has been stayed, modified, or reversed within fourteen days after such terminating Consenting Party(ies) deliver a written notice in accordance with Section 15.10 hereof;

(g)    the Bankruptcy Court enters an order terminating any Company Party's exclusive right to file and/or solicit acceptances of a chapter 11 plan;

(h)    any Company Party (i) withdraws the Plan, (ii) publicly announces, or announces to any of the Consenting Parties or other holders of Company Claims/Interests, its intention to withdraw the Plan or not support the Plan, or (iii) moves to voluntarily dismiss any of the Chapter 11 Cases;

(i)    any Company Party (i) files any motion seeking to avoid, invalidate, disallow, subordinate, recharacterize, or limit any Company Claims/Interests, lien, or interest held by any Consenting Creditor, or (ii) shall have supported any application, adversary proceeding, or Cause of Action referred to in the immediately preceding sub-clause (i) filed by a third party, or consents

to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action without the prior written consent of the Required Consenting Parties;

(j)      the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the First Lien Claims, Second Lien Claims, any of the Unsecured Funded Debt Claims, or any of the encumbrances that secure (or purport to secure) the First Lien Claims or the Second Lien Claims;

(k)      the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions;

(l)      termination of the Company Parties' right to use cash collateral under the Cash Collateral Order or the DIP Order, as applicable;

(m)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Parties):  (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code; (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party; (iii) dismissing any of the Chapter 11 Cases; (iv) approving an Alternative Restructuring; or (v) rejecting this Agreement;

(n)      after entry by the Bankruptcy Court of the Confirmation Order, the Confirmation Order is (i) reversed, dismissed, or vacated without the prior written consent of the Required Consenting Parties, or (ii) modified or amended in a manner that is inconsistent with this Agreement without the prior written consent of the Required Consenting Parties and such modification or amendment remains unchanged for a period of ten days after the terminating Consenting Parties deliver a written notice in accordance with Section 15.10 hereof detailing any such modification or amendment;

(o)      after entry by the Bankruptcy Court of an order approving the Convertible B Commitment Letter, such order is (i) reversed, dismissed, or vacated without the prior written consent of the Strategic Investor, or (ii) modified or amended in a manner that is inconsistent with this Agreement without the prior written consent of the Strategic Investor and such modification or amendment remains unchanged for a period of ten days after the Strategic Investor delivers a written notice in accordance with Section 15.10 hereof detailing any such modification or amendment;

(p)      after entry by the Bankruptcy Court of the DIP Order, the DIP Order is (i) reversed, dismissed, or vacated without the prior written consent of the Required Consenting First Lien Creditors and the Required DIP Commitment Parties, or (ii) modified or amended in a manner that is inconsistent with this Agreement without the prior written consent of the Required Consenting First Lien Creditors and the Required DIP Commitment Parties and such modification or amendment remains unchanged for a period of ten days after the terminating Consenting Parties

deliver a written notice in accordance with Section 15.10 hereof detailing any such modification or amendment;

(q)     (i) the termination of the DIP Facility or (ii) the acceleration of the DIP Facility following an event of default thereunder that has not been cured or waived by the requisite lenders under the DIP Facility;

(r)     the applicable Company Parties fail to make the First Lien Paydown on the Closing Date (each as defined in the DIP Term Sheet) of the DIP Facility;

(s)     after entry into the New A/R Facility, the New A/R Facility is terminated;

(t)     after its execution, the DIP Commitment Letter is terminated by the Initial DIP Commitment Parties or the Company Parties in accordance with its terms;

(u)     after its execution, the Convertible B Commitment Letter is terminated by any party thereto in accordance with its terms;

(v)     the Strategic Investor terminates this Agreement pursuant to this Section 13.01;

(w)     the Required DIP Commitment Parties or the Required Consenting First Lien Creditors terminate this Agreement pursuant to this Section 13.01;

(x)     the resignation (for Good Reason) by, or removal (without Cause) (as such terms are defined in the applicable employment agreements with the Company Parties in effect as of the date hereof) of, David Preschlack or David DeVoe from their respective roles at the Company Parties;

(y)     the expenditures related to the separation of the Company Parties from the Sinclair Parties incurred by the Company Parties after the Execution Date (excluding future ongoing run rate costs incurred in connection with the separation) exceed the Separation Cost Cap; provided that this Agreement may not be terminated pursuant to this Section 13.01(y) if the aggregate principal amount of the DIP Facility is increased by the amount by which the Separation Cost Cap is exceeded with the terms of such DIP Facility to otherwise be on substantially similar terms as set forth in this Agreement (including the Restructuring Term Sheet);

(z)     the YES Interests are Transferred in a manner inconsistent with the Restructuring Transactions; or

(aa)     the breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by a Company Party of any of the representations or warranties of the Company Parties set forth in the Convertible B Commitment Letter.

Notwithstanding anything in this Agreement to the contrary (including the lead-in paragraph to this Section 13.01), (A) if the Required Consenting First Lien Creditors terminate this Agreement pursuant to this Section 13.01, then this Agreement shall terminate with respect to all members of the First Lien Group in any capacity (whether as a Consenting First Lien Creditor, a Consenting Unsecured Creditor, or any other holder of any Company Claims/Interests), (B) if the Required

DIP Commitment Parties terminate this Agreement pursuant to this Section 13.01, then this Agreement shall terminate with respect to all members of the Crossover Group in any capacity (whether as a Consenting First Lien Creditor, a Consenting Unsecured Creditor, or any other holder of any Company Claims/Interests), and (C) if the Strategic Investor terminates this Agreement pursuant to this Section 13.01, then this Agreement shall terminate with respect to the Strategic Investor in any capacity (whether as a Consenting First Lien Creditor, a Consenting Unsecured Creditor, or any other holder of any Company Claims/Interests).

13.02. Company Party Termination Events. Any Company Party may terminate this Agreement as to all Parties upon the delivery to counsel to the Consenting Parties of a written notice in accordance with Section 15.10 upon the occurrence of any of the following events (unless waived in writing by the Company Parties) (each, a "**Company Party Termination Event**"):

(a)     the breach in any material respect by the Consenting Parties of any of the representations, warranties, covenants, or other obligations or agreements of the Consenting Parties set forth in this Agreement that remains uncured (if susceptible to cure) for five calendar days after such Company Party delivers a written notice in accordance with Section 15.10 detailing any such breach; provided, however, that this Agreement may not be terminated pursuant to this Section 13.02(a) if, in the event of a breach of this Agreement by any subset of Consenting Creditors, the non-breaching Consenting Creditors continue to hold or control at least 66.67% of the aggregate principal amount of each of the First Lien Claims and the Unsecured Funded Debt Claims (such percentage to be determined after giving effect to any *bona fide* unsettled trades as of such date, provided that, and solely to the extent requested by counsel to the Company Parties in writing, such non-breaching Consenting Creditors with unsettled trades as of such dates shall provide reasonably satisfactory documentation to counsel to the Company Parties evidencing the validity of such unsettled trades (it being understood and agreed that executed trade confirmations shall be deemed satisfactory documentation));

(b)     the termination of this Agreement as to any Consenting Creditors, such that the remaining Consenting Creditors own or control less than 66.67% of the aggregate outstanding principal amount of each of the First Lien Claims and the Unsecured Funded Debt Claims;

(c)     the termination of this Agreement by the Strategic Investor;

(d)     subject to Section 9.02, the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with outside counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to pursue a Superior Proposal; or

(e)     the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty days after such terminating Company Party delivers a written notice in accordance with Section 15.10 detailing any such issuance; provided that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order.

13.03.  <u>UCC Termination Events</u>.  The UCC may terminate this Agreement, solely as to itself, upon the delivery to counsel to the Company Parties and counsel to the other Consenting Parties of a written notice in accordance with <u>Section 15.10</u> upon the occurrence of any of the following events (unless waived in writing by the UCC) (each, a "**UCC Termination Event**," and together with each Consenting Party Termination Event and each Company Party Termination Event, each, a "**Termination Event**"):

(a)     the terms of this Agreement (including the Restructuring Term Sheet) are amended or modified in a manner that adversely affects holders of General Unsecured Claims and/or Go-Forward Trade Claims or the rights of the UCC under this Agreement without the prior written consent of the UCC;

(b)     the termination of this Agreement as to any Consenting Creditors, such that the remaining Consenting Creditors own or control less than 66.67% of the aggregate outstanding principal amount of each of the First Lien Claims and the Unsecured Funded Debt Claims;

(c)     the termination of this Agreement by the Strategic Investor;

(d)     any Company Party (i) publicly announces, or announces in writing, to any of the Consenting Parties or other holders of Company Claims/Interests, its intention not to support or pursue the Restructuring Transactions or to take any of the actions in sub-clauses (ii)-(iii) of this <u>Section 13.03(d)</u>, (ii) takes any action in furtherance of its intention not to support or pursue the Restructuring Transactions, or (iii) exercises any right pursuant to <u>Section 9.01</u>;

(e)     any Company Party (i) withdraws the Plan, (ii) publicly announces, or announces to any of the Consenting Parties or other holders of Company Claims/Interests, its intention to withdraw the Plan or not support the Plan, or (iii) moves to voluntarily dismiss any of the Chapter 11 Cases;

(f)     the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect that adversely affects the treatment of General Unsecured Claims and/or Go-Forward Trade Claims or the rights of the UCC under this Agreement without the prior written consent of the UCC or (ii) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by entering an order denying confirmation of the Plan or disallowing a material provision thereof that adversely affects the treatment of General Unsecured Claims and/or Go-Forward Trade Claims or the rights of the UCC under this Agreement (without the consent of the UCC), unless the order granting such relief has been stayed, modified, or reversed within fourteen days after the UCC delivers a written notice in accordance with <u>Section 15.10</u> hereof;

(g)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the UCC): (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code; (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party; (iii) dismissing any of the Chapter 11 Cases; (iv) approving an Alternative Restructuring; or (v) rejecting this Agreement;

(h)     after entry by the Bankruptcy Court of the Confirmation Order, the Confirmation Order is (i) reversed, dismissed, or vacated without the prior written consent of the UCC, or (ii) modified or amended in a manner that is inconsistent with this Agreement and that adversely affects the treatment of General Unsecured Claims and/or Go-Forward Trade Claims or the rights of the UCC under this Agreement without the prior written consent of the UCC and such modification or amendment remains unchanged for a period of ten days after the UCC delivers a written notice in accordance with Section 15.10 hereof detailing any such modification or amendment;

(i)     subject to Sections 9.01 and 9.02, as applicable, the UCC determines (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to pursue a Superior Proposal;

(j)     the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty days after the UCC delivers a written notice in accordance with Section 15.10 hereof detailing any such issuance; provided that this termination right may not be exercised by the UCC if the UCC sought or requested such ruling or order;

(k)     after entry by the Bankruptcy Court of the DIP Order, the DIP Order is (i) reversed, dismissed, vacated or (ii) modified or amended in a manner that is inconsistent with the UCC Settlement as set forth in this Agreement (including the Restructuring Term Sheet) and the DIP Order such that it adversely affects holders of General Unsecured Claims and/or Go-Forward Trade Claims or the rights of the UCC under this Agreement without the prior written consent of the UCC; or

(l)     the Required DIP Commitment Parties or the Required Consenting First Lien Creditors terminate this Agreement pursuant to Section 13.01.

13.04.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement between DSG, on behalf of each Company Party, and the Required Consenting Parties.

13.05.  Automatic Termination.  This Agreement shall automatically terminate (i) with respect to all Parties without any further required action or notice immediately after the occurrence of the earlier of the Plan Effective Date and 11:59 p.m. prevailing Eastern Time on the Outside Date or (ii) as to any Consenting Creditor upon its transfer of all (but not less than all) of its Claims in accordance with Section 10 as of the date that the Company Parties receive a Transfer Agreement or notice required under Section 10.01(b), provided that, for the avoidance of doubt, termination of this Agreement pursuant to this clause (ii) shall only apply with respect to such Consenting Creditor and this Agreement shall remain in effect as to all other Consenting Creditors; provided further, that if a Consenting Creditor transfers all of its Claims and then subsequently purchases Claims (that were not yet subject to this Agreement), such newly-acquired Claims shall also be subject to this Agreement and such creditor shall be deemed a Consenting Creditor).

13.06. <u>Effect of Termination</u>.  Subject to the provisions of <u>Section 15.13</u> and <u>Section 15.22</u> of this Agreement, upon the occurrence of the Termination Date as to any Party, this Agreement shall be of no further force and effect with respect to such Party and such Party shall be released from its commitments, undertakings, obligations, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action; <u>provided</u>, <u>however</u>, that in no event shall any such termination relieve any Party from (i) liability for its breach or non-performance of its obligations under this Agreement prior to the applicable Termination Date or (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement.  Upon the occurrence of the Termination Date prior to the Plan Effective Date, any and all consents or ballots tendered by the applicable Parties before such Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions, this Agreement, or otherwise.  If this Agreement is terminated as to a Consenting Creditor in accordance with this <u>Section 13</u> (other than a termination pursuant to <u>Sections 13.04</u> or <u>13.05</u>), such Consenting Creditor shall have an opportunity to change or withdraw (or cause to change or withdraw) its vote to accept the Plan or its consent (regardless of whether any deadline for votes or consents, or for withdrawal thereof, set forth in the Disclosure Statement has passed) and no Party shall oppose any attempt by such Consenting Creditor to change or withdraw (or cause to change or withdraw) such vote or consent at such time; <u>provided</u> that if this Agreement has been terminated in accordance with this <u>Section 13</u> with respect to any Consenting Creditor at a time when permission of the Bankruptcy Court shall be required for such Consenting Creditor to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, or to withdraw its providing of or opting into the releases set forth in the Plan, then the Company Parties shall consent to any attempt by such Consenting Creditor to change, withdraw, amend, or revoke (or cause to change,  withdraw, amend, or revoke) such vote or release at such time.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Parties from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Party, and (b) any right of any Consenting Party, or the ability of any Consenting Party, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Party.  No Party may terminate this Agreement on account of a Termination Event if the occurrence of such Termination Event was primarily caused by, or primarily resulted from, such Party's own action (or failure to act) in breach of the terms of this Agreement.  Nothing in this <u>Section 13.06</u> shall restrict any Company Party's right to terminate this Agreement in accordance with <u>Section 13.02(d)</u> or the UCC's right to terminate this Agreement in accordance with <u>Section 13.03(i)</u>.

13.07. <u>Automatic Stay</u>.  The Company Parties acknowledge that the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code, and the Company Parties hereby waive, to the fullest

extent permitted by Law, the applicability of the automatic stay as it relates to any such notice being provided.

**Section 14.** *Amendments and Waivers*.

14.01. <u>Amendments and Waivers</u>.

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this <u>Section 14</u>.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing (electronic mail being sufficient) signed: (i) in the case of a waiver, a waiver by the Party against whom the waiver is to be effective (it being understood that the Required Consenting Parties may waive any Milestones in accordance with <u>Section 5.01</u>, any conditions to the obligations of the Consenting Parties (other than the UCC) under this Agreement, or any rights of the Consenting Parties (other than the UCC) under this Agreement), and (ii) in the case of a modification, amendment, or supplement, by the Company Parties and the Required Consenting Parties, as applicable; <u>provided</u> that (A) if the proposed modification, amendment, or supplement will result in a material change from the terms provided in this Agreement, including the Restructuring Term Sheet, that has a disproportionate and adverse effect on the economic recoveries or treatment of (excluding effects that are in proportion to the amount of the Claims held by the applicable Consenting Creditor) (1) a Consenting First Lien Creditor, relative to all of the other Consenting First Lien Creditors (in each case in respect of the First Lien Claims) or (2) a Consenting Unsecured Creditor, relative to all of the other Consenting Unsecured Creditors (in each case in respect of the Unsecured Funded Debt Claims), then the consent of such affected Consenting Creditor (solely in its affected capacity) shall also be required to effectuate such modification, amendment, or supplement; (B) any modification, amendment, or supplement to (1) this <u>Section 14.01(b)</u> shall require the consent of all Parties except to the extent such change is solely to add a new consenting party hereunder (that would otherwise not be included in the definition of "Consenting Creditor" if such a person was a party to this Agreement as of the Agreement Effective Date) by providing such consenting party with consent rights or protections for the definitions related to such additional party, so long as the addition of such new consenting party hereunder does not adversely affect the rights or obligations of the Consenting Parties hereunder or the treatment of General Unsecured Claims, Go-Forward Trade Claims, or the Company Claims/Interests of the Consenting Creditors hereunder, (2) the definitions for "Required Consenting Parties", "Required Consenting First Lien Creditors," "Required Consenting Unsecured Creditors," "Initial DIP Commitment Parties," and "Required DIP Commitment Parties" shall also require the consent of each affected Consenting Party, and (3) the definition of "Outside Date" shall require the consent of each Initial DIP Commitment Party and the Strategic Investor, <u>provided</u> that, if the definition of Outside Date is amended pursuant to this <u>Section 14</u> to a later date, any Consenting Creditor who has not consented to such amendment may terminate this Agreement solely as to such Consenting Creditor and the UCC may terminate this Agreement solely as to the UCC to the extent the UCC has not consented to such amendment; (C) any modification, amendment or supplement to this Agreement and the Restructuring Term Sheet in order to reflect a settlement of all or any of the Sinclair-Related Litigations in accordance with <u>Section 8.01(n)</u> shall require only the prior written consent of the Required DIP Commitment

Parties (provided, however, that, solely to the extent any such settlement has a materially adverse impact on the rights or obligations of the Strategic Investor in connection with the Restructuring Transactions, any such modification, amendment, or supplement will require the consent of the Strategic Investor, with such consent not to be unreasonably withheld, conditioned, or delayed); and (D) any modification, amendment, or supplement to this Agreement (including the Restructuring Term Sheet) that adversely affects the treatment of or consideration to be provided on account of General Unsecured Claims and/or Go-Forward Trade Claims shall require the consent of the UCC (not to be unreasonably withheld, conditioned, or delayed).

(c)　　In determining whether any consent or approval has been given by an applicable Required Consenting Party or Required Consenting Unsecured Creditor, any Company Claims/Interests held by any then-existing Consenting Creditor that (i) is in material breach of its covenants, obligations, or representations under this Agreement, (ii) has been notified in writing of such material breach by the Company Parties or the Required Consenting Parties at least five calendar days prior to the earlier of the record date for determining Parties that can provide such consent or approval and the effective date of such consent or approval, and (iii) has not cured such material breach shall be excluded from such determination, and the Company Claims/Interests held by such Consenting Creditor shall be treated as if they were not outstanding.

(d)　　Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(e)　　The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.** *Miscellaneous*

15.01. Acknowledgement. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a chapter 11 plan for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02. Exhibits Incorporated by Reference; Conflicts. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. Subject to Section 4, in the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

15.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto (including the Original RSA), other than any Confidentiality Agreement.

15.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party agrees that it shall bring any action or other proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

15.06.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  Each of the Parties was represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, except that each No Recourse Party (as defined in <u>Section 15.24</u> hereof) shall be a third party beneficiary of

Section 15.24, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person, except as expressly permitted in this Agreement.

15.10.  Notices.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Company Party, to:

Diamond Sports Group, LLC
1350 Broadway, Suite 720
New York, NY 10018
Attention: David Preschlack
E-mail address: david.preschlack@ballysports.com

with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention:  Brian S. Hermann, Andrew M. Parlen, Joseph M. Graham, and Alice Nofzinger
E-mail address:  bhermann@paulweiss.com; aparlen@paulweiss.com; jgraham@paulweiss.com; anofzinger@paulweiss.com

and

Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich St., 45th floor
New York, NY 10007
Attention:  Andrew Goldman and Benjamin Loveland
E-mail address:  Andrew.Goldman@wilmerhale.com; Benjamin.Loveland@wilmerhale.com

(b)    if to a member of the First Lien Group, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attention:  Daniel M. Eggermann, Jennifer R. Sharret, and Ashland J. Bernard
E-mail address:  DEggermann@kramerlevin.com; JSharret@kramerlevin.com; ABernard@kramerlevin.com

(c)     if to a member of the Crossover Group, to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention:  Jayme Goldstein, Sayan Bhattacharyya, Chris Guhin, and Matthew Garofalo
E-mail address:  jaymegoldstein@paulhastings.com;
sayanbhattacharyya@paulhastings.com; chrisguhin@paulhastings.com;
mattgarofalo@paulhastings.com

(d)     if to the Strategic Investor, to:

Latham & Watkins LLP
1271 6th Avenue
New York, NY 10020
Attention:  Andrew Elken and Tessa Bernhardt
E-mail address:  andrew.elken@lw.com; tessa.bernhardt@lw.com

and

Latham & Watkins LLP
10250 Constellation Blvd. Suite 1100
Los Angeles, CA 90067
Attention:  Rick Offsay
E-mail address:  rick.offsay@lw.com

and

Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Attention:  Caroline Reckler and Jonathan Gordon
E-mail address:  caroline.reckler@lw.com; jonathan.gordon@lw.com

(e)     if to the UCC, to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attention: Ira S. Dizengoff, Abid Qureshi, and Naomi Moss
E-mail addresses: idizengoff@akingump.com; aqureshi@akingump.com;
nmoss@akingump.com

and

Akin Gump Strauss Hauer & Feld LLP

48

> 2001 K. Street N.W.
> Washington, DC 20006
> Attention:  Scott L. Alberino
> E-mail address:  salberino@akingump.com
>
> and
>
> Akin Gump Strauss Hauer & Feld LLP
> 2300 N. Field Street, Suite 1800
> Dallas, TX 75201
> Attention:  Marty L. Brimmage
> E-mail address:  mbrimmage@akingump.com

(f)      if to a Consenting Creditor that is not a member of the First Lien Group or the Crossover Group, to such persons that are identified as notice parties on such Consenting Creditor's signature page(s) to this Agreement, a Joinder, or a Transfer Agreement, as applicable.

Any notice given by delivery, mail, or courier shall be effective when received, and any notice delivered or given by electronic mail shall be effective when sent.

15.11.   Independent Due Diligence and Decision Making.  Each Consenting Party hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, and financial and other conditions, and prospects of the Company Parties.

15.12.   Enforceability of Agreement.  Each of the Parties, to the extent enforceable, waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.13.   Waiver/Settlement Discussions.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in the Chapter 11 Cases, or any subsequent case, litigation, or other dispute.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence, and any other applicable Law, foreign or domestic, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each

of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

15.14.   <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

15.15.   <u>Several, Not Joint, Claims</u>.   Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.16.   <u>Severability and Construction</u>.   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.17.   <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.18.   <u>Capacities of Consenting Creditors</u>.   Each Consenting Creditor has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises), except as expressly set forth on its signature page to this Agreement, a Transfer Agreement, or a Joinder, as applicable, and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

15.19.   <u>Electronic Mail Consents</u>.   Where a written consent, acceptance, approval, notice, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 3</u>, <u>Section 14</u>, or otherwise, including a written approval by the Company Parties, the Required Consenting Parties, or the UCC, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if such consent, acceptance, approval, or waiver is given or made by the applicable Party(ies) or counsel to the applicable Party(ies) to the other applicable Party(ies) or counsel to the other applicable Party(ies) by electronic mail.

15.20.   <u>Transaction Expenses</u>.

(a)   Whether or not the transactions contemplated by this Agreement are consummated, the Company Parties hereby agree, on a joint and several basis, to pay in cash the Transaction Expenses, as follows:

(i)   within two Business Days following (i) the date on which the Bankruptcy Court enters the DIP Order and (ii) the entry of an order by the Bankruptcy Court approving the

Convertible B Commitment Letter, all accrued and unpaid Transaction Expenses as of such date for which reasonably detailed summary invoices have been received by the Company Parties, shall be paid by the Company Parties;

(ii)     subject to Section 15.20(a)(i) and Section 15.20(a)(iv), (a) all accrued and unpaid Transaction Expenses of the First Lien Group Advisors and the Crossover Group Advisors invoiced prior to the Plan Effective Date shall be paid in full in cash by the Company Parties on a regular and continuing basis promptly in accordance with the timeframe set forth in the Cash Collateral Order or DIP Order, as applicable (or as otherwise permitted pursuant to any order of the Bankruptcy Court), following receipt of reasonably detailed summary invoices thereof, and (b) all accrued and unpaid Transaction Expenses of the Strategic Investor incurred up to (and including) the Plan Effective Date shall be paid in full in cash by the Company Parties on a regular and continuing basis promptly in accordance with the time frame set forth in the Convertible B Commitment Letter following receipt of reasonably detailed summary invoices;

(iii)    upon termination of this Agreement (other than a termination of this Agreement pursuant to Section 13.05, which is addressed in clause (iv) of this Section 15.20(a)), (a) all accrued and unpaid Transaction Expenses of the First Lien Group Advisors and the Crossover Group Advisors incurred up to (and including) the Termination Date shall be paid in full in cash promptly in accordance with the timeframe set forth in the Cash Collateral Order or DIP Order, as applicable, (or as otherwise permitted pursuant to any order of the Bankruptcy Court) following receipt of reasonably detailed summary invoices thereof, and (b) all accrued and unpaid Transaction Expenses of the Strategic Investor Advisors incurred up to (and including) the Termination Date shall be paid in full in cash promptly in accordance with the timeframe set forth in the Convertible B Commitment Letter, following receipt of reasonably detailed summary invoices;

(iv)    all accrued and unpaid Transaction Expenses incurred up to (and including) the Plan Effective Date, shall be paid in full in cash on the Plan Effective Date, provided the Company Parties receive reasonably detailed summary invoices by such date, without any requirement for Bankruptcy Court review or further Bankruptcy Court order; and

(v)     notwithstanding anything to the contrary herein, the Company Parties shall reimburse all reasonable and documented fees and expenses incurred following the Plan Effective Date invoiced by the First Lien Group Advisors, the Crossover Group Advisors, or the Strategic Investor Advisors on or after the Plan Effective Date solely in connection with the implementation of the Plan (including, for the avoidance of doubt, such fees and expenses incurred in connection with the prosecution or defense of any appeals thereof), which Transaction Expenses shall be paid in full in cash promptly in accordance with the timeframe set forth in the Cash Collateral Order or the DIP Order, as applicable (or as otherwise permitted pursuant to any order of the Bankruptcy Court), following receipt of reasonably detailed summary invoices thereof.

(b)     The terms set forth in this Section 15.20 shall survive termination of this Agreement.  Notwithstanding anything to the contrary set forth herein, with respect to invoices for Transaction Expenses submitted to the Company Parties by counsel to the First Lien Group, counsel to the Crossover Group, and counsel to the Strategic Investor, such invoices shall provide reasonable supporting detail in summary format (with such redactions as may be necessary to

maintain attorney-client privilege), and such invoices shall not be required to provide the Company Parties with attorney time entries.  At the conclusion of all post-Plan Effective Date work, the First Lien Group Advisors, the Crossover Group Advisors, and the Strategic Investor Advisors may, in their discretion, either apply the last invoice to any retainers or refund any remaining amounts of such retainers (if any) to the Company Parties.

15.21.  <u>Relationship Among Parties</u>.  It is understood and agreed that no Consenting Party owes any duty of trust or confidence of any kind or form to any other Party as a result of entering into this Agreement, and there are no commitments among or between the Consenting Parties, in each case except as expressly set forth in this Agreement.  In this regard, it is understood and agreed that any Consenting Party may trade in Company Claims/Interests without the consent of any other Party, subject to applicable securities laws and the terms of this Agreement, including <u>Section 10</u>; <u>provided</u>, <u>however</u>, that no Consenting Party shall have any responsibility for any such trading to any other Person by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.  No Consenting Party shall, nor shall any action taken by a Consenting Party pursuant to this Agreement, be deemed to be acting in concert or as any "group" (as that term is used in Section 13(d) of the Securities Exchange Act of 1934, as amended) with any other Consenting Party with respect to the obligations under this Agreement nor shall this Agreement create a presumption that the Consenting Parties are in any way acting in concert or as such a group.  The decision to commit to enter into the transactions contemplated by this Agreement has been made independently by each Party hereto.  The Parties acknowledge that all representations, warranties, covenants, and other agreements made by or on behalf of any Consenting Party that is a separately managed account of an investment manager signatory hereto are being made only with respect to the assets managed by such manager on behalf of such Consenting Party, and shall not apply to (or be deemed to be made in relation to) any assets or interests that may be beneficially owned by such Consenting Party that are not held through accounts managed by such manager.

15.22.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the terms, provisions, agreements and obligations set forth in <u>Section 1.02</u>, <u>Section 7</u>, <u>Section 13.06</u>, <u>Section 14</u>, and <u>Section 15</u> (other than <u>Section 15.03</u> in the event of a termination of this Agreement other than pursuant to <u>Section 13.05</u>), and <u>Section 6.02(a)(ii)</u>, and any defined terms used in any of the forgoing Sections or proviso (solely to the extent used therein), shall survive such termination and shall continue in full force and effect with respect to all Parties in accordance with the terms hereof.  For the avoidance of doubt, notwithstanding the termination of this Agreement, the Company Parties will comply with their obligations to pay the Transaction Expenses set forth in <u>Section 15.20</u>.

