**This Disclosure Statement is being submitted for approval but has not yet been approved by the Bankruptcy Court. This is not a solicitation of acceptance or rejection of the plan. Acceptances or rejections may not be solicited until a disclosure statement has been approved by the Bankruptcy Court. The information in this Disclosure Statement is subject to change. This Disclosure Statement is not an offer to sell any Securities and is not soliciting an offer to buy any Securities.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) | Case No. 23-90116 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DISCLOSURE STATEMENT FOR
## THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

[1] A complete list of each of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG. The Debtors' service address for purposes of the Chapter 11 Cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Brian S. Hermann (admitted *pro hac vice*)
Andrew M. Parlen (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Alice Nofzinger (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
*Counsel to the Debtors and Debtors in Possession*

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Andrew N. Goldman (admitted *pro hac vice*)
Benjamin W. Loveland (admitted *pro hac vice*)
Lauren R. Lifland (admitted *pro hac vice*)
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

*Section 327(e) Counsel to the Debtors and Debtors in Possession*

Dated:  February 29, 2024

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Bryan L. Rochelle (TX Bar No. 24107979)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248

**RECOMMENDATION BY THE DSG BOARD**

The Board of Managers (the "**DSG Board**") of Diamond Sports Group, LLC ("**DSG**") and the board of directors, managers, members, or partners, as applicable, of each of its affiliated debtors and debtors in possession (collectively, the "**Debtors**" or "**Diamond**") have approved the transactions contemplated by the Plan[2] and recommend that all holders ("**Holders**") of Claims whose votes are being solicited submit ballots ("**Ballots**") to **accept** the Plan.

As of the date hereof, Holders of over 94% of the First Lien Claims, over 95% of the Second Lien Claims, and 96% of the Unsecured Notes Claims have already agreed, subject to the terms and conditions of the RSA, to vote in favor of the Plan.

**RECOMMENDATION BY THE UCC**

The UCC is a party to the RSA, supports confirmation of the Plan, and recommends that all Holders of unsecured claims in the Voting Classes vote to **accept** the Plan.

---

**The deadline to vote to accept or reject the Plan is 4:00 p.m. (prevailing Central Time) on [●], 2024 (the "*Voting Deadline*"). The record date for determining which Holders of Claims may vote on the Plan is [●], 2024 (the "*Record Date*").**

---

**DISCLOSURE STATEMENT**

**SOLICITATION OF VOTES ON**
**THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**FROM HOLDERS OF CLAIMS IN THE FOLLOWING CLASSES:**

| Voting Class | Name of Class Under the Plan |
|:---:|:---:|
| **Class 3** | **First Lien Claims** |
| **Class 4** | **Junior Funded Debt Claims** |
| **Class 6** | **General Unsecured Claims** |

**February 29, 2024**

---

[2]   Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meanings ascribed to such terms in the Plan (as defined herein).  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

**Only Holders of Claims in Class 3 (First Lien Claims), Class 4 (Junior Funded Debt Claims), and Class 6 (General Unsecured Claims) (the "*Voting Classes*") are entitled to vote on the Plan and are being solicited to vote on the Plan under this Disclosure Statement.**

**The Plan provides that all Holders of Claims and Interests that (a) do not affirmatively opt out of the Third-Party Release contained in Article VIII.D of the Plan or (b) do not file an objection with the Bankruptcy Court that expressly objects to the inclusion of such Holder as a Releasing Party under the Third-Party Release contained in Article VIII.D of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties. Any Holder of Claims or Interests that objects to or elects to opt out of the Third-Party Release set forth in Article VIII.D of the Plan will forgo the benefit of obtaining the releases set forth in Article VIII of the Plan.**

## DISCLAIMERS

The Debtors are providing the information in this Disclosure Statement to Holders of certain Claims for the purpose of soliciting votes to accept or reject the Plan. The information included in this Disclosure Statement is provided solely for the purpose of soliciting votes under the Plan and should not be relied upon or used by any entity for any purpose other than to determine how to vote on the Plan. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including all attached exhibits and documents incorporated into this Disclosure Statement, as well as the risk factors described in <u>Article VIII</u> of this Disclosure Statement.

Upon confirmation of the Plan, the Securities described in this Disclosure Statement will be issued without registration under the U.S. Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder (the "*Securities Act*"), or similar U.S. federal, state, or local laws to persons resident or otherwise located in the United States in reliance on the exemption set forth in section 1145 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "*Bankruptcy Code*"), Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and/or other available exemption under the securities laws of the United States. Certain other Securities may be issued pursuant to other applicable exemptions under the U.S. federal and applicable state and local securities laws, as applicable. To the extent exemptions from registration under section 1145 of the Bankruptcy Code do not apply, the Securities may not be offered or issued to persons resident or otherwise located in the United States except pursuant to (i) an effective registration statement or (ii) an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. In accordance with section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a Security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor of the debtor under the plan is not liable, on account of such participation, for violation of any applicable law, rule, or regulation concerning the offer, issuance, sale, or purchase of Securities.

Neither the Plan nor any Securities to be issued pursuant to the Plan have been approved or disapproved by the U.S. Securities and Exchange Commission (the "*SEC*") or by any state securities regulatory authority or commission or similar public, governmental, or regulatory authority whether in the United States or elsewhere. This Disclosure Statement has not been filed for approval with the SEC or any state authority and neither the SEC nor any state authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or upon the merits of the Plan. Any representation to the contrary is a criminal offense in the United States. Neither the solicitation of votes on the Plan nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy Securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Disclosure Statement contains "forward-looking statements." Such forward-looking statements consist of any statement other than a recitation of historical fact

and can be identified by the use of forward-looking terminology such as "will," "may," "expect," "anticipate," "believe," "estimate," "forecast," "outlook," "budget," or "continue," or the negative thereof, or other variations thereon or comparable terminology. The Debtors consider all statements regarding anticipated or future matters to be forward-looking statements.

The reader is cautioned that all forward-looking statements are necessarily speculative and based on estimates and assumptions, and that there are certain risks and uncertainties that could cause actual events or results to differ materially from those presented in such forward-looking statements, including, but not limited to, risks and uncertainties described in Article VIII of this Disclosure Statement—"Certain Risk Factors to Be Considered." Statements concerning these and other matters are not guarantees of the Debtors' or Reorganized Debtors' future performance. There are assumptions, estimates, risks, uncertainties, and other important factors that could cause the Debtors' and Reorganized Debtors' actual performance and recoveries to Holders of Claims to be different from what is described herein, and the Debtors expressly disclaim any obligation to update the forward-looking statements, including projections, set forth herein, except as may be required by applicable law. The Liquidation Analysis, projections, and other information contained herein and attached hereto are estimates only, and the value of the property distributed to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate. Forward-looking statements should be evaluated in the context of the assumptions and estimates described herein.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and is not necessarily in accordance with federal or state securities laws or other similar laws.

The Debtors believe that the solicitation of votes on the Plan made by this Disclosure Statement, and the offer of certain new Securities that may be deemed to be made pursuant to the solicitation, are exempt from registration under the Securities Act and related state statutes by reason of the exemption provided by section 1145(a)(1) of the Bankruptcy Code, and that the offer of certain other new Securities are exempt from registration under the Securities Act and related state statutes pursuant to Section 4(a)(2) of the Securities Act and/or Rule 506 of Regulation D promulgated thereunder, and it is expected that the offer and issuance of the Securities under the Plan will be exempt from registration under the Securities Act and related state statutes by reason of the applicability of section 1145(a)(1) of the Bankruptcy Code and Section 4(a)(2) of, and/or Regulation D under, the Securities Act.

To the extent that the Debtors rely on a private placement exemption from registration under the Securities Act for the offer and issuance of any Securities, those Securities will be subject to restrictions on transfer under the Securities Act and may only be resold or otherwise transferred pursuant to (i) an effective registration statement or (ii) an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

No legal, financial, securities, tax, or business advice is provided to you by this Disclosure Statement. The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby. Furthermore, the Bankruptcy Court's approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan or a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein. The Debtors recommend that potential recipients of any Securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such Securities.

This Disclosure Statement contains, among other things, a summary of the Plan, certain events leading up to, during, and expected to occur in the Debtors' chapter 11 cases, and certain documents related to the Plan that are attached hereto, which are incorporated herein by reference, or that may be filed later with the Plan Supplement. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that the summaries do not set forth the entire text of such documents or relevant statutory provisions or every detail of such events, by reference to such documents or statutory provisions. In the event of any conflict, inconsistency, or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents, the Plan or such other documents will govern and control for all purposes. Except as otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any inaccuracy or omission.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' business. The statements contained in this Disclosure Statement are made as of the date hereof unless otherwise specified, are based on the Debtors' current beliefs, intentions, and expectations, and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in such statements, and the Debtors undertake no obligation to update any such statements. The Debtors' management has reviewed the financial information provided in this Disclosure Statement. Although the Debtors sought to ensure the accuracy of this financial information and the Liquidation Analysis, the financial information and Liquidation Analysis contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited (unless otherwise expressly provided herein), and no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' business and its future results and operations. The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

Neither this Disclosure Statement, the Plan, the Confirmation Order, nor the Plan Supplement waive any rights of the Debtors with respect to Holders of Claims or Interests before the Effective Date. Rather, this Disclosure Statement shall constitute a statement made in settlement negotiations related to potential contested matters, potential adversary proceedings, and other pending or threatened litigation or actions.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is or is not identified in this Disclosure Statement.  Except as provided under the Plan, the Debtors or the Reorganized Debtors may seek to investigate, file, and prosecute Claims and Causes of Action and may object to Claims after Confirmation of the Plan or the Effective Date irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims on the terms specified in the Plan.

Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty or obligation to update or otherwise revise such information, including any projections contained herein, to reflect events or circumstances existing or arising after the date hereof or to reflect the occurrence of unanticipated events or otherwise, unless instructed to do so by the Bankruptcy Court. Holders of Claims or Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was sent.  Information contained herein is subject to completion, modification, or amendment.  The Debtors reserve the right to file an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the RSA.

The Debtors have not authorized any other person or entity to give any information or advice in connection with the Plan or the Disclosure Statement other than that which is contained in the Plan or this Disclosure Statement.  The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

Holders of Claims entitled to vote to accept or reject the Plan must rely on their own evaluation of the Debtors and their own analyses of the terms of the Plan in deciding whether to vote to accept or reject the Plan.  Importantly, before deciding whether and how to vote on the Plan, each Holder of a Claim in a Voting Class should review the Plan in its entirety and consider carefully all of the information in this Disclosure Statement and any exhibits hereto.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims or Interests (including those Holders of Claims who do not submit ballots to accept or reject the Plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to become effective will be satisfied (or waived).

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION ....................................................................................................1
    A.    Development of the Plan ................................................................................2
    B.    Plan Overview ...............................................................................................5
    C.    Entitlement to Vote; Estimated Recoveries Under the Plan ..........................8
    D.    Recommendation ...........................................................................................9

ARTICLE II. OVERVIEW OF THE DEBTORS' OPERATIONS ...........................................9
    A.    The Debtors' History ....................................................................................9
    B.    The Debtors' Business ................................................................................12
    C.    Management and Operation of the Debtors' Business ..................................17
    D.    Prepetition Capital Structure .......................................................................19

ARTICLE III. KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11
    CASES ....................................................................................................................22
    A.    Challenges Facing the Debtors' Business ....................................................22
    B.    March 2022 Transactions .............................................................................24
    C.    Retention of Professionals ...........................................................................24
    D.    Prepetition Engagement with Creditors, Sinclair, and the Leagues .............25
    E.    Negotiations Regarding the Initial RSA ......................................................26
    F.    Negotiations Regarding the Use of Cash Collateral .....................................26

ARTICLE IV. THE CHAPTER 11 CASES ...........................................................................27
    A.    Commencement of the Chapter 11 Cases ....................................................27
    B.    Plan Exclusivity ..........................................................................................31
    C.    Investigation and Pursuit of Estate Causes of Action by the Debtors; Sinclair
           Disputes......................................................................................................32
    D.    Addressing Issues with Teams, Leagues, and MVPDs..................................36
    E.    Plan Development and RSA .........................................................................43

ARTICLE V. SUMMARY OF PLAN......................................................................................58
    A.    Administrative and Priority Claims ............................................................58
    B.    Classification, Treatment, and Voting of Claims and Interests .....................62
    C.    Means for Implementation of the Plan.........................................................70
    D.    Settlement, Release, Injunction, and Related Provisions...............................90
    E.    Conditions Precedent to the Effective Date .................................................98

ARTICLE VI. VOTING PROCEDURES AND REQUIREMENTS.........................................101

    A.    Voting Instructions and Voting Deadline ......................................................101

    B.    Voting Procedures............................................................................................102

    C.    Parties Entitled to Vote ...................................................................................103

    D.    Ballots .............................................................................................................103

    E.    Fiduciaries and Other Representatives............................................................103

    F.    Agreements upon Furnishing Ballots..............................................................104

    G.    Change of Vote ...............................................................................................104

    H.    Waivers of Defects, Irregularities, etc. ..........................................................104

    I.    Miscellaneous .................................................................................................105

ARTICLE VII. CONFIRMATION OF THE PLAN ..................................................................105

    A.    Confirmation Hearing .....................................................................................105

    B.    Objections to Confirmation.............................................................................105

    C.    Requirements for Confirmation of the Plan....................................................108

ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED......................................118

    A.    Certain Bankruptcy Law Considerations ........................................................118

    B.    Risks Relating to Recoveries Under the Plan and the Reorganized Debtors' Business ..........................................................................................................123

    C.    Factors Relating to Securities and Certain Other Debt to Be Issued Under the Plan Generally..................................................................................................133

    D.    Additional Factors...........................................................................................137

ARTICLE IX. TRANSFER RESTRICTIONS AND CONSEQUENCES  UNDER FEDERAL SECURITIES LAWS ..................................................................................138

    A.    1145 Securities................................................................................................138

    B.    Private Placement Securities...........................................................................140

ARTICLE X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................................................................................................................143

    A.    U.S. Federal Income Tax Consequences to the Debtors.................................145

    B.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Certain Allowed Claims ...............................................................................................145

    C.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims....................................................................................150

    D.    Certain U.S. Federal Income Tax Consequences of the Litigation Trust and Holders of Litigation Trust Interests................................................................153

    E.    FATCA ............................................................................................................155

    F.    Information Reporting and Withholding on Distributions...............................156

ARTICLE XI. CONCLUSION AND RECOMMENDATION....................................................156

## EXHIBITS

Exhibit A:    Debtors' Joint Chapter 11 Plan of Reorganization

Exhibit B:    RSA

Exhibit C:    Liquidation Analysis

Exhibit D:    Financial Projections

Exhibit E:    Valuation Analysis

---

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT
ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE
AS THOUGH FULLY SET FORTH HEREIN.

---

# ARTICLE I.
## INTRODUCTION[3]

The Debtors submit this Disclosure Statement in connection with the solicitation of votes on the *Debtors' Joint Chapter 11 Plan of Reorganization*, dated February 29, 2024 (as may be amended, restated, modified, or supplemented from time to time, the "***Plan***"), a copy of which is attached hereto as **Exhibit A**.  The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") on March 14 and 15, 2023 (the "***Petition Date***").  The Debtors' chapter 11 cases (the "***Chapter 11 Cases***") are jointly administered under Case No. 23-90116 (CML).

The Plan is the result of months of negotiations among Diamond, an ad hoc group of first lien lenders represented by Kramer Levin Naftalis & Frankel LLP and Centerview Partners LLC (the "***First Lien Group***"), an ad hoc group of secured lenders represented by Gibson Dunn & Crutcher LLP and Evercore Inc. (the "***Second Lien Group***"), an ad hoc group of crossholders of secured and unsecured debt represented by Paul Hastings LLP and PJT Partners, Inc. (the "***Crossholder Group***," and, together with the First Lien Group and the Second Lien Group, the "***Ad Hoc Groups***"), Amazon.com Services LLC ("***Amazon***" or the "***Strategic Investor***"), the official committee of unsecured creditors (the "***UCC***"), Diamond's commercial counterparties, and other parties in interest.[4]  These negotiations, the precursor of which began well before the Petition Date, ultimately were aided by Judge Marvin Isgur (the "***Mediator***"),[5] and reflected the rapidly changing nature of Diamond's business and the televised sports industry more generally, as discussed below.

The Plan contemplates the elimination of more than $8.5 billion of Diamond's funded debt, the separation of Diamond from its parent company, Sinclair Broadcast Group, Inc. ("***SBG***"),[6] the distribution of reorganized equity to certain of Diamond's existing funded debt creditors in exchange for their debt, and a minority investment by Amazon in reorganized Diamond.  Diamond also will enter into a go-forward commercial arrangement with Amazon pursuant to which Amazon Prime Video will become the Debtors' primary partner through which customers will be able to purchase direct-to-consumer access to stream the Debtors' local sports programming (the "***Amazon Commercial Agreement***").  This arrangement will make the Debtors' content available for purchase on a direct-to-consumer basis to many more fans nationwide, and thereby support the Debtors' future growth with audiences amid transition and uncertainty in the traditional

---

[3]   Capitalized terms used but not otherwise defined in this Article I will have the meanings ascribed to such terms elsewhere in this Disclosure Statement or in the Plan, as applicable.

[4]   While not all of these parties have committed to supporting the Plan, the negotiations with each of these parties were necessary predicates to the Debtors' formulation of the Plan.

[5]   As discussed below, both Judge Isgur and Judge Jones were appointed as co-mediators in the Chapter 11 Cases, but Judge Jones ceased his role as mediator upon the announcement of his resignation from the bench on October 15, 2023.

[6]   Pursuant to the internal reorganization described in Article IV.C.1 below, Sinclair Broadcast Group, Inc. was converted to a limited liability company and renamed Sinclair Broadcast Group, LLC.  As used herein, the term "SBG" refers to Sinclair Broadcast Group, Inc. before the internal reorganization and Sinclair Broadcast Group, LLC after the internal reorganization.

cable and satellite broadcast industries.  All together, these transactions will position Diamond to continue to broadcast the games of its team and league partners for the benefit of sports fans in each of Diamond's local markets.

The Plan also contemplates the distribution of $495 million of cash proceeds from the settlement of Diamond's substantial litigation claims against certain parties, including SBG, certain of SBG's affiliates and related individuals, Bally's Corporation ("**Bally's**"), JPMorgan Chase Funding Inc. ("**JPMCFI**"), and JP Morgan Chase & Co. ("**JPMC**," and together with JPMCFI, "**JPM**") (such settlement, the "**Sinclair Settlement**").  To the extent the proceeds of the Sinclair Settlement are not received, the Plan contemplates the creation of a litigation trust to pursue the Sinclair-Related Litigations (as defined herein).

Finally, in accordance with the UCC Settlement, the Plan provides for payment in full of all Allowed Go-Forward Trade Claims and, subject to Payment in Full (as defined in the DIP Order) of all First Lien Claims and the satisfaction of all DIP Obligations, cash payments to Holders of Allowed General Unsecured Claims in an amount equal to the lesser of (i) $13 million and (ii) a dollar amount equal to a 6% recovery on an aggregate basis (the "**Unsecured Claim Cash Distribution**").

**The Debtors believe that the Plan is fair and equitable and maximizes value for all stakeholders.  At this time, the Debtors believe the Plan is the best available option for the Debtors to successfully reorganize as a going concern with a significantly deleveraged balance sheet and well-positioned for growth in the ever-evolving sports broadcasting industry.  The Debtors strongly recommend that you vote to accept the Plan.**

A.    *Development of the Plan*

    1.    **The Initial RSA**

For over two years, Diamond has negotiated with certain of its creditors to substantially deleverage its balance sheet, and with its league and team partners to attempt to secure the rights necessary to grow its direct-to-consumer ("**DTC**") business in the face of a rapidly changing cable television ecosystem.  After months of negotiations, on the Petition Date, Diamond signed a restructuring support agreement (the "**Initial RSA**") with members of the Second Lien Group and the Crossholder Group.  The members of the First Lien Group were not parties to the Initial RSA.

The Initial RSA included an agreement to equitize more than $8 billion of secured and unsecured debt and was predicated on (a) achieving consensus around an acceptable go-forward business plan for a reorganized Diamond to continue as a going concern, (b) leaving the First Lien Claims unimpaired and equitizing all junior debt, and (c) determining whether new money financing was necessary to fund that business plan and reaching agreement on the source of that financing.

The Initial RSA ultimately was not actionable because Diamond and the other parties to the Initial RSA were unable to reach agreement on an acceptable business plan that would leave the First Lien Claims unimpaired and could support an appropriate level of exit financing.  This was due, in significant part, to the fact that Diamond was unable to obtain the necessary DTC rights from its league partners to maintain payments per its current rights agreements.  Obtaining

a broader set of DTC rights was a key part of Diamond's initial proposed business plan to offset declining linear distribution revenue.

As a result, Diamond needed to formulate alternative business plans that were unlikely to leave the First Lien Claims unimpaired, and actively engaged in the process of formulating alternatives with all three Ad Hoc Groups and the UCC.  In the course of these negotiations, significant intercreditor disputes emerged, including, among others, whether the first lien lenders were entitled to a make-whole payment and, if so, whether that make-whole payment became due and payable prior to the Petition Date, the extent of the Debtors' unencumbered value, whether there had been a diminution in value of the secured creditors' collateral, and whether adequate protection payments made to the first lien lenders should be recharacterized as payments of principal.  It also became clear that a significant new money investment likely would be needed for any reorganization to succeed.

2.    **The Cooperation Agreement**

These intercreditor issues paralyzed discussions among the Debtors, the Ad Hoc Groups, and the UCC, and were eventually resolved through mediation and memorialized through an agreement between the Debtors, the First Lien Group, certain other significant funded debt creditors, and the UCC, which also provided for the terms of an agreed baseline business plan (the "***Cooperation Agreement***").

Among other things, the Cooperation Agreement provided a framework for the Debtors to (a) continue to operate their business over the course of the 2023–24 seasons for the National Basketball Association (the "***NBA***") and the National Hockey League (the "***NHL***") and the 2024 season for Major League Baseball ("***MLB***") (collectively, the "***2023–24 Seasons***") and (b) propose a chapter 11 plan that would allocate the costs of the continued administration of the Chapter 11 Cases among the holders of First Lien Claims and junior creditors, distribute the proceeds derived from the continued operation of their business, the liquidation of their litigation claims and other assets, and the residual value of remaining estate interests.

This framework was intended to provide baseline recoveries to creditors, including junior funded debt creditors and general unsecured creditors, and allow the Debtors' counterparties, including their team, league, and distribution partners, to smoothly transition operations over the course of those seasons without an abrupt cessation of broadcasting brought about by an immediate winddown of the Debtors' operations.

Importantly, the Cooperation Agreement did not foreclose potential alternative transactions and instead preserved the Debtors' ability to consider opportunities that could potentially provide greater value to their estates and creditors, consistent with the Debtors' fiduciary duties.  In addition, the effectiveness of the Cooperation Agreement was conditioned on the occurrence of several events, including approval by the Bankruptcy Court of modified agreements with the NBA and NHL, and resolution of motions to compel assumption or rejection of agreements with Sinclair and MLB.  While many of these conditions, including the Bankruptcy Court's approval of modified agreements with the NBA and NHL and denial of the Sinclair Motion to Compel, were satisfied prior to the termination of the Cooperation Agreement, others, including the resolution of

the MLB Motion to Compel, were not.  As a result, the Cooperation Agreement never became fully effective prior to its termination.

3.  **The RSA**

While the Debtors engaged with creditors, teams, and leagues to implement the Cooperation Agreement, the Crossholder Group continued to work with the Debtors to explore restructuring alternatives premised on a reorganization of the Debtors' business as a going concern. Following the Debtors' disclosure to the Crossholder Group of discussions between the Debtors and Amazon concerning a potential commercial arrangement, the Crossholder Group and the Debtors engaged further with Amazon to explore Amazon's participation in a potential alternative to the winddown contemplated by the Cooperation Agreement.

Following several months of negotiations among the Debtors, the Crossholder Group, Amazon, and the First Lien Group, the Debtors executed a restructuring support agreement with those parties on January 16, 2024, which was filed with the Bankruptcy Court on January 17, 2024 [Docket No. 1613] (the "*January RSA*").[7]  After the execution of the January RSA, the Debtors and the other parties to the January RSA engaged in extensive negotiations with the UCC to resolve the UCC's potential objections to certain of the transactions contemplated by the January RSA, including the Debtors' entry into the DIP Facility.  Subsequent to the filing of the January RSA, the Debtors, the First Lien Group, and the Crossholder Group reached a comprehensive settlement with the UCC (the "*UCC Settlement*") resolving the UCC's potential objections (as discussed in more detail below).  On February 26, 2024, the January RSA was amended pursuant to its terms to add the UCC as a party and memorialize the terms of the UCC Settlement, which is attached hereto as **Exhibit B** (the "*RSA*," and the parties thereto, the "*RSA Parties*").  The RSA memorializes the RSA Parties' agreements with respect to a plan of reorganization and related transactions.  These transactions are described in more detail herein and include (a) the provision of a $450 million debtor-in-possession financing facility (the "*DIP Facility*") led by the Crossholder Group, (b) Amazon's commitment to provide $115 million in exit financing through the Convertible B Exit Notes, (c) Amazon's entry into the Amazon Commercial Agreement, and (d) the UCC Settlement.  The Debtors used $350 million of the proceeds of the DIP Facility to repay a like principal amount of the First Lien Claims on the closing date of the DIP Facility.

4.  **Investigation, Litigation, and the Sinclair Settlement**

In parallel with its negotiations with creditors, prior to the Petition Date, Diamond began an investigation of potential claims that it may have against Sinclair and other third parties.  This investigation continued postpetition in cooperation with the UCC, which also launched an investigation into the Debtors' prepetition transactions, and resulted in Diamond commencing litigation in July 2023 against SBG, certain of SBG's affiliates and related individuals, Bally's, and JPM.  This litigation had been ongoing for more than six months when the January RSA was executed, and had been subject to mediation since September 2023.

Contemporaneously with the execution of the January RSA, the Debtors settled their substantial litigation claims against the defendants for a $495 million cash payment to the Debtors,

---

[7]  The Debtors terminated the Cooperation Agreement immediately before entering into the January RSA.

which also resolved all ongoing disputes and claims between the Debtors and Sinclair related to a management services agreement.  The Sinclair Settlement will result in significant cash payments to creditors under the Plan and provide the Debtors with the necessary support and assistance to fully separate their business from Sinclair.

     5.    **Next Steps**

The Debtors continue to work with the NBA and the NHL with respect to modifications to their existing telecast rights agreements, and with their largest MVPDs on longer-term renewals for distribution agreements that would otherwise expire in 2024.  As discussed below, the Debtors have reached a series of agreements with MLB and certain baseball clubs to:  (i) amend the terms of the telecast rights agreements of the Rangers, Guardians and Twins; (ii) continue to perform in the ordinary course of business under the telecast rights agreements of the Braves, Tigers, Brewers, Rays, Cincinnati Reds, Kansas City Royals, Los Angeles Angels, Miami Marlins and St. Louis Cardinals for the 2024 MLB season; and (iii) provide adequate assurances of the foregoing on the terms set forth in the MLB Adequate Assurance Order (as defined below).  The Debtors previously successfully reached agreements with the NBA, the NHL, Comcast, and Charter in connection with implementing the baseline business plan contemplated under the Cooperation Agreement.  The Debtors also were engaged with DIRECTV on a necessary extension for that baseline business plan (in addition to DIRECTV's exercise of an extension option into the summer of 2024).  As part of the pivot to a reorganization, the Debtors are now engaged with the NBA, the NHL, and their MVPD partners, including DIRECTV, Comcast, Charter, and Cox, on their go-forward arrangements in connection with the reorganization contemplated by the Plan.

**B.**    *Plan Overview*

The Plan will allow for the successful reorganization of the Debtors' business as a going concern and maximize value for Holders of Claims.  Pursuant to the Plan:[8]

        a.    The equity of the ultimate parent company of the reorganized Debtors at emergence will be issued as follows (subject to dilution as set forth in the Plan):

                i.    45% to the DIP Commitment Parties;

                ii.    45% to the DIP Lenders; and

---

[8]    The below summary assumes:

    (a)  the Commitment Premium (as defined in the DIP Commitment Letter) and the DIP MOIC (as defined in the DIP Credit Agreement) are not paid in full in cash pursuant to the terms of the DIP Documents; and

    (b)  the Debtors receive $495 million in litigation proceeds pursuant to the Sinclair Settlement on or prior to the Effective Date.

      iii.      10% to Holders of Junior Funded Debt Claims.[9]

b.      In addition to the equity described above, Holders of Junior Funded Debt Claims will receive their *pro rata* share of at least 5% (which percentage is subject to upward adjustment upon repayment of the DIP Claims and the First Lien Claims up to the First Lien Claims Cap) of the Litigation Proceeds (estimated to be approximately $184 million based on the Sinclair Settlement).

c.      In addition to the First Lien Paydown, which was made on February 28, 2024, Holders of First Lien Claims will receive their *pro rata* share (up to the First Lien Claims Cap) of:

      i.      cash in an amount equal to $65 million less the AP Reduction Amount;[10]

      ii.      up to $200 million in aggregate principal amount of Take Back Term Loans (or additional cash in lieu of a portion thereof) to be issued upon the Debtors' emergence from chapter 11 as a going concern; and

      iii.      15% of the Litigation Proceeds (subject to a claims cap and certain adjustments) (estimated to be approximately $47 million based on the Sinclair Settlement).

d.      Holders of General Unsecured Claims will receive their applicable share of the Unsecured Claim Cash Distribution in accordance with the GUC Allocation.[11]

e.      Go-Forward Trade Claims will be unimpaired.

As further described below, the Plan also contemplates new money exit financing in the form of new $115 million convertible notes provided by Amazon (the "***Convertible B Exit Notes***") and a new accounts receivable financing facility (the "***New A/R Facility***") to support the Debtors' go-forward working capital needs.

---

[9]   "***Junior Funded Debt Claims***" means, collectively, the Second Lien Claims, the Third Lien Claims, and the Unsecured Notes Claims.

[10]   "***AP Reduction Amount***" means the aggregate amount of interest paid as adequate protection payments to the First Lien Agent or other holders of First Lien Claims after October 2, 2023, through and including the Effective Date pursuant to the Cash Collateral Order or the DIP Order, as applicable.

[11]   As of the date hereof, the GUC Allocation remains under discussion between the UCC and the Debtors. The Debtors intend to file an updated version of the Plan setting forth the structure and terms of the GUC Allocation (if any) in advance of the hearing to approve the adequacy of the Disclosure Statement.

A simplified organizational chart of the post-Effective Date structure of the Reorganized Debtors as contemplated by the Plan is set forth below:[12]



The Plan is currently supported by the RSA Parties, which includes the UCC, Amazon, and Holders of over 94% of the First Lien Claims, over 95% of the Second Lien Claims, and 96% of the Unsecured Notes Claims.

The Debtors and the RSA Parties believe the Plan will allow the Debtors to emerge from chapter 11 with a sustainable capital structure that will position the Reorganized Debtors to successfully operate in the rapidly-changing sports broadcasting market. Moreover, the Plan will allow the Debtors' business to continue as a going concern for the benefit of their employees, vendors, team and league partners, distributors, advertisers, and sports fans in local sports markets across the nation. The Plan also contemplates the provision of meaningful recoveries to Holders of General Unsecured Claims through the Unsecured Claim Cash Distribution.

---

[12]   As further detailed in the Plan:  (a) if the Litigation Trust is not created pursuant to the Plan, LitigationCo will not be formed in connection with consummation of the Plan; (b) pursuant to the Sinclair Settlement Order, Sinclair may exercise the Marquee Acquisition Right to acquire the Marquee Interests (which would otherwise be held by Marquee HoldCo as indicated in the chart) from the Debtors or Reorganized Debtors, as applicable, within six months of the Effective Date; and (c) if the Initial DIP Commitment Parties exercise the Purchase Option, certain Take Back Term Loans will be issued to the Initial DIP Commitment Parties.

The Debtors believe the proposed Plan is the only viable, feasible plan of reorganization that has support from a critical mass of the Debtors' constituents after months of intense negotiations, and represents the best path forward for the Debtors at this time.

## C. *Entitlement to Vote; Estimated Recoveries Under the Plan*

Under the Bankruptcy Code, only Holders of Claims or Interests in "impaired" Classes are entitled to vote on a chapter 11 plan, unless such Holders are deemed to reject the plan pursuant to section 1126(g) of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a Class of Claims or Interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights of each Holder of such Claim or Interest or (ii) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such Claim or Interest as it existed before the default.

The following table summarizes: (i) the treatment of Claims and Interests under the Plan; (ii) which Classes are impaired by the Plan; (iii) which Classes are entitled to vote on the Plan; and (iv) the estimated recoveries for Holders of Claims and Interests. **The classification, treatment, and the projected recoveries of classified Claims are described in summary form below for illustrative purposes only and are subject to material change. Actual recoveries could differ materially from the estimates in the following table based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceeds the estimates provided below. In such an instance, the recoveries available to the Holders of Claims could be materially lower when compared to the estimates provided below.** To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.[13]

| Class | Claim or Interest | Plan Treatment | Entitlement to Vote | Estimated Allowed Claims | Approx. Percentage Recovery Under the Plan | Approx. Percentage Recovery in a Chapter 7 Liquidation |
|---|---|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | [●] | 100% | [●] |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | [●] | 100% | [●] |
| 3 | First Lien Claims | Impaired | Entitled to Vote | $662,000,000[14] | [●] | [●] |

[13] Any Class of Claims against or Interests in a Debtor that is considered vacant under Article III of the Plan shall be deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject the Plan. Further, any Holder of a Claim or Interest in a Class that is considered vacant under Article III of the Plan will receive no distribution under the Plan.

[14] The Debtors used $350 million of the proceeds of the DIP Facility to repay a like principal amount of the First Lien Claims at the closing of the DIP Facility on February 28, 2024.

8

| Class | Claim or Interest | Plan Treatment | Entitlement to Vote | Estimated Allowed Claims | Approx. Percentage Recovery Under the Plan | Approx. Percentage Recovery in a Chapter 7 Liquidation |
|---|---|---|---|---|---|---|
| 4 | Junior Funded Debt Claims | Impaired | Entitled to Vote | $8,425,611,996.28 | [●] | [●] |
| 5 | Go-Forward Trade Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $8,993,345 | 100% | [●] |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote | [●] | [●] | [●] |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | N/A | N/A | N/A |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | N/A | N/A | N/A |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | 0% | 0% |

## D.     *Recommendation*

The Debtors believe that the Plan reflects the best possible outcome for their estates in the face of extraordinarily challenging and ever-changing market conditions. The Plan is in the best interests of the Debtors' estates, represents the best available path to restructuring their operations, ensures the Debtors will continue as a going concern, and significantly deleverages the Debtors' consolidated balance sheet.

The Debtors strongly urge all Holders of Claims entitled to vote to **accept** the Plan by returning their Ballots, so as to be **actually received** by Kroll Restructuring Administration LLC, the Debtors' claims agent (the "*Claims Agent*"), no later than **[●], 2024, at 4:00 p.m., prevailing Central Time**. The Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The UCC recommends that all Holders of general unsecured claims, including Junior Funded Debt Claims and General Unsecured Claims, vote to **accept** the Plan.

## ARTICLE II.
## OVERVIEW OF THE DEBTORS' OPERATIONS

## A.     *The Debtors' History*

Diamond is the leading provider of local sports programming in the United States. Diamond operates regional sports networks (the "*RSNs*") under the Bally Sports trade name (the "*Bally RSNs*") across the United States and maintains investments in Marquee Sports Network ("*Marquee*"), the local broadcast network for the Chicago Cubs, and the YES Network ("*YES*"),

the local broadcast network for the New York Yankees and Brooklyn Nets.  As of the Petition Date, the Debtors and their non-debtor subsidiaries had dozens of key operational counterparties, including, among others, MLB, the NBA, the NHL, 42 professional sports teams in those leagues, and national and local programming distributors, each of which they contracted with for the purpose of producing and delivering thousands of local professional sports games annually to sports fans located across the United States.[15]

All of Diamond's operations are conducted by direct and indirect subsidiaries of Debtor DSG.  DSG's parent, non-debtor Diamond Sports Intermediate Holdings, LLC ("***Holdings***"), is a holding company that is a wholly-owned indirect subsidiary of Sinclair, Inc. (together with its direct and indirect wholly-owned or controlled subsidiaries, other than the Debtors and their direct and indirect subsidiaries, "***Sinclair***").  A simplified organizational chart is provided below.[16]

---

[15]   As discussed more fully herein, since the Petition Date, the Debtors have exited certain RSNs and rejected certain telecast rights agreements as they have reevaluated their operations during the Chapter 11 Cases.

[16]   Ownership is 100% unless otherwise indicated.  Diamond Sports Net, LLC wholly owns two non-debtor accounts receivable financing special purpose entities:  (i) Diamond Sports Finance SPV, LLC, which was the borrower under the Prepetition A/R Loan Facility (as defined below), and (ii) Diamond Sports Finance SPV II, LLC, which was formed postpetition in anticipation of entering into a new accounts receivable financing facility.



Diamond's predecessors were originally subsidiaries of Twenty-First Century Fox, Inc. ("**Fox**") and operated their RSNs as the "Fox Sports" RSNs.  In 2019, following Disney's acquisition of Fox, SBG acquired the Diamond RSN business from Disney for approximately $10.6 billion.  SBG funded the 2019 acquisition through a combination of third-party debt incurred by DSG, a capital contribution by Sinclair, and an approximately $1 billion preferred equity ("**DSH Preferred Equity**") offering at Diamond Sports Holdings LLC ("**DSH**"), a wholly-owned subsidiary of SBG, to JPMCFI.  The acquisition closed on August 23, 2019.

As described in detail in Article II.C.2 below, since the 2019 acquisition, SBG, through its subsidiaries, has provided services to Diamond pursuant to a management services agreement.

In November 2020, SBG and Bally's, a global gaming, hospitality, and entertainment company, entered into an arrangement, pursuant to which, in March 2021, Diamond, then under SBG's control, rebranded its majority-owned RSNs with the "Bally Sports" name.  The Bally's transaction is discussed more fully herein.

While Diamond was formerly controlled, managed, and operated by SBG and its affiliates, it has been managed independently since May 2022 as a result of the March 2022 Transactions (as defined below), as discussed in further detail below.

11

B.      *The Debtors' Business*

1.      <u>**Overview of the RSN Landscape**</u>

Diamond's business primarily consists of the operation of RSNs, including the production and distribution of live sports and related programming for telecast, streaming, and advertising sales.  Diamond's business historically has been reliant on multichannel video programming distributors ("***MVPDs***"), such as DIRECTV, LLC (together with its affiliates, "***DIRECTV***"), Charter Communications, Inc. ("***Charter***"), and Comcast Corporation ("***Comcast***"), to reach consumers by being part of the traditional cable bundle (i.e., television programming delivered through cable and satellite providers).  But in recent years, traditional MVPDs across the industry have been impacted by the increasing consumption of television programming through streaming services rather than cable and satellite.

Diamond is acutely aware of consumers' changing preferences.  To address cord-cutting, Diamond has expanded its product offerings by delivering its programming through virtual multichannel video programming distributors ("***vMVPDs***") such as DIRECTV STREAM and FuboTV.  Diamond has also sought to transform its historic business to offer DTC programming on Bally Sports+, the new streaming service it launched in September 2022.

As of the Petition Date, Diamond's RSN portfolio consisted of three types of RSNs:

- 13 Bally RSNs operated by Diamond;

- six Bally RSNs operated by non-debtor affiliates in which Diamond owns a majority interest and an MLB team holds a minority interest (such non-debtor entities, the "***Bally JVs***"); and

- two non-Bally RSNs, Marquee and YES, operated by non-debtor entities in which Diamond owns non-majority interests (such non-debtor entities, the "***Non-Bally JVs***," and together with the Bally JVs, the "***JVs***").

The RSNs are organized by region, with each RSN airing the games of major league sports teams for which such RSN has rights within that region.  The broad geographic scope of the RSNs and the teams whose games they broadcasted as of the Petition Date is illustrated below:

12



### 2.   **Transition to DTC**

Diamond's DTC products include its "TV Everywhere" product, which is available in the Bally Sports app or on the MVPDs' own apps, and its Bally Sports+ platform, which was launched in September 2022 to allow sports fans to obtain streaming content via direct subscription. The goal for Bally Sports+ is to enable anyone to access live local sports content from anywhere, whether or not they subscribe to a traditional cable or satellite television bundle or to a vMVPD that carries the Bally RSNs. As discussed further below, Diamond's relationships with its team and league partners remain critical to the continuation and any further expansion and development of Diamond's DTC offerings.

As of the Petition Date, Diamond and the Bally JVs monetized DTC rights for all of the NBA and NHL teams with which they have telecast agreements and for each of the Detroit Tigers, the Kansas City Royals, the Milwaukee Brewers, the Miami Marlins, and the Tampa Bay Rays. Diamond and the Bally JVs did not have DTC rights for any of the other MLB teams with which they had a telecast agreement. These DTC rights allowed Diamond and the Bally JVs to stream content from these teams through "TV Everywhere" and Bally Sports+.

As of the Petition Date, Diamond had been actively pursuing a DTC strategy to give customers direct access and greater freedom, choice, and flexibility in terms of the content they want to receive and how they receive it. Debtor Diamond Digital Group, LLC is engaged in the development and commercialization of Diamond's DTC initiatives, including the Bally Sports+ platform.

3.      **Team/League Rights Agreements**

As of the Petition Date, Diamond, the Bally JVs, YES, and Marquee had exclusive multi-year rights agreements to air the games of 16 MLB teams, 17 NBA teams, and 12 NHL teams on the RSNs.  Generally, under the rights agreements, the teams grant the applicable Diamond or joint venture entity the exclusive right to telecast all local games (that are not selected for exclusive national telecast) within a specified territory in exchange for annual payments to the teams.  The specified territory generally includes the city where the team's stadium or arena is located and the surrounding area.  Most of the Diamond and Bally JV entities that operate the Bally RSNs have rights agreements with at least one MLB and one NBA or NHL team, which allows the applicable RSN to offer year-round live sports programming to sports fans.

The below chart summarizes the teams and Diamond or joint venture entities that were party to the rights agreements associated with the RSNs as of the Petition Date:

| RSN | Diamond or JV Entity | MLB Teams | NBA Teams | NHL Teams |
|---|---|---|---|---|
| **Bally Sports Arizona** | Diamond Sports Net Arizona, LLC | | | |
| **Bally Sports Detroit** | Diamond Sports Net Detroit, LLC | | | |
| **Bally Sports Florida** | Diamond Sports Net Florida 2, LLC | | | |
| **Bally Sports Sun** | Diamond Sports Sun, LLC | | | |
| **Bally Sports Indiana Bally Sports Kansas City** | Diamond Sports Kansas City, LLC | | | |
| **Bally Sports Midwest** | Diamond Sports Net St. Louis, LLC | | | |
| **Bally Sports North Bally Sports Wisconsin** | Diamond Sports Net North, LLC | | | |
| **Bally Sports Ohio** | Diamond Sports Net Ohio, LLC | | | |
| | Diamond Sports Net Cincinnati, LLC | | | |
| **Bally Sports Great Lakes** | Diamond Ohio Holdings II, LLC | | | |

| RSN | Diamond or JV Entity | MLB Teams | NBA Teams | NHL Teams |
|---|---|---|---|---|
| Bally Sports San Diego[17] | RSNCO, LLC | SD | | |
| Bally Sports SoCal | Diamond Sports Net West 2, LLC | | CLIPPERS | Anaheim Ducks |
| Bally Sports West | Diamond Sports Net West, LLC | A | | LA Kings |
| Bally Sports South[18] | SportSouth Network, LLC | | | Carolina Hurricanes / Nashville Predators |
| Bally Sports Southeast | SportSouth Network II, LLC | Braves | Atlanta Hawks / Hornets / Memphis Grizzlies | |
| Bally Sports Southwest | ARC Holding Ltd. | Texas Rangers | Dallas Mavericks / San Antonio Spurs | Dallas Stars |
| Bally Sports New Orleans | | | New Orleans Pelicans | |
| Bally Sports Oklahoma | | | Thunder | |
| Marquee | Marquee Sports Network, LLC | Cubs | | |
| YES | Red Seam Holdings LLC | Yankees | Nets Brooklyn | |

As of the Petition Date, the team rights agreements were set to expire between (i) 2023 and 2035 (with an average remaining length of six years) for MLB teams, (ii) 2023 and 2030 (with an average remaining length of three years) for NBA teams, and (iii) 2023 and 2030 (with an average remaining length of two years) for NHL teams. As discussed above, Diamond also has agreements with certain league partners that provide Diamond access to certain additional rights, including digital rights.

In addition to their agreements with MLB, NBA, and NHL teams, as of the Petition Date, certain Diamond and joint venture entities are parties to rights agreements that allow them to telecast other content, such as Major League Soccer, certain National Football League teams' pre-season games, certain college and high school sports games, World Poker Tour events, and horse racing. The RSNs round out their on-air programming with content obtained through individual, short-term agreements for particular events or television series and with their own self-produced content.

---

[17]   Bally Sports San Diego also airs Los Angeles Clippers and Anaheim Ducks games.

[18]   Bally Sports South also airs Atlanta Braves games.

4.       **Distribution Agreements**

Diamond has historically generated the majority of its revenue from distributing its RSNs through MVPDs such as AT&T, Charter, Comcast, Cox Communications, Inc., and DIRECTV, and vMVPDs such as DIRECTV STREAM and FuboTV (MVPDs and vMVPDs together, the "***Distributors***"). Approximately 83% of Diamond's revenue is generated from distributing its RSNs through the Distributors. Pursuant to Diamond's agreements with the Distributors (the "***Distribution Agreements***"), the Distributors pay Diamond monthly licensing fees in exchange for content from the Bally RSNs, which the Distributors then provide to residential and/or commercial consumers. Most of Diamond's distribution revenue (approximately 81%) is in turn derived from three large national MVPDs: DIRECTV, Charter, and Comcast. While Diamond derives most of its distribution revenue from these three large national Distributors, Diamond has Distribution Agreements with hundreds of Distributors, most of which serve small local markets.

The Distribution Agreements generally require the RSNs to meet certain thresholds (e.g., a minimum number of telecasts per year). In the event the RSNs fail to meet the thresholds, the Distribution Agreements contain fee reduction, rebate, refund, and/or termination provisions in favor of the Distributors.

From 2019 to the Petition Date, the number of Diamond's subscribers has declined by approximately 22 million, or 35%. These declines have been driven by, among other things, changes in consumer behavior, including through cord-cutting, and losses of Distributors in recent years.

The sale of advertising on the RSNs is historically Diamond's second largest source of revenue. Diamond generates advertising revenue primarily from the sale of advertising spots and impressions within RSN programming. The terms of Diamond's advertising arrangements are generally less than one year. Under certain of its advertising arrangements, Diamond provides audience ratings guarantees. In the event of a shortfall, Diamond will deliver additional advertising to the applicable advertisers until the ratings shortfall is settled.

5.       **Agreements with Bally's**

On November 18, 2020, Bally's and SBG entered into a Framework Agreement (the "***Bally's Framework Agreement***"). Diamond is not a party to the Bally's Framework Agreement. On the same date, Bally's, SBG, and DSG entered into a related commercial agreement pursuant to which DSG granted Bally's certain naming rights with respect to the Debtors' RSNs (the "***Bally's Commercial Agreement***").

Pursuant to the Bally's Framework Agreement and the Bally's Commercial Agreement, among other things, (i) Bally's obtained the naming rights of the 19 RSNs then owned by Diamond, which were rebranded as "Bally Sports," (ii) Sinclair received various warrants and options with respect to the common stock of Bally's, valued at more than $184 million at the time when the Bally's Framework Agreement was executed, and (iii) Diamond would receive naming rights fees from Bally's totaling approximately $88 million over ten years.

The initial term of the Bally's Commercial Agreement is 10 years from the date on which the rebranding of the RSNs was implemented.  That term could be renewed for one additional five-year term unless either Bally's or Sinclair elect not to renew.  While Bally's and SBG each have renewal and termination rights under the Bally's Commercial Agreement, Diamond has neither.

Under the Sinclair Settlement, upon entry of the order approving the Sinclair Settlement (the "***Sinclair Settlement Order***"), the Bally's Commercial Agreement (and any other contracts Diamond has with Bally's) will be rejected, and Bally's will release and waive any claims against Diamond, including any claims for rejection damages.  Diamond may, however, continue to use the Bally's trade name (at no cost to Diamond) through the end of the 2024 MLB season.

**C.**     ***Management and Operation of the Debtors' Business***

  1.     **DSG Board and Committees**

From August 2019 until May 2022, Diamond was controlled, managed, and operated by Sinclair, including through its affiliates and appointees.  As a result of the March 2022 Transactions, as described more fully below, the DSG Board was reconstituted in May 2022 to consist of a majority of independent managers.  As a result, management of DSG has since been vested in a board of managers that is independent from Sinclair.

Since May 2022 and currently, the DSG Board has consisted of five members: Mr. Randy Freer, Mr. David Preschlack, Ms. Maryann Turcke, Mr. Robert Whitsitt, and Mr. Christopher Ripley.  Mr. Freer serves as the Chairman of the Board.

In December 2022, to facilitate an efficient and independent governance process and to evaluate transactions, agreements, disputes, and other matters involving Diamond, on the one hand, and Sinclair and other third parties, on the other hand (the foregoing, collectively, the "***Related Party Matters***"), the DSG Board determined that it was appropriate and in DSG's best interest to establish a conflicts committee of the DSG Board (the "***Conflicts Committee***"). The DSG Board appointed Ms. Turcke and Messrs. Freer, Preschlack, and Whitsitt, all of whom are independent of Sinclair, to serve on the Conflicts Committee.

The DSG Board delegated to the Conflicts Committee, among other things, the full authority of the Board with respect to any Related Party Matter that is exclusively between Diamond and Sinclair.  The Conflicts Committee subsequently determined it was desirable and in the best interests of Diamond to establish a special subcommittee of the Conflicts Committee (the "***Claims Analysis Subcommittee***") empowered to, among other things, conduct a detailed investigation of potential legal claims of any nature that may be brought by Diamond against third parties, including Sinclair.  The Claims Analysis Subcommittee was established on January 28, 2023, and consists of Ms. Turcke and Mr. Freer, with Ms. Turcke serving as Chairperson of the Subcommittee.

After the commencement of the Chapter 11 Cases, on September 8, 2023, the DSG Board unanimously voted to rename the Conflicts Committee the "***Conflicts & Restructuring Committee***" and expand its authority to also include the authority to review, approve, and implement strategic alternatives available to the Debtors in their ongoing Chapter 11 Cases.

17

The following table sets forth the names of Diamond's principal executive officers and their current positions:

| Name | Position |
|---|---|
| David Preschlack | Chief Executive Officer |
| David F. DeVoe, Jr. | Chief Financial Officer and Chief Operating Officer |

2. **The MSA**

In connection with SBG's 2019 acquisition of Diamond, DSG and Sinclair Television Group, Inc. ("**STG**"), a subsidiary of SBG, entered into a management services agreement, dated as of August 23, 2019, by and between DSG and Sinclair Television Group, Inc. (as may have been amended, restated, modified, or supplemented from time to time, the "**MSA**"). In connection with the March 2022 Transactions, Sinclair entered into a letter agreement with Diamond and its prepetition first and second lien indenture trustees that altered the cash payment of a significant amount of MSA fees (the "**MSA Letter Agreement**").

The term of the MSA is from August 23, 2019, through August 23, 2024, subject to renewal for three five-year terms at Sinclair's sole option. Pursuant to the MSA, STG and certain of its affiliates provide Diamond with various managerial, operational, and administrative services that are critical to Diamond's day-to-day business operations, including certain sales and marketing, legal and business affairs, finance and accounting, IT support, payroll, employee benefits, and insurance services.

Debtor Diamond Sports Net, LLC ("**DSN**"), a wholly-owned direct subsidiary of DSG, pays Sinclair certain fees for the services provided to Diamond pursuant to the MSA, and DSG and DSN reimburse Sinclair for costs attributable to Diamond's business.

Under the MSA Letter Agreement—largely negotiated and agreed to by Sinclair and the Debtors' secured creditors at the time—the Debtors were obligated to pay Sinclair an average of over $4 million each month for base and incentive fees, and the remaining monthly balance was deferred (the "**Deferred Fees**") until the earlier of (a) the stated maturity, repayment, or refinancing in full of the Debtors' prepetition first lien term loan facility, (b) a bankruptcy filing by DSG, and (c) a change of control of DSG consented to by a majority of DSG's prepetition first lien and second lien funded debt creditors. The MSA Letter Agreement also contained a clause providing that all Deferred Fees would need to be paid in full if the MSA was assumed. The Debtors have asserted that the MSA Letter Agreement was an amendment to the MSA and that the provision purporting to reinstate the Deferred Fees upon a bankruptcy filing by DSG is an unenforceable *ipso facto* clause, and Sinclair has disputed these assertions.

Disputes regarding the MSA (including whether the MSA Letter Agreement was an amendment to the MSA) arose between Diamond and Sinclair during the Chapter 11 Cases, and were resolved through the Sinclair Settlement, which is described in Article IV.C below. Pursuant to the Sinclair Settlement, the Debtors and Sinclair will enter into an amended MSA to implement the terms of the Sinclair Settlement. On February 29, 2024, the Debtors filed a notice indicating that the Debtors and Sinclair have reached final agreement on the amended MSA and are prepared to execute it upon entry of the Sinclair Settlement Order [Docket No. 1843].

3.      **Governance and Management of the Bally JVs**

Diamond generally controls the day-to-day governance and management of the Bally JVs, with the minority owners generally having consent rights over certain transactions.  Diamond also provides technical and overhead services to certain of the Bally JVs pursuant to contractual arrangements with those Bally JVs.

The minority owners of the Bally JVs are entities affiliated with the Cincinnati Reds, the Kansas City Royals, the Los Angeles Angels, the Miami Marlins, the San Diego Padres, and the St. Louis Cardinals.  Diamond has also entered into a binding term sheet with the Milwaukee Brewers with respect to a joint venture with that team.

4.      **Management of YES and Marquee**

Since 2019, Debtor Sports Network, LLC has been a 50% joint venture partner with the Chicago Cubs in Marquee Sports Network, LLC, which owns and operates Marquee.

Also since 2019, Debtor Sports Network II, LLC has owned a 20% investment interest in Red Seam Holdings LLC, which is a joint venture among Sports Network II, LLC, the New York Yankees, and other joint venture partners.  Red Seam Holdings LLC, through its indirect wholly-owned subsidiary, owns and operates YES.

Affiliates of Sinclair provide management services to each of YES and Marquee through separate management services agreements.

**D.      *Prepetition Capital Structure***

1.      **Funded Indebtedness**

As of the Petition Date, Diamond had approximately $8.845 billion in aggregate principal amount of funded debt obligations outstanding.  The following table summarizes Diamond's funded indebtedness outstanding and the obligations of its non-debtor affiliate, Diamond Sports Finance SPV, LLC ("***DSPV***"), under the Prepetition A/R Loan Facility (as defined below), each as of the Petition Date:[19]

---

[19]   The following description of the Debtors' funded indebtedness is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

| Agreement[20] | Principal Amount Outstanding[21] | Maturity Date |
|---|---|---|
| **Secured Funded Debt** | | |
| First Lien Credit Agreement, dated as of March 1, 2022 (the "*First Lien Credit Agreement*") | $630.2 million of term loans (the "*First Lien Loans*") | May 25, 2026 |
| Second Lien Credit Agreement, dated as of March 1, 2022 (the "*Second Lien Credit Agreement*") | $227.5 million of revolving loans (the "*Second Lien RCF Loans*") | May 25, 2026 |
| | $3.189 billion of term loans (the "*Second Lien Term Loans*," and together with the Second lien RCF Loans, the "*Second Lien Loans*") | August 24, 2026 |
| Indenture, dated as of March 1, 2022 (the "*Second Lien Indenture*") | $3.040 billion of 5.375% Senior Secured Second Lien Notes due 2026 (the "*Second Lien Notes*") | August 15, 2026 |
| Third Lien Credit Agreement, dated as of August 23, 2019 (the "*Third Lien Credit Agreement*") | $4.1 million of term loans (the "*Third Lien Loans*") | August 24, 2026 |
| Indenture, dated as of August 2, 2019 (the "*Third Lien Indenture*") | $10.2 million of 5.375% Senior Secured Notes due 2026 (the "*Third Lien Notes*") | August 15, 2026 |
| **Unsecured Funded Debt** | | |
| Indenture, dated as of August 2, 2019 (the "*Unsecured Notes Indenture*") | $1.744 billion of 6.625% Senior Notes due 2027 (the "*Unsecured Notes*") | August 15, 2027 |
| **Prepetition A/R Loan Facility** | | |
| Amended and Restated Loan and Security Agreement, dated as of June 25, 2021 | $192.5 million of revolving loans | December 22, 2024 |

DSG is the borrower under the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Third Lien Credit Agreement. DSG and non-debtor Diamond Sports Finance Company, which is a wholly-owned subsidiary of Holdings, are the issuers under the Second Lien Indenture, the Third Lien Indenture, and the Unsecured Notes Indenture. Non-debtor DSPV is the borrower under the Prepetition A/R Loan Facility, which is described further below.

---

[20] All agreements listed are as amended, restated, supplemented, or otherwise modified from time to time, including, but not limited to, with respect to the Third Lien Credit Agreement, pursuant to that certain First Amendment dated as of December 20, 2019, and that certain Second Amendment dated as of March 1, 2022, and, with respect to the Third Lien Indenture, pursuant to that certain Supplemental Indenture No. 4 dated as of March 1, 2022.

[21] All amounts approximate as of the Petition Date.

The obligations under the First Lien Credit Agreement, the Second Lien Credit Agreement, the Second Lien Indenture, and the Unsecured Notes Indenture are guaranteed by Holdings and all of its wholly-owned subsidiaries except DSPV (the "**Guarantors**").   The obligations under the Third Lien Credit Agreement and Third Lien Indenture are guaranteed by all of the Guarantors except Debtor Diamond Gaming Services, LLC.

The obligations under the First Lien Credit Agreement are secured by first-priority liens on substantially all of the assets of DSG, Holdings, and the Guarantors (subject to certain customary exclusions), including Diamond's equity in the Bally JVs (the "**Prepetition Collateral**").   The obligations under the Second Lien Credit Agreement and the Second Lien Indenture are secured by second-priority liens on the Prepetition Collateral that rank *pari passu* with each other.   The obligations under the Third Lien Credit Agreement and Third Lien Indenture are secured by third-priority liens on all of the Prepetition Collateral except for the assets of Debtor Diamond Gaming Services, LLC; those liens also rank *pari passu* with each other.

The respective rights and interests of the lenders and noteholders under the First Lien Credit Agreement, the Second Lien Credit Agreement, the Second Lien Indenture, the Third Lien Credit Agreement, and the Third Lien Indenture are governed by three intercreditor agreements, each dated March 1, 2022 (collectively, the "**Intercreditor Agreements**").   Among other things, the Intercreditor Agreements set forth the parties' respective rights and interests relating to their rights to the Prepetition Collateral, their ability to exercise remedies in connection with an event of default, and their relative rights and obligations in the event of a chapter 11 filing by Diamond. Pursuant to the Intercreditor Agreements, the liens securing the obligations under the Third Lien Credit Agreement and the Third Lien Notes are subordinate to any liens securing the obligations under the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Second Lien Notes and the liens securing the obligations under the Second Lien Credit Agreement and the Second Lien Notes are subordinate to any liens securing the obligations under the First Lien Credit Agreement.

2.    **Prepetition A/R Loan Facility**

In addition to the loans and notes described above, prior to the Petition Date, Diamond also had a program in place (the "**Receivables Program**") with respect to accounts receivable (the "**Receivables**").   The Receivables Program had two essential aspects:  the A/R Purchase Agreement and the Prepetition A/R Loan Facility, each defined and described below.

Under a Purchase and Sale Agreement, dated as of September 23, 2020 (as amended and modified, the "**A/R Purchase Agreement**"), certain of the Diamond entities (the "**Prepetition Originators**") sold Receivables to DSPV, a non-debtor special-purpose entity, for cash used to meet Diamond's liquidity needs.

In addition, under an Amended and Restated Loan and Security Agreement, dated as of June 25, 2021 (the revolving credit facility thereunder, the "**Prepetition A/R Loan Facility**"), DSPV borrowed from Sinclair to fund DSPV's purchase of Receivables from the Prepetition Originators.

21

As of the Petition Date, the Prepetition A/R Loan Facility was secured by substantially all of the assets of DSPV, including the Receivables and the cash proceeds therefrom. Diamond did not guarantee the obligations under the Prepetition A/R Loan Facility, and the secured parties under the Prepetition A/R Loan Facility did not have recourse to Diamond except in limited circumstances for indemnification obligations.

Since the Petition Date, the Debtors have not been able to utilize the Prepetition A/R Loan Facility, as the filing of the Chapter 11 Cases triggered an event of default thereunder that prevented further draws. To minimize ongoing interest and unused commitment fee expenses, the Debtors caused DSPV to significantly pay down the outstanding balance of the Prepetition A/R Loan Facility in May 2023. The Prepetition A/R Loan Facility will be terminated upon approval of the Sinclair Settlement, and all security interests granted in connection with the Prepetition A/R Loan Facility will be released. On the Effective Date, all cash held by DSPV, which is approximately $50 million as of the date hereof, will be used to fund certain distributions under the Plan or otherwise be retained or contributed to, as applicable, New OpCo's (or its subsidiaries') balance sheet. As detailed further below, the Debtors intend to enter into a new accounts receivable financing facility on or before emergence from chapter 11.

3.    **Equity Ownership**

As of the date hereof, non-debtor Holdings, an indirect subsidiary of Sinclair, Inc. that is controlled by Sinclair, Inc., holds 100% of the equity interests in Debtor DSG. Each of the other Debtors is a direct or indirect wholly-owned subsidiary of DSG.

## ARTICLE III.
## KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

A.    *Challenges Facing the Debtors' Business*

1.    **Changing Industry Business Model**

Since even before Sinclair's 2019 acquisition of Diamond, Diamond's business faced material challenges driven in large part by a fundamental market shift away from traditional cable and satellite (i.e., linear) television. Under the established linear television model, various channels are packaged, or "bundled," together as part of each consumer's cable or satellite subscription. These bundles typically include RSNs, which consumers pay for through their subscription fees to MVPDs, with the MVPDs in turn paying carriage fees to the RSNs. Prior to cord-cutting, when cable and satellite subscriptions were the primary means of accessing television programming, this model was highly profitable—RSNs earned increasing carriage fees from MVPDs driven by higher annual rates while subscriber levels remained stable. Accordingly, RSNs were able to share a portion of increasing distribution revenue with professional sports teams via increasing fees to acquire sports broadcasting rights.

As new digital platforms emerged, however, consumers began cutting the cord on traditional linear television and/or paring down large bundles. Over the past decade, about 42 million U.S. households have abandoned their traditional pay-television plans, and most of them did not replace those plans with web-based alternatives, meaning that they gave up on live television altogether. This has affected Distributors' willingness to continue contracting with

Diamond, thus eroding Diamond's distribution revenue streams.  For example, Diamond lost carriage with Hulu + Live TV, YouTube TV, DISH Network, and DISH Network's wholly-owned subsidiary, Sling TV, over the course of 2019 and 2020.  Coupled with increased subscriber loss, or "churn," at Diamond's remaining Distributors, these events collectively drove an approximate $810 million, or 22.6%, decline in revenue from 2019 to 2022 (exclusive of the impact of any accrued rebates and related adjustments).

Given Diamond's historical reliance on traditional MVPDs to generate distribution revenue, the industry trend towards cord-cutting has significantly impacted Diamond's business.  As a result, certain rights fee arrangements that were first agreed to years ago have become uneconomic due to the changed broadcasting model, putting significant pressure on Diamond's ability to pay teams the rights fees under these agreements.  These challenges are not unique to Diamond—they are being faced industry-wide, and in particular in the RSN business.  For instance, Warner Bros. Discovery, the parent company of AT&T Sports Networks, announced in February 2023 that it was exiting the RSN business and has since shut down all of its RSNs.  Moreover, other cable channel operators, such as ESPN, are preparing for a future where they must reach customers directly rather than relying on the traditional MVPD business model.  Most recently, on February 6, 2024, ESPN, Warner Bros. Discovery, and Fox Corp. announced a new venture that would stream games from all major sports leagues.  According to *The Wall Street Journal*, this deal shows that, "as pay television's decline accelerates because of cord-cutting, companies such as ESPN, Warner and Fox are seeing the writing on the wall and shifting their bets to the streaming world."[22]

At the same time, major MVPDs, especially those with sizable broadband businesses, are approaching distribution negotiations with programming providers such as Diamond more aggressively than in the past due to their materially declining subscriber bases (and therefore subscription revenues).  These MVPDs have publicly asserted that they no longer see cable television as their key revenue driver (compared to their more lucrative broadband business) while they still collectively represent a large portion of the programming providers' earnings.  For example, amid negotiations regarding an extension of their carriage agreement, Disney and Charter engaged in a heated, public dispute in August and September 2023, which resulted in Disney's agreement to make certain Disney streaming offerings available to certain Charter cable customers.

2.  **Development of DTC Business**

As noted above, in response to the significant headwinds facing the traditional television broadcasting industry, Diamond has implemented digital initiatives designed to develop and expand consumer access to live local sports through its DTC platforms.  As of the Petition Date, Diamond monetized DTC rights for 16 NBA teams, 12 NHL teams, and five MLB teams.

Despite Diamond's advancements in developing its DTC initiatives throughout 2021, Diamond continued to face adverse market conditions, including increases in cord-cutting and

---

[22]   Joe Flint & Isabella Simonetti, ESPN, Fox and Warner Team Up to Create Sports Streaming Platform, The Wall Street Journal, Feb. 6, 2024, https://www.wsj.com/business/media/fox-warner-bros-discovery-and-disney-create-new-sports-streaming-venture-c9836792.

subscriber churn.  Accordingly, in late 2021, Diamond began exploring options to enable it to execute on its strategic vision and position itself for future success.

**B.**     *March 2022 Transactions*

Beginning in January 2021, Diamond engaged with certain lenders and holders of its secured and unsecured funded debt obligations regarding potential financing and recapitalization transactions to provide Diamond with additional liquidity to bolster operations, reassure counterparties of Diamond's viability, and enable Diamond to continue actively pursuing its DTC strategy.  On January 13, 2022, Diamond entered into a Transaction Support Agreement with certain of its secured lenders and noteholders to implement refinancing and recapitalization transactions.  On March 1, 2022, Diamond closed on these transactions (the "***March 2022 Transactions***"), which resulted in (a) Diamond receiving $635 million of new money financing through the First Lien Loans and (b) the exchange of DSG's then-existing first lien credit agreement and note obligations for the Second Lien Loans and Second Lien Notes (including the exchange of DSG's then-existing revolving credit facility into the Second Lien RCF Loans).  The obligations owed to lenders and noteholders that did not participate in the March 2022 Transactions became the Third Lien Loans and Third Lien Notes.  The March 2022 Transactions did not affect the Unsecured Notes.  In connection with the March 2022 Transactions, DSG also redeemed approximately all of its then-outstanding (approximately $31 million in principal amount) 12.75% Senior Secured Notes due 2026.  Wilmer Cutler Pickering Hale and Dorr LLP ("***WilmerHale***") and Moelis & Company LLC ("***Moelis***") represented Diamond in connection with the March 2022 Transactions.

As noted above, as a result of the March 2022 Transactions, the DSG Board was reconstituted in May 2022 to consist of a majority of independent managers, with two of the independent managers selected by the lenders under the First Lien Credit Agreement, one independent manager mutually selected by such lenders and Sinclair, and one independent manager selected by Sinclair and Sinclair's Chief Executive Officer to serve on the DSG Board.  In addition, as a result of the transition to independent management after the March 2022 Transactions, Diamond's financial statements were deconsolidated from Sinclair's beginning with the quarterly financial statements for the first quarter of 2022.

**C.**     *Retention of Professionals*

Following the March 2022 Transactions, Diamond continued to face greater-than-expected subscriber churn and emerging macroeconomic headwinds.  As a result of these market conditions, Diamond determined that it was prudent to engage restructuring advisors to assess all potential strategic alternatives to address Diamond's increasingly unsustainable capital structure.

In May 2022, the new DSG Board retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("***Paul, Weiss***") to assist principally with restructuring matters.  In September 2022, Diamond engaged Moelis and LionTree Advisors LLC ("***LionTree***") as its investment bankers to provide financial advice and analysis in connection with potential strategic transactions.  In December 2022, Paul, Weiss was asked to broaden its mandate to include representing Diamond, alongside WilmerHale, in connection with Diamond's strategic and corporate transactional matters, including a potential restructuring.  Diamond subsequently engaged AlixPartners, LLP

("**AlixPartners**") as its financial advisor and Porter Hedges LLP as its Texas counsel in January 2023.

### D.    *Prepetition Engagement with Creditors, Sinclair, and the Leagues*

Beginning in the fall of 2022, Diamond facilitated negotiations among its stakeholders, including the Second Lien Group, the Crossholder Group, and Sinclair, regarding Diamond's go-forward business, capital structure, and ownership.  In early January, these negotiations resulted in a deal in principle among those ad hoc groups and Sinclair on the key terms of a restructuring of Diamond's balance sheet and a separation of Diamond's business from Sinclair.  Diamond made clear that any agreement with Sinclair would need to be predicated on Diamond's Conflicts Committee completing its ongoing investigation into prepetition transactions between Sinclair and Diamond and a determination that any releases in a transaction were in the best interests of Diamond and its stakeholders.

Concurrently, Diamond engaged with each of MLB, the NBA, and the NHL regarding its potential restructuring and what that could mean for Diamond's operations, and in particular the continued development of its DTC business.  In addition to discussions with the leagues, Diamond also held discussions with certain of its individual team partners.

On January 11, 2023, as negotiations continued, Diamond drew the full amount of its Second Lien RCF Loans, adding approximately $227.5 million in additional liquidity.  On February 15, 2023, to preserve its financial flexibility and provide its stakeholders with additional time to coalesce around a go-forward business plan, Diamond elected to enter the 30-day grace period with respect to the approximately $140 million cash interest payments scheduled to be paid on its prepetition secured and unsecured notes.  Additionally, on February 22, 2023, to facilitate continued access to the Prepetition A/R Loan Facility, Diamond and Sinclair entered into a waiver of specified defaults under that facility related to the non-payment of the February 15 notes interest payment.

Diamond had also been reviewing its rights payments and considering its options with respect to its obligations to its team partners.  Diamond kept its organized creditors informed on these discussions as the DSG Board made decisions on whether to enter the payment grace period with respect to any rights agreement.  On March 1, 2023, as stakeholder negotiations continued, Diamond elected to enter the grace period with respect to a rights fee payment due under its rights agreement with AZPB Limited Partnership (the "**Diamondbacks**").  Diamond similarly did not make a payment to Raycom on February 28, 2023, with respect to the rights to broadcast Atlantic Coast Conference college sporting events on certain RSNs.

On March 11, 2023, Rangers Baseball LLC (the "**Rangers**"), the owner and operator of the Texas Rangers MLB team, delivered a "Notice of Default and Termination" (the "**Termination Notice**") related to that certain Telecast Rights Agreement, dated as of August 11, 2010, by and between the Rangers and Debtor ARC Holding, Ltd. ("**ARC Holding**," and such agreement, the "**Rangers Agreement**").  In the Termination Notice, the Rangers asserted that an event of default on account of ARC Holding's alleged insolvency had occurred under the Rangers Agreement.  The Rangers purported to terminate the Rangers Agreement, effective March 15, 2023, unless certain conditions were met.  ARC Holding had never missed a payment to the

Rangers and made a substantial payment to the Rangers in February pursuant to the Rangers Agreement.  ARC Holding and Diamond disputed the Rangers' assertions in the Termination Notice and were prepared to take all legal actions to protect ARC Holding's rights under the Rangers Agreement.  ARC Holding entered into a series of standstill agreements and related amendments and broadcasted all Rangers games in the 2023 MLB season that ARC Holding was permitted to broadcast pursuant to the terms of the Rangers Agreement.  As discussed in <u>Article IV.D.1</u> below, on February 9, 2024, the Debtors assumed the Rangers Agreement on amended terms, including a waiver of the purported event of default that was the subject of the Termination Notice.

E.    *Negotiations Regarding the Initial RSA*

On March 15, 2023, following extensive, good-faith, and arm's-length negotiations and concurrently with Diamond's commencement of the Chapter 11 Cases, Diamond and members of the Second Lien Group and the Crossholder Group executed the Initial RSA, which memorialized the parties' agreement on the key terms of transactions to be implemented through prearranged Chapter 11 Cases.  Members of the First Lien Group did not become parties to the  Initial RSA. Pursuant to the Initial RSA and subject to the conditions specified therein, members of the Second Lien Group and the Crossholder Group agreed, among other things, to support the restructuring transactions contemplated in the Initial RSA and vote in favor of a chapter 11 plan of reorganization consistent with the Initial RSA.

As further discussed in <u>Article IV.E.1</u> below, the Debtors ultimately determined that the Initial RSA was not actionable, and the Debtors and their stakeholders continued to negotiate alternatives throughout the Chapter 11 Cases.

F.    *Negotiations Regarding the Use of Cash Collateral*

As of the Petition Date, the Debtors and the Bally JVs collectively held approximately $426.6 million of cash on hand, of which approximately $115.0 million was held at the Bally JVs. Diamond's use of this cash was, and remains, critical to the Chapter 11 Cases because without access to cash collateral, Diamond would not have the means to continue operating its business or fund the administrative costs of the Chapter 11 Cases.  While Diamond negotiated the Initial RSA, it simultaneously engaged in discussions with all three Ad Hoc Groups regarding the consensual use of cash collateral.  Diamond sought to obtain the consent of lenders representing a majority of its first lien loans (the "***Majority 1L Lenders***") regarding the use of cash collateral to avoid a contested fight before the Bankruptcy Court on that issue at the outset of the Chapter 11 Cases.

Shortly before the Petition Date, the Majority 1L Lenders agreed to Diamond's consensual use of cash collateral in compliance with an approved initial budget, subject to certain permitted variances.  Approval of Diamond's use of cash collateral during the Chapter 11 Cases is discussed more fully below.

# ARTICLE IV.
## THE CHAPTER 11 CASES

A.   ***Commencement of the Chapter 11 Cases***

     1.   **First Day Motions**

To minimize disruption to the Debtors' operations, on and shortly after the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court (collectively, the "***First Day Motions***"), including First Day Motions to (a) use cash collateral and declare certain prepetition secured parties adequately protected [Docket No. 25] (the "***Cash Collateral Motion***"); (b) continue utilizing the Debtors' prepetition cash management system, including with respect to intercompany transactions [Docket No. 14] (the "***Cash Management Motion***"); (c) honor customer obligations in the ordinary course of business [Docket No. 11]; (d) make payment on account of prepetition claims of certain critical vendors, foreign vendors, and 503(b)(9) claimants [Docket No. 10]; (e) pay prepetition wage claims and related obligations in the ordinary course of business and continue certain employee benefit programs [Docket No. 12]; (f) pay certain taxes and fees [Docket No. 9]; and (g) establish procedures for utilities to request adequate assurance, pursuant to which the utilities were prohibited from discontinuing service except in certain circumstances [Docket No. 8]. On March 15, March 16, and April 11, 2023, the Bankruptcy Court entered orders granting the final relief requested in these First Day Motions, with the exception of the Cash Management Motion and the Cash Collateral Motion, which were granted on a final basis on April 20, 2023, and May 9, 2023, respectively.

     2.   **Appointment of the UCC**

On March 27, 2023, the Office of the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***") appointed the UCC pursuant to section 1102(a) of the Bankruptcy Code [Docket No. 247]. The UCC includes (a) Harte-Hanks Response Management/Austin, Inc.; (b) U.S. Bank Trust Company, National Association, as indenture trustee for the prepetition Unsecured Notes; (c) Intelsat US LLC; and (d) VITAC Corporation.

The UCC filed applications to retain Akin Gump Strauss Hauer & Feld LLP, as counsel [Docket No. 458], FTI Consulting, Inc., as financial advisor [Docket No. 459], Houlihan Lokey Capital, Inc., as investment banker [Docket No. 460], and Reid Collins & Tsai LLP, as special counsel [Docket No. 1034]. The Bankruptcy Court approved these retention applications [Docket Nos. 742–744, 1130].

     3.   **Approval of Use of Cash Collateral**

As discussed above, in the weeks leading up to the Petition Date, Diamond and its advisors worked with their organized creditor groups and certain individual first lien creditors to agree on terms for the consensual use of cash collateral. Eventually, the Debtors reached a package deal with the Majority 1L Lenders regarding the consensual use of cash collateral, including the Debtors' operating in accordance with a budget as approved by the Majority 1L Lenders. On March 16, 2023, the Bankruptcy Court entered an order granting interim relief for the Debtors' use of cash collateral [Docket No. 145].

Shortly after its appointment, the UCC raised several concerns to the Debtors and the Ad Hoc Groups related to final approval of the Debtors' use of cash collateral. Over the course of the following weeks, the Debtors, the UCC, and the First Lien Group engaged in extensive discussions regarding the relief sought by the Cash Collateral Motion. As a result of these discussions, the parties reached agreement regarding several modifications to the proposed Cash Collateral Order (as defined below), including with respect to, among other things, (i) the UCC's ability to investigate and/or contest the allowance of certain prepetition liens and claims, (ii) certain limitations on the Majority 1L Lenders' ability to terminate the Debtors' access to Cash Collateral and (iii) the provision of financial reporting to the UCC's advisors. In light of these modifications, the UCC thereafter agreed to support entry of the Cash Collateral Order.

In addition to the UCC's concerns, which were consensually resolved, a number of baseball clubs[23] and MLB filed objections to final approval of the Cash Collateral Motion [Docket Nos. 313, 369], which centered around whether the Debtors would make payments to MLB teams during the pendency of the Chapter 11 Cases and as more fully addressed in MLB and certain clubs' Motions to Compel Payment (as defined herein). The Debtors and their advisors endeavored to resolve this issue with MLB and the clubs. On April 21, 2023, the Bankruptcy Court entered an order granting further interim relief for the Debtors' use of cash collateral [Docket No. 390], which order incorporated, among other things, the modifications negotiated with the UCC and provided for payment of 50% of the contractual telecast rights fees owed by Diamond entities to the Guardians, Diamondbacks, Rangers, and Twins, with the remaining rights fee amounts for such clubs held in a segregated account pending a final hearing on the Motions to Compel Payment, as described in detail below.

The Debtors continued working with MLB and the clubs to resolve their objections to final approval of the use of cash collateral, ultimately reaching a settlement with MLB and the clubs to pay 75% of the outstanding rights fees, with the remaining amounts owed under the telecast rights agreements continuing to be held in a segregated account pending resolution of the Motions to Compel Payment. Following this resolution, on May 9, 2023, the Bankruptcy Court entered a final order approving the Debtors' use of cash collateral [Docket No. 572] (the "**Cash Collateral Order**").

As discussed below in Article IV.E.6, on January 23, 2024, the Debtors filed a motion seeking approval of the DIP Facility (the "**DIP Motion**"). On February 26, 2024, the Bankruptcy Court entered an order approving the DIP Facility [Docket No. 1834] (the "**DIP Order**"), which has superseded the Cash Collateral Order.

4.   **Other Procedural and Administrative Motions**

In the ordinary course of business, the Debtors employ professionals to render a wide variety of counsel related to matters that have a direct and significant impact on the Debtors' day-to-day operations. The Debtors filed a motion to continue to retain and compensate these

---

[23]   These clubs include the Diamondbacks, Atlanta National League Baseball Club, LLC (the "**Braves**"), Cleveland Guardians Baseball Company, LLC (the "**Guardians**"), Detroit Tigers, Inc. (the "**Tigers**"), Milwaukee Brewers Baseball Club, Limited Partnership (the "**Brewers**"), Minnesota Twins, LLC (the "**Twins**"), Rays Baseball Club, LLC (the "**Rays**"), and the Rangers.

ordinary course professionals, including law firms, attorneys, accountants, consultants, and other non-attorney professionals, without the need to file individual fee applications [Docket No. 684]. On June 9, 2023, the Bankruptcy Court entered an order granting the motion [Docket No. 851].

The Debtors filed applications to retain the following to assist the Debtors with carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases:  (a) Kroll Restructuring Administration LLC, as claims, noticing, and solicitation agent [Docket No. 4]; (b) Paul, Weiss, as lead counsel [Docket No. 319]; (c) Porter Hedges LLP, as Texas counsel [Docket No. 318]; (d) WilmerHale, as special corporate and litigation counsel [Docket No. 320]; (e) AlixPartners, as financial advisor [Docket No. 321]; (f) Moelis & Company LLC, as co-investment banker and financial advisor [Docket No. 322]; (g) LionTree Advisors LLC, as co-investment banker and financial advisor [Docket No. 323]; (h) Deloitte Tax LLP, as tax advisory services provider [Docket No. 324]; (i) Deloitte Financial Advisory Services LLP, as accounting advisory services provider [Docket No. 325]; (j) Deloitte Consulting LLP, as consulting services provider [Docket No. 326]; and (k) Quinn Emanuel Urquhart & Sullivan, LLP ("***Quinn Emanuel***"), as special litigation counsel for the purpose of investigating and asserting claims the Debtors may have against J.P. Morgan & Co. and/or its affiliated entities [Docket No. 931].

The Bankruptcy Court approved the retention of these applications (except for the retention applications for Moelis, LionTree, and Quinn Emanuel) on March 15, 2023 [Docket No. 45], May 3, 2023 [Docket Nos. 478–481, 485–486], and May 5, 2023 [Docket No. 511].   The applications for Moelis and LionTree were approved on June 13, 2023 [Docket Nos. 870, 871], after the Debtors resolved certain issues related to such retentions raised by the UCC.   The Bankruptcy Court approved the Quinn Emanuel retention application on July 20, 2023 [Docket No. 983].

On August 22, 2023, the Debtors filed a supplemental application seeking authorization for AlixPartners to provide addition litigation support consulting services to the Debtors [Docket No. 1125], which application was approved by the Bankruptcy Court on September 19, 2023 [Docket No. 1187].

The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court. The Debtors filed a motion to establish a process for the monthly allowance and payment of compensation and the reimbursement of expenses for those professionals whose services are authorized by the Bankruptcy Court [Docket No. 333], which the Bankruptcy Court approved on May 5, 2023 [Docket No. 512].

5.     **Schedules and Statements, Claims Process, 2015.3 Reports, Section 341 Meeting, and Civil Action Removal Period**

On May 12, 2023, each of the Debtors filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases (all such schedules, the "***Schedules***"), and statements of financial affairs (such statements, the "***Statements***") [Docket Nos. 597–648, 654–661].  On July 18, 2023, Debtor Diamond Ohio Holdings II, LLC filed amended Schedules and Debtor Diamond Sports Net, LLC filed amended Schedules and amended Statements [Docket Nos. 968, 971–972].

After the filing of the Schedules and Statements, the Bankruptcy Court entered an order establishing July 17, 2023, at 5:00 p.m., prevailing Central Time (the "***Claims Bar Date***"), and September 11, 2023, at 5:00 p.m., prevailing Central Time (the "***Governmental Bar Date***"), as the deadlines by which non-governmental claimants and governmental claimants, respectively, must file a proof of claim in the Chapter 11 Cases.  In addition, with respect to any claims arising from the Debtors' rejection of executory contracts and unexpired leases, the order established the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Central Time, on the date that is 30 days following entry of the order approving the Debtors' rejection of the applicable executory contract or unexpired lease as the rejection damages bar date.  Finally, if the Debtors amend the Schedules, any claims arising due to such amendment will be due 30 days from the date the notice of the Schedule amendment is mailed.

The Debtors are continuing to review proofs of claim filed on or before the Claims Bar Date at this time.  The Debtors cannot predict with certainty the outcome of the resolution of claims (including in connection with the rejections of contracts) arising out of their business operations.

Bankruptcy Rule 2015.3 requires a chapter 11 debtor to file periodic financial reports with respect to each entity that is not a debtor or a publicly traded entity in which the estate holds a substantial or controlling interest.  On May 11, 2023, the Debtors filed their first such report for the Bally JVs and for the Mobile Television Group [Docket No. 587].  In discussions with the U.S. Trustee, the U.S. Trustee agreed that the Debtors did not need to file a similar report for Debtor Sports Network LLC's interest in Marquee Sports Network, LLC, based on the terms of the relevant limited liability company agreement.  The U.S. Trustee, however, informed the Debtors they would need to seek a formal Bankruptcy Court waiver with respect to Debtor Sports Network II, LLC owning a 20% interest in Red Seam Holdings LLC ("***Red Seam***"), a joint venture that owns and operates the YES network through Yankees Entertainment and Sports Network, LLC, its indirect, wholly-owned subsidiary.  On May 11, 2023, the Debtors therefore also sought entry of an order finding that the Debtors do not have a substantial or controlling interest in Red Seam or, in the alternative, waiving the reporting requirements with respect to Red Seam under Bankruptcy Rule 2015.3 [Docket No. 588].  On June 8, 2023, the Bankruptcy Court entered an order finding that the Bankruptcy Rule 2015.3 does not apply as, solely for purposes of Bankruptcy Rule 2015.3, the Debtors do not own a substantial or controlling interest in Red Seam [Docket No. 841].

Section 341 of the Bankruptcy Code requires the U.S. Trustee to convene and preside over a meeting of creditors (the "***Section 341 Meeting***").  The Debtors' final Section 341 Meeting took place on May 25, 2023, after the filing of the Schedules and Statements.

Bankruptcy Rule 9027 and 28 U.S.C. § 1452 provide that a debtor may remove civil actions for a period of 90 days after the Petition Date, subject to extension for cause shown.  The Debtors were not aware of any civil actions to which any Debtor was a party and none were disclosed in the Schedules.  Out of an abundance of caution, however, the Debtors sought to extend the time within which the Debtors may file notices of removal of civil actions [Docket No. 843].  The Bankruptcy Court granted an extension through October 10, 2023 [Docket No. 934].  On October 9, 2023, the Debtors filed a second motion seeking to further extend the deadline to remove civil actions through February 7, 2024 [Docket No. 1248], which was granted by the Bankruptcy Court on November 3, 2023 [Docket No. 1338].  On February 5, 2024, the Debtors

filed a third motion seeking to further extend the deadline to remove civil actions through June 6, 2024 [Docket No. 1696], which was granted by the Bankruptcy Court on February 28, 2024 [Docket No. 1838].

6.      **Lease Assumption Extensions**

The Debtors had an initial 120-day period to assume or reject their unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code, which period would have expired on July 12, 2023, for the majority of the Debtors.  On July 11, 2023, the Debtors filed a motion seeking an extension of the deadline to assume or reject unexpired leases of nonresidential real property by 90 days, through and including October 11, 2023 [Docket No. 951].  This motion was approved on August 2, 2023 [Docket No. 1031].  On October 10, 2023, the Debtors, after receiving the written consent from each landlord, filed a second motion seeking to further extend the deadline to assume or reject unexpired leases of nonresidential real property through and including December 31, 2023 [Docket No. 1251].  In granting the Debtors' second motion to extend the deadline to assume or reject unexpired leases, the Bankruptcy Court also authorized further extensions that would automatically take effect upon the Debtors' filing a notice that a landlord had consented to such extensions [Docket No. 1339].  On December 21, 2023, the Debtors filed two such notices, indicating that the landlords for eight of the Debtors' leases consented to an extension to March 31, 2024 [Docket No. 1533], and the landlord for one of the Debtors' leases consented to an extension to March 15, 2024 [Docket No. 1534].

B.      *Plan Exclusivity*

Pursuant to section 1121 of the Bankruptcy Code, the initial 120-day period during which the Debtors had the exclusive right to file a chapter 11 plan would have expired on July 12, 2023, and the initial 180-day period within which the Debtors had the exclusive right to solicit votes on a plan would expire on September 11, 2023 (because the 180-day period otherwise would have expired on Sunday, September 10, 2023), for the majority of the Debtors.  Prior to the expiration of the plan filing exclusivity period, on July 11, 2023, the Debtors filed a motion [Docket No. 953] (the "*First Exclusivity Motion*") seeking to extend each of the plan filing and plan solicitation exclusivity periods by 120 days, which would extend the exclusivity periods to November 9, 2023, and January 8, 2024, respectively.

The UCC and the First Lien Group filed limited objections to the First Exclusivity Motion [Docket Nos. 1026, 1027], seeking to limit the extension to a shorter period.  In addition, DIRECTV filed a limited statement [Docket No. 1028] in connection with the requested relief.  Thereafter, the Debtors engaged in negotiations with the UCC and the First Lien Group to address their objections.  Parties ultimately agreed on an 80-day extension of the plan exclusivity period.  On August 10, 2023, the Bankruptcy Court entered an order extending the Debtors' exclusivity periods by 80 days [Docket No. 1052].

On September 29, 2023, the Debtors filed a second motion [Docket No. 1236] (the "*Second Exclusivity Motion*") seeking to further extend each of the plan filing and plan solicitation exclusivity periods by 60 days, which would extend the exclusivity periods to November 29, 2023, and January 29, 2024, respectively.  MLB and certain MLB teams (i.e., the Braves, Guardians, Tigers, Brewers, and Rangers (collectively, the "*Clubs*")) collectively filed a

limited objection [Docket No. 1060] to the Second Exclusivity Motion seeking a denial of such motion. The objectors asserted that the Debtors failed to show that cause exists to further extend the exclusivity periods. In addition, DIRECTV and the UCC each filed limited statements [Docket Nos. 1275, 1311] in connection with the requested relief. On November 8, 2023, the Debtors filed a reply in support of the Second Exclusivity Motion [Docket No. 1358], which was joined by the First Lien Group [Docket No. 1360]. Ultimately, no objections were pressed at the hearing on the Second Exclusivity Motion. On November 15, 2023, the Bankruptcy Court entered an order granting the Second Exclusivity Motion [Docket No. 1377].

On November 28, 2023, the Debtors filed their third request for an extension of their exclusive periods to file a plan and solicit acceptances thereof, through and including March 28, 2024, and May 28, 2024, respectively [Docket No. 1461] (the "***Third Exclusivity Motion***"). No parties objected to the Third Exclusivity Motion, and on December 20, 2023, the Bankruptcy Court entered an order granting the Third Exclusivity Motion [Docket No. 1532].

**C.**     ***Investigation and Pursuit of Estate Causes of Action by the Debtors; Sinclair Disputes***

1.     **The DSG Board's Investigation of Potential Claims and Causes of Action**

As described above in Article II.C.1, prior to the Petition Date, the DSG Board established the Conflicts Committee (now the Conflicts & Restructuring Committee), which in turn established the Claims Analysis Subcommittee, to conduct a detailed investigation of potential legal claims of any nature that may be brought by Diamond against third parties, including Sinclair.

Upon its formation, the Claims Analysis Subcommittee began an extensive, months-long investigation into potential claims against Sinclair and other third parties. As part of this investigation, the Debtors made numerous document requests to Sinclair, JPM, Bally's, and certain other third parties, held interviews with several key individuals, reviewed more than 60,000 documents received in connection with the investigation, and took 13 depositions. Ultimately, and as further described below, the investigation led the Debtors to commence adversary proceedings against Sinclair, Bally's, JPM, and other parties.

Immediately after its formation and retention of professionals, the UCC also launched an investigation into the Debtors' prepetition transactions. In connection therewith, the UCC sent information and Rule 2004 discovery requests to the Debtors and various third parties, including Sinclair. The UCC was active in the Rule 2004 investigation, including analyzing document productions and participating in depositions. Looking to avoid duplication of efforts and unnecessary expense, the UCC worked closely with the Debtors on a common interest basis to both support the Debtors' investigative efforts and conduct its own independent analysis and review. The UCC played an important role in developing the claims and legal theories that led to the filing of the adversary proceedings.

Prior to and following the establishment of the Conflicts Committee, Diamond made proactive efforts to preserve its claims against Sinclair and its ability to recover from Sinclair. On October 20, 2022, Diamond entered into a tolling agreement with Sinclair and certain of its subsidiaries, pursuant to which the Sinclair entities agreed to toll the statute of limitation and any similar legal bar for commencing an action until June 13, 2023, which covered any claims

Diamond could assert against the Sinclair entities and their directors and officers in its own right or under any cause of action belonging to or actionable by Diamond's bankruptcy estates, including pursuant to sections 544 and 548 of the Bankruptcy Code.  On May 26, 2023, the parties agreed to extend the tolling agreement's effect through December 13, 2023.

In addition, on April 3, 2023, Sinclair announced its intent to implement an internal reorganization, pursuant to which a new holding company would be created, which would then own the existing equity in SBG, and certain of SBG's assets would be transferred to a new and separate entity, Sinclair Ventures, Inc., which new entity would be held by the new holding company.  The assets to be transferred to Sinclair Ventures, Inc. included certain potentially valuable assets such as the Tennis Channel and certain real estate and marketing assets.  The Debtors informed Sinclair and its advisors that they were concerned about the impact of these transfers on the potential claims and causes of action that the Debtors were actively investigating.  The Debtors, working with the UCC, negotiated and executed a stipulation with Sinclair and its affiliates that provides to the Debtors, their estates, and their assigns a guarantee of collection from the newly created Sinclair entities (and future wholly-owned or controlled entities) and certain notice rights with respect to future transactions.  This stipulation was entered by the Bankruptcy Court on May 30, 2023 [Docket No. 760].  Sinclair completed its internal reorganization on June 1, 2023.

## 2.    __The Adversary Proceedings Against Sinclair and Other Parties__

After months of extensive investigation conducted by the Claims Analysis Subcommittee and the Debtors' advisors, in coordination with the UCC, on July 19, 2023, Debtors DSG and DSN initiated separate adversary proceedings (collectively, the "***Adversary Proceedings***") against Sinclair and certain Sinclair-related entities and persons (collectively, the "***Sinclair Defendants***") and Bally's, and against JPM [Sinclair Adv. Docket Nos. 2, 27; JPM Adv. Docket Nos. 2, 25] (the "***Complaints***").[24]  The Complaints sought over $1.5 billion based on several claims asserted against the defendants, including alleged actual and constructive fraudulent transfer, breaches of contract, breaches of fiduciary duties, and other causes of action relating to, among other things:

    a.  the redemption of the Sinclair-guaranteed preferred equity interests of JPMCFI with more than $900 million of cash from Diamond;

    b.  the MSA, including but not limited to the fees paid and payable by Diamond thereunder and the relative value of the MSA services provided to Diamond in exchange; and

    c.  the Bally's partnership transaction, under which Sinclair received equity from Bally's worth at least $184 million.

---

[24]   The claims brought in the adversary proceedings are discussed at length in the Complaints.  Any summary of the Adversary Proceedings in this Disclosure Statement is qualified in its entirety by the Complaints.

As alleged in the Complaints, the Debtors contend that either these actions were taken when the Debtors were insolvent or that such actions caused the Debtors to become insolvent. The Sinclair Defendants, Bally's, and JPM dispute the allegations in the Complaints.

On July 19, 2023, and August 8, 2023, respectively, the Debtors and the UCC filed joint stipulations to document the agreement for the UCC's consensual intervention as an intervenor-plaintiff in each Adversary Proceeding [Sinclair Adv. Pro., Docket No. 4; JPM Adv. Pro., Docket No. 10] (the "***Intervention Stipulations***"). The UCC's rights as intervenor-plaintiff were limited to the claims brought by DSG and DSN and its participation in the Adversary Proceedings was subject to conditions as set forth in the stipulations. On September 11, 2023, the UCC filed a motion in each Adversary Proceeding [Sinclair Adv. Pro., Docket No. 35; JPM Adv. Pro., Docket No. 35] seeking clarification as to the UCC's intervention in each Adversary Proceeding pursuant to the applicable Intervention Stipulation or, in the alternative, permitting the UCC to intervene on the terms of the relevant Intervention Stipulation. Those motions were granted by the Bankruptcy Court over the objections of the relevant defendants on November 22, 2023 [Sinclair Adv. Pro., Docket No. 86; JPM Adv. Pro., Docket No. 51]. Following the interventions, the UCC continued to be involved in discovery and in prosecuting the Adversary Proceedings in cooperation with the Debtors and played a constructive and important role in laying the foundation for the Sinclair Settlement, which is described in more detail below.

On September 19, 2023, each of Bally's and the Sinclair Defendants filed a motion to dismiss the Sinclair Adversary Proceeding [Sinclair Adv. Pro., Docket Nos. 38, 44] and JPM filed a motion to dismiss the JPM Adversary Proceeding [JPM Adv. Pro., Docket No. 36]. On October 18, 2023, the Debtors filed an opposition against each of these motions to dismiss [Sinclair Adv. Pro., Docket No. 70; JPM Adv. Pro., Docket No. 42], which were joined by the UCC [Sinclair Adv. Pro., Docket No. 73; JPM Adv. Pro., Docket No. 41]. On November 10, 2023, each of Bally's and the Sinclair Defendants filed a reply in support of their respective motion to dismiss [Sinclair Adv. Pro., Docket Nos. 82, 83] and JPM filed a reply in support of its motion to dismiss [JPM Adv. Pro., Docket No. 50].

As discussed further below, on January 16, 2024, Diamond, Sinclair, JPM, and Bally's entered into a settlement term sheet to resolve the Adversary Proceedings and all other claims among the Debtors, on the one hand, and each of Sinclair, JPM, and Bally's, on the other. As of the date hereof, the Adversary Proceedings and the motions to dismiss filed in each of the Adversary Proceedings remain pending, subject to Sinclair making the required payments under the Sinclair Settlement by the time period set forth in the Sinclair Settlement Order.

3.    **Sinclair's Motion to Compel Assumption or Rejection of the MSA**

On August 21, 2023, SBG and STG filed a motion for entry of an order compelling assumption or rejection of the MSA (the "***Sinclair Motion to Compel***") [Docket No. 1094]. In the Sinclair Motion to Compel, SBG and STG argued that the Debtors should be compelled to immediately decide whether to assume or reject the MSA because, among other things, the Debtors had not been paying the Deferred Fees during the Chapter 11 Cases. SBG and STG argued that, under the terms of the MSA Letter Agreement, the Deferred Fees became payable upon the bankruptcy filing by DSG, and that SBG and STG were suffering prejudice from not being paid the Deferred Fees during the Chapter 11 Cases.

On September 29, 2023, the Bankruptcy Court entered a stipulation and agreed order [Docket No. 1234] (the "***Sinclair Stipulation***") pursuant to which SBG and STG and the Debtors agreed to mediate disputes regarding the MSA and adjourn the hearing on the Sinclair Motion to Compel indefinitely while mediation remained ongoing. On November 14, 2023, the Debtors filed an objection to the Sinclair Motion to Compel [Docket No. 1375], arguing that Sinclair had failed to show that it had suffered undue hardship that would justify compelling the Debtors to immediately decide whether to assume or reject the MSA because, among other things, the provision in the MSA Letter Agreement purporting to reinstate the Deferred Fees upon the bankruptcy filing by DSG is an unenforceable *ipso facto* clause, and the Debtors were therefore paying SBG and STG everything they were owed under the MSA and the MSA Letter Agreement during the Chapter 11 Cases. That objection was joined by the First Lien Group [Docket No. 1478] and the UCC [Docket No. 1486].

On December 15, 2023, after holding an evidentiary hearing on the Sinclair Motion to Compel, the Bankruptcy Court entered an order denying the Sinclair Motion to Compel [Docket No. 1521]. In making its ruling, the Bankruptcy Court declined to decide whether the provision in the MSA Letter Agreement purporting to reinstate the Deferred Fees upon a bankruptcy filing by DSG is an unenforceable *ipso facto* clause.

4.    **The Mediation and Settlement**

As noted above, pursuant to the Sinclair Stipulation, the Debtors and Sinclair agreed to mediate all issues among the parties, including the Sinclair Adversary Proceeding and MSA-related disputes.

In the months following entry of the Sinclair Stipulation, the Debtors and Sinclair engaged in extensive and hard-fought negotiations with the assistance of the Mediator. The parties exchanged numerous proposals and held multiple mediation sessions during this time, including an in-person mediation session on December 7, 2023. On January 16, 2024, these persistent efforts culminated in the global resolution among the Debtors, Sinclair, and the other defendants embodied in the Sinclair Settlement. The resolution of the Adversary Proceedings, the MSA-related disputes, and all other claims and causes of action among the parties is a significant achievement and helps facilitate the Debtors' successful reorganization as contemplated by the RSA.

The Sinclair Settlement is memorialized in the term sheet attached as Exhibit A to the Debtors' motion seeking approval of the Sinclair Settlement [Docket No. 1658] (the "***Settlement Motion***," and such term sheet, the "***Settlement Term Sheet***"). Under the Sinclair Settlement, Sinclair has agreed to (a) pay the Debtors $495 million in cash, (b) waive over $85 million in asserted administrative claims and approximately $90 million in asserted prepetition claims, and (c) provide, in exchange for an agreed-upon fee, ongoing management and transition services to the Debtors to facilitate their reorganization and separation from Sinclair. If the Bankruptcy Court approves the Sinclair Settlement, Sinclair will be obligated to make a $50 million deposit to the Debtors within two business days of approval, with the $445 million balance to be paid within 60 days of approval, subject to Sinclair's option to extend the deadline for such payment for an additional 15 days, in exchange for nonrefundable cash fees of $6 million. Sinclair may exercise this option up to four times, resulting in a maximum extension of 60 days in the aggregate in

exchange for fees of $24 million in the aggregate.  Sinclair must use best efforts to raise sufficient cash to pay the full $495 million settlement amount.

Subject to Sinclair's timely payment of the $495 million in cash described above, and subject to any restrictions under applicable law, the Sinclair Settlement also provides Sinclair with the right to acquire or cause an affiliate or third party to acquire the Debtors' interests in Marquee Sports Network, LLC (the "*Marquee Interests*").  Such right must be exercised by no later than the six-month anniversary of the Effective Date, except that Sinclair may request to extend such six-month period for up to an additional six months with the Debtors' prior written consent (not to be unreasonably withheld, conditioned, or delayed).  To the extent Sinclair does not exercise such right prior to the Effective Date, the Marquee Interests will continue to be owned by the Reorganized Debtors on the Effective Date.

In addition, upon entry of the Sinclair Settlement Order, the Bally's Commercial Agreement (and any other contracts Diamond has with Bally's) will be rejected, and Bally's will release and waive any and all claims against Diamond, including any claims for rejection damages. Diamond may, however, continue to use the Bally's trade name (at no cost to Diamond) through the end of the 2024 MLB season.

On January 23, 2024, the Debtors filed the Settlement Motion.  On February 26, 2024, the Bankruptcy Court held a hearing on the Settlement Motion, and granted the relief requested by the Settlement Motion subject to the Debtors filing a notice to advise the Bankruptcy Court of the Debtors and Sinclair reaching final agreement on the amended MSA.  On February 29, 2024, the Debtors filed a notice indicating that the Debtors and Sinclair have reached final agreement on the amended MSA and are prepared to execute it upon entry of the Sinclair Settlement Order [Docket No. 1843].  Additional details regarding the terms of the Sinclair Settlement are included in the Settlement Motion, the Settlement Term Sheet, and the Sinclair Settlement Order.

As set forth in the Plan, if the Sinclair Release Effective Date does not occur, the Litigation Trust will prosecute the claims and causes of action set forth in the Complaints and any other claims or causes of action the Litigation Trustee deems appropriate.

D.    *Addressing Issues with Teams, Leagues, and MVPDs*

Since before commencing the Chapter 11 Cases, the Debtors and their advisors have spent numerous hours assessing their portfolio of contracts, and in particular their contracts with MLB, the NBA, the NHL, and the teams in those leagues.  Since the Petition Date, the Debtors have moved to reject money-losing contracts to prevent, among other things, incurring additional administrative claims and to preserve valuable liquidity for the estates.  The Debtors have also worked to address disputes with counterparties with respect to the Debtors' obligation to make payments to these contract counterparties on a postpetition basis and, where necessary, the Debtors have also taken action to protect their rights under their existing executory contracts in the Chapter 11 Cases.  Certain of these efforts are described more fully below.

1.     **MLB**

a.     Motions to Compel Payment

Due to concerns about the costs of the rights fees under their telecast rights agreements with certain MLB teams, the Debtors, in their reasonable business judgment, decided around the time of their bankruptcy filing to enter into the contractual grace period under the telecast rights agreements with the Diamondbacks (which was due prior to the Petition Date), the Guardians, the Twins, and the Rangers.  The Debtors made this determination to consider whether to make such payments or to reject such agreements.  In addition, the Debtors' position was that under section 503(b) of the Bankruptcy Code, pending assumption or rejection of executory contracts pursuant to section 365 of the Bankruptcy Code, debtors are required to pay only the actual and necessary costs of preserving their estates, including only the "reasonable value" of what they receive under these agreements.

Only days after entering into the contractual grace periods under the respective agreements with the Guardians, Twins, and Rangers, MLB and those clubs (as well as the Diamondbacks) filed a series of motions to compel the Debtors to make payment to these teams at the contract rates set forth in their telecast rights agreements [Docket Nos. 280, 303, 370] (collectively, the "***Motions to Compel Payment***").  The Debtors objected and urged the Bankruptcy Court to afford the Debtors the chance to utilize the "breathing spell" of the automatic stay to make decisions about their portfolio of executory contracts and only to pay the "reasonable value" of the rights they are receiving (rather than the contract amount) in the interim pending the Debtors' determination [Docket No. 409].  The parties conducted extensive discovery in connection with the Motions to Compel Payment, including the Debtors' presenting expert evidence with respect to the reasonable value of the rights they received under such rights agreements.  After a contested evidentiary hearing held on May 31 and June 1, 2023, the Bankruptcy Court granted the Motions to Compel Payment and ruled that the Debtors were not entitled to an adjustment of the contract rate during the pendency of the Chapter 11 Cases and that the Debtors were obligated to pay the full rights fees due under their telecast rights agreements pending assumption or rejection of the agreements [Docket No. 819].  The Bankruptcy Court declined to compel the Debtors to immediately assume or reject their telecast rights agreements with MLB and its clubs.  At a hearing on June 9, 2023, the Bankruptcy Court denied the Debtors' motion [Docket No. 838] seeking clarification of the order and noted that all parties' rights regarding any future assumption or rejection of the telecast rights agreements and the treatment of any payments made before rejection are reserved.

b.     The Debtors' Decision to Cease Funding RSNCO LLC

Debtor Diamond San Diego Holdings, LLC ("***Diamond San Diego***") holds a majority interest in the joint venture SoCal Sports Net LLC ("***SoCal Sports***"), which it co-owns with Padre Time, LLC.  As of the Petition Date, RSNCO LLC ("***RSNCO***"), which is wholly-owned by SoCal Sports and operated as the Bally Sports San Diego RSN, had a telecast rights agreement with Padres L.P. (the "***Padres***") that provided RSNCO with the exclusive rights to broadcast games of the San Diego Padres.

RSNCO was unable to generate sufficient revenue to independently support the rights fee payments under its telecast rights agreement with the Padres and to pay other operating expenses. The Debtors therefore had, when necessary, funded RSNCO to make up for the deficiency, including by extending $20.5 million in aggregate principal amount of loans to RSNCO during the 2022 MLB season (the "**RSNCO Loans**").

Prior to a rights payment due in late May 2023, it became clear that RSNCO would have insufficient cash to make that rights payment and would require the Debtors to fund RSNCO to make such payment. The Debtors, in their reasonable business judgment, made the decision to cease funding this money-losing joint venture, and after RSNCO failed to make its telecast rights payment by the end of the contractual grace period, the Padres terminated the telecast rights agreement on May 30, 2023.

As of the date hereof, Diamond San Diego has reached an agreement in principle with the relevant parties concerning the resolution of potential claims among Diamond San Diego, RSNCO, SoCal Sports, and the Padres, including claims relating to the RSNCO Loans. As part of this agreement in principle, Diamond San Diego and Padre Time, L.P. will cooperate to facilitate the orderly winding-up and dissolution of RSNCO, the settlement and payment of third-party creditor claims, and the distribution of RSNCO's remaining assets to the Padres and Diamond San Diego on account of their claims against RSNCO. The parties will grant mutual, general releases as part of the settlement.

c.      <u>The Debtors' Motion to Reject the Diamondbacks Agreement</u>

As of the Petition Date, Debtor Diamond Sports Net Arizona, LLC ("**Diamond Arizona**") was party to a telecast rights agreement with the Diamondbacks under which Diamond Arizona had the exclusive right to telecast all local Diamondbacks games. Unfortunately, the Debtors were losing significant sums on their agreement with the Diamondbacks since prior to the Petition Date and the rights fee payments thereunder would only increase on a year-to-year basis through 2035.

As described above, the Bankruptcy Court granted the Motions to Compel Payment filed by the Clubs, including the Diamondbacks, and ordered that the Debtors were obligated to pay the full rights fees due under their telecast rights agreements. In light of the Bankruptcy Court's order to compel payment at the contract rate, and the unprofitability of their agreement with the Diamondbacks, the Debtors, in their reasonable business judgment and in consultation with the advisors to the Ad Hoc Groups and the UCC, determined that it would be in the best interest of the estates to reject the agreement with the Diamondbacks ahead of a rights fee payment due on July 1, 2023, to ensure no additional losses were incurred in connection with this contract. As a result, the Debtors filed a rejection motion on June 22, 2023 [Docket No. 921].

Diamond Arizona and the Diamondbacks then engaged in discussions regarding potential amendments to the rights agreement that would make it more economical and fit within the Debtors' go-forward business strategy. Due to these discussions, the Debtors and the Diamondbacks agreed to keep the telecast rights agreement in place until July 17, 2023, to give the parties time to negotiate. Ultimately, the parties were unable to reach an agreement on an amended deal. After these negotiations ceased, the Debtors moved forward with their motion and

38

the Bankruptcy Court entered an order granting the Debtors' rejection of the Diamondbacks agreement effective as of July 17, 2023 [Docket No. 967].

        d.      <u>Motion to Compel Assumption or Rejection</u>

On October 11, 2023, MLB and the Clubs filed a motion to compel assumption or rejection of the Debtors' telecast rights agreements with each of the Clubs [Docket No. 1261] (the "***MLB Motion to Compel***"). MLB and the Clubs argued that the Debtors should be required to make an immediate decision regarding whether to assume or reject so that MLB and the Clubs would have certainty regarding the Debtors' broadcasting plans for the 2024 MLB season.

On November 8, 2023, the Debtors filed an objection to the MLB Motion to Compel [Docket No. 1357], which was joined by the First Lien Group [Docket No. 1359]. At a hearing held on the MLB Motion to Compel on December 15, 2023, the Debtors' and MLB's respective counsel indicated that significant progress had been made in mediation, and the parties wished to adjourn the hearing on the MLB Motion to Compel to continue discussions relating to a potential resolution of the MLB Motion to Compel in the context of the Cooperation Agreement. On January 17, 2024, after the announcement of the Debtors' entry into the January RSA, the hearing on the MLB Motion to Compel was adjourned indefinitely [Docket No. 1621] to permit the parties to continue their discussions.

On February 2, 2024, the Debtors filed motions for authority to enter into amendments to the respective telecast rights agreements with the Rangers, the Guardians, and the Twins [Docket Nos. 1684–1689] and assume such amended agreements. The motions were granted by the Bankruptcy Court on February 9, 2024 [Docket Nos. 1720–1722]. The respective amendments resolve the MLB Motion to Compel as to the Rangers and the Guardians,[25] and provide that the Debtors will continue to broadcast Rangers, Guardians, and Twins games for the entirety of the 2024 MLB season. The amendment to the Rangers Agreement also resolves the Debtors' and the Rangers' disputes concerning the Termination Notice. Each amendment provides that each of the Rangers, Guardians, and Twins are included in, and equally and ratably benefit from, the protections of the MLB Adequate Assurance Order, summarized below.

On February 12, 2024, the Bankruptcy Court entered an order, approving an adequate assurance package [Docket No. 1745] (the "***MLB Adequate Assurance Order***"). The MLB Adequate Assurance Order provides that the Debtors will not reject or, in the case of the Bally JVs, cause any such Bally JV to terminate, any telecast rights agreement with any MLB club until the conclusion of the 2024 MLB season and until all amounts have been paid to the clubs for the 2024 MLB season. It further provides that all amounts owed by the Debtors and the Bally JVs to the clubs pursuant to the telecast rights agreements for the 2024 MLB season will be paid in accordance with the terms of those agreements. As further assurances, the MLB Adequate Assurance Order provides that any claim by MLB or a club for amounts owed pursuant to a telecast rights agreement in the event of a default by a Debtor during the 2024 MLB season will be entitled to superpriority administrative expense claim status (subject to commercially reasonable mitigation efforts and not to exceed the aggregate amount of fees that remain outstanding and

---

[25]    The Twins' telecast rights agreement had expired on its terms at the conclusion of the 2023 MLB season, and the Twins did not join the MLB Motion to Compel.

unpaid for the 2024 MLB season under the applicable telecast rights agreement).  To secure payment of any superpriority administrative expense claim and any claims against the Bally JVs, the Debtors agreed to fund $20 million out of cash collateral into a segregated account for the exclusive benefit of the clubs (the "***MLB Security Deposit***").  The Debtors also agreed to grant to MLB and the clubs liens on the MLB Security Deposit, the Debtors' interest in YES, and certain unencumbered Sinclair-related litigation proceeds, subject to the priorities set forth in the MLB Adequate Assurance Order.  The protections afforded by the MLB Adequate Assurance Order will terminate automatically upon the earlier to occur of the Effective Date and the last date under any applicable telecast rights agreement as to which payments are due and paid to any club for the 2024 MLB season.  As a result of, and pursuant to, the MLB Adequate Assurance Order, MLB and the Clubs have withdrawn the MLB Motion to Compel.

2.   **NBA and NHL**

a.   <u>Negotiations with the NBA, NHL, and Teams</u>

Since before the Petition Date, Diamond has been engaged with the NBA, the NHL, and certain individual team partners within these leagues regarding long-term arrangements with those leagues and teams.  Following the Petition Date, the Debtors continued to work with the NBA, the NHL, and their teams in an effort to reach consensus on an actionable business plan in light of the rapid and fundamental industry changes affecting the sports and traditional cable television industries.

While Diamond came close to reaching long-term deals with each of the NBA and NHL in the summer of 2023, Diamond struggled to reach an actionable business plan with its creditors, which made long-term deals non-actionable at that time.  After the Debtors commenced mediation, on September 27, 2023, the NBA and the NHL participated in an in-person mediation session with Diamond, its key creditor constituencies, the UCC, and other parties in an effort to coalesce around a go-forward business plan and the key terms of a chapter 11 plan.  Those negotiations ultimately resulted in the execution of the Cooperation Agreement, which contemplated a business plan that was predicated on, among other things, Diamond's modified arrangements with the NBA, the NHL, and their teams.

In support of the business plan contemplated by the Cooperation Agreement, the NBA, the NHL, and their applicable teams agreed to certain modifications to their telecast rights agreements, including modified rights fees and amending all applicable team agreements to expire at the end of the NBA's and NHL's respective 2023–24 seasons, thereby eliminating any potential rejection damages claims that would otherwise have been assertable against the Debtors' estates in connection with the existing pre-modification telecast rights agreements.  The Debtors filed motions seeking approval of these modified arrangements with the NBA and the NHL on November 6, 2023, and December 20, 2023, respectively [Docket Nos. 1343, 1529], and the Bankruptcy Court entered orders approving these modified arrangements on November 15, 2023, and January 3, 2024, respectively [Docket Nos. 1378, 1587], subject to the occurrence of certain conditions before they became effective.  These modified arrangements never became fully effective by the time the Debtors pivoted to the reorganization contemplated by the January RSA and, later, the RSA.

Following termination of the Cooperation Agreement and entry into the January RSA, the Debtors immediately re-engaged with the NBA and NHL regarding the go-forward treatment of their contracts.  These negotiations remain ongoing as of the date hereof.

> b.  Dispute with the Suns

On April 28, 2023, Suns Legacy Partners, L.L.C. (the "**Suns**") announced it had entered into a new media rights agreement with Gray Television, Inc. ("**Gray**") and Kiswe Mobile Inc. ("**Kiswe**").  The Suns were party to an unexpired telecast rights agreement with Diamond Arizona at the time of that announcement, and that rights agreement provided Diamond Arizona with valuable back-end rights that provided Diamond Arizona with certain protections upon the expiration of the term of the existing rights agreement at the end of the 2022–23 NBA season.  On May 3, 2023, the Debtors filed a motion to enforce the automatic stay against the Suns, Gray, and Kiswe to, among other things, compel the Suns to comply with the Debtors' valuable back-end contractual rights [Docket No. 462].  Diamond Arizona also filed a complaint against the Suns, Gray, and Kiswe to pursue various breach of contract and tortious interference claims [Adv. Pro. No. 23-03071, Docket No. 1] (the "**Suns Adversary Proceeding**").

After a lengthy hearing on May 10, 2023, the Bankruptcy Court ruled that the Suns had violated the automatic stay by entering into a new agreement with Gray and Kiswe before complying with the back-end rights, but that Gray and Kiswe had not violated the automatic stay [Docket No. 579].

The Suns and Diamond Arizona then engaged in the back-end rights process to determine whether Diamond Arizona would be able to match the Gray and Kiswe agreement.  Upon the conclusion of that process, the Debtors, in their reasonable business judgment and in consultation with the advisors to the Ad Hoc Groups and the UCC, made the decision not to match the offer made by Gray and Kiswe and to allow the Suns agreement to expire in accordance with its terms.  Diamond Arizona then voluntarily dismissed the Suns Adversary Proceeding without prejudice [Adv. Pro. No. 23-03071, Docket No. 19].

> c.  The Debtors' Motion to Reject the Coyotes Agreement

On October 4, 2023, the Debtors filed a motion [Docket No. 1241] to reject Diamond Arizona's telecast rights agreement with IceArizona Hockey Co, LLC (d/b/a Arizona Coyotes) (the "**Arizona Coyotes**") *nunc pro tunc* to October 1, 2023.  As Debtor Diamond Arizona had already rejected its telecast rights agreement with Diamondbacks and declined to exercise their right to match the deal that the Phoenix Suns reached with Gray and Kiswe, the Debtors believed that the Bally Sports Arizona RSN was not profitable and, in their reasonable business judgment, determined that the agreement with the Arizona Coyotes no longer fit within the Debtors' business plans and should be rejected.  Diamond Arizona notified the Arizona Coyotes of its decision to file the rejection motion in advance and obtained the Arizona Coyotes' consent to the rejection.  On October 5, 2023, the consensual rejection motion was approved by the Bankruptcy Court [Docket No. 1242].

3.      **Other League/Operational Matters**

      a.      <u>Arizona Lease</u>

With the expiration of the agreement with the Suns and the decision to reject the agreements with the Diamondbacks and Arizona Coyotes, the Debtors decided to exit the Arizona market and shut down Debtor Diamond Arizona. Accordingly, on December 5, 2023, the Debtors filed a motion seeking rejection of a lease that Diamond Arizona had with AGP Arizona Center Owner, LLC (the "***Arizona Center Lease***") with respect to certain office space located at 455 N. 3rd Street, Phoenix, Arizona 85004 [Docket No. 1485]. The Bankruptcy Court granted this motion on December 27, 2023 [Docket No. 1572].

      b.      <u>Debtors' Motion to Reject the Raycom Agreement</u>

As of the Petition Date, Debtor DSN was party to an agreement with Raycom Sports Network, LLC ("***Raycom***") for the exclusive right to televise certain Atlantic Coast Conference college football and men's and women's basketball games through the 2026–27 season. Prior to the Petition Date, the Debtors determined, in their business judgment, not to make a prepetition payment due to Raycom. The Debtors ultimately determined that the Raycom agreement and the associated rights no longer fit within the Debtors' go-forward business strategy. Raycom also requested that the Debtors promptly reject the Raycom agreement so that Raycom could initiate the process of seeking a new partner for broadcasting future ACC events.

The Debtors filed the motion to reject the Raycom agreement on June 14, 2023 [Docket No. 874], and the motion was granted on July 7, 2023 [Docket No. 945]. On July 13, 2023, Raycom announced it had entered into a new partnership with The CW Network pursuant to which The CW Network would broadcast these ACC events through the 2026–27 season. The Debtors believe that this announcement will significantly mitigate any damages resulting from the rejection of the Raycom agreement.

      c.      <u>The Debtors' Motion to Reject the OB Agreement</u>

On October 9, 2023, Debtor Diamond Sports Sun, LLC ("***Diamond Sun***") filed a motion [Docket No. 1249] to reject its telecast rights agreement with O.B. Festival Events, LLC ("***OB Events***") for the exclusive broadcasting of the annual AutoNation Orange Bowl Basketball Classic (the "***OB Classic***"). The Debtors, in their reasonable business judgment, determined that the OB Agreement should be rejected ahead of the next OB Classic, to be held on December 9, 2023, to avoid incurring additional costs. Diamond Sun notified OB Events of its decision to file the rejection motion in advance and obtained OB Events' consent to the rejection. On October 10, 2023, the consensual rejection motion was approved by the Bankruptcy Court [Docket No. 1250].

4.      **MVPD Matters**

      a.      <u>Dispute with DIRECTV</u>

The Debtors have a distribution contract (the "***DIRECTV Agreement***") with DIRECTV that requires DIRECTV to pay the Debtors for the right to televise MLB games. Beginning in

July 2023, DIRECTV started underpaying the Debtors on the grounds that the Debtors and the applicable Bally JVs failed to televise certain San Diego Padres and Diamondbacks games. The Debtors believe DIRECTV has no basis for withholding any portion of the payments due to the Debtors under the DIRECTV Agreement and such withholding constitutes a violation of the automatic stay. On October 10, 2023, the Debtors filed a motion to enforce the automatic stay against DIRECTV and to compel DIRECTV to perform its obligation under the DIRECTV Agreement to pay the withheld amount [Docket No. 1253] (the "***DIRECTV Motion***"). Prior to the hearing on the DIRECTV Motion, the parties agreed to mediate the dispute, but ultimately did not reach a resolution. On January 11, 2024, DIRECTV objected to the DIRECTV Motion [Docket No. 1607; SEALED at Docket No. 1608]. On January 17, 2024, the DIRECTV Motion was adjourned indefinitely [Docket No. 1617].

        b.      <u>Negotiations with MVPDs</u>

The Debtors previously successfully reached agreements on extensions with Comcast and Charter in connection with implementing the baseline business plan contemplated under the Cooperation Agreement. In September, DIRECTV also exercised a carriage extension option, which requires the Debtors to engage in further carriage negotiations for longer-term carriage. As part of the pivot to a reorganization, the Debtors are now engaged with DIRECTV, Comcast, Charter, Cox, and others on longer-term distribution deals in connection with the reorganization contemplated by the Plan.

**E.**      ***Plan Development and RSA***

      1.      **<u>The Initial RSA</u>**

As noted above, for over two years, Diamond has negotiated with certain of its creditors to substantially deleverage its balance sheet, and with its league and team partners to attempt to secure the rights necessary to grow its DTC business in the face of a rapidly changing cable television ecosystem. After months of negotiations, and shortly after commencing the Chapter 11 Cases, Diamond signed the Initial RSA with members of the Second Lien Group and the Crossholder Group. Members of the First Lien Group were not parties to the Initial RSA.

The Initial RSA was predicated on three key premises: (a) achieving agreement on an acceptable go-forward business plan for a reorganized Diamond to continue as a going concern; (b) leaving the First Lien Claims unimpaired and equitizing all junior debt; and (c) obtaining agreement related to the quantum and funding, if any, of new money financing to fund the reorganized Debtors' go-forward business after reaching agreement on an acceptable business plan. Given the circumstances and complications discussed herein, the Debtors and their creditor constituencies could not reach an agreement on a going-concern business plan that existing creditors were willing to finance and that would leave the First Lien Claims unimpaired. Absent a new money investment from a third party or creditors within the Debtors' capital structure, which at that point remained unavailable to the Debtors, the Debtors had no choice but to pivot away from the restructuring transactions contemplated in the Initial RSA. As a result, the Debtors needed to formulate alternative business plans that were unlikely to leave the First Lien Claims unimpaired, and actively engaged in the process of formulating alternatives with the Ad Hoc Groups and the UCC.

The Debtors' efforts resulted in multiple potential business plans, but the Debtors were unable to garner requisite creditor support for these business plans.  The inability to obtain this support was the result of, among other things, significant intercreditor disputes that emerged, including:

- **Make-Whole Amount**:  Whether the first lien lenders are entitled to a make-whole amount under the First Lien Credit Agreement, including, among other things, whether such amount became due prior to the Debtors' bankruptcy filings (which would have increased their prepetition claim, together with principal and accrued but unpaid interest, to approximately $776.9 million), whether it would be disallowed as "unmatured interest" under section 502(b)(2) of the Bankruptcy Code, and whether it would be payable as a "reasonable fee" under section 506(b)(2) of the Bankruptcy Code if the first lien claims ultimately were oversecured.

- **Diminution in Value**:  Whether any diminution in value of the secured creditors' collateral had occurred as a result of the Chapter 11 Cases and, if so, the method to determine the extent of any such diminution in value.

- **Oversecured vs. Undersecured**:  Whether the first lien lenders were oversecured and if so, whether (and the rate at which) they would be entitled to postpetition interest (including interest on principal, overdue interest, and any make-whole amount).  And, if the first lien lenders were undersecured, the amount of, and method of calculation for, their deficiency claim.

- **Recharacterization**:  Whether adequate protection interest payments made to the first lien lenders under the Cash Collateral Order should be recharacterized as payments of principal.

- **Encumbered vs. Unencumbered Value**:  Whether certain of the Debtors' assets were encumbered by the liens asserted by the Debtors' secured creditors, including:

  o  Whether certain claims asserted in the Adversary Proceedings constitute general intangibles or were otherwise part of the secured creditors' collateral package, or whether such claims were unencumbered commercial tort claims or avoidance actions, and how the proceeds of any settlement or judgment must be allocated among encumbered and unencumbered claims.

  o  Whether cash and any cash proceeds from accounts receivable held by non-debtor DSPV, if and when distributed by that entity to Debtor DSN, would be encumbered by the liens of the Debtors' secured creditors.

  o  Whether the Debtors' secured creditors had valid liens on certain of the Debtors' assets, including Debtor Sports Network, LLC's 50% equity interest in Marquee and certain liens and claims granted in connection with

44

the Debtors' incurrence of new debt in March 2022 and in connection with Sinclair's purchase of the Debtors in August 2019.

- <u>Turnover Provisions</u>:  The impact of turnover provisions in the Intercreditor Agreements on potential plan distributions.

- <u>Allocation of Administrative Costs</u>:  The allocation of the administrative costs of the Chapter 11 Cases between encumbered and unencumbered assets, including costs related to the Debtors' investigation into prepetition transactions and the costs of administering the estates.

### 2.   **Appointment of Judicial Mediators**

After extensive negotiations with key commercial counterparties and creditors, it became clear to the Debtors that it would be increasingly challenging for parties to reach agreement on a consensual chapter 11 plan without a catalyst.  To break the impasse, on August 15, 2023, the Debtors filed a motion requesting the appointment of judicial mediators to assist the Debtors and other parties in interest in efficiently resolving complex issues necessary to successfully implement the Debtors' restructuring [Docket No. 1075].  On August 17, 2023, the Bankruptcy Court granted the motion and entered an order appointing Judge Marvin Isgur and then-Judge David Jones as mediators [Docket No. 1087].  Judge Jones subsequently ceased his role as mediator upon the announcement of his resignation from the bench on October 15, 2023.

The Debtors, the Ad Hoc Groups, the UCC, Sinclair, and many of the Debtors' key commercial counterparties (including MLB, the NBA, and the NHL) participated in mediation sessions beginning in September with the aim of bridging the gap among the parties on key issues, including intercreditor disputes and critical commercial negotiations.

### 3.   **The Cooperation Agreement**

Eventually, the Debtors, the UCC, and the First Lien Group reached an agreement in principle to resolve the aforementioned intercreditor issues and move the Chapter 11 Cases toward a consensual chapter 11 plan in an orderly and efficient manner, which agreement was ultimately joined by certain members of the Second Lien Group and memorialized in the Cooperation Agreement.

As noted above, the Cooperation Agreement provided a framework for the Debtors to (a) continue to operate their business over the course of the 2023–24 Seasons and (b) propose a chapter 11 plan that would allocate certain costs of the administration of the Chapter 11 Cases among the holders of First Lien Claims and junior creditors, distribute the proceeds derived from the continued operation of their business, the liquidation of their litigation claims and other assets, and the residual value of remaining estate interests.  This framework was intended to provide baseline recoveries to creditors, including junior funded debt creditors and general unsecured creditors, and allow the Debtors' counterparties, including their team, league, and distribution partners, to smoothly transition operations over the course of those seasons without an abrupt cessation of broadcasting brought about by an immediate winddown of the Debtors' operations.

The Cooperation Agreement allocated the value of the Debtors' estates among holders of First Lien Claims and junior creditors, the terms of which were broadly as follows:

a. Holders of First Lien Claims were to receive, up to a cap of $629 million:[26]

  i. all business value other than that allocated to junior creditors; and

  ii. 15% of the proceeds of the Adversary Proceedings.

b. Junior creditors (i.e., all creditors other than holders of First Lien Claims) were to receive:

  i. the proceeds from Diamond's interests in YES and Marquee (including any distributions from YES and Marquee);

  ii. any cash held in accounts owned by non-Debtor DSPV;

  iii. 85% of the proceeds of the Adversary Proceedings; and

  iv. all business and litigation value once the $629 million cap had been reached for holders of First Lien Claims.

The Cooperation Agreement also provided for agreed allocations of the costs of the Chapter 11 Cases among holders of First Lien Claims and junior creditors, including allocations of operating expenses, professional fees, litigation expenses, and employee-related obligations.

The Cooperation Agreement did not foreclose potential alternative transactions and instead preserved the Debtors' ability to consider opportunities that could potentially provide greater value to their estates and creditors, consistent with the Debtors' fiduciary duties.

On November 6, 2023, following the execution of the Cooperation Agreement, the Debtors filed a motion seeking authorization to enter into and perform under the Cooperation Agreement and approving the settlements and compromises contained therein [Docket No. 1342] (the "***Cooperation Agreement Motion***").  On November 15, 2023, the Bankruptcy Court entered an order authorizing entry into and performance under the Cooperation Agreement [Docket No. 1383] (the "***Cooperation Agreement Order***").

---

[26]    Adequate protection interest payments to the First Lien Lenders made after October 2, 2023, would have counted towards this cap.  Adequate protection interest payments made on or before October 2, 2023, and fees and expenses of the First Lien Group and the First Lien Agent would not have counted towards this cap.

Notwithstanding entry of the Cooperation Agreement Order, the effectiveness of the Cooperation Agreement was conditioned on the following:[27]

    a.    the Bankruptcy Court's entry of an order authorizing the Debtors to enter into an agreement with the NBA and/or its teams modifying the terms of the relevant telecast rights agreements;

    b.    the Bankruptcy Court's entry of an order authorizing the Debtors to enter into an agreement with the NHL and/or its teams modifying the terms of the relevant telecast rights agreements;

    c.    the Bankruptcy Court's entry of an order denying or otherwise resolving the Sinclair Motion to Compel;

    d.    the Bankruptcy Court's entry of an order amending the Cash Collateral Order (the "***CCO Condition***");

    e.    (i) the Bankruptcy Court's entry of an order denying MLB Motion to Compel or otherwise resolving such motion or (ii) withdrawal of the MLB Motion to Compel (the "***MLB Condition***"); and

    f.    the Bankruptcy Court's entry of an order approving the Debtors' motion to extend the periods within which the Debtors enjoy the exclusive right to file and solicit acceptances of a chapter 11 plan pursuant to section 1121(d) of the Bankruptcy Code, filed at Docket No. 1236.

All of these conditions were met following entry of the Cooperation Agreement Order (and before termination of the Cooperation Agreement) except for the CCO Condition and the MLB Condition. Although the Debtors had reached agreement with the parties to the Cooperation Agreement on the terms of an amended Cash Collateral Order, unresolved issues with MLB prevented the Debtors from filing a motion for approval of the amended Cash Collateral Order. Accordingly, the Cooperation Agreement ultimately never became effective pursuant to its terms, and the Debtors terminated the Cooperation Agreement immediately prior to their entry into the January RSA.

    4.    **<u>Development of Reorganization Alternative</u>**

While the Debtors engaged with creditors, league and team partners, MVPDs, and other parties in interest to implement the Cooperation Agreement, they simultaneously continued to explore restructuring alternatives premised on a reorganization of the Debtors' business as a going concern. During this time, the Debtors collaborated closely with the Crossholder Group, which similarly pursued reorganization. Following the Debtors' disclosure to the Crossholder Group of discussions between the Debtors and Amazon concerning a potential investment and commercial arrangement, the Crossholder Group and the Debtors engaged further with Amazon to explore

---

[27]    The following summary of conditions is qualified in its entirety by the terms of the Cooperation Agreement Order.

Amazon's participation in potential alternatives to the winddown contemplated by the Cooperation Agreement.

New money financing was a critical component of these discussions. The Crossholder Group and the Debtors explored various new money solutions, including debtor-in-possession and exit financing, but ultimately determined that the Debtors would require incremental financing in the form of a debtor-in-possession facility. The Crossholder Group proposed a $210 million DIP facility that would convert into exit debt upon emergence. At the time the Crossholder Group presented its initial proposal, no other party had presented any financing proposal that would support the Debtors' operations during these cases or bridge to a reorganization.

The Debtors and the Crossholder Group then approached the First Lien Group (who represent the Majority 1L Lenders) regarding an alternative transaction to the winddown contemplated by the Cooperation Agreement. To forgo the all cash recoveries expected under the winddown and support an alternative restructuring that would provide them with, among other things, $200 million of Take Back Term Loans, the First Lien Group required de-risking in the form of a partial, and a near-term, paydown of the First Lien Claims. Accordingly, and after extensive negotiations, the size of the DIP Facility increased from $210 million to $450 million, due to the addition of a $350 million paydown of First Lien Claims from the proceeds of the DIP Facility (the "***First Lien Paydown***"). In addition, the Crossholder Group also ultimately agreed to subordinate the DIP Facility to the First Lien Claims and liens securing the First Lien Claims, as well as all adequate protection claims and liens granted to holders of First Lien Claims pursuant to the Cash Collateral Order and the DIP Order. In exchange for the paydown and the subordination of the DIP Facility to the First Lien Claims, the first lien lenders also agreed to cap the amount of their claims (both in the context of the Plan and in a liquidation of the Debtors if the Plan is not confirmed) and share budget controls.

The Debtors and the First Lien Group also were clear that the new money, together with cash collateral, needed to be sufficient to pay for the ongoing costs of the Chapter 11 Cases, including restarting the process of separating the Debtors' business from Sinclair. In the course of those discussions, it was determined that the new money was needed before the end of February to ensure that the Debtors have sufficient liquidity to make their telecast rights payments, fund separation costs, pay for the administrative costs of the Chapter 11 Cases, and make the First Lien Paydown. These facts made it clear to the Debtors that a going-concern reorganization would only be possible with the DIP Facility proposed by the Crossholder Group, including the fees and premiums incorporated therein, as well as the timing for the funding of the DIP Facility.

In parallel with the negotiations regarding the DIP Facility, the Debtors, the Crossholder Group, the First Lien Group, and Amazon negotiated the various aspects of a going-concern reorganization. The Debtors also kept the UCC, among others, informed and updated on the developing situation in accordance with the Debtors' obligations under the Cooperation Agreement. After several weeks, these negotiations resulted in, among other things, the execution on January 16, 2024, of the January RSA, the DIP Commitment Letter, and the Exit Note Commitment Letter, each of which is described in detail below.

5.        **The RSA**

        a.        The January RSA and the UCC Settlement

As noted above, on January 16, 2024, the Debtors executed the January RSA with Amazon and Holders of more than 85% of the First Lien Claims, more than 50% of the Second Lien Claims, and more than 66% of the Unsecured Notes Claims.  The Debtors filed the January RSA with the Bankruptcy Court on January 17, 2024 [Docket No. 1613].  As contemplated by the January RSA, on January 23, 2024, the Debtors filed a series of motions to implement the transactions contemplated by the January RSA, including the DIP Motion and the Exit Note Commitment Letter Motion (each as defined and more fully described below).

As discussed in more detail below, the UCC initially expressed concerns regarding the January RSA and the DIP Facility in discussions with the Debtors and in pleadings filed with the Bankruptcy Court.  Of particular concern to the UCC was the First Lien Paydown, which was to occur prior to confirmation of a plan, and the size of the premiums under the DIP Facility, and the UCC asserted that the reorganization contemplated by the January RSA, at the time of its filing, remained subject to material execution risk.  The UCC believed that, to the extent the First Lien Paydown and the terms of the DIP Facility were approved, and the Debtors ultimately pivoted to a winddown or liquidation, the DIP Facility and the premiums thereunder would have a prejudicial effect on unsecured creditors by encumbering substantially all of the Debtors' unencumbered assets and increasing the administrative expense claims against the Debtors' estates.  The Debtors, the First Lien Group, and the Crossholder Group disagreed with these positions and believe that the DIP Facility and the January RSA were appropriate, and the Debtors were prepared to meet their burden on the appropriateness of the DIP Facility and the First Lien Paydown to the extent necessary.  The parties, however, also recognized the value of settlement and reducing the costs associated with litigation.  Therefore, during the weeks following the filing of the DIP Motion, the UCC, the Debtors, the First Lien Group, and the Crossholder Group engaged in negotiations regarding potential modifications to the January RSA and the terms of the DIP Facility that would provide greater certainty with respect to unsecured creditors' recoveries both in the context of the reorganization contemplated by the January RSA and in a scenario in which the Debtors were unable to consummate such reorganization and pivoted to a winddown or liquidation.  As a result of these negotiations, the parties reached agreement on the terms of the UCC Settlement, which resolved the UCC's concerns.  The terms of the UCC Settlement were memorialized in the RSA and in a revised proposed order approving the DIP Facility that the Debtors filed on February 23, 2024 [Docket No. 1816].

The UCC Settlement provides for the following treatment of Holders of General Unsecured Claims and Go-Forward Trade Claims in the reorganization contemplated by the Plan and in a winddown or liquidation pursuant to chapter 11, chapter 7, or otherwise:

- In a reorganization, subject to Payment in Full (as defined in the DIP Order) of all First Lien Claims and satisfaction of all DIP Obligations (a) Holders of Allowed General Unsecured Claims will receive their share of the Unsecured Claim Cash Distribution and (b) Holders of Allowed Go-Forward Trade Claims will be unimpaired (as contemplated by the January RSA).

- In a winddown or liquidation (in chapter 11, chapter 7, or otherwise), subject to Holders of First Lien Claims receiving a recovery in cash equal to the Wind Down Claim Cap (as defined in the DIP Order), Holders of Allowed General Unsecured Claims and Allowed Go-Forward Trade Claims will be entitled to receive their share of the Unsecured Claim Cash Distribution.[28]

- If the Debtors are unable to satisfy all administrative expenses under section 503(b) of the Bankruptcy Code in connection with a plan, or if the DIP Agent asserts that a termination event has occurred under the DIP Order and exercises any remedies provided under the DIP Order, the Debtors will be required to fund the Unsecured Claim Cash Distribution into a reserve (the "*Unsecured Claims Reserve*"), subject to the conditions set forth in the DIP Order.

- In the case of a winddown or liquidation, the Debtors will not (a) use any funds held in the Unsecured Claims Reserve to pay unsecured creditors until all (x) First Lien Claims have been paid in full up to the applicable First Lien Claims Cap (as defined in the DIP Order) and (y) DIP Obligations other than the DIP Obligations in respect of the DIP MOIC have been paid in full;[29] or (b) make any payment in cash on account of the Minimum Return Premium prior to funding the Unsecured Claims Reserve.

Finally, pursuant to the UCC Settlement, the Debtors irrevocably waived and released all Avoidance Actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law against trade creditors, effective upon entry of the DIP Order.

In connection with the UCC Settlement, the UCC became party to the RSA and was granted certain consent rights with respect to the terms of the Definitive Documents and any amendments or modifications to the DIP Documents, in each case, to the extent such terms, amendments or modifications, as applicable, adversely affect the Unsecured Claims Reserve or the treatment of General Unsecured Claims or Go-Forward Trade Claims.

     b.    <u>Overview of the RSA</u>

As of the date hereof, the UCC, Amazon, and creditors representing more than 94% of the First Lien Claims, more than 95% of the Second Lien Claims, and 96% of the Unsecured Notes

---

[28] To determine the applicable amount of the Unsecured Claim Cash Distribution, the 6% cash recovery component will be calculated on an aggregate basis of (i) in a reorganization, all Allowed General Unsecured Claims and (ii) in a winddown or liquidation, all Allowed General Unsecured Claims and Allowed Go-Forward Trade Claims.

[29] In the event that the Debtors have no other sources of cash or monetizable assets to provide for the Payment in Full of the First Lien Claims and the payment of all DIP Obligations (other than the DIP Obligations in respect of the DIP MOIC), in cash, the Debtors may use all or a portion of the Unsecured Claims Reserve to satisfy such obligations.

Claims have executed the RSA.  The RSA memorializes these parties' agreements with respect to the contemplated reorganization transactions described above, including:

1.  A commitment from the DIP Commitment Parties to provide the DIP Facility.

2.  A commitment from Amazon to provide the Debtors with a new money investment through $115 million in Convertible Exit B Notes to support the Debtors' reorganization.

3.  Amazon and the Debtors' commitments to enter into the Amazon Commercial Agreement, through which Amazon Prime Video would become the Debtors' primary partner through which customers will be able to purchase DTC access to stream the Debtors' local sports programming.

4.  The proposal of a plan of reorganization that provides as follows:[30]

    a.  The equity of the ultimate parent company of the reorganized Debtors at emergence will be issued as follows (subject to dilution as set forth in the Plan):

        i.   45% to the DIP Commitment Parties;

        ii.  45% to the DIP Lenders; and

        iii. 10% to Holders of Junior Funded Debt Claims.

    b.  In addition to the equity described above, Holders of Junior Funded Debt Claims will receive their *pro rata* share of at least 5% (which percentage is subject to upward adjustment upon repayment of the DIP Claims and the First Lien Claims up to the First Lien Claims Cap) of the Litigation Proceeds (estimated to be approximately $184 million based on the Sinclair Settlement).

    c.  In addition to the First Lien Paydown, which was made on February 28, 2024, Holders of First Lien Claims will receive their *pro rata* share (up to the First Lien Claims Cap) of:

        i.   cash in an amount equal to $65 million less the AP Reduction Amount;

---

[30]  The below summary assumes:

   (a)  the Commitment Premium (as defined in the DIP Commitment Letter) and the DIP MOIC (as defined in the DIP Credit Agreement) are not paid in full in cash pursuant to the terms of the DIP Documents; and

   (b)  the Debtors receive $495 million in litigation proceeds pursuant to the Sinclair Settlement on or prior to the Effective Date.

ii.    up to $200 million in aggregate principal amount of Take Back Term Loans (or additional cash in lieu of a portion thereof) to be issued upon the Debtors' emergence from chapter 11 as a going concern; and

iii.    15% of the Litigation Proceeds (subject to a claims cap and certain adjustments) (estimated to be approximately $47 million based on the Sinclair Settlement).

d.    Holders of General Unsecured Claims will receive their applicable share of the Unsecured Claim Cash Distribution in accordance with the GUC Allocation.[31]

e.    Go-Forward Trade Claims will be unimpaired.

Under the RSA, the Debtors must comply with various case milestones (each of which may be extended or waived pursuant to the terms of the RSA), including the following:

| Milestone | Deadline |
|---|---|
| Deadline for Debtors to file:<br><br>(a) a chapter 11 plan of reorganization consistent with the terms of the RSA and otherwise acceptable to the Debtors and the Required Consenting Parties (as defined in the RSA) (an "***Acceptable Plan***");<br>(b) a disclosure statement with respect to an Acceptable Plan; and<br>(c) a motion to approve the solicitation materials with respect to an Acceptable Plan | March 22, 2024 |
| Deadline for entry of the Confirmation Order | June 30, 2024 |
| Deadline for the occurrence of the Effective Date | August 31, 2024 |
| Outside Date | November 30, 2024 |

---

[31]    As of the date hereof, the GUC Allocation remains under discussion between the UCC and the Debtors.  The Debtors intend to file an updated version of the Plan setting forth the structure and terms of the GUC Allocation (if any) in advance of the hearing to approve the adequacy of the Disclosure Statement.

c.     Post-Effective Date Structure

A simplified organizational chart of the post-Effective Date structure of the Reorganized Debtors as contemplated by the RSA is below:[32]



---

[32]   As further detailed in the Plan:  (a) if the Litigation Trust is not created pursuant to the Plan, LitigationCo will not be formed in connection with consummation of the Plan; (b) pursuant to the Sinclair Settlement Order, Sinclair may exercise the Marquee Acquisition Right to acquire the Marquee Interests (which would otherwise be held by Marquee HoldCo as indicated in the chart) from the Debtors or Reorganized Debtors, as applicable, within six months of the Effective Date; and (c) if the Initial DIP Commitment Parties exercise the Purchase Option, certain Take Back Term Loans will be issued to the Initial DIP Commitment Parties.

The RSA contemplates that the equity of the Reorganized Debtors will be subject to dilution as follows:[33] [34]

| HoldCo - Effective Ownership | | | | | |
|---|---|---|---|---|---|
| | | After Exercise / Conversion of | | | |
| Tranche | Initial Reorganized Equity | MIP | Investment Options | Convert Note B | Convert Note A (if any) |
| **DIP Commitment Parties** | 45.0% | 40.5% | 32.4% | 27.1% | 18.3% |
| **DIP Lenders** | 45.0% | 40.5% | 32.4% | 27.1% | 18.3% |
| **Junior Funded Debt Creditors** | 10.0% | 9.0% | 7.2% | 6.0% | 4.1% |
| **MIP** | --% | 10.0% | 8.0% | 8.0% | 8.0% |
| **DIP Commitment Party Investment Option** | --% | --% | 10.0% | 8.4% | 5.7% |
| **Strategic Investor Investment Option** | --% | --% | 10.0% | 8.4% | 5.7% |
| **Convertible Note A (if any)** | --% | --% | --% | --% | 25.0% |
| **Convertible Note B** | --% | --% | --% | 15.0% | 15.0% |
| **Total Equity Ownership** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |

6. **The DIP Facility**

The DIP Facility provides the funding and liquidity necessary to ensure that the reorganization transactions contemplated by the Plan can be effectuated. The DIP Facility is a $450 million new money term loan facility, which was provided in a single borrowing. The DIP Facility carries an interest rate of 10% per year, with 5% per year payable monthly in cash and 5% per year payable monthly in kind. Default interest under the DIP Facility is an additional 2% per year. In addition, a premium of 40% of the total principal amount of DIP Loans to be prepaid or repaid, less the aggregate amount received by the DIP Lenders in cash on account of payments of cash interest on the DIP Loans (excluding default interest), will be payable to the DIP Lenders upon any voluntary repayment or on the maturity date (the "***DIP MOIC***"). If an Acceptable Plan is consummated, the DIP MOIC may be paid in a combination of cash and equity of the Reorganized Debtors.

---

[33]   Summary charts assume that the Commitment Premium and the DIP MOIC (each as defined in the DIP Commitment Letter) are not paid in full in cash pursuant to the terms of the DIP Commitment Letter and that 10% of the New HoldCo Equity issued and outstanding on the Effective Date is reserved for participants in the MIP on the Effective Date.

[34]   This dilution chart remains subject to ongoing review and revision by the applicable RSA Parties.

The DIP Facility is secured by liens on substantially all of the Debtors' assets, including proceeds of avoidance actions (but not avoidance actions themselves). The liens and claims under the DIP Facility are junior only to the Carve Out (as defined in the DIP Motion), the liens and claims of the first lien lenders, and certain liens under the MLB Adequate Assurance Order, in each case to the extent provided for in the DIP Order.

Pursuant to the DIP Commitment Letter, the Debtors secured commitments covering the full amount of the DIP Facility, subject to the Bankruptcy Court's entry of an order approving the DIP Facility and the DIP Commitment Letter. The DIP Commitment Letter provides that the DIP Commitment Parties will receive a commitment premium of 15% of the total commitments. The DIP Commitment Letter also provides an option to the Initial DIP Commitment Parties to invest up to $50 million in the Reorganized Debtors based on a $500 million equity valuation for New HoldCo, which option may be exercised by the Initial DIP Commitment Parties on or before the nine-month anniversary of the Effective Date (the "*DIP Commitment Party Investment Option*").

The Debtors filed the DIP Motion on January 23, 2024, seeking approval of the DIP Facility and authorization to enter into the DIP Commitment Letter. The DIP Motion made clear that participation in the DIP Facility would be open to all junior funded debt creditors, and that a syndication process for the DIP Facility would commence on January 25, 2024. The procedures pursuant to which the DIP Facility was syndicated were publicly filed as Exhibit B to the DIP Motion (the "*DIP Election Procedures*").

On January 24, 2024, the UCC filed an emergency motion requesting the Bankruptcy Court schedule a hearing on the DIP Election Procedures and require the Debtors to obtain the Bankruptcy Court's approval of the DIP Election Procedures prior to syndicating the DIP Facility pursuant to those procedures [Docket No. 1662] (the "*DIP Election Procedures Motion*"). On January 25, 2024, the DIP Facility syndication commenced as described in the DIP Motion. Also on January 25, 2024, Debtors filed an objection to the DIP Election Procedures Motion, arguing, among other things, that approval of the DIP Election Procedures was not required [Docket No. 1670] (the "*DIP Election Procedures Objection*"). On January 26, 2024, the Crossholder Group and the First Lien Group each filed an objection and joinder to the DIP Election Procedures Objection [Docket Nos. 1671, 1675]. On February 8, 2024, an ad hoc group of lenders represented by Schulte Roth & Zabel LLP (the "*Dissenting Lender Group*") filed a joinder to the DIP Election Procedures Motion [Docket No. 1708] (the "*Dissenting Lender Group Joinder*"). Later that day, the Bankruptcy Court entered an order denying the DIP Election Procedures Motion [Docket No. 1710].

As noted in the Dissenting Lender Group Joinder, on the evening of February 5, 2024, the Dissenting Lender Group provided the Debtors with a commitment letter and term sheet for an alternative debtor-in-possession financing facility on substantially similar terms as the proposed DIP Facility, but with a reduced commitment premium. The Dissenting Lender Group disclosed that it held approximately 10.8% of the aggregate Junior Funded Debt Claims [Docket No. 1707]. The Debtors' advisors immediately engaged in discussions with the Dissenting Lender Group advisors, and held calls with them on February 6 and 7, 2024, to discuss the proposal. The Debtors believed that the Dissenting Lender Group's proposal was not preferable to the DIP Facility under the circumstances, in large part because it did not come with creditor support for a viable reorganization. Nevertheless, the Debtors were willing to continue to engage with the Dissenting

Lender Group to further develop their proposal and to reduce risk around the Debtors' ability to exit chapter 11 as a going concern. Ultimately, the members of the Dissenting Lender Group determined not to continue to pursue an alternative financing proposal or object to the DIP Motion, and instead participated in the syndication process in accordance with the terms of the DIP Election Procedures.

As discussed above, the UCC's concerns regarding the DIP Facility were resolved through the UCC Settlement. On February 23, 2024, the Debtors filed a revised proposed order approving the DIP Facility incorporating the terms of the UCC Settlement [Docket No. 1816].

After a hearing held on February 26, 2024, the Bankruptcy Court entered the DIP Order. On February 28, 2024, the Debtors made the $350 million First Lien Paydown.

       7.      **The Exit Note Commitment Letter**

Pursuant to the exit financing commitment letter between the Debtors and Amazon (the "***Exit Note Commitment Letter***"), Amazon has agreed to purchase the Convertible B Exit Notes from the Debtors in the aggregate principal amount of $115 million at emergence, subject to entry by the Debtors and Amazon into the Amazon Commercial Agreement. The proceeds of the Convertible B Exit Notes will be used to fund, among other things, cash distributions to creditors pursuant to the Plan.

The Exit Note Commitment Letter provides for the Debtors to pay Amazon a break fee equal to $4.025 million (i.e., 3.5% of the $115 million principal amount of the Convertible B Exit Notes) if the Debtors consummate an Alternative Restructuring.[35] The Exit Note Commitment Letter also provides for reimbursement of certain expenses of Amazon on an ongoing basis. A summary of the Exit Note Commitment Letter is included in the Debtors' motion seeking authorization to enter into and perform under the Exit Note Commitment Letter, filed on January 23, 2024 [Docket No. 1655; SEALED at Docket No. 1656] (the "***Exit Note Commitment Letter Motion***").

The terms of the Convertible B Exit Notes are described in the term sheet attached to the Restructuring Term Sheet as Exhibit 4 (the "***Convertible B Exit Notes Term Sheet***").[36] The Convertible B Exit Notes will be issued upon emergence, with a maturity of two years and an

---

[35]   "***Alternative Restructuring***" means (a) any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, financing (including any debtor-in-possession financing or exit financing), use of cash collateral, liquidation or winding up, tender offer, asset sale, share issuance, recapitalization, plan of reorganization or liquidation, share exchange, business combination, joint venture, partnership, or similar transaction involving any one or more Debtors or any Affiliates of the Debtors or the debt, equity, or other interests in any one or more Debtors or any Affiliates, other than as contemplated by the RSA, including the Restructuring Term Sheet, or (b) any other transaction involving one or more Debtors that is an alternative to and/or materially inconsistent with the transactions contemplated by the RSA.

[36]   The summary of the terms of the Convertible B Exit Notes in this Disclosure Statement is qualified in its entirety by the Convertible B Exit Notes Term Sheet. In the event of any inconsistency between this summary and the Convertible B Exit Notes Term Sheet, the Convertible B Exit Notes Term Sheet shall control.

option to extend the maturity for an additional six months under certain circumstances.  The Convertible B Exit Notes come with several future options, including:

    a.    the option to convert the Convertible B Exit Notes into 15% of the equity of New HoldCo;

    b.    the Strategic Investor Investment Option; and

    c.    subject to certain conditions, the option to purchase all, but not less than all, of the YES Interests.

In addition to its agreement to purchase the Convertible B Exit Notes in accordance with the Exit Note Commitment Letter, Amazon also has committed to enter into the Amazon Commercial Agreement with the Debtors, pursuant to which Amazon Prime Video will become the Debtors' primary partner through which customers will be able to purchase DTC access to stream the Debtors' local sports programming.  Pursuant to the Amazon Commercial Agreement, customers will be able to access all local DTC content, including live games and pre- and post-game programming for the teams for which the Debtors retain DTC rights, through Prime Video Channels.

The Exit Note Commitment Letter also provides an option to the Strategic Investor to invest up to $50 million in the Reorganized Debtors, based on a $500 million equity valuation for New HoldCo, which option may be exercised by the Strategic Investor on or before the nine-month anniversary of the Effective Date (the "***Strategic Investor Investment Option***" and collectively with the DIP Commitment Party Investment Option, the "***Investment Options***").

On February 21, 2024, the Bankruptcy Court entered a stipulation and agreed order among the Debtors, Red Seam, and Amazon, pursuant to which the parties reserved their respective rights with respect to any contractual restrictions on the transferability (including any pledge) of the YES Interests [Docket No. 1774].  On February 26, 2024, the Bankruptcy Court entered an order approving the Exit Note Commitment Letter Motion [Docket No. 1826].

    8.    **The New A/R Facility and Work Fee Motion**

The RSA requires the Debtors to, among other things, obtain the New A/R Facility on or prior to the effective date of a chapter 11 plan.  To ensure a competitive process that will result in the best facility in terms of pricing, terms, and conditions, and to enable the Debtors and potential lenders to progress expeditiously toward implementation of the New A/R Facility on the timeline required by the RSA, on January 23, 2024, the Debtors filed a motion seeking authorization to pay up to an aggregate of $1,000,000 in work fees to potential providers of the New A/R Facility [Docket No. 1654] (the "***Work Fee Motion***").  The Bankruptcy Court entered an order granting the Work Fee Motion on February 26, 2024 [Docket No. 1827], and the Debtors are actively seeking a New A/R Facility.

## ARTICLE V.
## SUMMARY OF PLAN

This section of this Disclosure Statement summarizes the Plan.  This summary is qualified in its entirety by reference to the Plan.

THE FOLLOWING SUMMARIZES SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.

### A.    *Administrative and Priority Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

### 1.    **Administrative Claims**

Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of DIP Claims, Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of the Judicial Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 60 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except for Claims subject to section 503(b)(1)(D) of the Bankruptcy Code, Claims arising under section 503(b)(9) of the Bankruptcy Code (for which the general Bar Date applies), Claims for fees and expenses pursuant to section 1930 of the Judicial Code, Professional Fee Claims, DIP Claims, and Claims for professional fees and expenses to be paid pursuant to the Cash Collateral Order, the DIP Order, and/or the Restructuring Support Agreement, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order; *provided* that the Administrative Claims Bar Date does not apply to Administrative Claims incurred by the Debtors in the ordinary course of their business as conducted prior to the Petition Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be

determined by, and satisfied in accordance with an order that becomes a Final Order of, the Bankruptcy Court.

**Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, or the property of any of the foregoing, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

2. <u>**Professional Fee Claims**</u>

a. <u>Professional Fee Escrow Account</u>

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Reorganized Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

b. <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals

59

in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

c.     Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days prior to the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided*, *however*, that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

d.     Post-Confirmation Date Fees and Expenses

From and after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors, the Reorganized Debtors, or the UCC, as applicable.  Following the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court; provided that any Professional retained in the Chapter 11 Cases will provide reasonably detailed summary invoices to the First Lien Group Advisors and the Crossholder Group Advisors for any fees and expenses earned or incurred after the Confirmation Date and on and before the Effective Date, and the First Lien Group and/or the Crossholder Group shall have until the expiration of the Fee Review Period to inform the Debtors and the relevant Professionals that they dispute all or a portion of the fees and expenses contained in any such invoices.

The Debtors and the Reorganized Debtors, as applicable, shall pay, within 5 Business Days after the conclusion of the Fee Review Period, any such claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors, the Reorganized Debtors, or the UCC, as applicable, which are not subject to dispute by the Debtors or the Reorganized Debtors, as applicable, the First Lien Group, or the Crossholder Group.  If the Debtors or the Reorganized Debtors, as applicable, the First Lien Group, or the Crossholder Group dispute the reasonableness of such invoice prior to the expiration of the Fee Review Period, (i) the disputed portion of such invoice shall not be paid until the dispute is resolved and (ii) the Debtors or the Reorganized

60

Debtors, as applicable, or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice. Notwithstanding anything to the contrary contained herein, any success fees, restructuring fees, or similar back-end fees earned by any Professionals retained by the Debtors or the UCC shall not be paid unless and until such fees are approved by the Bankruptcy Court.

3. **DIP Claims**

As of the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Documents, including principal, interest, fees, and expenses. On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment of its Allowed DIP Claim (other than DIP Commitment Premium Claims), in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each Holder of an Allowed DIP Claim (or its designee(s) as designated pursuant to and in accordance with the Distribution Designation Procedures) shall receive its *pro rata* share of: (1) the DIP MOIC Equity; (2) $240 million in Cash from the proceeds of the New A/R Facility and the Convertible B Exit Notes; (3) (a) if the Litigation Proceeds Condition is met, (i) $210 million (plus the amount of any Capitalized DIP Interest) in Cash from the Class C Litigation Proceeds and (ii) the Litigation CVR Proceeds, or (b) if the Litigation Proceeds Condition is not met, (x) 80% of the Cash from each of the Sinclair Settlement Deposit and the Sinclair Settlement Extension Payments (if any) and (y) (i) at the election of the Holder of the Allowed DIP Claim in accordance with the DIP Claims Election Procedures, Convertible A Exit Notes, and/or Exit Term Loans (up to an aggregate cap of $40 million (plus Capitalized DIP Interest) in aggregate principal amount of Exit Term Loans) in an aggregate principal amount equal to $210 million (which shall be reduced by the amount of Cash distributed to the Holders of DIP Claims from the Sinclair Settlement Deposit and the Sinclair Settlement Extension Payments (if any)) *plus* the amount of Capitalized DIP Interest, and (ii) the Litigation CVRs; and (4) payment in full in Cash of any other DIP Claims, including any accrued and unpaid interest, fees, or other amounts owed under the DIP Documents (other than DIP Commitment Premium Claims). Notwithstanding anything to the contrary in the preceding sentence, (a) if the Litigation Proceeds Condition is met on or prior to the Confirmation Date, the DIP Claims Election Procedures shall not be utilized in connection with consummation of the Plan and (b) if the Litigation Proceeds Condition is met following the Confirmation Date, any elections made by Holders of DIP Claims pursuant to the DIP Claims Election Procedures shall be deemed null and void *ab initio*.

On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for any DIP Commitment Premium Claims, each DIP Commitment Party (or its designee(s) as designated pursuant to and in accordance with the Distribution Designation Procedures)) shall receive its *pro rata* share (based on the amount of such DIP Commitment Party's DIP Commitment Premium set forth in the DIP Commitment Letter) of the DIP Commitment Premium Equity.

Contemporaneously with the indefeasible payment or satisfaction in full of the DIP Claims in accordance with Article II.C of the Plan, the DIP Facility shall be deemed canceled, all commitments under the DIP Documents shall be deemed terminated, all Liens on property of the Debtors or the Reorganized Debtors, as applicable, arising out of or related to the DIP Facility shall automatically terminate, all collateral subject to such Liens shall be automatically released,

and all guarantees of the Debtors or the Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders. The DIP Agent and the DIP Lenders shall take all actions necessary to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

4.   **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business by the Reorganized Debtors.

B.   *Classification, Treatment, and Voting of Claims and Interests*

1.   **Classification of Claims and Interests**

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, Confirmation of the Plan, and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.  Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.  The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

The Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below.  The classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors, as applicable.  All of the potential Classes for the Debtors are set forth in the Plan.  Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and/or (iii) deemed to accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D of the Plan.  For all purposes under the Plan, each Class will contain sub-classes for each of the Debtors, except that Class 9 shall be vacant at each Debtor other than DSG.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Junior Funded Debt Claims | Impaired | Entitled to Vote |
| 5 | Go-Forward Trade Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

2.      **Treatment of Classes of Claims and Interests**

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

a.      Class 1 — Other Secured Claims

(i)     *Classification*:  Class 1 consists of any Other Secured Claims.

(ii)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, *release*, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the Debtors with the reasonable consent of the Required DIP Commitment Parties, either:

        (a)     payment in full in Cash;

        (b)     delivery of collateral securing any such Claim;

        (c)     Reinstatement of such Allowed Other Secured Claim; or

        (d)     such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii)    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

b.     <u>Class 2 — Other Priority Claims</u>

(i)    *Classification*: Class 2 consists of any Other Priority Claims.

(ii)    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the Debtors with the reasonable consent of the Required DIP Commitment Parties, either:

        (a)     payment in full in Cash; or

        (b)     such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii)    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

c.     <u>Class 3 — First Lien Claims</u>

(i)    *Classification*: Class 3 consists of any First Lien Claims against any Debtor.

(ii)    *Allowance*: On the Effective Date, First Lien Claims shall be Allowed in an amount equal to the First Lien Claims Cap.

(iii)   *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment of its Allowed First Lien Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed First Lien Claim, each Holder of an Allowed First Lien Claim shall receive its pro rata share of:

      (a)   Cash in an amount equal to $65 million less the AP Reduction Amount;

      (b)   Take Back Term Loans and, to the extent the Purchase Option is exercised, Cash received by the Debtors from the Purchase Option; and

      (c)   after taking into account the First Lien Paydown and the distributions set forth in items (i) and (ii) above, and in each case up to the First Lien Claims Cap, either:

            1.   if the Litigation Proceeds Condition is met, the Class A Litigation Proceeds; or

            2.   if the Litigation Proceeds Condition is not met, (x) 15% of the Cash from each of the Sinclair Settlement Deposit and the Sinclair Settlement Extension Payments (if any) and (y) the Class A Litigation Trust Interests.

(iv)   *Voting*:  Class 3 is Impaired under the Plan.  Holders of Allowed First Lien Claims are entitled to vote to accept or reject the Plan.

d.   <u>Class 4 — Junior Funded Debt Claims</u>

(i)   *Classification*:  Class 4 consists of any Junior Funded Debt Claims against any Debtor.

(ii)   *Allowance*:  On the Effective Date, Junior Funded Debt Claims shall be Allowed in the aggregate amount of $8,425,611,996.28, consisting of the following:

      (a)   Second Lien Revolving Loan Claims shall be allowed in the aggregate amount of $230,205,129.51;

      (b)   Second Lien Term Loan Claims shall be allowed in the aggregate amount of $3,234,860,037.30;

      (c)   Second Lien Notes Claims shall be allowed in the aggregate amount of $3,134,954,571.84;

(d)    Third Lien Term Loan Claims shall be allowed in the aggregate amount of $4,194,855.45;

(e)    Third Lien Notes Claims shall be allowed in the aggregate amount of $10,530,821.04; and

(f)    Unsecured Notes Claims shall be allowed in the aggregate amount of $1,810,866,581.14.

(iii)   *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed Junior Funded Debt Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Junior Funded Debt Claim, each Holder of an Allowed Junior Funded Debt Claim (or its designee(s) as designated pursuant to and in accordance with the Distribution Designation Procedures) shall receive its *pro rata* share of:

(a)    the Junior Creditor Equity; and

(b)    either:

1.    if the Litigation Proceeds Condition is met, the Class B Litigation Proceeds; or

2.    if the Litigation Proceeds Condition is not met, (x) 5% of the Cash from each of the Sinclair Settlement Deposit and the Sinclair Settlement Extension Payments (if any) and (y) the Class B Litigation Trust Interests.

(iv)   *Voting*:  Class 4 is Impaired under the Plan.  Holders of Allowed Junior Funded Debt Claims are entitled to vote to accept or reject the Plan.

e.    <u>Class 5 — Go-Forward Trade Claims</u>

(i)    *Classification*:  Class 5 consists of any Go-Forward Trade Claims.

(ii)   *Treatment*:  Except to the extent that a Holder of an Allowed Go-Forward Trade Claim agrees to a less favorable treatment of its Allowed Go-Forward Trade Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each such Allowed Go-Forward Trade Claim, each Holder of an Allowed Go-Forward Trade Claim shall receive, at the option of the applicable Debtor(s), either:

(a)    Reinstatement of such Allowed Go-Forward Trade Claim on the Effective Date;

(b)      payment in full in Cash on (a) the Effective Date, or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Go-Forward Trade Claim, unless otherwise agreed to by such Holder; or

(c)      such other treatment rendering its Allowed Go-Forward Trade Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii)    *Voting*: Class 5 is Unimpaired under the Plan. Holders of Allowed Go-Forward Trade Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Go-Forward Trade Claims are not entitled to vote to accept or reject the Plan.

f.     <u>Class 6 — General Unsecured Claims</u>

(i)    *Classification*: Class 6 consists of any General Unsecured Claims.

(ii)   *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim its share of the Unsecured Claim Cash Distribution in accordance with the GUC Allocation.[37]

(iii)  *Voting*: Class 6 is Impaired under the Plan. Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

g.     <u>Class 7 — Intercompany Claims</u>

(i)    *Classification*: Class 7 consists of any Intercompany Claims.

(ii)   *Treatment*: Each Allowed Intercompany Claim shall, at the option of the Debtors (with the reasonable consent of the Required DIP Commitment Parties), be:

(a)      Reinstated; or

---

[37]    As of the date hereof, the GUC Allocation remains under discussion between the UCC and the Debtors. The Debtors intend to file an updated version of the Plan setting forth the structure and terms of the GUC Allocation (if any) in advance of the hearing to approve the adequacy of the Disclosure Statement.

(b)    distributed, contributed, set off, cancelled, released, or otherwise addressed in a manner determined by the Debtors (with the reasonable consent of the Required DIP Commitment Parties) (without any distribution on account of such Claims).

(iii)    *Voting*:  Holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

h.    <u>Class 8 — Intercompany Interests</u>

(i)    *Classification*:  Class 8 consists of all Intercompany Interests.

(ii)    *Treatment*:  On the Effective Date, Intercompany Interests shall, at the option of the Debtors (with the reasonable consent of the Required DIP Commitment Parties) be:

(a)    Reinstated; or

(b)    cancelled and released without any distribution on account of such Interests.

For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

(iii)    *Voting*:  Holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

i.    <u>Class 9 — Existing Equity Interests</u>

(i)    *Classification*:  Class 9 consists of all Existing Equity Interests.

(ii)    *Treatment*:  On the Effective Date, all Existing Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect.  No Holder of Existing Equity Interests will receive a distribution under the Plan on account of such Existing Equity Interests.

(iii)    *Voting*:  Holders of Existing Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy

Code.  Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

3.     **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

4.     **Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  If a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, such Class shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

5.     **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

6.     **Intercompany Interests**

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests, but for the purposes of administrative convenience and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to use certain funds and assets as set forth in the Plan to make certain distributions to Holders of Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor as of the Effective Date shall continue to be owned by the applicable Reorganized Debtor as of the Effective Date.

7.     **Controversies Concerning Impairment**

Notwithstanding anything to the contrary in the Plan, if a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

8.  **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

9.  **No Substantive Consolidation**

Although the Plan is presented as a joint plan of reorganization for administrative purposes, the Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Except as expressly provided in the Plan, nothing in the Plan, the Confirmation Order, or the Disclosure Statement, shall constitute or be deemed to constitute a representation that any one or all of the Debtors is subject to or liable for any Claims or Interests against or in any other Debtor. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed the amount of the Allowed Claim.

C.  *Means for Implementation of the Plan*

1.  **General Settlement of Claims and Interests**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan, including numerous Debtor-creditor and inter-creditor issues designed to achieve an economic settlement of Claims against all of the Debtors and an efficient resolution of the Chapter 11 Cases.  The Plan constitutes a settlement of disputes including, (1) the waiver of the right of Holders of First Lien Claims and Second Lien Claims to assert a Claim arising on account of a Diminution in Value (as defined in the Cash Collateral Order), if any, (2) the allocation of encumbered versus unencumbered value and the scope of collateral securing the First Lien Claims, the Second Lien Claims, and the Third Lien Claims, (3) any potential challenges related to the legality, validity, priority, perfection, enforceability, avoidability, or extent of the Liens or Claims of the First Lien Claims, the Second Lien Claims, and the Third Lien Claims, (4) the agreement with respect to the Allowed amount of the First Lien Claims, including with respect to any premiums owed as part of such Claims and any recharacterization of Adequate Protection Payments (as defined in the Cash Collateral Order), (5) the applicability of any issues related to the Prepetition Intercreditor Agreement and the waiver of turnover of proceeds, if any, arising thereunder, (6) the allocation of value among Debtor entities, and (7) the disputes resolved by the UCC Settlement.

70

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlements and compromises are fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

2. **Restructuring Transactions**

On and after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, will enter into and will take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan in accordance with the Restructuring Steps Memorandum that are consistent with and pursuant to the terms and conditions of the Plan, including all actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable, in connection with such transactions, which may include, as applicable:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (1), pursuant to applicable state law; (4) the execution and delivery of the New Organizational Documents and the issuance, distribution, reservation, or dilution, as applicable, of New Equity, as set forth in the Plan; (5) to the extent not entered into prior to the Confirmation Date, the execution and delivery of the New A/R Facility Documents; (6) the execution and delivery of the Convertible B Exit Notes Documents; (7) the execution and delivery of, and performance under, the Commercial Agreement (to the extent not executed, delivered, and authorized prior to the Effective Date); (8) the execution and delivery of the Take Back Debt Documents; (9) the execution and delivery of the New Intercreditor Agreement; (10) the adoption of the Management Incentive Plan and the issuance and reservation of New HoldCo Equity (or its equivalent in Awards, such as profits interests) for the participants in the Management Incentive Plan on the Effective Date to be implemented on the terms and conditions set by the New HoldCo Board after the Effective Date; (11) all transactions and other actions necessary to separate the Debtors from Sinclair Parent and its Affiliates; (12) if the Litigation Proceeds Condition is not met, the execution and delivery of the Convertible A Exit Notes Documents; (13) if the Litigation Proceeds Condition is not met, the execution and delivery of the Exit Term Loan Documents; (14) if the Litigation Proceeds Condition is not met, all transactions and documents necessary to establish and fund the

Litigation Trust and transfer the Litigation Trust Assets to the Litigation Trust and issue the Litigation Trust Interests and Litigation CVRs; (14) entry into the DIP Commitment Party Investment Option Documents; and (15) all other actions that the applicable Entities determine to be necessary or appropriate, in the most tax efficient manner to the extent commercially reasonable, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

Notwithstanding anything to the contrary in the Plan, to the extent that the Commercial Agreement has taken effect prior to the Effective Date, any claims arising thereunder or in connection therewith shall not be released by the Debtor Release or the Third-Party Release.

3.     **Sources of Consideration for Plan Distributions and Transfers on the Effective Date**

a.     Cash on Hand and SPV Cash

On the Effective Date, the SPV Cash and Cash on hand at the Debtors will be used to fund certain distributions to certain Holders of Claims or otherwise be retained on or contributed to, as applicable, the balance sheet(s) of New OpCo and/or its wholly-owned subsidiaries (other than the New A/R Facility Borrower).

b.     Litigation Proceeds

If the Litigation Proceeds Condition is met, the Debtors shall use the $495 million in Cash (*plus* any Sinclair Settlement Extension Payments (if any)) received pursuant to the Sinclair Settlement Order to fund certain distributions to certain Holders of Claims on the Effective Date as set forth in the Plan. If the Litigation Proceeds Condition is not met, and to the extent the Sinclair Settlement Deposit and the Sinclair Settlement Extension Payments (if any) are received by the Debtors prior to the Effective Date, the Debtors shall first distribute Cash on account of the Sinclair Settlement Deposit and the Sinclair Settlement Extension Payments (if any) to Holders of certain Claims, and shall thereafter distribute the Litigation Trust Interests to the Litigation Trust Beneficiaries, in each case, on the Effective Date as set forth in the Plan.

c.     Issuance and Distribution of the New Equity

On or prior to the Effective Date, the New Equity shall be issued and distributed to the Entities entitled to receive the New Equity pursuant to the Plan in accordance with the Restructuring Steps Memorandum. The issuance and delivery of New Equity in accordance with the Plan shall be authorized without the need for any further limited liability company or corporate action and without any further action by the Holders of Claims or other parties in interest. All of the New Equity to be issued and/or delivered in accordance with the Plan, when so issued and/or delivered shall be duly authorized, validly issued, fully paid, and non-assessable.

Each distribution and issuance of the New Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution, issuance, and/or dilution,

as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, and/or dilution, as applicable, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution of the New Equity. Any Entity's acceptance of New Equity shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The New Equity will not be registered on any exchange as of the Effective Date and is not expected to trade on DTC. The Debtors intend for the New Equity to be distributed by delivery or book-entry transfer thereof by the Distribution Agent in accordance with the Plan and the New Organizational Documents and do not expect the New Equity to be eligible for DTC book-entry delivery, settlement, and depository services. Each Person that receives New TopCo Equity pursuant to the Plan or in connection with any of the transactions contemplated thereby (including pursuant to the DIP Commitment Letter) shall be deemed to have executed, without any further action by any party, the New Shareholders Agreement as of the Effective Date.

Any Holder of Claims may designate that all or a portion of such Holder's *pro rata* share of the New TopCo Equity to be distributed as part of the treatment of such Claim, be registered in the name of, and delivered to, its designee in accordance with the Distribution Designation Procedures.

On the Effective Date, 100% of the New HoldCo Equity will be indirectly owned by New TopCo, subject to dilution by the Strategic Investor Investment Option, the Convertible B Exit Notes, and the Management Incentive Plan. The Convertible B Exit Notes will be convertible into 15% of New HoldCo Equity on a fully diluted basis.

On the Effective Date, the issued and outstanding New TopCo Equity will be subject to dilution by the DIP Commitment Party Investment Option and the Convertible A Exit Notes (if any). The Convertible A Exit Notes (if any) will be convertible into 25% of New TopCo Equity on a fully diluted basis.

d.   New A/R Facility

The New A/R Facility Borrower and the relevant Debtors or Reorganized Debtors, as applicable,  will enter into the New A/R Facility Documents on the Effective Date. On the Effective Date, Cash proceeds of the New A/R Facility will be used to fund distributions to certain Holders of Claims. For so long as the Take Back Term Loans are outstanding (unless expressly permitted by the Take Back Debt Documents), the Reorganized Debtors will not have more than $135 million outstanding in the aggregate under the New A/R Facility at any single point in time. Subject to and upon such entry into the New A/R Facility Documents, the New A/R Facility Documents shall constitute legal, valid, and binding obligations of the Debtors or the Reorganized Debtors, as applicable, that are party to such New A/R Facility Documents and be enforceable in accordance with their respective terms. The terms and conditions of the New A/R Facility Documents shall bind each Entity that enters into such New A/R Facility Documents as an originator, servicer, or backstop performance guarantor. Any Entity's entry into the New A/R Facility Documents shall be deemed as its agreement to the terms of such New A/R Facility Documents, as amended or modified from time to time following the entry of such documents in accordance with their terms.

To the extent not approved by the Bankruptcy Court previously, Confirmation shall be deemed approval of the New A/R Facility Documents and authorization of the applicable Debtors' or Reorganized Debtors' performance of all of their obligations thereunder (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees and expenses paid in connection therewith), if any.   To the extent not approved by the Bankruptcy Court previously, the Debtors or the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the New A/R Facility, if any, including the New A/R Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors may deem to be necessary to consummate the New A/R Facility, if any.

To the extent not approved by the Bankruptcy Court previously, on the Effective Date, all of the claims, Liens, and security interests to be granted by the applicable Debtors or Reorganized Debtors in accordance with the terms of the New A/R Facility Documents, if any:  (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New A/R Facility Documents; (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such other liens and security interests as may be permitted under the New A/R Facility Documents; and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

e.      Convertible B Exit Notes

On the Effective Date, the Reorganized Debtors shall execute the Convertible B Exit Notes Documents, shall issue the Convertible B Exit Notes to the Strategic Investor in exchange for $115 million in Cash, and shall be authorized to enter into and perform their obligations under the Convertible B Exit Notes Documents and such other documents as may be reasonably necessary or appropriate.  Subject to the occurrence of the Effective Date, Confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the issuance of the Convertible B Exit Notes to the Strategic Investor and the Convertible B Exit Notes Documents (including all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the incurrence of Liens securing the Convertible B Exit Notes and the payment of all fees, payments, indemnities, and expenses provided for therein).

On the Effective Date, the Convertible B Exit Notes Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Convertible B Exit Notes Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, and shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  On the

Effective Date, all claims, liens, and security interests granted in accordance with the terms of the Convertible B Exit Notes Documents shall (a) be legal, binding, and enforceable liens and security interests subject only to such liens and security interests as may be permitted under the Convertible B Exit Notes Documents, (b) be deemed automatically attached and perfected on the Effective Date, and (c) not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors granting such liens and security interests in accordance with the terms of the Convertible B Exit Notes Documents are authorized to make, and shall make (to the extent reasonably requested by the Strategic Investor), all filings and recordings, and obtain all governmental approvals and consents necessary, to establish and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in absence of the Plan and the Confirmation Order (it being understood that notwithstanding anything in the Plan to the contrary, perfection shall occur automatically by virtue of the Plan and the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interest to third parties.

With respect to the shares of New HoldCo Equity to which they are entitled pursuant to the conversion right provided for in the Convertible B Exit Notes Documents, the Holders of the Convertible B Exit Notes shall be (a) deemed to be the beneficial owners of such New HoldCo Equity and (b) permitted to vote on all matters subject to a vote of Holders of the New HoldCo Equity, in each case on an as-converted basis and at all times without conversion; *provided* that New HoldCo Equity corresponding to any portion of the Convertible B Exit Notes that has not yet been converted shall not be entitled to distributions or other economic rights until such time as the Convertible B Exit Notes are converted in accordance with the Convertible B Exit Notes Documents.

f.      Take Back Term Loans

On the Effective Date, the applicable Reorganized Debtors shall execute and deliver the Take Back Debt Documents, and New OpCo shall distribute Take Back Term Loans in the aggregate principal amount equal to $200 million to Holders of First Lien Claims and, to the extent applicable, to any Initial DIP Commitment Party (or its designee) that exercises the Purchase Option and purchases Take Back Term Loans in accordance with the Purchase Option Election Procedures.  The Cash proceeds received by the Debtors from the exercise of the Purchase Option by any Initial DIP Commitment Parties shall be distributed to the Holders of First Lien Claims on the Effective Date in accordance with the Take Back Debt Documents and the Plan.

On the Effective Date, the Take Back Debt Documents shall constitute legal, valid, and binding obligations of the applicable Reorganized Debtors and all claims, liens, and security interests granted in accordance with the terms of the Take Back Debt Documents shall (a) be legal, binding, and enforceable subject only to such liens and security interests as may be permitted under the Take Back Debt Documents, (b) be deemed automatically attached and perfected on the Effective Date, and (c) not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential

transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

       g.      <u>Convertible A Exit Notes / Exit Term Loans</u>

If the Litigation Proceeds Condition is not met, the applicable Reorganized Debtors shall issue or distribute as applicable, the Convertible A Exit Notes and/or Exit Term Loans on the Effective Date, in an aggregate principal amount of $210 million (which shall be reduced by the amount of Cash distributed to the Holders of DIP Claims from the Sinclair Settlement Deposit and the Sinclair Settlement Extension Payments (if any) on the Effective Date) *plus* the amount of the Capitalized DIP Interest (*provided* that there will in no event be more than $40 million of Exit Term Loans entered into on account of principal amount of loans (other than on account of the Capitalized DIP Interest)) to Holders of DIP Claims in accordance with the elections made by such Holders pursuant to the DIP Claims Election Procedures.  On the Effective Date, Holders of DIP Claims will be deemed to tender the applicable amount of DIP Claims in exchange for an equal amount of Convertible A Exit Notes and/or Exit Term Loans in lieu of Cash.  In connection therewith, the Reorganized Debtors shall execute and deliver the Convertible A Exit Notes Documents and Exit Term Loan Documents to the Convertible A Exit Notes Trustee and the Exit Term Loan Agent, respectively, and shall distribute the Convertible A Exit Notes and the Exit Term Loans to Holders of DIP Claims (or their designees).

The Convertible A Exit Notes Documents and the Exit Term Loan Documents, if any, shall constitute legal, valid, and binding obligations of the applicable Reorganized Debtors and all claims, liens, and security interests granted in accordance with the terms of the Convertible A Exit Notes Documents and the Exit Term Loan Documents shall (a) be legal, binding, and enforceable subject only to such liens and security interests as may be permitted under the Convertible A Exit Notes Documents and the Exit Term Loan Documents, as applicable, (b) be deemed automatically attached and perfected on the date of their issuance, and (c) not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

       h.      <u>Litigation CVRs</u>

If the Litigation Proceeds Condition is not met, the Debtors or the Reorganized Debtors, as applicable, will form LitigationCo in accordance with the Restructuring Steps Memorandum, LitigationCo will receive 100% of Class C Litigation Trust Interests, and LitigationCo will issue the Litigation CVRs to Holders of DIP Claims (or their designees).  The Litigation CVRs will obligate LitigationCo to pay to Holders of the Litigation CVRs $45 million in the aggregate from Litigation Proceeds received on account of the Class C Litigation Trust Interests, after payment in full of the Convertible A Exit Notes and the Exit Term Loans. The Litigation CVRs shall be unsecured and shall not be guaranteed by the other Reorganized Debtors.

Any documents evidencing the Litigation CVR shall constitute legal, valid, and binding obligations of the applicable Reorganized Debtors and be in form and substance reasonably acceptable to the Debtors and the Required Consenting Parties, and all claims granted in accordance with such documents shall (a) be legal, binding, and enforceable and (b) not be subject

to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

i.    Investment Options

On the Effective Date, the applicable Reorganized Debtors will enter into the DIP Commitment Party Investment Option Documents.  The DIP Commitment Party Investment Option Documents will allocate the DIP Commitment Party Investment Option among the Initial DIP Commitment Parties (or their designees, as applicable) consistent with the terms of the DIP Commitment Letter, including Schedule 1 thereto.

Any documents evidencing the Investment Options shall constitute legal, valid, and binding obligations of the applicable Reorganized Debtors and all claims granted in accordance with such documents shall (a) be legal, binding, and enforceable and (b) not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

The Debtors do not intend for the Litigation CVRs to be "securities" under applicable laws. Notwithstanding this intention, to the extent the Litigation CVRs are deemed to be "securities," the issuance of the Litigation CVRs will be exempt pursuant to section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code).

4.    **Marquee Interests**

To the extent the Marquee Acquisition Right is not exercised pursuant to the Sinclair Settlement Order prior to the Effective Date, on the Effective Date, the Marquee Interests shall be indirectly wholly owned by New TopCo in accordance with the Restructuring Steps Memorandum. If the Litigation Proceeds Condition is not met, and subject in all respects to the Marquee Acquisition Right, the Convertible A Exit Notes and the Exit Term Loans will be secured, directly or indirectly, by the Marquee Interests.

5.    **Litigation Trust and Litigation Trust Assets**

Notwithstanding anything to the contrary set forth in the Plan, the Litigation Trust shall be created and the terms of Article IV.E of the Plan shall apply only if the Litigation Proceeds Condition is not met.  If the Litigation Proceeds Condition is not met, the Litigation Trust shall be created and the Litigation Trust Interests issued by no later than the Effective Date.

a.    Creation of the Litigation Trust

If the Litigation Proceeds Condition is not met, on the Effective Date, the Debtors and the Litigation Trustee shall execute the Litigation Trust Agreement and the other Litigation Trust Documents and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan, which shall be for the benefit of the Litigation Trust Beneficiaries.  In connection therewith, the Debtors shall transfer and/or assign and shall be deemed to transfer and/or assign to

the Litigation Trust all of their rights, titles, and interests in and to all of the Litigation Trust Assets. In accordance with section 1141 of the Bankruptcy Code, the Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims and Liens, subject only to (a) the Litigation Trust Interests and (b) the expenses of the Litigation Trust as provided for in the Litigation Trust Agreement.  Also on the Effective Date, and subject to, in all respects, the terms of the Litigation Trust Documents, all Privileges held by the Debtors shall be transferred to and vest exclusively in the Litigation Trust.

The Litigation Trust shall be established to monetize and distribute the proceeds of the Litigation Trust Assets in accordance with the Plan, the Confirmation Order, and the Litigation Trust Agreement.  Following the Effective Date, if the Sinclair Release Effective Date occurs on or prior to the Sinclair Settlement Outside Date, the Litigation Trust shall distribute the Cash proceeds thereof in accordance with the terms set forth in the Plan.  If the Sinclair Release Effective Date does not occur on or prior to the Sinclair Settlement Outside Date, then the Litigation Trust shall pursue the Sinclair-Related Litigations.  The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee.  The Litigation Trust Agreement shall specify the powers, rights, and responsibilities of the Litigation Trustee, and the rights of the Litigation Trust Beneficiaries.

On and after the date of transfer of the Litigation Trust Assets to the Litigation Trust, the Reorganized Debtors shall have no direct interest in the Litigation Trust Assets.  To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have been designated as a representative of the Litigation Trust pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Litigation Trust for the benefit of the Litigation Trust Beneficiaries. Notwithstanding the foregoing, all net proceeds of such Litigation Trust Assets shall be transferred to the Litigation Trust to be distributed in accordance with the Plan and the Litigation Trust Agreement.

Notwithstanding anything in the Plan to the contrary, the Debtors and the Reorganized Debtors shall have no obligation to provide any funds or financing to the Litigation Trust, other than the obligation to contribute the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement, and under no circumstances will the expenses of the Litigation Trust be paid or reimbursed by the Debtors and the Reorganized Debtors.

        b.      <u>Transfer of Assets and Causes of Action to the Litigation Trust</u>

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, (i) the Litigation Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, and substantively consistent with Rev. Proc. 94-45, 1994-2 C.B. 684, and thus, as a "grantor trust" within the meaning of Sections 671-679 of the Tax Code, (ii) the sole purpose of the Litigation Trust shall be to distribute the Litigation Trust Assets in accordance with Treasury Regulation § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, and (iii) each of the Debtors,

the Litigation Trustee, and the recipients of Litigation Trust Interests shall report consistent with such treatment. The Litigation Trust Interests held by the Litigation Trust Beneficiaries are intended to be held as "capital assets" within the meaning of Section 1221 of the Tax Code (generally, property held for investment). The Litigation Trust Beneficiaries shall be treated, for U.S. federal income tax purposes, as the grantors of the Litigation Trust and as the deemed owners of the Litigation Trust Assets. For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to applicable Holders of Claims, to the extent applicable, and, to the extent the Litigation Trust Assets are allocable to Disputed Claims, to the disputed claims reserve described below and (b) a second-step transfer of the Litigation Trust Assets by such Holders of Claims and, other than to the extent relevant with respect to the disputed claims reserve, to the Litigation Trust. As a result, the first step of the transfer of the Litigation Trust Assets to the Litigation Trust is expected to be treated as a taxable exchange under Section 1001 of the Tax Code. As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the Litigation Trustee, and the recipients of Litigation Trust Interests shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Following the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trust Beneficiaries shall include in their annual taxable incomes, and pay tax to the extent due on, their allocable shares of each item of the Litigation Trust's income, gain, deduction, loss, and credit. Under the Litigation Trust Agreement, the Litigation Trustee will be required to file income tax returns for the Litigation Trust as a grantor trust of the Litigation Trust Beneficiaries. In addition, the Litigation Trust Agreement will require consistent valuation by all parties, including the Debtors, the Reorganized Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries, for all U.S. federal income tax and reporting purposes, of any property held by the Litigation Trust. The Litigation Trust Agreement will also limit the investment powers of the Litigation Trustee in accordance with Internal Revenue Service Rev. Proc. 94-45 and will require the Litigation Trust to distribute at least annually to the Litigation Trust Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for taxes), except for recoveries retained as reasonably necessary to maintain the value of the Litigation Trust Assets.

With respect to amounts, if any, in a reserve for Disputed Claims, the Debtors expect that (a) such account will be treated for U.S. federal income tax purposes as either a "disputed ownership fund" governed by Treasury Regulation § 1.468B-9 or as a taxable entity separate from the Litigation Trust, (b) any appropriate elections with respect thereto shall be made, and (c) such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the Internal Revenue Service for such disputed claims reserve and will be subject to tax annually on a separate entity basis. Any taxes (including with respect to interest, if any, earned in the account, or any recovery on the portion of assets allocable to such account in excess of the disputed claims reserve's basis in such assets) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

c.       The Administration of the Litigation Trust and the Powers of the Litigation Trustee

The Litigation Trust shall be administered by the Litigation Trustee pursuant to the Litigation Trust Agreement.  The Litigation Trustee shall be selected by the Required DIP Commitment Parties, subject to the consent of the First Lien Group and the Debtors, in accordance with the terms set forth in the Litigation Trust Agreement and in accordance with the Restructuring Support Agreement.  The Litigation Trust, acting by and through the Litigation Trustee, shall be (a) the exclusive administrator of the assets of the Litigation Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(4), and (b) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code and "representative" of the Estates within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code, in each case, solely for purposes of carrying out the Litigation Trustee's duties under the Litigation Trust Agreement with respect to the Litigation Trust Beneficiaries.  In the event of any inconsistency solely between Article IV.E of the Plan and the Litigation Trust Documents, the Litigation Trust Documents shall control, with the Plan controlling in all other cases.  All compensation for the Litigation Trustee and other costs of administration for the Litigation Trust shall be paid by the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement.

The Litigation Trust Agreement will be Filed with the Plan Supplement and will provide for, among other things:  (a) the transfer of the Litigation Trust Assets to the Litigation Trust (other than the Sinclair Settlement Deposit and the Sinclair Settlement Extension Payments (if any), in each case, to the extent received by the Debtors prior to the Effective Date); (b) the payment of certain Litigation Trust Expenses (including the cost of pursuing the Sinclair-Related Litigations) of the Litigation Trust from the Litigation Trust Assets; (c) litigation of the Sinclair-Related Litigations, as applicable, which may include the prosecution, settlement, abandonment, or dismissal of such litigation; (d) distributions to Holders of Litigation Trust Interests, as provided in the Plan and in the Litigation Trust Agreement; (e) certain cooperation obligations of the Debtors and the Litigation Trust, including with respect to Privileges; (f) the identity of the Litigation Trustee; (g) the terms of the Litigation Trustee's engagement; (h) whether the Litigation Trustee shall be bonded; and (i) reasonable and customary provisions that allow for limitation of liability and indemnification of the Litigation Trustee and its professionals by the Litigation Trust. Any such indemnification shall be the sole responsibility of the Litigation Trust and payable solely from the Litigation Trust Assets.  The Litigation Trustee shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets, except as otherwise provided in the Plan, the Confirmation Order, or the Litigation Trust Agreement.

In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, the Litigation Trustee, for the benefit of the Litigation Trust, shall: (a) hold the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries; (b) make distributions as provided in the Plan and the Litigation Trust Agreement; and (c) have the power, authority, and responsibility to prosecute and resolve any Sinclair-Related Litigation.  The Litigation Trustee shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets, except as otherwise provided in the Litigation Trust Agreement.  The Litigation Trustee shall be responsible for (i) filing returns of the Litigation Trust as a "grantor trust" pursuant to Treasury Regulation § 1.671-4(a) and (ii) annual delivery to each Holder of Litigation Trust Interests of a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for

U.S. federal income tax purposes.  In all circumstances, the Litigation Trustee shall act in the best interests of the Litigation Trust Beneficiaries.

The Litigation Trust Expenses shall be paid from the Litigation Trust Assets in accordance with the Plan and Litigation Trust Agreement.  The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of those professionals without further order of the Bankruptcy Court from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement.

d.    Transferability of Litigation Trust Interests

The Litigation Trust Interests shall be non-transferable other than if transferred (a) by will, (b) through intestate succession, (c) by operation of Law, or (d) to the extent permitted by the Litigation Trust Agreement.  The Litigation Trust Agreement shall provide that no transfer, assignment, pledge, hypothecation, or other disposition of any Litigation Trust Interest may be effected until (i) such action is approved by the Litigation Trustee in accordance with the terms of the Litigation Trust Agreement, (ii) the Litigation Trustee has received such legal advice or other information that they, in their sole and absolute discretion, deem necessary to assure that any such disposition will not cause the Litigation Trust to be subject to entity-level taxation for U.S. federal income tax purposes, and (iii) either (x) the Litigation Trustee has received such legal advice or other information that they, in their sole and absolute discretion, deem necessary or appropriate to assure that any such disposition will not require the Litigation Trust to comply with the registration and reporting requirements of the Securities Act, the Securities Exchange Act of 1934, as amended, the Trust Indenture Act of 1939, as amended, or the Investment Company Act of 1940, as amended, or (y) the Litigation Trustee has determined, in accordance with the terms of the Litigation Trust Agreement, to cause the Litigation Trust to become a public reporting company and/or make periodic reports under the Securities Exchange Act of 1934, as amended, to enable such disposition to be made.  In the event that any such disposition is allowed, the Litigation Trustee may add such restrictions upon such disposition and other terms to the Litigation Trust Agreement as are deemed necessary or appropriate by the Litigation Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws.

The Debtors do not intend for the Litigation Trust Interests to be "securities" under applicable laws and any and all Litigation Trust Interests will not be registered pursuant to the Securities Act or any applicable state or local securities law.  Notwithstanding this intention, to the extent the Litigation Trust Interests are deemed to be "securities," the issuance of the Litigation Trust Interests under the Plan will be exempt pursuant to section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code).  Further, any and all Litigation Trust Interests will be exempt from the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and, to the extent such interests are deemed to be "securities," section 1145 of the Bankruptcy Code.

Subject in all respects to the terms, conditions, and requirements of the Litigation Trust Agreement and the Plan, (a) the Litigation Trustee shall maintain a register of the Holders of Litigation Trust Interests and (b) upon notice to the Litigation Trust by any Holder of a Litigation

Trust Interest in accordance with the Litigation Trust Agreement, the Litigation Trustee shall amend the register to reflect any transfer of Litigation Trust Interests as set forth above.

        e.      <u>Allocation of Litigation Proceeds</u>

If (a) the Litigation Proceeds Condition is not met and (b) the Litigation Proceeds consist of both Cash and non-Cash consideration, then Litigation Proceeds consisting of Cash consideration shall be used first to fund 50% of the Class A Litigation Proceeds (subject to the First Lien Claims Cap), with the remaining Litigation Proceeds to be distributed among the Holders of Class A Litigation Trust Interests, Class B Litigation Trust Interests, and Class C Litigation Trust Interests, as applicable, on a *pro rata* basis.

        f.      <u>Dissolution of the Litigation Trust</u>

The Litigation Trustee and the Litigation Trust shall be discharged or dissolved at such time as all distributions required to be made by the Litigation Trustee under the Plan have been made. The Litigation Trust shall in no event be dissolved later than five years from the creation of the Litigation Trust unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five years, together with any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the trustee(s) of the Litigation Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

Upon dissolution of the Litigation Trust, any remaining Litigation Trust Assets shall be distributed to Litigation Trust Beneficiaries in accordance with the Plan and the Litigation Trust Agreement, as appropriate. To the extent the Litigation Trust retains any residual Litigation Trust Assets, but such assets, net of Litigation Trust Expenses, are insufficient to effectuate any further distribution pursuant to the Litigation Trust Agreement, the Litigation Trustee shall donate such residual Litigation Trust Assets to an organization described in Section 501(c)(3) of the Tax Code, to be selected by the Litigation Trustee in its discretion.

        g.      <u>Cooperation and Privilege</u>

To effectively investigate, prosecute, compromise, and/or settle Causes of Action on behalf of the Litigation Trust, the Litigation Trustee and its counsel and representatives may require reasonable access to documents and information relating to applicable Causes of Action in the possession of the Debtors or the Reorganized Debtors, as applicable, and in such event, must be able to obtain such information from the Reorganized Debtors on a confidential basis and in common interest, without being restricted by or waiving any applicable work product, attorney-client, or other privilege. Accordingly, the Litigation Trust Documents shall provide for the Litigation Trustee's reasonable access to the Debtors' records and information (which shall be maintained by the Reorganized Debtors) relating to the Sinclair-Related Litigations, including electronic records or documents, as further detailed in, and subject in all respects to, the Litigation Trust Documents. The Litigation Trust Documents shall also provide that as of the Effective Date,

and subject in all respects to the terms of the Litigation Trust Documents, all Privileges held by the Debtors, the Reorganized Debtors (solely in their capacity as successors to the Debtors) shall transfer to and vest exclusively in the Litigation Trust, and that the Reorganized Debtors shall preserve all of the Debtors' records and documents (including all electronic records or documents) related to the Sinclair-Related Litigations for the later of a period of six years after the Effective Date or until such later time as the Litigation Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved.

6.   **Certain Securities Law Matters**

a.   Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the 1145 Securities issued pursuant to the Plan in respect of Allowed Claims will be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The 1145 Securities issued pursuant to the Plan in respect of Allowed Claims (a) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) will be freely tradable and transferable without registration under the Securities Act by any initial recipient thereof, provided that: (i) the recipient (x) is not an "affiliate" of the Debtors or the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in Section 2(a)(11) of the Securities Act and in Section 1145 of the Bankruptcy Code, and (ii) such trade or transfer is permitted under the restrictions, if any, on the transferability of such 1145 Securities in the organizational documents of the issuer of, or in agreements or instruments applicable to holders of, such 1145 Securities, including the New Organizational Documents.

The Debtors do not intend for the Litigation Trust Interests or the Litigation CVRs to be "securities" under applicable laws.  Notwithstanding this intention, to the extent such interests or rights are deemed to be "securities," the issuance of such interests or rights under the Plan will be exempt pursuant to section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code).

b.   Private Placement Securities

The offer (to the extent applicable), issuance, and distribution of the Private Placement Securities will be exempt (including with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code) from registration under the Securities Act pursuant to Section 4(a)(2) thereof and/or Regulation D thereunder.  The Private Placement Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law.  In that regard, the Strategic Investor and each of the Initial DIP Commitment Parties have made customary representations to the Debtors, including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a "qualified institutional buyer" (as defined under Rule 144A promulgated under the Securities Act).

c.      Treatment of Plan Securities

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including any transfer agent for any of the Plan Securities) with respect to the treatment of any of the Plan Securities to be issued under the Plan under applicable securities laws.

Any transfer agent for any of the Plan Securities shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether any of the Plan Securities to be issued under the Plan are exempt from registration and/or eligible for book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, except as otherwise provided in the Convertible B  Exit Note Documents to the Strategic Investor, no Entity (including any transfer agent for any of the Plan Securities) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether any of the Plan Securities to be issued under the Plan are exempt from registration and/or eligible for book-entry delivery, settlement, and depository services.

7.      **Corporate Existence**

Except as otherwise provided in the Plan or the Plan Supplement, each Debtor (a) shall continue to exist on and after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended under the Plan, by the New Organizational Documents, or otherwise, and to the extent such documents are amended, or amended and restated, such documents are deemed to be amended or amended and restated pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law) and (b) may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision of or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

8.      **Corporate Action**

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement (including any transaction described in, or contemplated by, the Restructuring Steps Memorandum) and the Restructuring Transactions shall be deemed authorized and approved by the Bankruptcy Court in all respects, without further notice or order of the Bankruptcy Court, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the adoption, execution, acknowledgement, delivery, entry into, recording, and/or filing of the New Organizational Documents; (3) the authorization, issuance, delivery, and distribution of the New Equity and the execution, delivery, and filing of any documents pertaining thereto, as applicable;

(4) the execution and delivery of the New A/R Facility Documents, the Convertible B Exit Notes Documents, the Take Back Debt Documents, the Convertible A Exit Notes Documents (if any), and the Exit Term Loan Documents (if any), and the incurrence and/or issuance of debt thereunder; (5) the separation of the Debtors from Sinclair Parent and its Affiliates; (6) if the Litigation Proceeds Condition is not met, the execution of the Litigation Trust Agreement, establishment of the Litigation Trust, appointment of the Litigation Trustee, and issuance and distribution of Litigation Trust Interests and the Litigation CVRs; (7) the selection of the managers or directors, as applicable, and officers of each of the Reorganized Debtors; and (8) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date) or Restructuring Transactions, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.  Upon the Effective Date, all matters provided for in the Plan involving the corporate or limited liability company structure of the Reorganized Debtors, and any corporate, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  On or before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, deliver, acknowledge, and/or file the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Organizational Documents, the New Equity, the execution and delivery of the New A/R Facility Documents, the Convertible B Exit Notes Documents, and the Take Back Debt Documents, the Convertible A Exit Notes Documents (if any), the Exit Term Loan Documents (if any), and any and all other agreements, documents, securities, certificates, and instruments relating to the foregoing.  The authorizations, approvals, and directives contemplated by Article IV.H of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 9.  <u>**Vesting of Assets in the Reorganized Debtors**</u>

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the New A/R Facility Documents, the Convertible B Exit Notes Documents, the Take Back Debt Documents, the Convertible A Exit Notes Documents (if any), and the Exit Term Loan Documents (if any).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 10.  <u>**Cancellation of Notes, Instruments, Certificates, and Other Documents**</u>

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims shall be cancelled, and the

obligations of the Debtors or the Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the Prepetition Agents and the Prepetition Notes Trustees shall be released from all duties thereunder; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of (1) allowing Holders of Allowed Claims to receive distributions under the Plan, (2) allowing and preserving the rights of the Debtors, the Prepetition Agents, and the Prepetition Notes Trustees to make distributions pursuant to the Plan, (3) maintaining, preserving, exercising, and/or enforcing the rights of the Prepetition Agents and the Prepetition Notes Trustees to compensation and indemnification as against any money or property distributable to Holders of Allowed First Lien Claims and Allowed Junior Funded Debt Claims, as applicable, including permitting each of the Prepetition Agents and the Prepetition Notes Trustees to maintain, enforce, and exercise its applicable Charging Lien against such distributions for the payment of fees, expenses and/or indemnification obligations, including Prepetition Agents Fees and Expenses, arising under the Prepetition Credit Agreements and the Prepetition Notes Indentures, as applicable, (4) allowing and preserving the rights of the Prepetition Agents and the Prepetition Notes Trustees to receive compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation, consummation, and defense of the Plan, the Cash Collateral Order, and/or the DIP Order, (5) maintaining, preserving, exercising, and/or enforcing all rights, including rights of enforcement, of the Prepetition Agents and the Prepetition Notes Trustees against any person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the Holders of First Lien Claims, Second Lien Claims, Third Lien Claims, or Unsecured Notes Claims pursuant and subject to the terms of the Prepetition Credit Agreements and the Prepetition Notes Indentures as in effect on the Effective Date, as applicable, (6) permitting the Prepetition Agents and the Prepetition Notes Trustees to enforce any obligation (if any) owed to the Prepetition Agents and Prepetition Notes Trustees under the Plan, the Cash Collateral Order, or the DIP Order, respectively, (7) permitting the Prepetition Agents and Prepetition Notes Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, and (8) permitting the Prepetition Agents and the Prepetition Notes Trustees to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or the Reorganized Debtors, as applicable, except as expressly provided for in the Plan.  The Prepetition Agents and the Prepetition Notes Trustees shall be deemed to have received any necessary directions to consummate the Restructuring Transactions.

The Prepetition Agents and the Prepetition Notes Trustees shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Prepetition Agents and the Prepetition Notes Trustees and their representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Prepetition Agents and the Prepetition Notes Trustees shall be relieved of and released from any obligations and duties arising thereunder.

If the record holder of the Notes is DTC or its nominee or another securities depository or custodian thereof, and such Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the Notes shall be

deemed to have surrendered such Holder's note, debenture, or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

Upon the final distribution in accordance with Article VI of the Plan, or notice from the Debtors or the Reorganized Debtors, as applicable, that there will be no further distributions on account of any Second Lien Notes Claims, Third Lien Notes Claims, or Unsecured Notes Claims, (a) the applicable Notes shall thereafter be deemed to be null, void, and worthless, and (b) at the request of the applicable Prepetition Notes Trustee, DTC shall take down the relevant position relating to such Notes without any requirement of indemnification or security on the part of the Debtors, the Reorganized Debtors, any Prepetition Notes Trustee, or any other Entity.

11.    **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any notices, approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

12.    **Exemptions from Certain Taxes and Fees**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors, including the New Equity, the New A/R Facility, the Convertible B Exit Notes, the Take Back Term Loans, the Convertible A Exit Notes (if any), and the Exit Term Loans (if any); (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the New A/R Facility, the Convertible B Exit Notes, the Take Back Term Loans, the Convertible A Exit Notes (if any), and the Exit Term Loans (if any); or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document tax, recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, personal or real property tax, real estate transfer tax, mortgage recording tax, sales tax, use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the

collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

13.  **New Organizational Documents**

On or immediately before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will file the New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of its state of incorporation or formation, to the extent required for such New Organizational Documents to become effective.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate its formation, organizational, and constituent documents as permitted by the laws of their respective jurisdictions of formation and the terms of such documents.

14.  **New Shareholders Agreement**

On the Effective Date, the Reorganized Debtors shall enter into the New Shareholders Agreement with the Holders of the New TopCo Equity, which shall become effective and binding in accordance with its terms and conditions upon the parties thereto, in each case without further (1) notice to or order of the Bankruptcy Court, (2) act or action under any applicable law, regulation, order, or rule, or (3) vote, consent, authorization, or approval of any Person(s) or Entity.

All of the Holders of New TopCo Equity shall execute the New Shareholders Agreement and provide a completed Investor Questionnaire in connection with receiving post-emergence dividends and distributions (if any) on account of the New TopCo Equity (other than, for the avoidance of doubt, the distributions set forth in the Plan).  Notwithstanding the foregoing or anything to the contrary in the Plan, (a) the New Shareholders Agreement shall be binding, effective, valid, and enforceable in accordance with its terms as of the Effective Date on all Person(s) or Entities receiving, and all Holders of, the New TopCo Equity (and their respective successors and assigns), regardless of whether such New TopCo Equity is received or to be received on or after the Effective Date and regardless of whether such Person or Entity executes or delivers a signature page to the New Shareholders Agreement, and (b) unless waived by the New TopCo Board in its sole and absolute discretion, any such Person, Entity or Holder that fails to execute and deliver to New TopCo a counterpart of the New Shareholders Agreement and a completed Investor Questionnaire (or any similar investor questionnaire authorized and approved by the New TopCo Board) shall not be entitled to receive any post-emergence dividends or other distributions on account of such Person's New TopCo Equity (other than, for the avoidance of doubt, the distributions set forth in the Plan) until such documents are executed and delivered to New TopCo.  As of the Effective Date, each Holder of New TopCo Equity shall be bound by the New Shareholders Agreement (including any obligation set forth therein to waive or refrain from exercising any appraisal, dissenters' or similar rights) even if such holder has not actually executed and delivered a counterpart thereof.

15.     **Directors and Officers**

As of the Effective Date, the terms of the current members of the board of managers of DSG shall expire and such managers shall cease to hold office or have any authority from or after such time (unless such manager is reappointed as of the Effective Date).  As of the Effective Date, all of the directors or managers, as applicable, for the New HoldCo Board and the New TopCo Board shall be appointed in accordance with the terms of the applicable New Organizational Documents and shall serve pursuant to the terms of the charters and bylaws or other formation and constituent documents, and the applicable laws of the jurisdiction of formation, of New HoldCo and New TopCo, as applicable.  To the extent known, the identities of the members of the New HoldCo Board and the New TopCo Board will be disclosed in the Plan Supplement prior to the Confirmation Hearing or at the Confirmation Hearing consistent with section 1129(a)(5) of the Bankruptcy Code.

16.     **Management Incentive Plan**

On or following the Effective Date, the New HoldCo Board shall adopt and implement the Management Incentive Plan.  On the Effective Date, the Reorganized Debtors shall reserve New HoldCo Equity representing up to 10% of the issued and outstanding New HoldCo Equity as of the Effective Date (or its equivalent in Awards, such as profits interests) for distribution to participating employees of the Reorganized Debtors pursuant to the Management Incentive Plan. The Reorganized Debtors shall be authorized to institute such Management Incentive Plan and enact and enter into related policies and agreements based on the terms and conditions determined by the New HoldCo Board.  To the extent not otherwise agreed prior to the Effective Date, the form of the Awards, the participants in the Management Incentive Plan, the allocations of the Awards to such participants, and the terms and conditions of the Awards (including time-based and performance-based vesting) will be determined by the New HoldCo Board on or after the Effective Date.

17.     **Preference Waiver**

As set forth in the DIP Order, all Preference Actions against any trade counterparty of the Debtors have been irrevocably waived by the Debtors and/or their Estates, as applicable.

18.     **Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to (i) the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date, and (ii) Preference Actions irrevocably waived by the Debtors and/or their Estates pursuant to the DIP Order; *provided* that, notwithstanding anything to the contrary set forth in the Plan, to the extent the Litigation Proceeds Condition is not met, the Sinclair-Related Litigations shall be transferred to the Litigation Trust

and, upon and after such transfer, the Litigation Trust shall retain and may enforce all rights to commence, pursue, prosecute, or settle any and all Sinclair-Related Litigations.

The Reorganized Debtors may pursue such Causes of Action (and, solely to the extent applicable, the Litigation Trust may pursue the Sinclair-Related Litigations), as appropriate, in accordance with the best interests of the Reorganized Debtors (or the Litigation Trust Beneficiaries, as applicable). **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. Except as otherwise set forth in the Plan or in a Final Order of the Bankruptcy Court (including the DIP Order), the Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity**. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court (including the DIP Order), the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

## D.     *Settlement, Release, Injunction, and Related Provisions*

### 1.     **Discharge of Claims**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan.

2.      **Release of Liens**

Except (1) with respect to the Liens securing (a) the New A/R Facility, the Convertible B Exit Notes, the Take Back Term Loans, the Convertible A Exit Notes (if any), and the Exit Term Loans (if any), (b) Other Secured Claims that are Reinstated pursuant to the Plan, or (c) obligations pursuant to Executory Contracts and Unexpired Leases assumed pursuant to the Plan, or (2) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, including any mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates granted pursuant to an order of the Bankruptcy Court, and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, at the sole cost of and expense of the Reorganized Debtors, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

3.      **Debtor Release**

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, its Estate, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, any investment in any Debtor by any Released Party, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, any other benefit provided by any Debtor to any Released Party, cash management arrangements, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between**

or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the Prepetition Credit Agreements, the Prepetition Notes Indentures, the formulation, preparation, dissemination, negotiation, or Filing of the Prior Restructuring Support Agreement, the Cooperation Agreement, the Restructuring Support Agreement, the Cash Collateral Order, the DIP Order, the Sinclair Settlement Order, the UCC Settlement, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the New A/R Facility, any other Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Prior Restructuring Support Agreement, the Cooperation Agreement, the Restructuring Support Agreement, the Cash Collateral Order, the DIP Order, the Sinclair Settlement Order, the UCC Settlement, the Disclosure Statement, the New A/R Facility, the DIP Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transaction, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes on the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities primarily arising out of any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  For the avoidance of doubt, any and all claims or Causes of Action against the Released Parties relating to the First Lien Claims or the Junior Funded Debt Claims is subject to the Debtor Release.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New A/R Facility Credit Agreement, or any Claim, obligation, or right arising under or preserved pursuant to the Plan or the Confirmation Order, including those rights which are expressly preserved pursuant to Article IV.R of the Plan, or (2) only if the Sinclair Release Effective Date does not occur, any Sinclair-Related Litigations; *provided* that if the Sinclair Release Effective Date occurs after the Effective Date, but on or prior to the Sinclair Settlement Outside Date, the Sinclair-Related Litigations shall be released as of the Sinclair Release Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and

92

implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

4.  **Third-Party Release**

Except as otherwise expressly set forth in the Plan (including pursuant to Article IV.R of the Plan) or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party (other than the Debtors, the Reorganized Debtors, and their Estates) from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, its Estate, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, any investment in any Debtor by any Released Party, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the Prepetition Credit Agreements, the Prepetition Notes Indentures, cash management arrangements, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the Prepetition Credit Agreements, the Prepetition Notes Indentures, the formulation, preparation, dissemination, negotiation, or Filing of the Prior Restructuring Support Agreement, the Cooperation Agreement, the Restructuring Support Agreement, the Cash Collateral Order, the DIP Order, the Sinclair Settlement Order, the UCC Settlement, the Disclosure Statement, the New A/R Facility, the DIP Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or

the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Prior Restructuring Support Agreement, the Cooperation Agreement, the Restructuring Support Agreement, the Cash Collateral Order, the DIP Order, the Sinclair Settlement Order, the UCC Settlement, the Disclosure Statement, the New A/R Facility, the DIP Facility, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transaction before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes on the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities primarily arising out of any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the New A/R Facility Credit Agreement, the Prior Restructuring Support Agreement, the Cooperation Agreement, the Restructuring Support Agreement, the Cash Collateral Order, the DIP Order, the Sinclair Settlement Order, the UCC Settlement, any Plan Supplement document, or any Claim, obligation, or right arising under or preserved pursuant to the Plan or the Confirmation Order, including those rights which are expressly preserved pursuant to Article IV.R of the Plan, or (2) only if the Sinclair Release Effective Date does not occur, any Non-Released Parties; *provided* that if the Sinclair Release Effective Date occurs after the Effective Date, but on or prior to the Sinclair Settlement Outside Date, the Non-Released Parties shall be included in the Released Parties as of the Sinclair Release Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that this Third-Party Release is:  (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

5.      **Exculpation**

Except as otherwise specifically provided in the Plan, to the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising from the Petition Date to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Transactions, the Prior Restructuring Support Agreement, the Cooperation Agreement, the Restructuring Support Agreement, the Cash Collateral Order, the DIP Order, the Sinclair Settlement Order, the UCC Settlement, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the solicitation of votes for, or confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action, in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

6.      **Injunction**

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, the Released Parties, the Litigation Trust, the Litigation Trustee, or the Litigation Trust Assets:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Interests, or Causes of Actions; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such claims, Interests, or Causes of Action; (4) asserting any right of setoff,

95

subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Interests, or Causes of Actions released, settled, or exculpated pursuant to the Plan.

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.**

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Claim or Cause of Action of any kind against any of the Debtors or the Released Parties that is subject to the Debtor Release or the Third-Party Release, or arose or arises from or is related to any Covered Claim without first (i) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim against a Debtor or a Released Party, as applicable, and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (ii) obtaining from the Bankruptcy Court specific authorization for such party to bring such Claim or Cause of Action against a Debtor or a Released Party, as applicable.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court *before* filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

7.    **Waiver of Statutory Limitations on Releases**

Each Releasing Party in each of the releases contained in the Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims that the claimant does not know or suspect to exist in its favor at the

time of executing the release, which if known by it may have materially affected its settlement with the Released Party.  The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

8.    **Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

9.    **Recoupment**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

10.    **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

11.    **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to section 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

E.     *Conditions Precedent to the Effective Date*

1.     **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied (or shall be satisfied concurrently with all other Restructuring Transactions to occur on the Effective Date (but giving effect to any ordering or sequencing of the Restructuring Transactions set forth in the Plan, including the Restructuring Steps Memorandum)) or waived pursuant to Article IX.B of the Plan:

a.     (i) the Restructuring Support Agreement shall have not been terminated in accordance with its terms (and no event shall have occurred that purports to terminate the Restructuring Support Agreement (even if such termination does not occur as a result of the automatic stay of section 362 of the Bankruptcy Code or otherwise)), and shall remain in full force and effect with respect to the Required Consenting Parties and the Debtors (provided, however, that for purposes of this clause (i), the Restructuring Support Agreement shall be deemed to have been in full force and effect with respect to the Debtors upon the execution thereof, notwithstanding the lack of a Bankruptcy Court order authorizing the Debtors' entry into the Restructuring Support Agreement), and (ii) there shall not be any event, occurrence, or condition that would after the expiration of any applicable notice or cure period permit any of the Consenting Parties or the Debtors to terminate the Restructuring Support Agreement in accordance with its terms where the applicable Required Consenting Parties or the Debtors have actually given notice of such event, occurrence, or condition;

b.     all steps necessary to separate the Debtors from the Sinclair Parties shall have occurred to the reasonable satisfaction of the Required DIP Commitment Parties and the Strategic Investor, and/or, to the extent the Debtors enter into or assumes any agreement(s) for transition or long-term services with the Sinclair Parties, such agreement(s) shall be reasonably acceptable to the Required DIP Commitment Parties and the Strategic Investor;

c.     the Debtors' agreements with the Sports Leagues and their teams as of January 16, 2024, shall not have been terminated (excluding, for the avoidance of doubt, the NBA Term Sheet and the NHL Term Sheet) and the Debtors shall not have entered into any arrangement or transaction with any of the Sports Leagues similar to the NBA Term Sheet and the NHL Term Sheet (except in each case with the consent of the Required DIP Commitment Parties and the Strategic Investor);

d.     (i) no Event of Default (as defined in the DIP Credit Agreement) shall exist under the DIP Order or the DIP Documents (or, to the extent such Event of Default exists on the proposed Effective Date, such Event of Default shall have been waived by the DIP Agent (acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement)) and the DIP Facility shall remain in full force and effect, and (ii) no Cash Collateral Termination Event (as defined in the DIP Order) shall exist under the DIP Order (or, to the extent such Cash Collateral Termination Event exists on the proposed Effective Date, such Cash Collateral Termination Event shall have been waived by the Majority 1L Lenders (as defined in the DIP Order)) and the DIP Order shall remain in full force and effect;

e.      there shall not have been instituted nor shall there be pending any action, proceeding, application, claim, counterclaim, or formal or informal investigation before or by any domestic court, governmental, regulatory, or administrative agency or instrumentality in connection with the Restructuring Transactions that, in the reasonable judgment of the Debtors, the Required DIP Commitment Parties, the Required Consenting First Lien Creditors, or the Strategic Investor would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

f.      each document or agreement constituting the Definitive Documents shall (i) be in form and substance consistent with the Restructuring Support Agreement and the consent rights thereunder, (ii) have been duly executed, delivered, acknowledged, filed, and/or effectuated, as applicable, by the Entities and Persons parties thereto, and (iii) be in full force and effect, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

g.      all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions, which in each case shall be in full force and effect (if applicable) and shall not be subject to unfulfilled conditions, and no temporary restraining order, preliminary injunction, judgment, or other law preventing challenging, voiding, or making illegal the consummation of any of the Restructuring Transactions shall have been entered, issued, rendered or made, nor shall any proceeding seeking any of the foregoing be commenced or pending, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

h.      the New Organizational Documents shall (i) be in form and substance consistent with the Restructuring Support Agreement and the consent rights thereunder, (ii) have been executed, delivered, acknowledged, filed, and/or effectuated, as applicable, with the applicable authorities in the relevant jurisdictions, and (iii) be in full force and effect, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

i.      all professional fees and expenses of retained Professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Effective Date shall have been placed in the Professional Fee Escrow Account;

j.      all accrued and unpaid Transaction Expenses (as defined in the Restructuring Support Agreement) shall have been paid in full in accordance with the Restructuring Support Agreement;

k.      the Bankruptcy Court shall have entered the Confirmation Order, which order shall (i) be consistent with the Restructuring Support Agreement, (ii) have become a Final Order, (iii) be in form and substance reasonably acceptable to the Debtors and the Required Consenting Parties, and (iv) solely with respect to any provision therein that directly impacts the treatment of or consideration to be provided on account of General Unsecured Claims and/or Go-Forward Trade Claims, consistent with the Restructuring Support Agreement and in form and substance reasonably acceptable to the UCC;

l.      the New Equity to be issued and/or delivered on the Effective Date pursuant to the Plan shall have been validly issued by New TopCo or New HoldCo, as applicable, shall be fully paid and non assessable, and shall be free and clear of all taxes, Liens and other encumbrances, preemptive rights, rights of first refusal, subscription rights, and similar rights, except for any restrictions on transfer as may be imposed by (a) applicable securities laws and (b) the applicable New Organizational Documents;

m.      the New A/R Facility Documents shall have been executed and delivered by the parties thereto, (b) all conditions precedent to the consummation of the New A/R Facility Documents shall have been waived or satisfied in accordance with their terms, and (c) the closing of the New A/R Facility shall have occurred;

n.      the Convertible B Exit Notes and the Take Back Term Loans shall have been issued in accordance with the Plan and the Convertible B Exit Notes Documents or the Take Back Debt Documents, as applicable;

o.      the Debtors shall have entered into the Commercial Agreement with the Strategic Investor;

p.      all accrued and unpaid Prepetition Agent and Trustee Fees and Expenses of each Prepetition Agent and Prepetition Notes Trustee for which invoices have been provided to the Debtors prior to the Effective Date shall have been paid in full in Cash;

q.      if the Litigation Proceeds Condition has not been met, the Convertible A Exit Notes, the Exit Term Loans, and the Litigation CVRs shall have been issued pursuant to the Plan and the Convertible A Exit Notes Documents, the Exit Term Loans Documents, or the documentation evidencing the Litigation CVRs, as applicable;

r.      if the Litigation Proceeds Condition has not been met, the Litigation Trust Agreement shall have been executed, the Litigation Trust shall have been established pursuant to the Litigation Trust Agreement, and all Litigation Trust Assets shall have been contributed to, and shall have vested in, the Litigation Trust;

s.      to the extent not otherwise addressed in the Plan, all actions, documents, and agreements necessary to implement and consummate the Restructuring Transactions shall have been effected and executed (or deemed executed), and shall be in form and substance consistent with the Restructuring Support Agreement (and the consent rights thereunder); and

t.      the Debtors shall have otherwise substantially consummated the Restructuring Transactions, and all transactions contemplated in the Plan, in a manner consistent in all respects with the Restructuring Support Agreement and the Plan, including the Restructuring Steps Memorandum.

2.      **Waiver of Conditions Precedent**

The conditions precedent to the Effective Date set forth in Article IX of the Plan may not be waived without the express prior written consent (which may be via e-mail of counsel) of each of the Debtors, the Required DIP Commitment Parties, the Strategic Investor, and (i) solely with

respect to conditions that require the consent or agreement of the Required Consenting First Lien Creditors or relate to distributions owed to the Holders of First Lien Claims or the First Lien Group or their advisors (in each case, solely with respect to the First Lien Claims), the Required Consenting First Lien Creditors, and (ii) solely with respect to conditions that require the consent or agreement of the UCC or relate to distributions owed to Holders of Go-Forward Trade Claims or General Unsecured Claims, the UCC, which waiver shall be effective without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.

3.     **<u>Substantial Consummation</u>**

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

4.     **<u>Effect of Non-Occurrence of Conditions to Consummation</u>**

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

**ARTICLE VI.**
**<u>VOTING PROCEDURES AND REQUIREMENTS</u>**

Before voting to accept or reject the Plan, each Holder of a Claim in any of the Voting Classes, in each case, as of the Record Date (a "***Record Holder***") should carefully review the Plan attached hereto as **<u>Exhibit A</u>**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

A.     *Voting Instructions and Voting Deadline*

All Record Holders have been sent a Ballot together with this Disclosure Statement.  Such Record Holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

The Debtors have engaged Kroll Restructuring Administration LLC as their Claims Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.  **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (PREVAILING CENTRAL TIME), ON [●], 2024, IF YOU ARE A RECORD HOLDER, UNLESS EXTENDED BY THE DEBTORS.  PLEASE RETURN YOUR BALLOT IN ACCORDANCE WITH THE INSTRUCTIONS RECEIVED WITH YOUR BALLOT.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE CLAIMS AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT

BALLOT.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE CLAIMS AGENT AT THE TELEPHONE NUMBER INDICATED ON YOUR BALLOT, OR AT ONE OF THE BELOW NUMBERS:

U.S./Canada (toll-free):  (877) 720-6635
International (toll):  +1 (646) 440-4763

Questions (but not documents) may also be directed to DSGInfo@ra.kroll.com (please reference "Diamond Sports Group Solicitation" in the subject line).

Additional copies of this Disclosure Statement are available for review and download, free of charge, at https://cases.ra.kroll.com/DSG, or upon request made to the Claims Agent at the telephone numbers or e-mail address set forth immediately above.

## B.     *Voting Procedures*

The Debtors are providing copies of this Disclosure Statement (including all exhibits thereto), related materials, and a Ballot (collectively, a "***Solicitation Package***") to Record Holders or, in the case of Beneficial Holders[38] of Second Lien Notes Claims, Third Lien Notes Claims, and Unsecured Notes Claims, to the bank, broker, or other intermediary through which such Beneficial Holders hold their publicly traded securities in a "street name" (each such intermediary, a "***Nominee***"), as applicable.  Any Record Holder or Nominee of a Record Holder who has not received an applicable Ballot should contact the Claims Agent.

Record Holders, Beneficial Holders, and/or their Nominees or agents, as applicable, should provide all of the information requested by the Ballot and return all Ballots in accordance with the instructions provided with the Ballot.

If any Beneficial Holder holds Second Lien Notes Claims, Third Lien Notes Claims, and Unsecured Notes Claims through more than one Nominee, such Beneficial Holder may receive multiple mailings containing beneficial holder Ballots.  The Beneficial Holder should submit a separate Plan vote, via a beneficial holder Ballot or otherwise according to its Nominee's instructions, for each block of Second Lien Notes Claims, Third Lien Notes Claims, and Unsecured Notes Claims that it holds through any particular Nominee and return each beneficial holder Ballot to the respective Nominee.

Each Ballot will provide applicable Holders of Claims with the option to elect to not grant the releases in Article VIII.D of the Plan.  No Holder that votes to accept the Plan may elect to opt out of the releases in Article VIII.D of the Plan.

---

[38]   A "***Beneficial Holder***" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Record Date pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees (as defined herein).

Holders of Claims or Interests in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 5 (Go-Forward Trade Claims), and Class 9 (Existing Equity Interests) as of the Record Date will receive notices of non-voting status on account of such Claims and Interests. Such notices of non-voting status will include optional election forms that such Holders may complete if they elect to not grant the releases in Article VIII.E of the Plan, along with related disclosures.

**C.      *Parties Entitled to Vote***

The Claims in Class 3 (First Lien Claims), Class 4 (Junior Funded Debt Claims), and Class 6 (General Unsecured Claims) are impaired under the Plan and entitled to vote to accept or reject the Plan.

**D.      *Ballots***

All Ballots must be signed by the Record Holders, their Nominees, or any person who has obtained a properly completed Ballot proxy from the Record Holders, as applicable, on such date. For purposes of voting to accept or reject the Plan, the Record Holders in the Voting Classes will be deemed to be the "Holders" of such Claims. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Claims Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If you return more than one Ballot voting different First Lien Claims, Junior Funded Debt Claims, or General Unsecured Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Record Holders (or their Nominees) in the Voting Classes will reflect the principal amount or asserted or scheduled claim amount of such Record Holders' Claims; however, when tabulating votes, the Claims Agent may adjust the amount of such Record Holders' Claims to reflect the amount of the Claims actually voted, including prepetition interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only Record Holders who actually vote will be counted. The failure of a Record Holder (or its Nominee) to deliver a duly executed Ballot to the Claims Agent will be deemed to constitute an abstention by such Record Holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless a Ballot is timely submitted to the Claims Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

**E.      *Fiduciaries and Other Representatives***

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should

indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit the separate Ballot of each Record Holder for whom they are voting.

UNLESS A BALLOT IS RECEIVED BY THE CLAIMS AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; *PROVIDED*, *HOWEVER*, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW ANY SUCH BALLOT(S) TO BE COUNTED.

F.      *Agreements upon Furnishing Ballots*

The delivery to the Claims Agent of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the voting creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this solicitation of votes on the Plan and (ii) the terms of the Plan, including the injunction, releases, and exculpations set forth in Article VIII therein. All parties in interest retain their right to object to confirmation of the Plan, subject to any applicable terms of the RSA.

G.      *Change of Vote*

Except as provided under the RSA, any party who has previously submitted to the Claims Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Claims Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan. After the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors.

H.      *Waivers of Defects, Irregularities, etc.*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Claims Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### I.    *Miscellaneous*

The Debtors, in their sole discretion, may request that the Claims Agent attempt to contact such voters to cure any such defects in the Ballots.  If you return more than one Ballot voting different Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, the last Ballot submitted will be the Ballot counted.  An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Record Holders who actually vote will be counted.

Except as provided below, unless the Ballot is timely submitted to the Claims Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

## ARTICLE VII.
## CONFIRMATION OF THE PLAN

### A.    *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  Notice of the Confirmation Hearing will be provided to all known creditors or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

### B.    *Objections to Confirmation*

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Bankruptcy Local Rules for the Southern District of Texas, must include the name of the objector, the nature and amount of Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order, so as to be **actually received** on or before [●]**, 2024, at 4:00 p.m., prevailing Central Time**:

1.    The Debtors at:

**Diamond Sports Group, LLC**
2960 Post Road
Southport, CT 06890
Attention:      David Preschlack
E-mail:          David.Preschlack@ballysports.com

2.      Counsel to the Debtors at:

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019-6064
Attention:      Brian S. Hermann
                     Andrew M. Parlen
                     Joseph M. Graham
                     Alice Nofzinger
E-mail:          bhermann@paulweiss.com
                     aparlen@paulweiss.com
                     jgraham@paulweiss.com
                     anofzinger@paulweiss.com

- and -

**PORTER HEDGES LLP**
1000 Main St., 36th Floor
Houston, Texas 77002
Attention:      John F. Higgins
                     M. Shane Johnson
                     Megan Young-John
                     Bryan L. Rochelle
Email:           jhiggins@porterhedges.com
                     sjohnson@porterhedges.com
                     myoung-john@porterhedges.com
                     brochelle@porterhedges.com

- and -

**WILMER CUTLER PICKERING HALE AND DORR LLP**
250 Greenwich Street
New York, New York 10007
Attention:      Andrew N. Goldman
                     Benjamin W. Loveland
                     Lauren R. Lifland
Email:           andrew.goldman@wilmerhale.com
                     benjamin.loveland@wilmerhale.com
                     lauren.lifland@wilmerhale.com

3.      Counsel to the First Lien Group at:

        **KRAMER LEVIN NAFTALIS & FRANKEL LLP**
        1177 Avenue of the Americas
        New York, New York 10036
        Attention:    Daniel M. Eggermann
                        Jennifer R. Sharret
                        Ashland J. Bernard
        Email:       deggermann@kramerlevin.com
                        jsharret@kramerlevin.com
                        abernard@kramerlevin.com

4.      Counsel to the Crossholder Group at:

        **PAUL HASTINGS LLP**
        600 Travis Street, 58th Floor
        Houston, Texas 77002
        Attention:    James T. Grogan III
                        Schlea M. Thomas
        Email:       jamesgrogan@paulhastings.com
                        schleathomas@paulhastings.com

        - and -

        200 Park Avenue
        New York, New York 10166
        Attention:    Jayme T. Goldstein
                        Sayan Bhattacharyya
                        Christopher Guhin
                        Matthew Garofalo
        Email:       jaymegoldstein@paulhastings.com
                        sayanbhattacharyya@paulhastings.com
                        chrisguhin@paulhastings.com
                        mattgarofalo@paulhastings.com

5.      Counsel to Amazon at:

        **LATHAM & WATKINS LLP**
        330 North Wabash Avenue, Suite 2800
        Chicago, Illinois 60611
        Attention:    Caroline Reckler
                        Jonathan Gordon
        Email:       caroline.reckler@lw.com
                        jonathan.gordon@lw.com

5.      Counsel to the Second Lien Group at:

> **GIBSON, DUNN & CRUTCHER LLP**
> 200 Park Avenue
> New York, New York 10166
> Attention:     Scott J. Greenberg
>                Jason Zachary Goldstein
> Email:         sgreenberg@gibsondunn.com
>                jgoldstein@gibsondunn.com

6.      Counsel to the UCC at:

> **AKIN GUMP STRAUSS HAUER & FELD LLP**
> One Bryant Park
> New York, New York 10036
> Attention:     Ira S. Dizengoff
>                Abid Qureshi
>                Naomi Moss
> Email:         idizengoff@akingump.com
>                aqureshi@akingump.com
>                nmoss@akingump.com
>
> - and -
>
> 2001 K Street N.W.
> Washington, DC 20006
> Attention:     Scott L. Alberino
> Email:         salberino@akingump.com
>
> - and -
>
> 2300 N. Field Street, Suite 1800
> Dallas, TX 75201
> Attention:     Marty L. Brimmage, Jr.
> Email:         mbrimmage@akingump.com

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

**C.**     ***Requirements for Confirmation of the Plan***

1.      **<u>Requirements of Section 1129(a) of the Bankruptcy Code</u>**

a.      <u>General Requirements</u>

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied, including, without limitation, whether:

i.      the Plan complies with the applicable provisions of the Bankruptcy Code;

ii.      the Debtors have complied with the applicable provisions of the Bankruptcy Code;

iii.      the Plan has been proposed in good faith and not by any means forbidden by law;

iv.      any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

v.      the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

vi.      with respect to each Class of Claims or Interests, each Holder of an impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such Holder's Claim, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code;

vii.      except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

viii.      except to the extent that a Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full on the Effective Date and that priority tax Claims will receive either payment in full on the Effective Date

or deferred cash payments over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date, equal to the Allowed amount of such Claims;

ix.    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

x.    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

xi.    all fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

    b.    <u>Best Interests Test</u>

As noted above, section 1129(a)(7) of the Bankruptcy Code requires a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an interest in such impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the plan effective date, that is not less than the value such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

A liquidation analysis has been prepared solely for purposes of estimating proceeds available in a liquidation under chapter 7 of the Bankruptcy Code of the Debtor's estates and is attached hereto as **<u>Exhibit C</u>** (the "***Liquidation Analysis***"). As detailed in the Liquidation Analysis, the Debtors believe that the Plan will produce a greater recovery for the Holders of Claims than would be achieved in a chapter 7 liquidation. Consequently, the Debtors believe that the Plan, which provides for the continuation of the Debtors' business, will provide a substantially greater ultimate return to the Holders of Claims than would a chapter 7 liquidation.

    c.    <u>Feasibility</u>

Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan. This condition is often referred to as the "feasibility" of the Plan. The Debtors believe that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, the Debtors' management prepared financial projections, and the assumptions on which they are based, which are attached hereto as **<u>Exhibit D</u>** (the "***Financial Projections***"). The Financial Projections reflect, among other things, the Reorganized Debtors' substantially deleveraged balance sheet. Based upon the Financial Projections, the Debtors believe that the Reorganized Debtors will be able to

110

make all payments required pursuant to the Plan, and therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

### 2.   **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each Class of Claims or Interests impaired under a plan, accept the plan. Pursuant to the provisions of the Bankruptcy Code, only Holders of Allowed Claims or Interests in Classes of Claims or Interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan. Under section 1124 of the Bankruptcy Code, a Class of Claims or Interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the Holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such Claim or Interest as it existed before the default. Classes of Claims or Interests in which Holders of Claims or Interests are unimpaired under a chapter 11 plan are deemed to have accepted such plan and are not entitled to vote to accept or reject the plan.

Section 1126(c) of the Bankruptcy Code defines "acceptance" of a plan by a Class of Claims as acceptance by creditors in that Class that hold at least two-thirds in dollar amount and more than one-half in number of the Claims that cast Ballots for acceptance or rejection of the plan.

Section 1126(d) of the Bankruptcy Code defines "acceptance" of a plan by a Class of impaired Class of Interests as acceptance by Holders of at least two-thirds in amount of the Allowed Interests that cast Ballots in such Class actually have voted to accept the plan.

In addition, any Class of Claims that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, such Class shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 3.   **Confirmation without Acceptance by All Impaired Classes**

In the event that any impaired Class of Claims does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if (a) at least one impaired Class has voted to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such Class) and (b) as to each impaired Class of Claims that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy

Code.  Both of these requirements are in addition to other requirements established by caselaw interpreting the statutory requirements.

a.    <u>Unfair Discrimination Test</u>

The "no unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests.  This test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test.  Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

b.    <u>Fair and Equitable Test</u>

The "fair and equitable" test applies to Classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no Class of Claims receive more than 100% of the Allowed amount of the Claims in such Class.  As to dissenting Classes, the test sets different standards depending on the type of Claims in such Class.

The Debtors believe that the Plan satisfies the "fair and equitable" test.  The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### 4.    **The Debtors' Releases, Third-Party Release, Exculpation, and Injunction Provisions**

Article VIII.C of the Plan provides for releases of certain claims and Causes of Action the Debtors may hold against the Released Parties (the "***Debtor Release***").  The Released Parties are each of the following in its capacity as such:  (a) each Debtor and Reorganized Debtor; (b) the Consenting Parties; (c) the Prepetition Notes Trustees; (d) the Prepetition Agents; (e) the UCC and each UCC Member; (f) if the Sinclair Release Effective Date occurs, the Sinclair-Related Litigations Defendants; and (g) and with respect to each Person or Entity listed or described in any of the foregoing clauses (a) through (f), each such Person's or Entity's current and former Affiliates, and each such Person's or Entity's and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, participants, affiliated investment funds or investment vehicles, managed accounts or funds, and each of their respective current and former members, equity holders, officers, directors, managers, principals,

112

employees, agents, advisory board members, investment fund advisors or managers, investment managers, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that the following Persons and Entities shall not be Released Parties: (i) a Person or Entity that either (A) elects to opt out of the releases contained in the Plan or (B) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before entry of the Confirmation Order; or (ii) other than (A) non-Debtor Diamond Sports Finance SPV, LLC, (B) any Debtor that is a member or equity holder (regardless of whether such interests are held directly or indirectly) in a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, and (C) any members, directors, managers, officers, employees, or agents appointed by any Debtor at a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, any other Person or Entity affiliated with a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date and any non-Debtor Affiliates thereof; *provided further* that, notwithstanding anything to the contrary set forth in the Plan, if the Sinclair Release Effective Date does not occur on or prior to the Effective Date, the Released Parties shall not include the Non-Released Parties; *provided further* that, if the Sinclair Release Effective Date occurs after the Effective Date, but on or prior to the Sinclair Settlement Outside Date, the Non-Released Parties shall be deemed Released Parties as of the Sinclair Release Effective Date.[39]

Article VIII.D of the Plan provides for releases of certain claims and Causes of Action that Holders of Claims or Interests may hold against the Released Parties in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties (the "***Third-Party Release***").  Holders of Claims and Interests who are releasing certain claims and Causes of Action against non-Debtors under the Third-Party Release include each of the following in its capacity as such:  (a) each Debtor and Reorganized Debtor; (b) the Consenting Parties; (c) all Holders of Claims (except as set forth in the proviso herein); (d) the Prepetition Notes Trustees; (e) the Prepetition Agents; (f) the UCC and each UCC Member; (g) if the Sinclair Release Effective Date occurs, the Sinclair-Related Litigations Defendants; and (h) with respect to each Person or Entity listed or described in any of the foregoing clauses (a) through (g), each such Person's or Entity's current and former Affiliates, and each such Person's or Entity's and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, participants, affiliated investment funds or investment vehicles, managed accounts or funds, and each of their respective current and former members, equity holders, officers, directors, managers, principals, employees, agents, advisory board members, investment fund advisors or managers, investment managers, financial advisors, partners, attorneys,

---

[39] "***Non-Released Party***" means, if the Sinclair Release Effective Date does not occur by the Effective Date, (a) any Sinclair Party or any Sinclair-Related Litigations Defendant, (b) each such Sinclair Party's or Sinclair-Related Litigations Defendant's current and former Affiliates (other than DSG and its direct and indirect subsidiaries), and (c) each such Sinclair Party's or Sinclair-Related Litigations Defendant's and their current and former Affiliates' (other than DSG and its direct and indirect subsidiaries) current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, participants, affiliated investment funds or investment vehicles, managed accounts or funds, and each of their respective current and former members, equity holders, officers, directors, managers, principals, employees, agents, advisory board members, investment fund advisors or managers, investment managers, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that the following Persons and Entities shall not be Releasing Parties: (i) a Person or Entity that either (A) elects to opt out of the releases contained in the Plan or (B) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before entry of the Confirmation Order; or (ii) other than (A) non-Debtor Diamond Sports Finance SPV, LLC, (B) any Debtor that is a member or equity holder (regardless of whether such interests are held directly or indirectly) in a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, and (C) any members, directors, managers, officers, employees, or agents appointed by any Debtor at a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, any other Person or Entity affiliated with a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date and any non-Debtor Affiliates thereof; *provided further* that, notwithstanding anything to the contrary set forth in the Plan, if the Sinclair Release Effective Date does not occur on or prior to the Effective Date, the Releasing Parties shall not include the Non-Released Parties; *provided further* that if the Sinclair Release Effective Date occurs after the Effective Date, but on or prior to the Sinclair Settlement Outside Date, the Non-Released Parties shall be deemed Releasing Parties as of the Sinclair Release Effective Date.

Article VIII.E of the Plan provides for the exculpation of each Exculpated Party for certain acts or omissions taken in connection with the Chapter 11 Cases. The released and exculpated claims are limited in those claims or Causes of Action that may have arisen in connection with, related to, or arising out of the Plan, this Disclosure Statement, or the Chapter 11 Cases. The Exculpated Parties are in each case solely in its capacity as such: (a) each Debtor and (b) the UCC and each UCC Member.

Article VIII.F of the Plan permanently enjoins Entities who have held, hold, or may hold Claims or Interests that have been discharged or released pursuant to the Plan or are subject to exculpation pursuant to the Plan from asserting such Claims, Interests, or Liens against the Debtors, the Exculpated Parties, and the Released Parties.

The Plan provides that all Holders of Claims who are entitled to vote on the Plan who vote to accept the Plan will be granting a release of any claims or rights they have or may have as against many individuals and Entities. In addition, certain other Holders of Claims or Interests identified in the definition of "Releasing Parties" will be granting a release of any claims or rights they have or may have as against many individuals and Entities, unless such Holders "opt out" of such release on their Ballot or election form, as applicable.

The Third-Party Release includes any and all claims that such Holders may have against the Released Parties, which in any way relate to the Debtors, their operations either before or after the Chapter 11 Cases began, any securities of the Debtors, whether purchased or sold, including sales or purchases which have been rescinded, and any transaction that these Released Parties had with the Debtors.

The Debtors are authorized to settle or release their claims in a chapter 11 plan. Section 1123(b)(3)(A) of the Bankruptcy Code allows the Debtors to release estate causes of action as consideration for concessions made by their various stakeholders pursuant to the Plan. *See, e.g.*, *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (finding that plan release provision

114

"constitute[d] an acceptable settlement under [section] 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737–39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991). In determining the appropriateness of such releases, courts in the Fifth Circuit generally consider whether the release is (a) "fair and equitable" and (b) "in the best interests of the estate." *In re Mirant*, 348 B.R. at 738. The "fair and equitable" prong is generally interpreted, consistent with that term's usage in section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule. *In re Mirant*, 348 B.R. at 738. Courts afford debtors discretion in determining the appropriateness of granting plan releases of estate causes of action. *See In re Gen. Homes*, 134 B.R. at 861 ("The court concludes that such a release is within the discretion of the Debtor.").

Additionally, in the Fifth Circuit and other jurisdictions, consensual third-party releases are permissible. The Fifth Circuit, in *Republic Supply Co.* v. *Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987), found that the Bankruptcy Code does not preclude a third-party release provision where "it has been accepted and confirmed as an integral part of a plan of reorganization." "Consensual nondebtor releases that are specific in language, integral to the plan, a condition of settlement, and given for consideration do not violate" the Bankruptcy Code. *See In re Wool Growers*, 371 B.R. 768, 776 (N.D. Tex. 2007) (citing *Republic Supply*, 815 F.2d at 1050); *see also FOM Puerto Rico S.E.* v. *Dr. Barnes Eyecenter, Inc.*, 255 F. App'x 909, 911–12 (5th Cir. 2007). Bankruptcy courts in Texas have applied this standard in recent chapter 11 bankruptcies when approving third-party releases. In doing so, these courts have focused on process—i.e., whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look it over, [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given." Confirmation Hr'g Tr. at 47, *In re Energy & Expl. Partners, Inc.*, No. 15 44931 (Bankr. N.D. Tex. April 21, 2016) [Docket No. 730]; *see also* Confirmation Hr'g Tr. at 7–8, *In re Hornbeck Offshore Servs., Inc.*, No. 20-32679 (Bankr. S.D. Tex. June 19, 2020) [Docket No. 227]; Confirmation Hr'g Tr. at 32, *In re Ameriforge Grp., Inc.*, No. 17-32660 (Bankr. S.D. Tex. May 24, 2017) [Docket No. 144]. These courts acknowledge that parties in interest waive their rights with respect to a third-party release if they do not object. *See In re Wool Growers*, 371 B.R. at 776 ("The Fifth Circuit has held that a non-debtor release violates section 524(e) when the affected creditor timely objects to the provision."); Confirmation Hr'g Tr. at 29, *In re CJ Holding Co.*, No. 16-33590 (Bankr. S.D. Tex. December 16, 2017) [Docket No. 1076] (approving as consensual a third-party release provision that bound all holders of claims and interest that did not object).

Further, a bankruptcy court has the power to approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith. *See* 11 U.S.C. § 1129(a)(3). Under Fifth Circuit caselaw, qualified immunity may be provided to "bankruptcy trustees," which extends to a debtor in possession under section 1107 of the Bankruptcy Code. *See In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 437–38 (5th Cir. 2022).

The Debtors believe that the releases, exculpation, and injunctions set forth in the Plan are customary for a chapter 11 plan in this and other districts. The Debtors believe that applicable caselaw and the Bankruptcy Code permit the Plan's releases and that they are justified under the

facts and circumstances of the Chapter 11 Cases.  The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because they are related to, among other things, the Debtors' restructuring proceedings, and each of the Released Parties and Exculpated Parties has afforded value to the Debtors and aided in the resolution of the Debtors' estates, including, but not limited to, participating in good faith in negotiations surrounding the Plan and the transactions contemplated thereunder.  The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan.  The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of confirmation of the Plan.

5. **Valuation of the Debtors**

The Debtors' investment banker, Moelis, has prepared an independent valuation analysis, which is attached hereto as **Exhibit E** (the "*Valuation Analysis*").  The Valuation Analysis should be considered in conjunction with this Disclosure Statement, including Article VIII entitled "Certain Risks to be Considered" and the Financial Projections.  Holders of Claims and Interests should carefully read the Valuation Analysis and the information contained therein in its entirety.  The Debtors believe that the Valuation Analysis demonstrates that the Plan is "fair and equitable" to the non-accepting Classes.

6. **Settlements**

As noted above, the Debtors are authorized to settle or release their claims in a chapter 11 plan.  Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan constitute (and the Confirmation Order shall constitute the Bankruptcy Court's approval of) a good faith compromise of all claims and controversies relating to the treatment and amount of First Lien Claims and approval of the treatment of Claims included in the UCC Settlement.

a.      Settlement with Holders of First Lien Claims

As described above, in the course of negotiations with the Ad Hoc Groups and the UCC, several potentially litigable issues arose relating to the amount and allowance of the First Lien Claims, including:

- whether the first lien lenders are entitled to a make-whole payment and whether any such obligation to make that make-whole payment was triggered prior to the Petition Date;

- whether any diminution in value of the first lien collateral had occurred and if so, the method to determine the extent of any such diminution in value,

- whether the first lien lenders were oversecured and entitled to postpetition interest (and at what rate) or if undersecured, the amount of, and method of calculation for, the deficiency claim,

- whether the adequate protection interest payments under the Cash Collateral Order could be recharacterized;

- whether certain of the Debtors' assets were encumbered by liens asserted by the holders of First Lien Claims, including (i) whether certain claims asserted in the Adversary Proceedings constitute general intangibles or were otherwise part of the secured collateral package or whether such claims were unencumbered commercial tort claims or avoidance actions, and how to allocate the proceeds of any settlement or judgment among encumbered and unencumbered claims, (ii) whether cash and non-cash proceeds from accounts receivable held by non-debtor DSPV, if and when distributed to Debtor DSN, would become encumbered by the liens securing the First Lien Claims, and (iii) whether the holders of First Lien Claims had valid liens on certain of the Debtors' assets including Debtor Sports Network LLC's 50% equity interest in Marquee and certain liens and claims granted in connection with the issuance of new debt in March 2022;

- impact of the turnover provisions in the Intercreditor Agreements on potential plan distributions; and

- allocation of administrative costs between encumbered and unencumbered assets, including costs related to the Debtors' investigation into prepetition transactions and the cost of administering the estates.

Absent resolution with the Holders of First Lien Claims, the Debtors or their estates would have to engage in costly and uncertain litigation, including regarding valuation. The Debtors or their estates would also be required to litigate allocation of proceeds of the Adversary Proceedings, including potentially on a claim by claim basis. If the Debtors litigated and lost over the allowed amount of the First Lien Claims, the Holders thereof may be entitled to substantially more than the First Lien Claims Cap in both a reorganization and a winddown scenario. Moreover, absent settlement, protracted litigation would delay and jeopardize the Debtors' successful emergence from chapter 11.

The settlement embodied in the Plan therefore represents a comprehensive resolution that efficiently resolves the myriad of complex intercreditor issues and is integral to the Plan. The Debtors believe that the settlement of the issues concerning the amount and allowance of the First Lien Claims is fair and reasonable and in the best interests of the Debtors and their estates.

       b.    The UCC Settlement

As described above, in the weeks following the filing of the January RSA and the DIP Motion, the UCC expressed concerns regarding, among other things, the January RSA and the DIP Facility. After extensive negotiations with the UCC, the Debtors, the First Lien Group, and the Crossholder Group reached agreement on the UCC Settlement, as described Article IV.E.5.a above.

Absent the UCC Settlement, the Debtors would have had to undergo costly litigation (including discovery) regarding, among other things, the DIP Facility, the DIP Election Procedures, approval of the Disclosure Statement, and Confirmation of the Plan, resulting in materially increased administrative costs to the Debtors' estates and potentially derailing the Debtors' efforts to reorganize as a going concern and thereby maximize the value of their estates for the benefit of all stakeholders.  The Debtors believe the UCC Settlement embodied in the Plan (and the DIP Order) is fair and reasonable and in the best interests of the Debtors and their estates.

## ARTICLE VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS IN VOTING CLASSES SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

Prior to voting to accept or reject the Plan, Holders of Claims in Voting Classes should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement and the attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation.

## A.    *Certain Bankruptcy Law Considerations*

1.    **General**.  While the Debtors believe that the remainder of the Chapter 11 Cases will be efficient and will not be materially harmful to the value of their assets, the Debtors cannot be certain that this will be the case.  It is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the value of the Debtors' assets or on the amount of distributable value available to Holders of Claims.

2.    **Risk of Non-Confirmation of Plan Under the Bankruptcy Code**.  Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan.  Even if all Voting Classes vote in favor of the Plan and the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court may decline to confirm the Plan, if it finds that any of the requirements for confirmation are not met.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests under a subsequent chapter 11 plan.

3. **Non-Consensual Confirmation**. In the event that any impaired Class of Claims or Interests does not accept or is deemed not to accept a chapter 11 plan, the Bankruptcy Court may nevertheless confirm such plan at the Debtors' request if at least one impaired Class has voted to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes.

4. **Risk of Non-Occurrence of Effective Date**. There can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX.B of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the confirmation date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

5. **Risk of Termination of the RSA**. The RSA contains provisions that give the RSA Parties the ability to terminate the RSA upon the occurrence of certain events or if certain conditions are not satisfied, including the failure to achieve certain milestones. Termination of the RSA could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with, among others, vendors, employees, and major customers.

6. **Conversion into Chapter 7 Cases**. If no chapter 11 plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. *See* Liquidation Analysis attached hereto as **Exhibit C** for a discussion of the effects that a chapter 7 liquidation would have on the recoveries to Holders of Claims.

7. **Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests**. Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

8. **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**. Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan. The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant

119

contributions to the Debtors' reorganization efforts and have agreed to make further contributions, including by agreeing to convert certain of their claims against the Debtors' Estates to into equity, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the RSA and the significant deleveraging and financial benefits embodied in the Plan.

9. **The Plan Is Based upon Assumptions the Debtors Developed That May Prove Incorrect and Could Render the Plan Unsuccessful**. The restructuring contemplated by the Plan would affect both the Debtors' capital structure and the ownership structure and operation of their business, and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances.

Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including, but not limited to, (a) the ability to implement the changes to the Debtors' capital structure; (b) the ability to obtain adequate liquidity and financing sources; (c) the ability to maintain customers' confidence in the Debtor's viability as a continuing entity and to attract and retain sufficient business from them; (d) the ability to retain key employees; and (e) the overall strength and stability of general economic conditions of the sports and media industries in the United States. The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

In addition, the feasibility of the Plan for confirmation purposes under the Bankruptcy Code relies on financial projections, including with respect to revenues, EBITDA, debt service (if any), and cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate.

The Debtors expect that their actual financial condition and results of operations may differ, perhaps materially, from what was anticipated. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization the Debtors may implement will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their respective subsidiaries or their business or operation. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan.

10. **The Debtors May Identify Additional Contracts and/or Leases for Rejection Following the Filing of This Disclosure Statement**. The Debtors remain engaged in negotiations with lease and contract counterparties, and are continuing to analyze their executory contracts and unexpired leases, especially their executory contracts with the teams and the leagues. Depending upon the outcome of these negotiations and this ongoing analysis, the Debtors may identify additional contracts or leases for rejection or assumption on modified terms. In the event that the Debtors identify additional contracts or leases for rejection as the Chapter 11 Cases progress, those rejections could lead to material changes in the Debtors' telecast rights portfolio, operations, relationships with contract counterparties, or amount of rejection damages Claims asserted in the Chapter 11 Cases. In addition, the Debtors remain engaged in discussions with certain contract counterparties on potential amendments to their executory contracts as a condition to such

120

agreements' assumption under the Plan. The Debtors cannot guarantee that all contemplated amendments will be implemented, or that the Reorganized Debtors will obtain the benefits of such amendments on a post emergence basis, and certain of the agreements that remain subject to ongoing negotiations may ultimately be rejected in accordance with the Plan and the Bankruptcy Code.

11. **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary**. Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, inflation, and other unanticipated market and economic conditions. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court, including any natural disasters, geopolitical events, or health epidemics may affect the actual financial results achieved by the Debtors. Such results may vary significantly from the forecasts and such variations may be material.

12. **Impact of Interest Rates**. Changes in interest rates may affect the fair market value of the Debtors' assets and/or the distributions to Holders of Claims under the Plan.

13. **The Debtors May Lose Continuing Access to Their Cash Collateral**. The Debtors' ability to fund administrative and operating expenses during the Chapter 11 Cases is predicated upon, among other things, their ability to continue using their cash collateral. The Debtors' ability to access their cash collateral depends on, among other things, whether the Debtors can continue receiving approval of future budgets from the applicable creditors under the DIP Order and whether the Debtors are able to comply with the variance tests and minimum liquidity requirement under the DIP Order or any subsequent order authorizing the Debtors to use cash collateral, as applicable. There can be no assurance that the Debtors will be able to continue using their cash collateral prior to the Effective Date.

14. **Contingencies May Affect Distributions to Holders of Allowed Claims and Interests**. The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including whether the Bankruptcy Court orders certain Allowed Claims to be subordinated and turned over to other Allowed Claims. The occurrence of any and all such contingences could affect distributions under the Plan.

15. **The Debtors May Seek to Amend, Waive, or Modify the Plan at Any Time Prior to Confirmation**. Subject to and in accordance with the terms of the RSA, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or

modify the Plan before the entry of the Confirmation Order or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (a) all Classes of adversely affected creditors and interest Holders accept the modification in writing or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests, or is otherwise permitted by the Bankruptcy Code.

16.     **Other Parties in Interest Might Be Permitted to Propose Alternative Chapter 11 Plans That May Be Less Favorable to Certain of the Debtors' Constituencies than the Plan**. Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative chapter 11 plan. Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a chapter 11 plan for a period of 120 days from the Petition Date, which may be extended with Bankruptcy Court approval for a period not to exceed 18 months. Such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court. If such an order were to be entered or if the Bankruptcy Court denies the Debtors' request to extend such exclusivity period, other parties in interest would then have the opportunity to propose alternative chapter 11 plans.

        If another party in interest were to propose an alternative chapter 11 plan following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims or Interests. If there were competing chapter 11 plans, the Chapter 11 Cases likely would become longer, more complicated, and much more expensive. If this were to occur, the adverse consequences discussed in the below Article VIII.A.17 also could occur.

17.     **The Debtors Will Be Subject to the Risks and Uncertainties Associated with Operating in the Chapter 11 Cases**. For the duration of the Chapter 11 Cases, the Debtors' ability to operate prior to the Effective Date will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) the Debtors' ability to obtain Bankruptcy Court approval of various forms of relief; (b) the Debtors' ability to maintain relationships with vendors, service providers, customers, employees, and other third parties; (c) the Debtors' ability to maintain contracts that are critical to the Debtors' operations; (d) the Debtors' ability to collect on accounts receivable from their distributors and advertisers; (e) whether the Debtors' counterparties will fully perform their obligations under their contracts with the Debtors on a timely basis; (f) the ability of third parties to obtain Bankruptcy Court approval to terminate contracts with the Debtors; (g) the ability of third parties to obtain a Bankruptcy Court order terminating or shortening the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; and (h) other actions of the Debtors' creditors and other third parties that may be inconsistent with the Debtors' plans.

The Debtors also will need to obtain the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' goals.

**B.      *Risks Relating to Recoveries Under the Plan and the Reorganized Debtors' Business***

1.      **Post-Effective Date Indebtedness**.   On the Effective Date, the Reorganized Debtors will incur approximately $440 million to $670 million in aggregate principal amount of debt through the Take Back Term Loans, the Convertible B Exit Notes, the New A/R Facility, the Convertible A Exit Notes (if any), and the Exit Term Loans (if any). The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

2.      **Allowed Claims May Exceed Estimates**. The projected distributions set forth in this Disclosure Statement are based upon the Debtors' good-faith estimate of, among other things, the amount of administrative expenses that will be incurred and the total amount of Claims that are ultimately Allowed. The actual amount of administrative claims could be greater than expected for a variety of reasons, including greater-than-anticipated administrative and litigation costs associated with resolving Disputed Claims. Additionally, the actual amount of Allowed Claims in any Class could be greater than anticipated, which will impact the distributions to be made to Holders of Claims. The Debtors reserve the right to object to the amount or classification of any Claim not previously Allowed by order of the Bankruptcy Court. Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any creditor whose Claim is subject to a successful objection. Any such creditor may not receive the estimated distributions set forth in the Plan.

3.      **The Debtors' Media Rights Agreements with Various Professional Sports Teams and Leagues Have Varying Durations and Terms and the Debtors May Be Unable to Renew Those Agreements on Acceptable Terms or Such Rights May Be Lost for Other Reasons**. The Debtors' ability to generate revenues is dependent upon media rights agreements with professional sports teams and leagues. Upon expiration, the Debtors may seek renewal of these agreements and, if they do, they may be outbid by competing programming networks or others for these agreements or the renewal costs could substantially exceed their costs under the current agreements. Even if the Debtors renew such agreements, the results of operations could be adversely affected if increases in sports programming rights costs outpace increases in distribution, advertising, and streaming revenues. In addition, one or more of these sports teams may seek to establish their own programming network or join one of their competitor's networks or regional sports network and, in certain circumstances, they may not have an opportunity to bid for the media rights.

Moreover, the value of these agreements may also be affected by various league decisions and/or league agreements that the Debtors may not be able to control, including a decision to alter the number of games played during a season.  The governing bodies of MLB, the NBA, and the NHL have imposed, and may impose in the future, various rules, regulations, guidelines, bulletins, directives, policies, and agreements (collectively, "***League Rules***"), which could have a material negative effect on our business and results of operations.  For example, the League Rules define the territories in which the Debtors may distribute games of the teams in the applicable league.  Changes to the League Rules, or the adoption of new League Rules, could affect the Debtors' media rights agreements with the various teams and, as consequence, have a material negative effect on our business and results of operations.

The value of these media rights can also be affected, or the Debtors could lose such rights entirely, if a team is liquidated, undergoes reorganization in bankruptcy, or relocates to an area where it is not possible or commercially feasible for the Debtors to continue to distribute programming for such team.  Any loss or diminution in the value of rights could impact the extent of the sports coverage offered by the Debtors and could materially negatively affect the Debtors and their results of operations.  In addition, the Debtors' distribution agreements with Distributors typically include certain remedies in the event their RSNs fail to meet a minimum number of professional event telecasts, and, accordingly, any loss of rights could materially negatively affect the Debtors' business and results of operations.

4. **The Debtors' Agreements with Various Distributors Have Varying Durations and Terms and the Debtors May Be Unable to Renew Those Agreements on Acceptable Terms**.  The Debtors' ability to generate revenues is dependent upon the Debtors' ability to maintain and renew their agreements with Distributors.  The Debtors have historically generated the majority of their revenue from distributing their RSNs through Distributors such as AT&T, Charter, Comcast, Cox Communications, Inc., DIRECTV, and others.  Approximately 83% of Debtors' revenue is generated from distributing their RSNs through the Distributors, with the significant majority of such revenues from the Debtors' top three Distributors.  There can be no assurances that the Debtors will be able to maintain and renew their agreements, including maintaining inclusion in existing bundles and packages, with existing Distributors and/or obtain new agreements with new Distributors on favorable terms.

5. **If the Rate of Decline in the Number of Subscribers to Distributor Services Increases or These Subscribers Shift to Other Services or Bundles That Do Not Include the Debtors' RSNs, There May Be a Material Adverse Effect on the Debtors' Revenues**.  The numbers of the subscribers to Distributor services is critical for the Debtors' business.  During the last few years, the number of subscribers to Distributor services in the United States has generally been declining, as technological advancements have driven changes in consumer behavior and have empowered consumers to seek more control over when, where, and how they consume news, sports, and other entertainment, including through the so-called "cutting the cord" and other consumption strategies.  The Distributor subscriber decline has led to a decline in subscribers from the Debtors' RSNs.  In addition, Distributors have introduced, marketed, and/or modified tiers or bundles of programming that have impacted the number of subscribers that receive the Debtors' RSNs, including tiers or bundles of programming that exclude the Debtors' RSNs.

If Distributor service offerings are not attractive to consumers for any reason (including due to pricing, increased competition from over-the-top ("**OTT**") and DTC services, increased dissatisfaction with the quality of Distributor services, poor economic conditions, or other factors), more consumers may cancel their Distributor service subscriptions, elect to instead subscribe to OTT services, which in some cases may be offered at lower prices, or elect to subscribe to Distributors with smaller bundles of programming that may not include the Debtors' RSNs. If the rate of decline in the number of Distributor service subscribers increases or if subscribers shift to OTT services or smaller bundles of programming that do not include the Debtors' RSNs, this may have a material adverse effect on the Debtors' revenues.

6.    **The Debtors' Long-Term Success Is Dependent on the Successful Execution of Their DTC Strategy, Which Is Subject to a Number of Risks and Uncertainties**.  There is intense competition among subscription services, including increasing competition in sports-related subscription offerings.  As a result, the Debtors' success will be dependent on a number of factors, including:

- the ability to maintain existing DTC rights and obtain additional DTC rights;

- the ability to appropriately price subscription offerings to optimize the DTC opportunity;

- offering high quality content and programming as part of the subscription packages, including creating or acquiring new content to complement live games; and

- ensuring a high level of consumer engagement, which is necessary for the Debtors to maximize advertising and other revenue.

Failure to successfully execute the Debtors' DTC strategy could negatively impact their financial condition and results of operations.

7.    **The Debtors Face Intense, Wide-Ranging Competition for Viewers and Advertisers**.  The Debtors compete, in certain respects and to varying degrees, for viewers and advertisers with other programming networks, pay-per-view, video on demand, online streaming services, and other content offered by Distributors.  The Debtors also compete for viewers and advertisers with OTT and DTC, mobile media, radio, motion picture, home video, stadiums and arenas, and other sources of information and entertainment and advertising services.  Important competitive factors are the prices the Debtors charge for their programming networks, the quantity, quality (in particular, the performance of the sports teams whose media rights the Debtors controls), and variety of the programming offered and the effectiveness of marketing efforts.

With respect to advertising services, factors affecting the degree and extent of competition include prices, reach, and audience demographics, among others.  Some of the Debtors' competitors are large companies that have greater financial resources available to them than the Debtors, which could impact their viewership and the resulting advertising revenues.

Rivals that may have greater resources than the Debtors have include:

- other local free over-the-air broadcast television and radio stations;

- national networks or programming services, including any bundles of such networks and services;

- distributors, such as telecommunication companies, cable providers, and direct broadcast satellite providers;

- internet service providers, social media platforms, websites, and mobile applications;

- OTT technologies; and

- other emerging technologies.

8. **The Debtors' Joint Venture Arrangements Are Subject to a Number of Operational Risks That Could Have a Material Adverse Effect on the Debtors' Business, Results of Operations, and Financial Condition**.  The Debtors have invested in a number of their RSNs, including Marquee and YES, through joint ventures with certain teams, and they may form additional joint ventures in the future.  The nature of the joint ventures requires the Debtors to consult with and share certain decision-making powers with unaffiliated third parties.  Further, differences in economic or business interests or goals among joint venture participants could result in delayed decisions, failures to agree on major issues, and even litigation.  If these differences cause the joint ventures to deviate from their business or strategic plans, or if the Debtors' joint venture partners take actions contrary to the Debtors' policies, objectives, or the best interests of the joint venture, the Debtors' results could be adversely affected.

The Debtors' participation in joint ventures is also subject to the risks that:

- the Debtors could experience an impasse on certain decisions because they do not have sole decision-making authority, which could require the Debtors to expend additional resources on resolving such impasses or potential disputes;

- the Debtors may not be able to maintain good relationships with their joint venture partners, which could limit their future growth potential and could have an adverse effect on their business strategies;

- the Debtors' joint venture partners could have investment or operational goals that are not consistent with the Debtors' corporate-wide objectives, including the timing, terms, and strategies for investments or future growth opportunities;

- the Debtors' joint venture partners might become bankrupt, fail to fund their share of required capital contributions, or fail to fulfill their other obligations as joint venture partners, which could cause the Debtors to decide to infuse their

capital into any such venture on behalf of the related joint venture partner or partners despite other competing uses for such capital;

- some of the Debtors' existing joint ventures require mandatory capital expenditures for the benefit of the applicable joint venture, which could limit their ability to expend funds on other corporate opportunities;

- some of the Debtors' joint venture partners have exit rights that require the Debtors to purchase their interests upon the occurrence of certain events or the passage of certain time periods, which could impact the Debtors' financial condition by requiring the Debtors to incur additional indebtedness in order to complete such transactions or otherwise use cash that could have been spent on alternative investments;

- the Debtors' joint venture partners may have competing interests in the Debtors' markets that could create conflict of interest issues;

- any sale or other disposition of the Debtors' interest in a joint venture or underlying assets of the joint venture may require consents from their joint venture partners, which they may not be able to obtain; and

- certain corporate-wide or strategic transactions may also trigger other contractual rights held by a joint venture partner (including termination or liquidation rights) depending on how the transaction is structured, which could impact the Debtors' ability to complete such transactions.

9.     **The Debtors are Substantially Dependent on the Popularity of the MLB, NBA, and NHL Teams Whose Media Rights They Control**.  The Debtors are dependent on the popularity of the MLB, NBA, and NHL teams whose local media rights they control and, in varying degrees, those teams achieving on-field, on-court, and on-ice success, which can generate fan enthusiasm, resulting in increased viewership and advertising revenues.  Furthermore, success in the regular season may qualify a team for participation in the post-season, which generates increased interest in such team, thereby improving viewership and advertising revenues.  Alternatively, if a team declines in popularity or fails to generate fan enthusiasm, this may negatively impact viewership and advertising revenues and the terms on which our distribution agreements are renewed.  There can be no assurance that any sports team will generate or maintain fan enthusiasm or compete in post-season play, and the failure to do so could result in a material negative effect on the Debtors and the Debtors' results of operations.

10.     **The Debtors' Advertising Revenue Can Vary Substantially from Period to Period Based on Many Factors Beyond Their Control; Volatility May Adversely Affect the Results of Their Operations**.  The Debtors rely on sales of advertising time for a portion of their revenues and, as a result, their operating results depend on the amount of advertising revenue they generate.  The Debtors' ability to sell advertising time depends on:

- the success of the automotive and services industries, which historically have provided a significant portion of the Debtors' advertising revenue;

- the health of the economy in the areas where the Debtors' networks are located and in the nation as a whole;

- the popularity of the Debtors' programming and that of their competition;

- the popularity of the sports teams with which the Debtors control rights;

- the effects of declining live/appointment viewership as reported through rating systems and local television efforts to adopt and receive credit for same day viewing plus viewing on-demand thereafter;

- the effects of new rating methodologies;

- changes in the makeup of the population in the areas where the Debtors' RSNs are located;

- the activities of their competitors, including increased competition from other forms of advertising-based mediums, such as radio stations, Distributors, internet and broadband content providers, and other print, outdoor, internet, and media outlets serving in the same markets;

- OTT and other emerging technologies and their potential impact on cord-cutting;

- the impact of Distributors and other OTT providers offering "skinny" programming bundles that may not include all programming of the Debtors' RSNs;

- changes in pricing and sellout levels;

- the effectiveness of the Debtors' salespeople;

- the Debtors' ability to compete with Distributors that are selling the advertising time that they provide them, which they are able to bundle with other sports and other geographic locations;

- advertisers' desire to message to the Debtors' viewer demographic;

- the ability to successfully execute the Debtors' DTC strategy;

- the Debtors' ability to monetize their naming rights;

- the effectiveness of the Debtors' digital app and the Debtors' ability to monetize impressions; and

- other factors that may be beyond the Debtors' control.

There can be no assurance that the Debtors' advertising revenue will not be volatile in the future or that such volatility will not have an adverse impact on the Debtors, their financial condition, or their results of operations.

11. **The Debtors Depend on the Appeal of Their Programming, Which May Be Unpredictable, and Increased Programming Costs May Have a Material Negative Effect on the Business and the Results of Operations**.  The Debtors depend in part upon viewer preferences and audience acceptance of the programming on the Debtors' RSNs.  These factors are often unpredictable and subject to influences that are beyond the Debtors' control, such as the quality and appeal of competing programming, general economic conditions, and the availability of other entertainment options.  The Debtors may not be able to successfully predict interest in proposed new programming and viewer preferences could cause new programming not to be successful or cause the Debtors' existing programming to decline in popularity.  An increase in the Debtors' costs associated with programming or a decrease in viewership of the Debtors' programming may materially negatively affect the Debtors and their results of operations.

In addition, the Debtors rely on third parties for sports and other programming for their RSNs.  The Debtors compete with other providers of programming to acquire the rights to distribute such programming.  If they fail to continue to obtain sports and other programming for their networks on reasonable terms for any reason, including as a result of competition, the Debtors could be forced to incur additional costs to acquire such programming or look for alternative programming, which may have a material negative effect on the Debtors and their results of operations.

12. **The Debtors Are Dependent on Their Senior Personnel**.  The Debtors depend on the continued services of their senior personnel, including their managers and senior officers.  The Debtors' existing managers and senior officers possess marketing, project management, financial, compliance, and administrative skills that are important to the operation of the Debtors' business.

The loss or an extended interruption in the services of a substantial number of the Debtors' managers and senior officers, or the inability to attract or develop a new generation of senior management, could have a material adverse effect on their business, financial condition, or results of operations.

13. **The Debtors' Operation May Be Significantly Disrupted Due to Uncertainty in Connection with the Separation Process**.  As described above, the Debtors have been relying on various managerial, operational, and administrative services Sinclair and its affiliates provide under the MSA for their day-to-day business operations.  Historically, many of the Debtors' key personnel are Sinclair employees, and the Debtors' payroll, benefits, and information technology functions are currently provided through Sinclair.  Although the Debtors are in the process of transitioning their business so that it can be completely separated from Sinclair and operated on a standalone basis, and are in the process of documenting transition services as part of the Sinclair Settlement, they will be unable to fully establish many necessary functions and complete hiring of appropriate personnel to manage and perform those functions on a go-forward basis in the near term.  It is uncertain how much time the Debtors would need to fully separate themselves from Sinclair and whether this separation process can be fully completed prior to the Effective Date.  If

129

the Debtors or the Reorganized Debtors are unable to hire qualified personnel and/or build the infrastructure to provide certain critical administrative services in house, their business operation may suffer from significant interruption.

14.    **The Debtors Could Be Affected by Labor Disputes and Legislation and Other Union Activity**.  The cost of producing and distributing entertainment programming has increased substantially in recent years due to, among other things, the increasing demands of creative talent and industry-wide collective bargaining agreements.  The Debtors produce content themselves and engage the services of writers, directors, actors, and on-air and other talent, as well as trade employees and others.  As of the Petition Date, certain of the temporary workers and independent contractors are covered by four collective bargaining agreements between the Debtors and various labor unions.  If the Debtors or their program suppliers are unable to renew expiring collective bargaining agreements, the affected unions could take action in the form of strikes or work stoppages.  Failure to renew these agreements, higher costs in connection with these agreements, or a significant labor dispute could adversely affect the Debtors by causing, among other things, delays in production that lead to declining viewers, a significant disruption of operations, and reductions in the profit margins of the Debtors' programming and the amounts the Debtors can charge advertisers for time.  The Debtors' RSNs broadcast certain professional sporting events, and their viewership may be adversely affected by player strikes or lockouts, which could adversely affect the Debtors' advertising revenues and results of operations.  The amounts paid under their sports rights agreements could be negatively impacted by rising professional player salaries, collective bargaining agreements, or changes in the league mandated salary caps.  Further, any changes in the existing labor laws, including the possible enactment of the Employee Free Choice Act, which would facilitate the formation of labor unions, may exacerbate the foregoing risks.

15.    **The Debtors May Be Obliged to Make Certain Payments to Teams During Labor Disputes**.  The Debtors may be impacted by union relations of professional sports leagues.  On December 2, 2021, MLB owners locked out players following the expiration of their prior collective bargaining agreement with its players.  Each of the NBA, the NHL and MLB has experienced labor difficulties in the past and may have labor issues, such as players' strikes or management lockouts, in the future.  For example, the NBA has experienced labor difficulties, including lockouts during the 1998-99 and 2011-12 seasons, resulting in a shortened regular season in each case.  The NHL has also experienced labor difficulties, including lockouts during the 1994-95 and 2012-13 seasons, resulting in a shortened regular season in each case, and a lockout beginning in September 2004, which resulted in the cancellation of the entire 2004-05 NHL season.  MLB has also experienced labor difficulties, including players' strikes during the 1972, 1981, and 1994 seasons, resulting in a shortened regular season in each case, and the loss of the entire post-season and the World Series in 1994.

Any labor disputes between professional sports leagues and players' unions may preclude the Debtors from airing or otherwise distributing scheduled games for which they have the rights to broadcast, resulting in decreased revenues, which would adversely affect business, revenue, and results of operations.  In addition, any labor disputes between professional sports leagues and players' unions may result in the Debtors having to broadcast games with substitute players, which would adversely affect the Debtors' business, revenue, and results of operations.  Although many of the Debtors' current programming rights agreements with local teams account for labor disputes

with certain pro rata reductions in the rights fees owed thereunder, the Debtors have a contractual obligation in some cases to continue paying a certain portion of such rights fees notwithstanding any labor dispute.

16. **Theft of the Debtors' Intellectual Property May Have a Material Negative Effect on the Debtors and the Results of Their Operations and the Debtors May Become Subject to Infringement or Other Claims Relating to Their Consent or Technology**. The Debtors' success depends in part on their ability to maintain and monetize the material intellectual property rights in their programming, technology, digital, and other content. The Debtors' intellectual property rights may be infringed upon by unauthorized usage of RSN telecast feeds (including, without limitation, live and non-live content) and other content for which the RSNs and/or the applicable league/team hold copyright ownership or distribution rights. Such unauthorized usage may occur on any and all distribution platforms, including, without limitation, linear and streaming services. Additionally, the Debtors' intellectual property rights may be further infringed upon by third-party unauthorized distribution of game content and/or highlights on social media platforms on a live or near live basis. Third-party licensors of content may infringe upon the Debtors' intellectual property rights by not complying with local territory blackout rules and RSN distribution exclusivity windows.

Theft, misappropriation, or the invalidity of the Debtors' intellectual property or the intellectual property that is licensed to the Debtors by licensors (including sports teams) could have a material negative effect on the Debtors and their results of operations by potentially reducing the revenue that they are able to obtain from the legitimate sale and distribution of the Debtors' content, undermining lawful and revenue-generating distribution channels, limiting the Debtors' ability to control the marketing of their content, and inhibiting their ability to recoup expenses or profit from the costs they incur creating their programming content. Litigation may be necessary to enforce the Debtors' intellectual property rights or protect their trade secrets. Any litigation of this nature, regardless of outcome, could cause the Debtors to incur significant costs and could divert management's attention from the operation of the Debtors' business.

While the Debtors' RSN programming personnel regularly monitor third-party streaming platforms and social media pages in an effort to identify intellectual property infringement, and the Debtors' RSN business and legal affairs work closely with the leagues to notify content protection representatives to take the necessary steps to protect league/team-owned intellectual property rights, and the Debtors take enforcement steps to preserve the value of the rights acquired by the RSNs, those protective measures cannot ensure that theft, misappropriation, or the invalidity of the Debtors' intellectual property or the intellectual property that is licensed to the Debtors by licensors will not occur.

In addition, from time to time, third parties may assert claims against the Debtors alleging intellectual property infringement or other claims relating to their programming, technology, digital, or other content. If any such infringement claim results in the loss of certain of the Debtors' intellectual property rights, it could have a materially negative impact on the Debtors' business and the results of their operations.

17. **Complaints or Litigation from Customers and Other Third Parties Could Adversely Affect the Debtors**. The Debtors may become in the future, involved in legal

131

proceedings initiated by their customers, employees, and other third parties. These current or potential future proceedings, whether individually or in the aggregate, could involve substantial claims for damages or other payments, and, even if successfully disposed of without direct adverse financial effect, could have a material adverse effect on their reputation and divert their financial and management resources from more beneficial uses. If the Debtors were to be found liable under any such claims, the Debtors' business, financial condition, or results of operations could be materially adversely affected.

18. **The Debtors May Be Vulnerable to Future Security Breaches, Data Privacy, and Other Information Technology Failures That Could Have a Material Adverse Effect on the Debtors' Financial Performance and Operating Results and Disrupt the Debtors' Operations**. The Debtors' information technology systems are critically important to operating their business efficiently and effectively. The Debtors rely on their information technology systems to manage their data, communications, sports and advertising content, digital products, and other business processes.

The Debtors recurringly identify cyber threats as well as vulnerabilities in their systems and work to address them. Despite the Debtors' efforts to ensure the integrity of their software, computers, systems, and information, they may not be able to anticipate, detect, or recognize threats to the Debtors' systems and assets, or to implement effective preventive measures against all cyber threats, especially because the techniques used are increasingly sophisticated, change frequently, are complex, and are often not recognized until launched. Cyber attacks can originate from a variety of sources, including external parties who are affiliated with foreign governments or are involved with organized crime or terrorist organizations. Third parties may also attempt to induce employees, customers, or other users of the Debtors' systems to disclose sensitive information or provide access to the Debtors' systems or network, or to their data or that of counterparties, and these types of risks may be difficult to detect or prevent. The Debtors expect cyber attack and breach incidents to continue, and are unable to predict the direct or indirect impact of future attacks or breaches on business operations.

Investigations of cyber attacks are inherently unpredictable, and it takes time to complete an investigation and have full and reliable information. The occurrence of a cyber attack, breach, unauthorized access, misuse, ransomware, computer virus, or other malicious code, or other cybersecurity event could jeopardize or result in the unauthorized disclosure, gathering, monitoring, misuse, corruption, loss, or destruction of confidential and other information that belongs to the Debtors, their customers, their counterparties, their employees, and third-party service providers that is processed and stored in, and transmitted through, the Debtors' computer systems and networks. The occurrence of such an event could also result in damage to the Debtors' software, computers, or systems, or otherwise cause interruptions or malfunctions in the Debtors', the Debtors' customers', counterparties', or third parties' operations. This could result in significant financial losses, loss of customers and business opportunities, reputational damage, litigation, regulatory fines, penalties, significant intervention, reimbursement, or other compensatory costs, significant costs to investigate the event, remediate vulnerabilities and modify the Debtors' protective measures, or otherwise adversely affect the Debtors' business, financial condition, or results of operations. While the Debtors maintain insurance to cover losses related to cybersecurity risks and business interruption, such policies may not be sufficient to cover all losses.

19.     **The Debtors May Need to Obtain FCC-Regulated Licenses for RSN Video Distribution**.  The Debtors' RSNs require use of certain uplink and downlink facilities for video distribution.  Such facilities are licensed by the Federal Communications Commission ("***FCC***") and subject to FCC regulations.  The Debtors have entered into a lease agreement whereby a third party, as FCC licensee, provides the Debtors with services and the use of such uplink and downlink facilities.  Upon termination or expiration of such agreement, the Debtors may need to acquire such authorizations from another licensee or obtain new authorizations.  In either case, the Debtors would need to apply for and obtain prior FCC consent.  From time to time, the FCC places limits or holds on applications related to such authorizations, and the Debtors cannot guarantee that the FCC will grant the Debtors' applications.

C.     *Factors Relating to Securities and Certain Other Debt to Be Issued Under the Plan Generally*

1.     **The Reorganized Debtors' Securities Will Not Be Publicly Traded**.  There is currently no market for the Reorganized Debtors' securities and there can be no assurance as to the development or liquidity of any market for any such securities.  The Reorganized Debtors are under no obligation to list any securities on any national securities exchange.  Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date.  If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities likely will trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.

2.     **The Reorganized Debtors' Securities Have Not Been Registered and May Be Subject to Resale Restrictions**.  See Article IX of this Disclosure Statement for a further discussion of the transfer restrictions applicable to the Reorganized Debtors' securities.

3.     **Potential Dilution**.  The ownership percentage represented by New Equity will be subject to dilution from any other shares that may be issued post-emergence, including by the Management Incentive Plan, the Investment Options, the conversion of the Convertible B Exit Notes, and the conversion of the Convertible A Exit Notes (if any), and the conversion or exercise of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to most other companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Equity.  The amount and dilutive effect of any of the foregoing could be material.

4.     **The Estimated Valuation of the Reorganized Debtors and the New Equity and the Estimated Recoveries to Holders of Allowed Claims Are Not Necessarily Representative of the Private or Public Sale Values of the New Equity**.  The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private or public sale values of the Reorganized Debtors' securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which are beyond the control of the Reorganized Debtors), including,

without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtors' ability to maintain adequate liquidity to fund operations.

5.       **A Small Number of Holders or Voting Blocks May Control the Reorganized Debtors**.  Consummation of the Plan may result in a small number of Holders owning a significant percentage of the New Equity.  These Holders may, among other things, exercise a controlling influence over the Reorganized Debtors and have the power to elect directors and approve significant transactions.

6.       **Equity Interests Subordinated to the Reorganized Debtors' Indebtedness**.  In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Equity would rank below all debt claims against the Reorganized Debtors.  As a result, Holders of the New Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

7.       **The New Convertible Debt May Not Be Rated or May Receive a Lower Rating Than Anticipated**.  It is not expected that the Reorganized Debtors will seek a rating on the New Convertible Debt. If, however, one or more rating agencies rates the New Convertible Debt and assigns them a rating lower than the rating expected by investors, or reduces its rating in the future, the market price of the New Convertible Debt, and/or the New Equity could be reduced.

8.       **Insufficient Cash Flow to Meet Debt Obligations**.  The Reorganized Debtors' earnings and cash flow may vary significantly from year to year.  Additionally, the Reorganized Debtors' future cash flow may be insufficient to meet their debt obligations and commitments, including their obligations under the Take Back Term Loans, the New A/R Facility, the Convertible B Exit Notes, the Convertible A Exit Notes (if any), or the Exit Term Loans (if any), increasing the risk that they may default on such debt obligations.  Any insufficiency could negatively impact the Reorganized Debtors' business.  A range of economic, competitive, business, and industry factors will affect the Reorganized Debtors' future financial performance and, as a result, their ability to generate cash flow from operations and to pay their debt.  Many of these factors are beyond the Reorganized Debtors' control.

If the Reorganized Debtors do not generate enough cash flow from operations to satisfy their debt obligations, they may have to undertake alternative financing plans, such as:

- refinancing or restructuring debt;

- selling assets;

- reducing or delaying capital investments; or

- seeking to raise additional capital.

It cannot be assured, however, that undertaking alternative financing plans, if necessary, would allow the Reorganized Debtors to meet their debt obligations.  An inability to generate

sufficient cash flow to satisfy their debt obligations or to obtain alternative financing could materially and adversely affect the Reorganized Debtors' ability to make payments on the Take Back Term Loans, the New A/R Facility, the Convertible B Exit Notes, the Convertible A Exit Notes (if any), or the Exit Term Loans (if any), as well as the Reorganized Debtors' business, financial condition, results of operations, and prospects.

9.      **Defects in Collateral**.  The indebtedness under the Take Back Term Loans, the New A/R Facility, the Convertible B Exit Notes, the Convertible A Exit Notes (if any), or the Exit Term Loans (if any) will be secured.  Such indebtedness may be subject to certain exceptions and permitted liens, as applicable, by security interests in the principal assets of the Debtors (the "***Collateral***").  The Collateral may be subject to exceptions, defects, encumbrances, liens, and other imperfections.  Accordingly, it cannot be assured that the remaining proceeds from a sale of the Collateral would be sufficient to repay all amounts owed under the Take Back Term Loans, the New A/R Facility, the Convertible B Exit Notes, the Convertible A Exit Notes (if any), or the Exit Term Loans (if any), as applicable.  The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell the Collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtors' failure to implement their business strategy, and similar factors.  The amount received upon a sale of Collateral would be dependent on numerous factors, including, but not limited to, the actual fair market value of the Collateral at such time, and the timing and manner of the sale.  By its nature, portions of the Collateral may be illiquid and may have no readily ascertainable market value.  In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Reorganized Debtors' obligations under the Take Back Term Loans, the New A/R Facility, the Convertible B Exit Notes, the Convertible A Exit Notes (if any), or the Exit Term Loans (if any), as applicable, in full or at all.  There can also be no assurance that the Collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain.  Accordingly, there may not be sufficient Collateral to pay all or any of the amounts due on the Take Back Term Loans, the New A/R Facility, the Convertible B Exit Notes, the Convertible A Exit Notes (if any), or the Exit Term Loans (if any), as applicable.

10.      **Failure to Perfect Security Interests in the Collateral**.  The failure to properly perfect liens on Collateral could adversely affect the applicable collateral agent's or collateral trustee's ability to enforce its rights with respect to Collateral for the benefit of the holders of the Reorganized Debtors' secured funded debt.  In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified.  There can be no assurance that the applicable collateral agent or collateral trustee will monitor, or that the Reorganized Debtors will inform the trustee or the applicable collateral agent or collateral trustee of, the future acquisition of property and rights that constitute Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral.  The applicable collateral agent has no obligation to monitor the acquisition of additional property or rights that constitute Collateral or the perfection of any security interests therein.  Such failure may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing the notes against third parties.

11.     **Restrictive Covenants**. The financing agreements governing the Reorganized Debtors' indebtedness are expected to contain various covenants that may limit the discretion of the Reorganized Debtors' management by restricting the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain restricted payments, make investments, consummate certain asset sales, enter into certain transactions with affiliates, merge, consolidate, and/or sell or dispose of all or substantially all of their assets. As a result of these covenants, the Reorganized Debtors will be limited in the manner in which they conduct their business and they may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. If the Reorganized Debtors are unable to repay amounts outstanding under their financing agreements when due, the lenders thereunder could, subject to the terms of the financing agreements, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility/notes.

As a result of these restrictions, the Reorganized Debtors may be limited in how they conduct their business, unable to raise additional debt or equity financing to operate during general economic or business downturns, unable to respond to changing circumstances or to pursue business strategies, and unable to compete effectively, execute their growth strategy, or take advantage of new business opportunities.

12.     **Additional Financing**. The Reorganized Debtors may be able to incur substantial additional indebtedness in the future. Although agreements governing the Reorganized Debtors' indebtedness are expected to restrict the incurrence of additional indebtedness, these restrictions are and will be subject to a number of qualifications and exceptions and the additional indebtedness incurred in compliance with these restrictions could be substantial. If new debt is added to the Reorganized Debtors' current debt levels, the related risks that the Debtors now face could intensify.

Moreover, the Reorganized Debtors may need to seek additional financing for general corporate purposes, acquisitions, or investments. The Reorganized Debtors may be unable to obtain any desired additional financing on terms that are favorable or acceptable to them, including as a result of their debt levels or if there is a decline in the demand for their services or other significantly unfavorable changes in economic conditions occur. Depending on market conditions, adequate funds may not be available to the Reorganized Debtors on acceptable terms or at all and they may be unable to fund expansion, successfully develop or enhance services, or respond to competitive pressures, any of which could have a material adverse effect on the Reorganized Debtors' competitive position, business, financial condition, results of operations, and cash flows.

New OpCo will be the issuer of both the Take Back Term Loans and a subsidiary of New OpCo will be the issuer of the New A/R Facility. The Plan provides that for so long as the Take Back Term Loans are outstanding (and unless expressly permitted by the Take Back Documents), the Reorganized Debtors will not have more than $135 million outstanding in the aggregate under the New A/R Facility at any single point in time. The initial draft of the credit agreement for the

Take Back Term Loans, the note purchase agreement or similar documents for the Convertible B Exit Notes, and the New Intercreditor Agreement will be filed with the Plan Supplement prior to the Voting Deadline.

13.    **No Intention to Pay Dividends**.  The Reorganized Debtors do not anticipate paying any dividends on the New Equity as it expects to retain any future cash flows for debt reduction and to support its operations.  In addition, covenants in the documents governing the Reorganized Debtors' indebtedness may restrict their ability to pay cash dividends and may prohibit the payment of dividends and certain other payments.  As a result, the success of an investment in the New Equity will depend entirely upon any future appreciation in the value of the New Equity.  There is, however, no guarantee that the New Equity will appreciate in value or even maintain its initial value.

D.    *Additional Factors*

1.    **Debtors Could Withdraw the Plan**.  Subject to the terms of the RSA, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

2.    **Debtors Have No Duty to Update**.  The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3.    **No Admissions Made**.  The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

4.    **No Representations Outside This Disclosure Statement Are Authorized**.  No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

5.    **The SEC Has Not Approved This Disclosure Statement**.  This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws.  Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

6.    **No Legal or Tax Advice Is Provided by This Disclosure Statement**.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Creditor should consult its own legal counsel and accountant as to legal, tax, and other matters concerning its Claim.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

7.     **No Representation Made**.  Nothing contained herein or in the Plan shall constitute a representation of the tax or other legal effects of the Plan on the Debtors or Holders of Claims.

8.     **Failure to Identify Litigation Claims or Claim Objections**.  No reliance should be placed on the fact that a particular litigation claim or objection to a particular Claim is or is not identified in this Disclosure Statement.  The Debtors may seek to investigate, File, and prosecute litigation claims and may object to Claims after Confirmation or the Effective Date irrespective of whether this Disclosure Statement identifies such litigation claims or objections to such Claims.

9.     **Certain Tax Consequences**.  For a discussion of certain tax considerations to the Debtors and certain Holders of Claims in connection with the implementation of the Plan, see Article X hereof.

## ARTICLE IX.
## TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

**A.**    *1145 Securities*

1.     **Issuance**

The Plan provides for the offer, issuance, sale, or distribution of the 1145 Securities.  The offer, issuance, sale, or distribution of the 1145 Securities by the Reorganized Debtors will be exempt from registration under Section 5 of the Securities Act and under any state or local law requiring registration for offer or sale of a security pursuant to section 1145 of the Bankruptcy Code.[40]

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's Claim against or Interest in the debtor, or "principally" in exchange for such Claim or Interest and "partly" for cash or property.

2.     **Subsequent Transfers**

The 1145 Securities may be freely transferred by recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the Holder is an "underwriter"

---

[40]    The Debtors do not intend for the Liquidation Trust Interests or the Litigation CVRs to be "securities" under applicable laws.  Notwithstanding this intention, to the extent such interests or rights are deemed to be "securities," the issuance of such interests or rights under the Plan is exempt pursuant to section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code).

with respect to such securities, as defined in section 1145(b) of the Bankruptcy Code. Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

       (i)     a person (as defined in section 101(41) of the Bankruptcy Code, a "***Person***") who purchases a Claim against, an Interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such Claim or Interest;

       (ii)    a Person who offers to sell securities offered or sold under a plan for the holders of such securities;

       (iii)   a Person who offers to buy securities offered or sold under a plan from the holders of such securities, if the offer to buy is:

              (A)    with a view to distributing such securities; and

              (B)    under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; and

       (iv)   a Person who is an "issuer" (as defined in section 2(a)(11) of the Securities Act) with respect to the securities.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any Person directly or indirectly controlling or controlled by the issuer, or any Person under direct or indirect common control of the issuer. An officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to directly or indirectly control such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor who owns 10% or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter, although the staff of the SEC has not endorsed this view.

To the extent that Persons who receive 1145 Securities pursuant to the Plan are deemed to be underwriters, resales by such Persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Persons deemed to be underwriters may, however, be permitted to resell such 1145 Securities without registration pursuant to the provisions of Rule 144 under the Securities Act or another available exemption under the Securities Act. In addition, such Persons will also be entitled to resell their 1145 Securities in transactions registered under the Securities Act following the effectiveness of a registration statement.

Holders of 1145 Securities who are deemed underwriters may resell 1145 Securities pursuant to the limited safe harbor resale provision under Rule 144 of the Securities Act. Generally, Rule 144 would permit the public sale of securities received by such Person if, at the time of the sale, certain current public information regarding the issuer is available and only if such Person also complies with the volume, manner of sale, and notice requirements of Rule 144.

If the issuer is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), adequate current public information as specified under Rule 144 is available if certain Reorganized Debtors information is made publicly available, as specified in Section (c)(2) of Rule 144.  The Reorganized Debtors will not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

Whether or not any particular Person would be deemed to be an underwriter with respect to the 1145 Securities or other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any particular Person receiving 1145 Securities or other securities under the Plan would be an underwriter with respect to such Section 1145 Securities or other securities, whether such Person may freely resell such securities, or the circumstances under which they may resell such securities.

Notwithstanding the foregoing, certain of the 1145 Securities will be subject to any applicable transfer restrictions in the organizational documents of the issuer of, or in agreements or instruments applicable to holders of, such 1145 Securities, including the New Shareholders' Agreement.

Notwithstanding the foregoing, the Debtors do not intend for the Litigation Trust Interests to be "securities" under applicable laws and any and all Litigation Trust Interests will not be registered pursuant to the Securities Act or any applicable state or local securities law.  In addition, any transfers of Litigation Interests will be subject in all respects to the requirements of the Litigation Trust Agreement.

B.     *Private Placement Securities*

1.     **Issuance**

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering is exempt from registration under the Securities Act. Rule 506 of Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under Section 4(a)(2) of the Securities Act.

The Debtors believe that the Convertible B Exit Notes and any New Equity issued pursuant to the Investment Options (collectively, the "***Private Placement Securities***") are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act and/or Rule 506 of Regulation D promulgated thereunder, and similar registration exemptions applicable outside of the United States.  The Private Placement Securities will be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable Law, as described below.

2.     **Subsequent Transfers**

The Private Placement Securities will be deemed "restricted securities" (as defined in Rule 144(a)(3) of the Securities Act), will bear customary legends and transfer restrictions and may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered

under the Securities Act, or an exemption from registration under the Securities Act is available. If in the future a Holder of Private Placement Securities decides to offer, resell, pledge, or otherwise transfer any Private Placement Securities, such Private Placement Securities may be offered, resold, pledged, or otherwise transferred only (a) in the United States to a person whom the seller reasonably believes is a qualified institutional buyer (as defined in Rule 144A promulgated under the Securities Act ("***Rule 144A***")) in a transaction meeting the requirements of Rule 144A, (b) outside the United States in a transaction complying with the provisions of Rule 904 under the Securities Act, (c) pursuant to an exemption from registration under the Securities Act (including the exemption provided by Rule 144) (to the extent the exemption is available), or (d) pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, in each of cases (a)-(d) in accordance with any applicable securities laws of any state of the United States. Such Holder will, and each subsequent Holder is required to, notify any subsequent acquiror of the Private Placement Securities from it of the resale restrictions referred to above.

Rule 144 provides a limited safe harbor for the resale of restricted securities (such that the seller is not deemed an "underwriter") if certain conditions are met. These conditions vary depending on whether the seller of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities pursuant to Rule 144 after a one-year holding period whether or not there is current public information regarding the issuer available and without compliance with the volume, manner of sale, and notice requirements described below.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144. *First*, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. (In the case of debt securities, the amount of debt securities sold for the account of an affiliate in any three-month period may not exceed the greater of the limitation set forth in the preceding sentence or 10% of the principal amount of the applicable tranche of debt securities.) *Second*, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). *Third*, if the amount of securities sold under Rule 144 in any three-month period exceeds 5,000 shares or other units or has an aggregate sale price greater than $50,000, an affiliate must electronically file or cause to be filed a copy of a notice of proposed sale on Form 144 via the SEC's EDGAR filing system.

The Debtors believe that the Rule 144 exemption will not be available with respect to any Private Placement Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, non-affiliate Holders of Private Placement Securities will be required to hold their Private Placement Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. The debtors expect that, after the Effective Date, the issuer of the New Equity will not be subject to the reporting requirements under Section 13 or 15(d) of the Exchange Act.

Each certificate representing, or issued in exchange for or upon the transfer, sale, or assignment of, any Private Placement Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Reorganized Debtors reserve the right to require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the Private Placement Securities. The Reorganized Debtors also reserve the right to stop the transfer of any Private Placement Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive Private Placement Securities will be required to acknowledge and agree that (a) they will not offer, sell, or otherwise transfer any Private Placement Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the Private Placement Securities will be subject to the other restrictions described above.

In addition to the foregoing restrictions, certain of the Private Placement Securities will also be subject to any applicable transfer restrictions in the organizational documents of the issuer of, or in agreements or instruments applicable to holders of, such Private Placement Securities, including the New Shareholders' Agreement.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY

REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN AND THE CONFIRMATION ORDER.

**THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN AND THE CONFIRMATION ORDER CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.**

### ARTICLE X.
### CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain U.S. federal income tax consequences of the Plan is provided below. Only the principal consequences of the Plan for the Debtors, Reorganized Debtors, and those Holders that are entitled to vote to accept or reject the Plan are described below. This description is for informational purposes only and substantial uncertainties exist with respect to various tax consequences of the Plan. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the United States Internal Revenue Service (the "***IRS***") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding on the IRS or such other authorities. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The following discussion is based upon the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), judicial decisions, existing and proposed regulations promulgated thereunder by the U.S. Department of the Treasury ("***Treasury Regulations***"), judicial decisions, and published administrative guidance of the IRS, all as in effect as of the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, real estate investment trusts, retirement plans, individual retirement and other tax-deferred accounts, small business investment companies, regulated investment companies, tax-exempt entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, partnerships or other entities treated as pass-through vehicles for U.S. federal income tax purposes, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, persons who received their Claims as compensation, dealers in securities or foreign currencies, U.S. expatriates, persons who hold Claims or who will hold any consideration received under the Plan as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, and Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code).

143

Additionally, this discussion does not address the implications of the alternative minimum tax, the base erosion and anti-abuse tax, or the "Medicare" tax on net investment income. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors, the Reorganized Debtor, or Holders based upon their particular circumstances. This summary does not discuss any tax consequences of the Plan that may arise under any laws other than U.S. federal income tax law, including under state, local, or non-U.S. tax law. Furthermore, this summary does not discuss any actions that a Holder may undertake with respect to its Claims, other than voting such Holder's Allowed Claim and receiving the consideration provided under the Plan, or with respect to any actions undertaken by a Holder subsequent to receiving any consideration under the Plan.

Furthermore, this summary assumes that each Holder holds its Claims as a "capital asset" within the meaning of section 1221 of the Tax Code. This summary also assumes that the various debt and other arrangements to which any of the Debtors or the Reorganized Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of the same Class or Classes (including as DIP Commitment Parties, Initial DIP Commitment Parties, or DIP Lenders), and the tax consequences of such Holder may differ materially from those described below. This summary does not address the U.S. federal income tax consequences to Holders (i) of DIP Claims, (ii) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (iii) who are deemed to reject the Plan.

For purposes of this discussion, a "*U.S. Holder*" is a beneficial owner of a Claim or Interest who is for U.S. federal income tax purposes: (1) an individual citizen or resident of the United States; (2) a corporation created or organized under the laws of the United States or any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. For purposes of this discussion, a "*Non-U.S. Holder*" is any beneficial owner that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a beneficial owner of a Claim, the tax treatment of a partner (or other owner) of such entity generally will depend upon the status of the partner (or other owner) and the activities of the entity. Partners (or other owners) of partnerships (or other pass-through entities) that are beneficial owners of a Claim are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE,

LOCAL, AND NON-U.S. TAX CONSEQUENCES APPLICABLE UNDER THE PLAN, INCLUDING THE IMPACT OF TAX LEGISLATION.

A.     *U.S. Federal Income Tax Consequences to the Debtors*

      1.     **Characterization of the Restructuring Transactions**

Pursuant to the MSA, Sinclair has historically provided tax compliance services to the Debtors. The Debtors have been informed by Sinclair that each of the Debtors is an entity disregarded as separate from its owner for U.S. federal income tax purposes. As disregarded entities, the Debtors generally are not themselves subject to U.S. federal income tax. Instead, the U.S. consolidated tax group of which Sinclair is the common parent reports on its consolidated U.S. federal income tax return, and is subject to tax in respect of, each item of income, gain, loss, deduction, and credit of the Debtors. Accordingly, the U.S. federal income tax consequences of the Restructuring Transactions are not expected to be borne by the Debtors and instead are expected to be borne by Sinclair. The remainder of this disclosure assumes that the information provided by Sinclair regarding the Debtors' U.S. federal income tax classification is correct.

      2.     **Consequences of the Transfer**

Pursuant to the Plan, on the Effective Date, a newly formed acquiring company (an indirect subsidiary of New TopCo), will acquire the equity of certain Debtors and their subsidiaries, including all of the operating entities (the "***Transfer***"), including indirect interests in entities owned by the Debtors that are partnerships for U.S. federal income tax purposes. The transfer of the equity of certain Debtors is intended to be treated—and the discussion herein assumes will be treated—for U.S. federal income tax purposes as the transfer of such entities' underlying assets and liabilities.

The Debtors believe, and the discussion herein assumes, that the Transfer will be treated for U.S. federal income tax purposes as a taxable asset purchase by the newly formed acquiring company, such that the acquiring company will obtain a cost basis in the assets and partnership interests acquired (or deemed acquired) from the Debtors, based on the fair market value of such assets and interests on the Effective Date. The Reorganized Debtors will not succeed to any tax attributes of the Debtors or Sinclair (such as NOLs, tax credits or tax basis in assets). However, there is no assurance that the IRS will not take a contrary view and treat the Transfer as a tax-free reorganization pursuant to which the Reorganized Debtors would take a carry-over tax basis in the transferred assets and inherit any other tax attributes of the Debtors, including any attribute reduction resulting from the substantial cancellation of debt income that would be incurred by the Debtors or Sinclair if the IRS successfully recharacterized the Transfer.

B.     *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Certain Allowed Claims*

      1.     **Consequences of the Exchange to U.S. Holders of Allowed First Lien Claims**

Pursuant to the Plan, except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment of its Allowed First Lien Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed First Lien Claim, each Holder

145

of an Allowed First Lien Claim will receive cash, Take Back Term Loans, and, if the Litigation Proceeds Condition is not met, Class A Litigation Trust Interests, as applicable.

       a.      <u>Taxable Exchange</u>

Other than with respect to amounts received that are attributable to accrued but untaxed interest (as discussed below), the exchange by U.S. Holders of their Claims for cash, Take Back Term Loans, and Class A Litigation Trust Interests (if applicable) will be a taxable exchange under section 1001 of the Tax Code and U.S. Holder will recognize gain or loss in an amount equal to the difference, if any, between (a) the sum of the cash received, the "issue price" of the Take Back Term Loans (as described below under "Issue Price of the Take Back Term Loans"), and the fair market value of the Class A Litigation Trust Interests received (if applicable), and (b) the U.S. Holder's adjusted tax basis in its Claims.

A U.S. Holder's tax basis in the Take Back Term Loans received will generally be equal to their issue price and such holder's tax basis in the Class A Litigation Trust Interests received (if applicable) will generally be equal to its fair market value as determined on the Effective Date. The holding period for the Take Back Term Loans and Class A Litigation Trust Interests (if applicable) received on the Effective Date will begin on the day following the Effective Date.

       b.      <u>Character of Gain or Loss</u>

The character of such gain or loss as capital or ordinary is determined by a number of factors including the tax status of the U.S. Holder, the rules regarding "market discount" and accrued but untaxed interest (as discussed below) and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. To the extent that a portion of the consideration received in exchange for a Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. See the discussions of "Accrued Interest," "Market Discount" and "Limitations on Use of Capital Losses" below.

       2.      **Consequences of the Exchange to U.S. Holders of Allowed Junior Funded Debt Claims**

Pursuant to the Plan, except to the extent that a Holder of an Allowed Junior Funded Debt Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Junior Funded Debt Claim each Holder of an Allowed Junior Funded Debt Claim will receive its *pro rata* share of the Junior Creditor Equity, and either cash or, if the Litigation Proceeds Condition is not met, the Class B Litigation Trust Interests.

       a.      <u>Taxable Exchange</u>

Other than with respect to amounts received that are attributable to accrued but untaxed interest (as discussed below), the exchange by U.S. Holders of their Claims for the Junior Creditor Equity, as well as cash or Class B Litigation Trust Interests (as applicable) would be a taxable

exchange under section 1001 of the Tax Code and U.S. Holder would recognize gain or loss in an amount equal to the difference, if any, between (a) the fair market value of the consideration received and (b) the U.S. Holder's adjusted tax basis in its Claims.

A U.S. Holder's tax basis in the Junior Creditor Equity and, if applicable, the Class B Litigation Trust Interests (if applicable) will generally be equal to their fair market value as determined on the Effective Date. The holding period for the Junior Creditor Equity and Class B Litigation Trust Interests (if applicable) received on the Effective Date will begin on the day following the Effective Date.

b.    Character of Gain or Loss and Holding Period

The character of such gain or loss as capital or ordinary is determined by a number of factors including the tax status of the U.S. Holder, the rules regarding "market discount" and accrued but untaxed interest (as discussed below) and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. To the extent that a portion of the consideration received in exchange for a Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. See the discussions of "Accrued Interest," "Market Discount" and "Limitations on Use of Capital Losses" below.

3.    **Consequences of the Exchange to U.S. Holders of Allowed General Unsecured Claims**

Pursuant to the Plan, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction of such Allowed General Unsecured Claim its share of the Unsecured Claim Cash Distribution.

a.    Taxable Exchange

Other than with respect to amounts received that are attributable to accrued but untaxed interest (as discussed below), the exchange by U.S. Holders or their Claims for Cash would be a taxable exchange under section 1001 of the Tax Code and U.S. Holder would recognize gain or loss in an amount equal to the difference, if any, between (a) the sum of the fair market value of the consideration received and (b) the U.S. Holder's adjusted tax basis in its Claims.

b.    Character of Gain or Loss and Holding Period

The character of such gain or loss as capital or ordinary is determined by a number of factors including the tax status of the U.S. Holder, the rules regarding "market discount" and accrued but untaxed interest (as discussed below) and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim

for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. To the extent that a portion of the consideration received in exchange for a Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. See the discussions of "Accrued Interest," "Market Discount" and "Limitations on Use of Capital Losses" below.

        4.      **Accrued Interest, Market Discount, and Capital Losses**

        a.      <u>Accrued Interest</u>

A portion of the consideration received by U.S. Holders of Allowed Claims may be attributable to accrued but untaxed interest (or original issue discount ("**OID**")) on such Claims. If any amount is attributable to such accrued interest (or OID), then such amount should be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Allowed Claims should be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims (as determined for United States federal income tax purposes), with any excess allocated to the remaining portion of such Claims, if any. There is no assurance that the IRS will respect such allocation.

U.S. Holders are urged to consult their own tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

        b.      <u>Market Discount</u>

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges a Claim on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of accrued "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market

discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that the Allowed Claims that were acquired with market discount are exchanged in certain tax-free transactions for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument.  To date, specific Treasury Regulations implementing this rule have not been issued.  U.S. Holders of Allowed Claims who acquired the notes underlying their Claims with market discount are urged to consult with their own tax advisors as to the appropriate treatment of any such market discount and the timing of the recognition thereof.

c.    <u>Limitation on Use of Capital Losses</u>

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 5.    Certain U.S. Federal Income Tax Consequences of Ownership and Disposition of the Take Back Term Loans

[To come]

### 6.    Certain U.S. Federal Income Tax Consequences of the Ownership and Disposition of New Equity

a.    <u>Dividends on New Equity</u>

Any distributions made on account of New Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of New TopCo, as determined under U.S. federal income tax principles.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits.  The

149

dividends-received deduction is only available, however, if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

                    b.          <u>Sale, Redemption, or Repurchase of New Equity</u>

Unless a non-recognition provision applies, U.S. Holders generally will recognize gain or loss upon the sale, redemption, or other taxable disposition of New Equity.  In general, this gain or loss will be a capital gain or loss subject to special rules that may apply in the case of redemptions.  Such capital gain generally would be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Equity for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.  Under the recapture rules of section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Equity as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Claim or recognized an ordinary loss on the exchange of its Allowed Claim for New Equity.

**C.**        ***Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims***

The following discussion includes only certain U.S. federal income tax consequences of the Plan to non-U.S. Holders of Claims.  The discussion does not include any non-U.S. tax considerations.  The rules governing U.S. federal income taxation of a non-U.S. Holder are complex.  Non-U.S. Holders should consult with their own tax advisors to determine the effect of U.S. federal, state, and local tax laws, as well as any other applicable non-U.S. tax laws and/or treaties, with regard to their participation in the transactions contemplated by the Plan.

Whether a non-U.S. Holder realizes gain or loss on an exchange of its Claim under the Plan, the amount of such gain or loss and any interest generally is determined in the same manner as set forth above in connection with U.S. Holders.

                    1.          **Gain Recognition**

Subject to the discussion of backup withholding below, any gain realized by a non-U.S. Holder on the exchange of its Claim under the Plan generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  In addition, if such non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.  **Payments in Respect of Accrued Interest**

Subject to the discussion of FATCA and backup withholding below, payments to a non-U.S. Holder that are attributable to amounts received pursuant to the Plan in respect of accrued but untaxed interest generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of the Debtor's stock (in the case of interest payments received pursuant to the Plan);

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtor (in the case of interest payments received pursuant to the Plan) (each, within the meaning of the Tax Code);

- the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States.

A non-U.S. Holder described in the first three bullets above generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on amounts received pursuant to the Plan in respect of accrued but untaxed interest.

A non-U.S. Holder described in the fourth bullet above generally will not be subject to withholding tax if it provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, but will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.  As described above in more detail under the heading "Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims—Accrued Interest," the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

3.      **Ownership of New Equity**

Any distributions made (or deemed to be made) with respect to New Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of New TopCo, as determined under U.S. federal income tax principles.  To the extent that a non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the non-U.S. Holder's basis in its New Equity.  Any such distributions in excess of a non-U.S. Holder's basis in its New Equity (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange.  Except as described below, dividends paid with respect to New Equity held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate, if applicable).  A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by providing an IRS Form W-8BEN or W-8BEN-E (or a successor form) to New TopCo upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to New Equity held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate under an applicable income tax treaty).

4.      **Sale, Redemption, or Repurchase of New Equity**

A non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption, unless such redemption is treated as a dividend for U.S. federal income tax purposes) of New Equity unless:

(a) such non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and satisfies certain other

conditions or who is subject to special rules applicable to former citizens and residents of the United States; or

(b) such gain is effectively connected with such non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States); or

(c) the applicable Reorganized Debtor is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Equity.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).  With respect to the third exception, the Debtors consider it unlikely, based on their current business plans and operations, that Reorganized Debtor will become a "U.S. real property holding corporation" in the future.

**D.** **Certain U.S. Federal Income Tax Consequences of the Litigation Trust and Holders of Litigation Trust Interests**

The Plan contemplates the establishment and funding of a Litigation Trust for the benefit of certain Holders of Claims in the event the Litigation Proceeds Condition is not met.

1. **Classification of Litigation Trust**

The Litigation Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes within the meaning of Treasury Regulations section 301.7701-4(d) and as a "grantor trust" (i.e., a pass-through entity) for U.S. federal income tax purposes, pursuant to sections 671 through 679 of the Tax Code, with no objective to continue or engage in the conduct of a trade or business (other than in respect of any portion of the Litigation Trust allocable to, or retained on account of, Disputed Claims, as discussed below).  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  Any liquidating trust will be structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45 all parties (including, without limitation, the Debtors, the Litigation Trustee and applicable Holders of Claims) will treat the transfer of the Litigation Trust Assets to the Litigation Trust as (i) a transfer of the Litigation Trust Assets (subject to any obligations relating to those assets) directly to the Holders of Claims (other than to the extent allocable to Disputed Claims) followed by (ii) the transfer by such beneficiaries to the Litigation Trust of such

153

assets and cash in exchange for Litigation Trust Interests. Accordingly, except in the event of contrary definitive guidance, the applicable Holders of Claims will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the underlying assets of the trust (other than to the extent allocable to Disputed Claims).

Although the following discussion assumes that the Litigation Trust would be treated as a liquidating trust for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Litigation Trust and the Holders of Claims in Class 3 and Class 4 could vary from those discussed herein.

2. **General Tax Reporting by Litigation Trust and Beneficiaries**

For all U.S. federal income tax purposes, all parties must treat the Litigation Trust as a grantor trust of which the Holders of Litigation Trust Interests are the owners and grantors, and such Holders as the direct owners of an undivided interest in the underlying assets of the trust (other than any assets allocable to Disputed Claims), consistent with their economic interests therein. The Litigation Trustee will file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations. The Litigation Trust also will be responsible for annually sending to each Holder of Litigation Trust Interests a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for U.S. federal income tax purposes.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), allocations of Litigation Trust taxable income or loss shall be allocated by reference to the manner in which any economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trustee will make a good faith valuation of the Litigation Trust Assets. All parties to the Litigation Trust (including, without limitation, the Debtors and Holders of Litigation Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Holder of Litigation Trust Interests will be treated as income or loss with respect to such Holder's undivided interest in the underlying assets of the trust,

and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the Holder.

The U.S. federal income tax obligations of a Holder with respect to its Litigation Trust Interests are not dependent on the Litigation Trust distributing any cash or other proceeds. Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of Litigation Trust income even if the Litigation Trust does not make a concurrent distribution to the Holder. In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a Holder's Allowed Claim), a distribution of cash by the Litigation Trust will not be separately taxable to a Holder of Litigation Trust Interests since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Litigation Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the Litigation Trust on account of Disputed Claims.

The Litigation Trustee will comply with all applicable governmental withholding requirements. If any Litigation Trust Beneficiaries are not U.S. persons, the Litigation Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

### 3. Tax Reporting for Assets Allocable to Disputed Claims

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of an IRS private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), the Litigation Trustee (A) may elect to treat any of the assets transferred to the Litigation Trust allocable to, or retained on account of, Disputed Claims (a "*Disputed Claims Reserve*") as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9, if applicable, and (B) to the extent permitted by applicable law, will report consistently with the foregoing for state and local income tax purposes.

Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claims Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to such assets (including any gain recognized upon the disposition of such assets), and any such taxes will be payable out of such assets and, in the event of insufficient cash to pay any such taxes, the Litigation Trustee may sell all or part of such assets to pay the taxes. All distributions from such reserves will be treated as received by Holders in respect of their Claims as if distributed by the Debtors. All parties to the Litigation Trust (including, without limitation, each of the Debtors, the Litigation Trust Beneficiaries, and the Litigation Trustee) will be required to report for tax purposes consistently with the foregoing.

### E. *FATCA*

Under the Foreign Account Tax Compliance Act ("*FATCA*"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account

holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Equity or interest on the Take Back Term Loans). Pursuant to proposed Treasury Regulations on which taxpayers are permitted to rely pending their finalization, this withholding obligation would not apply to gross proceeds from the sale or disposition of property such as the Take Back Term Loans and New Equity. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

**F.**     ***Information Reporting and Withholding on Distributions***

All distributions to Holders of Claims under the Plan are subject to any applicable tax withholding, including (as applicable) employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder fails to furnish its social security number or other taxpayer identification number (a "***TIN***"), furnishes an incorrect TIN, fails properly to report interest or dividends, or under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF TAX LEGISLATION AND ANY OTHER CHANGE IN APPLICABLE TAX LAWS.

**ARTICLE XI.**
**<u>CONCLUSION AND RECOMMENDATION</u>**

The Debtors believe the Plan is in the best interests of all stakeholders and urge Holders of Claims in the Voting Classes to vote in favor thereof.

Dated:   February 29, 2024

**DIAMOND SPORTS GROUP, LLC** (for itself and on behalf of each of its subsidiary debtors as debtors and debtors in possession)

By: _/s/ David Preschlack_____
      Name:   David Preschlack
      Title:    Chief Executive Officer

[*Signature Page to the Disclosure Statement*]