IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) Case No. 23-90116 (CML) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**DEBTORS' FOURTH MOTION FOR ENTRY OF AN ORDER
EXTENDING THE EXCLUSIVE PERIODS FOR THE FILING OF
A CHAPTER 11 PLAN AND SOLICITATION OF ACCEPTANCES THEREOF**

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within 21 days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within 21 days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") respectfully state as follows in support of this motion:

**Relief Requested**

1. The Debtors seek entry of an order, substantially in the form attached hereto, extending the periods within which the Debtors have the exclusive right to file a chapter 11 plan (the "Filing Exclusivity Period") through and including September 16, 2024, and solicit acceptances thereof (the "Solicitation Exclusivity Period," and, together with the Filing Exclusivity Period, the "Exclusivity Periods") through and including November 14, 2024. The requested extension of the Exclusivity Periods is to the statutory maximum allowed under

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

section 1121(d) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").

**Preliminary Statement**

2. Ample cause exists to extend the Exclusivity Periods as requested herein to allow the Debtors to capitalize on the tremendous progress made to date in these chapter 11 cases. The Debtors are currently in the process of prosecuting their chapter 11 plan of reorganization that was filed on February 29, 2024 [Docket No. 1845] (the "Plan"), which is predicated on a restructuring support agreement (the "RSA") supported by the official committee of unsecured creditors (the "UCC"), creditors representing over 94% of first lien claims, over 95% of second lien claims, and 96% of unsecured notes claims, and Amazon.com Services LLC ("Amazon"). The Plan and RSA represent critical achievements and reflect broad creditor consensus on the Debtors' restructuring path. The Debtors filed an accompanying disclosure statement [Docket No. 1846] (the "Disclosure Statement") at the time they filed the Plan, for which the Debtors are seeking approval at a hearing scheduled for April 17, 2024. The Plan, Disclosure Statement, and RSA demonstrate significant progress during the most recent extension of the Exclusivity Periods (which was granted by the Court on December 20, 2023), and now the Debtors should be permitted to continue to prosecute the Plan over the next several months without the need to address competing plans or seek further extensions of the Exclusivity Periods. The parties to the RSA support the requested extension.

3. Since the beginning of this year, in addition to entering into the RSA and filing the Plan and Disclosure Statement, the Debtors have:

    a. reached agreement on the terms of a $115 million investment by, and commercial arrangement with, Amazon, the terms of which were memorialized in a commitment letter (the "Exit Note Commitment Letter"),

2

    which was approved by the Court on February 26 [Docket No. 1826] (the "Exit Note Commitment Letter Order");

  b. reached agreement on the terms of a $450 million debtor-in-possession financing facility (the "DIP Facility") that serves as the backbone of their reorganization strategy, which the Court approved on February 26 [Docket No. 1834] (the "DIP Order"), and which DIP Facility was funded on February 28, at which time the Debtors repaid $350 million of principal on their first lien term loans;

  c. settled their substantial litigation claims against Sinclair Inc. ("Sinclair"), certain of Sinclair's affiliates and related individuals, Bally's Corporation ("Bally's"), JPMorgan Chase Funding Inc. ("JPMCFI"), and JP Morgan Chase & Co. ("JPMC," and together with JPMCFI, "JPM") in exchange for, among other things, (i) $495 million in cash, (ii) the waiver of over $170 million of asserted claims by Sinclair, (iii) the provision of management and transition services by Sinclair, and (iv) the rejection of the Debtors' agreement with Bally's for no rejection damages and with the ability to use the Bally's name for their regional sports networks through the end of the 2024 MLB season (the "Sinclair Settlement"), which settlement was approved by the Court on March 1 [Docket No. 1849] (the "Sinclair Settlement Order"); and

  d. settled MLB's motion to compel assumption or rejection of telecast rights agreements with various MLB teams [Docket No. 1261] (the "MLB Motion to Compel") through agreement on an adequate assurance and protection package to allow the Debtors and their non-debtor joint ventures to continue to produce and broadcast certain MLB games through the 2024 MLB season, which was approved by the Court on February 12 [Docket No. 1745] (the "Adequate Assurance Order"), as well as assumption of amended agreements with affiliates of the Cleveland Guardians and Texas Rangers and entry into a new agreement with an affiliate of the Minnesota Twins that will allow the Debtors to produce and broadcast those teams' games for the 2024 MLB season, which were approved by the Court on February 9 [Docket Nos. 1720–1722] (the "Assumption Orders").

