**Exhibit B**

**Changed Pages Only Redline**

**Solicitation Version**

> ~~This Disclosure Statement is being submitted for approval but has not yet been approved by the Bankruptcy Court.  This is not a solicitation of acceptance or rejection of the plan.  Acceptances or rejections may not be solicited until a disclosure statement has been approved by the Bankruptcy Court.  The information in this Disclosure Statement is subject to change.  This Disclosure Statement is not an offer to sell any Securities and is not soliciting an offer to buy any Securities.~~

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) Case No. 23-90116 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DISCLOSURE STATEMENT FOR
THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

---

[1]   A complete list of each of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG.  The Debtors' service address for purposes of the Chapter 11 Cases is:  c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

| | |
|---|---|
| **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**<br>Brian S. Hermann (admitted *pro hac vice*)<br>Andrew M. Parlen (admitted *pro hac vice*)<br>Joseph M. Graham (admitted *pro hac vice*)<br>Alice Nofzinger (admitted *pro hac vice*)<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Telephone: (212) 373-3000<br>Facsimile: (212) 757-3990<br><br>*Counsel to the Debtors and Debtors in Possession* | **PORTER HEDGES LLP**<br>John F. Higgins (TX Bar No. 09597500)<br>M. Shane Johnson (TX Bar No. 24083263)<br>Megan Young-John (TX Bar No. 24088700)<br>Bryan L. Rochelle (TX Bar No. 24107979)<br>1000 Main St., 36th Floor<br>Houston, Texas 77002<br>Telephone: (713) 226-6000<br>Facsimile: (713) 226-6248 |

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Andrew N. Goldman (admitted *pro hac vice*)
Benjamin W. Loveland (admitted *pro hac vice*)
Lauren R. Lifland (admitted *pro hac vice*)
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

*Section 327(e) Counsel to the Debtors and Debtors in Possession*

Dated:  April ~~16~~17, 2024

i

| RECOMMENDATION BY THE DSG BOARD |
|---|
| The Board of Managers (the "**DSG Board**") of Diamond Sports Group, LLC ("**DSG**") and the board of directors, managers, members, or partners, as applicable, of each of its affiliated debtors and debtors in possession (collectively, the "**Debtors**" or "**Diamond**") have approved the transactions contemplated by the Plan² and recommend that all holders ("**Holders**") of Claims whose votes are being solicited submit ballots ("**Ballots**") to **accept** the Plan.<br><br>As of the date hereof, Holders of over 94% of the First Lien Claims, over 95% of the Second Lien Claims, and 96% of the Unsecured Notes Claims have already agreed, subject to the terms and conditions of the RSA, to vote in favor of the Plan.<br><br>**RECOMMENDATION BY THE UCC**<br><br>The UCC is a party to the RSA, supports confirmation of the Plan, and recommends that all Holders of unsecured claims in the Voting Classes vote to **accept** the Plan. |
| **The deadline to vote to accept or reject the Plan is 4:00 p.m. (prevailing Central Time) on May 22, 2024 (the "*Voting Deadline*").  The record date for determining which Holders of Claims may vote on the Plan is April 15, 2024 (the "*Record Date*").** |

DISCLOSURE STATEMENT

SOLICITATION OF VOTES ON
THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION
FROM HOLDERS OF CLAIMS IN THE FOLLOWING CLASSES:

| Voting Class | Name of Class Under the Plan |
|---|---|
| Class 3 | **First Lien Claims** |
| Class 4 | **Junior Funded Debt Claims** |
| Class 6 | **General Unsecured Claims** |

**April ~~16~~17, 2024**

---

² Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meanings ascribed to such terms in the Plan (as defined below).  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

i

# TABLE OF CONTENTS

Page

ARTICLE I. INTRODUCTION ............................................................................................................1
    A.    Development of the Plan ..............................................................................................2
    B.    Plan Overview ..............................................................................................................5
    C.    Entitlement to Vote; Estimated Recoveries Under the Plan ........................................8
    D.    Recommendation .........................................................................................................9

ARTICLE II. OVERVIEW OF THE DEBTORS' OPERATIONS ....................................................10
    A.    The Debtors' History .................................................................................................10
    B.    The Debtors' Business ...............................................................................................12
    C.    Management and Operation of the Debtors' Business ..............................................17
    D.    Prepetition Capital Structure ......................................................................................19

