# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) Case No. 23-90116 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AMENDING THE FINAL DIP ORDER

> **Emergency relief has been requested. Relief is requested not later than 2:00 p.m. (prevailing Central Time) on September 3, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on September 3, 2024, at 2:00 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

**Relief Requested**

1. The Debtors seek entry of an order, substantially in the form attached hereto (the "DIP Amendment Order"), amending the order approving the Debtors' debtor-in-possession financing facility [Docket No. 1834] (the "Existing DIP Order").[2] In support of this motion, the Debtors submit the declaration of Zul Jamal (the "Jamal Declaration"), filed contemporaneously herewith.

**Preliminary Statement**

2. The Debtors have worked tirelessly over the last several months to secure new go-forward agreements with their key commercial counterparties, which agreements are expected to form the backbone of a business plan supporting their reorganization as a going concern. The Debtors have had great success in these efforts, locking in renewed carriage deals with their largest distribution partners that will ensure a steady stream of revenue to support their ongoing business operations. Moreover, contemporaneously herewith, the Debtors have filed motions to enter into term sheets with the National Basketball Association ("NBA") and the National Hockey League ("NHL") that will modify the Debtors' existing agreements with the teams in both leagues and provide certainty to the Debtors, their creditors, and both leagues on the go-forward relationships among the parties. The Debtors are optimistic that these recent achievements will provide the basis for a confirmable going-concern plan of reorganization.

3. Notwithstanding these recent successes, the Debtors must address other matters as part of completing their business and reorganization plans, including, among other things, finalizing their new naming rights agreement and raising additional capital through a new accounts

---

[2] Capitalized terms used but not otherwise defined in this motion have the meanings ascribed to them in the DIP Amendment Order or the Existing DIP Order, as applicable.

receivable financing facility. The Debtors' achievements to date also have required the Debtors to revise their projections based on the outcome of their various negotiations.

4. The Existing DIP Order provides the Debtors' first lien lenders with a right to terminate the Debtors' consensual use of cash collateral if the Debtors do not obtain confirmation of a chapter 11 plan by August 5, 2024. Due to various factors, the Debtors were unable to confirm a chapter 11 plan by that milestone. Moreover, the Debtors' go-forward distribution revenue and rights profile had been updated to reflect the deals they had reached with various stakeholders and were different than those used in the financial projections used at the time the Debtors had reached the agreements memorialized in the Existing DIP Order, the RSA,[3] and other related documents in January 2024. As a result, the first lien lenders required certain amendments to the Existing DIP Order in return for their consent to the Debtors' continued use of cash collateral in pursuit of a going-concern reorganization, including their support for the Debtors' entry into the term sheets with the NBA and the NHL. In connection with any going-concern reorganization, the Debtors' first lien lenders also have indicated that, in light of the necessary modifications to the Debtors' business plan, they will no longer consent to the plan treatment provided for in the parties' existing RSA (namely, the receipt of $200 million in take back debt) and are instead requiring any treatment on account of their claims to provide for payment in full in cash up to agreed-upon claims caps.

5. The Debtors, the DIP lenders, and the first lien lenders therefore have engaged in good faith, arm's length negotiations to address the missed milestone and provide the Debtors with sufficient time to explore all reorganization and business plan opportunities. The parties have

---

[3]  "RSA" refers to that certain *Amended and Restated Restructuring Support Agreement*, dated as of February 26, 2024 (as subsequently amended by that certain *First Amendment to Amended and Restated Restructuring Support Agreement*, dated as of June 6, 2024), by and among the Debtors, certain holders of the Debtors' prepetition funded indebtedness, Amazon.com Services LLC, and the official committee of unsecured creditors, a copy of which was filed with the Court [Docket No. 1829-1].

successfully reached agreement on amendments to the Existing DIP Order that, among other things, give the Debtors additional time to pursue a reorganization plan, allow them to provide the NBA and the NHL with adequate assurance packages that are necessary parts of the Debtors' go-forward agreements with those leagues, and provide the first lien lenders with greater certainty around repayment in full in cash up to agreed-upon claims caps, all as more fully described herein.

