**<u>Exhibit 1</u>**

**Disclosure Statement Supplement for the Debtors' First Amended Joint Chapter 11 Plan of Reorganization**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) Case No. 23-90116 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

### DISCLOSURE STATEMENT SUPPLEMENT FOR THE DEBTORS'
### FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

**PLEASE TAKE NOTICE THAT:**

On March 14 and 15, 2023 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

On April 17, 2024, the Bankruptcy Court entered an order approving the Debtors' disclosure statement for the Debtors' proposed chapter 11 plan [Docket No. 1977] (the "Disclosure Statement Order"). On the same day, the Debtors filed the solicitation versions of the *Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 1982] (the "Original Plan") and the *Disclosure Statement for the Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 1983] (the "Disclosure Statement") and commenced solicitation of acceptances and rejections of the Original Plan. Capitalized terms used but not defined herein have the meaning ascribed to them in the Disclosure Statement or the Amended Plan (as defined herein), as applicable.

As discussed in the Disclosure Statement and as described more fully herein, the Debtors have been engaged in discussions with key stakeholders, including renegotiating and/or renewing agreements with the NHL, the NBA, and MLB and their applicable respective teams, the Debtors' major MVPDs, including DIRECTV, Charter, Comcast, and Cox, and their major vMVPDs, such as FuboTV. Since entry of the Disclosure Statement Order, the Debtors have entered into new or renewed agreements with each of the NHL, NBA, DIRECTV, Cox, Charter, FuboTV, and Comcast. The Debtors are also close to reaching agreement with a third party on a new naming rights and branding agreement. These agreements have resulted in updates to the Debtors' business plan, which in turn have resulted in changes to the Debtors' reorganization plan.

On October 2, 2024, the Debtors filed the *Debtors' First Amended Joint Chapter 11 Plan of Reorganization* (as may be amended, supplemented, or otherwise modified from time to time,

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

the "Amended Plan"), a copy of which is attached hereto as **Exhibit A**. A redline of the Amended Plan against the Original Plan is attached hereto as **Exhibit B**. Among other things, and as described more fully below, the Amended Plan revises the treatment of DIP Claims, First Lien Claims, Junior Funded Debt Claims, and, in certain scenarios, the Go-Forward Trade Claims and the General Unsecured Claims.[2]

Pursuant to section 1127(a) of the Bankruptcy Code, because the Amended Plan has been filed before confirmation, the Amended Plan is now the Debtors' plan and supersedes and replaces all prior chapter 11 plans filed by the Debtors, including the Original Plan.

This supplement to the Disclosure Statement (this "Disclosure Statement Supplement") is being provided to all Holders of Claims and Interests to describe developments since the filing of the Original Plan and Disclosure Statement and the changes to the Original Plan that are incorporated in the Amended Plan.

The following are the major dates and deadlines in connection with confirmation of the Amended Plan and final approval of this Disclosure Statement Supplement:

| **Event** | **Date/Deadline** |
|---|---|
| Plan Supplement Filing Date[3] | October 21, 2024 |
| Voting/Opt-Out Deadline<br><br>Amended Plan and Disclosure Statement Supplement Objection Deadline | November 5, 2024, at 4:00 p.m. (prevailing Central Time) |
| Deadline to File Voting Report<br><br>Confirmation Brief and Reply Deadline | November 12, 2024 |
| Hearing on Confirmation of the Amended Plan and Final Approval of the Disclosure Statement Supplement | November 14, 2024, at 9:00 a.m. (prevailing Central Time)<br><br>November 15, 2024, at 9:00 a.m. (prevailing Central Time) (if necessary) |

---

[2]   In the event of any inconsistency between the description of the Amended Plan set forth in this Disclosure Statement Supplement and the Amended Plan, the terms of the Amended Plan shall govern.

[3]   On October 2, 2024, the Debtors filed an initial Plan Supplement attaching a Schedule of Rejected Executory Contracts and Unexpired Leases and a Schedule of Assumed Executory Contracts and Unexpired Leases [Docket No. 2498]. Following the Plan Supplement Filing Date, the Debtors may file additional Plan Supplements (which may be in installments) on or prior to the Effective Date. The Debtors reserve all rights to amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Amended Plan and Second A&R RSA (as defined below).

## I.      Summary of Developments Since the Filing of the Original Plan and Disclosure Statement

### A.      Developments with Sinclair

As discussed in detail in the Disclosure Statement, the Debtors and their parent, Sinclair, entered into the Sinclair Settlement, which was approved pursuant to the Sinclair Settlement Order [Docket No. 1849].  A condition of that settlement was that Sinclair pay $495 million in cash on or before April 30, 2024, subject to extension for additional consideration.  If Sinclair failed to pay the $495 million, the Original Plan contained a Litigation Trust that would pursue litigation against Sinclair.  On April 30, 2024, the Debtors received the full $495 million in cash (the "Sinclair Settlement Proceeds") from Sinclair pursuant to the Sinclair Settlement Order.  As a result of the payment of the Sinclair Settlement Proceeds, the Sinclair Release Effective Date occurred on April 30, 2024, and the Litigation Proceeds Condition (as defined in the Original Plan) was met.  Accordingly, the Amended Plan no longer includes a Litigation Trust.

As set forth in the Sinclair Settlement Order, Sinclair's payment of the Sinclair Settlement Proceeds provided Sinclair with the right to acquire or cause an affiliate or third party to acquire the Marquee Interests.  On July 25, 2024, Sinclair provided the Debtors with written notice that it was exercising its right to acquire the Marquee Interests under the Sinclair Settlement Order.  The transfer of the Marquee Interests was completed on August 9, 2024, and the Debtors no longer have any interest in the Marquee Interests.

As part of the Sinclair Settlement, the Debtors and Sinclair entered into an amendment to the MSA, pursuant to which Sinclair provided the Debtors ongoing management and transition services to facilitate the Debtors' reorganization and separation from Sinclair.  That separation will be complete as of October 31, 2024, and the Debtors will have no need for management or transition services after that date.

### B.      MVPD Agreements

As described in the Disclosure Statement, the Debtors reached agreement with Charter on a multi-year renewal of their distribution agreement on April 3, 2024.  Subsequent to that, the Debtors also reached agreements with Cox on April 30, 2024, DIRECTV on May 1, 2024, and FuboTV on May 22, 2024.  Notwithstanding these successes, the Debtors and Comcast reached an impasse on the terms of a renewal and, following the expiration of the existing distribution agreement on April 30, 2024, the Debtors' RSNs were taken off the air on Comcast on May 1, 2024.  On July 28, 2024, following months of negotiations, the Debtors and Comcast reached an agreement on a go-forward distribution agreement that restored the Debtors' RSNs to Comcast's cable packages on August 1, 2024.  In connection with entry into the Comcast agreement, the Debtors also amended their distributions agreements with DIRECTV and Charter.

### C.      League and Team Agreements

The Debtors have been engaged in discussions with their team and league partners both before and after the Petition Date.  Following the Debtors' pivot to a going-concern reorganization upon signing the January RSA on January 16, 2024, the Debtors made proposals to each of the NBA, the NHL, and their respective teams on go-forward agreements.  After months of

3

negotiations, on August 23, 2024, the Debtors entered into term sheets with each of the NBA and the NHL and their respective teams. These term sheets provide beneficial modifications to the Debtors' existing agreements with the leagues and teams and, subject to compliance with the terms and conditions set forth in the term sheets, for the extension of those agreements for seasons beyond the 2024-2025 NBA and NHL seasons. In the event the Debtors do not confirm a going-concern plan, the agreements will terminate at the end of the 2024-2025 NBA and NHL seasons, thus eliminating potential rejection damage claims (and administrative expense claims) for rights fees that would otherwise be due under such agreements beyond the 2024-2025 NBA and NHL seasons.

On August 23, 2024, the Debtors filed motions seeking approval of those term sheets and assumption of various agreements with each of the NBA and NHL and the underlying telecast rights agreements with the teams, each as amended by the term sheets [Docket Nos. 2355, 2358] (collectively, the "NBA/NHL Motions"). On September 3, 2024, the Bankruptcy Court entered orders approving those motions [Docket Nos. 2389, 2390].

### D. DIP Amendment Order

#### 1. Additional First Lien Paydown

Under the DIP Order [Docket No. 1834], the Debtors' first lien lenders had a right to terminate the Debtors' consensual use of cash collateral if the Debtors did not obtain confirmation of a chapter 11 plan by August 5, 2024. Due to various factors, including the events discussed above, the Debtors were unable to confirm a chapter 11 plan by that milestone. In addition, the Debtors' go-forward distribution revenue and rights profile had been updated to reflect the deals they had reached with distributors and league and team partners, as described above, which resulted in changes to the Debtors' financial projections relative to the financial projections that underpinned the agreements memorialized in the DIP Order, the RSA, and other related documents in January 2024.

As a result of those developments, the first lien lenders required certain amendments to the DIP Order in return for their consent to the Debtors' continued use of cash collateral in pursuit of a going-concern reorganization. The first lien lenders also indicated that they would no longer consent to the plan treatment provided for in the RSA, and would instead require any treatment on account of their claims to provide for payment in full in cash up to agreed-upon claims caps.

The Debtors, the DIP Lenders, the first lien lenders, and the UCC engaged in good-faith, arm's-length negotiations to address the missed milestone and provide the Debtors with sufficient time to explore all reorganization and business plan opportunities. Those negotiations resulted in amendments to the DIP Order that the Debtors sought approval of pursuant to a motion filed on August 23, 2024 [Docket No. 2362]. On September 3, 2024, the Court entered an order amending the DIP Order [Docket No. 2388] (the "DIP Amendment Order"). Among other changes, these amendments incorporated the following changes with respect to the treatment of First Lien Claims:

- The First Lien Claims Cap in a going-concern reorganization was reduced from $662 million to $647 million. The First Lien Claims Cap remained $637 million in a winddown of the Debtors' business.

4

- If the Debtors have not pivoted to a winddown by October 1, 2024, the Debtors must make the Additional First Lien Paydown on November 18, 2024, which, if paid on November 18, 2024, will be approximately $215 million.

- The cash used to fund the Additional First Lien Paydown will come from the Sinclair Settlement Proceeds.

- In addition, if the Debtors are still pursuing a reorganization after the Additional First Lien Paydown is made, holders of First Lien Claims will continue to receive Adequate Protection Interest Payments (as defined in the DIP Amendment Order) in an amount calculated on $10 million for remaining First Lien Claims.

As noted in the Disclosure Statement, the Debtors have already repaid $350 million of the First Lien Term Loan Facility upon the closing of the DIP Facility pursuant to the First Lien Paydown. The Debtors did not pivot to a winddown by October 1, 2024, and as a result, must make the Additional First Lien Paydown by November 18, 2024. The DIP Order and the amendments to the DIP Order also provide for the crediting of certain adequate protection payments toward the First Lien Claims Cap.[4]

### 2. Modifications to UCC Settlement

As noted in the Disclosure Statement, the DIP Order and the RSA memorialized the terms of a comprehensive settlement among the Debtors, the First Lien Group, the Crossholder Group, and the UCC that resolved the UCC's objections with respect to the DIP Facility and provided for, among other things, Holders of Allowed General Unsecured Claims (and, in the event of a wind down or liquidation of the Debtors' estates, Holders of Allowed Go-Forward Trade Claims) to receive their applicable share of the lesser of (i) $13 million and (ii) a dollar amount equal to a 6% recovery on an aggregate basis (the "Unsecured Claim Cash Distribution"), which amounts would be set aside in a reserve (the "Unsecured Claims Reserve") in the event the Debtors proved unable to satisfy all administrative expenses under section 503(b) of the Bankruptcy Code in connection with a chapter 11 plan or if the DIP Agent asserted that a termination event occurred under the DIP Order and exercised any remedies provided under the DIP Order (the "Reserve Funding Triggers").

In light of the above amendments to the DIP Order required by the First Lien Group, as well as the superpriority adequate assurance claims proposed to be granted to the NBA and NHL under the NBA/NHL Motions, the UCC, the Debtors, the First Lien Group, and the Crossholder Group agreed to certain modifications to the UCC Settlement to protect recoveries for unsecured creditors from the risks associated with the Debtors' continued pursuit of a going-concern reorganization. These modifications to the UCC Settlement were incorporated into the DIP Order and the Amended Plan and included, among other things, the following:

---

[4] Adequate Protection Interest Payments on account of amounts that accrue after November 15, 2024 (and to be paid current as set forth above) shall not be applied to the First Lien Claims Cap (each as defined in the DIP Amendment Order).

