**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **DIAMOND SPORTS GROUP, LLC, *et al.*,[1]** | § | **Case No. 23-90116 (CML)** |
| | § | **(Jointly Administered)** |
| **DEBTORS.** | § | |

**THE UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTORS' FIRST**
**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
[ECF NO. 2497-1]

TO:  THE HONORABLE CHRISTOPHER M. LOPEZ
       UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), submits this objection to the *First Amended Joint Chapter 11 Plan of Reorganization* filed by Diamond Sports Group, LLC, *et al* (the "Debtors").

1.      On October 2, 2024, the Debtors filed the *Emergency Motion for Entry of An Order (I) Conditionally Approving the Adequacy of the Disclosure Statement Supplement, (II) Authorizing Continued Solicitation of the Amended Plan, and (III) Granting Related Relief* (the "Emergency Motion") (ECF No. 2499.) On that same day, the Debtors filed the *Notice of Filing*

---

[1] The last four digits of Debtors federal tax identification number, include: Diamond Sports Group, LLC (3143); ARC Holding, Ltd. (6758); Diamond College Sports, LLC (5824); Diamond Digital Group, LLC (0831); Diamond Gaming Services, LLC (8533); Diamond Mobile Holdings, LLC (5174); Diamond Ohio Holdings, LLC (N/A); Diamond Ohio Holdings II, LLC (N/A); Diamond San Diego Holdings, LLC (6188); Diamond Southern Holdings, LLC (1431); Diamond Sports Net Arizona Holdings, LLC (0234); Diamond Sports Net Arizona, LLC (1168); Diamond Sports Net Detroit, LLC (5952); Diamond Sports Net North, LLC (1366); Diamond Sports Net Ohio, LLC (7503); Diamond Sports Net West 2, LLC (5177); Diamond Sports Net, LLC (7112); Diamond Sports Sun, LLC (0357); Diamond St. Louis Holdings, LLC (9387); Diamond West Holdings, LLC (9811); Diamond-BRV Southern Sports Holdings, LLC (9111); Fastball Sports Productions, LLC (6199); FRSM Holdings LLC (3026); Sports Holding, LLC (6757); Sports Network II, LLC (2051); Sports Network, LLC (7733); SportSouth Network II, LLC (9432); SportSouth Network, LLC (8790); Sunshine Holdco, LLC (4370); and Diamond Sports Net Florida, LLC (7491). The Debtors service address in this chapter 11 case is: 3003 Exposition Blvd., Santa Monica, CA 90404.

*Amended Plan*, with the *Debtors' First Amended Joint Chapter 11 Plan of Reorganization* (the "Amended Plan") attached as Exhibit A to the notice (ECF No. 2497-1).

2.       On October 8, 2024, the U.S. Trustee filed his objection to the Emergency Motion with respect to the Disclosure Statement, the Amended Plan, and the solicitation procedures (the "U.S. Trustee's Objection") (ECF. No. 2515).

3.       On October 9, 2024, the Court conducted a hearing on the Emergency Motion and overruled the U.S. Trustee's Objection, approved the solicitation procedures, and conditionally approved the Disclosure Statement. The Court further stated that the U.S. Trustee's objections to the third-party releases and opt out procedures were plan confirmation objections.

4.       The U.S. Trustee hereby renews his objections to the third-party releases and opt out procedures contained in the Amended Plan. The U.S. Trustee adopts and incorporates the U.S. Trustee's Objection filed on October 8, 2024, and requests that confirmation of the Amended Plan be denied.

5.       Articles I.A.166 and I.A.167 of the Amended Plan define "Released Parties," and "Releasing Parties" as follows:

> 166. "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor and Post-Effective Date Debtor; (b) the Consenting Parties; (c) the Prepetition Notes Trustees; (d) the Prepetition Agents; (e) the UCC and each UCC Member; (f) the Sinclair-Related Litigations Defendants; (g) the Plan Administrator; and (h) with respect to each Person or Entity listed or described in any of the foregoing clauses (a) through (g), each such Person's or Entity's current and former Affiliates, and each such Person's or Entity's and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, participants, affiliated investment funds or investment vehicles, managed accounts or funds, and each of their respective current and former members, equity holders, officers, directors, managers, principals, employees, agents, advisory board members, investment fund advisors or managers, investment managers, financial advisors, partners, attorneys, accountants, investment bankers, consultants,

representatives, and other professionals, each in their capacity as such; *provided* that the following Persons and Entities shall not be Released Parties: (i) a Person or Entity that either (A) elects to opt out of the releases contained in the Plan or (B) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before entry of the Confirmation Order; or (ii) other than (A) non-Debtor Diamond Sports Finance SPV, LLC and the New A/R Facility Borrower, (B) any Debtor that is a member or equity holder (regardless of whether such interests are held directly or indirectly) in a non Debtor Entity in which any Debtor held an Interest as of the Petition Date, and (C) any members, directors, managers, officers, employees, or agents appointed by any Debtor at a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, any other Person or Entity affiliated with a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date and any non-Debtor Affiliates thereof.