15.23.  <u>Publicity</u>.  The Company Parties shall submit drafts to counsel to the Consenting Parties of any press releases or other public statement or public disclosure of the existence or terms of this Agreement, the Restructuring Transactions, or any amendment to the terms of this Agreement at least two Business Days prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith; <u>provided</u> that if delivery of such document at least two Business Days in advance of such disclosure is impossible or

impracticable under the circumstances, such document shall be delivered as soon as otherwise practicable; <u>provided</u> that any press release or other public statement or public disclosure with respect to this Agreement or the Restructuring Transactions (whether or not such press release, public statement or public disclosure names the Strategic Investor) shall be in form and substance reasonably acceptable to the Strategic Investor.  Except as required by Law, no Party or its advisors shall (a) other than as necessary during live court proceedings and in filings in connection with the Chapter 11 Cases, use the name of any Consenting Creditor or the Strategic Investor, or describe the transactions contemplated by the Commercial Term Sheet, in any public manner (including in any press release) with respect to this Agreement, the Restructuring Transactions, or any of the Definitive Documents, or (b) disclose to any Person (including, for the avoidance of doubt, any other Consenting Party), other than advisors to the Company Parties, the principal amount or percentage of any Company Claims/Interests held by any Consenting Creditor, or any notice of a Transfer of ownership in any Company Claims/Interests by or to a Consenting Creditor pursuant to <u>Section 10</u> without such Consenting Creditor's prior written consent (it being understood and agreed that each Consenting Creditor's signature page to this Agreement shall be redacted to remove the name of such Consenting Creditor and the amount and/or percentage of Company Claims/Interests held by such Consenting Creditor); <u>provided</u>, <u>however</u>, that (i) if any disclosure contemplated by this sentence is required by Law, the disclosing Party shall afford the relevant Consenting Creditor or the Strategic Investor, as applicable, a reasonable opportunity to review and comment in advance of such disclosure, shall incorporate any comments from such Consenting Creditor or the Strategic Investor, as applicable, in good faith, and shall take all reasonable measures to limit such disclosure, (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Company Claims/Interests held by the Consenting Creditors of the same class, collectively, and (iii) the Company Parties shall submit drafts of any statements or disclosures of the terms of this Agreement or the Restructuring Transactions to be made during live court proceedings or in filings in connection with the Chapter 11 Cases (whether or not such statements or disclosures name the Strategic Investor) to the Strategic Investor at least two Business Days prior to making such statement or disclosure (or if delivery of such statement or disclosure at least two Business Days in advance is impossible or impracticable under the circumstance, delivery shall occur as soon as otherwise practicable) and shall incorporate any such reasonable comments from the Strategic Investor in good faith. Notwithstanding the provisions in this <u>Section 15.23</u>, (w) any Party may disclose the identities of the other Parties in any action to enforce this Agreement or in any action for damages as a result of any breaches hereof, (x) any Party may disclose, to the extent expressly consented to in writing by a Consenting Creditor such Consenting Creditor's identity and individual holdings, (y) any Party may disclose, to the extent expressly consented to in writing by the Strategic Investor, the Strategic Investor's identity and/or the transactions contemplated by the Commercial Term Sheet, as applicable, (z) to the extent the Company Parties, acting reasonably and in good faith, determine that disclosure of the Consenting Creditors' names is necessary to preserve relationships with customers, suppliers, employees, and licensing or regulatory bodies, the Company Parties may disclose the name of any Consenting Creditor that was previously disclosed in any of the Company Parties' press releases, other public statements, or other public disclosures or contained in the Company Parties' communications materials as provided to and approved by counsel to the applicable Consenting Creditor.

15.24. <u>No Recourse</u>.  This Agreement may only be enforced against the named parties hereto (and then only to the extent of the specific obligations undertaken by such parties in this

Agreement).  All Causes of Action (whether in contract, tort, equity, or any other theory) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution, or performance of this Agreement, may be made only against the Persons that are expressly identified as parties hereto (and then only to the extent of the specific obligations undertaken by such parties herein).  No past, present, or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, Affiliate, controlling person, agent, attorney, or other representative of any Party (including any person negotiating or executing this Agreement on behalf of a Party), nor any past, present, or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, Affiliate, controlling person, agent, attorney, or other representative of any of the foregoing (other than any of the foregoing that is a Party) (any such Person, a "**No Recourse Party**"), shall have any liability with respect to this Agreement or with respect to any Proceeding (whether in contract, tort, equity, or any other theory that seeks to "pierce the corporate veil" or impose liability of an entity against its owners or Affiliates or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement.

15.25.  Computation of Time. Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

*[Signature Pages Follow]*

**Company Parties' Signature Page to
the Amended and Restated Restructuring Support Agreement**

**DIAMOND SPORTS GROUP, LLC
ARC HOLDING, LTD.
DIAMOND COLLEGE SPORTS, LLC
DIAMOND DIGITAL GROUP, LLC
DIAMOND GAMING SERVICES, LLC
DIAMOND MOBILE HOLDINGS, LLC
DIAMOND OHIO HOLDINGS II, LLC
DIAMOND OHIO HOLDINGS, LLC
DIAMOND SAN DIEGO HOLDINGS, LLC
DIAMOND SOUTHERN HOLDINGS, LLC
DIAMOND SPORTS NET ARIZONA HOLDINGS, LLC
DIAMOND SPORTS NET ARIZONA, LLC
DIAMOND SPORTS NET DETROIT, LLC
DIAMOND SPORTS NET FLORIDA, LLC
DIAMOND SPORTS NET NORTH, LLC
DIAMOND SPORTS NET OHIO, LLC
DIAMOND SPORTS NET WEST 2, LLC
DIAMOND SPORTS NET, LLC
DIAMOND SPORTS SUN, LLC
DIAMOND ST. LOUIS HOLDINGS, LLC
DIAMOND WEST HOLDINGS, LLC
DIAMOND-BRV SOUTHERN SPORTS HOLDINGS, LLC
FASTBALL SPORTS PRODUCTIONS, LLC
FRSM HOLDINGS LLC
SPORTS HOLDING, LLC
SPORTS NETWORK II, LLC
SPORTS NETWORK, LLC
SPORTSOUTH NETWORK II, LLC
SPORTSOUTH NETWORK, LLC
SUNSHINE HOLDCO, LLC**

By: _____

DocuSigned by:
*David DeVoe*
4DDD6E9A7EEC4E2

Name: David F. DeVoe, Jr.
Title: Chief Financial Officer

**Strategic Investor Signature Page to**
**the Amended and Restated Restructuring Support Agreement**

**AMAZON.COM SERVICES LLC**

_DocuSigned by:_

_Michael Deal_

30FCD64500764AC...

Name: Michael Deal
Title: Sole Manager and President

Address:

c/o Amazon.com, Inc.
410 Terry Avenue North
Seattle, Washington 98109

E-mail address(es):

investments@amazon.com

**The UCC's Signature Page to
the Amended and Restated Restructuring Support Agreement**

**AKIN GUMP STRAUSS HAUER & FELD LLP,**

on behalf of the UCC, as a Consenting Party

_(signature)_

Name: Naomi Moss
Title: Partner

[*Consenting Creditor signature pages on file with the Company Parties.*]

<u>**Exhibit A**</u>

**Restructuring Term Sheet**

**DIAMOND SPORTS GROUP, LLC**

**RESTRUCTURING TERM SHEET**

**FEBRUARY 26, 2024**

THIS RESTRUCTURING TERM SHEET (TOGETHER WITH ALL ANNEXES, SCHEDULES, AND EXHIBITS HERETO, THIS "RESTRUCTURING TERM SHEET") DESCRIBES THE PRINCIPAL TERMS AND CONDITIONS OF A RESTRUCTURING TRANSACTION FOR DIAMOND SPORTS GROUP, LLC ("DSG") AND ITS DIRECT AND INDIRECT SUBSIDIARIES (COLLECTIVELY WITH ITS DIRECT AND INDIRECT SUBSIDIARIES, THE "COMPANY PARTIES," AND EACH, A "COMPANY PARTY") THAT WILL BE EFFECTUATED THROUGH A CHAPTER 11 PLAN OF REORGANIZATION (THE "PLAN") IN THE COMPANY PARTIES' CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (THE "CHAPTER 11 CASES") IN THE BANKRUPTCY COURT, ON THE TERMS, AND SUBJECT TO THE CONDITIONS, SET FORTH IN THE AMENDED & RESTATED RESTRUCTURING SUPPORT AGREEMENT TO WHICH THIS RESTRUCTURING TERM SHEET IS ATTACHED AS EXHIBIT A THERETO (TOGETHER WITH THE EXHIBITS AND SCHEDULES ATTACHED TO SUCH RESTRUCTURING SUPPORT AGREEMENT, INCLUDING THIS RESTRUCTURING TERM SHEET, EACH AS MAY BE AMENDED, RESTATED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS THEREOF, THE "RESTRUCTURING SUPPORT AGREEMENT").

THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL COMPLY WITH ALL APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.

CAPITALIZED TERMS USED BUT NOT INITIALLY DEFINED IN THIS RESTRUCTURING TERM SHEET SHALL HAVE THE MEANINGS HEREINAFTER ASCRIBED TO SUCH TERMS, OR IF NOT DEFINED IN THIS RESTRUCTURING TERM SHEET, SUCH TERMS SHALL HAVE THE MEANINGS ASCRIBED TO SUCH TERMS IN THE RESTRUCTURING SUPPORT AGREEMENT.

THIS RESTRUCTURING TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

THIS RESTRUCTURING TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.    NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON ANY OF THE PARTIES.

| | |
|---|---|
| **GENERAL PROVISIONS** | |
| **Transaction Overview** | Pursuant to the Restructuring Transactions, the Company Parties will undertake the following structuring transactions: |

1. On the Plan Effective Date, the Company Parties will be separated from Sinclair Parent and will be stood up as an operationally separate business owned, governed, and managed as set forth herein.  On the Plan Effective Date, any Interests in the Company Parties held indirectly by Sinclair Parent, including Holdings' Interests in DSG, will be cancelled and extinguished for no recovery.

2. On the Plan Effective Date, the Company Parties will create New HoldCo (as defined below), which will own 100% of the interests in (a) entities that will own the Company Parties' operating assets ("OpCo") and (b) an entity that will hold, directly or through its ownership of Debtor Sports Network II, LLC (or its successor in interest), the Company Parties' interests in Red Seam Holdings LLC (such interests, the "YES Interests," and such entity, "YES HoldCo"), which will hold no other assets and may not incur any liabilities or debt other than a guarantee of the Convertible Notes.

3. On or before the Plan Effective Date, a series of new holding companies, including New TopCo, New Intermediate HoldCo, and New Lower-Tier HoldCo (each, as defined below), will be created as set forth herein.  On the Plan Effective Date, assuming that the Convertible B Exit Notes have not been converted and the Investment Options have not been exercised, New TopCo will indirectly own 100% of New HoldCo through New Intermediate HoldCo and New Lower-Tier HoldCo.

4. On the Plan Effective Date, New TopCo will issue 100% of its equity (subject to dilution by the Convertible A Exit Notes and the DIP Commitment Party Investment Option) to holders of Junior Funded Debt Claims, the DIP Lenders, and the Initial DIP Commitment Parties as set forth herein.

5. On the Plan Effective Date, through New Intermediate HoldCo and New Lower-Tier HoldCo, New TopCo will indirectly hold 100% of the interests in (a) if the Litigation Proceeds Condition is not met, an entity that will hold 100% of the Class C Interests in the Litigation Trust that will prosecute the Sinclair-Related Litigations ("LitigationCo"), (b) subject to the Marquee Acquisition Right (as defined below), an entity that will hold, directly or through its ownership of Debtor Sports Network, LLC (or its successor in interest), the Company Parties' interests in Marquee Sports Network, LLC (such interests, the "Marquee Interests," and such entity, "Marquee HoldCo"), and (c) New HoldCo.

Pursuant to the Restructuring Transactions, the Company Parties will undertake the following financing transactions:

6. The Company Parties will enter into a subordinated secured super-priority debtor-in-possession term loan facility (the "DIP Facility") in an aggregate principal amount of $450 million.  The DIP Facility will be provided by certain Consenting Creditors as set forth in the DIP Commitment Letter.   The DIP Facility shall be backstopped by certain Consenting Creditors as set forth in the DIP Commitment Letter. Proceeds of the DIP Facility will be utilized to repay a portion of the First Lien Term Loans, fund ongoing operations and case administration during the Chapter 11 Cases, and for such other uses described in the DIP Term Sheet.

7. Prior to the Plan Effective Date, the Company Parties (or a special purpose vehicle formed by the Company Parties) will use commercially reasonable efforts to enter into the New A/R Facility (as defined below), which will remain in place following the Plan Effective Date to support the operations of OpCo.

8. On the Plan Effective Date, New HoldCo will issue $115 million of Convertible B Exit Notes to the Strategic Investor.  The Convertible B Exit Notes will be guaranteed by OpCo and YES HoldCo and secured by (a) a first lien, directly or indirectly, on the YES Interests (as further set forth herein) and (b) a second lien on all of OpCo's assets securing the Take Back Exit Facility, which second lien will be junior to the lien securing the Take Back Exit Facility and *pari passu* with the second lien securing the Convertible A Exit Notes and Exit Term Loans.

9. On the Plan Effective Date, OpCo will enter into a "take back" term loan credit facility (the "Take Back Exit Facility"), pursuant to which OpCo will issue debt in the aggregate principal amount of $200 million (the "Take Back Term Loans"), which, as further described herein, will be (a) distributed to holders of First Lien Claims and/or Initial DIP Commitment Parties, as applicable, and (b) secured by first priority security interests in, and liens on, subject to customary exceptions to be agreed, all of the assets of OpCo and each subsidiary guarantor (in each case, as further described in the Take Back Term Loans Term Sheet defined below).

10. If the Litigation Proceeds Condition is not met, in connection with consummation of the Plan, the Debtors will cause New TopCo to issue Convertible A Exit Notes and/or enter into Exit Term Loans in an aggregate principal amount of up to $210 million *plus* the amount of capitalized paid-in-kind ("PIK") interest as of the Plan Effective Date (the "Capitalized DIP Interest") under the DIP Facility (provided that there will in no event be more than $40 million of Exit Term Loans entered into on account of principal amount of loans (other than the Capitalized DIP Interest) under the DIP Facility), which will be used to repay a portion of  the DIP Facility on the Plan Effective Date.   The Convertible A Exit Notes and Exit Term Loans will be guaranteed by the entities constituting OpCo, LitigationCo, New HoldCo, YES HoldCo, and Marquee HoldCo (subject to the Marquee Acquisition Right) and secured by (a) a first lien on the Class C Interests, (b) a second lien on all of OpCo's assets securing the Take Back Exit Facility (as defined below), which second lien will be junior to the lien securing

the Take Back Exit Facility and *pari passu* lien with the second lien securing the Convertible B Exit Notes, (c) a second lien, directly or indirectly, on the YES Interests (as further set forth herein), and (d) subject to the Marquee Acquisition Right, a first lien, directly or indirectly, on the Marquee Interests   (as further set forth herein); provided, however, that YES HoldCo will only guarantee the Convertible A Exit Notes and Exit Term Loans and will only pledge the YES Interests on a second lien basis in favor of the Convertible A Exit Notes and Exit Term Loans if the Convertible B Exit Notes are secured on a first lien basis by a pledge of the YES Interests.  The guarantee of the Convertible A Exit Notes and Exit Term Loans by YES HoldCo, to the extent applicable, will be subordinated in right of payment to the guarantee of the Convertible B Exit Notes by YES HoldCo.

Creditor recoveries under the Restructuring Transactions will include:

11. On the Plan Effective Date, holders of First Lien Claims will receive: (a) Cash in an amount equal to (i) $415 million, *less* (x) the aggregate amount of interest paid as adequate protection payments to the holders of First Lien Claims after October 2, 2023, through the Plan Effective Date pursuant to the Cash Collateral Order or DIP Order, as applicable (the "AP Reduction Amount") and (y) the First Lien Paydown (as defined in the DIP Term Sheet) of $350 million, payable pursuant to the terms and conditions set forth in the DIP Term Sheet; (b) the Take Back Term Loans (or Cash in lieu of a portion thereof as further set forth herein); and (c) subject in all respects to the First Lien Claims Cap, either (i) if the Litigation Proceeds Condition is met, the Class A Litigation Proceeds, or (ii) if the Litigation Proceeds Condition is not met, the Class A Interests.  The "First Lien Claims Cap" is equal to (i) $662 million (subject to the First Lien Paydown being made on the Closing Date of the DIP Facility (as defined in the DIP Term Sheet)) and (ii) $686 million (to the extent the First Lien Paydown is not made on the Closing Date of the DIP Facility); provided that with respect to each of the foregoing, (x) the AP Reduction Amount shall reduce the First Lien Claims Cap and (y) the fees and expenses of the First Lien Group and the First Lien Agent shall not count toward the First Lien Claims Cap.  The par value of the $200 million in aggregate principal amount of Take Back Term Loans (regardless of whether it is distributed to holders of First Lien Claims and/or Initial DIP Commitment Parties), as well as the Cash distributed to holders of First Lien Claims on the Plan Effective Date and pursuant to the First Lien Paydown (as defined in the DIP Term Sheet), will be counted towards the First Lien Claims Cap.

12. On the Plan Effective Date, holders of Junior Funded Debt Claims will receive their *pro rata* share of: (a) 10% of the New TopCo Equity, subject to dilution by the Convertible A Exit Notes and the DIP Commitment Party Investment Option, and (b) either (i) if the Litigation Proceeds Condition is met, 100% of the Class B Litigation Proceeds or (ii) if the Litigation Proceeds Condition is not met, 100% of the Class B Interests, as further described herein.

|  | 13. On the Plan Effective Date, holders of General Unsecured Claims will receive their share of the Unsecured Claim Cash Distribution in accordance with the GUC Allocation (as defined herein). |
|---|---|

13. On the Plan Effective Date, holders of General Unsecured Claims will receive their share of the Unsecured Claim Cash Distribution in accordance with the GUC Allocation (as defined herein).

14. On the Plan Effective Date, holders of Go-Forward Trade Claims shall receive payment in Cash in full or such other treatment that renders such holders unimpaired.

The Restructuring Transactions will also provide for certain Investment Options for additional New Equity as set forth herein.  Pursuant to the Investment Options, on or before the nine month anniversary of the Plan Effective Date, each of (a) the Strategic Investor and (b) the Initial DIP Commitment Parties (as defined in the DIP Commitment Letter), will have the right to invest up to $50 million in New HoldCo (in the case of the Strategic Investor) or New TopCo (in the case of the Initial DIP Commitment Parties, which investment will then be invested by New TopCo in New HoldCo), based on a $500 million equity valuation for New HoldCo, in accordance with the terms set forth in this Restructuring Term Sheet and as further described below.

On the Plan Effective Date, and subject to dilution by  the Convertible A Exit Notes and the DIP Commitment Party Investment Option, New TopCo will be owned (i) 45% by the DIP Commitment Parties, (ii) 45% by the DIP Lenders, and (iii) 10% by holders of Junior Funded Debt Claims on account of such Claims (or such parties' respective designees, as applicable).  On the Plan Effective Date, assuming that the Convertible B Exit Notes are fully converted on the Plan Effective Date, New HoldCo will be owned (i) 85% by New TopCo and (ii) 15% by the Strategic Investor.

| **Existing Capital Structure** | <u>First Lien Term Loan</u>: Claims that consist of $630,237,500.00 in aggregate principal amount of outstanding First Lien Term Loans, plus unpaid interest, fees, premiums, and all other obligations, amounts, and expenses arising under or in connection with the First Lien Credit Agreement held by the First Lien Term Loan Lenders (the "<u>First Lien Claims</u>").<br><br><u>Second Lien Revolving Credit Facility</u>:  Claims that consist of any amounts drawn under the Second Lien Revolving Credit Facility, which as of the Petition Date had a drawn balance of $227,500,000.00 (the "<u>Second Lien Revolving Loan Claims</u>").<br><br><u>Second Lien Term Loan</u>:  Claims that consist of $3,189,355,783.00 in aggregate principal amount of outstanding Second Lien Term Loans, plus unpaid interest, fees, premiums, and all other obligations, amounts, and expenses arising under or in connection with the Second Lien Credit Agreement held by the Second Lien Term Loan Lenders (the "<u>Second Lien Term Loan Claims</u>").<br><br><u>Second Lien Notes</u>:  Claims that consist of $3,039,789,000.00 in aggregate principal amount of outstanding Second Lien Notes, plus unpaid interest, fees, premiums, and all other obligations, amounts, and expenses arising under or in connection with the Second Lien Notes Indenture held by the Second Lien Noteholders (the "<u>Second Lien Notes Claims</u>," and together with the Second Lien Revolving Loan Claims and the Second Lien Term Loan Claims, the "<u>Second Lien Claims</u>"). |
|---|---|

| | |
|---|---|
| | Third Lien Term Loan: Claims that consist of $4,136,717.00 in aggregate principal amount of outstanding Third Lien Term Loans, plus unpaid interest, fees, premiums, and all other obligations, amounts, and expenses arising under or in connection with the Third Lien Credit Agreement held by the Third Lien Term Loan Lenders (the "Third Lien Term Loan Claims").<br><br>Third Lien Notes: Claims that consist of $10,211,000.00 in aggregate principal amount of outstanding Third Lien Notes, plus unpaid interest, fees, premiums, and all other obligations, amounts, and expenses arising under or in connection with the Third Lien Notes Indenture held by the Third Lien Noteholders (the "Third Lien Notes Claims" and together with the Third Lien Term Loan Claims, the "Third Lien Claims").<br><br>Unsecured Notes:  Claims that consist of $1,743,797,000.00 in aggregate principal amount of outstanding Unsecured Notes, plus unpaid interest, fees, premiums, and all other obligations, amounts, and expenses arising under or in connection with the Unsecured Notes Indenture held by the Unsecured Noteholders (the "Unsecured Notes Claims," and, collectively, with the Second Lien Claims and the Third Lien Claims, the "Junior Funded Debt Claims"). |
| **New A/R Facility** | On or prior to the Plan Effective Date, the Company Parties will use commercially reasonable efforts to enter into a loan agreement (the "New A/R Facility Credit Agreement," and such facility created thereby, the "New A/R Facility") providing for the New A/R Facility, which will not have more than $135 million outstanding in the aggregate at any single point in time.  The New A/R Facility will be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Parties. |
| **DIP Facility / Commitments** | The DIP Facility will be provided by certain Consenting Creditors (the "DIP Lenders"), on the terms and conditions set forth in the DIP Commitment Letter, dated as of the Agreement Effective Date, and attached hereto as **Exhibit 1** (the "DIP Commitment Letter"), including the term sheet attached thereto (the "DIP Term Sheet").  To become a DIP Lender, a holder must (i) be an "accredited investor" (as defined by Rule 501 of the Securities Act), and (ii) complete a customary accredited investor questionnaire.<br><br>As more fully set forth in the DIP Term Sheet, the DIP Facility will provide, after entry of an order approving the Company Parties' entry into the DIP Facility (the "DIP Order"), for DIP Loans (as defined in the DIP Term Sheet) in the aggregate principal amount of $450 million.<br><br>The DIP Facility will be issued under the DIP Documentation.  The terms and conditions of the DIP Documentation are set forth in the DIP Term Sheet. |
| **Convertible A Exit Notes / Exit Term Loans** | If the Litigation Proceeds Condition is not met, on the Plan Effective Date, the Company Parties will issue the Convertible A Exit Notes and/or enter into Exit Term Loans, in an aggregate principal amount of up to $210 million, *plus* the Capitalized DIP Interest under the DIP Facility (provided that there will in no event be more than $40 million of Exit Term Loans entered into on account of principal amount of loans (other than the Capitalized DIP Interest) under the DIP Facility), which will be used to partially repay the DIP Facility on the Plan Effective Date.  To receive their Convertible A Exit Notes and/or Exit Term |

| | |
|---|---|
| | Loans, holders of DIP Claims will be deemed to tender their DIP Claims in exchange for Convertible A Exit Notes and/or Exit Term Loans in lieu of Cash.<br><br>The terms and conditions of the Convertible A Exit Notes are set forth in the term sheet attached hereto as **Exhibit 2**.  The terms and conditions of the Exit Term Loans are set forth in the term sheet attached hereto as **Exhibit 3**.<br><br>The Convertible A Exit Notes (if any), the Exit Term Loans (if any), the Convertible B Exit Notes, and the Take Back Term Loans will be subject to an intercreditor agreement with respect to their common collateral. |
| **Cash Collateral / DIP Order** | The DIP Order will modify the Cash Collateral Order with respect to the use of cash collateral and will in all respects be consistent with the DIP Term Sheet.<br><br>The Consenting First Lien Creditors (constituting the Majority 1L Lenders (as defined in the Cash Collateral Order)) will consent to the DIP Facility and to the use of cash collateral by the Debtors during the pendency of the Chapter 11 Cases and as set forth in the DIP Order, subject in all respects to the Required Consenting First Lien Creditors' consent rights in the Restructuring Support Agreement.  The budget approval process will be conducted in accordance with the DIP Term Sheet and documented in the DIP Order and the DIP Documentation.<br><br>The DIP Order shall (a) provide for the establishment of the Unsecured Claims Reserve and the Unsecured Claim Cash Distribution and (b) include the Preference Waiver. |
| **Treatment of DIP Claims** | On the Plan Effective Date, the claims under the DIP Facility (the "<u>DIP Claims</u>") will be treated as follows:<br><br>(1) <u>Principal and Capitalized DIP Interest</u>:  If the Litigation Proceeds Condition is met, the Debtors will repay the principal amount of the DIP Claims (including any Capitalized DIP Interest), in full in Cash on the Plan Effective Date ($210 million (plus the amount of Capitalized PIK Interest) of which shall be paid from the Class C Litigation Proceeds).  If the Litigation Proceeds Condition is not met, the Debtors will repay $210 million in principal of the DIP Claims, plus the Capitalized DIP Interest, with an equal face amount of Convertible A Exit Notes and/or Exit Term Loans.  The remaining aggregate principal amount of the DIP Claims (other than the Capitalized DIP Interest) will be repaid in Cash from the proceeds of the New A/R Facility and the Convertible B Exit Notes.<br><br>(2) <u>Commitment Premium</u>:  The Debtors will pay the Commitment Premium by issuing the DIP Premium Equity (as defined below) to the DIP Commitment Parties.<br><br>(3) <u>DIP MOIC</u>:  The Debtors will pay the DIP MOIC: (a) with respect to $45 million of the DIP MOIC, (i) if the Litigation Proceeds Condition is met, with the Litigation CVR Proceeds, and (ii) if the Litigation Proceeds Condition is not met, by issuing the Litigation CVRs (as defined below) to the DIP Lenders; and (b) with respect to remaining amounts owing on account of the DIP MOIC, by issuing the DIP MOIC Equity (as defined below) to the DIP Lenders.  Notwithstanding the foregoing, payment in cash of the DIP MOIC shall be subject to the funding of the Unsecured Claims Reserve, to the extent |

| | |
|---|---|
| | applicable |
| | (4) Other DIP Obligations: The Debtors will repay any other DIP Claims, including any accrued and unpaid interest as of the Effective Date, in Cash. |
| **Convertible B Exit Notes** | On the Plan Effective Date, the Strategic Investor and New HoldCo will enter into all necessary documentation for the issuance of the Convertible B Exit Notes. The aggregate principal amount of the Convertible B Exit Notes will be $115 million. The Convertible B Exit Notes will be issued in accordance with the terms and conditions set forth in the term sheet attached hereto as **Exhibit 4** and in the commitment letter for the Convertible B Exit Notes (the "Convertible B Commitment Letter"). The Convertible B Commitment Letter includes the Strategic Investor Investment Option. |
| | The Convertible A Exit Notes (if any), the Exit Term Loans (if any), the Convertible B Exit Notes, and the Take Back Term Loans will be subject to an intercreditor agreement with respect to their common collateral. |
| **Take Back Exit Facility** | On the Plan Effective Date, OpCo will issue the Take Back Term Loans under the Take Back Facility, on the terms and conditions set forth in the term sheet attached hereto as **Exhibit 5** (the "Take Back Term Loans Term Sheet"). The aggregate principal amount of the Take Back Term Loans will be $200 million. The Take Back Term Loans will be subject to a first priority lien on the OpCo Collateral (as defined in the Take Back Term Loans Term Sheet). |
| | On or prior to the Plan Effective Date, the Initial DIP Commitment Parties, individually and not jointly, will have the option to purchase up to $100 million in aggregate principal amount of such Take Back Term Loans at a discount to par of 10% (the "Purchase Option"). Any cash proceeds arising from the Purchase Option, as well as any Take Back Term Loans not subject to the Purchase Option, will be distributed to holders of First Lien Claims. |
| | The Convertible A Exit Notes (if any), the Exit Term Loans (if any), the Convertible B Exit Notes, and the Take Back Term Loans will be subject to an intercreditor agreement with respect to their common collateral. |
| **New HoldCo Equity & New TopCo Equity** | On the Plan Effective Date, (a) New HoldCo will issue a single class of membership interests (the "New HoldCo Equity") and (b) New TopCo will issue a single class of common shares (the "New TopCo Equity"). The New HoldCo Equity and the New TopCo Equity will be distributed in accordance with this Restructuring Term Sheet, including the Investment Options. |
| | On the Plan Effective Date, 100% of New HoldCo Equity will be indirectly owned by New TopCo, subject to dilution by the Convertible B Notes, the Strategic Investor Investment Option, and the Management Incentive Plan. The Convertible B Exit Notes will be convertible into 15% of New HoldCo Equity on a fully diluted basis. |
| | On the Plan Effective Date, the New TopCo Equity will be issued as follows: |
| | • 45% to the Initial DIP Commitment Parties (subject to dilution by the Convertible A Exit Notes and the DIP Commitment Party Investment Option) (the "DIP Premium Equity"); |