  4. Following on these critical achievements, work remains to bring the Plan to fruition. First, the Debtors must prosecute confirmation of their Plan. As noted, a hearing to consider approval of the Disclosure Statement and related solicitation procedures and materials is scheduled for April 17, 2024, and the Debtors have proposed June 18, 2024, for a hearing to consider confirmation of the Plan. Second, since executing the RSA, the Debtors have been working assiduously to implement the restructuring transactions. Among other things, the Debtors

are well down the path of separating their business operations from Sinclair and are negotiating renewed carriage agreements with their largest distribution partners, the terms of go-forward rights agreements with certain of their league and team partners, and a commitment for a new post-emergence accounts receivable financing facility.

5. In light of the foregoing, by this motion, the Debtors are requesting extensions of the Exclusivity Periods through the maximum periods permitted under section 1121 of the Bankruptcy Code. Given the overwhelming support from the Debtors' creditors and the UCC for the Plan, it is difficult to conceive of any other party filing a viable plan of its own. But the mere possibility, however remote, of other parties filing competing plans over the next few months would, at minimum, be a needless and costly distraction. The Debtors' focus is, and should remain fully, on finalizing commercial arrangements for the Debtors' go-forward business plan, separating their business from Sinclair, and prosecuting confirmation of the value-maximizing reorganization contemplated by the Plan. The requested extensions of the Exclusivity Periods will enable the Debtors to do just that, while at the same time minimizing go-forward administrative costs borne by their estates for the benefit of all parties in interest.

6. The Debtors have built substantial momentum towards a successful reorganization over the past several months, and the Debtors should be permitted to retain their exclusive right to file and solicit a chapter 11 plan to preserve and continue to build on this momentum as they embark on the Plan confirmation process. Accordingly, and for the reasons set forth below, the Debtors respectfully submit that ample cause exists to grant the Debtors' requested extensions of the Exclusivity Periods.

**Jurisdiction and Venue**

7. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the

*Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order"). The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The bases for the relief requested herein are section 1121(d) of the Bankruptcy Code, Bankruptcy Rule 9006, and Section K of the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

**Procedural Background**

10. On March 14 and 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On March 15, 2023, the Court entered an order authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"). The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On March 27, 2023, the Office of the United States Trustee for the Southern District of Texas appointed the UCC. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

**Case Background**

11.    The Filing Exclusivity Period currently expires on March 28, 2024, and the Solicitation Exclusivity Period currently expires on May 28, 2024. As discussed more fully below, in just the past few months, the Debtors have pivoted from a potential winddown of their business to pursuing a going-concern reorganization and have achieved overwhelming support for that reorganization from the Debtors' creditors and the UCC. While work remains before the Debtors can consummate the Plan, the Debtors intend to capitalize on the critical momentum they have built over the last several months to efficiently bring these chapter 11 cases to a value-maximizing close.

**I.    The Cooperation Agreement**

12.    At the time the Debtors' filed their third exclusivity extension motion in November 2023, they had been working to implement the terms of an agreement among the Debtors, an ad hoc group of first lien lenders (the "First Lien Group"), certain other significant funded debt creditors, and the UCC that contemplated the orderly winding down of the Debtors' business following the completion of the 2024 MLB season [Docket No. 1342-1] (the "Cooperation Agreement").