ARTICLE III. KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES ....22
    A.    Challenges Facing the Debtors' Business ..................................................................22
    B.    March 2022 Transactions ...........................................................................................24
    C.    Retention of Professionals ..........................................................................................24
    D.    Prepetition Engagement with Creditors, Sinclair, and the Leagues ..........................25
    E.    Negotiations Regarding the Initial RSA ....................................................................26
    F.    Negotiations Regarding the Use of Cash Collateral ..................................................26

ARTICLE IV. THE CHAPTER 11 CASES .......................................................................................27
    A.    Commencement of the Chapter 11 Cases ..................................................................27
    B.    Plan Exclusivity .........................................................................................................31
    C.    Investigation and Pursuit of Estate Causes of Action by the Debtors; Sinclair Disputes ......................................................................................................................32
    D.    Addressing Issues with Teams, Leagues, and MVPDs .............................................37
    E.    Plan Development and RSA .......................................................................................45

ARTICLE V. SUMMARY OF PLAN ................................................................................................58
    A.    Administrative and Priority Claims ...........................................................................58
    B.    Classification, Treatment, and Voting of Claims and Interests .................................62
    C.    Means for Implementation of the Plan ...................................................................~~70~~**71**
    D.    Settlement, Release, Injunction, and Related Provisions ..........................................91
    E.    Conditions Precedent to the Effective Date ...............................................................99

ARTICLE VI. VOTING PROCEDURES AND REQUIREMENTS ........................................................ 102
    A.    Voting Instructions and Voting Deadline ........................................................ 102
    B.    Voting Procedures ........................................................ 103
    C.    Parties Entitled to Vote ........................................................ 104
    D.    Ballots ........................................................ 104
    E.    Fiduciaries and Other Representatives ........................................................ 105
    F.    Agreements upon Furnishing Ballots ........................................................ 105
    G.    Change of Vote ........................................................ 105
    H.    Waivers of Defects, Irregularities, etc. ........................................................ 105
    I.    Miscellaneous ........................................................ 106

ARTICLE VII. CONFIRMATION OF THE PLAN ........................................................ 106
    A.    Confirmation Hearing ........................................................ 106
    B.    Objections to Confirmation ........................................................ 106
    C.    Requirements for Confirmation of the Plan ........................................................ ~~109~~**110**

ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ........................................................ 120
    A.    Certain Bankruptcy Law Considerations ........................................................ 120
    B.    Risks Relating to Recoveries Under the Plan and the Reorganized Debtors' Business ........................................................ 125
    C.    Factors Relating to Securities and Certain Other Debt to Be Issued Under the Plan Generally ........................................................ 135
    D.    Additional Factors ........................................................ 139

ARTICLE IX. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS ........................................................ 140
    A.    1145 Securities ........................................................ 140
    B.    Private Placement Securities ........................................................ ~~142~~**143**

ARTICLE X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................................................ 145
    A.    U.S. Federal Income Tax Consequences to the Debtors ........................................................ 147
    B.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Certain Allowed Claims ........................................................ ~~147~~**148**
    C.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims ........................................................ ~~156~~**157**
    D.    Certain U.S. Federal Income Tax Consequences of the Litigation Trust and Holders of Litigation Trust Interests ........................................................ ~~159~~**160**
    E.    FATCA ........................................................ 162
    F.    Information Reporting and Withholding on Distributions ........................................................ ~~162~~**163**

# ARTICLE I.
# INTRODUCTION[3]

The Debtors submit this Disclosure Statement in connection with the solicitation of votes on the *Debtors' Joint Chapter 11 Plan of Reorganization*, dated April ~~16~~17, 2024 (as may be amended, restated, modified, or supplemented from time to time, the "***Plan***"), a copy of which is attached hereto as **Exhibit A**. The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") on March 14 and 15, 2023 (the "***Petition Date***"). The Debtors' chapter 11 cases (the "***Chapter 11 Cases***") are jointly administered under Case No. 23-90116 (CML).

The Plan is the result of months of negotiations among Diamond, an ad hoc group of first lien lenders represented by Kramer Levin Naftalis & Frankel LLP and Centerview Partners LLC (the "***First Lien Group***"), an ad hoc group of secured lenders represented by Gibson Dunn & Crutcher LLP and Evercore Inc. (the "***Second Lien Group***"), an ad hoc group of crossholders of secured and unsecured debt represented by Paul Hastings LLP and PJT Partners, Inc. (the "***Crossholder Group***," and, together with the First Lien Group and the Second Lien Group, the "***Ad Hoc Groups***"), Amazon.com Services LLC ("***Amazon***" or the "***Strategic Investor***"), the official committee of unsecured creditors (the "***UCC***"), Diamond's commercial counterparties, and other parties in interest.[4] These negotiations, the precursor of which began well before the Petition Date, ultimately were aided by Judge Marvin Isgur (the "***Mediator***"),[5] and reflected the rapidly changing nature of Diamond's business and the televised sports industry more generally, as discussed below.