6. These agreements are memorialized in the DIP Amendment Order, which provides that if the Debtors (a) continue to pursue a going-concern reorganization and have not pivoted to a wind down by October 1, 2024, and (b) have not consummated a chapter 11 plan that provides first lien lenders with repayment in full in cash up to agreed-upon claims caps by November 15, 2024, then the Debtors will make an additional cash paydown to their first lien lenders on November 18, 2024 (the "<u>Additional First Lien Paydown</u>").[4]  After taking into account the initial $350 million paydown made upon the closing of the DIP Facility and the crediting of certain adequate protection payments in accordance with the DIP Amendment Order, the Additional First Lien Paydown will provide first lien lenders with a cash recovery equal to a $637 million wind down claims cap (which is the same amount as set forth in the Existing DIP Order), with the estimated payment equaling approximately $215 million.  The parties have also agreed that if the Debtors later pivot to a wind down, the first lien lenders will similarly be entitled to payment of the Additional First Lien Paydown.  If the Debtors do not wind down and instead emerge as a going concern, the claims of the first lien lenders will be capped at $647 million[5] (after taking into account the initial $350 million paydown, the Additional First Lien Paydown, and any crediting

---

[4] The DIP Amendment Order also provides for adjustments to the crediting of adequate protection payments to the principal outstanding on the first lien claims and the payment of certain advisor fees, as more fully described herein and as set forth more fully in the DIP Amendment Order.

[5] For avoidance of doubt, in this scenario, the first lien lenders will continue to receive adequate protection payments after November 15, 2024, as contemplated in the DIP Amendment Order.

4

of adequate protection payments), which is a $15 million reduction from the cap contained in the Existing DIP Order.  The Debtors would use cash from the $495 million Sinclair settlement to make any Additional First Lien Paydown.

7. The Debtors' majority DIP lenders and first lien lenders have consented to an amendment to the Existing DIP Order on the terms set forth in the DIP Amendment Order.  The Debtors have also previewed the relief sought in the DIP Amendment Order with their other key stakeholders in these cases, including the official committee of unsecured creditors, the NBA, the NHL, and Major League Baseball ("MLB").  The Debtors continue to discuss the DIP Amendment Order with their stakeholders at this time.

8. The Debtors believe that approval of the DIP Amendment Order is justified by the facts and circumstances of these chapter 11 cases and is in the best interests of their estates.  The Debtors therefore respectfully request that the Court grant the relief requested herein and enter the DIP Amendment Order.

**Jurisdiction and Venue**

9. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order").  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11. The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6004, and 9014, and Rules 2002-1, 4001-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules").

## Background

### A. The Existing DIP Order and RSA

12. On February 26, 2024, the Court entered the Existing DIP Order, which remains in effect as of the filing of this motion. The DIP Facility approved pursuant to the Existing DIP Order is a critical component of the going-concern reorganization contemplated by the RSA. The RSA represented a significant achievement in these chapter 11 cases by providing a framework for a going-concern reorganization and an alternative away from a previously contemplated orderly wind down of the Debtors' operations.

13. As a condition to their first lien lenders' support for the going-concern reorganization contemplated by the RSA, the Debtors agreed to make distributions for the first lien lenders up to $662 million, inclusive of (a) the payment of $350 million of the DIP Facility proceeds to partially repay their first lien lenders' claims, (b) the payment of adequate protection payments made after October 2, 2023, (c) the issuance of $200 million in take back term loans, and (d) the distribution of cash on the plan effective date up to a going-concern claims cap.