- The Unsecured Claims Reserve will be funded in the event of a Wind Down Pivot (as defined in the DIP Order) or the payment of the Additional First Lien Paydown (in addition to the original Reserve Funding Triggers).

- In the case of a winddown or liquidation, the Debtors will not make any payments or plan distributions to the DIP Lenders on account of any (A) paid-in-kind interest under the DIP Facility accruing on or after October 1, 2024, or (B) Excess DIP Amounts (as defined in the DIP Order) unless and until the Unsecured Claim Cash Distribution has occurred.

- For purposes of determining whether the Reserve Distribution Conditions (as defined in the DIP Order) have been met, any cash interest payments accruing under the DIP Facility on or after October 1, 2024, will be deemed to reduce the outstanding principal amount of DIP Obligations (as defined in the DIP Order) required to be paid to the DIP Lenders prior to making the Unsecured Claim Cash Distribution to unsecured creditors.

In light of the foregoing, the UCC agreed to support the amendments to the DIP Order, and, on September 3, 2024, the Bankruptcy Court entered the DIP Amendment Order.

### E. Developments with Respect to Amazon

Since the filing of the Original Plan and Disclosure Statement, the Debtors have been engaged in good faith negotiations with Amazon regarding the terms of a go-forward commercial partnership. As described in the Disclosure Statement, Amazon had also initially committed to provide the Debtors with $115 million in exit financing in connection with the Original Plan pursuant to the Convertible B Exit Notes subject to certain required conditions and based on facts and assumptions existing at that time, which conditional commitment was documented in the Exit Note Commitment Letter. Amazon had termination rights under the RSA (which would terminate their obligations under the Exit Note Commitment Letter), including because the Debtors had not obtained confirmation of a chapter 11 plan by August 5, 2024. During negotiations around amendments to the Original Plan, and following material changes to the Debtors' proposed business plan and capital structure, and given that the conditions to the investment could not be satisfied, Amazon informed the Debtors that they did not expect to provide that investment on the original terms contemplated in January 2024. In connection with entry into the Second A&R RSA, and subject to certain conditions (including releases by the RSA Parties and others), Amazon will waive any right it may have to the $4.025 million break fee contemplated by the Exit Note Commitment Letter and previously approved by the Bankruptcy Court, which waiver and releases are memorialized in the Amended Plan. Amazon and the Debtors remain engaged on the terms of a go-forward commercial agreement.

### F. Naming Rights Negotiations

The Debtors are close to reaching agreement with a third party on the terms of an agreement for naming and branding rights with respect to the Debtors' RSNs. The contemplated agreement will lock in a new naming rights partner for the 2024-2025 NHL and NBA seasons while also

providing the Debtors with a long-term naming rights partner if the Debtors are ultimately able to emerge as a going concern.

The naming rights agreement is contemplated to allow the naming rights partner to purchase up to a single-digit percentage of equity in the Reorganized Debtors and earn performance warrants exercisable for up to a like percentage of equity in the Reorganized Debtors. These equity components will incentivize the naming rights partner to use its best efforts to broaden the Debtors' subscriber base and provide the naming rights partner with an opportunity to co-invest in the Debtors' reorganized business. The equity components of the contemplated naming rights agreement have been incorporated into the Amended Plan.

### G. RSA Amendments

In light of the developments described above, the RSA Parties have been engaged in good faith negotiations regarding revisions to the RSA and the Original Plan. On October 9, 2024, the RSA Parties executed a second amended and restated restructuring support agreement (the "Second A&R RSA"), which among other things, memorializes the parties' agreements and commitments with respect to support of the Amended Plan. A copy of the Second A&R RSA is attached hereto as **Exhibit F**.

### H. SPV Cash

On September 24, 2024, the Debtors, in consultation with the RSA Parties, caused their non-Debtor affiliate Diamond Sports Finance SPV, LLC to transfer approximately $50 million that it held in a segregated account to an account held by the Debtors. This transfer was made to streamline the Debtors' bank accounts and cash management system and to bolster liquidity, and the Debtors intend to use that cash to fund the transactions contemplated by the Amended Plan.

## II. Summary of Changes to the Original Plan

### A. Overview of Toggle Structure

The Amended Plan provides for a toggle between a going-concern reorganization and an orderly winddown following the completion of the 2024-2025 NBA and NHL seasons. Whether a going-concern reorganization is ultimately pursued will be determined by the Debtors, with the consent of the Required DIP Commitment Parties, on or before December 16, 2024, and the Debtors will file a notice with the Bankruptcy Court by no later than that date advising parties in interest of the determination. To the extent a going-concern reorganization is not pursued, the Debtors will reject or otherwise terminate all of their contracts with MLB and its applicable teams effective as of December 31, 2024, well in advance of the 2025 MLB season.

### B. Revised Plan Treatments

The Amended Plan modifies distributions that will be made to holders of DIP Claims, First Lien Claims, and Junior Funded Debt Claims in a going-concern reorganization as summarized in the table below:

| Claims | Treatment Under Amended Plan |
|---|---|
| **DIP Claims** | DIP Claims will be treated as follows:<br><br>• <u>With respect to the aggregate principal amount of the DIP Claims and Capitalized DIP Interest</u>: DIP Lenders will receive (x) $270 million in cash, (y) the net Cash proceeds raised from an Acceptable Exit Financing (provided that the Reorganized Debtors have at least $50 million of cash or cash equivalents on their balance sheet after giving effect to the transactions occurring on the Reorganization Effective Date), and (z) the Exit Term Loans.<br><br>• <u>With respect to the DIP MOIC</u>: DIP Lenders will receive 45% of the New TopCo Equity (subject to dilution by the DIP Commitment Party Investment Option, the Management Incentive Plan, the Naming Rights Equity (if any), and the Exit Facility Equity (if any)).<br><br>• <u>With respect to the DIP Commitment Premium</u>: DIP Commitment Parties will receive 45% of the New TopCo Equity (subject to dilution by the DIP Commitment Party Investment Option, the Management Incentive Plan, the Naming Rights Equity (if any), and the Exit Facility Equity (if any)).<br><br>• <u>With respect to the Other DIP Obligations</u>: The Debtors will pay any other DIP Claims, including any accrued and unpaid interest as of the Plan Effective Date, in Cash; <u>provided</u> that cash payment on account of interest accruing under the DIP Facility on and after October 1, 2024 shall, solely for purposes of determining whether the Reserve Distribution Conditions (as defined in the DIP Order) have been met, be deemed to reduce the outstanding principal amount of DIP Claims required to be distributed to the DIP Lenders prior to distributing funds held in the Unsecured Claims Reserve to holders of Allowed General Unsecured Claims. |
| **Class 3 First Lien Claims** | Each holder of an Allowed First Lien Claim will receive its *pro rata* share of Cash in an amount equal to $647 million <u>less</u> the sum of (i) the AP Reduction Amount; (ii) the amount of the First Lien Paydown; and (iii) the amount of any Additional First Lien Paydown.[5] |

---

[5] For the avoidance of doubt, this treatment for holders of First Lien Claims is in addition to any Post-Additional First Lien Paydown AP Interest Payments, payable in accordance with the DIP Order, which Post-Additional First Lien Paydown AP Interest Payments that are accrued and unpaid as of the Plan Effective Date (if any) shall be paid on the Plan Effective Date.

| Claims | Treatment Under Amended Plan |
|---|---|
| **Class 4 Junior Funded Debt Claims** | Each holder of an Allowed Junior Funded Debt Claim will receive its *pro rata* share of 10% of the New TopCo Equity (subject to dilution by the DIP Commitment Party Investment Option, the Management Incentive Plan, the Naming Rights Equity (if any), and the Exit Facility Equity (if any)). |

In the event an orderly winddown is ultimately pursued, no New TopCo Equity (or any exit debt) will be issued and, following the completion of the 2024-2025 NBA and NHL seasons, the Debtors' cash will be distributed to holders of DIP Claims, Allowed First Lien Claims (to the extent not already paid in full in cash up to the applicable cap), and Allowed General Unsecured Claims, as set forth in the Amended Plan and the DIP Amendment Order. To the extent any cash remains following the foregoing distributions, such cash will be distributed to holders of Allowed Junior Funded Debt Claims. In such a scenario, Go-Forward Trade Claims will be treated as General Unsecured Claims. As noted above, the Amended Plan does not otherwise modify the treatment of General Unsecured Claims.

### C.  Revised Illustrative Class Recoveries

The following table summarizes:  (i) the treatment of Claims and Interests under the Amended Plan; (ii) which Classes are impaired by the Amended Plan; (iii) which Classes are entitled to vote on the Amended Plan; and (iv) the estimated recoveries for Holders of Claims and Interests. **The classification, treatment, and the projected recoveries of classified Claims are described in summary form below for illustrative purposes only and are subject to material change.  Actual recoveries could differ materially from the estimates in the following table based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceeds (or are less than) the estimates provided below and the ultimate valuation of the Debtors' reorganized business following negotiations with their commercial counterparties.  In such an instance, the recoveries available to the Holders of Claims could be materially different when compared to the estimates provided below.**  To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement Supplement and the Amended Plan, the terms of the Amended Plan shall govern.

| Class | Claim or Interest | Amended Plan Treatment | Entitlement to Vote | Estimated Allowed Claims | Approx. Percentage Recovery Under Amended Plan: Reorganization | Approx. Percentage Recovery Under Amended Plan: Orderly Runoff | Approx. Percentage Recovery in a Chapter 7 Liquidation |
|---|---|---|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0 | 100% | 100% | 0% |

| Class | Claim or Interest | Amended Plan Treatment | Entitlement to Vote | Estimated Allowed Claims | Approx. Percentage Recovery Under Amended Plan: Reorganization | Approx. Percentage Recovery Under Amended Plan: Orderly Runoff | Approx. Percentage Recovery in a Chapter 7 Liquidation |
|---|---|---|---|---|---|---|---|
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $650,000 | 100% | 100% | 100% |
| 3 | First Lien Claims | Impaired | Entitled to Vote | $647,000,000[6] | 100% | 100% | 100% |
| 4 | Junior Funded Debt Claims | Impaired | Entitled to Vote | $8,425,611,996 | <1%–1% | 0% | 0% |
| 5 | Go-Forward Trade Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Entitled to Vote[7] | $5,280,000 | 100% | 6% | 0%[8] |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote | $170,020,000[9] | 6% | 6% | 0% |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | N/A | N/A | N/A | 0% |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | N/A | N/A | N/A | N/A |

---

[6] Estimate assumes an Orderly Runoff is not pursued. The Debtors used $350 million of the proceeds of the DIP Facility to repay a like principal amount of the First Lien Claims at the closing of the DIP Facility on February 28, 2024.

[7] In the event the Debtors pursue a reorganization pursuant to the Amended Plan, Holders of Go-Forward Trade Claims will be Unimpaired and will be presumed to accept the Amended Plan. In the event the Debtors pursue an Orderly Runoff, however, Holders of Go-Forward Trade Claims will be Impaired and receive the same treatment as Holders of Allowed General Unsecured Claims. Accordingly, Holders of Go-Forward Trade Claims will be provided provisional ballots to cast votes on the Amended Plan, which votes will only be counted in the event the Debtors pursue an Orderly Runoff.

[8] Go-Forward Trade Claims are treated as General Unsecured Claims for purposes of this analysis.

[9] Estimate assumes an Orderly Runoff is not pursued.

| Class | Claim or Interest | Amended Plan Treatment | Entitlement to Vote | Estimated Allowed Claims | Approx. Percentage Recovery Under Amended Plan: Reorganization | Approx. Percentage Recovery Under Amended Plan: Orderly Runoff | Approx. Percentage Recovery in a Chapter 7 Liquidation |
|---|---|---|---|---|---|---|---|
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | 0% | 0% | 0% |

### D.    Revised Disclosure Statement Exhibits

The Disclosure Statement attached the following financial exhibits: Liquidation Analysis (Exhibit C), Financial Projections (Exhibit D), and Valuation Analysis (Exhibit E). Revised versions of the Liquidation Analysis, Financial Projections, and Valuation Analysis are attached hereto as **Exhibit C**, **Exhibit D**, and **Exhibit E**, respectively.