167. "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor and Post-Effective Date Debtor; (b) the Consenting Parties; (c) all Holders of Claims (except as set forth in the proviso herein); (d) the Prepetition Notes Trustees; (e) the Prepetition Agents; (f) the UCC and each UCC Member; (g) the Sinclair-Related Litigations Defendants; (h) the Plan Administrator; and (i) with respect to each Person or Entity listed or described in any of the foregoing clauses (a) through (h), each such Person's or Entity's current and former Affiliates, and each such Person's or Entity's and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, participants, affiliated investment funds or investment vehicles, managed accounts or funds, and each of their respective current and former members, equity holders, officers, directors, managers, principals, employees, agents, advisory board members, investment fund advisors or managers, investment managers, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that the following Persons and Entities shall not be Releasing Parties: (i) a Person or Entity that either (A) elects to opt out of the releases contained in the Plan or (B) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before entry of the Confirmation Order; (ii) other than (A) non-Debtor Diamond Sports Finance SPV, LLC and the New A/R Facility Borrower, (B) any Debtor that is a member or equity holder (regardless of whether such interests are held directly or indirectly) in a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, and (C) any members, directors, managers, officers, employees, or agents appointed by any Debtor at a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, any other Person

or Entity affiliated with a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date and any non-Debtor Affiliates thereof; or (iii) Affiliates of JPMorgan Chase & Co. other than the JPM Parties.

6.     A hearing to consider final approval of the Disclosure Statement and confirmation of the Amended Plan is presently scheduled for November 14, 2024, at 9:00 a.m.

## **OBJECTION**

7.     Section 1129(a) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if it complies with all" requirements of section 1129(a). 11 U.S.C. § 1129(a). The Bankruptcy Code further requires that the "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Among other requirements, section 1129(a) mandates that "[t]he plan complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1).  The Debtors, as plan proponents, bear the burden of proof with respect to the confirmation requirements by a preponderance of the evidence. *Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown").

8.     Consistent with the requirements set forth in sections 1125(a) and 1129(a), the U.S. Trustee objects to confirmation of the Amended Plan because the Debtors have failed to show the requisite affirmative consent from all parties subject to the "consensual" third-party releases in the Amended Plan. The Plan would impose non-debtor release on those who merely vote for the plan with no option to opt out.  Further, the opt-out procedures for creditors are insufficient to show the affirmative consent required by law.  As a result, the Debtors are seeking to impose nonconsensual third-party releases on numerous affected parties without their manifested consent. As the Supreme

Court in *Purdue* made clear, the Bankruptcy Code does not permit non-consensual third-party releases, and therefore, the Debtors cannot show that they meet the requirements for approval of the Disclosure Statement and ultimately, confirming the Amended Plan.

### A. The Bankruptcy Code Does Not Authorize Nonconsensual Third-Party Releases.

9.      Nonconsensual third-party releases are not authorized under the United States Bankruptcy Code. *Purdue,* 144 S. Ct. at 2082–88.  This has long been the conclusion held by the Fifth Circuit Court of Appeals. *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions").

10.      The Supreme Court in *Purdue* did not decide what constitutes consent to a non-debtor release.  For the reasons discussed below, neither a vote to accept a plan nor a failure to check an opt-out box on a ballot constitutes consent to a non-debtor release in a chapter 11 plan.  Although opt-out provisions have been approved in some cases in the Southern District of Texas, a careful analysis of applicable law warrants reconsideration of the conclusion that imposing non-debtor releases based on a failure to opt out is permissible.  As explained below, state contract law governs whether non-debtors have agreed to a release.  There is no federal law that preempts the requirements of state contract law for such releases.  The cases in this district that have approved non-debtor releases based on a failure to opt out did not apply state law.  Instead, they bound creditors to non-debtor releases based on a failure to opt out because they treated the creditors' silence as a form litigation default or analogized to class actions.  But as explained below, neither of those theories supports disregarding applicable state law.