|  | • 45% to the DIP Lenders (subject to dilution by the Convertible A Exit Notes and the DIP Commitment Party Investment Option) (the "DIP MOIC Equity"); and |
|  | • 10% to holders of Junior Funded Debt Claims (subject to dilution by the Convertible A Exit Notes and the DIP Commitment Party Investment Option). |
|  | The Convertible A Exit Notes will be convertible into 25% of New TopCo Equity on a fully diluted basis. |
|  | For the avoidance of doubt, the New HoldCo Equity and New TopCo Equity, as applicable, issued on account of the Convertible Notes will dilute the New HoldCo Equity and New TopCo Equity, as applicable, issued on account of the Investment Options. |
|  | With respect to the New HoldCo Equity issuable pursuant to the Management Incentive Plan: (a) New HoldCo Equity issued on account of the Convertible B Exit Notes will not dilute the New HoldCo Equity issued on account of the Management Incentive Plan, and (b) New HoldCo Equity issued on account of the Investment Options will dilute the New HoldCo Equity issued on account of the Management Incentive Plan. |
| **Investment Options** | The DIP Commitment Letter provides for the DIP Commitment Party Investment Option and the Convertible B Commitment Letter provides for the Strategic Investor Investment Option. Each Investment Option will be available to the Initial DIP Commitment Parties, on the one hand, and the Strategic Investor , on the other hand, regardless of whether the other Investment Option is exercised. Any investment made by the Initial DIP Commitment Parties through an investment in New TopCo will then be invested by New TopCo in New HoldCo. The New Equity issued on account of the Investment Options will be subject to dilution by the conversion of the Convertible Notes (as applicable). |
|  | To the extent that the full $50 million of investment rights is not exercised by the Strategic Investor within nine months of the Plan Effective Date, (i) the Initial DIP Commitment Parties will have the right to invest the unexercised amount in New TopCo for a period of fifteen days, and (ii) thereafter, the Initial DIP Commitment Parties will have the right to invest any remaining unexercised amount for fifteen days. To the extent that the full $50 million of investment rights is not exercised by the Initial DIP Commitment Parties (on a collective basis) within nine months, (i) all Initial DIP Commitment Parties will have the right to invest the unexercised amount in New TopCo for a period of fifteen days, (ii) thereafter, all Initial DIP Commitment Parties will have the right to invest any remaining unexercised amount for fifteen days, and (iii) thereafter, the Strategic Investor will have the right to invest any remaining unexercised amount for fifteen days. |
| **Litigation CVRs** | If the Litigation Proceeds Condition is not met, on the Plan Effective Date, LitigationCo will issue contingent value rights (collectively, the "Litigation CVRs") to the DIP Lenders. The Litigation CVRs (if any) shall obligate LitigationCo to pay any holders of the Litigation CVRs $45 million in the |

| | |
|---|---|
| | aggregate from Litigation Proceeds received on account of the Class C Trust Interests, after payment in full of the Convertible A Exit Notes and the Exit Term Loans.  The Litigation CVRs (if any) shall be unsecured and shall not be guaranteed by the other Reorganized Debtors. |
| **Litigation Treatment** | On January 16, 2024, the Debtors entered into the Sinclair Settlement in connection with the Sinclair-Related Litigations. |
| | If the Litigation Proceeds Condition is not met, but the Plan Effective Date occurs before the Sinclair Settlement Outside Date, the Debtors will distribute the Litigation Trust Interests and the deposit from the Sinclair Settlement (if any) and the Sinclair Settlement Extension Payments (if any) in accordance with the terms hereof.  If, following the Plan Effective Date, the Sinclair Release Effective Date occurs on or prior to the Sinclair Settlement Outside Date, the Litigation Trust will distribute the Cash proceeds of the Sinclair Settlement in accordance with the terms set forth herein.  If the Sinclair Release Effective Date does not occur on or prior to the Sinclair Settlement Outside Date, then the Litigation Trust will pursue the Sinclair-Related Litigations. |
| | If the Litigation Proceeds Condition is not met, on the Plan Effective Date, the Sinclair-Related Litigations and any rights in respect of the Sinclair Settlement (other than the deposit from the Sinclair Settlement (if any) and any Sinclair Settlement Extension Payments (if any), in each case, if received prior to the Plan Effective Date and distributed as set forth above) will be transferred to a litigation trust (the "<u>Litigation Trust</u>"), which will be governed by a litigation trust agreement, which will be consistent with the terms of this Restructuring Term Sheet (the "<u>Litigation Trust Agreement</u>").   The Required DIP Commitment Parties and the First Lien Group will jointly coordinate, cooperate, and participate in good faith with respect to a process for the selection of the initial trustee of the Litigation Trust (the "<u>Litigation Trustee</u>").  The Litigation Trustee (if any) will ultimately be selected by the Required DIP Commitment Parties, subject to the consent of the First Lien Group and the Company Parties (which will not be unreasonably withheld, conditioned, or delayed).   If the Litigation Proceeds Condition is not met but the Debtors receive Cash payments in connection with the Sinclair Settlement (including the initial deposit of $50 million in Cash and any Sinclair Settlement  Extension Payments), such Cash will be distributed in accordance with the allocations set forth herein. |
| | If the Litigation Proceeds Condition is not met, the Litigation Trust will be funded by the Company Parties with $25 million in Cash (the "<u>Litigation Trust Funding Amount</u>") on the Plan Effective Date, and Litigation Proceeds will be allocated as follows: |
| | • First, to repay any litigation expenses in excess of the Litigation Trust Funding Amount, and then as follows below. |
| | • Until payment in full in cash of or, if applicable, conversion of all outstanding Convertible A Exit Notes, the Exit Term Loans, and the Litigation CVRs, 15% of the Litigation Proceeds will be allocated to the Class A Interests in the Litigation Trust, 5% of the Litigation Proceeds will be allocated to the Class B Interests in the Litigation Trust, and 80% of the Litigation Proceeds will be allocated to the Class C Interests in |

|  | the Litigation Trust. |
|---|---|
|  | • Upon payment in full in cash of or, if applicable, conversion of all outstanding Convertible A Exit Notes, the Exit Term Loans and the Litigation CVRs, 15% of the Litigation Proceeds will be allocated to the Class A Interests and 85% of the Litigation Proceeds will be allocated to the Class B Interests. |
|  | • To the extent the holders of First Lien Claims have received a recovery equal to the First Lien Claims Cap, then any excess Litigation Proceeds allocable to the Class A Interests shall be reallocated to the Class B Interests. |
|  | If the Litigation Proceeds Condition is not met, LitigationCo will hold all Class C Interests and the Litigation Trust will retain the Sinclair-Related Litigations. If the Litigation Proceeds Condition is not met, after the Plan Effective Date, the Litigation Trust and LitigationCo, as applicable, will distribute the Litigation Proceeds in accordance with the Litigation Trust Agreement.  The Plan and Litigation Trust Agreement (if any) will provide, among other things, that,  if the Litigation Proceeds Condition is not met, to the extent the Litigation Proceeds consist of both Cash and non-Cash consideration, Cash Litigation Proceeds shall be used first to fund 50% of the amount of the Litigation Proceeds allocable to the Class A Interests, with the remaining Litigation Proceeds to distributed among the holders of Class A Interests, Class B Interests, and Class C Interests, as applicable, on a *pro rata* basis. |
|  | For the avoidance of doubt, and notwithstanding anything to the contrary set forth herein, if the Litigation Proceeds Condition is met, the Litigation Trust will not be formed and the interests therein will not be issued, LitigationCo will not be formed, the Litigation CVRs will not be issued, and the Convertible A Exit Notes and the Exit Term Loans will not be issued. |
| **Tax Structure** | The Restructuring Transactions will be structured and implemented in a manner that is tax-efficient and reasonably acceptable to the Company Parties, the Required DIP Commitment Parties, the Required Consenting First Lien Creditors, and the Strategic Investor, including as follows: |
|  | 1. The Restructuring Transactions will be structured in a manner intended to cause the acquisition by New Intermediate HoldCo and New Lower-Tier HoldCo, respectively, of LitigationCo (as applicable), Marquee HoldCo (as applicable), and New HoldCo as a disposition of property described under Section 1001 of the Internal Revenue Code (the "Code"), and for the avoidance of doubt, not as a reorganization pursuant to Section 368(a)(1)(G) of the Code. |
|  | 2. On or before the Plan Effective Date, the Company Parties will create a new Delaware limited liability company holding company initially treated as an entity disregarded as separate from its owner for U.S. federal income tax purposes ("New HoldCo") that will own 100% of each of OpCo and YES HoldCo. |
|  | 3. On or before the Plan Effective Date, a third-party will create a new Delaware corporation holding company ("New TopCo"), which in turn will create a new intermediate holding company ("New Intermediate |

HoldCo"), which in turn will create a new lower-tier holding company ("New Lower-Tier HoldCo"). Each of New Intermediate HoldCo and New Lower-Tier HoldCo will be treated as corporations for U.S. federal and applicable state and local income tax purposes.

4. On or immediately prior to the Plan Effective Date, New TopCo will issue the Convertible A Exit Notes and/or Exit Term Loans.

5. On or immediately prior to the Plan Effective Date:

    a. New TopCo will have contributed to New Intermediate HoldCo (i) the Convertible A Exit Notes and possibly the Exit Term Loans that will be distributed to the DIP Lenders, and (ii) the New TopCo Equity; and

    b. New Intermediate HoldCo will have (i) contributed to New Lower-Tier HoldCo the Convertible A Exit Notes, if applicable, Exit Term Loans received from New TopCo, and (ii) retained an amount of New TopCo Equity equal in value to 1% of the equity of New HoldCo and will have contributed the remainder of such New TopCo Equity to New Lower-Tier HoldCo.

    c. If determined to be tax advantageous, New TopCo may transfer the Exit Term Loans directly to New Lower-Tier HoldCo in a transaction separate from the contributions of Convertible A Exit Notes and New TopCo Equity described in (a) and (b), above.

6. On the Plan Effective Date, OpCo will issue the Take Back Term Loans to holders of First Lien Claims and/or the Initial DIP Commitment Parties, as applicable.

7. On the Plan Effective Date, pursuant to an acquisition agreement entered into among New Lower-Tier HoldCo, and the Company Parties, in exchange for the Convertible A Exit Notes, the Exit Term Loans, the New TopCo Equity and the assumption of certain liabilities, New Lower-Tier HoldCo will acquire: (i) 100% of the interests in Marquee HoldCo (if any), (ii) 100% of the interests in New HoldCo, and (iii) 100% of the interests in LitigationCo (if any).

8. On the Plan Effective Date, New Lower-Tier HoldCo will distribute to New Intermediate HoldCo 1% of the interests in New HoldCo. New HoldCo will become a partnership for U.S. federal and applicable state and local income tax purposes.

9. On the Plan Effective Date, New HoldCo will issue the Convertible B Exit Notes, the proceeds of which will be distributed in accordance with step 11 below.

10. On the Plan Effective Date, the Company Parties will distribute (or cause to be distributed) to the applicable creditors pursuant to the Plan all of the equity of New TopCo and, if the Litigation Proceeds Condition is not met, all of the Convertible A Exit Notes and/or Exit Term Loans that they own.

| | |
|---|---|
| | 11. On the Plan Effective Date, the Company Parties or New HoldCo, as applicable, will distribute (or cause to be distributed) to the DIP Lenders pursuant to the Plan the Cash proceeds from the issuance of the Convertible B Exit Notes. |
| **Unsecured Claim Cash Distribution / Unsecured Claims Reserve** | In accordance with the UCC Settlement:<br><br>(a)    in a going concern reorganization, subject to Payment in Full of all First Lien Claims and satisfaction of all DIP Obligations, each holder of an Allowed General Unsecured Claim will receive its applicable share of the Unsecured Claim Cash Distribution in accordance with the GUC Allocation;<br><br>(b)    in the event of a wind down or liquidation of the Debtors, the Debtors shall not (i) make any payment to holders of Allowed General Unsecured Claims and Allowed Go-Forward Trade Claims unless and until holders of First Lien Claims have received a recovery in cash equal to the Wind Down Claim Cap (as defined in the DIP Order) or (ii) make any payment on account of the DIP MOIC unless the Unsecured Claims Reserve has been funded by the Debtors. Subject to the condition in subclause (i), in the event of a wind down or liquidation, each holder of an Allowed General Unsecured Claim or Allowed Go-Forward Trade Claim will receive its applicable share of the Unsecured Claim Cash Distribution (or the balance thereof if there are insufficient funds remaining after payment of the First Lien Claims in cash in an amount equal to the Wind Down Claims Cap) in accordance with the GUC Allocation; and<br><br>(c)    in the event a Reserve Funding Trigger (as defined in the DIP Order) occurs, the Debtors will fund the Unsecured Claims Reserve to make distributions to holders of Allowed General Unsecured Claims and Allowed Go-Forward Trade Claims, subject to the Reserve Distribution Conditions (as defined in the DIP Order); *provided*, that if the Debtors have no other sources of cash or monetizable assets to provide for the Payment in Full of the First Lien Claims, the Debtors may use all or a portion of the Unsecured Claims Reserve to satisfy First Lien Claims.<br><br>The Debtors' obligation to fund the Unsecured Claims Reserve in accordance with this paragraph will survive termination of the Restructuring Support Agreement. |

## TREATMENT OF CLAIMS AND INTERESTS

| Class No. | Type of Claim | Treatment | Impairment/ Voting |
|---|---|---|---|
| | | **Unclassified Non-Voting Claims** | |
| **N/A** | **Administrative Claims** | On the Plan Effective Date, each holder of an Allowed Administrative Claim will receive treatment in a | N/A |

| | | | |
|---|---|---|---|
| | | manner consistent with section 1129(a)(9)(A) of the Bankruptcy Code. | |
| **N/A** | **Priority Tax Claims** | On the Plan Effective Date, each holder of an Allowed Priority Tax Claim will receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| | **Classified Claims and Interests of the Debtors** | | |
| **Class 1** | **Other Secured Claims** | On the Plan Effective Date, each holder of an Allowed Other Secured Claim will receive, at the Company Parties' option, with the reasonable consent of the Required DIP Commitment Parties, in full and final satisfaction of such Allowed Other Secured Claim, either (a) payment in full in Cash, (b) delivery of the collateral securing its Allowed Other Secured Claim, (c) Reinstatement of its Allowed Other Secured Claim, or (d) such other treatment rendering its Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired; Deemed to Accept. |
| **Class 2** | **Other Priority Claims** | Each holder of an Allowed Other Priority Claim will receive either (a) payment in full in Cash or (b) such other treatment rendering its Allowed Other Priority Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired; Deemed to Accept. |
| **Class 3** | **First Lien Claims** | On the Plan Effective Date, subject to the First Lien Claims Cap, each Allowed First Lien Claim will be released and extinguished, and each holder of an Allowed First Lien Claim will receive, in full and final satisfaction of such Allowed First Lien Claim, its *pro rata* share of:<br><br>• Cash in an amount equal to $65 million less the AP Reduction Amount;<br><br>• Take Back Term Loans and, to the extent the Purchase Option is exercised, Cash received by the Debtors from the Purchase Option; and<br><br>• after taking into account the First Lien Paydown and the distributions set forth in items (i) and (ii) above, and in each case up to the First Lien Claims Cap, either: (A) if the Litigation Proceeds Condition is met, the Class A Litigation Proceeds; or (B) if the Litigation Proceeds Condition is not met, the Class A Interests. | Impaired; Entitled to Vote. |

| Class 4 | **Junior Funded Debt Claims** | On the Plan Effective Date, each Allowed Junior Funded Debt Claim will be released and extinguished, and each holder of an Allowed Junior Funded Debt Claim will receive, in full and final satisfaction of such Allowed Junior Funded Debt Claim, its *pro rata* share of:<br><br>• the Junior Creditor Equity Distribution; and<br><br>• (i) if the Litigation Proceeds Condition is met, 100% of the Class B Litigation Proceeds; or (ii) if the Litigation Proceeds Condition is not met, 100% of the Class B Interests. | Impaired; Entitled to Vote |
|---|---|---|---|
| Class 5 | **Go-Forward Trade Claims** | On the Plan Effective Date, each holder of an Allowed Go-Forward Trade Claim will receive, at such Company Party's option, with the reasonable consent of the Required DIP Commitment Parties, either: (i) Reinstatement of such Go-Forward Trade Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in Cash on (a) the Plan Effective Date, or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Go-Forward Trade Claim, unless otherwise agreed to by such holder. | Unimpaired; Not Entitled to Vote |
| Class 6 | **General Unsecured Claims** | On the Plan Effective Date, each Allowed General Unsecured Claim will be released and extinguished, and each holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction of such Allowed General Unsecured Claim, its share of the Unsecured Claim Cash Distribution in accordance with the GUC Allocation. | Impaired; Entitled to Vote |
| Class 7 | **Intercompany Claims** | On the Plan Effective Date, Intercompany Claims will be, at the option of the Company Parties, with the reasonable consent of the Required DIP Commitment Parties, either: (i) Reinstated; or (ii) distributed, contributed, set off, cancelled, released, or otherwise addressed in a manner determined by the Company Parties, with the reasonable consent of the Required DIP Commitment Parties, (without any distribution on account of such Claims). | Unimpaired; Deemed to Accept / Impaired; Deemed to Reject. |
| Class 8 | **Intercompany Interests** | On the Plan Effective Date, Intercompany Interests will be, at the option of the Company Parties, with the reasonable consent of the Required DIP Commitment Parties, either: (i) Reinstated; or (ii) cancelled and | Unimpaired; Deemed to Accept / Impaired; |

| | | released without any distribution on account of such Interests. | Deemed to Reject. |
|---|---|---|---|
| **Class 9** | **Existing Equity Interests** | On the Plan Effective Date, all Existing Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No holders of Existing Equity Interests will receive a distribution under the Plan on account of such Existing Equity Interests. | Impaired; Deemed to Reject. |

| **GENERAL PROVISIONS REGARDING THE PLAN** |
|---|

| **Governance** | The New Board will be appointed on the Plan Effective Date and will consist of no more than seven members.  The Strategic Investor will have the right to appoint one member of the New Board on the Plan Effective Date and will maintain such board appointment right so long as the Strategic Investor owns 50% of the New Holdco Equity issued or issuable pursuant to the Convertible B Exit Notes on a converted or "as converted" basis (under the Convertible B Exit Notes) (for the avoidance of doubt, the Strategic Investor will lose its board appointment rights only if it sells the Convertible B Exit Notes and/or New Holdco Equity below the above threshold and not as a result of dilution).  Following conversion of the Convertible B Exit Notes, if the Strategic Investor holds 20% or more of the New Holdco Equity, the Strategic Investor will be entitled to designate an additional independent member of the New Board and will maintain such board appointment right so long as the Strategic Investor holds 20% or more of the New HoldCo Equity. |
|---|---|
| | Except as otherwise set forth herein, the governance of the Reorganized Debtors will be determined by the Required DIP Commitment Parties and the Strategic Investor, with the consent of the Company Parties (which will not be unreasonably withheld, conditioned, or delayed), and will be set forth in the Plan Supplement. |
| | The New Organizational Documents, including charters, bylaws, operating agreements, shareholder agreements, or other organizational documents, as applicable, will be consistent with this Restructuring Term Sheet, and section 1123(a)(6) of the Bankruptcy Code, and will otherwise be determined by the Required DIP Commitment Parties and the Strategic Investor, with the consent of the Company Parties (which will not be unreasonably withheld, conditioned, or delayed).  The New Organizational Documents will include terms and provisions that are usual and customary for Organizational Documents of reorganized debtors, including fiduciary duty waivers in the Organizational Documents for New HoldCo and customary indemnification and exculpation provisions. |
| | New HoldCo will be a private company not subject to reporting under the Securities Act of 1933, as amended. |

| | |
|---|---|
| **Management Incentive Plan** | Following the Plan Effective Date, the New Board will adopt an equity incentive plan (the "<u>Management Incentive Plan</u>") that provides for the issuance of equity and equity-based awards ("<u>Awards</u>") to employees, consultants, and directors/managers of New HoldCo.  The New Board will reserve a pool of New HoldCo Equity under the Management Incentive Plan representing up to 10% of the issued and outstanding New HoldCo Equity as of the Plan Effective Date (the "<u>MIP Pool</u>"), inclusive of New HoldCo Equity reserved in the MIP Pool.  The MIP Pool will not be subject to dilution by the New HoldCo Equity issued under the Plan or on account of any conversion of the Convertible B Exit Notes.  The MIP Pool will be subject to dilution by the New Equity issued in exchange for any Investment Options. <br><br> To the extent not otherwise agreed prior to the Plan Effective Date, the form of the Awards (which are expected to be in the form of profits interests), the participants in the Management Incentive Plan, the allocations of the Awards to such participants, and the terms and conditions of the Awards (including time-based and performance-based vesting) will be determined by the New Board on or after the Plan Effective Date. |
| **Employment Obligations and Programs** | Pursuant to the Restructuring Support Agreement and this Restructuring Term Sheet, the Consenting Parties consent to the continuation of the Company Parties' ordinary course wages, compensation, and benefits programs according to the terms and practices thereof as of the Petition Date, including ordinary course executive compensation programs and any motions in the Bankruptcy Court for the approval thereof.  On the Plan Effective Date, the Debtors will assume all employment agreements or letters, indemnification agreements, severance agreements, or other agreements entered into with employees as of the Petition Date or hired thereafter. |
| **Preference Waiver** | All Preference Actions against any trade counterparty of the Debtors will be deemed irrevocably waived by the Debtors and/or their Estates, as applicable, upon and as of the date of entry of the DIP Order by the Bankruptcy Court, which waiver will be effective upon entry of the DIP Order (the "<u>Preference Waiver</u>"). |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from registration under the Securities Act and applicable law. |
| **Executory Contracts** | Subject to the terms of the Restructuring Support Agreement, and except as otherwise agreed by the Company Parties, the Required DIP Commitment Parties, and the Strategic Investor, all unexpired agreements with Sports Leagues and MVPDs will be assumed by the Company Parties on the Plan Effective Date. |
| **Claims Reconciliation Process** | The Company Parties will be responsible for the claims reconciliation process and bear all costs thereof (in both the reorganization contemplated by the Restructuring Support Agreement (as may be amended, modified, or |

| | |
|---|---|
| | supplemented in accordance with its terms) and in an orderly wind down or liquidation of the Debtors).  The Company Parties will use reasonable best efforts to reduce or minimize the size of the rejection damages claims pool; provided that the foregoing obligation shall not in any manner restrict, limit, or otherwise alter the Company Parties' ability to make contract assumption or rejection decisions in accordance with their business judgment. |
| **Notes Trustee and Agent Claims** | The Plan will provide for the payment in full, in Cash, of all reasonable and documented fees and expenses of each Notes Trustee and Agent on the Plan Effective Date.  In the event of an orderly wind down or liquidation of the Debtors under a chapter 11 plan, such plan will provide for the payment in full, subject to the holders of First Lien Claims receiving a recovery equal to the First Lien Claims Cap, in Cash, of all reasonable and documented fees and expenses of the Notes Trustee under the Unsecured Notes Indenture upon the effective date of such plan. |
| **Survival of Indemnification Provisions and D&O Insurance** | All indemnification provisions of the Company Parties (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) (other than any indemnification of any of the Sinclair Parties or any other defendants in the Sinclair-Related Litigations) that are in place as of the Petition Date and consistent with applicable law for the directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties as of the Petition Date, as applicable, will be reinstated and remain intact, irrevocable, and will survive the Plan Effective Date on terms no less favorable to such directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties, as applicable, than the indemnification provisions in place as of the Petition Date.

In addition, after the Plan Effective Date, the Company Parties will not terminate or otherwise reduce the existing coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of or following the Petition Date, and (i) all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Plan Effective Date and (ii) any other individuals, in each case of (i) and (ii), covered by such existing insurance policies, will be entitled to the full benefits of any such policy, to the extent set forth therein, for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Plan Effective Date. |
| **Retained Causes of Action** | Subject to the Preference Waiver, the Reorganized Debtors will retain all rights to commence and pursue any Causes of Action, other than any Causes of Action released by the Debtors pursuant to the release and exculpation provisions outlined in this Restructuring Term Sheet.  For the avoidance of doubt, the Sinclair-Related Litigations will be assigned to the Litigation Trust if the Litigation Proceeds Condition is not met. |

18

| Discharge of Claims and Termination of Interests | Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Definitive Documents or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan will be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of all Company Claims/Interests and all Causes of Action against any of the Company Parties of any nature whatsoever, including any interest accrued on any Company Claims/Interests from and after the Petition Date, whether known or unknown, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of any such Company Claims/Interests or Causes of Action, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Company Claims/Interests or Causes of Action relate to services that employees of the Debtors have performed prior to the Plan Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) any of the Company Claims/Interests based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (c) the holder of any such Company Claims/Interests has accepted the Plan.    The Confirmation Order will be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Plan Effective Date. |
|---|---|
| Releases by the Debtors (the "**Debtor Release**") | Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, its Estate, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, any investment in any Debtor by any Released Party, the subject matter of, or the transactions or |

events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, any other benefit provided by any Debtor to any Released Party, cash management arrangements, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Prior Restructuring Support Agreement, the Cooperation Agreement, the Restructuring Support Agreement, the Cash Collateral Order, the DIP Order, the Sinclair Settlement Order, the UCC Settlement, the Disclosure Statement, the New A/R Facility, the DIP Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Prior Restructuring Support Agreement, the Cooperation Agreement, the Restructuring Support Agreement,  the Cash Collateral Order, the DIP Order, the Sinclair Settlement Order, the UCC Settlement, the Disclosure Statement, the New A/R Facility, the DIP Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transaction, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes on the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date, other than claims or liabilities primarily arising out of any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  For the avoidance of doubt, any and all claims or Causes of Action against the Released Parties relating to the First Lien Claims or the  Junior Funded Debt Claims is subject to the Debtor Release.   Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New A/R Facility Credit Agreement, or any Claim, obligation, or right arising under or preserved

| | |
|---|---|
| | pursuant to the Plan or the Confirmation Order, or (2) if the Litigation Proceeds Condition is not met, any Sinclair-Related Litigations. |
| **Releases by Holders of Claims and Interests (the "_Third-Party Release_")** | Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party (other than the Debtors, the Reorganized Debtors, and their Estates) from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been entitled to assert (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, its Estate, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, any investment in any Debtor by any Released Party, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the Credit Agreements, the  Notes Indentures, cash management arrangements, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Prior Restructuring Support Agreement, the Cooperation Agreement, the Restructuring Support Agreement, the Cash Collateral Order, the DIP Order, the Sinclair Settlement Order, the UCC Settlement, the Disclosure Statement, the New A/R Facility, the DIP Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Prior Restructuring Support Agreement, the Cooperation Agreement, the Restructuring Support Agreement, the Cash |

<table>
<tr><td></td><td>Collateral Order, the DIP Order, the Sinclair Settlement Order, the UCC Settlement, the Disclosure Statement, the New A/R Facility, the DIP Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transaction before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes on the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date, other than claims or liabilities primarily arising out of any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement)  executed to implement the Plan, including the New A/R Facility Credit Agreement, the Prior Restructuring Support Agreement, the Cooperation Agreement, the Restructuring Support Agreement, the Cash Collateral Order, the DIP Order, the Sinclair Settlement Order, the UCC Settlement, any Plan Supplement document, or any Claim, obligation, or right arising under or preserved pursuant to the Plan or the Confirmation Order.</td></tr>
<tr><td><strong>Exculpation</strong></td><td>Except as otherwise specifically provided in the Plan, to the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Plan Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Transactions, the Prior Restructuring Support Agreement, the Cooperation Agreement, the Restructuring Support Agreement, the Cash Collateral Order, the DIP Order, the Sinclair Settlement Order, the UCC Settlement, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the solicitation of votes for, or confirmation of, the Plan, the funding of the Plan, the occurrence of the Plan Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action, in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but</td></tr>
</table>

| | |
|---|---|
| | in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. |
| **Conditions Precedent to the Plan Effective Date** | The following shall be conditions to the Plan Effective Date (the "Conditions Precedent to the Plan Effective Date"): |
| | 1. (a) the Restructuring Support Agreement shall have not been terminated and shall remain in full force and effect with respect to the Company Parties and the Required Consenting Parties and (b) there shall not be any event, occurrence, or condition that would after the expiration of any applicable notice or cure period permit any of the Consenting Parties or the Company Parties to terminate the Restructuring Support Agreement in accordance with its terms where the applicable Required Consenting Parties or the Company Parties have actually given notice of such event, occurrence, or condition; |
| | 2. all steps necessary to separate the Company Parties from the Sinclair Parties shall have occurred to the reasonable satisfaction of the Required DIP Commitment Parties and the Strategic Investor, and, to the extent the Company Parties enter into or assumes any agreement(s) for transition or long-term services with the Sinclair Parties, such agreement(s) shall be reasonably acceptable to the Required DIP Commitment Parties and the Strategic Investor; |
| | 3. the Company Parties' agreements with the Sports Leagues and their teams as of the Agreement Effective Date shall not have been terminated (excluding, for the avoidance of doubt, the NBA Term Sheet and the NHL Term Sheet) and the Company Parties shall not have entered into any arrangement or transaction with any of the Sports Leagues similar to the NBA Term Sheet and the NHL Term Sheet (except in each case with the consent of the Required DIP Commitment Parties and the Strategic Investor); |
| | 4. there shall not have been instituted nor shall there be pending any action, proceeding, application, claim, counterclaim, or formal or informal investigation before or by any domestic court, governmental, regulatory, or administrative agency or instrumentality in connection with the Restructuring Transactions that, in the reasonable judgment of the Company Parties, the Required DIP Commitment Parties, the Required Consenting First Lien Creditors, or the Strategic Investor would prohibit, prevent, or restrict consummation of the Restructuring Transactions; |

5. each document or agreement constituting the Definitive Documents shall (a) be in form and substance consistent with the Restructuring Support Agreement and the consent rights thereunder, (b) have been duly executed, delivered, acknowledged, filed, and/or effectuated, as applicable, and (c) be in full force and effect, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived;

6. all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

7. the New Organizational Documents shall (a) be in form and substance consistent with the Restructuring Support Agreement and the consent rights thereunder, (b) have been executed, delivered, acknowledged, filed, and/or effectuated, as applicable, and (c) be in full force and effect, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived;

8. all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Plan Effective Date shall have been placed in the professional fee escrow account;

9. all accrued and unpaid Transaction Expenses shall have been paid in full in accordance with the Restructuring Support Agreement and any engagement letters, fee reimbursement letters, or other agreements between the Company Parties and the Consenting Parties;

10. the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance consistent with the Restructuring Support Agreement (and the consent rights thereunder), and the Confirmation Order shall have become a Final Order;

11. the New A/R Facility shall be in place;

12. the New HoldCo Equity shall have been issued by New HoldCo as contemplated by the Restructuring Support Agreement;

13. the New TopCo Equity shall have been issued by New TopCo as contemplated by the Restructuring Support Agreement;