13.    Importantly, the Cooperation Agreement did not foreclose potential alternative transactions and instead preserved the Debtors' ability to consider opportunities that could potentially provide greater value to their estates and creditors, consistent with the Debtors' fiduciary duties. In addition, the Cooperation Agreement never became fully effective prior to its termination, as all conditions to effectiveness had not been satisfied at that time.

**II.     The RSA and the Plan**

14.     While the Debtors engaged with creditors, teams, and leagues to implement the Cooperation Agreement, an ad hoc group of creditors holding first lien, second lien, and unsecured debt claims (the "<u>Crossholder Group</u>") continued to work with the Debtors to explore restructuring alternatives premised on a reorganization of the Debtors' business as a going concern. Following the Debtors' disclosure to the Crossholder Group of discussions between the Debtors and Amazon concerning a potential commercial arrangement, the Crossholder Group and the Debtors engaged further with Amazon to explore Amazon's participation in a potential alternative to the winddown contemplated by the Cooperation Agreement.

15.     Following several months of negotiations among the Debtors, the Crossholder Group, Amazon, and the First Lien Group, the Debtors terminated the Cooperation Agreement and executed a restructuring support agreement with those parties on January 16, 2024 [Docket No. 1613]. This agreement memorialized the parties' agreements with respect to a plan of reorganization and related transactions, including (a) the provision of the $450 million DIP Facility led by the Crossholder Group, (b) Amazon's commitment to provide $115 million in exit financing pursuant to the Exit Note Commitment Letter, (c) Amazon and the Debtors' entry into a go-forward commercial arrangement pursuant to which Amazon Prime Video will become the Debtors' primary partner through which customers will be able to purchase direct-to-consumer access to stream the Debtors' local sports programming, and (d) the Debtors' agreement to obtain a new accounts receivable financing facility in connection with consummation of the Plan. In furtherance of these agreements, the Debtors filed motions seeking authorization to enter into DIP Facility [Docket No. 1659] and the Exit Note Commitment Letter [Docket No. 1655], and to pay up to an aggregate of $1,000,000 in work fees to potential providers of a new accounts receivable

financing facility to facilitate a successful financing process [Docket Nos. 1654] (the "Work Fee Motion").

16. After executing this restructuring support agreement, the Debtors and the other parties thereto engaged in extensive negotiations with the UCC, and were able to reach a comprehensive settlement with the UCC that resolved all of its potential objections to the Debtors' proposed reorganization transactions and the DIP Facility (the "UCC Settlement"). On February 26, 2024, the initial restructuring support agreement was amended pursuant to its terms to add the UCC as a party and memorialize the terms of the UCC Settlement. Pursuant to the UCC Settlement:

   a. the parties to the RSA agreed to certain treatment (including cash distributions) of General Unsecured Claims and Go-Forward Trade Claims (each as defined in the Plan) both under the Plan and in a winddown or liquidation pursuant to chapter 11, chapter 7, or otherwise;

   b. the Debtors irrevocably waived and released all preference actions against trade creditors effective as of the date of entry of the DIP Order; and

   c. the Debtors agreed to administer the claims reconciliation process and to bear all costs thereof (in both a reorganization and an orderly winddown or liquidation).

17. On February 26, 2024, the Court entered the DIP Order, the Exit Note Commitment Letter Order, and an order approving the Work Fee Motion [Docket No. 1827]. Since obtaining this relief, the Debtors have worked diligently to proceed toward confirmation by filing the Plan and Disclosure Statement on February 29, 2024, and setting a hearing for approval of the adequacy of the Disclosure Statement for April 17, 2024. The Debtors also have worked to implement their commitment to administer the claims reconciliation process in an efficient manner, including coordinating with the UCC. On March 1, 2024, the Debtors filed a motion seeking approval of proposed omnibus claims objection procedures [Docket No. 1850], and the Debtors will soon begin filing omnibus claims objections.