The Plan contemplates the elimination of more than $8.5 billion of Diamond's funded debt, the separation of Diamond from its parent company, Sinclair Broadcast Group, Inc. ("***SBG***"),[6] the distribution of reorganized equity to certain of Diamond's existing funded debt creditors in exchange for their debt, and a minority investment by Amazon in reorganized Diamond. Diamond also will enter into a go-forward commercial arrangement with Amazon pursuant to which Amazon Prime Video will become the Debtors' primary partner through which customers will be able to purchase direct-to-consumer access to stream the Debtors' local sports programming (the "***Amazon Commercial Agreement***"). This arrangement will make the Debtors' content available for purchase on a direct-to-consumer basis to many more fans

---

[3] Capitalized terms used but not otherwise defined in this Article I will have the meanings ascribed to such terms elsewhere in this Disclosure Statement or in the Plan, as applicable.

[4] While not all of these parties have committed to supporting the Plan, the negotiations with each of these parties were necessary predicates to the Debtors' formulation of the Plan.

[5] As discussed below, both Judge Isgur and Judge Jones were appointed as co-mediators in the Chapter 11 Cases, but Judge Jones ceased his role as mediator upon the announcement of his resignation from the bench on October 15, 2023.

[6] Pursuant to the internal reorganization described in Article IV.C.1 below, Sinclair Broadcast Group, Inc. was converted to a limited liability company and renamed Sinclair Broadcast Group, LLC. As used herein, the term "SBG" refers to Sinclair Broadcast Group, Inc. before the internal reorganization and Sinclair Broadcast Group, LLC after the internal reorganization.

necessary costs of preserving their estates, including only the "reasonable value" of what they receive under these agreements.

Only days after entering into the contractual grace periods under the respective agreements with the Guardians, Twins, and Rangers, MLB and those clubs (as well as the Diamondbacks) filed a series of motions to compel the Debtors to make payment to these teams at the contract rates set forth in their telecast rights agreements [Docket Nos. 280, 303, 370] (collectively, the "**Motions to Compel Payment**"). The Debtors objected and urged the Bankruptcy Court to afford the Debtors the chance to utilize the "breathing spell" of the automatic stay to make decisions about their portfolio of executory contracts and only to pay the "reasonable value" of the rights they are receiving (rather than the contract amount) in the interim pending the Debtors' determination [Docket No. 409]. The parties conducted extensive discovery in connection with the Motions to Compel Payment, including the Debtors' presenting expert evidence with respect to the reasonable value of the rights they received under such rights agreements. After a contested evidentiary hearing held on May 31 and June 1, 2023, the Bankruptcy Court granted the Motions to Compel Payment and ruled that the Debtors were not entitled to an adjustment of the contract rate during the pendency of the Chapter 11 Cases and that the Debtors were obligated to pay the full rights fees due under their telecast rights agreements pending assumption or rejection of the agreements [Docket No. 819]. The Bankruptcy Court declined to compel the Debtors to immediately assume or reject their telecast rights agreements with MLB and its clubs. At a hearing on June 9, 2023, the Bankruptcy Court denied the Debtors' motion [Docket No. 838] seeking clarification of the order and noted that all parties' rights regarding any future assumption or rejection of the telecast rights agreements and the treatment of any payments made before rejection are reserved.

    b.  The Debtors' Decision to Cease Funding RSNCO LLC **and the Padres Settlement**

Debtor Diamond San Diego Holdings, LLC ("**Diamond San Diego**") holds a majority interest in the joint venture SoCal Sports Net LLC ("**SoCal Sports**"), which it co-owns with Padre Time, LLC **("*Padre Time*")**. As of the Petition Date, RSNCO LLC ("**RSNCO**"), which is wholly-owned by SoCal Sports and operated as the Bally Sports San Diego RSN, had a telecast rights agreement with Padres L.P. (the "**Padres**") that provided RSNCO with the exclusive rights to broadcast games of the San Diego Padres.