14. The first lien lenders' support for the going-concern reorganization contemplated by the RSA—and the issuance of take back term loans to them in connection therewith—was predicated on a business plan that assumed the Debtors would reach certain agreements on the terms of go-forward commercial arrangements with their distribution and professional sports

6

league and team partners in time to confirm a plan of reorganization by June 30, 2024, which milestone was later extended to August 5, 2024.[6]

### B. The Additional First Lien Paydown

15. Following the execution of the RSA, the Debtors made significant progress in advancing negotiations with their key commercial counterparties, including by securing renewed carriage deals with their material multichannel video programming distribution partners—DirecTV LLC, Charter Communications, and Comcast Corporation. But due to various delays, including around the timing of their negotiations with Comcast, the Debtors had not finalized, among other things, go-forward commercial arrangements with the NBA, the NHL, and the teams in those leagues before their plan confirmation milestone of August 5, 2024. As a result, the Debtors were unable to proceed to confirmation of their plan at that time. Moreover, the Debtors' business plan projections have evolved over the course of their negotiations with their distribution, team, and league partners as they locked in new go-forward arrangements.

16. The Debtors have continued to engage with their first lien lenders and DIP lenders regarding the status of the business plan negotiations. In light of the extended timeline of these chapter 11 cases and the fact that the Debtors' projections are different than the projections that formed the basis of the RSA and the first lien lenders' agreement to accept take back debt, the first lien lenders informed the Debtors that they would no longer accept take back term loans as a form of recovery for their remaining first lien claims. The Debtors and the DIP lenders then engaged in good faith negotiations with the first lien lenders to explore a potential resolution that would provide the Debtors with maximum optionality in connection with their ongoing commercial

---

[6] Although the RSA contains a milestone requiring confirmation of a chapter 11 plan by August 5, 2024, no party thereto has exercised its termination right thereunder as of the date of this motion.

7

negotiations and preserve the first lien lenders' support for the Debtors' restructuring efforts. Ultimately, the Debtors agreed to make the Additional First Lien Paydown and simultaneously pay the transaction fee payable to Centerview Partners LLP (the "Centerview Transaction Fee") in exchange for a $15 million reduction to the claims cap applicable in a going-concern reorganization and the first lien lenders' continued consent to the use of cash collateral and support for the Debtors' restructuring efforts, in each case subject to the terms and conditions in the DIP Amendment Order.

17. To allow the Debtors to focus on working with their majority DIP lenders and other key stakeholders on the terms of their go-forward business plan and a path forward for a going-concern reorganization, the terms of the Additional First Lien Paydown were structured so as not to impact the Debtors' operations or their payment obligations to their professional sports league and team partners. As structured, the timing of any Additional First Lien Paydown will not impact payments to the MLB and its teams for the remainder of the current MLB season, nearly all of which the Debtors likely will have made prior to payment of any Additional First Lien Paydown. Additionally, in advance of filing this motion, the Debtors also shared the DIP Amendment Order with the NBA and the NHL and engaged with them on the terms thereof, including the Additional First Lien Paydown, in the context of the Debtors' provision of agreed-upon adequate assurance packages for each respective league.[7] Finally, to ensure that the Debtors do not need to divert cash from their operations towards payment of any Additional First Lien Paydown, the Debtors are also seeking authority to use cash from the $495 million Sinclair settlement to make this payment.

---

[7] The Debtors are seeking the Court's approval of the agreed-upon adequate assurance packages through separate motions.

18.     The Additional First Lien Paydown is a critical first step of a broader agreement regarding an amended chapter 11 plan and restructuring support agreement to account for the DIP Amendment Order, the terms of which the Debtors continue to negotiate with their key stakeholders.

        C.     **The Proposed DIP Order Amendments**

19.     By this motion, the Debtors seek to amend the Existing DIP Order to provide the Debtors with authority to use proceeds of the $495 million Sinclair settlement to make the Additional First Lien Paydown and pay the Centerview Transaction Fee.  The amendments set forth in the DIP Amendment Order will allow the Debtors' reorganization efforts to benefit from the continued support of their key creditor constituencies and provide the Debtors with additional time and flexibility to make necessary decisions regarding go-forward business arrangements with their key commercial counterparties.