## III.    Additional Risk Factors

### A.    The Debtors May Not Be Able to Obtain Sufficient Exit Financing

The Debtors' ability to reorganize as a going concern will depend on the Debtors' ability to raise additional exit financing commitments, including through the New A/R Facility, to fund distributions under the Amended Plan and provide sufficient liquidity to support the Reorganize Debtors' business on a post-emergence basis. Although the Debtors are in discussions with multiple potential financing sources, there can be no assurances that the Debtors will be able to secure commitments acceptable to the Required DIP Commitment Parties on the timeframe required by the Amended Plan.

*        *        *        *        *

### Continued Solicitation of Votes

The Debtors have caused this Disclosure Statement Supplement and new ballots to be mailed to the Holders of Claims entitled to vote on the Amended Plan and have separately provided the Amended Plan and this Disclosure Statement Supplement to each DIP Lender. To be counted as votes to accept or reject the Amended Plan, all ballots must be properly executed, completed, and returned (as appropriate and in accordance with the instructions accompanying the ballot), so that they are **actually received** by the Claims Agent no later than the Voting Deadline, which is **November 5, 2024, at 4:00 p.m., prevailing Central Time**.

Holders of Claims in the Voting Classes are free to submit a new ballot with respect to the Amended Plan. If an eligible Holder (a) did not submit a ballot for the Original Plan and now wishes to vote on the Amended Plan or (b) previously submitted a ballot for the Original Plan but now wishes to submit a ballot reflecting a different vote for the Amended Plan, such Holder must submit a new ballot. If multiple ballots are received from the same Holder with respect to the same

Claim prior to the Voting Deadline, the last properly executed ballot timely received before the Voting Deadline will be deemed to reflect that voter's intent and will supersede and revoke any prior ballot.  Holders who previously submitted a ballot for the Original Plan and do not intend to change their vote for the Amended Plan do not need to submit a new ballot, and the prior submitted ballot will remain valid in compliance with section 1127(d) of the Bankruptcy Code.

Parties may request new or additional ballots at no charge by: (i) accessing the Debtors' restructuring website at https://cases.ra.kroll.com/DSG; (ii) writing to Diamond Sports Group, LLC Ballots Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; or (iii) calling or emailing the Claims Agent at:

U.S./Canada (toll-free): (877) 720-6635
International (toll): +1 (646) 440-4763

Email: DSGInfo@ra.kroll.com (with "DSG Solicitation Inquiry" in the subject line)

*       *       *       *       *

Copies of the Amended Plan and the Disclosure Statement (and all exhibits thereto) and all other documents filed in these chapter 11 cases may be obtained free of charge by:  (a) visiting the website maintained by the Claims Agent, at https://cases.ra.kroll.com/DSG; (b) calling (877) 720-6635 (U.S./Canada Toll-Free) or +1 (646) 440-4763 (International); or (c) emailing DSGinfo@ra.kroll.com (with "DSG Solicitation Inquiry" in the subject line).  Copies may also be obtained for a fee via PACER at http://www.txs.uscourts.gov.

[*Remainder of page intentionally left blank*]

Dated:    October 9, 2024                    **DIAMOND SPORTS GROUP, LLC** (for itself
                                            and on behalf of each of its subsidiary debtors as
                                            debtors and debtors in possession)

                                            By:    */s/ David Preschlack*
                                                   Name:   David Preschlack
                                                   Title:    Chief Executive Officer

**Exhibit A**

**Amended Plan**

[Filed at Docket No. 2521-1]

**Exhibit B**

**Redline of Amended Plan**

[Filed at Docket No. 2521-3]

**Exhibit C**

**Liquidation Analysis**

# Liquidation Analysis

## Introduction

Under the "Best Interests Test" set forth in section 1129(a)(7) of the Bankruptcy Code,[1] the Bankruptcy Court may not confirm a chapter 11 plan unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. Accordingly, to demonstrate that the Debtors' Amended Plan (regardless of whether the Wind-Down Toggle occurs thereunder) satisfies the Best Interests Test, the Debtors, with the assistance of their professional advisors, have prepared this hypothetical liquidation analysis (this "***Liquidation Analysis***") presenting recoveries that may be obtained by Holders of Claims and Interests upon a disposition of assets in a chapter 7 liquidation as an alternative to recoveries provided under the Amended Plan .

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests upon disposition of the Debtors' assets pursuant to a hypothetical chapter 7 liquidation. As illustrated by this Liquidation Analysis, no Holder of a Claim or Interest will receive or retain property under the Amended Plan of a value that is less than such Holder would receive in a chapter 7 liquidation. Accordingly, and as set forth in greater detail below, the Debtors believe that the Amended Plan (regardless of whether the Wind-Down Toggle occurs thereunder) satisfies the Best Interests Test.

This Liquidation Analysis presents information based on, among other things, the Debtors' books and records, good-faith estimates regarding asset recoveries, and Claims arising in connection with liquidation under chapter 7 of the Bankruptcy Code. This Liquidation Analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants. The determination of the proceeds from the liquidation of assets involves the use of estimates and assumptions. Although the Debtors consider the estimates and assumptions underlying this Liquidation Analysis to be reasonable under the circumstances, such estimates and assumptions are subject to business, economic, competitive, and other uncertainties and contingencies beyond the Debtors' and their professional advisors' control. Accordingly, the estimated results set forth in this Liquidation Analysis may not be realized if the Debtors were liquidated. Actual results in such a proceeding could vary materially from those presented herein, which could result in distributions to members of applicable Classes of Claims to differ from those set forth in this Liquidation Analysis.

**This Liquidation Analysis is a hypothetical exercise that has been prepared for the sole purpose of presenting a reasonable, good-faith estimate of the proceeds that would be realized if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code as of the Conversion Date (as defined below). This Liquidation Analysis is not intended and should not be used for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Amended Plan. No independent appraisals were**

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement Supplement, to which this Liquidation Analysis is attached as **Exhibit C**, the Disclosure Statement, or the Amended Plan attached to the Disclosure Statement Supplement as **Exhibit A**, as applicable.

conducted in preparing this Liquidation Analysis. This Liquidation Analysis does not purport to be a valuation of the Debtors' assets in the context of a going-concern reorganization, and there may be a significant difference between the values and recoveries defined in this Liquidation Analysis and the values that may be realized in an actual liquidation. All assumptions made herein, including those made for purposes of the "higher recovery" scenario, are for purposes of this Liquidation Analysis only and are subject to change. The Debtors make no representations or warranties regarding the accuracy of the estimates and assumptions contained herein.

Nothing contained in this Liquidation Analysis is intended to be, or constitutes, a concession, admission, or allowance of any Claim by the Debtors. The actual amount or priority of Allowed Claims in the Chapter 11 Cases could materially differ from the estimated amounts set forth and used in this Liquidation Analysis. The Debtors reserve all rights to supplement, modify, or amend this Liquidation Analysis, including by changing the assumptions and analyses set forth herein, at any time.

The following Liquidation Analysis should be reviewed with the accompanying notes. The following table reflects this Liquidation Analysis on an aggregated basis for the Debtor entities.

[*Remainder of page intentionally left blank*]

## Liquidation Analysis Table

| ($000's) | 11/30/2024 Estimated Book Balance | Estimated Recovery $ | | Estimated Recovery % | | Note |
|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | |
| **ILLUSTRATIVE FIRST LIEN ASSETS AND RECOVERY** | | | | | | |
| **A.**  **ASSETS** | | | | | | |
| Cash and Cash Equivalents | $  155,852 | $ 140,267 | $ 155,852 | 90% | 100% | 1 |
| Accounts Receivable | 256,429 | 135,862 | 174,638 | 53% | 68% | 2 |
| Prepaid Assets and Other Current Assets | 31,523 | 2,822 | 8,302 | 9% | 26% | 3 |
| Property, Plant and Equipment ("PP&E") | 46,187 | - | 1,775 | 0% | 4% | 4 |
| Rights of Use Assets | 23,304 | - | - | 0% | 0% | 5 |
| Customer Relationships | 1,915,524 | - | - | 0% | 0% | 5 |
| Other Definite-Lived Intangible Assets | 136,993 | - | - | 0% | 0% | 5 |
| Equity Investments and Other Assets | 409,365 | 92,000 | 115,000 | 22% | 28% | 6 |
| *Equity Investment - SPV* | | - | - | | | 6 |
| *Equity Investment - Majority Owned JVs (Bally JVs)* | | - | - | | | 6 |
| *Equity Investment - Minority-Owned JVs - (Excluding YES)* | | - | - | | | 6 |
| *Equity Investment - Minority-Owned JVs - YES* | | 92,000 | 115,000 | 80% | 100% | 6 |
| Sinclair Litigation Proceeds, net of Additional First Lien Paydown | 279,612 | 279,612 | 279,612 | 100% | 100% | 7 |
| MLB Security Deposit | *See MLB Claims and Recovery Section Below* | | | | | 12 |
| **GROSS LIQUIDATION PROCEEDS** | | **650,563** | **735,179** | | | |
| **B.**  **LIQUIDATION EXPENSES** | | | | | | |
| Chapter 7 Wind-Down Expenses | | (20,078) | (16,063) | | | 8 |
| Chapter 7 Wind-Down Professional Fees | | (7,500) | (6,000) | | | 9 |
| Chapter 7 Trustee Fees | | (19,517) | (22,055) | | | 10 |
| **TOTAL LIQUIDATION EXPENSES** | | **(47,095)** | **(44,118)** | | | |
| NET LIQUIDATION PROCEEDS AVAILABLE TO SATISFY CARVE-OUT CLAIMS | | **603,468** | **691,061** | | | |
| **C.**  **CARVE-OUT CLAIMS  (UNPAID PROFESSIONAL FEES)** | (13,600) | (13,600) | (13,600) | 100% | 100% | 11 |
| NET LIQUIDATION PROCEEDS AVAILABLE TO REMAINING CLAIMS | | **589,868** | **677,461** | | | |
| **ILLUSTRATIVE MLB CLAIMS AND RECOVERY** | | | | | | |
| **D.**  **ASSETS TO SATISFY MLB CLAIMS** | | | | | | |
| MLB Security Deposit | 20,000 | 20,000 | 20,000 | 100% | 100% | 12 |
| **GROSS LIQUIDATION PROCEEDS** | | **20,000** | **20,000** | | | |
| **E.**  **LIQUIDATION EXPENSES** | | | | | | |
| Chapter 7 Trustee Fees | | (600) | (600) | | | 10 |
| **F.**  **MLB CLAIMS** | (16,424) | (16,424) | (16,424) | 100% | 100% | 13 |
| NET LIQUIDATION PROCEEDS AVAILABLE TO SATISFY REMAINING | | **2,976** | **2,976** | | | |
| **ILLUSTRATIVE DIP CLAIMS, NBA CLAIMS, NHL CLAIMS, JUNIOR FUNDED DEBT CLAIMS, AND GENERAL UNSECURED CLAIMS, UNSECURED CLAIM RESERVE, AND OTHER ASSETS AND RECOVERIES** | | | | | | |
| **G.**  **ASSETS TO SATISFY REMAINING CLAIMS** | | | | | | |
| Remaining Assets after satisfying Carve Out Claims | | 589,868 | 677,461 | | | |
| Remaining Assets after satisfying MLB Claims | | 2,976 | 2,976 | | | |
| **GROSS LIQUIDATION PROCEEDS** | | **592,844** | **680,437** | | | |
| **H.**  **DIP CLAIMS (EXCLUDING THE EXCLUDED DIP** | (528,515) | (341,833) | (392,339) | 65% | 74% | 14 |
| **I.**  **NBA CLAIMS** | (253,139) | (163,726) | (187,916) | 65% | 74% | 15 |
| **J.**  **NHL CLAIMS** | (134,953) | (87,285) | (100,182) | 65% | 74% | 16 |
| NET LIQUIDATION PROCEEDS AVAILABLE TO SATISFY GENERAL UNSECURED CLAIMS (UNSECURED CLAIMS RESERVE) | | - | | | | |
| **K.**  **GENERAL UNSECURED CLAIMS (UNSECURED CLAIMS RESERVE)** | (175,288) | - | - | 0% | 0% | 17 |
| NET LIQUIDATION PROCEEDS AVAILABLE TO SATISFY EXCLUDED DIP AMOUNT CLAIMS | | - | | | | |
| **L.**  **EXCLUDED DIP AMOUNTS CLAIMS** | (170,485) | - | - | 0% | 0% | 18 |
| NET LIQUIDATION PROCEEDS AVAILABLE TO SATISFY JUNIOR FUNDED DEBT CLAIMS | | - | | | | |
| **M.**  **JUNIOR FUNDED DEBT CLAIMS** | (8,425,612) | - | - | 0% | 0% | 19 |
| NET LIQUIDATION PROCEEDS AVAILABLE TO SATISFY REMAINING CLAIMS | | - | | | | |
| **N.**  **REMAINING CLAIMS (OTHER SECURED, ADMIN, OTHER PRIORITY, INTERCOMPANY, AND EQUITY INTERESTS)** | n/a | - | - | 0% | 0% | 20-25 |

3

**General Notes and Assumptions**

This Liquidation Analysis has been prepared assuming that the Debtors hypothetically commence a liquidation under chapter 7 of the Bankruptcy Code as of November 30, 2024 (the "**Conversion Date**").