### B.    State Law Governs Whether a Release Is Consensual

11.    Whether parties have reached an agreement—including an agreement not to sue—is governed by state law.  The only exception is if there is federal law that preempts applicable state contract law.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

12.    No federal law applies to the question of whether the nondebtor Releasing Parties have agreed to release the non-debtor Released Parties.  The Bankruptcy Code does not apply to agreements between non-debtors.  And no Bankruptcy Code provision authorizes courts, as part of an order confirming a chapter 11 plan, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where consent would not exist under state law.  Nor does 11 U.S.C. § 105(a) confer any power to override state law.  Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code."  *Purdue Pharma, L.P.*, 144 S. Ct. at 2082 n.2 (quotation marks omitted).  Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity."  *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).  Thus, the state-law definition of consent is not diluted or transformed by the Bankruptcy Code.

13.    Indeed, "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law."  *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48

(1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").  Thus, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

14.    Because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state contract principles are the source of authority when considering whether a release is consensual.  *See, e.g., Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024) (holding that after *Purdue*, "in the absence of some sort of affirmative expression of consent that would be sufficient as a matter of contract law, the creditor's silence in the face of a plan and form of ballot can no longer be sufficient."); *Patterson et al. v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (holding that a third-party release "is no different from any other settlement or contract"); *id.* at 507 (holding that "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks

7

omitted) (alterations in original).  As one court recently held, because "nothing in the bankruptcy code contemplates (much less authorizes it)' . . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent."  *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 144 S. Ct. at 2086). Accordingly, "any such consensual agreement would be governed by state law."  *Id.*

15.     Here, the Debtors do not meet the state-law burden of establishing that the Releasing Parties will expressly consent to release their property rights.

### C.  Under State law, silence does not confer consent in contract, except in limited circumstances not applicable here

16.     The "general rule of contracts is that silence cannot manifest consent." *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 686 (E.D. Va. 2022).

17.     "Acceptance by silence is exceptional.  Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

18.     "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

19.     Thus, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  *See also Patterson*, 636 B.R. at 686 (discussing how contract law does not support consent by failure to opt out).  Further, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent

8

without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69, cmt. c (1981). *See also Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227-28 (9th Cir. 2022) ("[E]ven though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance.") (quotation marks omitted).

20.     Texas state law, as a point of reference, is in accord.  Under Texas law, silence does not equate to consent except under limited circumstances not applicable in these cases. *See Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000). Further, the Commission of Appeals of Texas stated that:

> A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services. Of course, in implied contracts as well as express contracts there must be shown the element of mutual agreement. But the only difference is that such agreement is expressly stated, in the one instance, and is inferred from the circumstances, in the other. A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one.

*Marr-Piper Co. v. Bullis*, 1 S.W.2d 572, 575 (Tex. Comm'n App. 1928).

21.     Silence and inaction, however, will generally not be deemed assent to an offer because, with silence, there is no meeting of the minds. *Matagorda Cty.*, 52 S.W.3d at 132–33 (quoting 2 Williston on Contracts § 6:49 (4th ed. 1991)). "[A]s a matter of law, when a party is unilaterally informed of [a contract term], 'mere failure to object within a reasonable time . . ., without more, could not establish an agreement between the parties.'" *In re Couture Hotel Corp.*, 554 B.R. 369, 381 (Bankr. N.D. Tex. 2016) (quoting *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 665 S.W. 2d 443, 445–46 (Tex. 1982)). "[A] meeting of the minds is

an essential element of an implied in fact contract." *Id.* (quoting *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008)) (internal quotation omitted). 2008)); *see also Beverick v. Koch Power, Inc., 186 S.W.3d 145, 152* (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("Silence cannot satisfy the basic requirements of contract creation.").

22.     As the Fifth Circuit explained: "Tacit acquiescence between relative strangers ignores the basic tenets of contract law. . . .  While there may be exceptions in cases involving parties with longstanding relationships, generally speaking, 'silence or inaction does not constitute acceptance of an offer.'"  *Imperial Ind. Supply Co v. Thomas*, 825 F. App'x 204, 207 (5th Cir. Sept. 2, 2020) (quoting *Norcia v. Samsung Telecomms Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017)).  As another District Court within this Circuit explained, "[t]his idea that [the plaintiff] can unilaterally bind another party to a contract, however, is contrary to law.  It is a fundamental principle of contract law that to create an enforceable contract, there must be a clear and definite offer followed by a clear and definite acceptance in accordance with the offer's terms."  *Redmond v. Williams*, No. 22-cv-00910, 2023 LW 7984388, at *6 (E.D. Tex. Sept. 13, 2023).  Acceptance of an offer "is established only by conforming to the rules governing acceptance, not a separate theory of 'waiver and ratification.'"  *Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1186 (5th Cir. 1981).

23.     Thus, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  *See also Patterson*, 636 B.R. at 686 (discussing how contract law does not support consent by failure to opt out).  Further, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent

without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69, cmt. c (1981). *See also Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227-28 (9th Cir. 2022) ("[E]ven though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offeror cannot prescribe conditions so as to turn silence into acceptance." (quotation marks omitted).