14. the Convertible B Exit Notes shall have been issued as contemplated by the Restructuring Support Agreement;

15. the Take Back Term Loans shall have been issued as contemplated by the Restructuring Support Agreement;

16. the Company Parties shall have entered into the commercial agreement with the Strategic Investor in form and substance consistent with the Commercial Term Sheet;

|  | 17. if the Litigation Proceeds Condition has not been met, the Convertible A Exit Notes, the Exit Term Loans, and the Litigation CVRs shall have been issued pursuant to the Plan and the Convertible A Exit Notes Documents, the Exit Term Loans Documents, or the documentation evidencing the Litigation CVRs, as applicable; |
|---|---|
|  | 18. if the Litigation Proceeds Condition has not been met, the Litigation Trust Agreement shall have been executed, the Litigation Trust shall have been established pursuant to the Litigation Trust Agreement, and all Litigation Trust Assets shall have been contributed to, and shall have vested in, the Litigation Trust; |
|  | 19. all accrued and unpaid reasonable and documented fees and expenses of each Notes Trustee and Agent shall have been paid in full in Cash; |
|  | 20. to the extent not otherwise addressed herein, all actions, documents, and agreements necessary to implement and consummate the Restructuring Transactions shall have been effected and executed, and shall be in form and substance consistent with the Restructuring Support Agreement (and the consent rights thereunder); |
|  | 21. all conditions denominated "Closing Conditions" in the Plan shall have been satisfied, waived, or satisfied contemporaneously with the occurrence of the Plan Effective Date; and |
|  | 22. the Company Parties shall have otherwise substantially consummated the Restructuring Transactions, and all transactions contemplated herein, in a manner consistent in all respects with the Restructuring Support Agreement and the Plan. |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Conditions Precedent to the Plan Effective Date may not be waived without the express prior written consent (which may be via email of counsel) of each of the Debtors, the Required DIP Commitment Parties, the Strategic Investor and, (i) solely with respect to conditions that require the consent or agreement of the Required First Lien Creditors or relate to distributions owed to the First Lien Creditors or the First Lien Group or their advisors (in each case, solely with respect to the First Lien Claims), the Required Consenting First Lien Creditors, and (ii) solely with respect to conditions that require the consent or agreement of the UCC or relate to distributions owed to holders of Go-Forward Trade Claims or General Unsecured Claims, the UCC, which waiver shall be effective without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. |

| **TERM** | **DEFINITION** |
|---|---|
| **Administrative Claim** | A Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(c)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan |

| **TERM** | **DEFINITION** |
|---|---|
| | Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed professional fee Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code. |
| **Affiliate** | As defined in the Restructuring Support Agreement. |
| **Agent** | As defined in the Restructuring Support Agreement. |
| **Agreement Effective Date** | As defined in the Restructuring Support Agreement. |
| **Allowed** | As to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law.  "Allow," "Allowing," and "Allowance" shall have correlative meanings. |
| **Avoidance Actions** | Any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors and any recovery, subordination, or other remedies that may be brought by and on behalf of the Debtors and their Estates arising under chapter 5 of the Bankruptcy Code, including actions or remedies under sections 502, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code or under similar or related state, federal, or foreign statutes and common law, including fraudulent transfer laws. |
| **Awards** | As defined in this Restructuring Term Sheet. |
| **Bankruptcy Code** | As defined in the Restructuring Support Agreement. |
| **Bankruptcy Court** | As defined in the Restructuring Support Agreement. |
| **Bankruptcy Rules** | As defined in the Restructuring Support Agreement. |
| **Business Day** | As defined in the Restructuring Support Agreement. |
| **Capitalized DIP Interest** | As defined in this Restructuring Term Sheet. |
| **Cash** | Legal tender of the United States of America. |
| **Cash Collateral Order** | As defined in the Restructuring Support Agreement. |
| **Causes of Action** | Any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character |

| **TERM** | **DEFINITION** |
|---|---|
|  | whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Actions. |
| **Chapter 11 Cases** | As defined in this Restructuring Term Sheet. |
| **Claim** | As defined in the Restructuring Support Agreement. |
| **Class A Interests** | Means, if the Litigation Proceeds Condition is not met,  non-certificated beneficial interests in the Litigation Trust to be distributed on a *pro rata* basis to holders of First Lien Claims on the Plan Effective Date as set forth herein and in the Litigation Trust Agreement, which shall entitle such holders to receive their *pro rata* share of the Class A Litigation Proceeds, up to the First Lien Claims Cap. |
| **Class A Litigation Proceeds** | 15% of the Litigation Proceeds to be distributed to Holders of First Lien Claims and Holders of Litigation Trust Class A Interests (if applicable), in each case, until such Holders have received total distributions equal to the amount of the First Lien Claims Cap, after which any overage will be deemed Class B Litigation Proceeds. |
| **Class B Interests** | Means, if the Litigation Proceeds Condition is not met, non-certificated beneficial interests in the Litigation Trust to be distributed on a *pro rata* basis to holders of Junior Funded Debt Claims on the Plan Effective Date as set forth herein and in the Litigation Trust Agreement, which shall entitle such holders to receive their *pro rata* share of the Class B Litigation Proceeds. |
| **Class B Litigation Proceeds** | 5% of the Litigation Proceeds, which percentage will be increased by any overages contemplated in the definitions of Class A Litigation Proceeds and Class C Litigation Proceeds herein.. |
| **Class C Interests** | Means, if the Litigation Proceeds Condition is not met, non-certificated beneficial interests in the Litigation Trust to be distributed to LitigationCo on the Plan Effective Date as set forth herein and in the Litigation Trust Agreement, which shall entitle LitigationCo to receive the Class C Litigation Proceeds. |
| **Class C Litigation Proceeds** | 80% of the Litigation Proceeds to be distributed to Holders of (a) if the Litigation Proceeds Condition is met, the DIP Claims (1) until $210 |

| **TERM** | **DEFINITION** |
|---|---|
| | million in principal and all Capitalized DIP Interest has been satisfied in full plus (2) $45 million on account of the Litigation CVR Proceeds or (b) if the Litigation Proceeds Condition is not met, the Convertible A Exit Notes, the Exit Term Loans, and the Litigation CVRs until such Convertible A Exit Notes, the Exit Term Loans, and the Litigation CVRs have been paid in full in Cash (or are otherwise converted, as applicable), after which any overage will be deemed Class B Litigation Proceeds. |
| **Commercial Term Sheet** | As defined in the Restructuring Support Agreement. |
| **Company Parties** | As defined in this Restructuring Term Sheet. |
| **Conditions Precedent to the Plan Effective Date** | As defined in this Restructuring Term Sheet. |
| **Confirmation Order** | As defined in the Restructuring Support Agreement. |
| **Consenting Creditors** | As defined in the Restructuring Support Agreement. |
| **Consenting First Lien Lenders** | As defined in the Restructuring Support Agreement. |
| **Consenting Parties** | As defined in the Restructuring Support Agreement. |
| **Consenting Unsecured Creditors** | As defined in the Restructuring Support Agreement. |
| **Consummation** | The occurrence of the Plan Effective Date. |
| **Convertible A Exit Notes** | The notes issued on the terms and conditions set forth in the term sheet attached hereto as **Exhibit 2**. |
| **Convertible B Exit Notes** | The notes issued on the terms and conditions set forth in the Convertible B Commitment Letter and the term sheet attached hereto as **Exhibit 4**. |
| **Convertible Notes** | Means, collectively, the Convertible A Exit Notes (if any) and the Convertible B Exit Notes. |
| **Cooperation Agreement** | As defined in the Restructuring Support Agreement. |
| **Credit Agreements** | As defined in the Restructuring Support Agreement. |
| **Debtor Releases** | As defined in this Restructuring Term Sheet. |
| **Debtors** | The Company Parties that commenced the Chapter 11 Cases. |
| **Definitive Documents** | As defined in the Restructuring Support Agreement. |

| **TERM** | **DEFINITION** |
|---|---|
| **DIP Commitment Letter** | As defined in this Restructuring Term Sheet. |
| **DIP Commitment Parties** | As defined in this Restructuring Term Sheet. |
| **DIP Commitment Party Investment Option** | Means the option for the Initial DIP Commitment Parties to invest up to $50 million in New TopCo (which investment will then be invested by New TopCo in New HoldCo), based on a $500 million equity valuation for New HoldCo, which option may be exercised by the Initial DIP Commitment Parties on or before the nine-month anniversary of the Plan Effective Date. |
| **DIP Credit Agreement** | The credit agreement evidencing the DIP Facility, substantially in the form of the DIP Credit Agreement filed in the Chapter 11 Cases at Docket No. 1695-1. |
| **DIP Documentation** | The DIP Credit Agreement, the DIP Commitment Letter, and all other agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or evidencing the DIP Loans issued pursuant to the DIP Credit Agreement, as such documents may be amended, supplemented, or otherwise modified from time to time in accordance with their terms |
| **DIP Facility** | As defined in this Restructuring Term Sheet. |
| **DIP Lenders** | As defined in this Restructuring Term Sheet. |
| **DIP Loans** | As defined in the Restructuring Support Agreement. |
| **DIP MOIC Equity** | As defined in this Restructuring Term Sheet. |
| **DIP Order** | As defined in this Restructuring Term Sheet. |
| **DIP Premium Equity** | As defined in this Restructuring Term Sheet. |
| **Disclosure Statement** | As defined in the Restructuring Support Agreement. |
| **Disclosure Statement Order** | As defined in the Restructuring Support Agreement. |
| **DSG** | Diamond Sports Group, LLC |
| **Entity** | As defined in the Restructuring Support Agreement. |
| **Estate** | The estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case. |
| **Exculpated Parties** | Means: (a) each Debtor and (b) the UCC and each of its members. |

| **TERM** | **DEFINITION** |
|---|---|
| **Exit Term Loans** | The loans entered into on the terms and conditions set forth in the term sheet attached hereto as **Exhibit 3**. |
| **Existing Equity Interest** | As defined in the Restructuring Support Agreement. |
| **File, Filed, or Filing** | File, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases. |
| **Final Order** | An order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order. |
| **First Lien Claims** | As defined in this Restructuring Term Sheet. |
| **First Lien Claims Cap** | As defined in this Restructuring Term Sheet. |
| **First Lien Credit Agreement** | As defined in the Restructuring Support Agreement. |
| **First Lien Group** | As defined in the Restructuring Support Agreement. |
| **First Lien Paydown** | As defined in this Restructuring Term Sheet. |
| **First Lien Term Loan Lenders** | The lenders party to the First Lien Credit Agreement from time to time. |
| **First Lien Term Loans** | As defined in the Restructuring Support Agreement. |
| **General Unsecured Claim** | Any unsecured claim against a Debtor that is not (i) an Administrative Claim, (ii) a Priority Tax Claim, (iii) an Other Secured Claim, (iv) an Other Priority Claim, (v) a First Lien Claim, (vi) a Second Lien Revolving Loan Claim, (vii) a Second Lien Term Loan Claim, (viii) a Second Lien Notes Claim, (ix) a Third Lien Term Loan Claim, (x) a Third Lien Notes Claim, (xi) an Unsecured Notes Claims, (xii) a Go-Forward Trade Claim, |

| **TERM** | **DEFINITION** |
|---|---|
| | (xiii) an Intercompany Claim, or (xiv) any claim arising under section 510(b) of the Bankruptcy Code. |
| **Go-Forward Trade Claim** | Means any prepetition unsecured claim against a Debtor held by a trade claimant that provides, or will provide, goods and services necessary to the operation of the Debtors' and Reorganized Debtors' business, as determined by the Debtors (in consultation with the Required DIP Commitment Parties and the Strategic Investor), and which trade claimant will continue to do business with the Reorganized Debtors after the Plan Effective Date; provided that such trade claimants will be consistent with the schedule provided by the Debtors to the UCC Advisors on February 21, 2024, and no trade claimant will be removed from such schedule without the reasonable consent of the UCC. |
| **Governmental Unit** | As defined in section 101(27) of the Bankruptcy Code. |
| **GUC Allocation** | Means the allocation of the Unsecured Claim Cash Distribution among, (i) in the reorganization contemplated by the Restructuring Support Agreement (as may be amended, modified, or supplemented in accordance with its terms), holders of General Unsecured Claims, and (ii) in an orderly wind down or liquidation of the Debtors, holders of General Unsecured Claims and Go-Forward Trade Claims, which allocation will be determined by the UCC in consultation with the Debtors and subject to the reasonable consent of the Debtors (not to be unreasonably withheld, conditioned, or delayed). |
| **Holdings** | Diamond Sports Intermediate Holdings LLC |
| **Initial DIP Commitment Parties** | As defined in the DIP Commitment Letter. |
| **Intercompany Claim** | Any Claim against a Company Party held by another Company Party. |
| **Intercompany Interest** | Any Interest in a Company Party held by another Company Party. |
| **Interest** | Collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into, or which are exercisable or exchangeable for, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement). |
| **Investment Options** | Collectively, the DIP Commitment Party Investment Option and the Strategic Investor Investment Option |

| TERM | DEFINITION |
|---|---|
| **Junior Creditor Equity Distribution** | 10% of the New TopCo Equity that is issued and outstanding on the Plan Effective Date, which will be issued to holders of Class 4 Claims on the Plan Effective Date, subject to dilution by the Convertible A Exit Notes and the DIP Commitment Party Investment Option. |
| **Junior Funded Debt Claims** | As defined in this Restructuring Term Sheet. |
| **Lien** | As defined in section 101(37) of the Bankruptcy Code. |
| **Litigation CVR Proceeds** | $45 million in Cash from the Class C Litigation Proceeds. |
| **Litigation CVRs** | As defined in this Restructuring Term Sheet. |
| **Litigation Proceeds** | Means the net proceeds of the Sinclair-Related Litigations, which, if the Litigation Proceeds Condition is met, shall be (a) $495 million in Cash plus (b) Cash in the aggregate amount of Sinclair Settlement Extension Payments (if any) paid pursuant to the Sinclair Settlement Order. |
| **Litigation Proceeds Condition** | Means the occurrence of the Sinclair Release Effective Date on or prior to the Plan Effective Date. |
| **Litigation Trust** | As defined in this Restructuring Term Sheet. |
| **Litigation Trust Agreement** | As defined in this Restructuring Term Sheet. |
| **Litigation Trust Assets** | If the Litigation Proceeds Condition is not met, collectively: (a) the rights of the Debtors in the Sinclair-Related Litigations and the Sinclair Settlement (other than the deposit from the Sinclair Settlement (if any) and any Sinclair Settlement Extension Payments (if any), in each case, if received prior to the Plan Effective Date and distributed as set forth in this Restructuring Term Sheet) and (b) the Litigation Trust Funding Amount. |
| **Litigation Trust Funding Amount** | As defined in this Restructuring Term Sheet. |
| **Litigation Trustee** | As defined in this Restructuring Term Sheet. |
| **Management Incentive Plan** | As defined in this Restructuring Term Sheet. |
| **Management Services Agreement** | Means that certain Management Services Agreement, dated as of August 23, 2019, by and between Sinclair Television Group, Inc. and DSG, as modified by that certain Letter Agreement, dated as of March 1, 2022, by and between Sinclair Television Group, Inc. and DSG, as may be amended from time to time, including by that certain amendment, dated as of March 1, 2022, by and between Sinclair Television Group, Inc. and DSG, extending the initial term of the Management Services Agreement. |

| **TERM** | **DEFINITION** |
|---|---|
| **Marquee Acquisition Right** | Means, if the Sinclair Release Effective Date occurs and subject to any restrictions under applicable law, Sinclair Parent's right to cause another party to acquire the Marquee Interests pursuant to the Sinclair Settlement Order, which right must be exercised by no later than the six-month anniversary of the Plan Effective Date. |
| **Marquee Interests** | As defined in this Restructuring Term Sheet. |
| **MVPD** | Multichannel video programming distributor or virtual multichannel video programming distributor. |
| **MIP Pool** | As defined in this Restructuring Term Sheet. |
| **New A/R Facility** | As defined in this Restructuring Term Sheet. |
| **New A/R Facility Credit Agreement** | As defined in this Restructuring Term Sheet. |
| **New A/R Facility Documents** | Collectively, the New A/R Facility Credit Agreement and any related agreements, documents, and instruments delivered or entered into in connection with the New A/R Facility, including any purchase and sale agreements, deposit account control agreements, back-up servicing agreements, new limited liability company agreements, and other documents related to or executed in connection therewith, which shall be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Parties. |
| **New Board** | The board of managers of New HoldCo. |
| **New Equity** | Collectively, the New HoldCo Equity and the New TopCo Equity. |
| **New HoldCo** | As defined in this Restructuring Term Sheet. |
| **New HoldCo Equity** | As defined in this Restructuring Term Sheet. |
| **New Intermediate HoldCo** | As defined in this Restructuring Term Sheet. |
| **New Lower-Tier HoldCo** | As defined in this Restructuring Term Sheet. |
| **New Organizational Documents** | The organizational and governance documents for the Reorganized Debtors (including New HoldCo and New TopCo), including, without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements or partnership agreements (or equivalent governing documents), as applicable, in any such case which shall be consistent with the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to |

| **TERM** | **DEFINITION** |
|---|---|
| | the Required DIP Commitment Parties and the Strategic Investor, and with the reasonable consent of the Company Parties (which shall not be unreasonably withheld, conditioned, or delayed). |
| **New TopCo** | As defined in this Restructuring Term Sheet. |
| **New TopCo Equity** | As defined in this Restructuring Term Sheet. |
| **Non-Released Party** | If the Litigation Proceeds Condition is not met:  (a) any Sinclair Party or any Sinclair-Related Litigations Defendant; (b) each such Sinclair Party's or Sinclair-Related Litigations Defendant's current and former Affiliates (other than DSG and its direct and indirect subsidiaries); and (c) each such Sinclair Party's or Sinclair-Related Litigations Defendant's and their current and former Affiliates' (other than DSG and its direct and indirect subsidiaries) current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, participants, affiliated investment funds or investment vehicles, managed accounts or funds, and each of their respective current and former members, equity holders, officers, directors, managers, principals, employees, agents, advisory board members, investment fund advisors or managers, investment managers, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. |
| **Notes Indentures** | As defined in the Restructuring Support Agreement. |
| **Notes Trustees** | As defined in the Restructuring Support Agreement. |
| **Other Priority Claim** | Any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claim** | Any secured claim that is not a First Lien Claim, a Second Lien Revolving Loan Claim, a Second Lien Term Loan Claim, a Second Lien Notes Claim, a Third Lien Term Loan Claim, or a Third Lien Notes Claim. |
| **Party or Parties** | As defined in the Restructuring Support Agreement. |
| **Person** | As defined in the Restructuring Support Agreement. |
| **Petition Date** | As defined in the Restructuring Support Agreement. |
| **Plan** | As defined in the Restructuring Support Agreement. |
| **Plan Effective Date** | As defined in the Restructuring Support Agreement. |

| **TERM** | **DEFINITION** |
|---|---|
| **Plan Supplement** | As defined in the Restructuring Support Agreement. |
| **Preference Actions** | Any and all Causes of Action which any of the Debtors or the Estates have asserted or may assert under section 547 of the Bankruptcy Code or any state law equivalent or, to the extent such Causes of Action arise solely in connection with claims under section 547 of the Bankruptcy Code, section 550 of the Bankruptcy Code. |
| **Preference Waiver** | As defined in this Restructuring Term Sheet. |
| **Prior Restructuring Support Agreement** | Means that certain restructuring support agreement by and among the Company Parties and certain creditors, dated as of March 14, 2023, a copy of which is filed in the Chapter 11 Cases at Docket No. 26-2, as amended, modified, or supplemented from time to time in accordance with its terms. |
| **Priority Tax Claims** | Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Proof of Claim** | A proof of claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable bar date as established by the Bankruptcy Court. |
| **Reinstatement or Reinstated** | With respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **Released Party** | Means, collectively, and in each case in its capacity as such:  (a) each Debtor and Reorganized Debtor; (b) the Consenting Parties; (c) the Notes Trustees; (d) the Agents; (e) the UCC and each of its members; (f) if the Sinclair Release Effective Date occurs, the Sinclair-Related Litigations Defendants; and (g) with respect to each Person or Entity listed or described in any of the foregoing (a) through (f), each such Person's or Entity's current and former Affiliates, and each such Person's or Entity's and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, participants, affiliated investment funds or investment vehicles, managed accounts or funds, and each of their respective current and former members, equity holders, officers, directors, managers, principals, employees, agents, advisory board members, investment fund advisors or managers, investment managers, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; provided that the following Persons and Entities shall not be Released Parties: (i) a Person or Entity that either (A) elects to opt out of the releases contained in the Plan or (B) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before entry of the Confirmation Order; or (ii) other than (A) non-Debtor Diamond Sports Finance SPV, LLC, (B) any Debtor that is a member or equity holder (regardless of whether such interests are held |

| **TERM** | **DEFINITION** |
|---|---|
| | directly or indirectly) in a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, and (C) any members, directors, managers, officers, employees, or agents appointed by any Debtor at a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, any other Person or Entity affiliated with a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date and any non-Debtor Affiliates thereof; provided further that, notwithstanding anything to the contrary set forth herein, if the Sinclair Release Effective Date does not occur, the Released Parties shall not include the Non-Released Parties. |
| **Releasing Party** | Means, collectively, and in each case in its capacity as such:  (a) each Debtor and Reorganized Debtor; (b) the Consenting Parties; (c) all holders of Claims (except as set forth in the proviso herein); (d) the Notes Trustees; (e) the Agents; (f) if the Sinclair Release Effective Date occurs, the Sinclair-Related Litigations Defendants; and (g) with respect to each Person or Entity listed or described in any of the foregoing (a) through (f), each such Person's or Entity's current and former Affiliates, and each such Person's or Entity's and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, participants, affiliated investment funds or investment vehicles, managed accounts or funds, and each of their respective current and former members, equity holders, officers, directors, managers, principals, employees, agents, advisory board members, investment fund advisors or managers, investment managers, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; provided that the following Persons and Entities shall not be Releasing Parties: (i) a Person or Entity that either (A) elects to opt out of the releases contained in the Plan or (B) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before entry of the Confirmation Order; or (ii) other than (A) non-Debtor Diamond Sports Finance SPV, LLC, (B) any Debtor that is a member or equity holder (regardless of whether such interests are held directly or indirectly) in a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, and (C) any members, directors, managers, officers, employees, or agents appointed by any Debtor at a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, any other Person or Entity affiliated with a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date and any non-Debtor Affiliates thereof; provided further that, notwithstanding anything to the contrary set forth herein, if the Sinclair Release Effective Date does not occur, the Releasing Parties shall not include the Non-Released Parties. |
| **Reorganized Debtor** | Any Debtor, as reorganized pursuant to and under the Plan, including any successor thereto or any entity established to acquire, directly or |

| **TERM** | **DEFINITION** |
|---|---|
|  | indirectly, all or a portion of the assets of Holdings and/or its direct and indirect subsidiaries. |
| **Required Consenting First Lien Creditors** | As defined in the Restructuring Support Agreement. |
| **Required Consenting Parties** | As defined in the Restructuring Support Agreement. |
| **Required Consenting Unsecured Creditors** | As defined in the Restructuring Support Agreement. |
| **Required DIP Commitment Parties** | As defined in the Restructuring Support Agreement. |
| **Restructuring Support Agreement** | As defined in this Restructuring Term Sheet. |
| **Restructuring Transactions** | As defined in the Restructuring Support Agreement. |
| **Second Lien Claims** | As defined in this Restructuring Term Sheet. |
| **Second Lien Credit Agreement** | As defined in the Restructuring Support Agreement. |
| **Second Lien Noteholders** | The holders of Second Lien Notes from time to time. |
| **Second Lien Notes** | As defined in the Restructuring Support Agreement. |
| **Second Lien Notes Claims** | As defined in this Restructuring Term Sheet. |
| **Second Lien Notes Indenture** | As defined in the Restructuring Support Agreement. |
| **Second Lien Revolving Credit Facility** | The credit facility under the Second Lien Credit Agreement that provides for the extension of Second Lien Revolving Loans to the borrower thereunder. |
| **Second Lien Revolving Loan Claims** | As defined in this Restructuring Term Sheet. |
| **Second Lien Revolving Loan Lenders** | The lenders party to the Second Lien Credit Agreement from time to time that hold Second Lien Revolving Loans. |
| **Second Lien Revolving Loans** | As defined in the Restructuring Support Agreement. |

| **TERM** | **DEFINITION** |
|---|---|
| **Second Lien Term Loan Claims** | As defined in this Restructuring Term Sheet. |
| **Second Lien Term Loan Lenders** | The lenders party to the Second Lien Credit Agreement from time to time that hold Second Lien Term Loans. |
| **Second Lien Term Loans** | As defined in the Restructuring Support Agreement. |
| **Sinclair-Related Litigations** | Collectively (a) Adversary Proceeding Case No. 23-03134 against Sinclair Broadcast Group, Inc., Sinclair Television Group, Inc., Diamond Sports TopCo LLC, Diamond Sports Intermediate Holdings LLC, Diamond Sports Intermediate Holdings A LLC, Diamond Sports Holdings LLC, David Smith, Christopher Ripley, Lucy Rutishauser, Scott Shapiro, and Bally's Corporation (and any other defendants that may later be added), (b) Adversary Proceeding Case No. 23-03135 against JP Morgan Chase Funding Inc., and JP Morgan Chase & Co. (and any other defendants that may later be added), (c) any other litigation commenced by the Debtors against Sinclair Parties, and (d) any other litigation commenced by the Debtors against non-Sinclair Parties arising out of, or otherwise relating to, the same transactions or occurrences that are the subject of clauses (a) through (c) of this definition. |
| **Sinclair-Related Litigations Defendant** | Means, any Sinclair Party or any other Person or Entity that is or may be a defendant in any Sinclair-Related Litigations. |
| **Sinclair Parent** | Sinclair, Inc., a Maryland corporation. |
| **Sinclair Parties** | Collectively, Sinclair Parent and its Affiliates that are not Company Parties (or direct or indirect subsidiaries of Company Parties). |
| **Sinclair Release Effective Date** | Means the date on which the Debtors have received $495 million in Cash (excluding the receipt of any Sinclair Settlement Extension Payments, which payments are in addition to such $495 million Cash payment) pursuant to the Sinclair Settlement Order, which date must occur on or prior to the Sinclair Settlement Outside Date. |
| **Sinclair Settlement** | As defined in the Restructuring Support Agreement. |
| **Sinclair Settlement Extension Payments** | Means $6 million in non-refundable Cash payments to the Debtors for each 15-day extension to the Sinclair Settlement Outside Date paid to the Debtors in accordance with the Sinclair Settlement Order, which payments will not exceed $24 million in the aggregate. |
| **Sinclair Settlement Order** | Means an order of the Bankruptcy Court approving the terms of the Sinclair Settlement, substantially in the form of the proposed order filed in the Chapter 11 Cases at Docket No. 1658-2. |

| **TERM** | **DEFINITION** |
|---|---|
| **Sinclair Settlement Outside Date** | Means 60 calendar days following the date on which the Sinclair Settlement Order is entered by the Bankruptcy Court, as such date may be extended in exchange for Sinclair Settlement Extension Payments pursuant to the terms of the Sinclair Settlement Order, which date may not be extended beyond the date that is 120 calendar days following the date on which the Sinclair Settlement Order is entered by the Bankruptcy Court. |
| **Sports Leagues** | Collectively, Major League Baseball, the National Basketball Association, the National Hockey League, and the teams in such leagues. |
| **Strategic Investor Investment Option** | Means the option for the Strategic Investor to invest up to $50 million in New HoldCo, based on a $500 million equity valuation for New HoldCo, which option may be exercised by the Strategic Investor on or before the nine-month anniversary of the Plan Effective Date pursuant to the terms of the Convertible B Exit Notes Commitment Letter. |
| **Take Back Term Loans** | As defined in this Restructuring Term Sheet. |
| **Take Back Term Loans Term Sheet** | As defined in this Restructuring Term Sheet. |
| **Take Back Exit Facility** | As defined in this Restructuring Term Sheet. |
| **Third Lien Claims** | As defined in this Restructuring Term Sheet. |
| **Third Lien Credit Agreement** | As defined in the Restructuring Support Agreement. |
| **Third Lien Noteholders** | The holders of Third Lien Notes from time to time. |
| **Third Lien Notes** | As defined in the Restructuring Support Agreement. |
| **Third Lien Notes Claims** | As defined in this Restructuring Term Sheet. |
| **Third Lien Notes Indenture** | As defined in the Restructuring Support Agreement. |
| **Third Lien Term Loan Claims** | As defined in this Restructuring Term Sheet. |
| **Third Lien Term Loan Lenders** | The lenders party to the Third Lien Credit Agreement from time to time. |
| **Third Lien Term Loans** | As defined in the Restructuring Support Agreement. |
| **Third-Party Release** | As defined in this Restructuring Term Sheet. |

| **TERM** | **DEFINITION** |
|---|---|
| **Transaction Expenses** | As defined in the Restructuring Support Agreement. |
| **UCC** | As defined in the Restructuring Support Agreement. |
| **UCC Settlement** | As defined in the Restructuring Support Agreement. |
| **Unsecured Claim Cash Distribution** | Means, either: (i) in the reorganization contemplated by the Restructuring Support Agreement (as may be amended, modified, or supplemented in accordance with its terms), Cash in an amount equal to the lesser of (a) a dollar amount equal to a 6% Cash recovery on an aggregate basis to all holders of General Unsecured Claims and (b) $13 million; or (ii) in an orderly wind down or liquidation of the Debtors, Cash in an amount equal to the lesser of (a) a dollar amount equal to a 6% Cash recovery on an aggregate basis to all holders of General Unsecured Claims and Go-Forward Trade Claims and (b) $13 million. |
| **Unsecured Claims Reserve** | As defined in the DIP Order. |
| **Unsecured Noteholders** | The holders of Unsecured Notes from time to time. |
| **Unsecured Notes** | As defined in the Restructuring Support Agreement. |
| **Unsecured Notes Claims** | As defined in this Restructuring Term Sheet. |
| **Unsecured Notes Indenture** | As defined in the Restructuring Support Agreement. |
| **YES Interests** | As defined in this Restructuring Term Sheet. |

## Exhibit 1

**DIP Commitment Letter**

*EXECUTION VERSION*

January 16, 2024

Diamond Sports Group, LLC
2960 Post Road
Southport, CT 06890
Attention: David Preschlack
Email: david.preschlack@ballysports.com

## DIP FACILITY COMMITMENT LETTER

### SUBORDINATED SECURED SUPER-PRIORITY
### DEBTOR-IN-POSSESSION TERM LOAN FACILITY

Ladies and Gentlemen:

We understand that Diamond Sports Group, LLC, a Delaware limited liability company (the "**Company**") and certain of the Company's direct and indirect subsidiaries (such subsidiaries, the "**Guarantors**" and, together with the Company, collectively, the "**Company Parties**", "**Debtors**" and "**you**"), have filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") (such petitions, collectively, the "**Chapter 11 Cases**").  In connection with the Chapter 11 Cases, each DIP Commitment Party (as defined below) is pleased to inform you of its several but not joint commitment to provide (where applicable, in such entity's capacity as investment advisor or manager with respect to certain managed accounts or funds and/or one or more affiliates designated by such entities) to the Debtors, as debtors and debtors-in-possession during the Chapter 11 Cases, in each case, on the terms, and subject to the conditions set forth in Section 1 of this letter agreement (together with the Term Loan DIP Facility Term Sheet attached hereto as Annex I (together with all attachments thereto, the "**DIP Term Sheet**") and all other annexes, schedules, exhibits or attachments hereto, collectively, this "**DIP Commitment Letter**") the principal amount set forth opposite such DIP Commitment Party's name on Schedule I under the heading "Commitment Amount" (as such schedule may be updated in accordance with the terms hereof) hereto (each such amount, a "**Commitment Amount**") of a subordinated secured super-priority debtor-in-possession term loan facility (the "**DIP Facility**") in an aggregate principal amount of $450,000,000 ("**DIP Commitment**"), as set forth in the DIP Term Sheet.