8

**III.     The Sinclair Settlement**

18. On January 16, 2024, after months of hard-fought litigation and mediation, the Debtors entered into the Sinclair Settlement with Sinclair, certain of Sinclair's affiliates and related individuals, Bally's, and JPM, which resolved the Debtors' substantial litigation claims against those parties as well as the Debtors' ongoing disputes with Sinclair regarding the management services agreement pursuant to which Sinclair's affiliates have historically provided management services to the Debtors. Under the Sinclair Settlement, Sinclair agreed to (a) pay the Debtors $495 million in cash, (b) waive over $85 million in asserted administrative claims and approximately $90 million in asserted prepetition claims related to the management services agreement, and (c) provide, in exchange for an agreed upon fee, ongoing management and transition services to the Debtors to facilitate their reorganization and separation from Sinclair.

19. On March 1, 2024, the Court entered the Sinclair Settlement Order, and the Debtors and Sinclair entered into an amended management services agreement, which provides for continued management services, certain transition services, and the parties' agreements regarding the process of separating the Debtors' business from Sinclair. As of the date hereof, and pursuant to and in accordance with the terms of the amended management services agreement and the Sinclair Settlement Order, the Debtors are working with Sinclair to separate their operations as efficiently as possible. Pursuant to the Sinclair Settlement Order, on March 4, 2024, Sinclair paid $50 million to the Debtors, with the $445 million balance to be paid within 60 days of entry of the Sinclair Settlement Order, subject to Sinclair's option to extend the deadline in exchange for additional cash payments.

20. In addition, upon entry of the Sinclair Settlement Order, the Debtors rejected all agreements they had with Bally's, and Bally's released and waived all claims against the Debtors,

including any claims for rejection damages. The Debtors may, however, continue to use the Bally's trade name (at no cost to Diamond) through the end of the 2024 MLB season. The Debtors are in the process of exploring alternative naming rights arrangements with potential commercial partners.

**IV.     Negotiations with League, Team, and Distribution Partners**

21.     MLB and certain teams filed the MLB Motion to Compel in October 2023. The ongoing dispute around the MLB Motion to Compel created uncertainty regarding the Debtors' ability to continue producing and broadcasting MLB games during the 2024 MLB season and to ultimately consummate a reorganization. In February 2024, after months of extensive negotiations, including in mediation, the Court entered orders approving the Debtors' settlement of the MLB Motion to Compel through (a) agreements on an adequate assurance and protection package that will allow the Debtors and their non-debtor joint ventures to continue to produce and broadcast MLB games through the 2024 MLB season and (b) assumption of amended agreements with affiliates of the Cleveland Guardians and Texas Rangers and entry into a new agreement with an affiliate of the Minnesota Twins that will allow the Debtors to produce and broadcast those teams' games for the 2024 MLB season. The settlement of the MLB Motion to Compel represents a significant achievement in these cases as resolution of the underlying disputes provided clarity and certainty to MLB and the relevant teams, the Debtors, and all stakeholders with respect to the Debtors' continued carriage of those teams' games through the end of the 2024 MLB season.

22.     In addition, while the Debtors previously successfully reached agreements with the NBA, the NHL, Comcast, and Charter, those agreements were premised on the baseline business plan contemplated under the Cooperation Agreement. Now that the Debtors have pivoted to a reorganization, the Debtors are engaged with the NBA, the NHL, and their larger MVPD partners,

including DIRECTV, Comcast, Charter, and Cox, on their go-forward arrangements in connection with the reorganization contemplated by the Plan.

## V. Next Steps

23. As described above, the Debtors have secured the support of substantially all of their funded debt creditors and the UCC on the resolution of these chapter 11 cases pursuant to the Plan. Nevertheless, work remains to implement the Plan, including prosecuting confirmation of the Plan. Moreover, the Debtors' management team and advisors are focused on workstreams related to separating their business operations from Sinclair, renewing carriage agreements with their distribution partners, negotiating the terms of go-forward rights agreements with certain of their league and team partners, implementing the commercial arrangement between the Debtors and Amazon, obtaining commitments for a new accounts receivable financing facility, negotiating naming rights arrangements with potential commercial partners, and reconciling claims to ensure prompt distributions to general unsecured creditors following emergence. And while the Debtors have made meaningful progress on these workstreams, their efforts are not yet complete, and they should not be derailed by the cost, distraction, and uncertainty that would result if a competing plan were filed. The Debtors therefore request an extension of the Filing Exclusivity Period through and including September 16, 2024, and an extension of the Solicitation Exclusivity Period through and including November 14, 2024.