RSNCO was unable to generate sufficient revenue to independently support the rights fee payments under its telecast rights agreement with the Padres and to pay other operating expenses. The Debtors therefore had, when necessary, funded RSNCO to make up for the deficiency, including by extending $20.5 million in aggregate principal amount of loans to RSNCO during the 2022 MLB season (the "**RSNCO Loans**").

Prior to a rights payment due in late May 2023, it became clear that RSNCO would have insufficient cash to make that rights payment and would require the Debtors to fund RSNCO to make such payment. The Debtors, in their reasonable business judgment, made the decision to cease funding this money-losing joint venture, and after RSNCO failed to make its telecast rights

39

payment by the end of the contractual grace period, the Padres terminated the telecast rights agreement on May 30, 2023.

The Padres initiated an arbitration against RSNCO, alleging that RSNCO had breached the telecast rights agreement and seeking damages. The parties then entered into an arm's-length mediation, ultimately reaching a settlement of all issues among them, including claims relating to the RSNCO Loans, and agreed to a process for an orderly wind-down of RSNCO. On April 15, 2024, Diamond San Diego, SoCal Sports, the Padres, Padre Time, and RSNCO executed various agreements documenting this settlement, pursuant to which the parties agreed to grant mutual releases of all claims related to the Bally Sports San Diego RSN and on the dissolution of RSNCO after the monetization of its remaining assets and a payment waterfall that provides for distribution of RSNCO's remaining assets to its stakeholders, including Diamond San Diego and the Padres. On April 16, 2024, the Debtors filed a motion seeking authorization for Diamond San Diego to enter into and perform its obligations under this settlement [Docket No. 1971], which motion remains pending as of the date of this Disclosure Statement. ~~As of the date hereof, Diamond San Diego has reached an agreement in principle with the relevant parties concerning the resolution of potential claims among Diamond San Diego, RSNCO, SoCal Sports, and the Padres, including claims relating to the RSNCO Loans. As part of this agreement in principle, Diamond San Diego and Padre Time, L.P. will cooperate to facilitate the orderly winding-up and dissolution of RSNCO, the settlement and payment of third-party creditor claims, and the distribution of RSNCO's remaining assets to the Padres and Diamond San Diego on account of their claims against RSNCO. The parties will grant mutual, general releases as part of the settlement.~~

        c.        The Debtors' Motion to Reject the Diamondbacks Agreement

As of the Petition Date, Debtor Diamond Sports Net Arizona, LLC ("**Diamond Arizona**") was party to a telecast rights agreement with the Diamondbacks under which Diamond Arizona had the exclusive right to telecast all local Diamondbacks games. Unfortunately, the Debtors were losing significant sums on their agreement with the Diamondbacks since prior to the Petition Date and the rights fee payments thereunder would only increase on a year-to-year basis through 2035.

As described above, the Bankruptcy Court granted the Motions to Compel Payment filed by the Clubs, including the Diamondbacks, and ordered that the Debtors were obligated to pay the full rights fees due under their telecast rights agreements. In light of the Bankruptcy Court's order to compel payment at the contract rate, and the unprofitability of their agreement with the Diamondbacks, the Debtors, in their reasonable business judgment and in consultation with the advisors to the Ad Hoc Groups and the UCC, determined that it would be in the best interest of the estates to reject the agreement with the Diamondbacks ahead of a rights fee payment due on July 1, 2023, to ensure no additional losses were incurred in connection with this contract. As a result, the Debtors filed a rejection motion on June 22, 2023 [Docket No. 921].

Diamond Arizona and the Diamondbacks then engaged in discussions regarding potential amendments to the rights agreement that would make it more economical and fit within the Debtors' go-forward business strategy. Due to these discussions, the Debtors and the Diamondbacks agreed to keep the telecast rights agreement in place until July 17, 2023, to give

Dated:    April ~~16~~<ins>17</ins>, 2024        **DIAMOND SPORTS GROUP, LLC** (for itself and on behalf of each of its subsidiary debtors as debtors and debtors in possession)

By: */s/ David Preschlack*
   Name:  David Preschlack
   Title:   Chief Executive Officer

[*Signature Page to the Disclosure Statement*]

**Exhibit A**

**Debtors' Joint Chapter 11 Plan of Reorganization**

[Filed at Docket No. 1968-1]

**Exhibit B**

**RSA**

[Filed at Docket No. 1829-1]