20.     The proposed amendments to the Existing DIP Order are reflected in the redline against the Existing DIP Order attached as **Exhibit A** to the DIP Amendment Order, with the key changes summarized below:[8]

---

[8] Any summary of the provisions of the DIP Amendment Order in this motion is qualified in its entirety by the terms of the DIP Amendment Order.  In the event of any inconsistency between this motion and the DIP Amendment Order, the DIP Amendment Order will control.

| Term | Summary of Amended Terms[9] |
|---|---|
| **Additional First Lien Paydown**<br><br>Exhibit A to the DIP Amendment Order ¶¶ 3(c), 13(b), 18(o) | The Additional First Lien Paydown shall be paid subject to the following terms and conditions:<br>• Paydown is required to be made on November 18, 2024, if:<br>  ○ a Wind Down Pivot has not occurred on or before the Pivot Deadline (each as defined below); or<br>  ○ a Wind Down Pivot occurs after the Pivot Deadline.<br>• Paydown is authorized to be made with the Required DIP Lenders' consent:<br>  ○ after November 18, 2024, if a Wind Down Pivot has occurred on or before the Pivot Deadline; or<br>  ○ before November 18, 2024, if the Debtors are in compliance with paragraph 3(e) of the MLB Adequate Assurance Order<br>• The Debtors are authorized to use proceeds of the Sinclair-Related Litigation to make such paydown.<br>• No paydown is required to be made if an Acceptable Plan (as defined below) is consummated by November 15, 2024.<br><br>"Wind Down Pivot" means the date on which the Debtors (with the consent of the Required DIP Commitment Parties) (i) notify the Ad Hoc First Lien Group in writing of their intention to move to a wind down and/or liquidation, and (ii) have withdrawn any pending proposed chapter 11 plan of reorganization or amended such plan to provide for a wind down and/or liquidation.<br><br>"Pivot Deadline" means October 1, 2024, or such later date as agreed to in writing by the Majority 1L Lenders.<br><br>An "Acceptable Plan" means either (i) a chapter 11 liquidation plan that pays first lien lenders cash in the amount of $637 million, agent and professional fees, and any accrued and unpaid adequate protection interest payments that are not otherwise applied against the $637 million cash payments (an "Acceptable Wind Down Plan") or (ii) a chapter 11 reorganization plan that pays first lien lenders cash in the amount of $647 million, agent and professional fees, and any accrued and unpaid adequate protection interest payments that are not otherwise applied against the $647 million cash payments (an "Acceptable Reorganization Plan"). |

---

[9] Capitalized terms used but not otherwise defined in this chart have the meanings ascribed to them in the DIP Amendment Order.

| Term | Summary of Amended Terms[9] |
|---|---|
| **First Lien Claims Cap**<br><br>Exhibit A to the DIP Amendment Order ¶ 3(c) | The First Lien Claims will be capped at $637 million in a wind down scenario and $647 million in a reorganization scenario.<br><br>• The following adequate protection interest payments will reduce the applicable claims caps:<br>    o interest payments made on account of amounts that accrued from October 1, 2023, through November 15, 2024; and<br>    o if a Wind Down Pivot occurs on or before the Pivot Deadline, interest payments made on account of amounts that accrue from November 16, 2024, through December 31, 2024.<br>• The following adequate protection interest payments will <u>not</u> reduce the applicable caps:<br>    o if no Wind Down Pivot occurs on or before the Pivot Deadline, interest payments made on account of amounts that accrue from November 15, 2024; and<br>    o interest payments made on account of amounts that accrue after December 31, 2024<br><br>Once the Additional First Lien Paydown is made, (i) in a wind down scenario, such paydown shall be deemed to have satisfied the First Lien Claims (other than agent and professional fees) in full and (ii) in a reorganization scenario, the remaining First Lien Claims (other than agent and professional fees) shall be reduced to $10 million, *provided that* the first lien creditors will continue to receive adequate protection payments after November 15, 2024. |
| **Payment of Centerview Transaction Fee**<br><br>Exhibit A to the DIP Amendment Order ¶ 9(e) | The Debtors shall pay the Centerview Transaction Fee at the time of the Additional First Lien Paydown is made (which fee will be in the amount of approximately $3,875,000 if the Additional First Lien Paydown is paid on November 18, 2024). |
| **Modified Plan Milestones**<br><br>Exhibit A to the DIP Amendment Order ¶ 18(t) | If a Wind Down Pivot occurs on or before the Pivot Deadline, failure to meet any of the following milestones will trigger a termination event:<br><br>• Deadline for confirmation of an Acceptable Wind Down Plan: <u>November 30, 2024</u>.<br>• Deadline for consummation of an Acceptable Wind Down Plan: <u>December 31, 2024</u>. |
| **Additional Cash Collateral Termination Events**<br><br>Exhibit A to the DIP Amendment Order ¶¶ 18(u)-(v) | The Majority 1L Lenders may terminate the Debtors' ability to use cash collateral based on the following additional termination events:<br><br>• the Debtors fail to make the Additional First Lien Paydown by November 18, 2024, when there is no Wind Down Pivot by the Pivot Deadline; or<br>• the Debtors use the proceeds of the Sinclair-Related Litigation (other than making a qualifying pledge) for any purpose other than to make the Additional First Lien Paydown without the consent of the Majority 1L Lenders. |