Except as otherwise noted herein, the asset values reflected in this Liquidation Analysis are based upon the Debtors' unaudited books and records as of August 31, 2024, adjusted to reflect forecasted operating results between September 1, 2024, and November 30, 2024.

This Liquidation Analysis includes estimated ranges of value for all assets where such estimates could be made reasonably under current facts and circumstances. The ranges utilized in this Liquidation Analysis include "lower" and "higher" estimates. There is no assurance that in an actual chapter 7 liquidation recoveries of any individual asset category or in total would be within the reflected range.

It is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "**Trustee**") on the Conversion Date to oversee the liquidation of the Debtors' estates, during which process substantially all of the Debtors' assets would be sold, abandoned, surrendered, or otherwise liquidated, as applicable, and the cash proceeds, net of liquidation-related costs, distributed in accordance with applicable law. These activities, together with claims reconciliation, dissolution of corporate entities, and other associated matters, have been estimated to require approximately 6 months to complete. While it is possible that the liquidation period could be extended, this would increase the risk of additional liquidation costs and reduce overall distributable proceeds and recoveries. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the Best Interests Test.

Any available net proceeds would be allocated to the applicable Holders of Claims and Interests in accordance with section 726 of the Bankruptcy Code and the terms of the DIP Order as amended by the *Order Amending the Final DIP Order* [Docket No. 2388] (the "**Amended DIP Order**") (and in the event of any conflict between this Liquidation Analysis and the Amended DIP Order, the terms of the Amended DIP Order shall control). Under a chapter 7 liquidation, all secured claims are required to be satisfied from the proceeds of the collateral securing such claims before any such proceeds would be distributed to any other creditors, subject to the terms of the Amended DIP Order, including the Unsecured Claims Reserve (as defined below) and the Carve Out (as defined in the Amended DIP Order). Subject to the terms of the Amended DIP Order, this Liquidation Analysis otherwise assumes the application of the rule of absolute priority of distributions with respect to the remaining proceeds of the Debtors. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full. The costs, expenses, and fees associated with the liquidation would be paid in full from the liquidation proceeds before the balance of the proceeds would be made available to pay chapter 11 administrative Claims, and then to pay priority Claims and then to pay unsecured Claims. This Liquidation Analysis assumes that the Unsecured Claims Reserve is funded pursuant to the terms of the Amended DIP Order.

This Liquidation Analysis assumes that the Debtors would be liquidated in a jointly

administered case.  Except as otherwise noted herein, each Debtor is jointly and severally liable for each of the Carve-Out Claims, First Lien Claims, MLB Claims, DIP Claims, NBA Claims, NHL Claims, and the Junior Funded Debt Claims (each as defined below).  Because there is no scenario under this Liquidation Analysis in which all such Claims will be paid in full, this Liquidation Analysis is presented on a consolidated basis.  For purposes of this Liquidation Analysis, the term "***General Unsecured Claims***" includes all Go-Forward Trade Claims.  In addition, for purposes of illustrating recoveries resulting from the distribution of amounts held in the Unsecured Claims Reserve, this Liquidation Analysis assumes that all General Unsecured Claims are asserted against the Debtors on a consolidated basis.  For the avoidance of doubt, the Amended Plan does not provide for the substantive consolidation of the Debtors.

This Liquidation Analysis assumes that Claims related to administrative expenses (including professional fees), chapter 7 trustee expenses, and the Carve Out are allocated across the Debtors according to the percentage of asset recovery by each entity.  Parties in interest may dispute that allocation.  Any successful challenge to the allocation of the Claims described in this paragraph could materially alter recoveries shown in this Liquidation Analysis.

This Liquidation Analysis contains an estimate of the amount of certain Classes of Claims that may ultimately become Allowed Claims.  The Debtors developed the estimate for each Class of Claims based on the Debtors' continuing review of Claims filed in the Chapter 11 Cases, the Debtors' books and records, and the Debtors' schedules and statements.  The Debtors also developed an estimate of additional Claims that would arise in a chapter 7 liquidation.  Accordingly, this analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Amended Plan.  Moreover, the Claims filed against the Debtors' Estates have not been fully evaluated by the Debtors and no order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of any Claims at the projected amounts of Allowed Claims set forth in this Liquidation Analysis.  Thus, the actual amount of Allowed Claims could differ materially from the amount of Allowed Claims estimated herein.

This Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon the liquidation of the Debtors in the manner described above.

This Liquidation Analysis assumes that all asset proceeds and creditor recoveries are at nominal amounts and does not consider the discounting of values over time (except for the depreciation of PP&E (as defined below)).  The discounting of values would result in lower recoveries to stakeholders than those presented.

*[Remainder of page intentionally left blank]*

**Specific Notes to this Liquidation Analysis**

**ILLUSTRATIVE FIRST LIEN ASSETS AND RECOVERY**

**1.      Cash and Cash Equivalents**

The Debtors' estimated cash balance (excluding cash held at non-Debtor entities, including the Majority-Owned JVs) as of the Conversion Date is $156 million.  The Debtors' estimated cash balance includes approximately $51 million of cash previously held at DSPV related to the Debtors' Prepetition A/R Loan Facility (the "***DSPV Cash***").  Recoveries from this asset were categorized as Equity Interests – SPV in the Liquidation Analysis filed as <u>Exhibit C</u> to the Disclosure Statement (the "***Prior Liquidation Analysis***").  The Prepetition A/R Loan Facility was terminated in March 2024, and the DSPV Cash was transferred to a segregated account held in the name of DSPV at Wilmington Trust, National Association.  The DSPV Cash was transferred to the Debtors in September 2024.  This Liquidation Analysis assumes 100% of the estimated cash balance is available for distribution in the higher recovery estimate and 90% in the lower recovery estimate, to account for potential negative variances in cash flows from operations prior to the Conversion Date.

**2.      Accounts Receivable**

The Debtors' estimated accounts receivable balance as of the Conversion Date is approximately $247 million.  Accounts receivable are primarily comprised of distribution / affiliate revenue receivables due from MVPDs, advertising revenue receivables due from advertising agencies, and DTC revenue from streaming service counterparties.

Recovery estimates for accounts receivable were made at the sub-classification level and considered factors such as counterparty, aging, concentration, and potential offsets resulting in a blended lower recovery estimate of 53% and a higher recovery estimate of 68%:

**3.      Prepaid Assets and Other Current Assets**

The Debtors' estimated book balance for prepaid expenses and other current assets as of the Conversion Date is approximately $32 million.  The balance includes prepayments for insurance premiums, lease obligations, DTC marketing-related deposits, and other current assets.

The Debtors estimate a recovery of prepaid expenses and deposits between 9% and 26% in aggregate, based on a review of the nature and the amounts of the component balances as of August 31, 2024.

**4.      Property, Plant & Equipment ("*PP&E*")**

The Debtors' estimated PP&E book value as of the Conversion Date is approximately $46 million.  PP&E primarily consists of production equipment, computer hardware, and leasehold improvements.

Production equipment and computer hardware are assumed to yield net recoveries of 0% to 5% of net book value, based on a review of the nature and the amount of the component balances on August 31, 2024. No recovery is assumed for leasehold improvements or other PP&E.

In aggregate, the Debtors assume a lower recovery estimate of 0% and a higher recovery estimate of 4% for PP&E.

Subject to the terms and conditions of the Sinclair Settlement Order, if the Debtors wind down any of their business operations in a liquidation, Sinclair may, at no cost to Sinclair, acquire any residual assets unless the Debtors have received a bona fide offer(s) to acquire such assets.

**5. Rights of Use, Customer Relationships, and Other Definite-Lived Intangible Assets**

The Debtors' estimated book value of these intangible assets as of the Conversion Date is approximately $2.1 billion. These are all considered non-saleable, intangible assets with no value in a liquidation.

**6. Equity Investments and Other Assets**

The Debtors' estimated book value for these assets as of August 31, 2024, is approximately $409 million.

"***Equity Investments – SPV***" includes the Debtors' 100% equity interest in DSPV, which was the borrower under the Debtors' Prepetition A/R Loan Facility. The remaining cash at the DSPV (i.e., the approximately $51 million DSPV Cash) was transferred to the Debtors in September 2024 (see Cash and Cash Equivalents, above). No additional recovery is assumed from this equity interest.

"***Equity Investments – Majority-Owned JVs***" includes the Debtors' majority equity interests in non-Debtor joint ventures. In the absence of operational and business support from the Debtors, it is assumed that all of the Majority-Owned JVs would undertake parallel liquidations, under which the proceeds of such liquidations would be distributed in accordance with the priority of claims and ownership on an entity-by-entity basis. It is assumed that claims exceed the asset recoveries at each of the Majority-Owned JVs and, as a result, no recovery is assumed from these equity interests.

"***Equity Investments – Minority-Owned JVs (Excluding YES)***" includes the Debtors' non-majority equity interests in Mobile Television Group (excludes Marquee, which was transferred to Sinclair in August 2024 pursuant to the terms of the Sinclair Settlement Order).

> **Mobile Television Group** – Subject to the terms of the Sinclair Settlement Order, and applicable law, if the Debtors wind down any of their business operation in a liquidation, Sinclair may, at no cost to Sinclair, acquire any residual assets unless the Debtors have received a bona fide offer(s) to acquire such assets. Given the uncertainty of the Debtors' ability to sell their interest in Mobile Television Group, along with the terms in the Sinclair Settlement Order, no proceeds related to Mobile Television Group have been included in this Liquidation Analysis.

"**Equity investments – Minority-owned JVs (YES)**":  The potential value of the Debtors' interests in Red Seam Holdings LLC (the "**YES Adequate Assurance Collateral**") has not been determined. For illustrative purposes, this Liquidation Analysis includes an estimated book value of $115 million for the YES Adequate Assurance Collateral.  The estimated book value is based on the aggregate principal amount of Convertible B Exit Notes, which would have been secured by the YES Adequate Assurance Collateral and issued on the Effective Date if the prior Plan of Reorganization filed on April 16, 2024 [Docket No. 1982] had been consummated.  The Debtors assume a lower recovery of 80% and a higher recovery of 100% of the illustrative estimated book value of the YES Adequate Assurance Collateral.

- Proceeds of the Debtors' minority equity interest in YES are (a) *first*, used to satisfy the Carve-Out Claims, (b) *second*, used to satisfy the First Lien Adequate Protection Superpriority Claims (as defined in the Amended DIP Order) (up to $100 million, but such claims are assumed to be satisfied in full as part of the Additional First Lien Paydown, as defined in the Amended DIP Order), (c) *third*, used to satisfy the MLB Claims (as defined below), (d) *fourth,* available to satisfy the remaining First Lien Adequate Protection Superpriority Claims (if any, but such claims are assumed to be satisfied in full as part of the Additional First Lien Paydown), (e) *fifth.* available to satisfy the DIP Claims, the NBA Claims, and the NHL Claims, and (f) *sixth,* available to satisfy other creditor claims assuming application of the rule of absolute priority.

## 7.   Sinclair Litigation Proceeds, net of the Additional First Lien Paydown

As further described in the Disclosure Statement and the Disclosure Statement Supplement, the Debtors commenced the Adversary Proceedings against SBG, certain of SBG's affiliates and related individuals, Bally's, and JPM, which Adversary Proceedings were subsequently settled pursuant to the Sinclair Settlement Order.  Pursuant to the terms of the Sinclair Settlement Order, the Debtors received settlement payments in the aggregate amount of $495 million from Sinclair ($50 million received in March 2024 and $445 million received in May 2024).