### D. The Plan Proponents Cannot Impose Releases by Treating a Failure to Opt Out as a Form of Default

24.     Applicable state contract law cannot be disregarded on a default theory, applied by some courts, that creditors who remain silent forfeit their rights against non-debtors because they received notice of the non-debtor release, just as they would forfeit their right to object to a plan if they failed timely to do so.  In particular, this Court in *In re Robertshaw US Holding Corp.*, No. 24-90052, 2024 WL 3897812, at \*17 (Bankr. S.D. Tex. Aug. 16, 2024), cited *In re Arsenal Intermediate Holdings, LLC* for the proposition that "there is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan."  As Judge Goldblatt, the author of *Arsenal*, explained in *Smallhold, Inc.*, "[t]he rationale of *Arsenal* was that creditors that did not object to or opt out of a third-party release could essentially be 'defaulted,' with the release being imposed on them, despite their silence, on that basis." *In re: Smallhold Inc.,* No. 24-10267 (CTG), 2024 WL 4296938, at \*8 (Bankr. D. Del. Sept. 25, 2024). But "[u]nder established principles," courts may enter relief against a party who defaulted by not responding "*only* after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff in litigation." *Smallhold, Inc.*, 2024 WL 4296938, at \*2 (emphasis added); *see also id*. at \*13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so.").

25.     A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *Id*.  "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id*.  Because a nonconsensual nondebtor release is "*per se* unlawful . . it is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id*. Absent the default theory of consent that was applied in *Arsenal*, Judge Goldblatt reasoned that "no other justification for treating the failure to 'opt-out' as 'consent' to the release can withstand analytic scrutiny." *Id*. Because imposing non-debtor releases is not "appropriate under the ordinary principles that govern when a default may be entered . . . ***affirmative consent is required.*" *In re: Smallhold Inc.,* No. 24-10267 (CTG), 2024 WL 4296938, at *8 (Bankr. D. Del. Sept. 25, 2024) (*emphasis added*).

26.     Judge Goldblatt further illustrated the point with an example of a plan of reorganization that required each creditor who failed to check an "opt-out" box on a ballot was required to make a $100 contribution to the college education fund for the CEO of the debtor. He concluded that "no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution. But none of the cases that authorizes the opt-out third-party release provides any limiting principle that would distinguish the third-party release from the college education fund plan. And after *Purdue Pharma*, there is none." *Id*.

27.     Here, the Amended Plan provides broad non-debtor third-party releases to numerous known and unknown parties and would also deprive creditors (some of whom will not receive notice as discussed below) from their legal rights under the pretense of consent. As noted in *Smallhold*, "[t]his Court's application of ordinary and settled legal principles leads it to conclude

that there is no longer a legal basis to distinguish a traditional opt-out plan from the college education fund plan, which no bankruptcy court would confirm." As such, this Court should not approve the third-party releases in the Amended Plan because there is not sufficient evidence of manifested consent from creditors to release with their legal rights against non-debtors.

### E.   Merely Voting for a Plan Does Not Provide the Required Affirmative Consent

28.     The Debtors propose that the non-debtor releases in the Amended Plan bind all parties who vote to accept the Amended Plan.  Because the Amended Plan forces non-debtor releases on these parties without their affirmative consent, the releases are non-consensual and cannot be approved under *Purdue*.

29.     The Amended Plan's conflation of voting for the Amended Plan with acceptance of the Third-Party Release is inconsistent with state law.  Voting for a plan does not reflect the unambiguous assent necessary to find consent to a release.  *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (holding that, because consensual releases are premised on the party's agreement to the release, "it is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan").

30.     Voting on a chapter 11 plan is governed by the Bankruptcy Code, and voter support only reflects approval of the plan's treatment of the voters' claims *against the debtor*.  Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors.  People voting on the chapter 11 plan have not "manifest[ed] [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. A.  Nor are they "silently tak[ing] offered

benefits" from the released non-debtors, such that consent may be inferred. *Id.* The only benefits received are through distributions from the debtor's chapter 11 plan—there are no benefits provided from the released non-debtor to the releasing claimant in exchange for the release. And because the plan's distributions are not contingent on agreeing to the non-debtor release, one cannot infer consent from the acceptance of those distributions. *See Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017) (holding customer did not retain any benefits such that a failure to opt out of arbitration indicated consent when the warranty applied regardless of the failure to opt out).

31.     As explained in *Arrowmill*, a voluntary release arises only "because the *creditor agrees*" to it. 211 B.R. at 507 (emphasis in original). Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan." *Id.* (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998). Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt." *Arrowmill*, 211 B.R. at 507.