Capitalized terms used in this DIP Commitment Letter but not defined herein shall have the meanings given to them in the DIP Term Sheet.  For the purposes of this DIP Commitment Letter, the term (i) "**Initial DIP Commitment Party**" means each of the financial institutions and other entities named on Schedule I hereto (where applicable, in such entity's capacity as investment advisor or manager with respect to certain managed accounts or funds and/or one or more affiliates designated by such entities) as of the date hereof, and "**DIP Commitment Parties**", "**we**" or "**us**" is a collective reference to the Initial DIP Commitment Parties and any Additional DIP Commitment Parties (as defined below) that become party to this agreement in accordance with Section 2 hereof and (ii) "**Transactions**" means, collectively, the entering into and funding of the DIP Facility and all transactions in connection therewith (including, without limitation, the payment of any related premiums, fees, costs and expenses (including professional fees)).

The Company's obligations in respect of the DIP Facility shall be guaranteed by the Guarantors, and the Debtors' obligations in respect of the DIP Facility shall constitute super-priority claims under section 364(c)(1) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, with seniority over certain other claims asserted against the Debtors, and be entitled to security interests under sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code in all DIP Collateral, in each case, subject to the relative priorities more fully described in the DIP Term Sheet.

The Debtors agree that (i) an institution acceptable to the Initial DIP Commitment Parties, in consultation with the Debtors, will act as the administrative agent in respect of the DIP Facility and (ii) such administrative agent will act as the collateral agent in respect of the DIP Facility (in such capacities, together with their successors and permitted assigns, in such capacities, the "**DIP Agent**") on the terms and subject to the conditions set forth in this DIP Commitment Letter and the DIP Term Sheet.

1.    <u>Conditions Precedent</u>.  The commitments of each DIP Commitment Party with respect to the DIP Facility and the availability and funding of the DIP Facility are in all respects subject to the satisfaction (or waiver by the Required DIP Commitment Parties (as defined below), in their sole discretion) of only the applicable conditions precedent set forth in the section of the DIP Term Sheet entitled "Conditions Precedent to Closing".

2.    <u>Additional DIP Commitment Parties; DIP Election Process</u>.  Following execution of this DIP Commitment Letter, additional parties may, solely with the consent of Initial DIP Commitment Parties holding a majority of the DIP Commitments on the date of this DIP Commitment Letter (the "**Majority Initial DIP Commitment Parties**"), become party to this DIP Commitment Letter as commitment parties (such parties, "**Additional DIP Commitment Parties**") and be allocated a portion of the DIP Commitments and the Commitment Premium hereunder (such allocation of DIP Commitments and the Commitment Premium, an "**Additional DIP Commitment Party Allocation**") as determined by the Majority Commitment Parties.  Each Additional DIP Commitment Party Allocation shall reduce the DIP Commitments of, and Commitment Premium payable to, each of the Initial DIP Commitments Parties on a pro rata basis (such reduction in DIP Commitments (pro rata based on the amount of the DIP Commitments) and Commitment Premium (pro rata based on the amount of the Commitment Premium)  a "**Pro Rata Reduction**"); <u>provided</u>, that, in no event shall Pro Rata Reductions, in the aggregate, (i) cause the DIP Commitments of any Initial DIP Commitment Party to be reduced by more than 15% from the amounts set forth in Schedule I on the date hereof or (ii) cause Commitment Premium payable to any Initial DIP Commitment Party to be reduced by more than 5% from the amounts set forth in <u>Schedule I</u> on the date hereof, in each case except to the extent such Pro Rata Reduction is agreed to by such Initial DIP Commitment Party; and <u>provided</u>, <u>further</u> that, any Initial DIP Commitment Party may agree to a reduction of its DIP Commitments and/or Commitment Premium on a greater than pro rata basis in connection with an Additional DIP Commitment Party Allocation.  To join this DIP Commitment Letter, any Additional DIP Commitment Party shall execute and deliver to counsel to the Debtors and counsel to the Initial DIP Commitment Parties, on a timely basis (i) a joinder to this DIP Commitment Letter in a form acceptable to the Majority Initial DIP Commitment Parties; (ii) if such Additional DIP Commitment Party is not already a party to the Restructuring Support Agreement, a Joinder (or similar term defined therein) thereto; and (iii) a completed accredited investor questionnaire confirming that such party is an "accredited

investor" (as defined by Rule 501 of the Securities Act) (the foregoing clauses (i)-(iii), collectively, the "**Additional DIP Party Documents**"). Promptly following receipt of the Additional DIP Party Documents, the Crossover Group Advisors (as defined below) shall calculate the Commitment Amount and Commitment Premium of each of the DIP Commitment Parties, and promptly thereafter shall (x) update Schedule I attached hereto to (1) reflect the names of the Additional DIP Commitment Parties, (2) update the Commitment Amounts for the Additional DIP Commitment Parties and the Initial DIP Commitment Parties and (3) update the amount of the Commitment Premium payable to each of the Additional DIP Commitment Parties and the Initial DIP Commitment Parties and (y) notify each DIP Commitment Party of its Commitment Amount and portion of the Commitment Premium. All questions concerning the completeness, execution and delivery (including the timeliness of delivery) of any documentation in connection with the joinder of the Additional DIP Commitment Parties will be determined jointly between the Company Parties and the Initial DIP Commitment Parties.

Following the filing of the motion to approve the DIP Facility, the Debtors and the DIP Commitment Parties shall coordinate with respect to the syndication of the DIP Facility to holders of Second Lien Claims and Unsecured Funded Debt Claims in the manner and in the amounts determined in accordance with DIP election procedures acceptable to the Required DIP Commitment Parties, with the reasonable consent of the Debtors (the "**DIP Election Procedures**", and the syndication of DIP Commitments and the DIP Facility pursuant thereto, the "**DIP Facility Syndication**"; and the lenders that are not DIP Commitment Parties electing to participate in such DIP Facility Syndication, the "**DIP Election Lenders**"); provided, that any DIP Election Lender that elects to participate in the DIP Facility Syndication shall become a party to the Restructuring Support Agreement prior to, or concurrently with, its election to participate in the DIP Facility Syndication. Notwithstanding the foregoing, in connection with the DIP Facility Syndication, no DIP Commitment Party shall be relieved, released or novated from its commitments and obligations hereunder (including its obligation with respect to the funding under the DIP Facility on the Closing Date) until after the initial funding of the DIP Facility has occurred on the Closing Date in accordance with the terms hereof; provided that, so long as the DIP Election Lenders have funded their allocated portion of the DIP Facility after giving effect to the DIP Facility Syndication, the amounts the DIP Commitment Parties are required to fund under the DIP Facility shall be reduced on a pro rata basis to the extent of such amounts so funded by the DIP Election Lenders.

Each of the parties hereto hereby agree that the Commitment Premium and the other obligations to the DIP Commitment Parties under this DIP Commitment Letter shall constitute part of the DIP Obligations and shall be subject to the DIP Subordination Annex in all respects.

3.    Information; Representations and Warranties; Covenants. Each Company Party represents and warrants that (i) all written information that has been, or will hereafter be, made available to the DIP Agent or any DIP Commitment Party or their financial or legal advisors by or on behalf of the Company Parties or any of your representatives in connection with the Transactions (other than the Projections (as defined below) and information of a general economic or industry nature, the "**Information**"), when taken as a whole, is and will be complete and correct in all material respects as of the time provided and does not and will not contain any untrue statement of a material fact known at the time such Information was provided or omit to state a then-known material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made, and (ii) all written financial

projections, if any, that have been or will be prepared by or on behalf of the Company Parties or any of their respective representatives and made available to the DIP Agent or any DIP Commitment Party or their financial or legal advisors in connection with the Transactions contemplated hereby (the "**Projections**") have been or will be prepared in good faith based upon reasonable assumptions at the time made and at the time the related Projections are made available to such parties (it being understood that (i) Projections are not to be viewed as certain, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond the Company Parties' control, (iii) no assurance can be given that the Projections will be realized and (iv) actual results may differ and such differences may be material).  If at any time from the date hereof until the effectiveness of the DIP Documents, you become aware that any of the representations and warranties in the preceding sentence would be materially incorrect if the Information or Projections were then being furnished, and such representations and warranties were then being made, at such time, then the Company Parties will promptly supplement, or cause to be promptly supplemented, the Information and the Projections so that such representations and warranties contained in this paragraph will be correct in all material respects at such time.  In issuing this DIP Commitment Letter and in arranging and providing the DIP Facility, the DIP Agent and the DIP Commitment Parties will be entitled to use, and to rely on the accuracy of, the Information and Projections furnished to them by or on behalf of the Company Parties and their respective affiliates, agents or representatives without responsibility for independent verification thereof.

4.      Indemnification.    The Debtors agree, jointly and severally, and irrespective of the occurrence of the Closing Date, to indemnify and hold harmless the DIP Agent and each DIP Commitment Party, in each case, in such capacities, and each of their respective affiliates, and each of their and their affiliates' respective officers, directors, employees, agents, advisors, legal counsel, consultants, representatives, controlling persons, members and successors and permitted assigns (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, expenses (including, without limitation, reasonable and documented out-of-pocket fees and disbursements of one counsel for all Indemnified Persons taken as a whole and, if reasonably necessary, a single local counsel for all Indemnified Persons taken as a whole in each relevant jurisdiction (which may be a single local counsel acting in multiple jurisdictions) and, solely in the case of any actual or perceived conflict of interest between Indemnified Persons where the Indemnified Persons affected by such conflict inform you of such conflict, one additional counsel and one additional local counsel in each relevant jurisdiction to each group of affected Indemnified Persons similarly situated, taken as a whole) and liabilities (including any actions or other proceedings commenced or threatened in respect thereof), joint or several, that may be incurred by or asserted or awarded against any Indemnified Person (including, without limitation, in connection with any action, investigation, litigation or proceeding or the preparation or conduct of a defense in connection therewith (whether or not such Indemnified Person is a party to any such action, investigation, litigation or proceeding)), in each case, arising out of, in connection with or related to this DIP Commitment Letter (including the DIP Term Sheet), the DIP Documents, the Transactions or any other transactions contemplated hereby or thereby, or any use made or proposed to be made with the proceeds of the DIP Facility, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from (i) such Indemnified Person's gross negligence or willful misconduct or (ii) a material breach of the obligations of such Indemnified Person under this DIP Commitment Letter.  The Debtors further agree to reimburse each Indemnified Person promptly

upon (but in any event within 10 calendar days of) demand for all legal and other expenses incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to any such investigation, litigation or proceeding to which the indemnity in this paragraph applies (including, without limitation, in connection with the enforcement of the indemnification obligations set forth herein).  In the case of any such investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective, whether or not such investigation, litigation or proceeding is brought by any Company Party, any securityholder or creditor of any Company Party, an Indemnified Person or any other person, or an Indemnified Person is otherwise a party thereto and whether or not the Transactions or any other transactions contemplated hereby are consummated.

No Indemnified Person shall be liable for any damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such damages have resulted from (in each case as finally determined by a court of competent jurisdiction in a final and non-appealable judgment) the willful misconduct or gross negligence of such Indemnified person.  Neither any Indemnified Person, nor other party hereto shall have any liability, for special, indirect, consequential or punitive damages in connection with, or as a result of this DIP Commitment Letter or the Transactions; provided that this sentence shall not limit your indemnification obligations set forth in the immediately preceding paragraph.

The Debtors further agree that, without the prior written consent of an Indemnified Person, the Company Parties will not enter into any settlement of any such investigation, litigation or other proceeding to which the indemnity in this Section 4 applies unless such settlement (i) includes an express and unconditional release of such Indemnified Person from the party bringing such lawsuit, claim or other proceeding of such Indemnified Person from liability and claims that are the subject matter of such proceedings and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of such Indemnified Person.

5.      Commitment Premium; Costs and Expenses.  In consideration for the Company Parties' right to cause the DIP Commitment Parties to make advances under the DIP Facility, the Company Parties shall pay a non-refundable premium to each DIP Commitment Party (or its designee) in the amount set forth opposite such DIP Commitment Party's name on Schedule I hereto under the heading "Commitment Premium" (the "**Commitment Premium**"), which shall be fully earned upon execution of this DIP Commitment Letter and be due and payable in U.S. dollars in immediately available funds on the Maturity Date of the DIP Facility; provided, however, that the Commitment Premium shall be paid in full on the date that this DIP Commitment Letter terminates or the date on which the Company Parties determine not to borrow the DIP Commitments.  As set forth above, in connection with the addition of Additional DIP Commitment Parties to this DIP Commitment Letter, the Commitment Premium payable to each of the Initial DIP Commitment Parties will be updated as reflected on a revised Schedule I attached hereto.  For the avoidance of doubt, the Commitment Premiums of the Initial DIP Commitment Parties will not be adjusted in connection with the DIP Facility Syndication.   The Commitment Premium, once paid, is nonrefundable and not creditable against any other payments to be made in connection with the Transactions or any other transactions contemplated by this DIP Commitment Letter or otherwise.  Notwithstanding anything to the contrary contained herein, solely to the extent an Acceptable Plan

(as defined in the DIP Term Sheet) is consummated in accordance with the terms of the Restructuring Support Agreement, the DIP Commitment Parties hereby agree that the Debtors may pay the Commitment Premium in the form and manner set forth such Acceptable Plan; provided, however than the receipt by any DIP Commitment Party of securities shall be subject to reasonable documentation to be delivered by such DIP Commitment Party to the Debtors.

The Company Parties, the Initial DIP Commitment Parties and the Additional DIP Commitment Parties, as applicable, shall treat the Commitment Premium, for U.S. federal income tax purposes, as resulting in "original issue discount" on the advances made and/or as a payment for an option or series of options to cause the Initial DIP Commitment Parties or the Additional DIP Commitment Parties to make advances under the DIP Facility, and not in either case as a payment for services, except to the extent otherwise required by a "determination" within the meaning of Section 1313(a) of the Internal Revenue Code of 1986, as amended. The Commitment Premium shall be paid free and clear of, and without deduction for, any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, except as otherwise required by law (but with appropriate gross-up for taxes to the extent provided in the DIP Documents). Without limiting the foregoing, the obligation of the Debtors to pay the Commitment Premium shall be absolute and unconditional and shall not be subject to reduction by way of setoff or counterclaim or otherwise (except to the extent provided in the DIP Documents). Without limiting the foregoing, the Commitment Premium shall not in any way be subject to any challenge, contest, attack, rejection, offset, recoupment, defense, subordination (whether contractual, equitable or otherwise), recharacterization, avoidance, disallowance, impairment, disgorgement, or any other claim, counterclaim or cause of action of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity.

The Company Parties shall jointly and severally pay all reasonable and documented fees and out-of-pocket costs, expenses and disbursements of the Initial DIP Commitment Parties incurred up to the date of termination of this DIP Commitment Letter, including, without limitation, all reasonable and documented fees and out-of-pocket costs, expenses and disbursements of the following: (i) Paul Hastings LLP, as counsel to certain of the DIP Commitment Parties, (ii) PJT Partners, as financial advisor to certain of the DIP Commitment Parties, and (iii) such other professional advisors hired by the Initial DIP Commitment Parties subject to the consent of the Company, which consent shall not be unreasonably withheld or delayed (clauses (i) through (iii), the "**Crossover Group Advisors**"), in each case, in connection with the DIP Facility and the preparation, negotiation, execution and delivery of this DIP Commitment Letter, the DIP Documents, the Final DIP Order, the administration of the DIP Facility and the Chapter 11 Cases, including, without limitation, (1) all due diligence, syndication, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Agent and the Initial DIP Commitment Parties in connection therewith, (2) the enforcement of any rights and remedies hereunder, (3) commencing, defending or intervening in any litigation or in filing a petition, complaint, answer, motion or other pleadings in any legal proceeding arising out of, in connection with or related to the DIP Facility, the DIP Obligations, the DIP Documents, the Final DIP Order, the Transactions or any other transactions contemplated hereby or thereby, and (4) taking any other action in or with respect to any suit or proceeding (bankruptcy or otherwise) described in clauses (1) through (3) above. Except as may otherwise be

6

provided in the Final DIP Order, the Company Parties shall promptly pay all fees and out-of-pocket costs, expenses and disbursements of the DIP Agent and the Initial DIP Commitment Parties required by this paragraph promptly after demand is made therefor from any of the DIP Agent or the Initial DIP Commitment Parties (and no later than 10 calendar days after such demand, which shall be inclusive of, and run concurrent with, any fee review period that may be set forth in the Final DIP Order).

6.      Confidentiality.  By accepting delivery of this DIP Commitment Letter, each Company Party agrees that the existence, contents and terms of this DIP Commitment Letter (including the DIP Term Sheet) are confidential and are solely for its confidential use in connection with the transactions contemplated hereby and that, without the prior written consent of the DIP Commitment Parties, neither the existence, nor the terms and contents hereof and thereof shall be disclosed by it to any person or entity (whether legal or other entity), other than affiliates of the Company Parties and the Company and its affiliates' officers, directors, employees, agents, representatives, equity-holders, accountants, attorneys and other advisors of the Debtors, and then only on a confidential basis in connection with the transactions contemplated hereby. Notwithstanding the foregoing, the Company Parties may disclose this DIP Commitment Letter (including, for the avoidance of doubt, the DIP Term Sheet) (i) as compelled in a judicial or administrative proceeding or as otherwise required by applicable law (in which case the Company Parties agree to provide prompt written notice thereof to the DIP Commitment Parties, to the extent legally permitted to do so), (ii) in filings with the Bankruptcy Court presiding over the Chapter 11 Cases (provided that the commitment schedule attached hereto and any information concerning the amount of any pre-petition claims or interests (if any) held by any of the DIP Commitment Parties (other than the aggregate amount of the Commitment Premium of all DIP Commitment Parties) shall not be publicly disclosed without the prior written consent of each affected DIP Commitment Party or unless otherwise ordered by the Bankruptcy Court) and (iii) in any suit or legal action or proceeding relating to the Company Parties' exercise of any rights or remedies hereunder (in which case the Company Parties agree to provide prompt written notice thereof to the DIP Commitment Parties and to limit disclosure to relevant proceedings and court filings relating thereto), it being understood and agreed that this clause (iii) shall not permit any disclosure in the context of any marketing or press materials or other form of general public release.

7.      No Third Party Reliance, Etc.  The agreements of the DIP Commitment Parties hereunder and of any DIP Lender that issues a commitment to provide financing under the DIP Facility are made solely for the benefit of the Company Parties and may not be relied upon or enforced by any other person or entity; provided, however, that the DIP Agent is a third party beneficiary of the agreements of the DIP Commitment Parties in this DIP Commitment Letter and of the provisions of Sections 3 and 4 hereof and shall be entitled to enforce such agreements and provisions.

8.      Sharing Information; Absence of Fiduciary Relationship.  You acknowledge that the DIP Agent, each DIP Commitment Party and/or one or more of their affiliates may conduct business with, have connection with, and/or provide financing, equity capital or other services (including financial advisory services) to parties whose interests may conflict with the interests of the Company Parties.  None of the DIP Agent, any DIP Commitment Party, or any of their affiliates will use in connection with the Transactions, or furnish to the Debtors, confidential information that the DIP Agent, such DIP Commitment Party or any of their affiliates obtained or may obtain from any other person.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you, on the one hand, and the DIP Agent and/or any of the DIP Commitment Parties, on the other hand, has been or will be created in respect of any of the Transactions or any other transactions contemplated by this DIP Commitment Letter or the DIP Term Sheet, irrespective of whether the DIP Commitment Parties or their respective affiliates have advised or are advising you on other matters, and (b) you will not bring or otherwise assert any claim against the DIP Agent or any of the DIP Commitment Parties for breach of fiduciary duty or alleged breach of fiduciary duty, and further agree that none of the DIP Agent and DIP Commitment Parties shall have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person or entity asserting a fiduciary duty claim on behalf of or in right of the Company Parties, including the Company Parties' stockholders, employees or creditors.

You further acknowledge that each of the DIP Agent and the DIP Commitment Parties and their respective affiliates (collectively, the "**DIP Secured Parties**") may be a full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services.  In the ordinary course of business, any of the DIP Secured Parties may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, you and your subsidiaries and other companies with which you or your subsidiaries may have commercial or other relationships.  With respect to any securities and/or financial instruments so held by any of the DIP Secured Parties, or any of its/their customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. Accordingly, there may be situations where one or more of the DIP Secured Parties and/or their clients either now have or may in the future have interests, or take actions, that may conflict with the Company Parties' interests.  For example, the DIP Secured Parties may, in the ordinary course of business, engage in trading in financial products or undertake other investment businesses for their own account or on behalf of other clients, including without limitation, trading in or holding long, short or derivative positions in securities, loans or other financial products of the Company Parties or its affiliates or other entities connected with the DIP Facility or the transactions contemplated hereby.

9.    Commitment Termination.  This DIP Commitment Letter and each DIP Commitment Party's commitments and undertakings set forth in this DIP Commitment Letter will terminate and expire automatically on the earliest to occur of:

(a)    11:59 p.m., New York City time, on January 16, 2024 (as such time may be extended with the prior written consent of the Initial DIP Commitment Parties and the Company) unless by such time each of the Company Parties and each of the Initial DIP Commitment Parties executes and delivers this DIP Commitment Letter;

(b)    11:59 p.m., New York City time, on the date that is five business days following the execution of this DIP Commitment Letter (as such time may be extended with the prior written consent of the Required DIP Commitment Parties and the Company) unless by such time the Company Parties have filed a motion with the Bankruptcy Court seeking approval of the Final DIP Order (the "DIP Motion");

(c)      11:59 p.m., New York City time, on the date that is 30 days after the initial filing of the DIP Motion (as such time may be extended with the prior written consent of the Required DIP Commitment Parties and the Company) unless by such time the Final DIP Order has been entered by the Bankruptcy Court;

(d)      the Closing Date, or the date that is three business days after the date of entry of the Final DIP Order if the Closing Date shall not have occurred by such date;

(e)      the earliest date on which any issuance, placement, incurrence or funding of debt, loans, securities or other financing (including equity financings) by any of the Company Parties with third parties outside the ordinary course of business (other than the DIP Facility) is consummated; or

(f)      the filing by any Debtor of any motion or request in the Chapter 11 Cases or in any other legal proceeding seeking, or the entry by the Bankruptcy Court of, an order (i) directing the appointment of a chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (iii) dismissing the Chapter 11 Cases.

10.    <u>Assignments; Designations</u>.

(a)      This DIP Commitment Letter may not be assigned by any Company Party to any other person or entity without the prior written consent of each DIP Commitment Party, and any attempted assignment without such consent shall be void.  Subject in all respects to the rights of the DIP Commitment Parties under <u>Section 10(b)</u> and <u>(c)</u>, the DIP Commitment Parties may not assign this DIP Commitment Letter, directly or indirectly (by operation of law or otherwise), without the prior written consent of the Required DIP Commitment Parties (other than, for the avoidance of doubt, the reallocation of the Commitment Amounts and Commitment Premiums expressly contemplated herein).  Any attempted or purported assignment in contravention of this <u>Section 10</u> shall be null and void and of no force or effect.

(b)      Each DIP Commitment Party's obligations to fund all or any portion of its DIP Commitment set forth in this DIP Commitment Letter and any of its rights and obligations herein may be assigned by such DIP Commitment Party (i) to one or more of its affiliates or funds or accounts that are managed, advised or sub-advised by such DIP Commitment Party or its affiliates (each, a "**Related Purchaser**"), (ii) to any other DIP Commitment Party, and (iii) solely with the prior written consent of the Company, such consent not to be unreasonably withheld or delayed, to any other person or entity; <u>provided</u>, <u>however</u>, that if any such assignee is not a party to the Restructuring Support Agreement, such party must execute a joinder to the Restructuring Support Agreement.  Any assignment shall be evidenced by an assignment agreement in form and substance reasonably satisfactory to such assigning DIP Commitment Party and the Company, executed by each of the assignor and the assignee, which shall be delivered to the Company, shall state the aggregate principal amount of the DIP Commitment so assigned.  The Company shall maintain a copy of each assignment agreement delivered to it and a register for the recordation of the names of each DIP Commitment Party or other person that has an obligation to fund all or a portion of the DIP Commitment or is entitled to a Commitment Premium and the amount of the

applicable commitments of, and Commitment Premium (to the extent not pro rata based on commitments) with respect to, each such DIP Commitment Party or other person pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error.

(c)     Each DIP Commitment Party shall have the right to designate by written notice to the Company prior to any applicable Closing Date that some or all of its DIP Commitment shall be funded by one or more Related Purchasers, which notice of designation may be delivered via email (it being understood such notice shall not relieve such DIP Commitment Party of its commitments hereunder).

11.     Investment Option.   If an Acceptable Plan (as defined in the DIP Term Sheet) is consummated in accordance with the terms of the Restructuring Support Agreement, the Initial DIP Commitment Parties shall be entitled to receive an option to purchase common stock of New TopCo (as defined in the Restructuring Support Agreement) on the terms set forth in the Restructuring Support Agreement (the "**Investment Option**"). The terms of the Investment Option shall be more fully set forth in the Acceptable Plan or related documents (which may be included in the plan supplement for the Acceptable Plan, and the Investment Option shall (a) be available to the Initial DIP Commitment Parties in the amount set forth opposite such Initial DIP Commitment Party's name on Schedule I hereto under the heading "Investment Option Amount"; (b) be exercisable by the holders thereof on or before the nine month anniversary of the effective date of the Acceptable Plan, (c) contain customary "soak up" rights if each of the Initial DIP Commitment Parties do not exercise such rights in full, and (d) contain other terms (including in the documents governing the Investment Option) in form and substance acceptable to the Required DIP Commitment Parties; provided, however that the receipt by any DIP Commitment Party of securities shall be subject to reasonable documentation to be delivered by such DIP Commitment Party to the Debtors, including a completed accredited investor questionnaire confirming that such party is an "accredited investor" (as defined by Rule 501 of the Securities Act).

12.     Amendments.  This DIP Commitment Letter may not be amended or any provision hereof waived or modified except by written agreement signed by Initial DIP Commitment Parties whose aggregate DIP Commitments constitute more than sixty six and two thirds percent (66.67%) of the aggregate DIP Commitments of all Initial DIP Commitment Parties (the "**Required DIP Commitment Parties**") (which amendment, waiver or modification may be effected via email); provided, however that any amendment or modification to this DIP Commitment Letter that would have the effect of changing the Commitment Amount, the Commitment Premium or Investment Option of any DIP Commitment Party (other than as provided in Section 2 hereof) shall require the prior written consent of such DIP Commitment Party.

13.     Governing Law; Waiver of Jury Trial; Jurisdiction.  This DIP Commitment Letter, and the rights and obligations of the parties hereunder and thereunder and any claim, controversy or dispute arising under or in connection herewith or therewith shall be governed by, and construed in accordance with, the laws of the State of New York. Each party hereto irrevocably waives, to the fullest extent permitted by law, all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this DIP Commitment Letter or the Transactions or the actions of the parties hereto in the negotiation, performance or enforcement hereof. By its execution and delivery of this DIP Commitment Letter,

each of the parties hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall have exclusive jurisdiction with respect to any matter under or arising out of or in connection with this DIP Commitment Letter; provided, that the parties acknowledge and agree that any appeals from the Bankruptcy Court may have to be heard by a court other than the Bankruptcy Court.

14.     Counterparts.   This DIP Commitment Letter may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original and all of which, taken together, shall constitute one and the same DIP Commitment Letter.  Delivery of an executed counterpart of a signature page to this DIP Commitment Letter by electronic transmission (e.g., "pdf") shall be as effective as delivery of a manually executed counterpart of this DIP Commitment Letter.

15.     Entire Agreement.   This DIP Commitment Letter sets forth the entire agreement among the parties with respect to the matters addressed herein and therein and supersedes all prior communications, written or oral, with respect hereto.