## Basis for Relief

24. Section 1121(b) of the Bankruptcy Code provides a debtor with an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to file a chapter 11 plan and an additional 60-day period during which only a debtor may solicit votes for a plan. 11 U.S.C. § 1121(b), (c)(3). The Court has previously extended the Debtors' Filing Exclusivity Period and Solicitation Exclusivity Period three times, and those

periods currently expire on March 28, 2024 and May 28, 2024, respectively. By this motion, the Debtors seek a fourth extension of the Exclusivity Periods, through and including September 16, 2024, for the Filing Exclusivity Period and through and including November 14, 2024, for the Solicitation Exclusivity Period.

25. Section 1121(d) of the Bankruptcy Code permits a bankruptcy court to extend a debtor's filing exclusivity period and solicitation exclusivity period for "cause" for a maximum period of 18 months and 20 months, respectively, from the debtor's petition date. 11 U.S.C. § 1121(d). Although the Bankruptcy Code does not define "cause," such term should be viewed flexibly in this context "to allow the debtor to reach an agreement." H.R. Rep. No. 95, 95th Cong., 1st Sess. 232 (1997); *see also In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987) (noting that the meaning of "cause" under section 1121 should be viewed in the context of the Bankruptcy Code's goal of fostering reorganization).

26. Courts often consider the following factors in determining whether "cause" exists to extend a debtor's exclusivity periods:

    a. the size and complexity of the debtor's case;

    b. whether the debtor has made progress in negotiations with its creditors;

    c. the existence of good faith progress towards reorganization;

    d. the need for sufficient time to permit the debtor to negotiate a chapter 11 plan and prepare adequate information;

    e. whether the debtor has demonstrated reasonable prospects for filing a viable plan;

    f. the amount of time that has elapsed in the case;

    g. whether the debtor is seeking an extension of exclusivity to pressure creditors to submit to the debtor's reorganization demands;

    h. the fact that the debtor is paying its bills as they become due; and

    i. whether an unresolved contingency exists.

*See, e.g.*, *In re New Millennium Mgmt., LLC*, No. 13-35719, 2014 WL 792115, at *6 (Bankr. S.D. Tex. Feb. 25, 2014) (identifying factors to consider in determining whether cause exists to extend exclusivity); *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) (noting the nine factors listed above "have been identified by courts as being relevant in determining whether 'cause' exists").

27. Courts are afforded broad discretion to assess these factors and to consider a relevant subset to determine whether cause exists to grant an exclusivity extension in a particular chapter 11 case. *See, e.g.*, *Express One Int'l*, 194 B.R. at 100 (identifying four of the factors as relevant in determining whether "cause" existed to extend exclusivity); *In re Hoffinger Indus., Inc.*, 292 B.R. 639, 644 ("It is within the discretion of the bankruptcy court to decide which factors are relevant and give the appropriate weight to each."). For example, both Congress and the courts have recognized that the size and complexity of a debtor's case alone may constitute cause to extend a debtor's exclusive periods to file a plan and solicit acceptances. H.R. No. 95-595, at 231–232, 406 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6191 ("[I]f an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement."); *see also In re Texaco Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) ("The large size of the debtor and the consequent difficulty in formulating a plan of reorganization for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusivity periods.").