| Term | Summary of Amended Terms[9] |
|---|---|
| **Adequate Assurance for the NBA Parties and the NHL Parties**<br><br>Exhibit A to the DIP Amendment Order ¶ 44 | The Debtors are authorized to perform and satisfy their obligations under the NBA Adequate Assurance Order and the NHL Adequate Assurance Order, each of which shall control in the event of a conflict with the DIP Amendment Order. |

## Basis for Relief

**I.  Payment of the Additional First Lien Paydown and Centerview Transaction Fee is a Reasonable Exercise of the Debtors' Business Judgment**

21. The Bankruptcy Code authorizes the use and disposition of property outside the ordinary course of business with court approval. 11 U.S.C. § 363(b)(1). Such transactions should be approved when they are supported by a sound business purpose, with deference given to the debtor's business judgment. *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.C.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." (quoting *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986))); *In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 520 (N.D. Tex. 2019) ("Great judicial deference is given to the Trustee's exercise of business judgment." (quoting *GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005))), aff'd, 850 F. App'x 302 (5th Cir. 2021).

22. Here, the Debtors have ample business justification for making the Additional First Lien Paydown. Without the Debtors' agreement to make the Additional First Lien Paydown on the terms and conditions set forth in the DIP Amendment Order, the Debtors' first lien lenders would not have agreed to the Debtors' continued use of cash collateral to emerge from chapter 11

12

as a going concern (including the Debtors' entry into the term sheets with the NBA and the NHL), which could have forced the Debtors to pivot back to a wind down of their operations. The Debtors believe that a plan of reorganization likely will provide a better outcome for their estates and creditor recoveries than a wind down of their operations, and are therefore prepared to make the Additional First Lien Paydown to continue their efforts to reach a going-concern outcome for their stakeholders.

23. The Debtors' agreement to pay the Additional First Lien Paydown also comes with significant benefit for their estates through certain concessions agreed to by their first lien lenders, which will support the Debtors' reorganization efforts. Specifically, the Debtors' first lien lenders have agreed to the reduction of the cap on the total amount of their claims in a reorganization scenario by $15 million (as compared to the corresponding cap provided for under the Existing DIP Order). Additionally, to the extent that the Additional First Lien Paydown is made, the total amount of remaining first lien claims will (a) in a reorganization scenario, be capped at $10 million (plus adequate protection payments on that amount continuing to accrue and be paid after November 15, 2024), and (b) in a wind down scenario, be deemed discharged as of the date thereof. These agreements will help facilitate the Debtors' emergence as a going concern in a reorganization scenario while also eliminating any additional first lien claims that need to be paid in a wind down scenario.

24. The Debtors submit that any Additional First Lien Paydown likely would not affect the recovery of any other creditors, as the first lien lenders are already entitled to these distributions due to their secured position and priority over the DIP Facility with respect to the claims to be repaid. Pursuant to the Existing DIP Order, the first lien lenders are entitled to payment in full, in cash, up to the wind down claims cap prior to repayment of the DIP Facility. Accordingly, the

proposed payment merely shifts the timing of the first lien lenders' distributions on account of their existing rights in a manner that is entirely consistent with the priorities established by the Existing DIP Order.