The amount included in the "**Sinclair Litigation Proceeds, net of the Additional First Lien Paydown**" in this Liquidation Analysis reflects the total amount due from Sinclair (consisting of the Unencumbered Sinclair-Related Litigation Collateral (as defined in the MLB Adequate Assurance Order) and the Encumbered Sinclair-Related Litigation Collateral (i.e., all proceeds of the Sinclair-Related Litigations received by the Debtors that are not Unencumbered Sinclair-Related Litigation Collateral)) pursuant to the terms of the Sinclair Settlement Order, net of the Additional First Lien Paydown, which is assumed to occur on November 18, 2024 pursuant to the Amended DIP Order.

- The First Lien Claims consist of the principal amount, unpaid interest, fees, premiums, and all other obligations, amounts, and expenses arising under or in connection with the First Lien Credit Agreement (as defined in the Amended DIP Order) (the "**First Lien Claims**").

- Pursuant to the Amended DIP Order, in the event of a liquidation, the First Lien Claims are capped at $637 million of outstanding principal and interest ("**Wind Down Claim Cap**") including, without limitation, any asserted deficiency claims, make-whole claims,

diminution in value claims, and recharacterization claims.

- Pursuant to the Amended DIP Order, to the extent an Acceptable Plan (as defined in the Amended DIP Order) has not been consummated by November 15, 2024 and no Wind Down Pivot (as defined in the Amended DIP Order) has occurred on or before October 1, 2024, then on November 16, 2024, the Debtors, their successors, or a chapter 7 trustee (and in the case of a chapter 7 trustee, as soon as reasonably practicable after appointment) are authorized and directed to pay to the First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, cash in an amount equal to the Wind Down Claim Cap (after the application of certain reductions as described below).

- Pursuant to the Amended DIP Order, the Wind Down Claim Cap is reduced by the aggregate amount of Cash paid as adequate protection to the holders of First Lien Claims on account of amounts that accrued from October 1, 2023, through and including November 15, 2024, pursuant to the Cash Collateral Order or the Amended DIP Order, as applicable, the First Lien Paydown (as defined in the Amended DIP Order) and the Additional First Lien Paydown (if any).  The First Lien Paydown of $350 million was paid by the Debtors on February 28, 2024.  Accordingly, after applying the Wind Down Claim Cap, the outstanding First Lien Claims are estimated to be approximately $215 million on November 18, 2024, which would be deemed as being satisfied in full upon payment of the Additional First Lien Paydown.

- Pursuant to the Amended DIP Order, subject to the Carve-Out Claims, the Assumption Orders (as defined in the Amended DIP Order), and the MLB Adequate Assurance Order, the First Lien Adequate Protection Superpriority Claims shall not be junior or *pari passu* to any claims and shall have priority over all administrative expense claims and other claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, and 1114 of the Bankruptcy Code.

- Finally, pursuant to the Priorities Annex (as defined in the Amended DIP Order), the First Lien Claims are senior to the DIP Superpriority Claims (as defined in the Amended DIP Order).

Net Proceeds from the Encumbered Sinclair-Related Litigation Collateral, net of the Additional First Lien Paydown, are (a) *first,* used to satisfy the Carve-Out Claims, (b) *second*, used to satisfy the First Lien Claims up to the Wind Down Claim Cap (although such claims are assumed to be satisfied in full up to the Wind Down Claim Cap as part of the Additional First Lien Paydown), (c) *third*, used to satisfy the MLB Claims, (d) *fourth*, available to satisfy the DIP Claims, the NBA Claims, and the NHL Claims, and (e) *fifth*, available to satisfy other creditor claims assuming application of the rule of absolute priority.

Net Proceeds from the Unencumbered Sinclair-Related Litigation Collateral, net of the Additional First Lien Paydown, are (a) *first*, used to satisfy the Carve-Out Claims, (b) *second*, used to satisfy the First Lien Adequate Protection Superpriority Claims (up to $100 million, although such claims are assumed to be satisfied in full as part of the Additional First Lien Paydown), (c) *third*, used to

satisfy the MLB Claims, (d) *fourth*, available to satisfy the remaining First Lien Adequate Protection Superpriority Claims (if any, as such claims are assumed to be satisfied in full as part of the Additional First Lien Paydown), (e) *fifth*, available to satisfy the DIP Claims, the NBA Claims, and the NHL Claims, and (f) *sixth*, available to satisfy other creditor claims assuming application of the rule of absolute priority.

8.      **Chapter 7 Wind-Down Expenses**

Wind-down expenses are assumed to consist primarily of the ordinary course general and administrative costs that would be required to liquidate the Debtors' businesses during a six-month wind-down period after the Conversion Date. Expenses would primarily include wind-down employee compensation, insurance, and costs associated with the dissolution of corporate entities.

All estimated postpetition accounts payable and accrued expenses (with the exception of professional fees included in the Carve-Out Claims below) as of the Conversion Date are assumed to be Administrative Claims and thus not treated as wind-down expenses or otherwise deducted for purposes of deriving "net proceeds available" in this Liquidation Analysis.

9.      **Chapter 7 Wind-down Professional Fees**

Professional fees include estimates for advisors supporting the chapter 7 proceeding.

10.     **Chapter 7 Trustee Fees**

Trustee fees are assumed to be 3% of liquidation proceeds realized, including cash and cash equivalents, pursuant to sections 326 and 330 of the Bankruptcy Code.

11.     **Carve-Out Claims**

The Amended DIP Order permits the carve-out of certain statutory fees and allowed professional fees of the Debtors and any committee appointed in the chapter 11 cases pursuant to section 1103 of the Bankruptcy Code (the "***Carve-Out Claims***").  The Carve-Out Claims include estimated incurred but unpaid professional and trustee fees through the Conversion Date.

## ILLUSTRATIVE MLB CLAIMS AND RECOVERY

12.     **MLB Security Deposit**

As further described in the MLB Adequate Assurance Order, the Debtors deposited $20 million in a segregated account held by the Debtors for the exclusive benefit of the Clubs (as defined in the MLB Adequate Assurance Order).

Pursuant to the MLB Adequate Assurance Order and the Amended DIP Order, prior to the end of the 2024 MLB Season (as defined in the MLB Adequate Assurance Order), the Debtors shall not use the MLB Security Deposit for any purpose other than satisfying any allowed MLB Superpriority Administrative Expense Claim or MLB JV Claim (each as defined in the MLB

Adequate Assurance Order).

### 13.    MLB Claims

The MLB Superpriority Administrative Expense Claims and MLB JV Claims (collectively, the "**MLB Claims**") include all outstanding and unpaid telecast rights payments related to the 2024 MLB Season owed to the Clubs whose telecast rights agreements are with the Debtors or Majority-Owned JVs, subject to reduction for any mitigation of damages set forth in the MLB Adequate Assurance Order. The estimated claim balance includes all unpaid telecast rights payments for the 2024 MLB Season due on or after November 30, 2024, and, for the purposes of this analysis, includes no mitigation. The estimated claim balance also includes an estimated amount of performance bonuses that may be payable by the Debtors or the non-Debtor Majority-Owned JVs, as applicable, to the applicable Clubs for the 2024 MLB Season, all or a portion of which may not be payable subject to the applicable Clubs' performance in the 2024 MLB Season.

Pursuant to the MLB Adequate Assurance Order, the MLB Superpriority Administrative Expense Claims are entitled to superpriority administrative expense claim status under section 507 of the Bankruptcy Code. The MLB Claims (including both the MLB Superpriority Administrative Expense Claims and MLB JV Claims) are secured by the MLB Liens (as defined in the MLB Adequate Assurance Order). With respect to the MLB Security Deposit, the MLB Liens are senior to all other liens. With respect to the YES Adequate Assurance Collateral and the Unencumbered Sinclair-Related Litigation Collateral, the MLB Liens are subordinate to the Carve-Out Claims and the First Lien Adequate Protection Superpriority Claims (up to $100 million, although such claims are assumed to be satisfied in full as part of the Additional First Lien Paydown) but are senior to all other claims. The MLB Superpriority Administrative Expense Claims are otherwise subordinate to the Carve-Out Claims and rank *pari passu* with each of the First Lien Adequate Protection Superpriority Claims (assumed to be satisfied in full as part of the Additional First Lien Paydown), the DIP Superpriority Claims, the NBA Superpriority Administrative Expense Claims (as defined in the NBA Adequate Assurance Order [Docket No. 2390]), and the NHL Superpriority Administrative Expense Claims (as defined in the NHL Adequate Assurance Order [Docket No. 2389]).

### ILLUSTRATIVE DIP CLAIMS, NBA CLAIMS, NHL CLAIMS. JUNIOR FUNDED DEBT CLAIMS, GENERAL UNSECURED CLAIMS, UNSECURED CLAIMS RESERVE, AND OTHER ASSETS AND RECOVERIES

### 14.    DIP Claims (Excluding the Excluded DIP Amounts)

The estimated DIP Claims (excluding the Excluded DIP Amounts (as defined in the Amended DIP Order) and as further described below) on the Conversion Date are estimated to be $529 million. The claim balance includes the outstanding principal amount, unpaid interest, the DIP Commitment Premium Claims, and all other obligations, amounts, and expenses arising under or in connection with the DIP Credit Agreement, excluding the (x) DIP MOIC, (y) any PIK Amounts (as defined below) accruing on or after October 1, 2024, and (z) any Excess DIP Amounts (as defined below). Holders of DIP Claims (excluding any DIP Claims on account of the Excluded DIP Amounts) are estimated to receive a 65% recovery in the lower recovery estimate and a 74%

recovery in the higher recovery estimate.

Pursuant to the Amended DIP Order, the Debtors shall not make any payment on account of the Excluded DIP Amounts unless the Unsecured Claims Reserve has been funded by the Debtors. This Liquidation Analysis therefore assumes that no distributions will be made on account of the Excluded DIP Amounts unless and until Holders of Allowed General Unsecured Claims have received distributions from the Unsecured Claims Reserve.

Pursuant to the Amended DIP Order, the DIP Claims (i) are subordinate and subject in right of payment to the First Lien Claims up to the Wind Down Claim Cap (assumed to be satisfied in full as part of the Additional First Lien Paydown) in all respects and (ii) are subordinate to the MLB Claims with respect to the MLB Security Deposit, the YES Adequate Assurance Collateral, and the Unencumbered Sinclair-Related Litigation Collateral, but are *pari passu* with the NBA Claims and the NHL Claims and any recovery on account of (i) the DIP Superiority Claims from the DIP Collateral, (ii) any NHL Superpriority Administrative Expense Claims from the NHL Adequate Assurance Collateral, and (iii) any NBA Superpriority Administrative Expense Claims from the NBA Adequate Assurance Collateral shall be shared on a *pro rata* basis.

## 15. NBA Claims[2]

The NBA Superpriority Administrative Expense Claims and NBA JV Claims (collectively, the "***NBA Claims***") include all outstanding and unpaid telecast rights payments related to the 24–25 NBA Season owed to the NBA Parties whose telecast rights agreements are with the Debtors or Majority-Owned JVs, subject to reduction for any mitigation of damages set forth in the NBA Adequate Assurance Order. The estimated claim balance includes all unpaid telecast rights payments for the 24–25 NBA Season due on or after November 30, 2024, and, for the purposes of this analysis, includes no mitigation. The estimated claim balance also includes all unpaid EMA rights fees owed to the NBA. Holders of NBA Claims are estimated to receive a 65% recovery in the lower recovery estimate and a 74% recovery in the higher recovery estimate.

Pursuant to the NBA Adequate Assurance Order, the NBA Superpriority Administrative Expense Claims are entitled to superpriority administrative expense claim status under section 507 of the Bankruptcy Code. The NBA Claims (including both the NBA Superpriority Administrative Expense Claims and NBA JV Claims) are secured by the NBA Liens. The NBA Superpriority Administrative Expense Claims (i) are subordinate and subject in right of payment to the First Lien Claims up to the Wind Down Claim Cap (assumed to be satisfied in full as part of the Additional First Lien Paydown) in all respects and (ii) are subordinate to the MLB Claims with respect to the MLB Security Deposit, the YES Adequate Assurance Collateral, and the Unencumbered Sinclair-Related Litigation Collateral, but are *pari passu* with the DIP Claims and the NHL Claims and any recovery on account of (i) the DIP Superiority Claims from the DIP Collateral, (ii) any NHL Superpriority Administrative Expense Claims from the NHL Adequate Assurance Collateral, and (iii) any NBA Superpriority Administrative Expense Claims from the NBA Adequate Assurance

---

[2] Capitalized terms used in this section but not otherwise defined herein have the meanings ascribed to them in the NBA Adequate Assurance Order.

Collateral shall be shared on a *pro rata* basis.

## 16.  NHL Claims[3]

The NHL Superpriority Administrative Expense Claims and NHL JV Claims (collectively, the "***NHL Claims***") include all outstanding and unpaid telecast rights payments related to the 24–25  NHL Season owed to the NHL Parties whose telecast rights agreements are with the Debtors or Majority-Owned JVs, subject to reduction for any mitigation of damages set forth in the NHL Adequate Assurance Order.   The estimated claim balance includes all unpaid telecast rights payments for the 24–25 NHL Season due on or after November 30, 2024, and, for the purposes of this analysis, includes no mitigation.  The estimated claim balance also includes an estimated amount of performance bonuses that may be payable by the Debtors to the applicable NHL Parties for the 24–25 NHL Season, all or a portion of which may not be payable subject to the NHL Parties' performance in the 24–25 NHL Season.  Holders of NHL Claims are estimated to receive a 65% recovery in the lower recovery estimate and a 74% recovery in the higher recovery estimate.

Pursuant to the NHL Term Sheet, the NHL Superpriority Administrative Expense Claims are entitled to superpriority administrative expense claim status under section 507 of the Bankruptcy Code.  The NHL Claims (including both the NHL Superpriority Administrative Expense Claims and NHL JV Claims) are secured by the NHL Liens.  The NHL Superpriority Administrative Expense Claims (i) are subordinate and subject in right of payment to the First Lien Claims up to the Wind Down Claim Cap (assumed to be satisfied in full as part of the Additional First Lien Paydown) in all respects and (ii) are subordinate to the MLB Claims with respect to the MLB Security Deposit, the YES Adequate Assurance Collateral, and the Unencumbered Sinclair-Related Litigation Collateral, but are *pari passu* with the DIP Claims and the NBA Claims and any recovery on account of (i) the DIP Superpriority Claims from the DIP Collateral, (ii) any NHL Superpriority Administrative Expense Claims from the NHL Adequate Assurance Collateral, and (iii) any NBA Superpriority Administrative Expense Claims from the NBA Adequate Assurance Collateral shall be shared on a *pro rata* basis.

## 17.  General Unsecured Claims; Unsecured Claims Reserve

Pursuant to the Amended DIP Order, in the event that, among other things, the Debtors are unable to satisfy all administrative expenses under section 503(b) of the Bankruptcy Code in connection with a chapter 11 plan, which is the outcome reflected by this Liquidation Analysis, the Debtors must fund a reserve (the "***Unsecured Claims Reserve***") in an amount equal to the lesser of (a) a dollar amount equal to a 6% cash recovery on an aggregate basis on account of all Allowed General Unsecured Claims and (b) $13 million.[4]  This Liquidation Analysis assumes that the amount to be

---

[3]  Capitalized terms used in this section but not otherwise defined herein have the meanings ascribed to them in the NHL Adequate Assurance Order.

[4]  The Amended DIP Order provides for the following priorities of distribution with respect to amounts funded into the Unsecured Claims Reserve:  The Unsecured Claims Reserve shall not be distributed to Holders of Allowed General Unsecured Claims until (x) Payment in Full (as defined in the DIP Subordination Provisions) of the First Lien Claims (including any such Payment in Full following the payment of the Additional First Lien Paydown after the occurrence of a Wind Down Pivot) and (y) all DIP Obligations (other than the Excluded DIP Amounts) have been paid in cash (clauses (x) and (y), together, the "***Reserve Distribution Conditions***").  If the Debtors have no other sources of cash or monetizable assets to provide for the Payment in Full of the First Lien Claims, the Debtors

funded into the Unsecured Claims Reserve is estimated to be approximately $10.5 million, which is 6% of $175 million, the estimated Allowed General Unsecured Claims (including, for the avoidance of doubt, any Go-Forward Trade Claims).

For illustrative purposes, in both the higher and lower recovery estimate in this Liquidation Analysis, the funds in the Unsecured Claims Reserve are presented as not available to satisfy any Allowed General Unsecured Claims as the remaining assets of the Debtors are not sufficient to satisfy the DIP Claims (other than the Excluded DIP Amounts) in full (and the deficiency is larger than the full amount of the Unsecured Claims Reserve). Accordingly, in the event the Unsecured Claims Reserve is the sole source of recovery, Holders of Allowed General Unsecured Claims are estimated to receive no recovery in the lower recovery or in the higher recovery estimate.

For the avoidance of doubt, Unsecured Notes Claims are not included in General Unsecured Claims; instead, Unsecured Notes Claims are included in Junior Funded Debt Claims.

For the avoidance of doubt, nothing contained in this analysis is intended to be, or constitutes, a concession, admission, or allowance of any General Unsecured Claims by the Debtors, and any values set forth herein are for illustrative purposes only.

## 18. Excluded DIP Amounts

Pursuant to the Amended DIP Order, the Excluded DIP Amounts is the aggregate amount of the (x) DIP MOIC, (y) any PIK Amounts accruing on or after October 1, 2024, or (z) any Excess DIP Amounts. Pursuant to the Amended DIP Order, the Unsecured Claims Reserve must be funded by the Debtors before the Debtors may distribute any cash on account of the Excluded DIP Amounts. The aggregate amount of Claims on account of the Excluded DIP Amounts is estimated to be approximately $170 million for the purposes of this Liquidation Analysis. Holders of DIP Claims on account of the Excluded DIP Amounts are estimated to receive no recovery on account of such claims in the lower or higher recovery estimate.

- Pursuant to the Amended DIP Order, the DIP MOIC is equal to 0.4 multiplied by the total principal amount of DIP Loans less the aggregate amount received by the DIP Lenders in cash on account of payments of cash interest on the DIP Loans. The aggregate amount of Claims on account of the DIP MOIC is estimated to be approximately $163 million for the purposes of this Liquidation Analysis.

- Pursuant to the DIP Credit Agreement, the DIP Loans (as defined in the Amended DIP Order) bear interest on the outstanding principal amount thereof at a rate per annum equal to 10.00%; provided that on each Interest Payment Date (as defined in the DIP Credit Agreement) (i) accrued interest at a rate per annum equal to 5.00% shall be payable in cash (subject to the DIP Subordination Provisions) and (ii) accrued interest at a rate per annum

---

may use all or a portion of the Unsecured Claims Reserve to satisfy First Lien Claims. After Payment in Full of the First Lien Claims, if the Debtors have no other sources of cash or monetizable assets to provide for payment of all DIP Obligations (other than the DIP Obligations on account of the Excluded DIP Amounts) in cash, the Debtors may use all or a portion of the Unsecured Claims Reserve to make payments to the DIP Lenders until all DIP Obligations other than the Excluded DIP Amounts have been paid in full.

equal to 5.00% shall be payable in kind (the amount of interest paid in kind, "***PIK Amount***") by capitalizing the PIK Amount and adding it to, and increasing the then-outstanding aggregate principal amount of the DIP Loans by, such PIK Amount on and as of such Interest Payment Date and such PIK Amount shall thereafter constitute principal of the DIP Loans and shall bear interest at the rate set forth in the DIP Credit Agreement. As part of the Amended DIP Order, any PIK Amounts accruing on or after October 1, 2024, through the Conversion Date are treated as Excluded DIP Amounts. The aggregate amount of Claims on account of the PIK Amounts is estimated to be approximately $4 million for the purposes of this Liquidation Analysis.

- Pursuant to the Amended DIP Order, solely for purposes of determining whether the Reserve Distribution Conditions have been met, any cash payments made on account of interest accruing under the DIP Facility (as defined in the Amended DIP Order) on and after October 1, 2024, through the Conversion Date shall be deemed to reduce the outstanding principal amount of DIP Obligations (the "***Reduced DIP Obligations***" and, any outstanding principal amount of DIP Obligations in excess of the Reduced DIP Obligations, the "***Excess DIP Amounts***") required to be paid to the DIP Lenders prior to the distribution of the funds held in the Unsecured Claims Reserve to holders of Allowed General Unsecured Claims and Allowed Go-Forward Trade Claims. The aggregate amount of Claims on account of the Excess DIP Amounts is estimated to be approximately $4 million for the purposes of this Liquidation Analysis.

## 19.    Junior Funded Debt Claims

The "***Junior Funded Debt Claims***" consist of the Second Lien Claims, the Third Lien Claims, and the Unsecured Notes Claims as described below. This Liquidation Analysis concludes that Holders of Junior Funded Debt Claims will receive no recovery in a hypothetical chapter 7 liquidation.

- Second Lien Revolving Loan Claims are allowed in the aggregate amount of $230,205,129.51;

- Second Lien Term Loan Claims are allowed in the aggregate amount of $3,234,860,037.30;

- Second Lien Notes Claims are allowed in the aggregate amount of $3,134,954,571.84;

- Third Lien Term Loan Claims are allowed in the aggregate amount of $4,194,855.45;

- Third Lien Notes Claims are allowed in the aggregate amount of $10,530,821.04; and

- Unsecured Notes Claims are allowed in the aggregate amount of $1,810,866,581.14.

## 20.    Other Secured Claims

This Liquidation Analysis concludes that Holders of Other Secured Claims will receive no recovery in a hypothetical chapter 7 liquidation.

The Company does not anticipate there to be any allowed Other Secured Claims.

**21.   Administrative Claims**

Administrative Claims include postpetition accounts payable and accrued expenses, including estimated severance for terminated employees prior to the Conversion Date, and any purported break fee payable under the Convertible B Exit Note Commitment Letter.  This Liquidation Analysis concludes that, except as otherwise specifically described herein, Holders of Administrative Claims will receive no recovery in a hypothetical chapter 7 liquidation.

**22.   Other Priority Claims**

This Liquidation Analysis concludes that Holders of Other Priority Claims will receive no recovery in a hypothetical chapter 7 liquidation.

**23.   Intercompany Claims**

This Liquidation Analysis concludes that Holders of Intercompany Claims will receive no recovery in a hypothetical chapter 7 liquidation.

**24.   Intercompany Interests**

This Liquidation Analysis concludes that Holders of Intercompany Interests will receive no recovery in a hypothetical chapter 7 liquidation.

**25.   Existing Equity Interests**

This Liquidation Analysis concludes that Holders of Existing Equity Interests will receive no recovery in a hypothetical chapter 7 liquidation.

<u>**Conclusion**</u>

The Debtors have determined, as summarized in the above analysis, that upon the effective date of the Amended Plan, the Amended Plan (regardless of whether the Wind-Down Toggle occurs thereunder) will provide all Holders of Claims with a recovery (if any) that is not less than what such Holders would receive pursuant to a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and as such believe that the Amended Plan (regardless of whether the Wind-Down Toggle occurs thereunder) satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

*[Remainder of page intentionally left blank]*

**<u>Exhibit D</u>**

**Financial Projections**

# Financial Projections

The Debtors' management ("Management")[1] prepared the following financial projections for the Reorganized Debtors (collectively, the "Financial Projections") to provide parties in interest, including Holders of Claims who may be entitled to vote to accept or reject the Amended Plan, with information about the future performance of the Debtors' operations (assuming the Wind-Down Toggle does not occur under the Amended Plan).  As of the date hereof, and as more fully described in the Disclosure Statement Supplement and the Disclosure Statement, the Debtors remain in negotiations with various commercial counterparties, including MLB, MLB teams, naming rights partners, and DTC distribution partners, among others, regarding go-forward arrangements.  The Financial Projections reflect, among other things, the terms of the recently renewed MVPD agreements and the potential outcomes of the aforementioned ongoing negotiations, as well as assumptions around naming rights, advertising sales, and DTC growth. Accordingly, the Financial Projections remain subject to update following completion of such negotiations.

The Financial Projections were prepared in good faith and reflect Management's estimate of the expected consolidated financial position, results of operations, and cash flows for the Reorganized Debtors after the transactions contemplated by the Amended Plan for 2024 through 2027 (the "Projection Period") assuming the Wind-Down Toggle does not occur under the Amended Plan, and are not applicable in a scenario where the Wind-Down Toggle occurs.  For the purposes of the Financial Projections, the Effective Date is assumed to be December 1, 2024 (the "Assumed Effective Date").  The Financial Projections take into account the estimated effects on the deleveraging and capitalization of the Debtors as set forth in the Amended Plan.

The Financial Projections reflect Management's judgment of expected future operating, business, and financial conditions, which are subject to change.  Although the Debtors have prepared the Financial Projections in good faith and believe the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized. All estimates and assumptions shown within the Financial Projections were developed by Management.  The Financial Projections have not been audited or reviewed by independent accountants.  The assumptions disclosed herein are those that Management believes to be significant to the Financial Projections.  Although Management is of the opinion that these assumptions, when considered on an overall basis, are reasonable under the current circumstances and expectations, such assumptions are subject to significant uncertainties, such as changes in customer demand and consumer preferences, successful implementation of cost-cutting and growth plans, laws and regulations, interest rates, inflation, and other economic factors affecting the Reorganized Debtors' business, and no assurance can be given that the Financial Projections will be realized.  Despite efforts to foresee and plan for the effects of changes in these circumstances, the impact cannot be predicted with certainty.  Consequently, actual financial results could vary significantly from projected results.  The Financial Projections should not be regarded as an expressed or implied representation or warranty by the Debtors, the Reorganized

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement Supplement, to which these Financial Projections are attached as **Exhibit D**, the Disclosure Statement, or the Amended Plan attached to the Disclosure Statement Supplement as **Exhibit A**, as applicable.

Debtors, or any other person as to the fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed in the Financial Projections.

The Financial Projections have been prepared on a consolidated basis.

Management continues to review treatment and planning strategies for U.S. federal, state, and foreign income tax purposes. The Financial Projections set forth herein assume an illustrative combined federal, state, and local tax rate of 24%. Actual treatment and realization of planning strategies may vary materially, resulting in substantially greater tax liabilities for the Debtors than is set forth in the Financial Projections.

**The Financial Projections, including the underlying assumptions, should be carefully reviewed in evaluating the Amended Plan. The significant assumptions used in the preparation of the Financial Projections are stated below. The Financial Projections assume that the Debtors will emerge from chapter 11 on the Assumed Effective Date and that a Wind-Down Toggle does not occur. The Financial Projections should be read in conjunction with (i) the Disclosure Statement and the Disclosure Statement Supplement, including any of the exhibits thereto or incorporated references therein, as well as the risk factors set forth in Article VIII of the Disclosure Statement and Article III of the Disclosure Statement Supplement, and (ii) the significant assumptions, qualifications, and notes set forth below. In deciding whether to vote to accept or reject the Amended Plan, Holders of Claims must make their own determinations as to the reasonableness of such assumptions.**

**The Financial Projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the Financial Accounting Standards Board, or the rules and regulations of the Securities and Exchange Commission. Furthermore, the Financial Projections have not been audited, reviewed, or subjected to any procedures designed to provide any level of assurance by the Debtors' independent public accountants. While presented with numerical specificity, the Financial Projections are based upon a variety of estimates and assumptions which, although developed and considered reasonable by Management, may not be realized and are subject to significant business, economic, and competitive uncertainties and contingencies, many of which are inherently difficult to predict and beyond the control of Management. These uncertainties include, among other things, the ultimate outcome and contents of a confirmed plan of reorganization and the timing of the confirmation of such plan. As noted above, the Financial Projections have also been developed while the Debtors remain in negotiations regarding material go-forward contractual arrangements, which may affect the Financial Projections in a material and possibly adverse or positive manner. Consequently, the Financial Projections should not be regarded as a representation or warranty by the Debtors, or any other person, as to the accuracy of the Financial Projections or that the Financial Projections will be realized. Moreover, the Financial Projections are subjective in many respects, and thus are susceptible to multiple interpretations and periodic revisions based on actual experience and future developments. Actual results may vary materially from those presented in the Financial Projections.**

The Debtors do not, as a matter of course, publish or disclose their financial projections. Accordingly, the Debtors disclaim any obligation to, (a) furnish updated Financial Projections to

Holders of Claims at any time in the future, (b) include updated information in any documents that may be required to be filed with the Bankruptcy Court or the Securities and Exchange Commission, or (c) otherwise make updated information or Financial Projections publicly available.

**Summary of General Assumptions**

The Financial Projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of confirmation and consummation of the Amended Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Reorganized Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends, including related to subscriber "churn" in the traditional linear cable and satellite business; and (e) the Reorganized Debtors' ability to grow their DTC product, including through a potential commercial arrangement with Amazon. The Financial Projections assume that the Debtors' will enter into an exclusive "channels" arrangement with a strategic partner with respect to the Debtors' DTC offering. The Financial Projections also make assumptions regarding the Debtors' ongoing negotiations with MLB, MLB teams, naming rights partners, and DTC distribution partners. As noted above, the Financial Projections assume that a Wind-Down Toggle does not occur.

The Financial Projections assume that the Amended Plan will be consummated on December 1, 2024, and the Debtors will emerge from chapter 11 at that time, although there can be no assurance as to when the Effective Date will actually occur, and that the Reorganized Debtors will continue to conduct their post-emergence operations substantially similar to their current business. The Financial Projections have been prepared using accounting policies that are consistent with those applied in the Debtors' historical financial statements. The Financial Projections, however, are unaudited and do not purport to represent financial statements prepared in accordance with accounting principles generally accepted in the United States, and are not intended to fully reconcile to the consolidated financial statements prepared by the Debtors. The Financial Projections assume working capital accounts, including accounts receivable, inventories, prepaid expenses, accounts payable, and accrued expenses continue to perform in line with historical activity.

Revenues include projected receipts from MVPDs and vMVPDs, the Debtors' DTC business, ad sales, and the naming rights deal. As described in the Disclosure Statement Supplement and the Disclosure Statement, the Debtors have successfully reached renewals of their distribution agreements with Charter, DIRECTV, Comcast, Cox, and others regarding longer-term distribution deals. The Financial Projections reflect, among other things, the terms of these renewed agreements. With respect to linear revenues, the Financial Projections assume certain customer churn rates over the Projection Period. There is no guaranty that the assumptions made in the Financial Projections in connection with the Debtors' go-forward arrangements with their MVPD partners will materialize. Thus, the projected revenues remain subject to change following finalization of such negotiations.

Operating expenses include production costs, sports rights payments, and other variable operating expenses, including costs associated with implementing the separation from Sinclair contemplated by the Amended Plan. The Financial Projections reflect the terms agreed with the NBA, the NHL, and their applicable teams for the duration of the Projection Period, which agreements were approved in orders entered by the Bankruptcy Court [Docket Nos. 2389, 2390]. As described in the Disclosure Statement Supplement and the Disclosure Statement, the Debtors are currently engaged with MLB and certain of its teams regarding the go-forward treatment of their contracts. The Financial Projections reflect, among other things, the potential outcomes of the ongoing negotiations with their team and league partners. There is no guaranty that the assumptions made in the Financial Projections in connection with the Debtors' go-forward arrangements with their team and league partners will materialize. Thus, the projected operating expenses remain subject to change following finalization of such negotiations.

The Financial Projections assume a post-emergence capital structure as of the Assumed Effective Date consisting of $200 million in aggregate principal amount of the Exit Term Loans and $100 million in loans outstanding under the New A/R Facility. The Exit Term Loans are assumed to have a maturity in the fourth quarter of 2027 and the New A/R Facility is assumed to have a maturity outside the Projection Period. Interest expense for the New A/R Facility is assumed to be 9.0% per annum cash interest. Interest expense for the Reorganized Debtors' Exit Term Loans is assumed to be 12.0% per annum cash interest. The Financial Projections assume no Investment Option is exercised during the Projection Period.

[*Reminder of the Page is Intentionally Left Blank.*]

## UNAUDITED PROJECTED BALANCE SHEET

*($ in millions)*

| | Forecast | | | |
|---|---|---|---|---|
| | **Dec-24E** | **Dec-25E** | **Dec-26E** | **Dec-27E** |
| **Assets** | | | | |
| **Current Assets** | | | | |
| Cash & Cash Equivalents | $249 | $293 | $307 | $290 |
| Accounts Receivable | 246 | 197 | 197 | 209 |
| Prepaid Sports Rights | 48 | 45 | 45 | 45 |
| Prepaid Expenses & Other Current Assets | 30 | 50 | 71 | 70 |
| **Total Current Assets** | **$573** | **$585** | **$620** | **$615** |
| | | | | |
| **Non-Current Assets** | | | | |
| Other Assets | $253 | $253 | $253 | $253 |
| Property & Equipment | 61 | 66 | 69 | 69 |
| Operating Lease Assets | 24 | 24 | 24 | 24 |
| Customer Relationships & Other Definite-Lived Intangible Assets, net | 1,118 | 1,118 | 1,118 | 1,118 |
| **Total Non-Current Assets** | **$1,456** | **$1,461** | **$1,464** | **$1,464** |
| | | | | |
| **Total Assets** | **$2,029** | **$2,046** | **$2,084** | **$2,079** |
| | | | | |
| **Liabilities & Equity** | | | | |
| **Current Liabilities** | | | | |
| Accounts Payable and Accrued Liabilities | $69 | $38 | $45 | $54 |
| New Exit Term Loans and New A/R Facility, current | -- | -- | 123 | -- |
| Operating Lease Liabilities, current | 12 | 12 | 12 | 12 |
| Other Current Liabilities | 15 | 24 | 40 | 54 |
| **Total Current Liabilities** | **$96** | **$73** | **$220** | **$120** |
| | | | | |
| **Non-Current Liabilities** | | | | |
| New Term Loans New A/R Facility, non-current | $300 | $247 | $75 | $63 |
| Operating Lease Liabilities, non-current | 16 | 16 | 16 | 16 |
| Other Long-Term Liabilities | 5 | 5 | 5 | 5 |
| Redeemable Noncontrolling Interests | 6 | 6 | 6 | 6 |
| **Total Non-Current Liabilities** | **$326** | **$274** | **$101** | **$89** |
| | | | | |
| **Total Liabilities** | **$422** | **$347** | **$321** | **$210** |
| | | | | |
| **Total Equity** | **$1,606** | **$1,699** | **$1,763** | **$1,869** |
| | | | | |
| **Total Liabilities & Equity** | **$2,029** | **$2,046** | **$2,084** | **$2,079** |

# UNAUDITED PROJECTED INCOME STATEMENT

| ($ in millions) | Forecast | | | |
|---|---|---|---|---|
| | 2024E | 2025E | 2026E | 2027E |
| EoP Linear Paying Subscribers | 22.6 | 20.1 | 18.2 | 16.7 |
| EoP DTC Subscribers | 0.7 | 1.5 | 1.8 | 2.1 |
| **Linear** | | | | |
| Distribution Revenue | $1,477 | $662 | $547 | $517 |
| Advertising and Other Revenue | 368 | 206 | 212 | 215 |
| **Total Linear Revenue** | **$1,845** | **$868** | **$760** | **$731** |
| Linear Expenses (excl. Sports Rights) | ($439) | ($246) | ($248) | ($265) |
| **Linear EBITDA Contribution** | **$1,406** | **$622** | **$512** | **$466** |
| **DTC** | | | | |
| Streaming Revenue | $74 | $157 | $327 | $475 |
| Advertising & Other Revenue | 15 | 34 | 55 | 67 |
| **Total DTC Revenue** | **$88** | **$190** | **$382** | **$542** |
| Cost of Revenue | ($13) | ($47) | ($100) | ($145) |
| Marketing Expenses | (15) | (21) | (37) | (51) |
| Other Expenses | (38) | (29) | (30) | (33) |
| **Total DTC Expenses (excl. Sports Rights)** | **($66)** | **($98)** | **($167)** | **($229)** |
| **DTC EBITDA Contribution** | **$22** | **$93** | **$215** | **$313** |
| **Consolidated Financials** | | | | |
| Linear EBITDA Contribution | $1,406 | $622 | $512 | $466 |
| DTC EBITDA Contribution | 22 | 93 | 215 | 313 |
| Sports Rights Payments | (1,499) | (675) | (637) | (637) |
| **Consolidated EBITDA** | **($70)** | **$39** | **$90** | **$143** |

# UNAUDITED PROJECTED STATEMENT OF CASH FLOWS

| ($ in millions) | Forecast | | | |
| --- | --- | --- | --- | --- |
| | **2024E** | **2025E** | **2026E** | **2027E** |
| **Consolidated EBITDA** | **($70)** | **$39** | **$90** | **$143** |
| Net JV and NCI Funds | 3 | 26 | 21 | 20 |
| Capital Expenditures | (8) | (17) | (19) | (19) |
| Separation Work | (21) | -- | -- | -- |
| Debt Service | (79) | (86) | (79) | (158) |
| Restructuring Professional Fees | (111) | -- | -- | -- |
| Emergence Transaction Fees & Other | (58) | -- | -- | -- |
| GUC Recoveries | (10) | -- | -- | -- |
| Federal & Local Income Taxes | -- | (2) | (2) | (14) |
| Initial DIP Funding | 100 | -- | -- | -- |
| Net Cash Flows of Emergence Sources & Uses | (97) | -- | -- | -- |
| Net Working Capital | 293 | 84 | 3 | 11 |
| **Increase / (Decrease) in Cash** | **($59)** | **$44** | **$14** | **($17)** |

# <u>Exhibit E</u>

## Valuation Analysis

### Valuation Analysis[1]

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE AMENDED PLAN. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE AMENDED PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE AMENDED PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

At the Debtors' request, Moelis & Company LLC ("Moelis") performed a valuation analysis to estimate the enterprise value of the Reorganized Debtors (the "Enterprise Value") on a going concern basis.

The valuation analysis set forth herein (this "Valuation Analysis") is based on information as of September 30, 2024, and is based on the business plan prepared by the Debtors' management. This Valuation Analysis assumes that the Wind-Down Toggle does not occur under the Amended Plan, and is not applicable in a scenario where the Wind-Down Toggle occurs.

Based upon and subject to the review and analysis described herein, and subject to the assumptions, limitations, and qualifications described herein, Moelis' view, as of September 30, 2024, was that the Enterprise Value of the Reorganized Debtors, as of an assumed valuation date, for purposes of Moelis' valuation analysis, of December 1, 2024 (the "Assumed Valuation Date"), would be in a range between $600 million and $1,000 million.  This analysis is based on the Debtors' management's assumption that the Reorganized Debtors will emerge with approximately $80 million of net debt on the balance sheet as of the Assumed Effective Date.  After adjusting for net debt, the implied equity value (the "Equity Value") would be in a range between $520 million and $920 million.

Moelis' views are necessarily based on economic, monetary, market, and other conditions as in effect on, and the information made available to Moelis as of the date of its analysis (September 30, 2024).  It should be understood that, although subsequent developments may affect Moelis' views, Moelis does not have any obligation to update, revise, or reaffirm its analysis or its estimate.

Moelis' analysis is based, at the Debtors' direction, on a number of assumptions, including, among other assumptions, that (i) the Debtors will be reorganized in accordance with the Amended Plan, which will be effective on the Assumed Valuation Date, (ii) the Reorganized Debtors will achieve the results set forth in the Debtors' management's financial projections attached as Exhibit D to the Disclosure Statement Supplement (the "Financial Projections") for 2024 through 2027

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement Supplement, to which this Valuation Analysis is attached as **Exhibit E**, the Disclosure Statement, or the Amended Plan attached to the Disclosure Statement Supplement as **Exhibit A**, as applicable.

(the "Projection Period") provided to Moelis by the Debtors,[2] (iii) the Reorganized Debtors' capitalization and available cash will be as set forth in the Amended Plan and the Disclosure Statement Supplement, and (iv) the Reorganized Debtors will be able to obtain all future financings, on the terms and at the times, necessary to achieve the results set forth in the Financial Projections.  Moelis makes no representation as to the achievability or reasonableness of such assumptions.  In addition, Moelis assumed that there will be no material change in economic, monetary, market, and other conditions as in effect on, and the information made available to Moelis, as of the Assumed Valuation Date.

Moelis assumed, at the Debtors' direction, that the Financial Projections prepared by the Debtors' management were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the Debtors' management as to the future financial and operating performance of the Reorganized Debtors.  The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project.  The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and, as a result, the actual enterprise value and/or equity value of the Reorganized Debtors may be materially higher or lower than the estimated range herein.  Among other things, failure to consummate the Amended Plan in a timely manner may have a materially negative impact on the enterprise value and/or equity value of the Reorganized Debtors.

The estimated Enterprise and Equity Values set forth above represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operators of the business and assets of the Debtors, after giving effect to the Amended Plan, based on consideration of certain valuation methodologies as described below.  The estimated Enterprise and Equity Values do not purport to constitute an appraisal or necessarily reflect the actual market values that might be realized through a sale or liquidation of the Reorganized Debtors, their securities or their assets, which may be materially higher or lower than the estimated value ranges herein.  The actual value of an operating business such as the Reorganized Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of such a business.

In conducting its analysis, Moelis, among other things: (i) reviewed certain publicly available business and financial information relating to the Reorganized Debtors that Moelis deemed relevant (i.e. historical filings, court filings, cleansed information as part of the current chapter 11 process, etc.); (ii) reviewed the Financial Projections furnished to Moelis by the Debtors; (iii) reviewed the capitalization of the Reorganized Debtors; (iv) conducted discussions with members of senior management and representatives of the Debtors concerning the matters described in clauses (i) and (iii) of this paragraph, as well as their views concerning the Debtors' business and prospects before giving effect to the Amended Plan, and the Reorganized Debtors' business and prospects after giving effect to the Amended Plan; (v) reviewed publicly available financial and stock market data for certain other companies in lines of business that Moelis deemed relevant; (vi) reviewed publicly available financial data for certain transactions that Moelis deemed

---

[2] Notwithstanding the use of the Financial Projections for purposes of this Valuation Analysis, the Valuation Analysis and the Financial Projections are qualified in their entirety by the notes set forth in the Financial Projections and the Disclosure Statement Supplement.

relevant; and (vii) conducted such other financial studies and analyses and took into account such other information as Moelis deemed appropriate. In connection with its review, Moelis did not assume any responsibility for independent verification of (and did not independently verify) any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects. In addition, at the direction of the Debtors, Moelis did not make any independent evaluation or appraisal of any of the assets or liabilities (contingent, insurance-related, derivative, off-balance-sheet, tax-related, or otherwise, nor was Moelis furnished with any such evaluation or appraisal) of the Reorganized Debtors. Moelis also assumed, with the Debtors' consent, that the final form of the Amended Plan does not differ in any respect material to its analysis from the final draft of the Amended Plan that Moelis reviewed.

The estimated Enterprise and Equity Values set forth herein do not constitute a recommendation to any Holder of a Claim as to how such Holder of a Claim should vote or otherwise act with respect to the Amended Plan. Moelis has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Amended Plan or the prices at which they may trade in the future. The estimated Enterprise and Equity Values set forth herein does not constitute an opinion as to fairness from a financial point of view to any Holder of a Claim of the consideration to be received by such Holder of a Claim under the Amended Plan, if any, or of the terms and provisions of the Amended Plan.

*[Remainder of page intentionally left blank]*

Valuation Methodologies

In preparing its valuation, Moelis performed a variety of financial analyses and considered a variety of factors. The following is a brief summary of the material financial analyses performed by Moelis, which consisted of (a) a discounted unlevered cash flow analysis, (b) a selected publicly traded companies analysis, and (c) for reference only, a selected transactions analysis. This summary does not purport to be a complete description of the analyses performed and factors considered by Moelis. The preparation of a valuation analysis is a complex analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description. As such, Moelis' valuation analysis must be considered as a whole. Reliance on only one of the methodologies used, or portions of the analysis performed, could create a misleading or incomplete conclusion as to enterprise value.

A. ***Discounted Unlevered Cash Flow Analysis.*** The discounted cash flow ("<u>DCF</u>") analysis is a valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business plus a present value of the estimated terminal value of that asset or business. Moelis' DCF analysis used the Financial Projections' estimated debt-free, after-tax free cash flows through December 31, 2027. These cash flows were then discounted at a range of estimated weighted average costs of capital ("<u>Discount Rate</u>") for the Reorganized Debtors. In determining the estimated terminal value of the Reorganized Debtors, Moelis utilized the perpetuity growth rate method which estimates a range of values for the Reorganized Debtors at the end of the Projection Period based on applying a range of growth rates to final year unlevered free cash flow. In estimating a range of perpetuity growth rates for its DCF analysis, Moelis took into account the highly contractual nature of the Reorganized Debtors' business, the long-term secular declines in the Reorganized Debtors' linear business segment, and the nascent nature of the Reorganized Debtors' DTC business segment.

To determine the Discount Rate, Moelis used the estimated cost of equity and the estimated after-tax cost of debt for the Reorganized Debtors, assuming a targeted, long-term, debt-to-total capitalization ratio based on debt-to-capitalization ratios of the selected publicly traded companies and the proposed capital structure contemplated by the Amended Plan. Moelis calculated the cost of equity based on (i) the capital asset pricing model, which assumes that the expected equity return is a function of the risk-free rate, equity risk premium, and the correlation of the stock performance of the selected publicly traded companies to the return on the broader market, and (ii) an adjustment related to the estimated equity market capitalization of the Reorganized Debtors, which reflects the historical equity risk premium of small, medium, and large equity market capitalization companies. Moelis utilized the statutory corporate tax rate in determining a go-forward blended tax rate. Moelis calculated the cost of debt utilizing its judgment based on the size, industry, and end-uses for the Reorganized Debtors and on corporate credit spreads in the current market environment.

B. ***Selected Publicly Traded Companies Analysis*** The selected publicly traded companies analysis is based on the enterprise values of selected publicly traded broadcasting and

regional sports network companies, diversified media and networks companies, and streamers that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors. Under this methodology, certain financial multiples that measure financial performance and value are calculated for each selected company and then applied to certain financial metrics for the Reorganized Debtors to imply an enterprise value for the Reorganized Debtors. Moelis used, among other measures, enterprise value (defined as market value of equity, plus book value of debt and book value of preferred stock and minority interests, less cash, subject to adjustments for other items where appropriate) for each selected company as a multiple of such company's publicly available consensus projected earnings before interest, taxes, depreciation, and amortization ("EBITDA") for calendar year 2026 and 2027.

Although the selected companies were used for comparison purposes, no selected publicly traded company is either identical or directly comparable to the business of the Reorganized Debtors. Accordingly, Moelis' comparison of selected publicly traded companies to the business of the Reorganized Debtors and analysis of the results of such comparisons was not purely mathematical, but instead involved considerations and judgments concerning differences in operating and financial characteristics and other factors that could affect the relative values of the selected publicly traded companies and the Reorganized Debtors. The selection of appropriate companies for this analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful market-based information.

C. ***Selected Transactions Analysis.*** Moelis conducted a selected transactions analysis for reference only and did not rely on the selected transactions analysis in determining its valuation analysis. The selected transactions analysis is based on the implied enterprise values of companies and assets involved in publicly disclosed merger and acquisition transactions for which the targets had operating and financial characteristics comparable in certain respects to the Reorganized Debtors. Under this methodology, a multiple is derived using the enterprise value of each such target, calculated as the consideration paid and the net debt assumed in the selected precedent transaction relative to a financial metric, in this case EBITDA. Such multiples were then applied to the Reorganized Debtors' EBITDA projected for the twelve month period as of December 31, 2026, to imply an enterprise value for the Reorganized Debtors. Moelis analyzed various merger and acquisition transactions that have occurred in the broadcasting / regional sports network sector since 2012.

Although the selected precedent transactions were used for comparison purposes, no company included in the selected precedent transaction analysis is either identical or directly comparable to the business of the Reorganized Debtors. Accordingly, Moelis' comparison of selected precedent transactions to the business of the Reorganized Debtors and analysis of the results of such comparisons was not purely mathematical, but instead involved considerations and judgments concerning differences in operating and financial characteristics and other factors that could affect the relative values implied by the selected precedent transactions analysis and the Reorganized Debtors. The selection of appropriate transactions for this analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful market-based information. Due to the limited number of recent transactions with

disclosed financials in the broadcasting / regional sports network sector, this methodology was considered for reference only.

<u>Reorganized Debtors - Valuation Considerations</u>

The estimated Enterprise Value and Equity Value set forth herein is not necessarily indicative of actual value, which may be significantly higher or lower than the ranges set forth herein. Accordingly, none of the Debtors, Moelis, or any other person assumes responsibility for the accuracy of such estimated Enterprise Value.  Depending on the actual financial results of the Debtors or changes in the economy and the financial markets, the equity value of the Reorganized Debtors as of the Assumed Valuation Date may differ from the estimated Equity Value set forth herein.  In addition, the market prices, to the extent there is a market, of the Reorganized Debtors' securities will depend upon, among other things, prevailing interest rates, conditions in the economy and the financial markets, the investment decisions of creditors receiving such securities under the Amended Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

*[Remainder of page intentionally left blank]*

**Exhibit F**

**Second A&R RSA**

[Filed at Docket No. 2519-1]