32.     Further, a plan is presented as a package deal—a person votes yes or no on the entire plan, not particular aspects of it—and a person should not be compelled to accept a non-debtor release as a condition of receiving the benefits of a plan. That is not true consent. For those who believe the plan is the best way to maximize the return of their money from the debtor, requiring them to vote "no" on the Plan—thus raising the possibility that the Plan may not be able to be confirmed and they thus cannot receive the economic benefit under the Plan—to reject the nondebtor release would be penalizing them for exercising their right to vote in favor of the Plan.

That an offeree is penalized unless an "offer" is accepted "preclude[es] an inference of assent." *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1230-31 (9th Cir. 2022).

33.     Hence, voting for a plan does not reflect actual and knowing consent, particularly in the context of "an immensely complicated plan" where "it would be difficult for any layperson to comprehend all of its details."  *In re Congoleum Corp.*, 362 B.R. at 194.

### F.   *Failing to Opt Out Does Not Provide the Required Affirmative Consent*

34.     As discussed above, merely voting for a plan is not an expression of consent to a non-debtor release.  Failure to opt out of a non-debtor release or object to the Plan is still nothing more than silence with respect to the offer to release claims against non-debtors.

35.     But an affirmative agreement—something more than the failure to opt out or object—is required to support a consensual third-party release.  *See In re Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *3 (Sept. 25, 2024) ("[A] creditor cannot be deemed to consent to a third-party release without some affirmative expression of the creditor's consent."); *see also id*. at *8 *In re Decision and Order on Disclosure Statement, Tonawanda Coke Corp.*, Case No. 18-12156, Dkt. 790 at 5 (Bankr. W.D.N.Y. Aug. 27, 2024); *Patterson*, 636 B.R. at 686.  Failing to "opt out" of an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits.  For example, applying black letter contract principles to opt-out releases in a chapter 11 plan in *Patterson*, the Court found that contract law does not support consent by failure to opt-out.  *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient ***affirmation of consent***." *Id.* at 688. (*emphasis added*).

36.     The Ninth Circuit's decision in *Norcia*, cited by the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement.  *Norcia*, 845 F.3d at 1282.  Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number."  *Id*.  It also stated that opting out would not affect the warranty coverage. *Id*.  The customer did not take any steps to opt out.  *Id*.  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *Id*. at 1282-83.

37.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer.  Samsung is not a signatory."  845 F.3d at 1290.  That is even more true in the context of a chapter 11 plan.  Not only are the nondebtor Released Parties not signatories to it, a chapter 11 plan is not a contract but a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not for resolving claims between non-debtors.  As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors.... [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators."  *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

38.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate.  Unsurprisingly—because there was no applicable federal law

and the question was not whether one could opt out of a class action—the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." 845 F.3d at 1286 (quotation marks and citation omitted).

39. The Ninth Circuit explained that exceptions to this rule exist when the offeree has a duty to respond or when the offeree retains the offered benefits but held neither exception applied. *Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *Id.* at 1286.

40. Here, too, the debtor's creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests acceptance of an offer to release them.

41. *First*, those voting to reject a plan have not affirmatively consented to a non-debtor release by failing to opt out of it. To the contrary, they have affirmatively rejected the Plan. It is

implausible to suggest that a party returning a ballot rejecting the plan but neglecting to opt out of the third-party release is evidencing consent to the third-party release.  Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan.

42.     Merely casting a vote on a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). While the *Smallhold* court was to correct to apply "ordinary contract principles," *In re Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *3 (Sept. 25, 2024), in concluding that voting on a plan without opting out can be deemed consent, it erred by failing to consider whether any of the exceptions to the rule that silence is not consent apply in this context.  They do not.

43.     Those voting on the chapter 11 plan have not "manifest[ed] [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Creditors have no affirmative obligation to act on a plan, either to vote or to opt out.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *In re SunEdison, Inc.*, 576 B.R. at 460–61 (holding creditors have no duty to speak regarding a plan that would allow a court to infer consent from silence). And as in *Norcia*, creditors have no state law duty to respond to an offer to release nondebtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released nondebtors that would impose such a duty.  A claimant's failure to respond with an affirmative acceptance of a non-debtor release thus does not fit within the exception to the general rule that consent cannot be inferred from silence.

44.     Nor are creditors who cast a vote on a plan without checking an opt-out box "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). The only benefits received are through distributions from the debtor's chapter 11 plan. Because creditors are entitled to whatever distributions the Plan allocates them regardless of whether they opt out of the nondebtor releases, consent to the nondebtor release cannot be inferred from acceptance of those benefits. *See Norcia*, 845 F.3d at 1286 (holding customer did not retain any benefits when warranty applied regardless of failure to opt out). Further, acceptance of a "benefit"—distributions under the plan— that the offeror had no right to refuse the offeree does not manifest acceptance of the offer. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co*., 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

45.     All this is made clearer by the circumstance where a creditor casts his vote on a plan by *rejecting* that plan but neglects, for reasons unknown, to also check an opt out box.   In *In re Chassix Holdings, Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015), the United States Bankruptcy Court for the Southern District of New York explained why the independent consent to a third-party release required under contract law cannot be inferred from a vote to reject a chapter 11 plan:

> If (as prior cases have held) a creditor who votes in favor of a plan have implicitly endorsed and 'consented' to third party releases that are contained in that plan, then by that same logic a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. ***The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.***

*Id.* at 79 (emphasis added).

19

46. *Second*, even more obviously, the releases cannot be imposed on those who do not vote and do not opt out—whether because they abstain from voting or are ineligible to vote. *See Smallhold*, 2024 WL 4296938. In either case, the creditor has not manifested affirmative consent to a nondebtor release by failing to return an opt out form or by failing to object to the Plan. *See, e.g., In re Wash. Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) (holding failing to return a ballot is not a sufficient manifestation of consent to a third-party release"); *SunEdison*, 576 B.R. at 458–61 (holding that, under principles of New York contract law, a creditor could not be deemed to consent to third party releases merely by failing to object to the plan, even when the disclosure statement made it clear that such a consequence would result); *Chassix Holdings*, 533 B.R. at 81–82. An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place). *Wash. Mut.*, 442 B.R. at 355.

47. Conspicuous warnings in the disclosure statement, the plan ballots, or an opt-out form that silence or inaction will constitute consent to a release are not sufficient to convert a party's silence into consent to the release. *SunEdison*, 576 B.R. at 458–61. In *SunEdison*, the debtors argued that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release. *Id*. at 460–61. The court rejected this argument because the debtors failed to show that the nonvoting creditors' silence was misleading or that the nonvoting creditors' silence signified their intention to consent to the release (finding that silence could easily be attributable to other causes). *Id*. The debtors did not contend that an ongoing course of conduct between themselves and the nonvoting creditors gave rise to a duty to speak. *Id*. at 460.

20

48.     Just as creditors have no federal or state law duty to vote on a plan, they also have no obligation to read a plan.  And creditors who have no intention of voting in the first place are unlikely to do so. "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." [2] *In re Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015). *See also In re Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *12 (Sept. 25, 2024) ("It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy.").

49.     Moreover, the court in *SunEdison* observed that parties who are solicited, but do not vote, may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. As the *Emerge Energy Services, LP* court noted, "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not

---

[2] At the confirmation hearing in *Chassix Holdings Inc.*, Judge Wiles explained why courts should be wary of deeming consent based on a party's inaction:

> [I]t's a legal fiction.  It's not consent in any real sense.  It's consent by inaction, knowing perfectly well, that the legal fiction that people have read it and decided, well, I'm just going to abide by this consequence is nonsense.  People throw these things away.  They pay no attention whatsoever, and so the question is, what business do the Courts have basically helping to expand the number of parties who are deemed to consent to these releases.

*In re Chassix Holdings, Inc.,* Case No. 15-10578 (MEW), ECF No. 654 (Bankr. S.D.N.Y. Jul. 21, 2015), Tr. 158:1-9.

qualify" as waiver through a party's silence or inaction. No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original).

50.     In addition, Judge Scott W. Everrett in the Northern District of Texas found that because "there are no Federal Bankruptcy Rules or Federal Civil Rules that govern whether or not somebody can assent through silence to a deemed release," courts should look at Texas law to determine whether opt-out provisions are effective to confer consent to a third party. *In re 4 W. Holdings, Inc.*, Case No. 18-30777, ECF No. 2086 (Bankr. N.D. Tex. Oct. 18, 2022). In examining Texas state law, Judge Everett held in *4 West Holdings, Inc.* that silence does not equate to consent under Texas contract law and that none of the three exceptions to that principle applied to the opt-out provisions. *Id.*  Based on these holdings, the U.S. Trustee submits that evidence of affirmative consent, is required by applicable law for the third-party releases to be effective.

51.     Here, the Court should apply state law and not construe the inaction of abstaining parties to mean that they consent to the broad third-party releases in the Amended Plan. Instead, the releasing parties should be limited to those parties that affirmatively manifested their consent to grant a release. Accordingly, the Court should not approve imposition of the third-party releases on parties that abstained from acting in these cases.

### G.  The Debtors Have Not Provided Notice to Procure Affirmative Consent from All Parties Affected by the "Consensual" Third-Party Releases

52.     Even if the Court finds that the third-party releases are consensual for parties that received notice of them, the Debtors have not provided notice to all affected parties and such parties cannot be deemed to have consented based on the record provided. As the Supreme Court held in *Mullane v. Central Hanover Bank & Trust Co.*, an "elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present

their objections." 339 U.S. 306, 314 (1950). Not all affected parties in these cases have received notice or an opportunity to object or opt-out of the third-party releases, and certainly never expressly consented to the broad releases in the Plan. There is no evidence in the Plan or the solicitation materials that the Debtors provided notice to the unusually broad breadth of parties included in the definition of "Releasing Parties." The "Releasing Parties" include *inter alia* with respect to each defined person or entity listed or described in the definition,

> each such Person's or Entity's current and former Affiliates, and each such Person's or Entity's and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, participants, affiliated investment funds or investment vehicles, managed accounts or funds, and each of their respective current and former members, equity holders, officers, directors, managers, principals, employees, agents, advisory board members, investment fund advisors or managers, investment managers, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

*See* Amended Plan, Art. I.A.167.

53.     Indeed, the record is devoid of *any* evidence showing that the Debtors made efforts to (1) identify the parties referenced above that are affected by the third-party releases; (2) provide notice to the parties referenced above of the third-party releases and an opportunity to object or opt out; and (3) show a manifestation of their affirmative consent to the third-party releases in the Amended Plan.  Because these affected parties were not even provided notice of the nondebtor release, much less an opportunity to consent or even opt out, imposing nondebtor releases on them is inarguably nonconsensual and in violation of the Supreme Court's recent ruling in *Purdue.*

### H.  Opt-Outs in Class Actions are Distinct from Opt-Outs in a Chapter 11 Plan

54.     This Court in *Robertshaw* referenced opt outs in class actions as providing consent. *In re Robertshaw*, 662 B.R. 300, 323 n.120 (Bankr. S.D. Tex. 2024). But the class action rules— Federal Rule of Civil Procedure 23, incorporated by Federal Rule of Bankruptcy Procedure 7023

only for adversary proceedings—by their own terms do not apply here.  This is not an adversary proceeding to which Bankruptcy Rule 7023 applies and no one has sought class treatment here. Fed. R. Bankr. P. 7023.

55.     Nor is there any provision in the Bankruptcy Code that would authorize treatment of creditors' claims against non-debtors as a class action.  Importantly, "people who fail to respond to class action notices are bound because that is the legal consequence that the Rule specifies, and not on the theory that their inaction is the equivalent of an affirmative joinder in an action." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, "[t]here is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism." *Id*.  Absent a duly enacted statute or federal rule of procedure, a court cannot unilaterally transplant Rule 23(b)(3)'s class-action "opt out" procedure to bankruptcy proceedings to confirm a chapter 11 plan. Accordingly, federal class action law does not apply and cannot preempt state contract law, which (as discussed above) requires affirmative consent.

56.     Indeed, as the court found in *Patterson*, "the comparison to class action litigation highlights the impropriety of finding releases consensual based merely on a failure to opt out" because in class actions, unlike chapter 11 plan confirmations, "courts must ensure that the class action complies with the unique requirements of Rule 23 of the Federal Rules of Civil Procedure."[3] 636 B.R. at 686. As Judge Goldblatt observed in *Smallhold,* while opt outs are allowed in the class

---

[3] Further, "in the class action context there is a public policy that favors the consolidation of similar cases and that justifies the imposition of a rule that binds class members who have not affirmatively opted out." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, there is no "general 'public policy' in favor of making third party releases applicable to as many creditors as possible." *Id*.

action context, "the critical difference is that in the class action context, a class is only certified after a court makes a factual finding that the named representative is an appropriate representative of the unnamed class member. In the plan context, there is no named plaintiff, found by the court to be an adequate representative, whose actions may presumptively bind others." 2024 WL 4296938, at *12 n.53.

57.     Federal class actions may proceed only after a court certifies that the class meets a series of rigorous procedural requirements designed to ensure the appropriateness and fairness of class-wide litigation.   For any class to be certified, Rule 23(a) requires a court to find: (1) commonality ("questions of law or fact common to the class"); (2) typicality (named parties' claims or defenses "are typical . . . of the class"); and (3) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23); *see id.* at 621 (noting that these standards protect against the variability of equitable justice).

58.     Once those threshold showings are made, Rule 23(b) then requires that one of three further predicates satisfied.  Speaking generally, Rule 23(b)(1) authorizes class treatment where "individual adjudications would be impossible or unworkable," while Rule 23(b)(2) authorizes class actions where "the relief sought must perforce affect the entire class at once."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011).  Rule 23(b)(3), in turn, authorizes class treatment only where a court finds both that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Opt-out procedures are only available in class actions under Rule 23(b)(3),

not those under Rule 23(b)(1) and 23(b)(2).  *See Wal-Mart Stores*, 564 U.S. at 362 (explaining that "unlike (b)(1) and (b)(2) classes, the (b)(3) class is not mandatory").

59.     Congressionally approved class action procedures also entail additional procedural safeguards.  A class must be specifically defined to identify the class members and the class claims. Fed. R. Civ. P. 23(c)(1)(B).   Moreover, the court must appoint class counsel that can best "represent the interests of the class."  Fed. R. Civ. P. 23(g).  And for classes certified under Rule 23(b)(3), class members must receive "the best notice practicable" that must "clearly and concisely state in plain, easily understood language:" the nature of the action, who the class is, what their claims or defenses are; their right to appear in the action through an attorney; their right to exclude themselves from the action; how and when to exclude themselves; and the binding nature of the judgment if they do not. In other words, the Federal Rules of Civil Procedure set objective procedural protections before a class can be certified and potential members bound.

60.     Further, "any class settlement that would bind absent class members requires court approval."  *Patterson*, 636 B.R. at 686 (citing Fed. R. Civ. P. 23(e)).  And approval may only be granted if, after a hearing, the court finds the settlement is "'fair, reasonable, and adequate' taking into account whether '(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other.'"  *Id*. at 687 (quoting Fed. R. Civ. P. 23(e)(2)).  "The inquiry appropriate under Rule 23(e) . . . protects unnamed class members from unjust or unfair settlements affecting their rights."  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

61.     None of these protections exist in the context of a non-debtor release in a bankruptcy action."  *Patterson*, 636 B.R. at 686.  "[N]o party litigates on behalf of the absent

releasing party." *Id.*  And "[n]o party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent releasing party." *Id.*  "Moreover, the absent releasing party does not enjoy counsel that will represent his best interests in his stead."[4]  *Id.*

62.     Finally, in a class action, members that fail to opt out have claims litigated on their behalf, and they may receive whatever proceeds are won in that litigation.  Under a chapter 11 plan with non-debtor releases, although non-debtors may receive a distribution under the plan for their claims against a debtor, non-debtors lose their claims against the non-debtor and any corresponding compensation forever if they (1) are unaware of the release and (2) fail to take affirmative action to opt out or object.  Indeed, if a mere failure to opt out constitutes consent to a non-debtor release in bankruptcy, "then no court carries an obligation to ensure the fairness, reasonableness and adequacy of the relief afforded the absent releasing parties." *Patterson*, 636 B.R. at 687.

63.     Notably, state law also provides class-action procedures, with similar procedural protections to federal class actions, in which unnamed class members are bound by a court-approved class settlement unless they opt out.  *See* Tex. R. Civ. P. 42.  But outside of that class-action context, ordinary contract principles apply, and a person cannot force a contract on someone else by deeming silence, such as a failure to "opt out," to be consent, except in narrow circumstances inapplicable here.  *See supra* ¶¶ 11-23.

---

[4] Although the official committee of unsecured creditors owes a fiduciary duty to the creditor body as a whole, it does not owe a duty to any individual creditor or any specific group of creditors, and the diverse body of creditors to whom it owes duties often has conflicting interests.  *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992) (fiduciary duty of individual members of an official committee "extends to the class as a whole, not to its individual members").  Further, the committee's duties relate only to claims against the debtor, not claims against non-debtors.

## CONCLUSION

64.     The Court should not confirm the Plan because it will impermissibly impose third-party releases on parties who have not affirmatively and unambiguously consented to broad releases. Neither a vote in favor of a plan nor the Debtors' use of the opt-out provisions in the solicitation materials and Amended Plan is sufficient to confer a party's manifested consent to third-party releases. Further, the individuals and entities included as Releasing Parties include affected parties that have not been identified or provided notice of the third-party releases and the Debtors have provided no evidence that such creditors have consented. Absent the Debtors showing appropriate consent from all parties affected by the third-party releases in the Amended Plan, the Court should not confirm the Plan.

Dated: November 5, 2024,

Respectfully submitted,

KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

/s/ Ha M. Nguyen
Ha Nguyen, Trial Attorney
CA Bar #305411
FED ID NO. 3623593
United States Department of Justice
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, Texas 77002
E-mail: Ha.Nguyen@usdoj.gov
Cell: 202-590-7962

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *The United States Trustee's Objection to the Debtors' First Amended Joint Chapter 11 Plan of Reorganization*, was served by electronic means for all Pacer system participants requesting notice on this the 5th day of November 2024.

/S/ Ha Nguyen, Trial Attorney

28