16.     Termination.   You may terminate this DIP Commitment Letter upon written notice to the DIP Agent and the DIP Commitment Parties at any time; provided, that the provisions of Section 3, Section 4, Section 5, Section 6, Section 7, the second paragraph of Section 8, Section 12, Section 13 and this Section 16 of this DIP Commitment Letter shall survive the expiration and termination of this DIP Commitment Letter unless, with respect to each such provision, such provision shall be superseded by a comparable provision in the DIP Documents.

17.     PATRIOT Act Notification.   The DIP Commitment Parties hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "**PATRIOT Act**"), the DIP Commitment Parties and each DIP Lender is required to obtain, verify and record information that identifies the issuer and each guarantor under the DIP Facility, which information includes the name, address, tax identification number and other information regarding the issuer and each guarantor that will allow the DIP Commitment Parties or such DIP Lender to identify the issuer and each guarantor in accordance with the PATRIOT Act and is effective as to each DIP Commitment Party and each DIP Lender.

Please indicate your acceptance of the provisions hereof by signing the enclosed copy of this DIP Commitment Letter and returning them to the DIP Commitment Parties.

The DIP Commitment Parties are pleased to have been given the opportunity to assist you in connection with this financing.

*[Remainder of Page Intentionally Left Blank]*

[*DIP Commitment Party signature pages on file with the Company Parties*]

DocuSign Envelope ID: F1176C17-B6CE-4BDD-8352-0AA443338295

Accepted and agreed to as of the date first written above:

**DIAMOND SPORTS GROUP, LLC**

By: _David DeVoe_____
Name: David F. DeVoe, Jr.
Title: Chief Financial Officer

[*Company Signature Page to the DIP Commitment Letter*]

**Schedule I**

**Commitment Parties and Allocations**

| DIP Commitment Party | Commitment Amount | Commitment Premium | Investment Option Amount |
|---|---|---|---|

| **Total** | **$450,000,000** | **$67,500,000** | **$50,000,000** |

**Annex I**

**<u>DIP Term Sheet</u>**

[See attached]

**Diamond Sports Group, LLC**

**Term Loan DIP Facility Term Sheet**

This term sheet (together with all annexes, exhibits and schedules attached hereto, this "**DIP Term Sheet**") sets forth certain material terms of the proposed DIP Facility (as defined below). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the DIP Facility Commitment Letter, dated as of January 16, 2024 (together with all annexes, exhibits and schedules attached thereto, in each case, as amended, supplemented or modified in accordance with its terms, the "**DIP Commitment Letter**"), to which this DIP Term Sheet is attached.

| | |
|---|---|
| **Borrower** | Diamond Sports Group, LLC, a Delaware limited liability company (the "**Borrower**"), in its capacity as a debtor and debtor-in-possession. |
| **Guarantors** | Each of the Borrower's direct and indirect subsidiaries that are debtors in the Chapter 11 Cases (as defined in the Restructuring Support Agreement (as defined below)), each in their respective capacities as debtors and debtors-in-possession (the "**Guarantors**" and, together with the Borrower, the "**Debtors**"). |
| **Administrative Agent and Collateral Agent** | The administrative agent and the collateral agent for the DIP Lenders (as defined below) with respect to the DIP Facility (in such capacities, the "**DIP Agent**") shall be a financial institution selected by the Initial DIP Commitment Parties (as defined in the DIP Commitment Letter). |
| **DIP Lenders** | Such financial institutions or entities who become party to the DIP Credit Agreement (as defined below) in accordance with its terms shall be lenders (each a "**DIP Lender**", and collectively, the "**DIP Lenders**").<br><br>Following the filing of the motion to approve the DIP Facility, all holders of Second Lien Claims and Unsecured Funded Debt Claims that execute the Restructuring Support Agreement by and among the Debtors, certain creditors of the Debtors, and a strategic investor (the "**Restructuring Support Agreement**") will have the opportunity to become DIP Lenders pursuant to syndication procedures acceptable to the Required DIP Commitment Parties (as defined in the DIP Commitment Letter) in consultation with the Borrower (the "**DIP Syndication**"). |
| **Final DIP Order** | The order approving the DIP Facility on a final basis (the "**Final DIP Order**"), which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Borrower, the Required DIP Commitment Parties and the Majority 1L Lenders (as defined in the Final Cash Collateral Order (as defined below)), and subject to the following paragraph, shall authorize and approve, among other matters, (i) the Debtors' entry into the DIP Documents (as defined below), (ii) the making of the DIP Loans (as defined below), (iii) the granting of the super-priority claims and liens against the Debtors and their assets, which claims and liens shall be subject to the priorities set forth in Annex I attached hereto and subject in all cases to the Carve-Out and the DIP Subordination Annex (as defined below), in accordance with the DIP Documents, respectively, with respect to the DIP Collateral (as defined below); (iv) the continued use of cash collateral contingent upon the payment in full in cash of the First Lien |

| | |
|---|---|
| | Paydown on the terms set forth herein, and (v) the granting of adequate protection.<br><br>From and after the date of entry thereof, the Final DIP Order shall supersede the Corrected Final Order (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief [Dkt. No. 572] (the "**Final Cash Collateral Order**"); provided, however, that (x) the Final DIP Order shall modify the Final Cash Collateral Order solely to the extent necessary to implement the DIP Facility (as defined below) and the transactions contemplated by the Restructuring Support Agreement and (y) all adequate protection, other protections, waivers, releases and all stipulation, adequate protection, waivers, releases and other protections granted to the Prepetition First Lien Secured Parties (as defined in the Final Cash Collateral Order) under the Final Cash Collateral Order shall be incorporated into the Final DIP Order without any modification or amendment unless otherwise agreed by the Majority 1L Lenders. |
| **Type and Amount of the DIP Facility** | Subordinated secured super-priority debtor-in-possession term loan facility (the "**DIP Facility**") in an aggregate principal amount of commitments of $450 million (the "**DIP Commitments**"), pursuant to which the DIP Lenders shall provide new money term loans (the "**DIP Loans**") in a single borrowing on the Closing Date.<br><br>DIP Loans that are repaid or prepaid may not be reborrowed. |
| **Use of Proceeds** | Solely in accordance with and subject to the credit agreement governing the terms of the DIP Facility (the "**DIP Credit Agreement**", and together with all security and collateral agreements related thereto, the "**DIP Documents**"), the proceeds of the DIP Facility may be used only (1) for the First Lien Paydown (as defined below); (2) to pay costs and expenses associated with the Chapter 11 Cases; and (3) for general working capital purposes, in each case, in accordance with and subject to the DIP Documents and the Final DIP Order (including the budget approved for variance testing), subject to permitted variances. |
| **Closing Date** | The date of the satisfaction (or waiver) of each of the conditions precedent to the DIP Loans after entry of the Final DIP Order (the "**Closing Date**"). |
| **Maturity** | The DIP Loans will mature on the earliest to occur of (the "**Maturity Date**"):<br><br>(i)    November 30, 2024;<br><br>(ii)    the effective date of a chapter 11 plan of any of the Debtors, which has been confirmed by an order entered by the Bankruptcy Court (as defined in the Restructuring Support Agreement) in any of the Chapter 11 Cases;<br><br>(iii)    dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code, in each case with respect to a Significant Subsidiary (to be defined);<br><br>(iv)    the acceleration of the DIP Loans and the termination of the DIP |

|  | Commitments; and |
|  | (v)    the closing of a sale of all or substantially all assets or equity of the Debtors (other than to another Debtor). |
|  | The DIP Documents shall provide that repayment of the DIP Loans may be subject to alternative treatment under an Acceptable Plan and in accordance with the terms of the Restructuring Support Agreement. |
| **Amortization** | None. |
| **Interest** | 10.0% per annum, comprised of (i) 5.0% per annum payable monthly in cash and (ii) 5.0% per annum payable in kind, compounded monthly ("**PIK Interest**").<br><br>Default Interest: 2.0% per annum. |
| **Premiums** | <u>Commitment Premium</u>:  15% of the total DIP Commitments, payable to the DIP Commitment Parties on the terms set forth in the DIP Commitment Letter, which shall be fully earned upon the execution of the Commitment Letter and payable upon the maturity (including upon an acceleration) of the DIP Facility (the "**Commitment Premium**").  The Commitment Premium shall constitute part of the DIP Obligations, shall be secured by the DIP Collateral and shall be payable on a *pari passu* basis with the DIP Loans.<br><br><u>MOIC</u>: an amount equal to 0.4 <u>multiplied</u> by the total principal amount of DIP Loans to be paid or repaid, <u>less</u> the aggregate amount received by the DIP Lenders in cash on account of payments of cash interest on the DIP Loans (excluding default interest), payable to each DIP Lender upon any repayment or on the Maturity Date (the "**DIP MOIC**"). The DIP MOIC shall constitute part of the DIP Obligations, shall be secured by the DIP Collateral and shall be payable on a "last-out" basis after satisfaction of all other DIP Obligations. |
| **Mandatory Prepayments** | Mandatory prepayments of the DIP Loans shall be required in an amount equal to 100% of net cash proceeds from (i) the issuance of post-petition indebtedness not permitted by the DIP Credit Agreement, (ii) the issuance of any equity of the Borrower or any subsidiary thereof, (iii) any event of loss or condemnation of Unencumbered Property (iv) any sale of assets of any of the Debtors or their subsidiaries (other than asset sales in the ordinary course of business) that constitutes Unencumbered Property, in each case, subject to the Documentation Principles (as defined below) and the DIP MOIC; <u>provided</u>, however, that no mandatory prepayments shall be required prior to the payment in full in cash of all outstanding Prepetition First Lien Indebtedness, subject to the First Lien Claims Cap. |
| **Voluntary Prepayments** | Permitted, in whole or in part, subject to limitations as to minimum amounts of prepayments and the DIP MOIC; <u>provided</u>, <u>however</u>, that no voluntary prepayments may be made on the DIP Loans prior to the payment in full in cash of all outstanding Prepetition First Lien Indebtedness, subject to the First Lien Claims Cap. |

| | |
|---|---|
| **Segregated Account** | 100% of the proceeds received by the Debtors from the any settlement, judgment or other disposition of any Sinclair-Related Litigation, or the sale or other disposition of the Debtors' interests in Red Seam Holdings LLC or Marquee Sports Network, LLC shall be held in a segregated account of the Debtors. |
| **Collateral and Priority** | As security for the prompt payment and performance of DIP Loans due under the DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses, indemnities or other amounts (collectively, the "**DIP Obligations**"), effective as of the Closing Date, the DIP Agent, for the benefit of itself and the DIP Lenders, shall be granted automatically and properly perfected liens and security interests ("**DIP Liens**") in all assets and properties of each of the Debtors and their bankruptcy estates, whether tangible or intangible, real, personal or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of the Debtors (including under any trade names, styles or derivations thereof), whether prior to or after the Closing Date, including, without limitation, all of the Debtors' rights, title and interests in (1) all Prepetition Collateral (as defined in the Final Cash Collateral Order); (2) all money, cash and cash equivalents; (3) all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (4) all accounts and other receivables (including those generated by intercompany transactions); (5) all contracts and contract rights; (6) all instruments, documents and chattel paper; (7) all securities (whether or not marketable); (8) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (9) all real property interests; (10) all interests in leaseholds, (11) all franchise rights; (12) all patents, tradenames, trademarks, copyrights, licenses and all other intellectual property; (13) all general intangibles, tax or other refunds, or insurance proceeds; (14) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (15) all investment property; (16) all supporting obligations; (17) all letters of credit and letter of credit rights; (18) all commercial tort claims; (19) the proceeds of or property recovered, whether by judgment, settlement or otherwise, from all claims and causes of action arising under Chapter 5 of the Bankruptcy Code ("**Avoidance Action Proceeds**"); (20) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (21) to the extent not covered by the foregoing, all other goods, assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (22) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing (collectively, the "**DIP Collateral**"); <u>provided</u> that the DIP Collateral does not include all claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions"); <u>provided</u> further that DIP Collateral shall exclude other assets to be mutually agreed among the Borrower and the Required DIP Lenders, but shall include any and all proceeds and products of such excluded assets, unless such |

4

| | |
|---|---|
| | proceeds and products otherwise separately constitute excluded assets. |
| | Subject in all cases to the Carve-Out and the DIP Subordination Annex, the DIP Liens shall have the following priorities: |
| | i. *Liens on Unencumbered Property*. Pursuant to Section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral that is not subject to Permitted Prior Liens (as defined below) (collectively, "**Unencumbered Property**"), including Avoidance Action Proceeds, which DIP Liens shall be subject to the priorities set forth on Annex I attached hereto. For the avoidance of doubt, Adequate Protection Liens (as defined in the Final Cash Collateral Order) granted under the Final Cash Collateral Order shall not be considered "Permitted Prior Liens" for the purposes of the Final DIP Order, and will not impact the determination as to whether any DIP Collateral is Unencumbered Property for the purposes of the Final DIP Order. |
| | ii. *Priming DIP Liens and Liens Junior to Certain Other Liens*. Pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected in all DIP Collateral (other than as described in clause (i) above), which DIP Liens shall be subject to the priorities set forth in Annex I attached hereto. |
| | Except to the extent expressly permitted hereunder, but in any event subject to the priorities set forth in Annex I attached hereto and the DIP Subordination Annex, the DIP Liens and the DIP Superpriority Claims (as defined below) (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (B) any lien or security interest that is avoided or preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate claim, lien or security interest of the Debtors or their affiliates, or (D) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof. |
| | The term "Permitted Prior Liens" means any valid, enforceable and unavoidable liens ("**Permitted Prior Liens**") that are (1) in existence on the Closing Date, (2) either properly perfected as of the Closing Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code and (3) senior in priority to the Prepetition First Liens (as defined in the Final Cash Collateral Order) either under the First Lien Credit Agreement or by operation of applicable non-bankruptcy law. |
| **DIP Superpriority Claims** | Subject to the Carve-Out, the priorities set forth in Annex I attached hereto and the DIP Subordination Annex, the DIP Obligations shall be allowed super-priority administrative expense claims under Section 364(c) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claims shall have priority over any and all administrative expense claims against the Debtors |

| | |
|---|---|
| | and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 1113 and 1114 of the Bankruptcy Code, with recourse against all DIP Collateral  (the "**DIP Superpriority Claims**"). |
| **Milestones** | The Debtors shall comply with the following milestones: |
| | 1.  Deadline for the Debtors to file a chapter 11 plan on terms acceptable to the Required DIP Lenders and reasonably acceptable to the Majority 1L Lenders (an "Acceptable Plan")[1]: March 22, 2024. |
| | 2.  Deadline for confirmation of an Acceptable Plan:  June 30, 2024. |
| | 3.  Deadline for consummation of an Acceptable Plan: August 31, 2024, which in the event that an Acceptable Plan has been confirmed, may be extended by the Borrower for up to sixty (60) days to the extent necessary to obtain regulatory approvals required for consummation of the Acceptable Plan (provided that the requests of applications for any such authorization, consent, regulatory approvals, rulings or documents are pending on August 31, 2024). |
| **Documentation** | The DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a DIP Credit Agreement, to be based on the First Lien Credit Agreement, negotiated in good faith and in form and substance acceptable to the Borrower and the Required DIP Commitment Parties and reasonably acceptable to the Majority 1L Lenders, which shall (i) reflect the terms set forth herein, (ii) reflect the terms of the Final DIP Order, and (iii) have usual and customary provisions for debtor-in-possession financings of this kind and provisions that are necessary to effectuate the financing contemplated hereby; (b) the Final DIP Order; and (c) as applicable, the related security agreements, pledge agreements, guarantees and other legal documentation or instruments as are, in each case, usual and customary for debtor-in-possession financings of this type and/or reasonably necessary to effectuate the financing contemplated hereby, as determined by the Debtors and the Required DIP Commitment Parties and reasonably acceptable to the Majority 1L Lenders (this paragraph, the "**Documentation Principles**"). |
| **Representations and Warranties** | The DIP Documents will contain usual and customary representations and warranties, subject to the Documentation Principles. |
| **Cash Flow Reporting; Variance Reporting and Testing** | The DIP Credit Agreement shall provide for cash flow and variance reporting. Variances against the approved budget shall be tested on a weekly basis for each Testing Period, commencing on the fifth full week after the Closing Date.[2]  The Borrower shall not permit actual receipts of the Debtors and the Debtors' majority owned joint venture subsidiaries (the "**Reporting Parties**") to be less |

---

[1]    For the avoidance of doubt, the chapter 11 plan contemplated by the Restructuring Support Agreement constitutes an Acceptable Plan.

[2]    "Testing Period" shall mean (i) initially, the first four week period after the Closing Date and (ii) thereafter each rolling four-week period.

| | |
|---|---|
| | than 85% of budgeted receipts of the Reporting Parties for any four-week rolling period or actual disbursements of the Reporting Parties to exceed 115% of budgeted disbursements of the Reporting Parties for any four-week rolling period (such variance to exclude the disbursements excluded from the calculation of the variances under paragraph 3(d) of the Final Cash Collateral Order); <u>provided</u>, that the Borrower shall require consent from Required DIP Lenders and the Majority 1L Lenders for any amendments to any prior budget, or any future budget, with respect to which the variance covenant is tested; <u>provided, further</u>, that if the Required DIP Lenders agree to an updated budget and the Majority 1L Lenders do not agree as to whether the proposed budget constitutes an approved budget, the determination of the Required DIP Lenders shall prevail, and the Majority 1L Lenders shall have the right to object and seek relief from the Court before the new budget goes into effect by filing an emergency motion with the Court on at least two (2) business days' notice (with the Debtors and the Required DIP Lenders consenting to such emergency hearing), <u>provided further, however</u>, that notwithstanding the foregoing, both a proposed budget and an approved budget shall include the professional fees and expenses of the First Lien Group (as defined in the Restructuring Support Agreement), subject to the reasonable objection rights to such fees and expenses as set forth in paragraph 29 of the Final Cash Collateral Order.<br><br>Every four weeks, the Borrower shall provide the DIP Lenders and the First Lien Group with an Informational Forecast (as defined in the Final Cash Collateral Order), to be delivered at the same time as the weekly variance report.<br><br>The Debtors are permitted to submit a proposed budget to the DIP Agent and the First Lien Group for approval by the Required DIP Lenders and the Majority 1L Lenders at any time, but in any event no later than 10 business days prior to the end of the existing approved budget period; <u>provided</u> that the current approved budget remains in effect until such time the proposed budget is approved. |
| **Liquidity Covenant** | The Borrower will not permit the Reporting Parties' unrestricted cash and cash equivalents to be less than $75 million as of the last day of any week. |
| **Affirmative and Negative Covenants** | The DIP Documents will contain usual and customary affirmative and negative covenants for facilities of this type, subject to the Documentation Principles and other covenants agreed to by the Borrower and the Required DIP Commitment Parties; <u>provided</u> that (x) without limitation, the DIP Documents shall require compliance with all reporting requirements under Paragraph 4(g) of the Final Cash Collateral Order (as modified to require delivery of such reporting to the DIP Agent and/or the DIP Lenders and the First Lien Group); and (y) the DIP Credit Agreement shall not contain any financial maintenance covenants other than the liquidity and budget covenants set forth herein. |
| **Conditions Precedent to Closing** | The Closing Date under the DIP Facility, and the borrowing thereunder, shall be subject to customary conditions to closing for facilities of this type, including, without limitation, the following:<br><br>(i)      the Bankruptcy Court shall have entered the Final DIP Order, and the Final DIP Order shall be in full force and effect and shall not have been |

<table>
<tr><td></td><td></td><td>vacated, reversed, modified, amended or stayed without the prior written consent of the Required DIP Lenders;</td></tr>
<tr><td></td><td>(ii)</td><td>the preparation, authorization and execution of the DIP Documents with respect to the DIP Facility, in form and substance consistent with this DIP Term Sheet and otherwise acceptable to the Debtors, the DIP Commitment Parties and the DIP Agent;</td></tr>
<tr><td></td><td>(iii)</td><td>the delivery of a 13-week cash flow projection in form and substance acceptable to the DIP Lenders, reflecting (i) the Debtors' anticipated cash receipts and disbursements for each calendar week during the period from the week following the week in which the Closing Date occurs through and including the end of the thirteenth calendar week thereafter and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by professionals retained by the Debtors, the Committee (as defined in the Final Cash Collateral Order), and other professionals during the thirteen week period;</td></tr>
<tr><td></td><td>(iv)</td><td>the delivery of (i) a secretary's (or other officer's) certificate of the Borrower and each of the other Debtors, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Debtor is organized, with appropriate insertions and attachments; (ii) a customary closing officer's certificate of the Borrower; (iii) a notice of borrowing for the DIP Loans and (iv) a customary legal opinion;</td></tr>
<tr><td></td><td>(v)</td><td>all applicable fees, costs and expenses (including, without limitation, the fees and expenses of the Lender Advisors (as defined below) and all other counsel, financial advisors and other professionals of the DIP Lenders and DIP Agent (whether incurred before or after the Closing Date) to the extent earned, due and owing, and including estimated fees and expenses through the Closing Date, in each case to the extent invoiced at least one business day prior to the Closing Date) shall have been paid out of the proceeds of the DIP Loans;</td></tr>
<tr><td></td><td>(vi)</td><td>the DIP Lenders shall have received from each of the Debtors, at least three business days prior to the Closing Date: (a) documentation and other information requested by any DIP Lender that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (b) if the Borrower qualifies as a "legal entity customer" under the beneficial ownership regulations, the DIP Lenders shall have received from the Borrower, at least one business day prior to the Closing Date, a beneficial ownership certification in relation to the Borrower;</td></tr>
<tr><td></td><td>(vii)</td><td>the DIP Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the DIP Documents and the Final DIP Order, having the priorities set forth in the Final DIP Order;</td></tr>
<tr><td></td><td>(viii)</td><td>the Restructuring Support Agreement and the Convertible B Commitment Letter shall remain in full force and effect; and</td></tr>
<tr><td></td><td>(ix)</td><td>the Closing Date shall have occurred on or before the date that is three business days after the date of entry of the Final DIP Order.</td></tr>
</table>

| | |
|---|---|
| **Events of Default** | The DIP Documents will contain usual and customary events of default for facilities of this type (the "**Events of Default**"), but including, in any event, without limitation, (i) the Termination Events set forth in paragraph 8(a) through 8(q) of the Final Cash Collateral Order (with appropriate modifications to provide that any necessary consents are subject to the consent of the Required DIP Lenders and the Majority 1L Lenders) and (ii) other Events of Default consistent with the Documentation Principles. The existing Termination Events set forth in paragraph 8(a) through 8(q) of the Final Cash Collateral Order shall not be modified in any manner adverse to the Prepetition First Lien Lenders without the consent of the Majority 1L Lenders. The cash collateral termination events to be set forth in the Final DIP Order and the Events of Default set forth in the DIP Credit Agreement shall be substantially the same as each other, with conforming changes to be agreed by the Requisite DIP Commitment Parties and the Majority 1L Lenders.<br><br>Upon the occurrence and during the continuation of an Event of Default, subject to the DIP Subordination Annex, without further order from or application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit (1) the First Lien Agent (as defined in the Final Cash Collateral Order), acting at the direction of the Majority 1L Lenders and/or (2) the DIP Agent, acting at the request of the Required DIP Lenders, as applicable, subject to the DIP Subordination Annex, to (A) deliver to the Borrower a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the commitments under the DIP Facility, (C) declare the DIP Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Debtors to use any cash collateral, (E) terminate the DIP Facility, (F) charge the default rate of interest under the DIP Facility, (G) freeze all monies in any deposit accounts of the Debtors, (H) exercise any and all rights of setoff, (I) exercise any right or remedy with respect to the DIP Collateral or the DIP Liens, or (J) take any other action or exercise any other right or remedy permitted under the DIP Documents, the Final DIP Order or applicable law; provided, however, that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (G) though (J) above, (i) the DIP Agent, acting at the request of the Required DIP Lenders, may file a motion seeking emergency from the relief from the automatic stay (a "**Stay Relief Motion**"), and the Debtors, the Committee and the DIP Lenders shall consent to an emergency hearing upon five days' notice to the Debtors, the Committee and the U.S. Trustee (the "**Remedies Notice Parties**") and (ii) following a determination on the Stay Relief Motion that a Termination Event has occurred, the Court may fashion an appropriate remedy at the hearing pursuant to the Stay Relief Motion providing that the automatic stay as to all of the DIP Secured Parties may be terminated and the DIP Secured Parties may be permitted to exercise all remedies set forth in the DIP Documents and as otherwise available at law or in equity); provided, further, that until such Stay Relief Motion has been adjudicated by the Court, the Debtors are permitted to use cash collateral and proceeds of the DIP Facility solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, as determined by the Required DIP Lenders.<br><br>The Final DIP Order shall include an annex containing payment subordination |

| | |
|---|---|
| | and intercreditor provisions, that, among other things, (i) include: (x) until the payment in full in cash of all outstanding Prepetition First Lien Indebtedness, subject to the First Lien Claims Cap, provisions relating to the exclusive enforcement of remedies by the First Lien Agent, (y) application of claim and collateral proceeds provisions, and (z) turnover provisions; and (ii) provide that (x) the First Lien Agent, acting at the direction of the Majority 1L Lenders, have the exclusive right to exercise and enforce all rights, remedies and privileges with respect to the DIP Collateral, the DIP Liens, the First Lien Adequate Protection Liens and/or the Prepetition First Lien Collateral (as defined in the Final Cash Collateral Order), as applicable, and (y) the enforcement or exercise of remedies by the DIP Agent and the DIP Lenders, in each case, shall be subject to a standstill while the First Lien Agent is pursuing the exercise of remedies or if such exercise is otherwise stayed (collectively, the "**DIP Subordination Annex**"). |
| **Adequate Protection** | Except as otherwise agreed to by the Majority 1L Lenders, the Final DIP Order shall provide the Prepetition First Lien Secured Parties with the same adequate protection provided to such parties under the Final Cash Collateral Order. |
| **First Lien Paydown** | On the Closing Date, $350 million of proceeds of the DIP Loans shall be used to repay the First Lien Term Loans (as defined in the Restructuring Support Agreement) (the "**First Lien Paydown**"), which amount shall be paid directly from the DIP Loans.<br><br>In connection with the First Lien Paydown, the Final DIP Order shall provide that, (i) solely in the event of an orderly winddown or liquidation of the Debtors, the allowed amount of the First Lien Claims (as defined in the Restructuring Term Sheet) (including, without limitation, any asserted deficiency claims, makewhole claims, diminution in value claims and recharacterization claims) shall be subject to a cap equal to $637 million (the "**Wind Down Claim Cap**") and (ii) in connection with the consummation of the Acceptable Plan under the Restructuring Support Agreement, the allowed amount of the First Lien Claims (including, without limitation, any asserted deficiency claims, makewhole claims, diminution in value claims and recharacterization claims) shall be subject to a cap equal to (x) to the extent the First Lien Paydown is made on the Closing Date, $662 million or (y) to the extent the First Lien Paydown is not made on the Closing Date, $686 million (the foregoing clause (x) or (y), as applicable, the "**Acceptable Plan Claim Cap**", and together with the Wind Down Claim Cap, the "**First Lien Claims Cap**"); provided, that (A) adequate protection payments paid to First Lien Agent or the First Lien Lenders after October 2, 2023 shall be applied to reduce the First Lien Claims Cap and (B) the fees and expenses of the First Lien Group and the First Lien Agent shall not be applied to reduce the First Lien Claims Cap. |
| **Carve-Out** | The DIP Liens, the Adequate Protection Liens, and all super-priority administrative expense claims granted under the Final DIP Order, shall be subject and subordinate to the Carve-Out.  The Carve-Out under the Final DIP Order (the "**Carve-Out**") shall be substantially similar to the Carve-Out under the Final Cash Collateral Order. |

| | |
|---|---|
| **Waivers, Releases and Protections** | The Final DIP Order shall contain the following waivers, releases and other protections in favor of the DIP Lenders. The Final DIP Order shall also reaffirm and restate the waivers, releases and protections set forth in the Final Cash Collateral Order.<br><br>1. The Debtors shall waive any right to surcharge pursuant to section 506(c) of the Bankruptcy Code the DIP Collateral with respect to the DIP Lenders (in addition to the 506(c) waivers provided for under the Final Cash Collateral Order.<br><br>2. The Debtors shall waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the DIP Lenders (in addition to the marshalling waivers provided for under the Final Cash Collateral Order).<br><br>3. The Debtors shall waive and forever release and discharge any and all claims and causes of action against each of the DIP Lenders (in their capacities as such).<br><br>4. No cash collateral, proceeds of the DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to or contest the extent, validity, enforceability, security, perfection or priority of any of the DIP Liens, DIP Obligations, the First Lien Claims or the Second Lien Claims, (b) investigate or initiate any claim or cause of action against any of the DIP Lenders, the First Lien Secured Parties or the Second Lien Secured Parties, (c) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the DIP Lenders or the First Lien Secured Parties, or (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the DIP Documents and the Final DIP Order) that are senior to or *pari passu* with the DIP Liens or the DIP Superpriority Claims and the Prepetition First Liens or the Prepetition First Lien Indebtedness or the First Lien Adequate Protection Claims.<br><br>5. The DIP Secured Parties shall have the right to credit bid the DIP Obligations, subject to the payment in full in cash of all outstanding Prepetition First Lien Indebtedness, subject to the First Lien Claims Cap, prior to or contemporaneously with the closing of the sale subject to the credit bid.<br><br>6. The DIP Lenders shall be entitled to good faith protection under Section 364(e) of the Bankruptcy Code. |
| **Stipulations** | The Final DIP Order shall reaffirm and restate the Debtors' Stipulations (as defined in the Final Cash Collateral Order) contained in the Final Cash Collateral Order. |
| **Expenses and Indemnification** | The DIP Credit Agreement shall provide for the payment of all reasonable and documented costs and expenses of the DIP Agent and the DIP Lenders, including, without limitation, the payment of all reasonable and documented fees and expenses of the Lender Advisors.<br><br>The DIP Credit Agreement shall also provide for customary indemnification by each of the Debtors, on a joint and several basis, of each of the DIP Lenders |

|  | (together with their related parties and representatives). |
|---|---|
|  | The Final DIP Order shall provide that all unpaid fees costs and expenses of the Lender Advisors in connection with the Chapter 11 Cases shall (i) be paid on the Closing Date (to the extent invoiced at least one business day prior to the Closing Date) and (ii) subject to a 10- day objection period, be paid on a monthly basis after the Closing Date. |
| **Assignments** | The DIP Credit Agreement shall contain assignment provisions that are usual and customary for financings of this type and as determined in accordance with the Documentation Principles; provided, however, that any assignee must execute the Restructuring Support Agreement. |
| **Ratings** | The Borrower shall use commercially reasonable efforts to have the DIP Facility rated by S&P and Moody's. |
| **Amendments** | Usual and customary for facilities of this type requiring the consent of the Required DIP Lenders, except for amendments customarily requiring approval by each affected DIP Lender under the DIP Facility.  Any amendment to the Final DIP Order shall also require the consent of the Majority 1L Lenders.<br><br>"**Required DIP Lenders**" shall mean DIP Lenders holding greater than (i) 50% of the aggregate amount of DIP Loans and (ii) 66.67% of the aggregate amount of DIP Loans held by the Initial DIP Commitment Parties. |
| **Governing Law** | This DIP Term Sheet and the DIP Documents will be governed by the laws of the State of New York (except as otherwise set forth therein). During the pendency of the Chapter 11 Cases, the Bankruptcy Court shall maintain exclusive jurisdiction with respect to the interpretation and enforcement of the DIP Documents and the exercise of the remedies by the DIP Lenders and preservation of the value of the DIP Collateral. |
| **Lender Advisors** | The Lender Advisors include: (i) Paul Hastings, LLP, as counsel to certain DIP Lenders, (ii) PJT Partners, as financial advisor to certain DIP Lenders, and (iii) any other attorneys, financial advisors or professionals retained by the DIP Lenders with the consent of the Borrower (such consent not to be unreasonably withheld) (clauses (i) through (iii), collectively, the "**Lender Advisors**"). |

**Annex I**

| Priority | DIP Collateral (other than Unencumbered Property) | Unencumbered Property | Claims |
|---|---|---|---|
| 1 | Carve-Out and Permitted Prior Liens | Carve-Out | Carve-Out |
| 2 | First Lien Adequate Protection Liens (as defined in the Final Cash Collateral Order) | First Lien Adequate Protection Liens | First Lien Adequate Protection Superpriority Claims, up to the First Lien Claims Cap |
| 3 | Prepetition First Liens | DIP Liens | Prepetition First Lien Indebtedness, up to the First Lien Claims Cap |
| 4 | DIP Liens | | DIP Superpriority Claims |
| 5 | Prepetition Second Liens and Prepetition Third Liens | | |

## **Exhibit 2**

**Convertible A Exit Notes Term Sheet**

**Convertible A Exit Notes Term Sheet**

THIS CONVERTIBLE A EXIT NOTES TERM SHEET (THIS "TERM SHEET") SUMMARIZES, ON A PRELIMINARY, INDICATIVE, NON-BINDING, AND SUMMARY-LEVEL BASIS, THE PRINCIPAL TERMS OF THE PURCHASE BY THE INVESTORS (AS DEFINED BELOW) OF THE CONVERTIBLE A EXIT NOTES (AS DEFINED BELOW) OF THE ISSUER (AS DEFINED BELOW). THIS TERM SHEET DOES NOT REFLECT OR PURPORT TO DESCRIBE ALL OF THE TERMS AND CONDITIONS OF THE CONVERTIBLE A EXIT NOTES AND THE DEFINITIVE SECURED CONVERTIBLE NOTES DOCUMENTATION (AS DEFINED BELOW), EACH OF WHICH SHALL, NOTWITHSTANDING ANYTHING HEREIN, BE REQUIRED TO BE SATISFACTORY TO THE INVESTORS AND THE COMPANY PARTIES. THIS TERM SHEET IS PROVIDED IN CONNECTION WITH THE PROPOSED TRANSACTIONS DESCRIBED IN THE RESTRUCTURING SUPPORT AGREEMENT (THE "RSA").

THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, WITH RESPECT TO ANY SECURITIES, OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.

CAPITALIZED TERMS USED BUT NOT DEFINED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE RSA OR THE RESTRUCTURING TERM SHEET (AS DEFINED IN THE RSA) TO WHICH THIS TERM SHEET IS ATTACHED TO AS **EXHIBIT 2**, AS THE CASE MAY BE.

| 1. | **Issuer:** | New TopCo (the "Issuer").<br><br>The Issuer will be a newly formed Delaware corporation that indirectly holds 100% of the interests in (v) OpCo, (w) New HoldCo, (x) LitigationCo, (y) YES Holdco, and (z) Marquee HoldCo, in each case, in accordance with the Restructuring Term Sheet. |
|----|----|----|
| 2. | **Title of Securities:** | Convertible Senior Secured Notes due 2030 (the "Convertible A Exit Notes"). |
| 3. | **Guarantors:** | The Convertible A Exit Notes shall be guaranteed by all subsidiaries of the Issuer, subject to customary exceptions; provided that (x) any subsidiary of the Issuer that guarantees the Take Back Exit Facility shall be a guarantor of the Convertible A Exit Notes and (y) YES HoldCo shall only guarantee the Convertible A Exit Notes if the Convertible B Exit Notes are secured by a Direct YES Pledge, and any such guarantee by YES HoldCo will be subordinated in right of payment to the guarantee of the Convertible B Exit Notes by YES HoldCo. |
| 4. | **Investors:** | Each of the lenders under the DIP Facility (together with any of their respective designees for receipt of a Convertible A Exit Note, each an "Investor" and collectively the "Investors"). |

| 5. | **Aggregate Principal Amount:** | Initial aggregate principal amount of $210 million *plus* the amount of paid-in-kind interest under the DIP Facility *minus* the initial aggregate principal amount of Exit Term Loans to be issued on the Closing Date. The outstanding principal amount of a Convertible A Exit Note or Convertible A Exit Notes (in the aggregate) shall be referred to herein as the "<u>Principal Amount</u>."  The "<u>Note Obligations Amount</u>" shall mean, with respect to any Convertible A Exit Note or Convertible A Exit Notes (in the aggregate), an amount equal to the Principal Amount of such Note(s) (including any PIK Interest that has been paid in kind), <u>plus</u> any accrued and unpaid PIK Interest. |
| 6. | **Common Stock:** | The common stock of the Issuer ("<u>Common Stock</u>"). |
| 7. | **Requisite Holders:** | Subject to certain sacred rights customary for convertible note indentures, the indenture governing the Convertible A Exit Notes (the "<u>Indenture</u>") may be amended by the Issuer and the holders of a majority of the aggregate amount of (i) the outstanding Principal Amount of then-outstanding Convertible A Exit Notes and (ii) the outstanding principal amount of the Exit Term Loans (the "<u>Requisite Holders</u>"); <u>provided</u> that the Indenture may not be amended in a way that disproportionately affects the Convertible A Exit Notes, as compared to the Exit Term Loans, without the consent of the holders of a majority of the aggregate amount of the outstanding Principal Amount of then-outstanding Convertible A Exit Notes. |
| 8. | **Use of Proceeds:** | Repayment of a portion of the DIP Facility in accordance with the Restructuring Term Sheet. |
| 9. | **Maturity Date:** | Five and a half years from the Closing Date (as defined below), unless earlier converted or repurchased (the "<u>Maturity Date</u>"), at which time the Note Obligations Amount shall become due and payable.  If the Note Obligations Amount is not paid in full in cash on the Maturity Date, the Convertible A Exit Notes will be subject to mandatory conversion under the procedures set forth with respect to the "Conversion Rights" below. |
| 10. | **Closing:** | The Indenture will become effective and the Convertible A Exit Notes will be issued on the Plan Effective Date upon satisfaction of all conditions precedent to the effectiveness of the Indenture set forth in the Definitive Secured Convertible Notes Documentation, including without limitation, the issuance of the Convertible B Exit Notes to the Strategic Investor (the "<u>Closing Date</u>"). |
| 11. | **Security:** | The Note Obligations Amount shall be secured by:<br><br>• First priority security interests in, and liens on, the Class C Interests (the "<u>Litigation Collateral</u>"); |

|  |  | • First priority security interests in, and liens on, the equity interests in Marquee HoldCo and any assets thereof (excluding the Marquee Interests); |
|---|---|---|
|  |  | • A second priority pledge of, directly or indirectly, the equity of YES Holdco, and, if applicable, the Direct YES Pledge, (collectively, the "<u>YES Collateral</u>") in a manner that complies with Section 7.02(d) of the operating agreement for Red Seam Holdings LLC (the "<u>Red Seam LLCA</u>"); <u>provided</u> that the Debtors shall use commercially reasonable efforts prior to confirmation of the Plan to obtain the necessary consents for the Convertible A Exit Notes to be secured by a direct pledge of the YES Interests on a second lien basis, free and clear of any ROFO, repurchase or similar rights (a "<u>Direct YES Pledge</u>"); <u>provided</u>, <u>further</u>, that the failure to obtain the required consents for a Direct YES Pledge shall not constitute a default under the Convertible A Exit Notes or terminate Investors' commitment to purchase the Convertible A Exit Notes; and |
|  |  | • Second priority security interests, and liens on, all equity interests of OpCo and all present and after-acquired assets of OpCo that secure the Take Back Exit Facility (collectively, the "<u>OpCo Collateral</u>"). |
|  |  | The Convertible A Exit Notes, the Exit Term Loans, the Convertible B Exit Notes, and the Take Back Exit Facility will be subject to a customary intercreditor agreement with respect to their common collateral. |
|  |  | The liens securing the Convertible A Exit Notes shall be (i) *pari passu* with the liens securing the Exit Term Loans, (ii) with respect to the Litigation Collateral, senior to the Convertible B Exit Notes and the Take Back Exit Facility (both of which shall not have liens on such collateral), (iii) with respect to the OpCo Collateral, junior to the Take Back Exit Facility and *pari passu* with the Convertible B Exit Notes, and (iv) with respect to the YES Collateral, junior to the Convertible B Exit Notes, in each case subject to the terms of a customary intercreditor agreement. |
| 12. | **Interest:** | 17.0% per annum (the "<u>Interest Rate</u>"). Interest shall be payable quarterly in kind ("<u>PIK Interest</u>"). |
| 13. | **Conversion Rights:** | At any time prior to maturity, each Investor will have the right (the "<u>Conversion Right</u>") to convert, in full but not in part, the Note Obligation Amount of all Convertible A Exit Notes held by such Investor into a number of shares of Common Stock of the Issuer equal to such Investor's *pro rata* share of (a) 25% of the Issuer's outstanding equity securities on a pro forma fully diluted basis at the time of conversion *divided by* (b) the ownership percentage that Issuer holds |

| | | (directly or indirectly) in New HoldCo (the "Conversion Common Stock").<br><br>Upon the occurrence of a change of control of the Issuer or New HoldCo or similar event (other than any such change of control or similar event pursuant to the Plan), each Investor will have the right to, at its election, (x) convert all or a portion of the Note Obligations Amount into the Conversion Common Stock (which Conversion Common Stock shall then receive the same treatment as the other Common Stock of the Issuer, subject to the Registration Rights) or (y) require the Issuer to repurchase all or a portion or all of the Convertible A Exit Notes (such amount to be determined by the Investor) at a price equal to 100% of the then-applicable Note Obligations Amount.<br><br>Upon a liquidation of the Issuer, each Investor shall receive the greater of (i) the Note Obligations Amount and (ii) the as-converted value of the Convertible A Exit Notes. |
|---|---|---|
| **14.** | **Redemption** | (a)       The Convertible A Exit Notes may be redeemed on a *pro rata* basis at the Issuer's option at any time following the six month anniversary of the Closing Date upon 60 days' notice to the holders at a redemption price equal to the Note Obligations Amount.  Holders of the Convertible A Exit Notes may continue to exercise their Conversion Right prior to the effective date of any redemption.<br><br>(b)       Upon a sale of the YES Interests (a "YES Sale"), the Issuer shall make an offer to repurchase the Convertible A Exit Notes on a *pro rata* basis among the Investors and the holders of Exit Term Loans (a "YES Sale Offer") at a price equal to up to 100% of the Note Obligations Amount, in an aggregate amount (together with any pro rata mandatory prepayment of the Exit Term Loans) equal to the lesser of (x) the aggregate Note Obligations Amount plus the amount of any Exit Term Loans subject to a comparable mandatory prepayment requirement and (y) the net proceeds of the YES Sale *minus* the amount of such proceeds used to repurchase Convertible B Exit Notes, and the portion of the aggregate Note Obligation Amount, if any in excess of such lesser amount shall remain outstanding.  Any holder of the Convertible A Exit Notes may elect to decline a YES Sale Offer; provided that, in the event that a holder declines a YES Sale Offer, the Convertible A Exit Notes held by such holder that are the subject of the YES Sale Offer shall remain outstanding. |

| 15. | **Covenants:** | Covenants to include the following, applicable to the Issuer and its subsidiaries (subject to customary exceptions):<br><br>•   Prompt notice of any event of default;<br><br>•   Merger covenant;<br><br>•   Limitations on indebtedness or extensions of credit;<br><br>•   Limitations on liens;<br><br>•   Limitations on restricted payments (including any distributions on common equity);<br><br>•   Limitations on affiliate transactions;<br><br>•   Parameters regarding designees to the Issuer's board of directors;<br><br>•   Milestone to commence sale process for YES Interests within 18 months following the Closing Date; and<br><br>•   Other affirmative and negative covenants customary for secured debt instruments. |
| 16. | **Information Rights:** | Information rights consistent with the Red Seam LLCA. |
| 17. | **Events of Default:** | Customary events of default for secured indebtedness, including cross-defaults to the Convertible B Exit Notes, the Exit Term Loans, the Take Back Exit Facility and other material indebtedness of the Issuer or its subsidiaries.  Upon an event of default, there shall be a customary increase in the Interest Rate per annum payable on demand. |
| 18. | **Other Terms:** | Other terms substantially consistent with the indenture governing the Convertible B Exit Notes. |
| 19. | **Trustee/Collateral Agent:** | An entity acceptable to the Required DIP Commitment Parties (as defined in the RSA), in consultation with the Company Parties. |
| 20. | **Certain Tax Matters** | The Issuer and the Investor intent to treat the Notes as equity for U.S. federal income tax purposes. |
| 21. | **Definitive Secured Convertible Notes Documentation** | The definitive documentation governing or evidencing the Convertible A Exit Notes (the "<u>Definitive Secured Convertible Notes Documentation</u>") shall include an indenture and all other documents, agreements, legal opinions, and other supporting materials necessary to execute the offering of the Convertible A Exit Notes, in each case, in form and substance reasonably satisfactory to the Required DIP Commitment Parties and the Company Parties.  Except as specified in this Term Sheet or as necessary to reflect the nature of the Convertible A Exit Notes as notes, the Definitive Secured Convertible |

|  |  | Notes Documentation shall be substantially consistent with, and no more restrictive to the Issuer and its subsidiaries than, the definitive documentation governing and evidencing the Take Back Exit Facility. |
|---|---|---|
| **22.** | **Governing Law:** | The State of New York, without reference to its choice of law rules. |

## **Exhibit 3**

**Exit Term Loan Term Sheet**

**Exit Term Loans Term Sheet**

THIS EXIT TERM LOANS TERM SHEET (THIS "TERM SHEET") SUMMARIZES, ON A PRELIMINARY, INDICATIVE, NON-BINDING, AND SUMMARY-LEVEL BASIS, THE PRINCIPAL TERMS OF THE FACILITY (AS DEFINED BELOW). THIS TERM SHEET DOES NOT REFLECT OR PURPORT TO DESCRIBE ALL OF THE TERMS AND CONDITIONS OF THE EXIT TERM LOANS (AS DEFINED BELOW) AND THE DEFINITIVE EXIT TERM LOAN DOCUMENTATION (AS DEFINED BELOW), EACH OF WHICH SHALL, NOTWITHSTANDING ANYTHING HEREIN, BE REQUIRED TO BE SATISFACTORY TO THE LENDERS AND THE COMPANY PARTIES. THIS TERM SHEET IS PROVIDED IN CONNECTION WITH THE PROPOSED TRANSACTIONS DESCRIBED IN THE RESTRUCTURING SUPPORT AGREEMENT (THE "RSA").

THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, WITH RESPECT TO ANY SECURITIES, OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.

CAPITALIZED TERMS USED BUT NOT DEFINED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE RSA OR THE RESTRUCTURING TERM SHEET (AS DEFINED IN THE RSA) TO WHICH THIS TERM SHEET IS ATTACHED TO AS **EXHIBIT 3**, AS THE CASE MAY BE.

| 1. | **Borrower:** | New TopCo (the "Borrower"). |
|----|----|----|
| | | The Borrower will be a newly formed Delaware corporation that indirectly holds 100% of the interests in (v) OpCo, (w) New HoldCo, (x) LitigationCo, (y) YES Holdco, and (z) Marquee HoldCo, in each case, in accordance with the Restructuring Term Sheet. |
| 2. | **Guarantors:** | The Exit Term Loans shall be guaranteed by all subsidiaries of the Borrower, subject to customary exceptions; provided that (x) any subsidiary of the Borrower that guarantees the Take Back Exit Facility shall be a guarantor of the Exit Term Loans and (y) YES HoldCo shall only guarantee the Exit Term Loans if the Exit Term Loans are secured by a Direct YES Pledge, and any such guarantee by YES HoldCo will be subordinated in right of payment to the guarantee of the Convertible B Exit Notes by YES HoldCo. |
| 3. | **Lenders:** | Each of the lenders under the DIP Facility who elects to receive Exit Term Loans under the Plan (together with any of their respective designees for receipt of an Exit Term Loan, each a "Lender" and collectively the "Lenders"). |
| 4. | **Facility Type/Aggregate Principal Amount:** | Term loan credit facility (the "Facility" and the loans thereunder, the "Exit Term Loans") in an aggregate principal amount of up to $40 million plus the amount of paid-in-kind interest under the DIP Facility (minus the principal amount of Convertible A Exit Notes issued on account of paid-in-kind interest under the DIP Facility). |

|   |   | The outstanding principal amount of Exit Term Loans (in the aggregate) shall be referred to herein as the "Principal Amount." The "Exit Term Loan Obligations Amount" shall mean an amount equal to the Principal Amount of the Exit Term Loans (including any PIK Interest that has been paid in kind), plus any accrued and unpaid PIK Interest. |
|---|---|---|
| 5. | **Administrative Agent and Collateral Agent:** | An entity acceptable to the Required DIP Commitment Parties, in consultation with the Company Parties. |
| 6. | **Amendments:** | Subject to certain sacred rights customary for term loans, the credit agreement governing the Exit Term Loans (the "Credit Agreement") may be amended by the Borrower and the holders of a majority of the aggregate amount of (i) the outstanding Principal Amount of then-outstanding Convertible A Exit Notes and (ii) the outstanding principal amount of the Exit Term Loans (the "Requisite Holders"); provided that the Credit Agreement may not be amended in a way that disproportionately affects the Exit Term Loans, as compared to the Convertible A Exit Notes, without the consent of the holders of a majority of the aggregate amount of the outstanding Principal Amount of then-outstanding Exit Term Loans. |
| 7. | **Use of Proceeds:** | Repayment of a portion of the DIP Facility in accordance with the Restructuring Term Sheet. |
| 8. | **Maturity Date:** | Seven and a half years from the Closing Date (as defined below) (the "Maturity Date"), at which time the Exit Term Loan Obligations Amount shall become due and payable. |
| 9. | **Closing:** | The Credit Agreement will become effective on the Plan Effective Date upon satisfaction of all conditions precedent to the effectiveness of the Credit Agreement set forth in the Definitive Exit Term Loan Documentation, including without limitation, the issuance of the Convertible B Exit Notes to the Strategic Investor (the "Closing Date"). |
| 10. | **Security:** | The Exit Term Loan Obligations Amount shall be secured by:<br><br>• First priority security interests in, and liens on the Class C Interests (the "Litigation Collateral");<br><br>• First priority security interests in, and liens on, the equity interests in Marquee HoldCo and any assets thereof (excluding the Marquee Interests);<br><br>• A second priority pledge of, directly or indirectly, the equity of YES Holdco, and, if applicable, the Direct YES Pledge (collectively, the "YES Collateral") in a manner that complies with Section 7.02(d) of the operating agreement for Red Seam Holdings LLC (the "Red Seam LLCA"); provided that the |

Debtors shall use commercially reasonable efforts prior to confirmation of the Plan to obtain the necessary consents for the Exit Term Loans to be secured by a direct pledge of the YES Interests on a second lien basis, free and clear of any ROFO, repurchase or similar rights (a "<u>Direct YES Pledge</u>"); <u>provided</u>, further, that the failure to obtain the required consents for a Direct YES Pledge shall not constitute a default under the Exit Term Loans; and

- Second priority security interests, and liens on, all equity interests of OpCo and all present and after-acquired assets of OpCo that secure the Take Back Exit Facility (collectively, the "<u>OpCo Collateral</u>").

The Exit Term Loans, the Convertible A Exit Notes, the Convertible B Exit Notes, and the Take Back Exit Facility will be subject to a customary intercreditor agreement with respect to their common collateral.

The liens securing the Exit Term Loans shall be (i) *pari passu* with the liens securing the Convertible A Exit Notes, (ii) with respect to the Litigation Collateral, senior to the Convertible B Exit Notes and the Take Back Exit Facility (both of which shall not have liens on such collateral), (iii) with respect to the OpCo Collateral, junior to the Take Back Exit Facility and *pari passu* with the Convertible B Exit Notes, and (iv) with respect to the YES Collateral, junior to the Convertible B Exit Notes, in each case subject to the terms of a customary intercreditor agreement.

| 11. | **Interest:** | 17.0% per annum (the "<u>Interest Rate</u>"). [For the first five and a half years following the Closing Date (the "<u>PIK Period</u>"), interest shall be payable quarterly in kind ("<u>PIK Interest</u>"). Upon the conclusion of the PIK Period, all capitalized PIK Interest (together with any interest thereon) shall be paid in cash. Following the conclusion of the PIK Period, interest shall be paid quarterly, in cash.][1] |
|---|---|---|
| 12. | **Amortization:** | None |
| 13. | **Call Protection/ Voluntary Prepayments:** | The Exit Term Loans shall not be callable during the first six months following the Closing Date.<br><br>The Borrower may prepay the Exit Term Loans on a *pro rata* basis with any outstanding Convertible A Exit Notes, without premium or penalty, at any time following the six month anniversary of the Closing Date upon 60 days' notice to the Lenders at the Exit Term Loan Obligations Amount. |
| 14. | **Mandatory Prepayments:** | Upon the occurrence of a change of control of the Borrower or New HoldCo or similar event (other than any such change of control or |

---

[1] Subject to further tax analysis.

<table>
<tr>
<td></td>
<td></td>
<td>

similar event pursuant to the Plan), the Borrower shall repay all or a portion of all of the Exit Term Loans Notes such amount to be determined by the Lender) at a price equal to 100% of the then-applicable Exit Term Loans Obligations Amount.

Upon a liquidation of the Borrower, each Lender shall be entitled to receive the Exit Term Loans Obligations Amount.

Upon a sale of the YES Interests (a "<u>YES Sale</u>"), the Borrower shall offer to repay the Exit Term Loans (a "<u>YES Sale Offer</u>") at a price equal to up to 100% of the Exit Term Loans Obligations Amount, in an aggregate amount (together with any pro rata repurchase offer with respect to Convertible A Exit Notes) equal to the lesser of (x) the aggregate Exit Term Loans Obligations Amount plus the amount of any Convertible A Exit Notes subject to a comparable repurchase requirement and (y) the net proceeds of the YES Sale *minus* the amount of such proceeds used to repurchase Convertible B Exit Notes, and the portion of the aggregate Exit Term Loans Obligation Amount, if any in excess of such lesser amount shall remain outstanding.  Any Lender may elect to decline a YES Sale Offer; <u>provided</u> that, in the event that a Lender declines a YES Sale Offer, the Exit Term Loans held by such Lender that are the subject of the YES Sale Offer shall remain outstanding.

</td>
</tr>
<tr>
<td>15.</td>
<td><strong>Covenants:</strong></td>
<td>

Covenants to include the following, applicable to the Borrower and its subsidiaries (subject to customary exceptions):

•   Prompt notice of any event of default;

•   Merger covenant;

•   Limitations on indebtedness or extensions of credit;

•   Limitations on liens;

•   Limitations on restricted payments (including any distributions on common equity);

•   Limitations on affiliate transactions;

•   Parameters regarding designees to the Borrower's board of directors;

•   Milestone to commence sale process for YES Interests within 18 months following the Closing Date; and

•   Other affirmative and negative covenants customary for secured debt instruments.

</td>
</tr>
<tr>
<td>16.</td>
<td><strong>Information Rights:</strong></td>
<td>Information rights consistent with the Red Seam LLCA.</td>
</tr>
</table>

| 17. | **Events of Default:** | Customary events of default for secured indebtedness, including cross-defaults to the Convertible A Exit Notes, the Convertible B Exit Notes, the Take Back Exit Facility and other material indebtedness of the Borrower or its subsidiaries.  Upon an event of default, there shall be a customary increase in the Interest Rate per annum payable on demand. |
|---|---|---|
| 18. | **Other Terms:** | Other terms substantially consistent with the Convertible A Exit Notes and Convertible B Exit Notes. |
| 19. | **Definitive Exit Term Loan Documentation:** | The definitive documentation governing or evidencing the Exit Term Loans (the "Definitive Exit Term Loan Documentation") shall include the Credit Agreement and all other documents, agreements, legal opinions, and other supporting materials necessary to execute the Exit Term Loans, in each case, in form and substance reasonably satisfactory to the Required DIP Commitment Parties and the Company Parties.  Except as specified in this Term Sheet, the Definitive Exit Term Loan Documentation shall be substantially consistent with, and no more restrictive to the Borrower and its subsidiaries than, the definitive documentation governing and evidencing the Take Back Exit Facility. |
| 20. | **Governing Law:** | The State of New York, without reference to its choice of law rules. |

**<u>Exhibit 4</u>**

**Convertible B Exit Notes Term Sheet**

**Convertible B Exit Notes Term Sheet**

*This Term Sheet (this "Term Sheet") summarizes the principal terms of the purchase of the Notes (as defined below) of the Issuer (as defined below) by the Investor (as defined below).  Capitalized terms used but not defined herein have the meanings ascribed to them in the Restructuring Support Agreement (the "RSA") or the Restructuring Term Sheet (as defined in the RSA) to which this Term Sheet is attached to as **Exhibit 4**, as the case may be.*

| 1. | **Issuer:** | New HoldCo (the "Issuer"). |
|----|----|----|
| | | The Issuer will be a newly formed Delaware limited liability company that holds 100% of the interests in (x) OpCo and (y) indirectly, 100% of the interests of Sports Network II, LLC (or its successor in interest) ("YES HoldCo") (which shall continue to hold 100% of the YES Interests) in accordance with the RSA.  The Issuer shall be treated as a partnership for tax purposes. |
| 2. | **Title of Securities:** | Convertible Senior Secured Notes due 2026 (the "Notes"). |
| 3. | **Guarantors:** | The Notes shall be guaranteed by (x) OpCo and each of its subsidiaries that guarantee the Convertible A Exit Notes and Exit Term Loans, (y) YES HoldCo, and (z) any parent entity of YES HoldCo that is a subsidiary of the Issuer. |
| 4. | **Investor:** | Strategic Investor or one or more of its designated affiliates (the "Investor"). |
| 5. | **Aggregate Principal Amount:** | Aggregate principal amount of $115 million.  The outstanding principal amount of a Note under a particular Note or Notes (in the aggregate) shall be referred to herein as the "Principal Amount." The "Note Obligations Amount" shall mean, with respect to any Note or Notes (in the aggregate), an amount equal to the Principal Amount of such Note(s), plus any accrued and unpaid interest thereon. |
| 6. | **Requisite Holders:** | The Notes may be amended by the Issuer and the Note holders holding a majority of the aggregate outstanding Principal Amount of the then-outstanding Notes (the "Requisite Holders"). |
| 7. | **Use of Proceeds:** | Repayment of a portion of the DIP Facility in accordance with the RSA and the Plan. |
| 8. | **Maturity Date:** | Two years from the Closing Date (as defined below), unless earlier converted or repurchased in accordance with the terms hereof (the "Maturity Date"), at which time the then-applicable Note Obligations Amount shall become due and payable; provided that if (x) a sale process for the YES Interests has commenced within 18 months following the Closing Date (as defined below) and remains ongoing and (y) the YES Interests have not been sold or transferred by the Issuer or one of its subsidiaries prior to the Maturity Date, the Maturity Date may be extended at the Issuer's option for up to six |

| | | months subject to an additional 250 bps PIK interest in addition to continuing cash interest at the Interest Rate (as defined below). |
|---|---|---|
| **9.** | **Closing:** | The closing will occur on the Plan Effective Date.  The date on which the closing occurs is referred to as the "Closing Date." |
| **10.** | **Security:** | The Note Obligations Amount shall be secured as follows:<br><br>• By a first priority pledge of the equity securities of YES HoldCo and any subsidiary of the Issuer that directly or indirectly holds the YES Interests (the "YES Collateral") in a manner that complies with the operating agreement for Red Seam Holdings LLC (the "Red Seam LLCA"); provided that the Company Parties and Investor shall use commercially reasonable efforts prior to confirmation of the Plan to obtain the necessary consents for the Notes to also be secured by a direct pledge of the YES Interests, free and clear of any ROFO, repurchase, or similar rights (a "Direct YES Pledge"); provided, further, that the failure to obtain the required consents for a Direct YES Pledge shall not constitute a default under the Notes or terminate the Investor's commitment to purchase the Notes.<br><br>• By second priority security interests, and liens on, all present and after-acquired assets of OpCo and each of its subsidiaries that guarantee the Convertible A Exit Notes and Exit Term Loans (collectively, the "OpCo Collateral").<br><br>• The liens securing the Notes shall be (i) with respect to the OpCo Collateral, junior to the Take Back Exit Facility and *pari passu* with the Convertible A Exit Notes and the Exit Term Loans and (ii) with respect to the YES Collateral, senior to the Convertible A Exit Notes and the Exit Term Loans, in each case subject to the terms of a customary intercreditor agreement. |
| **11.** | **Interest:** | 6.25%, provided that if the Company Parties and Investor are unable to obtain the Direct YES Pledge as of the Closing Date, then 7.5% (the "Interest Rate").  Interest shall be payable quarterly in cash. |
| **12.** | **Conversion Rights:** | (a)  At any time, the Investor will have the right (the "Conversion Right") to convert, in full or in part, the then-applicable Note Obligations Amount into a number of common equity securities in the Issuer equal to 15% (or such lesser amount, on a proportionate basis, in the case of a partial conversion) of the Issuer's outstanding common equity securities on a pro forma fully diluted basis at the time of conversion (not accounting for the Management Incentive Plan (which will not be diluted by such conversion) of up to 10% of the Issuer's outstanding equity on a pro forma fully diluted basis) and which shall otherwise be on customary terms (the "Conversion Units"). |

| | | |
|---|---|---|
| | | (b) Upon the occurrence of a change of control of the Issuer or similar event (other than any change of control or similar event pursuant to the Plan), the Investor will have the right to, at its election, (x) convert all or a portion of the then-applicable Note Obligations Amount into the Conversion Units immediately prior to such time (which Conversion Units shall then receive the same treatment as the other units of the Issuer) or (y) require the Issuer to repurchase a portion or all of the Notes (such amount to be determined by the Investor) at a price equal to 100% of the then-applicable Note Obligations Amount of such Notes being repurchased.<br><br>(c) Upon a liquidation of the Issuer, the Investor shall receive the greater of (i) the then-applicable Note Obligations Amount and (ii) the as-converted value of the then-applicable Note Obligations Amount at such time. |
| **13.** | **Redemption:** | Upon a sale of the YES Interests (a "<u>YES Sale</u>"), the Issuer shall make an offer to repurchase Notes (a "<u>YES Sale Offer</u>") at a price equal to 100% of the then-applicable Note Obligations Amount, with such payment applying first to accrued interest and then to principal; <u>provided</u> that if the net proceeds of the YES Sale are less than 100% of the then-applicable Note Obligations Amount, the Issuer shall offer to repay such portion of the Note Obligations Amount equal to the net proceeds of the YES Sale, and the Notes corresponding to the portion of the Note Obligations Amount in excess of the net proceeds of the YES Sale shall remain outstanding and be subject to optional, but not mandatory, conversion.<br><br>Any holder of the Notes may also elect to decline a YES Sale Offer for a portion or all of their Note Obligations Amount that such YES Sale Offer would otherwise satisfy in full; <u>provided</u> that the corresponding Notes held by such holder that are the subject of the YES Sale Offer and not repurchased due to such declination shall be immediately mandatorily converted to Conversion Units as set forth under paragraph (a) of "Conversion Rights" such that such conversion results in the holder of such Notes to a proportionate portion of the Conversion Units based on the portion of the Note Obligations Amount so converted; <u>provided</u>, <u>further</u>, that, on the date of such conversion, each holder of the Notes shall receive all accrued and unpaid interest as of such date plus a customary make-whole premium calculated at the Treasury rate plus 50 basis points. |
| **14.** | **Covenants:** | Covenants to include the following applicable to the Issuer and its subsidiaries (subject to customary exceptions):<br><br>• Prompt notice of any event of default.<br><br>• Merger covenant.<br><br>• Limitations on indebtedness or extensions of credit; including that YES HoldCo may not incur any debt other than a guarantee of the |

Notes and, to the extent that the Notes are secured by a Direct YES Pledge, a subordinated guarantee of the Convertible A Exit Notes.

• Limitations on liens.

• Restricted payments (including any distributions on any equity).

• Affiliate transactions.

• Parameters regarding designees to the Issuer's board of directors to be mutually agreed among Investor and the Initial DIP Commitment Parties.

• Certain Investor approval rights with respect to its first-priority Security, as set forth in Annex VII to the Convertible B Commitment Letter.

• Supermajority approval and notice requirements consistent with those set forth in previous Issuer and Investor investments, as set forth in Annex VII to the Convertible B Commitment Letter.

• Certain Investor approval rights over transfers/issuance of equity of the Issuer, all of the Issuer's subsidiaries, New TopCo, New Intermediate HoldCo, and New Lower-Tier HoldCo, as set forth in Annex VII to the Convertible B Commitment Letter.

• Obligations for the Issuer to use reasonable best efforts in connection with certain matters under the Commercial Term Sheet, as set forth in Annex VII to the Convertible B Commitment Letter.

• Investor approval over certain material commercial actions by the Issuer, as set forth in Annex VII to the Convertible B Commitment Letter.

• Other affirmative and negative covenants customary for secured debt instruments.

Investor consent rights described above (the "Investor Consent Rights") shall be set forth in the Notes and the Issuer's limited liability company agreement (the "Issuer LLCA"). Investor Consent Rights in the Notes to fall away upon earliest of (w) full repayment of the Note Obligations Amount, (x) the consummation of a YES Sale resulting in an offer to purchase at least 75% of the then-applicable Note Obligations Amount, (y) the Notes ceasing to be outstanding (by conversion or otherwise), and (z) Investor's Conversion Units, on an as-converted basis (prior to conversion of the Notes) falling below the Investor Threshold (as defined below).

Investor Consent Rights in the Issuer LLCA to fall away if the sum of Investor's Conversion Units, on an as-converted basis (prior to conversion of the Notes) and any additional common Units held by

へ

<table>
<tr>
<td></td>
<td></td>
<td>Investor pursuant to the exercise of the Investment Option fall below the Investor Threshold, subject to certain continuing approval rights to be negotiated in good faith (e.g., with respect to launches of RSN in new markets).<br><br>For the avoidance of doubt, the Investor Consent Rights under the Issuer LLCA are not conditioned on the Investor Consent Rights under the Notes remaining, or vice versa.</td>
</tr>
<tr>
<td>15.</td>
<td><strong>Information Rights:</strong></td>
<td>Information rights consistent with the Red Seam LLCA.</td>
</tr>
<tr>
<td>16.</td>
<td><strong>Governance:</strong></td>
<td>The Investor will be entitled to designate one seat on the board of directors of the Issuer and will have continuing approvals as a member following conversion consistent with those under the covenants set forth above, subject, in both cases, to the Investor holding at all times, on an as-converted basis (prior to conversion of the Notes), a number of Conversion Units (which shall include any additional common Units held by Investor pursuant to exercise of the Investment Option) equal to at least 1/2 of the Conversion Units that were initially issuable upon full conversion of all of the Notes (the "<u>Investor Threshold</u>"). A repurchase of the Notes by the Issuer will be treated as a sell down by the Investor of its Conversion Units for purposes of the Investor Threshold. The Issuer board shall be no greater than seven directors without the consent of the Investor. Following conversion of the Notes, if Investor holds 20% or more of the outstanding equity securities of the Issuer (the "<u>Minimum Designation Amount</u>"), Investor will be entitled to designate an additional independent director to the Issuer's board. Such designation shall continue as long as the Investor continues to hold the Minimum Designation Amount.<br><br>The Issuer LLCA to include full waiver of fiduciary duties and corporate opportunities for all members of the Issuer and all managers (other than any manager that is an employee of the Issuer or any of its subsidiaries) and include customary preemptive rights on equity issuances, tag rights, ROFO (to only apply at Issuer-level, not at New TopCo), and other rights of members to be negotiated in good faith.</td>
</tr>
<tr>
<td>17.</td>
<td><strong>Conversion Units:</strong></td>
<td>Note holders will vote on an as-converted basis on all matters subject to a vote of the Issuer's unitholders.<br><br>Note holders will be deemed to be the beneficial owners of the Conversion Units on an as-converted basis at all times without conversion (subject in the case of Investor, to Section 23 of this Term Sheet); <u>provided</u> that such Conversion Units will not be entitled to distributions or other economic rights until such time as the Notes are converted (and the rights of such Conversion Units will be subject to adjustment to account for 15% of the Issuer's outstanding equity securities on a pro forma fully diluted basis at the time of conversion (not accounting for the Management Incentive Plan)).</td>
</tr>
</table>

| 18. | **Events of Default:** | Customary events of default for secured indebtedness, including in the event of a material uncured breach by the Issuer or any affiliate under the long form commercial agreement contemplated by the Commercial Term Sheet.  Upon an event of default, there shall be a customary increase in the Interest Rate. |
| --- | --- | --- |
| 19. | **Transfer Restrictions:** | Any transfer of the Notes shall require the prior written consent of the Issuer (not to be unreasonably withheld, conditioned or delayed); <u>provided</u> that the Investor may transfer the Notes to one or more of its affiliates without consent. |
| 20. | **YES Call Option:** | Investor shall have a call option to purchase all, but not less than all, of the YES Interests for a fair market value purchase price of such YES Interests as determined pursuant to the process set forth in Section 7.05(a) of the Red Seam LLCA, as applied *mutatis mutandis*, until the Maturity Date (the "<u>Call Option</u>").  Prior to a full redemption of the Notes, the Call Option is contingent upon Investor's election to have converted the Notes it holds at such time into Conversion Units prior to or contemporaneously with exercise thereof.  The Call Option shall be structured in a manner that does not violate the terms of the Red Seam LLCA.<br><br>In the event of a full or partial redemption of the Notes, the Call Option will continue until the original Maturity Date of the Notes. |
| 21. | **YES Sale Cooperation:** | Investor (or its applicable affiliate) shall reasonably cooperate with a third party sale process for the YES Interests in its capacity as a member of Red Seam Holdings LLC (subject to contractual restrictions); <u>provided</u> that Investor is not waiving, and shall not be required to waive, any of its rights under the Red Seam LLCA. |
| 22. | **Investment Option:** | Investor shall have the option to invest up to $50 million in equity securities of the Issuer at a $500 million equity valuation on or before the 9 month anniversary of the Closing Date (the "<u>Investment Option</u>").  To the extent that the Initial DIP Commitment Parties decline to exercise the full amount of their Investment Option, Investor's option with respect to the Investment Option shall correspondingly be increased. |
| 23. | **Beneficial Ownership Limitation:** | Upon the occurrence of any event set forth in the second sentence of this paragraph, the Issuer shall not honor or permit any discretionary or mandatory conversion of any convertible equity or debt into any shares of the Issuer's capital stock of any class of securities registered under Section 12 or subject to Section 15(d) of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>") if the aggregate holdings of Investor and its affiliates, or those with whom the Investor's holdings would be aggregated for purposes of Section 13(d) or Section 16 of the Exchange Act (collectively, the "<u>Attribution Parties</u>"), would result in the Attribution Parties beneficially owning in excess of 4.999% of the outstanding shares of such class calculated in accordance with Section 13(d) of the |

| | | |
|---|---|---|
| | | Exchange Act and after giving effect to the proposed conversion (the "<u>Beneficial Ownership Limitation</u>").  The Beneficial Ownership Limitation shall take effect upon the earlier of the filing or submission of a registration statement (including in draft form) that includes disclosure of beneficial owners of the Issuer's equity in connection with an initial public offering or direct listing of shares, whether in the United States or elsewhere; the registration of the Issuer's securities under Section 12 of the Exchange Act; or any other event that results in any Issuer shares becoming a class of "equity security," as such term is defined in Rule 13d-1(i) under the Exchange Act, including any merger or other transaction involving a special purpose acquisition company which results in securities of the same class or type as those held by Investor being converted into or exchanged for publicly-traded securities.   The Beneficial Ownership Limitation shall be construed and implemented in a manner otherwise than in strict conformity with its terms to the extent necessary to correct any portion of it (or its entirety) which may be defective or inconsistent with the intended effect of a beneficial ownership limitation or to make changes or supplements necessary or desirable to properly give effect to such limitation.  The Beneficial Ownership Limitation may be waived or amended by Investor in its sole discretion only upon 61 days' written notice to the Issuer, except that in the event of the sale or transfer of 50% or greater voting rights, or sale, transfer or exclusive license of 50% or greater of assets of the Issuer (a "<u>Change of Control</u>;" <u>provided</u> that where 'change of control' or another term of similar import is defined elsewhere in contractual obligations between the Issuer and Investor using a lower percentage, such lower percentage shall apply here), including any notice thereof to Investor, Investor may immediately waive or amend (and may immediately subsequently reinstitute) the Beneficial Ownership Limitation.  The Beneficial Ownership Limitation shall not limit the number of shares of capital stock that Investor may receive or beneficially own in order to determine the amount of securities or consideration that Investor may receive in the event of a Change of Control, and for consideration consisting of securities, the Beneficial Ownership Limitation shall apply to such securities following their issuance or exchange in such Change of Control, unless waived by Investor. |
| 24. | **Certain Tax Matters:** | The Issuer and the Investor intend to treat the Notes as indebtedness for U.S. federal income tax purposes.  For U.S. federal income tax purposes, the Notes, together with the Call Option and the Investment Option, shall be treated as an investment unit, and the Investor and the Issuer shall determine the allocation of purchase price for the investment unit among the Notes, the Call Option and the Investment Option jointly in good faith in a reasonable manner.  Each of the Issuer and the Investor agrees to file tax returns and conduct all audits, claims, investigations, inquiries or other proceedings in respect of taxes consistent with the understandings set forth in this paragraph and to take no contrary position unless otherwise required pursuant to |

Section 1313 of the Code, or any analogous provision of applicable state, local or non-U.S. law.

The Issuer LLCA will provide for customary tax distributions to each holder of membership interests on a quarterly basis that will be treated as advance distributions. The Issuer shall, to the extent available, make "push out" elections described in Section 6226 of the Internal Revenue Code of 1986, as amended, and similar state and local law in connection with any "imputed underpayment" or similar amount. The Investor will be provided with customary tax information for purposes of filings tax returns in connection with the Notes and any other investment in the Issuer.

The Issuer LLCA shall include representations and covenants substantially similar to the below:

"The Issuer represents that it does not directly or through an affiliate or subsidiary conduct regular or continuous business activities (the "Activities") in a jurisdiction outside of the United States (a "Foreign Jurisdiction"). For so long as the Investor holds any membership interest in the Issuer, if the Issuer intends to conduct Activities in a Foreign Jurisdiction, the Issuer shall first notify the Investor in writing of such intention, provided, however, no notification shall be required, if (i) the Activities in the Foreign Jurisdiction will be conducted by an entity that is treated as a corporation for U.S. federal income tax purposes; or (ii) the Issuer has obtained written advice from nationally recognized and reputable counsel in the Foreign Jurisdiction in which such Activities will be conducted, (1) to confirm that such Activities will not be considered a "permanent establishment," "fixed place of business," or the equivalent taxable nexus in such Foreign Jurisdiction under the Foreign Jurisdiction's tax laws then in effect and (2) will not cause the Investor, solely as a result of being a member of the Issuer to be required (a) to file an income tax or information return in such jurisdiction with respect to the Investor's income (other than any form or declaration required to establish the right to a benefit under an applicable tax treaty or an exemption from or reduced rate of withholding, income, capital gains or similar taxes, or in connection with an application for a refund of withholding, income, capital gains or similar taxes), whether or not allocated or distributed by the Issuer, or (b) to pay tax on a net basis in such Foreign Jurisdiction. Within 5 business days of the Investor's receipt of such notice, the Investor shall notify the Issuer in writing as to whether the Investor or any of its affiliates is a "dual resident corporation" or a "separate unit" within the meaning of Section 1503(d) of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations thereunder, with respect to such Foreign Jurisdiction. If the Issuer receives such notice, and if so reasonably requested by the Investor in the notice, the Issuer and the Investor shall cooperate in good faith to find a mutually tax-efficient structure that allows the Issuer to conduct the Activities in the Foreign Jurisdiction consistent with the Issuer's business objectives and U.S.

|  |  | federal, state, local and non-U.S. tax laws and to the extent not inconsistent therewith, taking into account the "dual consolidated loss" considerations of the Investor.

For so long as the Investor holds any membership interest in the Issuer,, if the Issuer becomes aware that the Investor, solely as a result of its ownership of Units or other membership interests of the Issuer, is (i) required to file any income tax return in any Foreign Jurisdiction (other than any tax return, form, or declaration required to establish the right to a benefit under an applicable tax treaty or an exemption from or reduced rate of withholding, income, capital gains, or similar taxes, or in connection with an application for a refund of withholding, income, capital gains or similar taxes) with respect to the profits or income of the Issuer allocated to the Investor on a pass-through basis with respect to the membership interests of the Issuer; or (ii) directly subject to taxation on a net income basis in such Foreign Jurisdiction (other than any tax fully satisfied through withholding) with respect to the profits or income of the Issuer allocated to the Investor on a pass-through basis with respect to the membership interests of the Issuer, then the Issuer will promptly notify the Investor of such filing or taxation.  For so long as the Investor holds any membership interest in the Issuer, the Issuer agrees, upon the Investor's reasonable request, to use commercially reasonable efforts to provide the Investor with any information or other documentation in the Issuer's possession (or reasonably available without undue effort to obtain) that is reasonably necessary to file any such tax return or to contest the position that the Investor is required to file such a tax return or is directly subject to income taxation in such Foreign Jurisdiction (other than any tax fully satisfied through withholding); provided, however, that the Issuer shall not be required to provide information or documentation that is confidential or privileged." |
| 25. | **Expenses:** | Within two Business Days following the date on which the Bankruptcy Court enters the Approval Order, the Issuer shall reimburse the Investor for all of the Investor's reasonable and documented out-of-pocket legal and diligence fees and expenses incurred in connection with this Term Sheet, the Notes, and the restructuring transactions. |

**Exhibit 5**

**Take Back Term Loans Term Sheet**

**Take Back Term Loans Term Sheet**

THIS TAKE BACK TERM LOANS TERM SHEET (THIS "<u>TERM SHEET</u>") SUMMARIZES, ON A PRELIMINARY, INDICATIVE, NON-BINDING, AND SUMMARY-LEVEL BASIS, THE PRINCIPAL TERMS OF THE FACILITY (AS DEFINED BELOW).  THIS TERM SHEET DOES NOT REFLECT OR PURPORT TO DESCRIBE ALL OF THE TERMS AND CONDITIONS OF THE TAKE BACK TERM LOANS (AS DEFINED BELOW) AND THE DEFINITIVE TAKE BACK TERM LOAN DOCUMENTATION (AS DEFINED BELOW), EACH OF WHICH SHALL, NOTWITHSTANDING ANYTHING HEREIN, BE REQUIRED TO BE SATISFACTORY TO THE REQUIRED CONSENTING FIRST LIEN CREDITORS (AS DEFINED IN THE RSA (AS DEFINED BELOW)).  THIS TERM SHEET IS PROVIDED IN CONNECTION WITH THE PROPOSED TRANSACTIONS DESCRIBED IN THE RESTRUCTURING SUPPORT AGREEMENT (THE "<u>RSA</u>").

THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, WITH RESPECT TO ANY SECURITIES, OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.

CAPITALIZED TERMS USED BUT NOT DEFINED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE RSA OR THE RESTRUCTURING TERM SHEET (AS DEFINED IN THE RSA) TO WHICH THIS TERM SHEET IS ATTACHED TO AS **EXHIBIT 5**, AS THE CASE MAY BE.

| 1. | **Borrower:** | OpCo (the "<u>Borrower</u>"). |
|---|---|---|
| 2. | **Guarantors:** | The Take Back Term Loans shall be guaranteed by all wholly-owned subsidiaries of the Borrower (subject to customary exceptions to be agreed) (each such subsidiary guarantor, a "<u>Subsidiary Guarantor</u>"); <u>provided</u>, that any subsidiary of the Borrower that guarantees any of the Convertible A Exit Notes, the Convertible B Exit Notes, or the Exit Term Loans shall also be a guarantor of the Take Back Term Loans. |
| 3. | **Lenders:** | Holders of First Lien Claims and, in connection with the Purchase Option below, Initial DIP Commitment Parties (together with any of their respective designees for receipt of a Take Back Term Loan, each a "<u>Lender</u>" and collectively the "<u>Lenders</u>").<br><br>On or prior to the Closing Date, the Initial DIP Commitment Parties, individually and not jointly, will have the option to purchase up to $100 million in aggregate principal amount of Take Back Term Loans at a discount to par of 10% (the "<u>Purchase Option</u>").  Any cash proceeds received by the Borrower from the Purchase Option, as well as any Take Back Term Loans not subject to the Purchase Option, will be distributed to holders of First Lien Claims. |

| 4. | **Facility Type/Aggregate Principal Amount:** | Take back term loan credit facility (the loans thereunder, the "Take Back Term Loans") in an aggregate principal amount of $200 million.<br><br>The aggregate outstanding principal amount of Take Back Term Loans (in the aggregate) shall be referred to herein as the "Principal Amount." |
| --- | --- | --- |
| 5. | **Administrative Agent and Collateral Agent:** | An entity acceptable to the Required Consenting First Lien Creditors, in consultation with the Company Parties. |
| 6. | **Amendments; Voting Limitation:** | Subject to certain sacred rights customary for term loans, the credit agreement governing the Take Back Term Loans (the "Credit Agreement") may be amended by the Borrower and the Lenders holding a majority of the aggregate outstanding Principal Amount of the then-outstanding Take Back Term Loans (the "Required Lenders").<br><br>If any Lender, together with the affiliates of such Lender, at the time of determination owns beneficially or of record, directly or indirectly, more than 5% of the outstanding equity of New TopCo or the Borrower (such Lender an "Affiliated Lender"), then the holdings of such Affiliated Lender, together with the holdings of all other Affiliated Lenders, shall not account for more than 25% of any vote (regardless of the principal amount held by such Affiliated Lenders). |
| 7. | **Use of Proceeds:** | Distribution to holders of First Lien Claims in accordance with this Term Sheet and the Restructuring Term Sheet. |
| 8. | **Maturity Date:** | Four years from the Closing Date (as defined below) (the "Maturity Date"), at which time the Principal Amount shall become due and payable. |
| 9. | **Closing:** | The Credit Agreement will become effective on the Plan Effective Date upon satisfaction of all conditions precedent to the effectiveness of the Credit Agreement set forth in the Definitive Take Back Term Loan Documentation (defined below) (the "Closing Date"). |
| 10. | **Security:** | The Take Back Term Loans and all other obligations under the Definitive Take Back Term Loan Documentation (collectively, the "Take Back Term Loan Obligations") shall be secured by:<br><br>▪ First priority security interests in, and liens on, (a) subject to customary exceptions to be agreed, all of the assets of the Borrower and each Subsidiary Guarantor, including, for the avoidance of doubt, accounts receivable that are not securitized or otherwise pledged for the benefit of the New A/R Facility, (b) all rights of the Borrower (arising as a result of or related to its holding of equity interests in (including, without limitation, all management rights, voting rights, and interest in any capital account associated in connection therewith), contractual |

relationship with or otherwise) in respect of any special purpose entity that is established for purposes of the New A/R Facility, (c) to the extent that Diamond Sports Finance SPV, LLC has not been dissolved on or prior to the Plan Effective Date, all rights of the Borrower (arising as a result of or related to its holding of equity interests in (including, without limitation, all management rights, voting rights, and interest in any capital account associated in connection therewith), contractual relationship with or otherwise) in respect of Diamond Sports Finance SPV, LLC (provided, however, that, notwithstanding anything to the contrary herein, any cash held by Diamond Sports Finance SPV, LLC on or prior to the Plan Effective Date will be used exclusively to fund distributions under the Plan or be contributed to the Debtors' or reorganized Debtors' balance sheet), and (d) any and all products and proceeds of the forgoing (collectively, the "OpCo Collateral").

- The Take Back Term Loans, the Convertible A Exit Notes, the Convertible B Exit Notes, and the Exit Term Loans will be subject to an intercreditor agreement with respect to the OpCo Collateral, in form and substance satisfactory to the Company Parties, the Required DIP Commitment Parties, and the Required Consenting First Lien Creditors (the "OpCo Intercreditor Agreement").

- The security interests in and liens on the OpCo Collateral securing the Take Back Term Loan Obligations shall be senior to the Convertible A Exit Notes, the Convertible B Exit Notes, and the Exit Term Loans, in each case, subject to the OpCo Intercreditor Agreement.

| 11. | **Interest:** | 11.5% per annum payable quarterly in cash (the "Interest Rate"). |
|---|---|---|
| 12. | **Amortization:** | None. |
| 13. | **Voluntary Prepayments:** | The Borrower may prepay the Take Back Term Loans on a *pro rata* basis, without premium or penalty, at any time upon five business days' notice to the Lenders. |
| 14. | **Mandatory Prepayments:** | The Borrower shall make a mandatory prepayment of the Take Back Term Loans with 60% of OpCo's excess cash flow after debt service and other customary deductions (including deductions for customary tax distributions and for distributions to joint venture partners), with (i) the first such payment to be made for the period commencing with the month of the Debtors' emergence from bankruptcy and ending on December 31, 2024 and (ii) subsequent payments to be made on a quarterly basis following the end of each fiscal quarter of the Borrower thereafter. |

| | | |
|---|---|---|
| | | The Credit Agreement shall include other usual and customary mandatory prepayment provisions in form and substance reasonably satisfactory to the Required Consenting First Lien Creditors. |
| 15. | **Representations and Warranties:** | The Credit Agreement shall include usual and customary representations and warranties applicable to the Borrower and its subsidiaries (subject to customary exceptions to be agreed) in form and substance reasonably satisfactory to the Company Parties, the Required DIP Commitment Parties, and the Required Consenting First Lien Creditors. |
| 16. | **Covenants:** | Covenants to include the following applicable to the Borrower and its subsidiaries (subject to customary exceptions to be agreed), in each case, in form and substance reasonably satisfactory to the Company Parties, the Required DIP Commitment Parties, and the Required Consenting First Lien Creditors: <br><br> ▪ Prompt notice of any event of default; <br><br> ▪ Merger covenant; <br><br> ▪ Limitations on indebtedness; <br><br> ▪ Limitations on liens; <br><br> ▪ Limitations on investments; <br><br> ▪ Limitations on asset sales and other dispositions; <br><br> ▪ Limitations on restricted payments (including any distributions on common equity); <br><br> ▪ Limitations on affiliate transactions; and <br><br> ▪ Other affirmative (including financial reporting) and negative covenants to be mutually agreed by the Company Parties, the Required DIP Commitment Parties, and the Required Consenting First Lien Creditors. |
| 17. | **Information Rights:** | Information rights consistent with the Exit Term Loans. |
| 18. | **Events of Default:** | Customary events of default to be mutually agreed by the Company Parties, the Required DIP Commitment Parties, and the Required Consenting First Lien Creditors, including, without limitations, the occurrence of a change of control of the Borrower or New HoldCo or similar event (other than any such change of control or similar event pursuant to the Plan) and cross-defaults to Convertible A Exit Notes, the Convertible B Exit Notes, and the Exit Term Loans. Upon an event of default, there shall be a customary increase in the Interest Rate per annum payable on demand. |

| 19. | **Definitive Take Back Term Loan Documentation:** | The definitive documentation governing or evidencing the Exit Term Loans (the "<u>Definitive Take Back Term Loan Documentation</u>") shall include the Credit Agreement and all other usual and customary documents, agreements, legal opinions, and other supporting materials to execute the Take Back Term Loans, in each case, in form and substance reasonably satisfactory to the Borrower, the Required DIP Commitment Parties, and the Required Consenting First Lien Creditors. |
| --- | --- | --- |
| 20. | **Governing Law:** | The Definitive Take Back Term Loan Documentation shall be governed by and construed in accordance with the internal laws of the State of New York. |

**Exhibit B**

**[Form of] Joinder**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Amended and Restated Restructuring Support Agreement, dated as of February 26, 2024 (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"), by and among the Company Parties and the Consenting Parties party thereto. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

1.      <u>Agreement to be Bound</u>. The Joinder Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached hereto as <u>Annex I</u> (as the same has been or may hereafter be amended, supplemented, amended and restated, or otherwise modified from time to time in accordance with the provisions hereof). The Joinder Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to all Company Claims/Interests held such Joinder Party.

(a)      <u>Representations and Warranties</u>. The Joinder Party hereby makes the representations and warranties of the Parties and Consenting Creditors set forth in the Agreement to each other Party, including that such Joinder Party is not a Disqualified Party.

2.      <u>Notice</u>. The Joinder Party shall deliver an executed copy of this joinder agreement (the "**Joinder**") to the Parties identified in <u>Section 15.10</u> of the Agreement. Any notices to the Joinder Party shall be provided in accordance with <u>Section 15.10</u> of the Agreement to the following address: [_____].

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Date Executed: _____

_____

Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| First Lien Term Loans | |
| Second Lien Revolving Loans | |
| Second Lien Term Loans | |
| Second Lien Notes | |
| Third Lien Term Loans | |
| Third Lien Notes | |
| Unsecured Notes | |

## Exhibit C

### [Form of] Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Amended and Restated Restructuring Support Agreement, dated as of February 26, 2024 (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"), by and among the Company Parties and the Consenting Parties party thereto, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions of the Agreement to the extent the Transferor was bound, and shall be deemed a "**Consenting Creditor**" and a "**Party**" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed in this Transfer Agreement.

This Transfer Agreement shall be governed by the governing law set forth in the Agreement.

Date Executed:

**[TRANSFEREE]**

_____
Name:
Title:

Address:

E-mail address(es):
Date Executed: _____

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| First Lien Term Loans | |
| Second Lien Revolving Loans | |
| Second Lien Term Loans | |
| Second Lien Notes | |
| Third Lien Term Loans | |
| Third Lien Notes | |
| Unsecured Notes | |