28. Based on a weighing of the relevant factors, the Debtors submit that sufficient "cause" exists under section 1121(d) of the Bankruptcy Code to further extend the Exclusivity Periods as requested herein:

- **The Debtors' Chapter 11 Cases Are Large and Complex**. The indisputable size and complexity of these cases are sufficient to warrant the requested extension. The

Debtors and others in the cable industry are navigating seismic shifts due to significant cord-cutting and changing consumer preferences resulting in declining revenues while the Debtors remain committed to substantial rights fees to team and league partners. As of the Petition Date, the Debtors, together with their non-debtor subsidiaries, operated 19 regional sports networks throughout the United States that produced over 4,500 live professional sports telecasts each year. The Debtors also commenced these cases with approximately $9 billion in aggregate principal amount of funded debt obligations outstanding. Furthermore, the Debtors have an array of active stakeholders, including the UCC, multiple ad hoc creditor groups, Sinclair, league and team partners, and MVPDs, in addition to their other contract counterparties, customers, and vendors, each of which have their own interests and views regarding the Debtors' chapter 11 cases, go-forward business structure, and the terms of a value-maximizing chapter 11 plan. The size and complexity of the Debtors' capital structure and the wide range of interrelated business issues requiring input and consensus from a broad array of parties alone justify the requested extension of the Exclusivity Periods.

- **The Debtors Have Made Significant Progress in Good-Faith Negotiations With Their Creditors and Administering These Chapter 11 Cases**. The Debtors have made significant progress with their creditors and in administering these chapter 11 cases. As described above, the Debtors have reached agreement on the terms of the Plan with holders of over 94% of first lien claims, over 95% of second lien claims, 96% of unsecured notes claims, and the UCC, as memorialized in the RSA. The Debtors have also filed the Plan and Disclosure Statement, which implement the terms of the RSA, and are proceeding expeditiously toward confirmation. In addition, after months of mediation and after defeating Sinclair's motion to compel assumption or rejection of the management services agreement at a hearing before the Court on December 15, 2023, the Debtors have reached a comprehensive settlement of their substantial litigation claims against Sinclair, Bally's, JPM, and others, and have entered into an amended management services agreement with Sinclair that will allow the Debtors to transition their operations to be independent from Sinclair. The Debtors have made critical progress on their separation efforts since the Sinclair Settlement was reached. The Debtors have also reached a series of agreements with MLB and certain baseball clubs to resolve the MLB Motion to Compel, which were approved by the Court pursuant to the Adequate Assurance Order and the Assumption Orders. Finally, the Debtors have been actively engaged with the NBA, the NHL, and their MVPD partners on their go-forward arrangements in connection with the reorganization contemplated by the Plan.

- **The Debtors Require Additional Time to Negotiate and Resolve Open Issues with Stakeholders and Implement the Plan**. While the RSA, the UCC Settlement, and the Sinclair Settlement, among other agreements, resolve a substantial number of issues, the Debtors require additional time to resolve open business issues and prosecute confirmation of the Plan. As noted above, the Debtors are actively engaged in ongoing discussions with certain of their league and team partners on the terms of their go-forward agreements, and with their

14

distribution partners on the terms of renewals of their carriage agreements. The Debtors also have substantial work to complete in separating their business from Sinclair, implementing the commercial arrangement between the Debtors and Amazon, obtaining commitments for a new accounts receivable financing facility, and negotiating naming rights arrangements with potential commercial partners. Each of these efforts requires a substantial amount of time and focus by the Debtors and their stakeholders, and each of these workstreams would be delayed by the distraction of competing plans.

- **The Debtors Have Filed a Viable Plan**. The Debtors filed the Plan on February 29, 2024, which has the support of over 94% of first lien claims, over 95% of second lien claims, 96% of unsecured notes claims, and the UCC. This overwhelming support demonstrates that the Plan is viable and confirmable, and the Debtors are proceeding toward confirmation expeditiously. The Plan is the culmination of tremendous efforts by the Debtors and their stakeholders both before and during these chapter 11 cases, and is the best option available to maximize the value of the estates.

- **An Extension of the Exclusivity Periods Will Not Prejudice Creditors**. Continued exclusivity will permit the Debtors and other key stakeholders to focus on prosecuting confirmation of the Plan without the distraction of competing plans or the costs of seeking additional extensions prior to confirmation or consummation of the Plan. Being diverted from that path by plans from third parties would be wasteful, result in uncertainty to the detriment of all stakeholders, and materially increase the administrative expenses of these cases. Importantly, creditors will not be prejudiced by the requested extension, including in the event that the RSA is terminated, because all parties in interest will retain their rights to seek termination of the Debtors' Exclusivity Periods for cause. The Debtors will continue to communicate regularly and transparently with their stakeholders on the Debtors' progress during the Exclusivity Periods as they proceed toward confirmation of the Plan and carry out their business plan. Additionally, and as noted below, the Debtors are paying their bills as they come due and are projected to have sufficient liquidity to operate their business and pay rights fees during the requested extension of the Exclusivity Periods. The Debtors therefore believe that the requested extensions of the Exclusivity Periods will benefit the Debtors' estates and their creditors and will not prejudice creditors in any way.

- **The Debtors Are Not Pressuring Creditors By Requesting an Extension of the Exclusivity Periods**. The Debtors are not seeking an extension of the Exclusivity Periods to pressure or prejudice any of their stakeholders. Rather, the Debtors are seeking to extend exclusivity to preserve the progress made to date, to build upon that progress by continuing to negotiate with their league, team, and distribution partners, among others, and to minimize administrative costs while the Debtors and stakeholders focus on implementing the Plan on the timeline set forth in the RSA.

- **The Debtors Are Paying Their Bills as They Come Due**. The Debtors are paying their postpetition debts in the ordinary course of business or as otherwise provided

by Court order. The Debtors' provision of adequate assurance to MLB and certain teams further demonstrates the Debtors' ability to continue paying their debts as they come due. The Debtors continue to monitor their liquidity closely and believe that sufficient funding will be available during the requested extension of the Exclusivity Periods, particularly given the liquidity enhancement provided by the DIP Facility.

29. An objective analysis of the relevant factors demonstrates that the Debtors are working diligently and effectively to bring these chapter 11 cases to a successful conclusion for the benefit of all stakeholders. Accordingly, the Debtors respectfully submit that sufficient cause exists to extend the Exclusivity Periods as requested herein.

### Notice

30. The Debtors will provide notice of this motion to (a) the parties on the Master Service List available on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG and (b) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the proposed order, substantially in the form attached hereto, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

March 25, 2024

Respectfully submitted,

*/s/ John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Bryan L. Rochelle (TX Bar No. 24107979)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
brochelle@porterhedges.com

- and -

| | |
|---|---|
| **WILMER CUTLER PICKERING HALE AND DORR LLP** | **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP** |
| Andrew Goldman (admitted *pro hac vice*) | Brian S. Hermann (admitted *pro hac vice*) |
| Benjamin Loveland (admitted *pro hac vice*) | Andrew M. Parlen (admitted *pro hac vice*) |
| 250 Greenwich Street | Joseph M. Graham (admitted *pro hac vice*) |
| New York, New York 10007 | Alice Nofzinger (admitted *pro hac vice*) |
| Telephone: (212) 230-8800 | 1285 Avenue of the Americas |
| Facsimile: (212) 230-8888 | New York, New York 10019 |
| andrew.goldman@wilmerhale.com | Telephone: (212) 373-3000 |
| benjamin.loveland@wilmerhale.com | Facsimile: (212) 757-3990 |
| | bhermann@paulweiss.com |
| | aparlen@paulweiss.com |
| | jgraham@paulweiss.com |
| | anofzinger@paulweiss.com |
| *Section 327(e) Counsel to the Debtors and Debtors in Possession* | *Counsel to the Debtors and Debtors in Possession* |

17

**Certificate of Service**

      I certify that on March 25, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                  */s/ John F. Higgins*
                                                  John F. Higgins