25. The Debtors' agreement to pay the Centerview Transaction Fee at the time (and to the extent) that they make the Additional First Lien Paydown is also an integral part of the first lien lenders' agreement to continue supporting the Debtors' restructuring efforts. The Debtors are already obligated to pay the Centerview Transaction Fee as part of the adequate protection package provided to their first lien lenders under the Existing DIP Order, so the payment as provided under the DIP Amendment Order merely modifies the timing of this payment. Payment of the Centerview Transaction Fee would also be beneficial to the estates, as the Debtors' obligation to pay Centerview's monthly fees would cease thereafter.

26. Finally, to compensate the Debtors' first lien lenders for the continuation of these chapter 11 cases, the DIP Amendment Order makes a modification to the Existing DIP Order to the manner in which certain adequate protection payments are credited in the event of a wind down. Specifically, the DIP Amendment Order provides that such crediting goes away (a) after November 15, 2024, to the extent the Debtors (x) are pursuing a going-concern reorganization or (y) have not pivoted to a wind down by October 1, 2024, and (b) after December 31, 2024, to the extent the Debtors pivot to a wind down of their operations by October 1, 2024. This amendment to the adequate protection crediting is also an integral component of the overall agreement with the Debtors' first lien lenders.

27. The Debtors therefore believe it is a reasonable exercise of their business judgment to make any Additional First Lien Paydown, pay the Centerview Transaction Fee at the time (and to the extent) that they do so, and adjust the adequate protection crediting mechanism in the

Existing DIP Order, in each case as part of securing their first lien lenders' continuing support during these chapter 11 cases. In addition, these changes are supported by the Crossholder Group, which represents a majority of the holders of the Debtors' prepetition junior funded indebtedness and the Debtors' majority DIP lenders.

28. Entry of the DIP Amendment Order is necessary to secure the first lien lenders' consent to the continued use of cash collateral and support for the Debtors' continued pursuit of a going-concern reorganization, which the Debtors believe represents the most value-maximizing option currently available to their estates and creditors. Accordingly, for the foregoing reasons, the Debtors respectfully request that the Court grant the relief requested herein.

### Emergency Consideration

29. Pursuant to Local Rule 9013-1, the Debtors respectfully request emergency consideration of this motion, as the Debtors believe that any delay in granting the relief requested would cause irreparable harm. The first lien lenders' continuing consent to the Debtors' use of cash collateral and support for the Debtors' restructuring efforts is conditioned on, among other things, entry of the DIP Amendment Order. Accordingly, any delay in entry of the DIP Amendment Order may result in stakeholders, including the Debtors' first lien lenders, withdrawing support for the Debtors' efforts to maximize the value of their estates for the benefit of their creditors. Finally, as all parties with an interest in cash collateral have consented (or have been deemed to consent) to the use of cash collateral on the terms of the DIP Amendment Order, no party will be prejudiced by granting the relief requested. Accordingly, the Debtors respectfully request that the Court grant the relief requested in this motion on an emergency basis.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

30. The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

31. The Debtors will provide notice of this motion to (a) the parties on the Master Service List available on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG, and (b) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Amendment Order granting the relief requested herein and grant such other relief as the Court deems appropriate under the circumstances.

August 23, 2024                                     Respectfully submitted,

/s/ *John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Bryan L. Rochelle (TX Bar No. 24107979)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
brochelle@porterhedges.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Brian S. Hermann (admitted *pro hac vice*)
Andrew M. Parlen (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Alice Nofzinger (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
bhermann@paulweiss.com
aparlen@paulweiss.com
jgraham@paulweiss.com
anofzinger@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

**Certificate of Accuracy**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief. This statement is made pursuant to Local Rule 9013-1(i).

*/s/ John F. Higgins*
John F. Higgins

**Certificate of Service**

I certify that on August 23, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins