# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) Case No. 23-90116 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DEBTORS' (I) MEMORANDUM OF LAW IN SUPPORT OF (A) FINAL APPROVAL OF THE DEBTORS' DISCLOSURE STATEMENT SUPPLEMENT AND (B) CONFIRMATION OF THE DEBTORS' PLAN AND (II) REPLY TO CERTAIN OBJECTIONS THERETO

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG.  The Debtors' service address for purposes of these chapter 11 cases is:  c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

# Table of Contents

**Page**

Preliminary Statement ........................................................................................................ 1

Background ......................................................................................................................... 5

I.       Procedural History ................................................................................................. 5

    A.       The Initial RSA .......................................................................................... 5

    B.       The Cooperation Agreement ....................................................................... 6

    C.       The RSA ...................................................................................................... 7

    D.       Investigation, Litigation, and the Sinclair Settlement ................................ 8

    E.       Original Plan and Initial Solicitation ......................................................... 8

    F.       Subsequent Developments Following the Filing of the Original Plan ................ 10

        i.       Developments with Sinclair .......................................................... 10

        ii.       MVPD Agreements ........................................................................ 11

        iii.       Commercial Agreement with Amazon ........................................... 11

        iv.       League and Team Agreements ........................................................ 12

        v.       The DIP Amendment and Modified UCC Settlement .................... 12

    G.       Amended Plan, Disclosure Statement Supplement, and Supplemental Solicitation .............................................................................................. 14

II.      Voting Results ...................................................................................................... 16

III.     Objections ............................................................................................................ 18

Argument ......................................................................................................................... 18

I.       The Disclosure Statement Supplement Contains "Adequate Information" as Required by Section 1125 of the Bankruptcy Code, and the Debtors Complied with Applicable Notice Requirements ................................................................. 18

    A.       The Disclosure Statement Supplement Contains Adequate Information ............. 18

    B.       The Debtors Complied with the Applicable Notice Requirements ..................... 21

    C.       The Solicitation of the Plan Complied with the Bankruptcy Code and Was Conducted in Good Faith ..................................................................... 22

II.      The Plan Satisfies Each Requirement for Confirmation Under Section 1129 of the Bankruptcy Code and Should be Confirmed ................................................. 22

    A.       Section 1129(a):  The Plan Meets Each of the Applicable Requirements for Confirmation Under Section 1129(a) of the Bankruptcy Code ..................... 23

        i.       Section 1129(a)(1):  The Plan Complies with the Applicable Provisions of the Bankruptcy Code ......................................... 23

        ii.       The Debtors Have Complied with Applicable Provisions of the Bankruptcy Code as Required by Section 1129(a)(2) ............ 35

**Table of Contents**
(Continued)

Page

iii.     Section 1129(a)(3):  The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law................................. 37

iv.     Section 1129(a)(4):  The Plan Provides That Professional Fees and Expenses Are Subject to Court Approval .................................. 38

v.      Section 1129(a)(5):  The Debtors Have or Will Disclose All Necessary Information Regarding Directors, Officers, and Insiders ........ 39

vi.     Section 1129(a)(6):  The Plan Does Not Contain Any Rate Changes ................................................................................. 41

vii.    Section 1129(a)(7):  The Plan Satisfies the Best Interests Test ............... 41

viii.   Section 1129(a)(8):  The Plan Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8) .................................... 43

ix.     Section 1129(a)(9):  The Plan Provides for Payment in Full of All Allowed Priority Claims ...................................................... 43

x.      Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan ............................................................. 44

xi.     Section 1129(a)(11):  The Plan Is Feasible ................................... 44

xii.    Section 1129(a)(12):  All Statutory Fees Have Been or Will Be Paid Under the Plan ............................................................ 45

xiii.   Section 1129(a)(13):  The Plan Does Not Modify Retiree Benefits ........ 45

B.      Section 1129(b):  The Plan Satisfies the "Cram Down" Requirements ............... 46

i.      The Plan Does Not Discriminate Unfairly ................................. 47

ii.     The Plan Is Fair and Equitable ............................................. 51

C.      Section 1129(c):  The Plan Is the Only Plan Currently on File .......................... 53

D.      Section 1129(d):  The Purpose of the Plan Is Not Tax or Securities Law Avoidance ................................................................... 53

E.      Section 1129(e):  Does Not Apply to the Plan ............................................ 54

F.      The Plan's Settlements and Compromises Are Reasonable and Satisfy Bankruptcy Rule 9019 ..................................................... 54

III.    The Revisions to the Plan Do Not Require Resolicitation and Should Be Approved ................................................................... 56

IV.     The UST Objection and the Sinclair Objection Should Be Overruled ............................ 57

A.      The UST Objection Should Be Overruled .......................................... 57

i.      The Third-Party Release Is Consensual and *Purdue* Is Therefore Inapplicable .................................................................. 58

ii.     The Scope of the Releases Is Narrowly and Appropriately Tailored ....... 63

ii

**Table of Contents**
**(Continued)**

Page

iii.    The Third-Party Release Satisfies Applicable Law ................................... 64

B.    The Sinclair Objection Should Be Overruled and the Sinclair Administrative Claims Disallowed .................................................................. 66

i.    Sinclair Is Not Entitled to an Administrative Expense Claim ................. 67

ii.    At Most, the Sinclair Objection Should Be Resolved Through the Claims Administration Process In Accordance With the Plan ................ 70

Good Cause Exists to Waive the Stay of the Confirmation Order ............................................... 71

Conclusion .................................................................................................................................. 73

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ......................................................................42

*In re Age Refining, Inc.*,
   801 F.3d 530 (5th Cir. 2015) ...................................................................................30

*In re Allied Props., LLC*,
   2007 WL 1849017 (Bankr. S.D. Tex. June 25, 2007) ............................................30

*In re Altera Infrastructure L.P., et al.*,
   Case No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) ....................................34

*In re Am. HomePatient, Inc.*,
   420 F.3d 559 (6th Cir. 2005) ...................................................................................49

*In re Am. Solar King Corp.*,
   90 B.R. 808 (Bankr. W.D. Tex. 1988) ...............................................................39, 57

*In re Ameriforge Grp., Inc.*,
   No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) ........................................63

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................................48

*B.D. Int'l Disc. Corp.* v. *Chase Manhattan Bank* (*In re B.D. Int'l Disc. Corp.*),
   701 F.2d 1071 (2d Cir. 1983).................................................................................37

*Bank of Am. Nat'l Tr. & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999).................................................................................................42

*In re Bigler LP*,
   442 B.R. 537 (Bankr. S.D. Tex. 2010) .............................................................29, 54

*NLRB* v. *Bildisco & Bildisco*,
   465 U.S. 513 (1984).................................................................................................37

*In re Block Shim Dev. Company-Irving*,
   939 F.2d 289 (5th Cir. 1991) ..................................................................................37

*In re Bowflex Inc.*,
    Case No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 19, 2024)....................................61

**Table of Authorities**
(Continued)

Page(s)

*In re Cajun Elec. Power Co-op., Inc.*,
119 F.3d 349 (5th Cir. 1997) ........................................................................29, 55

*In re Cajun Elec. Power Co-op., Inc.*,
150 F.3d 503 (5th Cir. 1998) ........................................................................38, 39

*In re Carlson Travel, Inc.*,
Case No. 21-90017 (MI) (Bankr. S.D. Tex. Nov. 12, 2021) ..................................63

*In re Century Glove*, *Inc.*,
1993 WL 239489 (D. Del. Feb. 10, 1993) ..............................................................38

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986) .....................................................................38

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ....................................................................39

*Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*,
597 B.R. 597 (S.D. Tex. 2019) ...............................................................................58

*In re Core Scientific, Inc.*,
Case No. 22-90341 (CML) (Bankr. S.D. Tex. Jan. 16, 2024) ................................34

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) ..............................................................22, 35

*In re Derosa-Grund*,
567 B.R. 773 (Bankr. S.D. Tex. 2017) ...................................................................29

*In re Divine Ripe, L.L.C.*,
554 B.R. 395 (Bankr. S.D. Tex. 2016) ...................................................................19

*In re DRF Logistics, LLC*,
Case No. 24-90447 (CML) (Bankr. S.D. Tex. Sept. 24, 2024) ..............................61

*In re Eagle Bus Mfg., Inc.*,
134 B.R. 584 (Bankr. S.D. Tex. 1991) ...................................................................24

*In re Eiger BioPharmaceuticals, Inc.*,
Case No. 24-80040-SGJ11 (N.D. Tex. Sept. 5, 2024)............................................61

*In re Energy & Exploration Partners, Inc.*,
Case No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) ...............................64

ii

**Table of Authorities**
**(Continued)**

**Page(s)**

*In re Energy Partners, Ltd.*,
  2009 WL 2898876 (Bankr. S.D. Tex. Aug. 3, 2009).............................................71

*Evanston Ins. Co. v. Amspec Holding Corp.*,
  495 F. Supp. 3d 485, 491 (S.D. Tex. 2020) .............................................68

*FOM Puerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*,
  255 F. App'x 909 (5th Cir. 2007) .............................................64

*In re Foster Mortg. Corp.*,
  68 F.3d 914 (5th Cir. 1995) .............................................30

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) .............................................47

*In re FTX Trading Ltd.*,
  Case No. 22-11068 (Bankr. D. Del. Oct. 8, 2024).............................................61

*Gandy v. Burton*,
  No. CIV.A. H-12-1883, 2013 WL 2902786 (S.D. Tex. June 13, 2013) .............................................68

*In re Gigamonster Networks, LLC*,
  Case No. 23-10051 (JKS) (Bankr. D. Del. Aug. 30, 2024) .............................................61

*Harrington v. Purdue Pharma L.P.*,
  144 S. Ct. 2071 (2024).............................................59

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*),
  994 F.2d 1160 (5th Cir. 1993) .............................................22

*In re Highland Cap. Mgmt., L.P.*,
  48 F.4th at 437 .............................................34

*Hooks v. Samson Lone Star, Ltd. P'ship*,
  457 S.W.3d 52 (Tex. 2015).............................................62

*In re Idearc Inc.*,
  423 B.R. 138 (Bankr. N.D. Tex. 2009), *aff'd In re Idearc, Inc.*, 662 F.3d 315
  (5th Cir. 2011).............................................passim

*In re Invitae Corp.*,
  Case No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 9, 2024) .............................................61

**Table of Authorities**
**(Continued)**

**Page(s)**

*In re Ion Media Networks, Inc.*,
419 B.R. 585 (Bankr. S.D.N.Y. 2009) .................................................................53

*In re J T Thorpe Co.*,
308 B.R. 782 (Bankr. S.D. Tex. 2003) .................................................................22

*In re Jackson Brewing Co.*,
624 F.2d 599 (5th Cir. 1980) .............................................................................29

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987).............................................................................46

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
*aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ...................48, 49

*Kane* v. *Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988)...............................................................................46

*In re Kolton*,
1990 WL 87007 (Bankr. W.D. Tex. Apr. 4, 1990)................................................47

*In re Landing Assocs., Ltd.*,
157 B.R. 791 (Bankr. W.D. Tex. 1993)...........................................................39, 40, 45

*Liberty Nat'l Enters.* v. *Ambanc La Mesa Ltd. P'ship* (*In re Ambanc La Mesa Ltd.*
*P'ship*),
115 F.3d 650 (9th Cir. 1997) .........................................................................47, 48

*In re Linn Energy, LLC*,
576 B.R. 532 (Bankr. S.D. Tex. 2017) ................................................................68

*In re Mallinckrodt PLC*,
639 B.R. 837 (Bankr. D. Del. 2022) ...................................................................62

*Malt Fam. Tr. v. 777 Partners LLC*,
Case No. 2022-0652 (MTZ), 2023 WL 7476966 (Del. Ch. Nov. 13, 2023) .........................68

*In re Mirant Corp.*,
2005 WL 6443614 (Bankr. N.D. Tex. Dec. 9, 2005) ............................................24

*In re Mirant Corp.*,
348 B.R. 725 (Bankr. N.D. Tex. 2006).................................................................29

**Table of Authorities**
(Continued)

Page(s)

*In re Moore*,
608 F.3d 253 (5th Cir. 2010) ..........................................................30

*In re Nat'l CineMedia, LLC*,
Case No. 23-90291 (DRJ) (Bankr. S.D. Tex. June 27, 2023)..................63

*NexPoint Advisors, L.P.* v. *Highland Cap. Mgmt., L.P.* (*In re Highland Cap.*
*Mgmt., L.P.*),
48 F.4th 419 (5th Cir. 2022) ...........................................................33

*In re Pac. Lumber Co.*,
584 F.3d 229 (5th Cir. 2009) ..........................................................58

*In re Party City HoldCo, Inc.*,
Case No. 23-90005 (DRJ) (Bankr. S.D. Tex. Sept. 6, 2023)..................63

*In re Phoenix Petroleum Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) ...............................................20

*In re Pipeline Health Sys., LLC*,
Case No. 22-90291 (MI) (Bankr. S.D. Tex. Jan. 13, 2023)..................34

*In re Pisces Energy LLC*,
2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) ..........................24

*In re Placid Oil Co.*,
753 F.3d 151 (5th Cir. 2014) ..........................................................64

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)............................................................32

*In re Reagor-Dykes Motors, LP*,
2021 WL 1219537 (Bankr. N.D. Tex. Mar. 30, 2021) ..........................57

*In re Robertshaw US Holding Corp.*,
662 B.R. 300 (Bankr. S.D. Tex. 2024) ...................................... *passim*

*In re Robertshaw US Holding Corp.*,
Case No. 24-90052 (CML) (Bankr. S.D. Tex. July 31, 2024)................63

*In re Roqumore*,
393 B.R. 474 (Bankr. S.D. Tex. 2008) ........................................30, 55

**Table of Authorities**
(Continued)

Page(s)

*Safeco Ins. Co. of Am. v. Clear Vision Windshield Repair, LLC*,
564 S.W.3d 913 (Tex. App. 2018)......................................................................................62

*In re Scioto Valley Mortg. Co.*,
88 B.R. 168 (Bankr. S.D. Ohio 1988).................................................................................20

*In re Sentry Operating Co. of Tex., Inc.*,
264 B.R. 850 (Bankr. S.D. Tex. 2001) ...............................................................................24

*In re Southcross Holdings, LP*,
Case No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016)...............................................59

*In re Star Ambulance Serv., LLC*,
540 B.R. 251 (Bankr. S.D. Tex. 2015) ...............................................................................23

*In re Sun Country Dev., Inc.*,
764 F.2d 406 (5th Cir. 1985) ..............................................................................................37

*In re SunEdison, Inc.*,
576 B.R. 453 (Bankr. S.D.N.Y. 2017).................................................................................61

*In re T-H New Orleans Ltd. P'ship*,
116 F.3d 790 (5th Cir. 1997) ..............................................................................................37

*In re Talen Energy Supply, LLC, et al.*,
Case No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 15, 2022)...............................................34

*In re Tex. Extrusion Corp.*,
844 F.2d 1142 (5th Cir. 1988) ......................................................................................19, 42

*Travelers Lloyds Ins. Co. v. Pac. Emplrs. Ins. Co.*,
602 F.3d 677, 681 (5th Cir. 2010) ......................................................................................68

*In re Tribune Media Company*,
587 B.R. 606 (D. Del. 2018), *aff'd*, 972 F.3d 228 (3d Cir. 2020)......................................49

*In re U.S. Brass Corp.*,
194 B.R. 420 (Bankr. E.D. Tex. 1996) ...............................................................................20

*In re Ultra Petrol. Corp.*,
Case No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017)...............................................61

*Union Carbide Corp. v. Jones*,
Case No. 14-00574-CV, 2016 WL 1237825 (Tex. App. Mar. 29, 2016) ............................62

**Table of Authorities**
(Continued)

Page(s)

*In re Vitro Asset Corp.*,
    2013 WL 6044453 (Bankr. N.D. Tex. Nov. 14, 2013) ..........................................................24

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ..................................................................................................38

*In re Westmoreland Coal Co.*,
    Case No. 18-35672 (DRJ) (Bankr. S.D. Tex. Mar. 2, 2019) ..................................................63

*In re Wool Growers*,
    371 B.R. 768 (Bankr. N.D. Tex. 2007) ................................................................................64

STATUTES

11 U.S.C. § 105 ....................................................................................................................33

11 U.S.C. § 157(b)(2)(L) ......................................................................................................32

11 U.S.C. § 365 ..............................................................................................................27, 35

11 U.S.C. § 507(a) ...............................................................................................................45

11 U.S.C. § 1114 ..................................................................................................................45

11 U.S.C. § 1122 ...........................................................................................................23, 25

11 U.S.C. § 1122(a) .......................................................................................................23, 24

11 U.S.C. § 1123 ...........................................................................................................23, 25

11 U.S.C. § 1123(a) .......................................................................................................26, 28

11 U.S.C. § 1123(b) ...........................................................................................26, 27, 29, 33

11 U.S.C. § 1123(d) .............................................................................................................35

11 U.S.C. § 1125 ........................................................................................................... *passim*

11 U.S.C. § 1125(a) .............................................................................................................21

11 U.S.C. § 1125(b) .............................................................................................................36

11 U.S.C. § 1125(e) .......................................................................................................22, 32

11 U.S.C. § 1126 ...................................................................................................35, 36, 37

**Table of Authorities**
(Continued)

<b>Page(s)</b>

11 U.S.C. § 1126(a) ...............................................................................................36

11 U.S.C. § 1126(b)(2) ...........................................................................................21

11 U.S.C. § 1126(c) ................................................................................................37

11 U.S.C. § 1126(d) ...............................................................................................37

11 U.S.C. § 1126(f) ............................................................................................36, 37

11 U.S.C. § 1126(g) ...........................................................................................36, 37

11 U.S.C. § 1127(a) ...............................................................................................56

11 U.S.C. § 1129 ........................................................................................18, 22, 23

11 U.S.C. § 1129(a) ........................................................................................ *passim*

11 U.S.C. § 1129(b) .....................................................................................46, 50, 51

11 U.S.C. § 1129(d) ...............................................................................................53

11 U.S.C. § 1129(e) ...............................................................................................53

**OTHER AUTHORITIES**

Complex Case Procedures ¶ 40 .................................................................................59

Fed. R. Bankr. P. 3019(a) ........................................................................................56

Fed. R. Bankr. P. 3020(e) ........................................................................................69

Fed. R. Bankr. P. 6004(h) ........................................................................................69

Fed. R. Bankr. P. 6006(d) ........................................................................................69

H.R. Rep. No. 95-595 (1977) ...............................................................................23, 35

S. Rep. No. 95-989 (1978) ........................................................................................23

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this (a) memorandum of law in support of an order (i) approving, on a final basis, the *Disclosure Statement Supplement for the Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 2529-1] (the "Disclosure Statement Supplement"), (ii) confirming the *Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 2652-1] (as amended, supplemented, or otherwise modified from time to time, the "Plan")[2] and (b) reply to certain objections to confirmation of the Plan. In connection therewith, the Debtors submit (a) the declaration of Stanislav Kesler [Docket No. 2650] (the "Voting Certification"), (b) the declaration of Daniel Kelsall, filed contemporaneously herewith (the "Kelsall Declaration"), and (c) the declaration of Zul Jamal, filed contemporaneously herewith (the "Jamal Declaration," and, collectively, the "Supporting Declarations").

## Preliminary Statement

1.    The Plan, which is the result of many months of restructuring negotiations with the Debtors' funded debt creditors and team and league partners, is a remarkable achievement. The Plan provides for a going-concern reorganization of the Debtors' business, which will allow the reorganized Debtors to continue to produce and provide live sports programming to millions of local sports fans across the nation through both traditional distribution channels as well as the Debtors' direct-to-consumer ("DTC") platform. With the support of its funded debt creditors, who will be the new owners of the business, as well as key strategic partners, such as FanDuel and Amazon, the Debtors will be well positioned upon emergence to invest in and grow their DTC

---

[2]    Capitalized terms (a) used in the preliminary statement hereof have the meanings ascribed to them in the remainder of this brief and (b) used but not otherwise defined herein have the meanings ascribed to them in the Plan, the solicitation version of the *Disclosure Statement for the Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 1983] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), or the Disclosure Statement Supplement, as applicable. All section references refer to the applicable section of the Bankruptcy Code unless otherwise specified herein.

business to meet evolving consumer demands and deliver best-in-class products to sports fans. The Plan should be confirmed.

2.    The fact that the Debtors have reached confirmation is an extraordinary success in and of itself.  The Debtors commenced these cases facing secular declines in their traditional cable and satellite broadcasting business that were impacting all regional sports networks ("RSNs"), as well as many other traditional cable network and broadcast businesses, due to "cord cutters" and "cord nevers" who no longer, or never, subscribed to cable and satellite television.  While facing these industry-wide risks to their traditional revenue source, the Debtors also had significant fixed costs associated with rights fees owed to their team and league partners under long-term television rights agreements and a materially overleveraged balance sheet with almost $9 billion of funded debt.  Moreover, as the Debtors sought to transition their business to provide more DTC services, they faced certain challenges with respect to obtaining digital rights from certain team and league partners, which impacted the Debtors' ability to grow a full suite of DTC product offerings accessible by fans that subscribe to the Debtors' sports programming.

3.    The Plan and the Debtors' go-forward business plan address each of these issues. The Plan, among other things, eliminates over $8 billion of debt, significantly deleveraging the Debtors' balance sheet to position the reorganized company for future success and allowing the Debtors to focus on their business rather than an overleveraged balance sheet.  The Debtors' go-forward business plan, which underpins the Plan, was finalized after months of engagement with their league and team partners in the National Basketball Association (the "NBA"), the National Hockey League (the "NHL"), and Major League Baseball ("MLB"), as well as their critical traditional cable and satellite multichannel video programming distributors ("MVPDs"), such as DIRECTV, Cox, Charter, and Comcast, and their growing relationship with virtual

multichannel video programming distributors ("vMPVDs"), such as FuboTV.  With respect to the NBA and NHL, the Debtors have reached deals that provide the Debtors with rights they need to grow their business, and with respect to certain MLB teams, certain of the Debtors and their controlled joint ventures have reached similar agreements.  With respect to their MVPD and vMPVD partners, the Debtors have also reached agreements on new deals that provide the Debtors with relatively stable revenue streams on the linear side of their business while they focus on growing their DTC product.  The Debtors also have reached critical commercial agreements with Amazon and FanDuel (which includes naming and branding rights to the Debtors' RSNs), which will, among other things, help attract new customers to the Debtors' DTC offerings.  Finally, through the various financings contemplated by the Plan, the Debtors will have sufficient liquidity to operate successfully post-emergence.  Having deleveraged their balance sheet and updated their distribution agreements and rights portfolio, the Debtors are well-positioned for future growth.

4.      The Plan has overwhelming support from the Debtors' creditors.  Pursuant to the Restructuring Support Agreement, the Plan is supported by, among others, the Debtors' DIP lenders, first lien lenders, the UCC, and substantially all of the Debtors' more than $8.2 billion of prepetition junior funded debt.  The Plan provides the DIP lenders and junior funded debt holders with equity in the reorganized company and cash recoveries to unsecured creditors notwithstanding the fact that the Debtors' substantial debt (including the DIP loans) would not entitle those unsecured creditors to any recoveries under the absolute priority rule.  In short, confirmation of the Plan will provide the Debtors with the opportunity to achieve a value-maximizing reorganization for the benefit of their stakeholders, including their creditors, employees, and contract counterparties.

5.     Notwithstanding these achievements and benefits, the Debtors received objections filed by MLB and the Atlanta Braves [Docket No. 2638] (the "MLB Objection"), Sinclair [Docket No. 2629] (the "Sinclair Objection"), and the United States Trustee for the Southern District of Texas (the "U.S. Trustee") [Docket No. 2625] (the "UST Objection").[3]  None of these objections should be an impediment to confirmation of the Plan.

6.     **First**, with respect to the MLB Objection, the Debtors have reached deals on amended telecast rights agreements with the Atlanta Braves, the Detroit Tigers, and the Tampa Bay Rays, and the Debtors' joint ventures have reached agreements on amended telecast rights agreements with the Los Angeles Angels, the Miami Marlins, and the St. Louis Cardinals.  With those agreements in hand, the MLB Objection has been resolved.

7.     **Second**, with respect to the Sinclair Objection, Sinclair is asserting that the Debtors' management services agreement was not properly terminated and that Sinclair is owed at least $6 million as an administrative expense claim.  Sinclair is wrong.  The agreement was properly terminated and Sinclair's last-ditch effort to claw back some of the cash it paid to settle the parties' previous litigation should not be sanctioned.  In any event, as demonstrated in the Debtors' financial projections and as will be adduced at the Confirmation Hearing, the reorganized business will be sufficiently capitalized to address Sinclair's alleged administrative expense claim, which, to be clear, should be disallowed in its entirety.

8.     **Finally**, the UST Objection sets forth the U.S. Trustee's now standard objection about the scope of the Third-Party Release in the Plan and how to make a release "consensual."

---

[3]    Additionally, Red Seam Holdings LLC, a holding company that operates the YES regional sports network and is partially owned by the Debtors, filed a reservation of rights associated with its operating agreement (to which certain of the Debtors are a party) [Docket No. 2626] (the "Red Seam Reservation") and National Advertising Partners filed an objection to the Debtors' proposed cure amount [Docket No. 2627].  A summary of each of the objections is attached hereto as **Exhibit A**.

The Debtors respectfully submit that the Third-Party Release is narrowly tailored and is consensual following long-standing precedent in this jurisdiction and as set forth in this District's Complex Case Procedures.  In short, the objections should not derail confirmation of the Plan and the Debtors' emergence from chapter 11 as a going-concern enterprise.

9.      The Debtors now seek final approval from this Court with respect to the Disclosure Statement Supplement and confirmation of the Plan.  For the reasons set forth herein and based upon the evidence to be adduced at the Confirmation Hearing, the Court should approve the Disclosure Statement Supplement on a final basis, confirm the Plan, overrule the objections, and permit the Debtors to continue toward the successful conclusion of these chapter 11 cases.

## Background[4]

### I.      Procedural History

#### A.      The Initial RSA

10.      Since well before the commencement of these chapter 11 cases, the Debtors have worked tirelessly to position themselves for the next phase in sports media distribution for the benefit of all of their stakeholders.  Prior to the Petition Date, the Debtors had been working with certain of their key creditor constituencies to substantially deleverage their balance sheet, and with their league and team partners to secure the rights necessary to grow their DTC business in the face of a rapidly changing cable television ecosystem.  After months of negotiation, the Debtors signed a restructuring support agreement (the "Initial RSA") with certain holders of their prepetition funded indebtedness at the very outset of these chapter 11 cases.

---

[4]      The pertinent facts are more fully set forth in the Disclosure Statement, the Disclosure Statement Supplement, the Plan, and the testimony and Supporting Declarations that will be adduced and submitted at or in connection with the Confirmation Hearing.  Such facts are incorporated herein as if fully set forth herein.

11.     The Initial RSA contemplated agreement on a business plan that would leave first lien claims unimpaired and facilitate the Debtors' emergence from chapter 11 as a going concern. But, over time, the Debtors' inability to obtain rights for an expanded digital product made it clear that the plan contemplated by the Initial RSA—including the treatment of first lien claims provided for therein—could not be implemented without obtaining a source of new money financing.

### B.     The Cooperation Agreement

12.     In light of the sea changes facing the traditional cable and satellite and RSN industries, and given the Debtors' inability up to that point to secure additional DTC rights, the Debtors struggled to identify sources of new money financing to provide a path to reorganize their business.  With no clear path to reorganizing their business, the Debtors engaged in several months of negotiations, including through Court-approved mediation, with their various stakeholders, which culminated in an agreement (the "Cooperation Agreement") on the terms of a baseline winddown plan with certain of their secured funded debt creditors, including an ad hoc group of first lien lenders holding a majority of the First Lien Claims (the "First Lien Group"), and the UCC.  Among other things, the Cooperation Agreement provided a framework for the Debtors to (a) continue to operate their business over the course of the 2023–24 seasons for the NBA and NHL and the 2024 season for MLB and (b) propose a chapter 11 plan that would distribute the proceeds derived from the continued operation of their business, the liquidation of their litigation claims and other assets, and the residual value of remaining estate interests. This framework provided baseline recoveries to creditors and would allow the Debtors' commercial counterparties, including their team, league, and distribution partners, to smoothly transition operations over the course of those seasons without an abrupt cessation of broadcasting brought about by an immediate

winddown of the Debtors' operations.[5]  Importantly, the Cooperation Agreement preserved the Debtors' ability to consider opportunities that could potentially provide greater value to their estates and creditors, consistent with their fiduciary obligations.

      **C.**    **The RSA**

13.    While the Debtors engaged with their stakeholders to implement the winddown contemplated by the Cooperation Agreement, an ad hoc group of holders of their secured and unsecured prepetition funded debt (the "Crossholder Group") continued to work with the Debtors to explore restructuring alternatives premised on a reorganization of the Debtors' business as a going concern, including through a potential commercial partnership with Amazon.com Services LLC ("Amazon").  Following several months of negotiations among the Debtors, the Crossholder Group, the First Lien Group, and Amazon, the Debtors executed a restructuring support agreement with those parties on January 16, 2024, which was filed with the Court on January 17, 2024 [Docket No. 1613] (the "January RSA").  The Debtors terminated the Cooperation Agreement pursuant to its terms shortly before executing the January RSA.

14.    The January RSA memorialized the parties' agreements with respect to a plan of reorganization and related transactions, including (a) the provision of a $450 million debtor-in-possession financing facility (the "DIP Facility") led by the Crossholder Group, (b) Amazon's commitment to provide $115 million in exit financing, and (c) Amazon's entry into a commercial agreement with the Debtors.

15.    After the execution of the January RSA, the Debtors and the other parties to the January RSA engaged in extensive negotiations with the UCC to resolve the UCC's potential

---

[5]    On November 15, 2023, the Court entered an order [Docket No. 1383] authorizing the Debtors to enter into the Cooperation Agreement and approving the terms of the settlements contained therein.

objections to certain of the transactions contemplated by the January RSA, including the Debtors' entry into the DIP Facility.  Eventually, the Debtors, the First Lien Group, and the Crossholder Group reached a comprehensive settlement with the UCC (the "UCC Settlement") resolving the UCC's potential objections, which was memorialized in an amended and restated restructuring support agreement entered into on February 26, 2024 (the "RSA").  Consistent with the terms of the RSA, the Debtors subsequently used $350 million of the proceeds of the DIP Facility to repay a like principal amount of the First Lien Claims on February 28, 2024.

> **D.     Investigation, Litigation, and the Sinclair Settlement**

16.     In parallel with its negotiations with creditors, prior to the Petition Date, Diamond began an investigation of its potential claims against Sinclair and other third parties. This investigation continued postpetition in cooperation with the UCC and resulted in the commencement of litigation by the Debtors against Sinclair, certain of Sinclair's affiliates and related individuals, Bally's, and JPM in July 2023.

17.     Contemporaneously with the execution of the January RSA, the Debtors settled their substantial litigation claims against the defendants, which settlement (a) was conditioned on the payment to the Debtors of $495 million in cash and (b) provided for the resolution of all ongoing disputes between the Debtors and Sinclair, including with respect to the parties' management services agreement. The RSA provided that the proceeds of the Sinclair Settlement would be used to fund cash distributions to certain creditors under a chapter 11 plan.  The Sinclair Settlement also provided for certain support obligations by Sinclair in favor of the Debtors to enable the Debtors to fully separate their business from Sinclair.

> **E.     Original Plan and Initial Solicitation**

18.     The Debtors filed a chapter 11 plan [Docket No. 1845] and related disclosure statement [Docket No. 1846] on February 29, 2024, which incorporated the terms of the RSA and

the UCC Settlement.  On April 17, 2024, the Court entered an order approving the disclosure statement and the solicitation of votes on the then filed chapter 11 plan [Docket No. 1977] (the "Initial Solicitation Order").  On April 17, 2024, the Debtors filed solicitation versions of the chapter 11 plan [Docket No. 1982-1] (the "Original Plan") and disclosure statement [Docket No. 1983-1] (the "Disclosure Statement").  Among other things, the Initial Solicitation Order (a)  approved the Disclosure Statement on a final basis, (b) established solicitation and voting procedures with respect to the Original Plan (the "Initial Solicitation Procedures"), and (c) scheduled the commencement of the Confirmation Hearing for June 18, 2024.

19.     In accordance with the Initial Solicitation Order,[6] the Debtors caused their notice and claims agent, Kroll Restructuring Administration LLC (the "Notice and Claims Agent"), to distribute (a) copies of, among other things, the Disclosure Statement, the Original Plan, and the applicable form of ballot with voting instructions to the holders of First Lien Claims in Class 3, Junior Funded Debt Claims in Class 4, and General Unsecured Claims in Class 6, and (b) a notice of non-voting status (the "Notice of Non-Voting Status"), which included a return form and instructions for such holders to opt out of the Third-Party Release at their election, to the holders of Other Secured Claims in Class 1, Other Priority Claims in Class 2, Go-Forward Trade Claims in Class 5, and Existing Equity Interests in Class 9 because the holders in those Classes were either Unimpaired under and deemed to accept the Original Plan or were to receive nothing under and deemed to reject the Original Plan.

20.     In addition, the Debtors caused the Notice and Claims Agent to (a) serve a notice of the Confirmation Hearing and the deadline for objections to the Original Plan

---

[6]     *See Affidavit of Service of Solicitation Materials* [Docket No. 2055-2] (the "Initial Solicitation Affidavit").

(the "Initial Confirmation Hearing Notice") to all parties in interest on or about April 23, 2024,[7] and (b) publish a substantially similar version of the Initial Confirmation Hearing Notice in the national edition of *The New York Times* and the national edition of *USA Today* on April 23, 2024.[8]

21.     Through various notices filed with the Court, and in accordance with the Initial Solicitation Order, the Debtors subsequently modified certain dates and deadlines related to solicitation and confirmation of the Original Plan and eventually adjourned the Confirmation Hearing to a later date to facilitate the finalization of key commercial negotiations and documentation, as further described below [Docket Nos. 2058, 2109, 2251, 2258, and 2295].

**F.    Subsequent Developments Following the Filing of the Original Plan**

**i.      Developments with Sinclair**

22.     A condition to the effectiveness of the Sinclair Settlement was that Sinclair pay the Debtors $495 million in cash on or before April 30, 2024.  If Sinclair failed to pay the $495 million, the Original Plan provided for the creation of a litigation trust that would pursue litigation against Sinclair.  On April 30, 2024, the Debtors received the full $495 million in cash and, as a result, the effective date of the Sinclair Settlement occurred on April 30, 2024, and the Litigation Proceeds Condition (as defined in the Original Plan) was met.

23.     As part of the Sinclair Settlement, the Debtors and Sinclair entered into an amendment to the MSA, pursuant to which Sinclair agreed to provide the Debtors with ongoing management and transition services to facilitate the Debtors' reorganization and separation from Sinclair (the "MSA Amendment").  The MSA Amendment provided that the services would remain in effect for six months from and after May 1, 2024, and automatically would extend for

---

[7]    *See Id.*

[8]    *See Certificate of Publication* [Docket No. 2027] (the "Certificate of Publication").

up to six successive one-month periods unless the Debtors provided 60 days' notice of intent to terminate. The Debtors provided notice of their intent to terminate in August 2024.[9]

### ii. MVPD Agreements

24. On April 3, 2024, the Debtors reached agreement with Charter on a multi-year renewal of their distribution agreement on April 3, 2024. Subsequently, the Debtors also reached agreements with Cox on April 30, 2024, DIRECTV on May 1, 2024, and FuboTV on May 22, 2024. Notwithstanding these successes, the Debtors and Comcast reached an impasse on the terms of a renewal and, following the expiration of the parties' existing distribution agreement on April 30, 2024, the Debtors' RSNs were taken off the air on Comcast on May 1, 2024. On July 28, 2024, following months of negotiations, the Debtors and Comcast reached an agreement on a go-forward distribution agreement that restored the Debtors' RSNs to Comcast's cable packages as of August 1, 2024. In connection therewith, the Debtors also amended their distributions agreements with DIRECTV and Charter.

### iii. Commercial Agreement with Amazon

25. Since before signing the January RSA, the Debtors were engaged in good faith negotiations with Amazon regarding the terms of a go-forward commercial partnership. During negotiations around amendments to the Original Plan, and following material changes to the Debtors' proposed business plan and go-forward capital structure, Amazon informed the Debtors that they did not expect to provide the Debtors with an investment on the original terms contemplated by the January RSA, given that the conditions to the proposed investment could not be satisfied. In connection with its entry into the RSA, Amazon agreed to waive certain administrative claims related to the commitment letter that had previously been approved by the

---

[9] *See* Sinclair Objection ¶ 4.

Court.   On November 7, 2024, Amazon and the Debtors executed a go-forward commercial agreement providing the Debtors with access to Amazon's Channels Store for the Debtors' DTC product.

### iv.   League and Team Agreements

26.   Following execution of the January RSA, the Debtors made proposals to each of the NBA, the NHL, and their respective teams on go-forward agreements.   After months of negotiations, on August 23, 2024, the Debtors (a) entered into term sheets with each of the NBA, the NHL, and their respective teams and (b) filed motions seeking approval of those term sheets and authorization to assume various agreements with each of the NBA, the NHL, and the underlying telecast rights agreements with various teams, each as amended by the term sheets, and granting superpriority adequate protection claims and liens to the NBA and NHL in connection with the 2024-2025 NBA and NHL seasons.   Those term sheets provided beneficial modifications to the Debtors' existing agreements with the leagues and teams and, subject to compliance with certain terms and conditions, for the extension of the parties' agreements for seasons beyond the 2024-2025 NBA and NHL seasons.   On September 3, 2024, the Court entered orders approving these go-forward agreements, the assumption of the underlying telecast rights agreements (as amended), and granting the leagues and their teams adequate protection claims and liens on the terms set forth in such orders [Docket Nos. 2389, 2390].

### v.   The DIP Amendment and Modified UCC Settlement

27.   Under the DIP Order, the First Lien Group had a right to terminate the Debtors' consensual use of cash collateral if the Debtors did not obtain confirmation of a chapter 11 plan by August 5, 2024.   Due to various factors, including the events discussed above, the Debtors were unable to confirm a chapter 11 plan by that milestone.   In addition, the Debtors' go-forward distribution revenue and rights profile had been updated to reflect certain deals reached

with their distribution, league, and team partners, which resulted in changes to the Debtors' financial projections relative to the financial projections that underpinned the agreements memorialized in the DIP Order, the January RSA, and other related documents in January 2024. As a result of those developments, the First Lien Group required certain amendments to the DIP Order and the treatment of their claims under a chapter 11 plan in return for their consent to the Debtors' continued use of cash collateral in pursuit of a going-concern reorganization and their acceptance of their treatment under a chapter 11 plan.

28.    The Debtors, the DIP Lenders, and the First Lien Group engaged in good-faith, arm's-length negotiations to address the First Lien Group's concerns, ultimately agreeing to amendments to the DIP Order and the treatment of the First Lien Claims.  Among other changes, the proposed amendments agreed to by the parties reduced the First Lien Claims Cap in a going-concern reorganization from $662 million to $647 million and provided that, in certain scenarios, the Debtors must make the Additional First Lien Paydown on November 18, 2024.[10]

29.    In light of these proposed DIP Order amendments and the superpriority adequate protection claims and liens proposed to be granted to the NBA and NHL (as discussed above), the Debtors, the Crossholder Group, the First Lien Group, and the UCC agreed to certain modifications to the UCC Settlement to protect recoveries for unsecured creditors from the risks associated with the Debtors' continued pursuit of a going-concern reorganization.  These modifications to the UCC Settlement were incorporated into the DIP Order amendments.  On September 3, 2024, the Court entered an order amending the DIP Order that incorporated these various modifications [Docket No. 2388] (the "DIP Amendment Order").

---

[10]    The Debtors will make the Additional First Lien Paydown in the amount of approximately $215 million by November 18, 2024

G.  **Amended Plan, Disclosure Statement Supplement, and Supplemental Solicitation**

30.     In light of the developments summarized above, the Debtors, the First Lien Group, the Crossholder Group, Amazon, and the UCC entered into negotiations over, and ultimately agreed to, certain modifications to the Original Plan to account for the Debtors' revised financial outlook and incorporate the terms of the DIP Amendment Order.  On October 2, 2024, the Debtors filed the initial version of the Plan [Docket No. 2497-1], which reflects the terms of such modifications, and the Disclosure Statement Supplement.  On October 9, 2024, the Debtors filed a revised version of the Plan [Docket No. 2521-1] and a solicitation version of the Disclosure Statement Supplement [Docket No. 2529].

31.     On October 9, 2024, this Court entered an order conditionally approving the Disclosure Statement Supplement and the continued solicitation of the Plan [Docket No. 2527] (the "Supplemental Solicitation Order").   The Supplemental Solicitation Order, among other things  (a) established supplemental solicitation and voting procedures and vote modification procedures with respect to the Plan (the "Supplemental Solicitation Procedures"), (b) approved the Supplemental Solicitation Packages (as defined below) related thereto, (c) established notice and objection procedures with respect to confirmation of the Plan and final approval of the Disclosure Statement Supplement, (d) set November 5, 2024, at 4:00 p.m. (Prevailing Central Time), as the deadline for (i) holders of Claims entitled to vote or modify a prior vote on the Plan to submit their votes or modified votes, as applicable (the "Supplemental Voting Deadline"), and (ii) filing objections to the Plan or final approval of the Disclosure Statement Supplement, and (e) scheduled the commencement of the Confirmation Hearing for November 14, 2024, at 9:00 a.m. (prevailing Central Time).

32.     In accordance with the Supplemental Solicitation Order, the Debtors caused their Notice and Claims Agent to (a) distribute copies of, among other things, a Ballot (as defined in the Supplemental Solicitation Order), the Disclosure Statement Supplement, and the then-latest version of the Plan (collectively, the "Supplemental Solicitation Packages") to the holders of First Lien Claims in Class 3, Junior Funded Debt Claims in Class 4, Go-Forward Trade Claims in Class 5,[11] and General Unsecured Claims in Class 6 (collectively, the "Voting Classes")[12] and (b) serve the Confirmation Hearing Notice to all parties in interest, including the holders in the Voting Classes and holders of Claims or Interests, as applicable, in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 7 (Intercompany Claims), Class 8 (Intercompany Interests), Class 9 (Existing Equity Interests) (collectively, the "Non-Voting Classes").[13]

33.     On October 2, 2024, October 21, 2024, October 29, 2024, November 1, 2024, and November 12, 2024, the Debtors filed the Plan Supplement,[14] which consisted of the following documents:   (a) the Schedule of Rejected Executory Contracts and Unexpired Leases; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases; (c) the Schedule of Retained Causes of Action; (d) the Restructuring Steps Memorandum; (e) a corporate governance term sheet

---

[11]   The Plan contemplates that Class 5 Go-Forward Trade Claims will be treated as General Unsecured Claims (and be deemed impaired and entitled to vote) in the event the Wind-Down Toggle occurs pursuant to the Plan. Accordingly, holders of Class 5 Go-Forward Trade Claims were provided with provisional Ballots to cast votes on the Plan.

[12]   *See Affidavit of Service of Supplemental Solicitation Materials* [Docket No. 2622] (the "Supplemental Solicitation Affidavit," and, together with the Initial Solicitation Affidavit, the "Solicitation Affidavits").

[13]   *See* Supplemental Solicitation Affidavit.

[14]   *See Notice of Filing Initial Plan Supplement for Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 2498]; *First Amended Plan Supplement for the Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 2593]; *Second Amended Plan Supplement for the Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 2615]; *Third Amended Plan Supplement for the Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 2621], and *Fourth Amended Plan Supplement for the Debtors' First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 2653] (collectively, and as amended, supplemented, or modified from time to time, the "Plan Supplement").

summarizing key terms of the New Organizational Documents; (f) the Exit Term Loan Credit Agreement; (g) the agreement evidencing the DIP Commitment Party Investment Option; (h) the Distribution Registration Procedures; (i) the New Shareholders Agreement; (j) the New TopCo certificate of incorporation; and (k) the New TopCo bylaws.

## II.    Voting Results

34.    On November 12, 2024, the Debtors filed the Voting Certification on behalf of the Notice and Claims Agent.  As set forth in the Voting Certification, the Notice and Claims Agent tabulated the Ballots received by the Supplemental Voting Deadline from holders of Claims in the Voting Classes on a by Debtor basis.[15]  Based on the votes received and the assumptions permitted under the Supplemental Solicitation Order, each Debtor had at least one accepting impaired Class of Claims.  A summary per Class of the aggregate voting results combining each Debtor's results is included below:[16]

| Class | Debtor | Percentage of Voting Number Accepting | Percentage of Voting Amount Accepting | Percentage of Voting Number Rejecting | Percentage of Voting Amount Rejecting |
|---|---|---|---|---|---|
| Class 3 (First Lien Claims) | All Debtors | 100% | 100% | 0% | 0% |
| Class 4 (Junior Funded Debt Claims) | All Debtors | 97.27% | 99.45% | 2.73% | 0.55% |
| Class 5 (Go-Forward Trade Claims)[17] | ARC Holding, Ltd | 50.00% | 100.00% | 0% | 0.00% |
| Class 5 (Go-Forward Trade Claims) | Diamond San Diego Holdings | 100% | 100% | 0% | 0% |
| Class 5 (Go-Forward Trade Claims) | Diamond Sports Group, LLC | 100% | 100% | 0% | 0% |
| Class 5 (Go-Forward Trade Claims) | Diamond Sports Net Arizona Holdings, LLC | 100% | 100% | 0% | 0% |

---

[15]    *See* Voting Certification ¶ 8.

[16]    *See* Voting Certification, Ex. A., for the final tabulation of votes by each Debtor.

[17]    As noted above, the votes submitted by holders of such Class 5 Go-Forward Trade Claims will only be counted in the event that the Wind-Down Toggle occurs pursuant to the Plan.

| Class | Debtor | Percentage of Voting Number Accepting | Percentage of Voting Amount Accepting | Percentage of Voting Number Rejecting | Percentage of Voting Amount Rejecting |
|---|---|---|---|---|---|
| Class 5 (Go-Forward Trade Claims) | Diamond Sports Net Arizona, LLC | 100% | 100% | 0% | 0% |
| Class 5 (Go-Forward Trade Claims) | Diamond Sports Net Detroit | 100% | 100% | 100% | 0% |
| Class 5 (Go-Forward Trade Claims) | Diamond Sports Net Florida | 0% | 0% | 0% | 100% |
| Class 5 (Go-Forward Trade Claims) | Diamond Sports Net North | 100% | 100% | 0% | 0% |
| Class 5 (Go-Forward Trade Claims) | Diamond Sports Net Ohio | 100% | 100% | 0% | 0% |
| Class 5 (Go-Forward Trade Claims) | Diamond Sports Net West 2 | 100% | 100% | 0% | 0% |
| Class 5 (Go-Forward Trade Claims) | Diamond Sports Net, LLC | 100% | 100% | 0% | 0% |
| Class 5 (Go-Forward Trade Claims) | Diamond Sports Sun, LLC | 100% | 100% | 0% | 0% |
| Class 5 (Go-Forward Trade Claims) | Diamond-BRV Southern Sports | 100% | 100% | 0% | 0% |
| Class 5 (Go-Forward Trade Claims) | Fastball Sports Productions | 100% | 100% | 0% | 0% |
| Class 5 (Go-Forward Trade Claims) | SportSouth Network, LLC | 100% | 100% | 0% | 0% |
| Class 6 (General Unsecured Claims) | ARC Holding, Ltd. | 0% | 0% | 100% | 100% |
| Class 6 (General Unsecured Claims) | Diamond Ohio Holdings II, LLC | 100% | 100% | 0.00% | 0% |
| Class 6 (General Unsecured Claims) | Diamond Sports Net North, LLC | 100% | 100% | 0.00% | 0% |
| Class 6 (General Unsecured Claims) | Diamond Sports Net Ohio, LLC | 0% | 0% | 100% | 100% |

35.   The Notice and Claims Agent was also designated to tabulate which holders of Claims and Interests elected to not grant the Third-Party Release, either by submitting an opt-out form or by checking the appropriate opt-out box on their Ballot.  As set forth in the Voting Certification, the Notice and Claims Agent received 205 opt out elections with respect to the Third-Party Release.

36.     The Debtors refer the Court to the Plan, the Disclosure Statement, the Disclosure Statement Supplement, the Initial Solicitation Order, the Supplemental Solicitation Order, the Plan Supplement, the Supporting Declarations, and the record of these chapter 11 cases for an overview of the Debtors' business and any other relevant facts that may bear on Confirmation of the Plan. The Supporting Declarations and any testimony and other declarations that may be proffered or submitted in connection with the Confirmation Hearing are fully incorporated herein.

## III.     Objections

37.     As noted above, the Debtors are aware of only three objections to the Plan—the UST Objection, the Sinclair Objection, and the MLB Objection.  They are also aware of the Red Seam Reservation, which has been resolved, and one cure objection.  Each of these is summarized in the chart attached hereto as **Exhibit A**.  For the reasons stated herein, the Debtors believe that the UST Objection and the Sinclair Objection should be overruled.  The MLB Objection has been resolved.

## Argument

38.     The following section of this brief is divided into three parts.  ***First***, the Debtors request final approval of the Disclosure Statement Supplement.  ***Second***, the Debtors address satisfaction of the confirmation requirements of section 1129 of the Bankruptcy Code and the applicable requirements for the settlements contained in the Plan pursuant to Bankruptcy Rule 9019.  ***Third***, the Debtors respond to the UST Objection and the Sinclair Objection.

## I.     The Disclosure Statement Supplement Contains "Adequate Information" as Required by Section 1125 of the Bankruptcy Code, and the Debtors Complied with Applicable Notice Requirements

### A.     The Disclosure Statement Supplement Contains Adequate Information

39.     The primary purpose of a disclosure statement is to provide material information, or "adequate information," that allows parties entitled to vote on a proposed plan to make an

informed decision about whether to vote to accept or reject the plan.[18] "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[19] Courts within the Fifth Circuit and elsewhere acknowledge that bankruptcy courts have broad discretion in determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code.[20]

40.     Courts generally look for certain information when evaluating the adequacy of the disclosures in a proposed disclosure statement, including:

- the events that led to the filing of a bankruptcy petition;

- the relationship of the debtors with their affiliates;

- a description of the available assets and their value;

- the anticipated future of the companies;

- the source of information stated in the disclosure statement;

- the present condition of the debtors while in chapter 11;

- claims asserted against the debtors;

- the estimated return to creditors under a chapter 7 liquidation;

- the chapter 11 plan or a summary thereof;

- financial information, valuations, and projections relevant to the creditors' decision to accept or reject the chapter 11 plan;

- information relevant to risks posed to creditors under the plan;

- the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;

- litigation likely to arise in a non-bankruptcy context; and

---

[18]   *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988).

[19]   *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 400–01 (Bankr. S.D. Tex. 2016) (citing *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988)).

[20]   *See, e.g.*, *In re Tex. Extrusion*, 844 F.2d at 1157.

- tax attributes of the debtors.[21]

41.     Pursuant to the Initial Solicitation Order, the Disclosure Statement was approved by the Court, on a final basis, as containing adequate information.  As discussed in the Disclosure Statement Supplement, the Debtors subsequently engaged in additional discussions with certain of their key stakeholders, culminating in the Debtors' entry into new or renewed agreements with each of the NHL, NBA, DIRECTV, Cox, Charter, FuboTV, and Comcast.  As part of these developments, the Debtors also reached agreement on amendments to the DIP Order, which resulted in changes to the treatment of the First Lien Claims contemplated by the Original Plan. These agreements resulted in updates to the Debtors' business plan and the reorganization contemplated by the Original Plan, which changes were incorporated into the Plan.  The Debtors therefore supplemented the Disclosure Statement through the Disclosure Statement Supplement, which provided a detailed description of the modifications to the Original Plan reflected in the Plan, the events leading to the development of the Plan, and the new voting and objection deadlines with respect to the Plan.

42.     The Disclosure Statement and the Disclosure Statement Supplement collectively contain adequate information for holders of Claims in the Voting Classes to make an informed decision about whether to vote to accept or reject the Plan.  The Disclosure Statement and the Disclosure Statement Supplement, as applicable, contain descriptions and summaries of, among other things: (a) the Plan; (b) the Debtors' business operations; (c) key events leading to the

---

[21]   *See In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996) (citing *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)); *see also In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (citing factors that courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (setting forth a non-exhaustive list of 19 categories of information that may be included in a disclosure statement). Disclosure regarding all of the aforementioned topics is not necessary in every case.  *See In re U.S. Brass*, 194 B.R. at 425; *see also In re Phoenix Petroleum*, 278 B.R. at 393 ("[C]ertain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").

commencement of these chapter 11 cases; (d) the Debtors' prepetition indebtedness; (e) the Reorganized Debtors' proposed capital structure; (f) financial information and valuations that would be relevant to creditors' determination to accept or reject the Plan, including projected recoveries; (g) a liquidation analysis setting forth the estimated return that Holders of Claims and Interests would receive in a hypothetical chapter 7 liquidation; (h) securities disclosures with respect to the Plan; (i) risk factors associated with the Plan; and (j) federal tax law consequences of the Plan.

43.     Accordingly, the Debtors submit that the Disclosure Statement, as modified by the Disclosure Statement Supplement, contains "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the modifications to the Original Plan, and the transactions contemplated by the Plan, and should therefore be approved.

**B.      The Debtors Complied with the Applicable Notice Requirements**

44.     In addition to conditionally approving the adequacy of the Disclosure Statement Supplement, the Supplemental Solicitation Order approved, among other things: (a) the Supplemental Solicitation Procedures; (b) the form and manner of the Confirmation Hearing Notice; and (c) certain dates and deadlines with respect to the Plan and Disclosure Statement Supplement.   The Debtors complied with the procedures and timeline approved by the Supplemental Solicitation Order.[22]

---

[22]   *See* Solicitation Affidavits.

C.     **The Solicitation of the Plan Complied with the Bankruptcy Code and Was Conducted in Good Faith**

45.     Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.[23]  As set forth in the Disclosure Statement, the Disclosure Statement Supplement, the motions seeking approval of the Disclosure Statement and Disclosure Statement Supplement,[24] the Supporting Declarations, and as demonstrated by the Debtors' compliance with the Initial Solicitation Order and Supplemental Solicitation Order,[25] the Debtors at all times engaged in arm's-length, good faith negotiations and took appropriate actions in connection with the solicitation of the Original Plan and the Plan in compliance with section 1125 of the Bankruptcy Code.   Therefore, the Debtors request that the Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

## II.     The Plan Satisfies Each Requirement for Confirmation Under Section 1129 of the Bankruptcy Code and Should be Confirmed

46.     The Debtors must show by a preponderance of the evidence that the Plan satisfies section 1129 of the Bankruptcy Code to achieve Confirmation.[26]  The Debtors submit that the Plan

---

[23]   11 U.S.C. § 1125(e).

[24]   *See Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation Procedures and Solicitation Packages; (III) Scheduling a Hearing on Confirmation of the Plan; (IV) Establishing Procedures for Objecting to the Plan; (V) Approving the Form, Manner, and Sufficiency of Notice of the Confirmation Hearing; and (VI) Granting Related Relief* [Docket No. 1897]; *Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement Supplement, (II) Authorizing Continued Solicitation of the Amended Plan, and (III) Granting Related Relief* [Docket No. 2499].

[25]   *See* Voting Certification.

[26]   *See, e.g.*, *Heartland Fed. Sav. & Loan Ass'n* v. *Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160, 1165 (5th Cir. 1993) ("The . . . preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."); *see also In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).

satisfies the requirements of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas, and should be confirmed.[27]

### A.     Section 1129(a):  The Plan Meets Each of the Applicable Requirements for Confirmation Under Section 1129(a) of the Bankruptcy Code

#### i.     Section 1129(a)(1):  The Plan Complies with the Applicable Provisions of the Bankruptcy Code

47.     Section 1129(a)(1) of the Bankruptcy Code requires a plan to comply with all applicable provisions of the Bankruptcy Code, including the rules governing the classification of claims and interests (section 1122) and the provisions dictating the contents of a plan (section 1123).[28]  The Plan complies with all applicable provisions of the Bankruptcy Code (as required by section 1129(a)(1)), including sections 1122 and 1123 of the Bankruptcy Code.

#### 1.     Section 1122:  The Plan's Classification Structure Is Proper

48.     The Plan's classification of Claims and Interests complies with section 1122(a) of the Bankruptcy Code, which provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[29]  Substantial similarity, however, does not require that claims or interests in a particular class be identical, or that all similarly situated claims or interests must receive the same plan

---

[27]   Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code do not apply to the Debtors. Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations to which the Debtors are not subject.  *See* 11 U.S.C. § 1129(a)(14).  Similarly, section 1129(a)(15) of the Bankruptcy Code applies only to "individuals" as that term is defined in the Bankruptcy Code, and not to companies such as the Debtors.  Finally, section 1129(a)(16) of the Bankruptcy Code governs property transfers by entities that, unlike the Debtors, are something other than a "moneyed, business, or commercial corporation or trust."

[28]   11 U.S.C. §§ 1122, 1123, 1129(a)(1). *See In re Star Ambulance Serv., LLC*, 540 B.R. 251, 260 (Bankr. S.D. Tex. 2015) ("Courts interpret [section 1129(a)(1)] to mean that a plan must meet the requirements of Bankruptcy Code Sections 1122 and 1123."); *see also* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978).

[29]   11 U.S.C. § 1122(a).

treatment.[30]  Courts afford a plan proponent with "significant flexibility" in classifying claims and interests under section 1122(a), provided that there is a reasonable basis for the classification scheme and all claims or interests within a particular class are substantially similar.[31]  Here, the Plan appropriately classifies Claims and Interests as follows:[32]

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote *(Deemed to Accept)* |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote *(Deemed to Accept)* |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Junior Funded Debt Claims | Impaired | Entitled to Vote |
| 5 | Go-Forward Trade Claims | Unimpaired / Impaired | Not Entitled to Vote (*Deemed to Accept*) / Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote *(Deemed to Accept / Deemed to Reject)* |

---

[30]  *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (recognizing that "[section] 1122 is permissive of any classification scheme that is not proscribed, and that substantially similar claims may be *separately* classified"); *see also In re Vitro Asset Corp.*, 2013 WL 6044453, at *5 (Bankr. N.D. Tex. Nov. 14, 2013) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class.").

[31]  *See In re Pisces Energy LLC*, 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009) ("Significantly, a plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."); *see also In re Mirant Corp.*, 2005 WL 6443614, at *19 (Bankr. N.D. Tex. Dec. 9, 2005); *In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991) ("A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the choices made and all claims within a particular class are substantially similar.").

[32]  Administrative Claims (including Professional Fee Claims and all fees and charges assessed against the Estates under chapter 123 of the Judicial Code), DIP Claims, and Priority Tax Claims are not classified and are separately treated under the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote *(Deemed to Accept / Deemed to Reject)* |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote *(Deemed to Reject)* |

49.     The Plan's classification of Claims and Interests is reasonable and complies with the Bankruptcy Code.  All Claims and Interests within each Class have the same or similar rights against the Debtors.  The Plan provides for the separate classification of Claims against and Interests in each Debtor based upon the differences in such Claims' and Interests' legal nature or priority.  For example, with respect to Claims arising from prepetition funded indebtedness, the classification structure generally tracks the Debtors' prepetition capital structure and divides Claims into Classes based on the instruments giving rise to such Claims.  Similarly, the Plan separately classifies prepetition general unsecured Claims into (a) Class 5 (Go-Forward Trade Claims), which consists of prepetition general unsecured Claims held by certain trade claimants that are expected to provide goods and services necessary to the operation of the Reorganized Debtors' business after the Effective Date, and (b) Class 6 (General Unsecured Claims), which consists of a broad array of general unsecured Claims held by, among others, vendors and contract counterparties who each generally have different rights and obligations governing their Claims but whose Claims share a common general unsecured priority and are not expected to have an ongoing relationship with the Reorganized Debtors' business (absent assumption of any underlying contracts).  The Plan thus complies with section 1122 of the Bankruptcy Code.

> **2.     The Plan Satisfies the Requirements of Section 1123 of the Bankruptcy Code**

50.     Section 1123 of the Bankruptcy Code sets forth both mandatory and optional provisions that a chapter 11 plan must and may include.  For the reasons set forth below, the Plan

(a) satisfies each of the mandatory requirements of section 1123(a) of the Bankruptcy Code, (b) includes several of the optional provisions permitted under section 1123(b) of the Bankruptcy Code, and (c) includes other provisions not inconsistent with other applicable provisions of the Bankruptcy Code within the meaning of section 1123(b)(6) of the Bankruptcy Code.

### a.   The Plan Satisfies the Mandatory Provisions of Section 1123(a) of the Bankruptcy Code

51.     The Plan satisfies the seven mandatory requirements of section 1123(a) of the Bankruptcy Code:[33]

(a)     <u>Section 1123(a)(1)</u>:  Article III of the Plan designates Classes of Claims and Interests as required by section 1123(a)(1) of the Bankruptcy Code.

(b)     <u>Section 1123(a)(2)</u>:  Article III of the Plan specifies the treatment of Unimpaired Classes of Claims and Interests as required by section 1123(a)(2) of the Bankruptcy Code.

(c)     <u>Section 1123(a)(3)</u>:  Article III of the Plan specifies the treatment of Impaired Classes of Claims and Interests as required by section 1123(a)(3) of the Bankruptcy Code.

(d)     <u>Section 1123(a)(4)</u>:  Article III of the Plan provides the same treatment for each Claim or Interest of a particular Class, unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of such particular Claim or Interest as required by section 1123(a)(4) of the Bankruptcy Code.  This applies to Holders within each Class.

(e)     <u>Section 1123(a)(5)</u>:  Article IV of the Plan, in conjunction with various other Plan provisions and the Plan Supplement, provides adequate means for implementing the Plan as required by section 1123(a)(5) of the Bankruptcy Code.

(f)     <u>Section 1123(a)(6)</u>:  Article IV.S of the Plan provides for the prohibition of non-voting equity securities, as implemented by the New Organizational Documents, as required by section 1123(a)(6) of the Bankruptcy Code.

(g)     <u>Section 1123(a)(7)</u>:  Article IV.U of the Plan provides that as of the Effective Date, the New TopCo Board will be appointed in accordance with the terms of the applicable New Organizational Documents.  As discussed below, pursuant to section 1129(a)(5) of the Bankruptcy Code, the appointment of the New TopCo Board and officers of the Reorganized Debtors is consistent with the interests of

---

[33]     *See generally* 11 U.S.C. § 1123(a)(1)–(7).

creditors and equity security holders and complies with public policy with respect to the manner of selection of the Reorganized Debtors' officers and directors, as required by section 1123(a)(7) of the Bankruptcy Code.

> ### b.  The Plan Satisfies the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code

52.     Section 1123(b) of the Bankruptcy Code allows a plan to include a variety of different permissive provisions. Each of the Plan's permissive provisions comports with these requirements:

(a)   <u>Section 1123(b)(1)</u>: Per section 1123(b)(1) of the Bankruptcy Code, Article III of the Plan classifies and describes the treatment for Claims and Interests under the Plan, and identifies which Claims and Interests are impaired or unimpaired.

(b)   <u>Section 1123(b)(2)</u>: Per section 1123(b)(2) of the Bankruptcy Code, Article V of the Plan provides that all of the Debtors' Executory Contracts and Unexpired Leases will be assumed as of the Reorganization Effective Date in accordance with section 365 of the Bankruptcy Code, unless expressly otherwise provided pursuant to the Plan. As noted above, the Debtors filed their Schedule of Rejected Executory Contracts and Unexpired Leases and Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement.[34]

(c)   <u>Section 1123(b)(3)</u>: Per section 1123(b)(3)(A) of the Bankruptcy Code, Article VIII of the Plan provides for a release of certain of the Debtors' Claims and Causes of Action. Article IV.A of the Plan incorporates the settlement of a variety of issues, Claims, Interests, and controversies. In addition, Article IV.N of the Plan provides that, except as otherwise provided in the Plan, all of the Debtors' Causes of Action will vest in the Reorganized Debtors and that the Reorganized Debtors will retain, and may compromise or settle, all such Causes of Action.

(d)   <u>Section 1123(b)(5)</u>: As permitted by section 1123(b)(5) of the Bankruptcy Code, Article III of the Plan modifies the rights of Holders of Claims as set forth therein.

---

[34]   *See* Plan Supplement at Exs. A–B. In the event a Wind-Down Toggle occurs, Article V of the Plan provides that all of the Debtors' Executory Contracts and Unexpired Leases will be rejected, unless such Executory Contract or Unexpired Lease: (a) was assumed (or assumed and assigned) or rejected previously by the Debtors; (b) previously expired or terminated pursuant to its own terms; or (c) is the subject of a motion to assume, assume and assign, or reject that is pending as of the Wind Down Effective Date.

          **c.**      **The Discretionary Contents of the Plan Are Permitted by Section 1123(b)(6) of the Bankruptcy Code**

53.     Section 1123(b)(6) of the Bankruptcy Code also authorizes the inclusion of "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code.]" 11 U.S.C. § 1123(a)(6). The Plan includes several such discretionary provisions, including various terms discharging, releasing, and enjoining the pursuit of certain potential claims. The release and exculpation provisions of the Plan are the result of extensive good faith and arm's-length negotiations by and among the Debtors and certain of the Released Parties[35] and the Exculpated Parties,[36] respectively. Such provisions are consistent with applicable case law and precedent in this District, comply with the Bankruptcy Code in all respects, and should be approved in all respects as integral components of the Plan.

54.     In its objection, the U.S. Trustee takes issue with the Plan's Third-Party Release. The Debtors address the UST Objection in paragraphs 116–131 of this brief and limit the

---

[35]    Pursuant to Article I.A.175 of the Plan, the term "Released Parties" means, collectively, and in each case in its capacity as such: (a) each Debtor and Post-Effective Date Debtor; (b) the Consenting Parties; (c) the Prepetition Notes Trustees; (d) the Prepetition Agents; (e) the UCC and each UCC Member; (f) the Sinclair-Related Litigations Defendants; (g) the Plan Administrator; and (h) with respect to each Person or Entity listed or described in any of the foregoing clauses (a) through (g), each such Person's or Entity's current and former Affiliates, and each such Person's or Entity's and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, participants, affiliated investment funds or investment vehicles, managed accounts or funds, and each of their respective current and former members, equity holders, officers, directors, managers, principals, employees, agents, advisory board members, investment fund advisors or managers, investment managers, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; provided that the following Persons and Entities shall not be Released Parties: (i) a Person or Entity that either (A) elects to opt out of the releases contained in the Plan or (B) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before entry of the Confirmation Order; or (ii) other than (A) non-Debtor Diamond Sports Finance SPV, LLC and the New A/R Facility Borrower, (B) any Debtor that is a member or equity holder (regardless of whether such interests are held directly or indirectly) in a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, and (C) any members, directors, managers, officers, employees, or agents appointed by any Debtor at a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, any other Person or Entity affiliated with a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date and any non-Debtor Affiliates thereof.

[36]    Pursuant to Article I.A.80 of the Plan, the term "Exculpated Parties" means (a) each Debtor and (b) the UCC and each UCC Member.

discussion in this section to the propriety of the Debtor Release, the Exculpation, and the Injunction (each as defined below).

55.     <u>Debtor Release</u>.   Article VIII.C of the Plan provides for a release of any and all claims and Causes of Action, including contingent, unliquidated, unknown, and derivative claims, of (or through) the Debtors, the Post-Effective Date Debtors, and their estates, against the Released Parties in connection with, among other things and in whole or in part, the Debtors or their estates, their affiliates, the Post-Effective Date Debtors, the Plan, the Plan transactions, or these chapter 11 cases (the "<u>Debtor Release</u>").[37]   No objections have been filed with respect to the Debtor Release.

56.     Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may include "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[38]   In considering the appropriateness of such settlements, courts in the Fifth Circuit generally examine whether the release is "'fair and equitable' and 'in the best interests of the estate.'"[39]   The "fair and equitable standard" incorporates the absolute priority rule.[40]   Courts in the Fifth Circuit generally weigh the following factors in determining whether a settlement is in the best interests of the estate:   (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (b) the complexity and likely duration of the

---

[37]   The above description is only a summary of the Debtor Release, which is qualified entirely by the language of the Debtor Release and the applicable definitions in the Plan, which shall control.

[38]   *See* § 1123(b)(3)(A); *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan. . . .").

[39]   *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.* v. *Anderson*, 390 U.S. 414, 424–25 (1968)); *In re Bigler*, 442 B.R. at 543 n.6; *In re Derosa-Grund*, 567 B.R. 773, 784–85 (Bankr. S.D. Tex. 2017).

[40]   *See In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 355–56 (5th Cir. 1997) ("'The words 'fair and equitable' are terms of art—they mean that senior interests are entitled to full priority over junior ones.'") (citation omitted); *see also In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006) ("'fair and equitable' translates to the absolute priority rule").

litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection; (c) the paramount interest of the creditors and a proper deference to their respective views; (d) the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and (e) all other factors bearing on the wisdom of the compromise.[41]

57.     In determining whether a settlement is appropriate and should be approved, "a bankruptcy court need not 'conduct a mini-trial' . . . [but] [r]ather . . . must 'apprise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision.'"[42]  Although the debtor bears the burden of establishing that a settlement is fair and equitable based on a balance of the above factors, "the [debtor's] burden is not high."[43]  Indeed, the court need only determine that the settlement does not "'fall beneath the lowest point in the range of reasonableness.'"[44]

58.     The Debtor Release satisfies the applicable legal standard.  The Plan (including the Debtor Release) complies with the Bankruptcy Code's absolute priority rule.  While certain Classes rejected, or are deemed to reject, the Plan, the Debtor Release and the settlements embodied therein and in the Plan do not result in any junior Classes receiving or retaining any property on account of junior Claims or Interests.  Thus, the Debtor Release is fair and equitable and in line with Fifth Circuit precedent.

59.     In addition to being fair and equitable, the Debtor Release is in the best interest of the Estates because: (a) the Debtors are not aware of the existence of any claims or Causes of

---

[41]   *See In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010); *In re Foster Mortg. Corp.*, 68 F.3d 914, 917–18 (5th Cir. 1995); *In re Roqumore*, 393 B.R. 474, 479–80 (Bankr. S.D. Tex. 2008).

[42]   *In re Age Refining, Inc.*, 801 F.3d 530, 541 (5th Cir. 2015) (citations omitted).

[43]   *See In re Roqumore*, 393 B.R. at 480.

[44]   *In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), *aff'd In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011) (citations omitted); *In re Allied Props., LLC*, 2007 WL 1849017, at *4–5 (Bankr. S.D. Tex. June 25, 2007) ("[t]he Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'").

Action of material value being released by the Debtors, and are expressly preserving certain claims and Causes of Action pursuant to the Schedule of Retained Causes of Action;[45] (b) the Plan, including the Debtor Release, was negotiated in good faith and at arm's length by sophisticated entities that were represented by able advisors, each of which conditioned its support for and acceptance of the Plan, among other things, on the grant of the Debtor Release, without which support and acceptance the Debtors would not be in a position to reorganize as a going-concern; and (c) no party has objected to the Debtor Release.

60.     Finally, the Debtor Release is given for consideration, as it is given in exchange for the Released Parties' agreements to the substantial and complex settlements embodied in the Plan and the significant time and effort the Released Parties have contributed to the Debtors' restructuring.  All parties in interest benefit from the Restructuring Transactions contemplated by the Plan and the significant contributions of the Released Parties in furtherance thereof, including, among others, the agreement by Consenting Creditors to equitize billions of dollars in prepetition funded debt, the capital infusion through the DIP Facility, the concessions made pursuant to the intercreditor settlements embodied in the Plan, including the UCC Settlement, the agreement to waive preference actions, and the waiver of certain potential administrative claims by Amazon. These settlements and contributions will allow for a comprehensive and value-maximizing reorganization that will enable the Debtors to significantly reduce their funded indebtedness and emerge from bankruptcy as a going concern.

61.     Accordingly, the Debtor Release is fair, equitable, in the best interest of the Debtors' Estates, and consistent with applicable law in this District, and should be approved.

---

[45]   *See* Plan Supplement at Ex. C.

62.     <u>Exculpation</u>.     Article VIII.E of the Plan contains a customary exculpation benefitting the Exculpated Parties[46] for claims arising out of or relating to these chapter 11 cases and the agreements made in connection therewith (the "<u>Exculpation</u>").  The Exculpation carves out acts or omissions that are determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence.[47]

63.     The Exculpation does not affect the liability of third parties *per se*, but rather sets a standard of care of gross negligence, fraud, or willful misconduct in hypothetical future litigation against an exculpated party for acts arising out of the Debtors' restructuring.[48]  A bankruptcy court has the power to approve an exculpation provision in a chapter 11 plan because a plan cannot be confirmed unless the bankruptcy court finds that the plan has been proposed in good faith.[49]

64.     An exculpation provision represents a legal determination that flows from several different findings that a bankruptcy court must reach in confirming a plan, as well as the statutory exculpation in section 1125(e) of the Bankruptcy Code.[50]  Once the court makes a good faith finding, it is appropriate to set the standard of care of the parties involved in the formulation of that chapter 11 plan.[51]

---

[46]    Pursuant to Article I.A.80 of the Plan, the term "<u>Exculpated Parties</u>" means: (a) each Debtor and (b) the UCC and each UCC Member.

[47]    The above description is only a summary of the Exculpation, which is qualified entirely by the language of the Exculpation and the applicable definitions in the Plan, which shall control.

[48]    *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").

[49]    *See* 11 U.S.C. § 1129(a)(3).

[50]    *See* 11 U.S.C. § 157(b)(2)(L).

[51]    *See PWS*, 228 F.3d at 246–47 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

65.     Here, the Exculpation appropriately provides protection to estate fiduciaries that participated actively in the Debtors' restructuring.  The Exculpation represents an integral component of the Plan, is the product of good faith, arm's-length negotiations among various parties (including the key constituents of these chapter 11 cases), is appropriately and narrowly tailored in time and scope under applicable Fifth Circuit precedent,[52] and is authorized pursuant to the Court's authority under sections 105, 1123(b), 1125, and 1129(a)(1) of the Bankruptcy Code. The Exculpated Parties are similarly narrowly tailored to include the Debtors and the UCC and its members.  Each of these parties has made significant contributions towards the consummation of the Debtors' restructuring and acted in good faith throughout the process that has culminated in the Plan.  Moreover, no objections have been filed with respect to the Exculpation.

66.     _Injunction_.  Article VIII.F of the Plan contains an injunction provision that permanently enjoins all entities who have held, hold, or may hold claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation, from, among other things, commencing or continuing any action against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties on account of such Claims or Interests (the "Injunction").[53]

67.     The Injunction also includes a "gatekeeping provision" providing that no party may commence, continue, amend, or otherwise pursue a claim or Cause of Action of any kind against any of the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties that is subject to the Debtor Release or the Third-Party Release, or arose or arises from or is related

---

[52]   _See NexPoint Advisors, L.P._ v. _Highland Cap. Mgmt., L.P._ (_In re Highland Cap. Mgmt., L.P._),48 F.4th 419 (5th Cir. 2022).

[53]   The above description is only a summary of the Injunction, which is qualified entirely by the language of the Injunction and the applicable definitions in the Plan, which shall control.

to any Covered Claim, without first (a) requesting a determination from the Court, after notice and a hearing, that such claim or Cause of Action represents a colorable claim against a Debtor or a Released Party, as applicable, and is not a claim that the Debtors released under the Plan and (b) obtaining from the Court a specific authorization for such person or entity to bring such claim or Cause of Action against any Debtor or a Released Party, as applicable (the "Gatekeeping Provision").[54]  The Gatekeeping Provision is consistent with both Fifth Circuit law and recent confirmation orders in this District.[55]

68.    The Injunction, including the Gatekeeping Provision, is necessary to implement, preserve, and enforce the Plan's release, discharge, and exculpation provisions, which are integral to the Plan.  Furthermore, the Injunction is properly tailored to achieve its objective and only encompasses claims, Interests, or Causes of Action that have been released or exculpated under the Plan.  The Court should therefore approve the Injunction in connection with approving the discharge, release, and exculpation provisions included in the Plan.

---

[54]  The foregoing description is a summary of the operative Plan provisions only.  To the extent there is any conflict between the foregoing summary and the Plan, the Plan shall control.

[55]  *See In re Highland Cap. Mgmt., L.P.*, 48 F.4th at 437–39 ("Courts have long recognized bankruptcy courts can perform a gatekeeping function. . . . We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan."); *see also Findings of Fact, Conclusions of Law, and Order (I) Approving Disclosure Statement on a Final Basis and (II) Confirming Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc. and its Affiliated Debtors* [Docket No. 1749], ¶ ee, *In re Core Scientific, Inc*., Case No. 22-90341 (CML) (Bankr. S.D. Tex. Jan. 16, 2024) (confirming chapter 11 plan that included an injunction and gatekeeper provision); *Order Approving the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization of Pipeline Health System, LLC and Its Debtor Affiliates (Technical Modifications)* [Docket No. 1041], ¶¶ 44–45, *In re Pipeline Health Sys., LLC*, Case No. 22-90291 (MI) (Bankr. S.D. Tex. Jan. 13, 2023); *Findings of Fact, Conclusions of Law, and Order Confirming Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1760], ¶ 37, *In re Talen Energy Supply, LLC, et al.*, Case No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 15, 2022); *Order Approving the Debtors' Disclosure Statement and Confirming the Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and Its Debtor Affiliates* [Docket No. 533], ¶ 43, *In re Altera Infrastructure L.P., et al.*, Case No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022).

### 3. The Plan's Cure Process Is Appropriate Under Section 1123(d)

69.     Section 1123(d) of the Bankruptcy Code provides that amounts necessary to cure defaults under a plan shall be "determined in accordance with the underlying agreement and applicable nonbankruptcy law."  11 U.S.C. § 1123(d).  Article V.C of the Plan provides for the satisfaction of the Cure Claims associated with each Executory Contract or Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.  *See* 11 U.S.C. § 365(b)(1). Specifically, the Debtors or the Reorganized Debtors, as applicable, will pay, on or as soon as reasonably practicable after the Effective Date, any Cure Claims as indicated on the cure notices distributed to the counterparties of assumed Executory Contracts and Unexpired Leases.[56]  Any disputed Cure Claim will be determined in accordance with the procedures set forth in Article V.C of the Plan and applicable law.  As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts or Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code, and therefore the Plan complies with section 1123(d) of the Bankruptcy Code.

70.     Based upon the foregoing, the Plan complies fully with sections 1122 and 1123, and therefore satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### ii. The Debtors Have Complied with Applicable Provisions of the Bankruptcy Code as Required by Section 1129(a)(2)

71.     Section 1129(a)(2) of the Bankruptcy Code requires compliance with the disclosure, solicitation, and voting requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[57]

---

[56]  *See* Plan Art. V.C; *Affidavit of Service* [Docket No. 2595].  The form of the cure notice was approved in the Initial Solicitation Order at paragraph 24 and Exhibit G thereto.

[57]  *See* 11 U.S.C. § 1129(a)(2); H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also Cypresswood*, 409 B.R. at 424 ("Bankruptcy courts limit their inquiry under § 1129(a)(2)

1.       **Section 1125: Post-Petition Disclosure Statement and Solicitation**

72.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."  11 U.S.C. § 1125(b).  Following the Court's entry of the Initial Solicitation Order and the Supplemental Solicitation Order, the Notice and Claims Agent solicited votes and/or modified votes, as applicable, on the Original Plan and the Plan, respectively, consistent with the Initial Solicitation Procedures and the Supplemental Solicitation Procedures, as applicable.[58]  The Debtors did not solicit acceptances or rejections of the Original Plan or the Plan until after the entry of the Initial Solicitation Order, thus complying with section 1125(b) of the Bankruptcy Code.

2.       **Section 1126:  Acceptance of the Plan**

73.     Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes on a plan and determining acceptance thereof.  Pursuant to section 1126, only holders of allowed claims or equity interests in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan.  *See* 11 U.S.C. §§ 1126(a), (f), and (g).  As set forth above, the Debtors solicited acceptances of the Plan only from the holders of Claims in the Voting Classes, which are the only Classes that are Impaired and entitled to vote on the Plan.  The Debtors did not solicit votes to accept or reject the Plan from the holders of Claims and Interests in the Non-Voting Classes, all of which are either (a) Unimpaired and, therefore, deemed to have accepted the Plan pursuant to

---

to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125.").

[58]     *See generally* Voting Certification.

section 1126(f) of the Bankruptcy Code or (b) Impaired and presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

74.     Sections 1126(c) and (d) of the Bankruptcy Code specify that holders of an impaired class of claims or interests must vote in favor of a plan by at least two-thirds in amount and more than one-half in number of the allowed claims, or interests, of such class to accept the plan.  *See* 11 U.S.C. §§ 1126(c), (d).  Of those who timely voted, Holders of Claims in Classes 3 and 4, among others, in excess of this statutory threshold voted to accept the Plan.  Based on the foregoing, the requirements of sections 1125 and 1126 of the Bankruptcy Code have been satisfied, and thus the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

### iii.     Section 1129(a)(3):  The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law

75.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  In assessing good faith, courts in the Fifth Circuit consider whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."[59]  A plan must also "achieve a result consistent with the [Bankruptcy] Code."[60]  The fundamental purpose of chapter 11 is to enable a debtor to reorganize its affairs to prevent job losses and the adverse economic effects associated with disposing of assets at liquidation value.[61]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[62]

---

[59]   *See In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

[60]   *See In re Block Shim Dev. Company-Irving*, 939 F.2d 289, 292 (5th Cir. 1991) (citation omitted).

[61]   *NLRB* v. *Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp.* v. *Chase Manhattan Bank* (*In re B.D. Int'l Disc. Corp.*), 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) ("[T]he two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start.").

[62]   *See, e.g.*, *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997) (citing *In re Sun Country Dev.,*

76.     The Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  Here, the Plan and the accompanying Restructuring Transactions will enable the Debtors to substantially deleverage their balance sheet and raise sufficient financing to fund emergence costs and go-forward operations.  The RSA, the Plan, the UCC Settlement, the DIP Order, the DIP Amendment Order, and all related documents were negotiated, proposed, and entered into by the Debtors and the respective parties thereto in good faith and from arm's-length bargaining positions, without any collusion, fraud, or attempt to take unfair advantage of any party.  The support for the Plan in the aggregate from the holders of Claims in Classes 3, 4, 5, and 6 is strong evidence that the Plan has a proper purpose and is likely to succeed.  The support from the UCC, following the negotiation of the UCC Settlement and subsequent modifications thereto, also demonstrates the good faith nature of the Plan.  Finally, as set forth herein, the Plan complies with bankruptcy and applicable non-bankruptcy law.  Accordingly, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

###### iv.     Section 1129(a)(4):  The Plan Provides That Professional Fees and Expenses Are Subject to Court Approval

77.     Section 1129(a)(4) of the Bankruptcy Code requires that "any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."[63]  Section 1129(a)(4) has been construed to require that all payments of estate professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the court.[64]  As to routine legal fees and expenses that

---

*Inc.*, 764 F.2d at 408); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *In re Century Glove, Inc.*, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993).

[63]     11 U.S.C. § 1129(a)(4).

[64]     *See In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 517–18 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate."); *see also In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that

have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[65]

78. Article II.B of the Plan provides that all Professional Fees must be approved by the Court as reasonable pursuant to final fee applications, and Article XII.2 of the Plan provides that the Court retains jurisdiction to "decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan."  Accordingly, the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

### v. Section 1129(a)(5):  The Debtors Have or Will Disclose All Necessary Information Regarding Directors, Officers, and Insiders

79. Section 1129(a)(5) of the Bankruptcy Code requires that:  (a) the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors; (b) the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and (c) to the extent there are any insiders that will be retained or employed by the debtors, that there be disclosure of the identity and nature of any compensation of any such insiders.[66]  Courts have held that these provisions are meant to ensure that the post-confirmation governance of a reorganized debtor is in good hands.[67]

---

before a plan can be confirmed, "there must be a provision for review by the Court of any professional compensation").

[65] *In re Cajun Elec. Power*, 150 F.3d at 517.

[66] 11 U.S.C. § 1129(a)(5).

[67] *See In re Landing Assocs., Ltd.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("[T]o lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors."); *In re Am. Solar King Corp.*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible, however.  If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i)."); *In re Charter Commc'ns*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y. 2009) ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the

80.     As set forth in Article IV.U of the Plan and in the corporate governance term sheet included in the Plan Supplement, the Debtors disclosed the process by which the members of the New TopCo Board will be selected.   The corporate governance terms have been further incorporated into the New Organizational Documents, including the New Shareholders Agreement, in the Plan Supplement.  The New TopCo Board will be comprised of seven directors, consisting of (a) the chief executive officer, (b) three directors designated by shareholders that are affiliates of PGIM, Inc., (c) one director designated by shareholders that are affiliates of Hein Park Capital Management LP, (d) one director designated by shareholders that are affiliates of Hudson Bay Capital Management LP, and (e) one director designated by shareholders that are affiliates of Alta Fundamental Advisors LLC.   In accordance with Article IV.U of the Plan and section 1129(a)(5) of the Bankruptcy Code, and to the extent known, the Debtors will disclose in advance of the Confirmation Hearing or the Reorganization Effective Date the identity and affiliations of any person proposed to serve as member of the New TopCo Board and all members will be appointed to the New TopCo Board pursuant to the New Organizational Documents, whether before or following the Reorganization Effective Date.  Accordingly, the Debtors submit that the appointment of directors of the Reorganized Debtors is consistent with the interests of creditors.[68]

81.     Additionally, the existing officers of the Debtors as of the Reorganization Effective Date are expected to remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the New TopCo Board set forth in the New

---

Debtors' disclosure at this time of the identities of the *known* directors.") (citing *Am. Solar King Corp.*, 90 B.R. at 815).

[68]     *See Landing Assocs.*, 157 B.R. at 817 ("Under § 1129(a)(5) the plan proponent must disclose the identity of the individuals that will manage the business post-confirmation, and the participation of these individuals in the debtor's business must be consistent with the interests of creditors.").

Organizational Documents and any applicable employment agreements that are assumed, including as amended or amended and restated, pursuant to the Plan.

82.     The Debtors believe that control of the Reorganized Debtors by individuals to be appointed in accordance with the Plan, the New Organizational Documents, and the New Shareholders Agreement will be consistent with public policy.  No party in interest has objected to the Plan arguing otherwise.  Moreover, the Debtors will satisfy section 1129(a)(5)(B) of the Bankruptcy Code because they will publicly disclose the identity of all insiders, if any, that the Reorganized Debtors will employ or retain and the nature of any compensation for such insiders on or immediately prior to the Reorganization Effective Date.  Accordingly, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

### vi.     Section 1129(a)(6):  The Plan Does Not Contain Any Rate Changes

83.     Section 1129(a)(6) of the Bankruptcy Code requires applicable government approval of "any rate change provided for in the plan."[69]  Section 1129(a)(6) is inapplicable to these chapter 11 cases, as the Plan does not provide for any rate changes.

### vii.     Section 1129(a)(7):  The Plan Satisfies the Best Interests Test

84.     Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.[70]  The "best interests" test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less

---

[69]   11 U.S.C. § 1129(a)(6).

[70]   11 U.S.C. § 1129(a)(7).

than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's chapter 11 plan that rejects the plan.[71]

85.     As set forth in the Kelsall Declaration, the Debtors' financial advisor, AlixPartners, LLP, with input from the Debtors' management, performed a liquidation analysis that was attached as Exhibit C to the Disclosure Statement Supplement (the "Liquidation Analysis").[72]  Subject to the assumptions and qualifications contained therein, the Liquidation Analysis establishes that all holders of Claims and Interests in Impaired Classes will receive or retain property under the Plan valued, as of the Effective Date, in an amount greater than or equal to the value of what they would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.[73]

86.     The Liquidation Analysis is sound, reasonable, and incorporates justified assumptions and estimates regarding the liquidation of the Debtors' assets and claims, such as the (a) additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 liquidation, (b) erosion in value of assets that would be caused to the Debtors' assets as a result of a chapter 7 liquidation, and (c) substantial increase in claims that may arise in a chapter 7 liquidation.[74]  No party in interest has asserted otherwise.  Accordingly, the Plan satisfies the requirements of the best interests test under section 1129(a)(7) of the Bankruptcy Code.

---

[71]   *See Bank of Am. Nat'l Tr. & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *see also Tex. Extrusion Corp.*, 844 F.2d at 1159 n.23 (5th Cir. 1988) (stating that under section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court is required to determine whether impaired claims would receive no less under a reorganization than through a liquidation); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

[72]   *See generally* Kelsall Declaration.

[73]   Kelsall Declaration at ¶¶ 9–10.

[74]   *See generally* Liquidation Analysis.

### viii.    Section 1129(a)(8):  The Plan Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8)

87.     Section 1129(a)(8) of the Bankruptcy Code requires the following: "[w]ith respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan."[75]   As set forth in the Voting Certification, Class 3 and Class 4 each voted to accept the Plan with respect to each Debtor.  Other Classes, however, did not accept the Plan.  Specifically, (a) Class 6 (General Unsecured Claims) voted to reject the Plan with respect to Debtors ARC Holdings, Ltd. and Diamond Sports Net Ohio, LLC, (b) Class 5 (Go-Forward Trade Claims) voted to reject the Plan with respect to Debtor ARC Holding, Ltd. (which votes are applicable solely if a Wind-Down Toggle occurs and such Claims are Impaired), and (c) Class 7 (Intercompany Claims), Class 8 (Intercompany Interests), and Class 9 (Existing Equity Interests) may be or are deemed to reject, as applicable, the Plan under section 1126(g) of the Bankruptcy Code.  Notwithstanding this non-acceptance by such classes, the Plan may still be confirmed because, as set forth below, it satisfies the requirements for cramdown under section 1129(a)(10) of the Bankruptcy Code.

### ix.    Section 1129(a)(9):  The Plan Provides for Payment in Full of All Allowed Priority Claims

88.     Section 1129(a)(9) of the Bankruptcy Code requires that Claims entitled to priority under section 507(a) of the Bankruptcy Code be paid in full in cash unless the holders thereof agree to a different treatment with respect to such Claims.[76]  The Plan provides that Allowed Administrative Claims and Allowed Priority Tax Claims will be paid in full in cash on or as soon as reasonably practicable after the Effective Date or, if not then due or Allowed, on or as soon as

---

[75]    11 U.S.C. § 1129(a)(8).

[76]    11 U.S.C. § 1129(a)(9).

reasonably practicable after the date such Claim is due or becomes Allowed, or otherwise in the ordinary course of business or as agreed with the relevant holder of such Claims, all consistent with sections 1129(a)(9)(A)–(C) of the Bankruptcy Code.

### x.    Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan

89.     Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one Class of impaired Claims, "determined without including any acceptance of the plan by any insider."[77]   As set forth in the Voting Certification, each of Class 3 (First Lien Claims) and Class 4 (Junior Funded Debt Claims) is Impaired and voted to accept the Plan by the requisite numbers and amounts of Claims with respect to each Debtor, as determined without including the acceptance of the Plan by any insiders in such Classes.   Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

### xi.    Section 1129(a)(11):  The Plan Is Feasible

90.     Section 1129(a)(11) of the Bankruptcy Code requires the court to determine that a plan is feasible, and that "[c]onfirmation of the plan is not likely to be followed by [a] liquidation, or the need for further financial reorganization."[78]  A debtor does not have to guarantee the success of a plan to demonstrate its feasibility under section 1129(a)(11) of the Bankruptcy Code.[79]

---

[77]   11 U.S.C. § 1129(a)(10).

[78]   11 U.S.C. § 1129(a)(11).

[79]   *See In re Save Our Springs (S.O.S.) All., Inc.*, 632 F.3d 168, 172 (5th Cir. 2011) ("To obtain confirmation of its reorganization plan, a debtor must show by a preponderance of the evidence that its plan is feasible, which means that it is 'not likely to be followed by . . . liquidation, or the need for further financial reorganization.'") (citation omitted); *Briscoe*, 994 F.2d at 1166 ("Only a reasonable assurance of commercial viability is required.") (citation omitted); *In re Landing Assocs.*, 157 B.R. at 820 (stating that section 1129(a)(11) only requires a finding that a plan offers "a reasonable probability of success"); *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (finding that feasibility "contemplates whether the debtor can realistically carry out its plan and whether the plan offers a reasonable prospect of success and is workable") (citations omitted); *In re Cajun Elec. Power Co-op, Inc.*, 230 B.R. 715, 745 (Bankr. M.D. La. 1999) ("The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds . . . .").

Instead, courts will find that a plan is feasible if a debtor demonstrates a reasonable assurance that consummation of the plan will not likely be followed by a further need for financial reorganization. "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."[80]   As the Debtors will demonstrate at the Confirmation Hearing, the Debtors believe that the Plan is feasible and satisfies section 1129(a)(11) of the Bankruptcy Code.

### xii.   Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid Under the Plan

91.   Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under section 1930 of title 28 of the United States Code, which are afforded priority as administrative expenses.[81]   Article XII.C of the Plan provides that all such fees will be paid for each quarter (including any fraction thereof) until each Debtor's chapter 11 case is converted, dismissed, or a final decree closing such chapter 11 case is issued, whichever occurs first.   The Plan therefore complies with section 1129(a)(12) of the Bankruptcy Code.

### xiii.   Section 1129(a)(13): The Plan Does Not Modify Retiree Benefits

92.   Section 1129(a)(13) of the Bankruptcy Code requires that the Plan provide for the continuation, after the Effective Date, of all retiree benefits.[82]   The Debtors submit that they do not provide any retiree benefits within the meaning of section 1114 of the Bankruptcy Code but, to the extent they do, the Plan does not modify any such retiree benefits.   Accordingly, the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

---

[80]   *Pizza of Haw., Inc.* v. *Shakey's, Inc.* (*In re Pizza of Haw., Inc.*), 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted).

[81]   11 U.S.C. §§ 1129(a)(12); 507(a)(2).

[82]   11 U.S.C. §§ 1129(a)(13); 1114.

**B.    Section 1129(b):  The Plan Satisfies the "Cram Down" Requirements**

93.    Under section 1129(b) of the Bankruptcy Code, the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.  By its express terms, section 1129(b) of the Bankruptcy Code is only applicable to a class of creditors or equity holders that rejects a plan.[83]  Accordingly, a dissenting holder in an accepting class lacks standing to object to the plan on the basis of unfair discrimination or absolute priority.[84]

94.    As discussed above, holders of Claims in Class 3 (First Lien Claims) and Class 4 (Junior Funded Debt Claims) voted to accept the Plan with respect to each Debtor.  Additionally, (a) to the extent applicable, holders of Claims in Class 5 (Go-Forward Trade Claims) voted to accept the Plan with respect to each applicable Debtor other than ARC Holding, Ltd.  and (b) holders of Claims in Class 6 (General Unsecured Claims) voted to accept the Plan with respect to each applicable Debtor other than Debtors ARC Holding, Ltd. and Diamond Sports Net Ohio, LLC (such accepting Classes, the "Accepting Classes").  Accordingly, "cram down" is only relevant to holders of Claims and Interests, as applicable, in (a) solely in the event of a Wind-Down Toggle, Class 5 (Go-Forward Trade Claims) with respect to Debtors ARC Holding, Ltd., (b) Class 6 (General Unsecured Claims) with respect to Debtors ARC Holding, Ltd. and Diamond Sports Net Ohio, LLC, (c) Class 7 (Intercompany Claims), which have been deemed under certain

---

[83]    *See* 11 U.S.C. § 1129(b) ("[T]he court . . . shall confirm the plan notwithstanding the requirements of [section 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan.") (emphasis added).

[84]    *See Kane* v. *Johns-Manville Corp.*, 843 F.2d 636, 650 (2d Cir. 1988) (refusing to consider objection of dissenting creditor in accepting class because section 1129(b) did not need to be satisfied as to an accepting class); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1062 (3d Cir. 1987) (overruling "cram down" objection because objecting party was a member of an accepting class and therefore section 1129(b)(1) afforded no protection to such party).

circumstances to reject the Plan, (d) Class 8 (Intercompany Interests), which have been deemed under certain circumstances to reject the Plan, and (e) Class 9 (Existing Equity Interests), which have been deemed to reject the Plan (collectively, the "Rejecting Classes"). The Plan may be confirmed as to each of the Rejecting Classes pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

### i. The Plan Does Not Discriminate Unfairly

95. "The Bankruptcy Code does not provide a standard for determining when 'unfair discrimination' exists."[85] Courts instead examine the facts and circumstances of the particular case to determine whether there is unfair discrimination.[86] The unfair discrimination requirement ensures that similarly situated creditors and interest holders do not receive materially different treatment under a proposed plan without a compelling justification.[87] For the reasons set forth below, the Plan does not discriminate unfairly with respect to any Class.

### 1. The Plan Does Not Unfairly Discriminate Among Holders of Claims

96. There is no unfair discrimination among the Classes of Claims that voted to accept the Plan, on the one hand, and the Classes of Claims that rejected or are deemed to reject the Plan, on the other hand. Class 3 (First Lien Claims) consists of all Claims arising under the First Lien

---

[85] *See In re Idearc Inc.*, 423 B.R. at 171 (citation omitted).

[86] *See In re Kolton*, 1990 WL 87007 at *5–6 (Bankr. W.D. Tex. Apr. 4, 1990) (quoting *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis . . . .")); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[87] *See In re Idearc Inc.*, 423 B.R. at 171 ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling *justifications* for doing so.") (emphasis added); *Liberty Nat'l Enters.* v. *Ambanc La Mesa Ltd. P'ship* (*In re Ambanc La Mesa Ltd. P'ship*), 115 F.3d 650, 654 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

Credit Agreement, which provides the holders of First Lien Claims with, among other things, a first priority interest on substantially all of the Debtors' assets. Class 4 (Junior Funded Debt Claims) consists of all Claims arising under the Second Lien Credit Agreement, the Second Lien Notes Indenture, the Third Lien Credit Agreement, the Third Lien Notes Indenture, and the Unsecured Notes Indenture, which provide the holders thereunder with specific rights and obligations with respect to the Debtors on account of the applicable Junior Funded Debt Claims that collectively share a common junior priority vis-à-vis the First Lien Claims. Class 5 (Go-Forward Trade Claims) consists of prepetition general unsecured Claims held by certain trade claimants that are expected to provide goods and services necessary to the operation of the Reorganized Debtors' business after the Effective Date. Class 6 (General Unsecured Claims) consists of a broad array of general unsecured Claims held by, among others, vendors and contract counterparties, who each generally have different rights and obligations governing their Claims but whose Claims share a common general unsecured priority and are not expected to have an ongoing relationship with the Reorganized Debtors' business (absent assumption of any underlying contracts). Class 7 (Intercompany Claims) consists of Claims held by a Debtor against another Debtor.

97.     The Plan does not discriminate unfairly among the Claims in the Accepting Classes and the Claims in the Rejecting Classes because (a) the Claims in the Accepting Classes are legally distinct from the Claims in the Rejecting Classes, and the Plan's classification scheme with respect to such Claims is accordingly premised on a legally acceptable rationale, and (b) all similarly situated holders of Claims will receive substantially similar treatment. With respect to Class 5 (Go-Forward Trade Claims) against Debtor ARC Holding, Ltd., which voted to reject the Plan in the event of a Wind-Down Toggle, and Class 6 (General Unsecured Claims) against Debtors ARC

Holding, Ltd. and Diamond Sports Net Ohio, LLC, there is no unfair discrimination under the Plan because Class 5 Go-Forward Trade Claims will be treated as Class 6 General Unsecured Claims in the event the Wind-Down Toggle occurs, resulting in the same treatment of all prepetition general unsecured Claims.  In the event there is no Wind-Down Toggle, the Debtors have a rational basis for treating Class 5 differently than Class 6 because Class 5 claimants are expected to have an ongoing relationship with the Reorganized Debtors' business after emergence while Class 6 claimants, absent assumption of any underlying contracts, are not.[88]  Additionally, as in the case of the Intercompany Interests described below, it is reasonable for the Plan to provide for the maintenance or cancellation of Intercompany Claims for administrative ease in connection with consummation of the Plan.  To the extent any holder of Claims in Class 7 (Intercompany Claims) receives a recovery, such treatment has no economic substance and is not "on account of" such Intercompany Claims; instead, such treatment is intended to maintain the Debtors' prepetition organizational structure for the administrative benefit of the Reorganized Debtors.

98.     Accordingly, there is no unfair discrimination among the holders of Claims in the Accepting Classes and the Rejecting Classes, and there is a reasonable basis for the disparate treatment among the holders of Claims in those Classes.  Thus, the Plan does not "discriminate unfairly" with respect to any Impaired Class of Claims.

---

[88]  *In re Idearc Inc.*, 423 B.R. at 160 ("Classification of substantially similar claims in different classes is permitted for purposes of reorganization only and for reasons independent of debtor's motivation to secure the vote of an impaired, assenting class of claims . . . ." (citing *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278–79 (5th Cir.1991))); *In re Tribune Media Company*, 587 B.R. 606, 614 (D. Del. 2018), *aff'd*, 972 F.3d 228 (3d Cir. 2020) (cramdown requirement that a plan must not unfairly discriminate against any impaired, dissenting class "does not prohibit all disparity in plan treatment, only *unfair* discrimination.") (emphasis in original); *In re Am. HomePatient, Inc.,* 420 F.3d 559 (6th Cir. 2005) (plan did not discriminate unfairly by paying trade creditors faster than other creditors; favorable treatment permitted to maintain good relations with trade creditors); *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 657; *In re Johns-Manville Corp*., 68 B.R. at 636.

### 2. The Plan Does Not Unfairly Discriminate Among Holders of Interests

99.     Similarly, there is no unfair discrimination among the Classes of Interests that are deemed to accept the Plan, on the one hand, and the Classes of Interests that are deemed to reject the Plan, on the other hand.  Class 9 (Existing Equity Interests) is legally distinct in nature from all other Classes, including Class 8 (Intercompany Interests).  Specifically, Class 9 represents all Interests in DSG, whereas Class 8 (Intercompany Interests) represents Interests held by a Debtor in another Debtor.  All Interests in DSG are classified together and afforded the same treatment under the Plan.  Similarly, all Intercompany Interests are classified together and afforded the same treatment under the Plan.

100.     The Plan does not discriminate unfairly among the Interests in the Accepting Classes and the Interests in the Rejecting Classes because (a) the Interests in the Accepting Classes are legally distinct from the Interests in the Rejecting Classes, and the Plan's classification scheme with respect to such Interests is accordingly premised on a legally acceptable rationale, and (b) all similarly situated holders of Interests will receive substantially similar treatment.  Additionally, as in the case of the Intercompany Claims described above, it is reasonable for the Plan to provide for the maintenance or cancellation of Intercompany Interests for administrative ease in connection with consummation of the Plan.  To the extent any holder of Interests in Class 8 (Intercompany Interests) receives a recovery, such treatment has no economic substance and is not "on account of" such Intercompany Interests; instead, such treatment is intended to maintain the Debtors' prepetition organizational structure for the administrative benefit of the Reorganized Debtors.

101.     Accordingly, there is no unfair discrimination among the holders of Interests in Class 8 and Class 9, and there is a reasonable basis for the disparate treatment among the holders

of Interests in those Classes.  Thus, the Plan does not "discriminate unfairly" with respect to any Impaired Class of Interests.

### ii.    The Plan Is Fair and Equitable

102.    Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if under the plan no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest.[89]  In other words, a plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan if it follows the "absolute priority" rule.[90]  The absolute priority rule mandates that a junior class of claims or interests cannot receive a distribution under the plan unless senior classes are rendered unimpaired or give their consent.[91]

103.    Distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code and in accordance with the rule of absolute priority.  The holders of Claims in the Accepting Classes have consented to the recoveries the Plan provides to the holders of Claims and Interests junior to them through their Class vote to accept the Plan.  There is no Class junior to Class 9 (Existing Equity Interests).

104.    With respect to Class 6 (General Unsecured Claims), the Plan is "fair and equitable" because no Claims junior to such Class will receive or retain any property under the Plan on account of such junior Claims.  As further discussed below, the only class of Claims junior to Class 6 is Class 7 (Intercompany Claims) and holders of Class 7 Claims will not receive or retain any property under the Plan on account of such junior Claims.  In the event the Wind-Down Toggle

---

[89]    *See* 11 U.S.C. §§ 1129(b)(2)(B)(ii), (C)(ii).

[90]    *See* 11 U.S.C. § 1129(b); *203 N. LaSalle St. P'ship*, 526 U.S. at 441–42.

[91]    11 U.S.C. § 1129(b).

occurs, the "fair and equitable" rule is also satisfied as to Class 5 (Go-Forward Trade Claims) with respect to Debtor ARC Holding, Ltd. because (a) the Plan provides that all Class 5 Go-Forward Trade Claims will be treated as Class 6 General Unsecured Claims and (b) no holders of any Claims junior in priority to such Go-Forward Trade Claims and General Unsecured Claims will receive or retain any property under the Plan on account of such junior Claims.[92]

105.    The "fair and equitable" rule is also satisfied as to each Class that is deemed to reject the Plan (i.e., Class 7 (Intercompany Claims), Class 8 (Intercompany Interests), and Class 9 (Existing Equity Interests)), as no Claims and Interests junior to each such Class, as applicable, will receive or retain any property under the Plan on account of such junior Claims or Interests. The Plan provides that on the Effective Date, all Intercompany Claims shall be reinstated, or cancelled, released, and extinguished without any distribution, and all Intercompany Interests shall be reinstated, or cancelled, released, and extinguished without any distribution.[93]  To the extent reinstated, Intercompany Interests and Intercompany Claims are Unimpaired solely to preserve the Debtors' corporate structure and internal business operations, and holders of such Intercompany Interests shall not otherwise receive or retain any property on account of such Intercompany Interests.  The option to reinstate these Intercompany Interests and Intercompany Claims is designed to allow the Debtors to preserve their holding company structure and business operations instead of having to reconstitute a new one or recreate their internal business operations and relationships.[94]

---

[92]    In the event the Wind-Down Toggle does not occur, Class 5 (Go-Forward Trade Claims) is Unimpaired (and their provisional votes not counted in determining acceptance of the Plan by voting creditors).

[93]    *See* Plan Art. III.B.7 and 8.

[94]    *See In re Ion Media Networks, Inc.*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) ("[R]etention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure.").

106.    Courts have explained that this type of "technical preservation of equity" does not violate the absolute priority rule because it is simply a "means to preserve the corporate structure that does not have any economic substance" and "does not enable any junior creditor or interest holder to retain or recover any value under the Plan."[95]  This reasoning similarly applies to the preservation of intercompany claims between debtors and other debtors and their non-debtor affiliates, as the sole purpose of maintaining such claims is to preserve the corporate structure and the intercompany business relationships therein.  The Plan is thus "fair and equitable" as to the Rejecting Classes.  Moreover, as demonstrated in the uncontroverted valuation analysis attached as Exhibit E to the Disclosure Statement Supplement, no senior creditor will receive in excess of the full value of its Claims under the Plan.

107.    Because the Plan does not discriminate unfairly and is fair and equitable, the Plan satisfies the "cram down" requirements of section 1129(b) of the Bankruptcy Code and may be confirmed.

### C.    Section 1129(c):  The Plan Is the Only Plan Currently on File

108.    The Plan is the only plan filed in these chapter 11 cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.

### D.    Section 1129(d):  The Purpose of the Plan Is Not Tax or Securities Law Avoidance

109.    The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no governmental unit has objected to Confirmation of the Plan on such grounds.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

---

[95]    *Id.* (rejecting argument that a plan violated the absolute priority rule "because it preserves intercompany interests without paying [more senior claims] in full").

E.      **Section 1129(e): Does Not Apply to the Plan**

110.    The provisions of section 1129(e) of the Bankruptcy Code apply only to a "small business case." These chapter 11 cases are not "small business cases" and, accordingly, section 1129(e) of the Bankruptcy Code has no application to the Plan.

F.      **The Plan's Settlements and Compromises Are Reasonable and Satisfy Bankruptcy Rule 9019**

111.    The Plan embodies a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an equity holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account thereof. "The standard for evaluating the validity of a settlement contained in a Chapter 11 plan is the same as the standard for evaluating a settlement between a debtor and another party outside the context of a plan . . . . Stated differently, settlement provisions in a Chapter 11 plan must satisfy the standards used to evaluate compromises under [Bankruptcy] Rule 9019."[96] Accordingly, approval should be given "if the settlement is 'fair and equitable and in the best interest of the estate.'"[97]

112.    To determine whether a settlement is fair and equitable, courts "apply [a] three-part test . . . with a focus on comparing 'the terms of the compromise with the likely rewards of litigation.'"[98] Specifically, a bankruptcy court evaluates: (a) "the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law"; (b) "the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay"; and (c) "all other factors bearing on the wisdom of the compromise,"

---

[96]    *In re Bigler*, 442 B.R. at 543 n.6 (citing *In re MCorp Fin., Inc.*, 160 B.R. 941, 951 (S.D. Tex. 1993)).

[97]    *In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d at 355 (quoting *In re Foster Mortg. Corp.*, 68 F.3d at 917 (additional citations omitted)).

[98]    *In re Age Refin., Inc.*, 801 F.3d at 540 (quoting *In re Jackson Brewing Co.*, 624 F.2d at 602).

including (i) "the best interests of the creditors, with proper deference to their reasonable views," and (ii) "the extent to which the settlement is truly the product of arm's length bargaining, and not of fraud or collusion."[99]

113.    Although the debtor bears the burden of establishing that a settlement is fair and equitable based on the balance of the above factors, "the [debtor's] burden is not high."[100]  Indeed, the court need only determine that the settlement does not "fall beneath the lowest point in the range of reasonableness."[101]  Here, the Plan's settlements and compromises, including the UCC Settlement, are the result of months of good faith, arm's-length negotiations among the parties. The Plan's settlements and compromises, among other things:

- provide for a clear path to the present Plan and the Debtors' exit from chapter 11 with a deleveraged balance sheet, providing the Debtors with stability to run their business going forward;

- represent a comprehensive restructuring transaction, which facilitates a significant deleveraging through the significant reduction of the Debtors' balance sheet liabilities;

- provide significantly improved recoveries to holders of Claims in Class 4 (Junior Funded Debt Claims), Class 5 (Go-Forward Trade Claims), and Class 6 (General Unsecured Claims) as compared to their potential recovery in a liquidation;

- resolves numerous potential intercreditor disputes (including those described in Article IV.A of the Plan) and avoids associated administrative costs, thereby preserving and maximizing the value of the Debtors' estates for the benefit of creditors; and

- have the support of the Debtors' key stakeholders, including the First Lien Group, the Crossholder Group, and the UCC.

114.    The Debtors, the First Lien Group, the Crossholder Group, the UCC, and other

---

[99]    *Id.*

[100]    *See In re Roqumore*, 393 B.R. at 480.

[101]    *See In re Idearc Inc.*, 423 B.R. at 182 (citation omitted); *In re Roqumore*, 393 B.R. at 480 ("The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'") (citations omitted).

parties in interest involved in the Plan negotiation process are all represented by experienced and competent counsel and financial advisors who vigorously negotiated these settlements and compromises, as applicable, and agree that approval of the Plan is a significantly better outcome than the alternatives.  Accordingly, the Plan's settlements and compromises collectively represent a reasonable resolution of the issues raised in these chapter 11 cases, result in a Plan that is fair and equitable and in the best interest of the Debtors' estates, and should therefore be approved by the Court.

## III.    The Revisions to the Plan Do Not Require Resolicitation and Should Be Approved

115.    The Debtors have filed a further revised version of the Plan contemporaneously herewith reflecting certain technical, non-substantive modifications [Docket No. 2652-1].  None of the Plan modifications will adversely affect the treatment of those Classes of Claims that voted to accept the Plan.[102]  Instead the revisions merely incorporate certain comments from FanDuel, the Crossholder Group, and other stakeholders that address and clarify technical aspects of the Plan.  Pursuant to Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted chapter 11 plan will be deemed accepted—without the need for further solicitation—where such modification is not material or does not adversely affect the treatment of stakeholders thereunder.[103]  Accordingly, the modifications do not require the Debtors to re-solicit acceptances for the Plan and prior acceptances by voting creditors should be deemed

---

[102]   *See* 11 U.S.C. § 1127(a) ("The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.").

[103]   *See* Fed. R. Bankr. P. 3019(a);  *In re Reagor-Dykes Motors, LP*, 2021 WL 1219537, at *6 (Bankr. N.D. Tex. Mar. 30, 2021) ("A modified plan must provide a new disclosure statement and resolicit votes when the modifications materially and adversely affect the treatment of a creditor who voted in favor of the plan."); *In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) ("[I]f a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.").

votes to accept the revised Plan.

## IV.     The UST Objection and the Sinclair Objection Should Be Overruled

### A.     The UST Objection Should Be Overruled

116.     Article VIII.D of the Plan provides for a consensual Third-Party Release of any and all Claims and Causes of Action held by the Releasing Parties[104] against the Released Parties that are based on or relate to, among other things, the Debtors and their estates, these chapter 11 cases, and related prepetition and postpetition claims and transactions.

117.     The U.S. Trustee objects on the basis that the Debtors' solicitation materials include an opt-out mechanism for the Third-Party Release, and that the Releasing Parties are overly broad in scope.   Respectfully, the U.S. Trustee's objection contravenes well-settled law in this jurisdiction and should be overruled.

---

[104]   Pursuant to Article I.A.176 of the Plan, the term "Releasing Parties" means, collectively, and in each case in its capacity as such: (a) each Debtor and Post-Effective Date Debtor; (b) the Consenting Parties; (c) all Holders of Claims (except as set forth in the proviso herein); (d) the Prepetition Notes Trustees; (e) the Prepetition Agents; (f) the UCC and each UCC Member; (g) the Sinclair-Related Litigations Defendants; (h) the Plan Administrator; and (i) with respect to each Person or Entity listed or described in any of the foregoing clauses (a) through (h), each such Person's or Entity's current and former Affiliates, and each such Person's or Entity's and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, participants, affiliated investment funds or investment vehicles, managed accounts or funds, and each of their respective current and former members, equity holders, officers, directors, managers, principals, employees, agents, advisory board members, investment fund advisors or managers, investment managers, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; provided that the following Persons and Entities shall not be Releasing Parties: (i) a Person or Entity that either (A) elects to opt out of the releases contained in the Plan or (B) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before entry of the Confirmation Order; (ii) other than (A) non-Debtor Diamond Sports Finance SPV, LLC and the New A/R Facility Borrower, (B) any Debtor that is a member or equity holder (regardless of whether such interests are held directly or indirectly) in a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, and (C) any members, directors, managers, officers, employees, or agents appointed by any Debtor at a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date, any other Person or Entity affiliated with a non-Debtor Entity in which any Debtor held an Interest as of the Petition Date and any non-Debtor Affiliates thereof; or (iii) Affiliates of JPMorgan Chase & Co. other than the JPM Parties.

118.     The Debtors crafted the opt-out mechanism in their solicitation materials to conform to settled law in this Circuit prohibiting non-consensual releases[105] as well as settled law in this District as to what constitutes a consensual release.[106]   Thus, the Debtors' solicitation materials were uncontroversial when they were filed with and approved by this Court after notice during a hearing on April 17, 2024.   Indeed, the U.S. Trustee accepted the Debtors' solicitation materials at that time.

119.     In addition, the Third-Party Release is, as in *Robertshaw*, "narrowly tailored to this case."[107]   As discussed below, the released claims are expressly limited to those that are based on or relate to, among other things, the Debtors and their estates, these chapter 11 cases, and related prepetition and postpetition claims and transactions, with a carveout for claims arising from actual fraud, willful misconduct, or gross negligence.

120.     Accordingly, and as more fully explained below, the Third-Party Release should be approved.

### i.     The Third-Party Release Is Consensual and *Purdue* Is Therefore Inapplicable

121.     The U.S. Trustee relies on the Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024) to justify its objection.   But *Purdue* did not limit consensual releases or otherwise address what constitutes a consensual release.[108]     And because

---

[105]   *See In re Pac. Lumber Co.*, 584 F.3d 229 (5th Cir. 2009).

[106]   *See Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*, 597 B.R. 597, 608–09 (S.D. Tex. 2019).

[107]   *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 324 (Bankr. S.D. Tex. 2024).

[108]   *See Purdue*, 144 S. Ct. at 2087 ("Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan . . . .   Nor do we have occasion today to express a view on what qualifies as a consensual release.").

non-consensual third-party releases were already prohibited in the Fifth Circuit, "*Purdue* did not change the law in this Circuit."[109]

122. As this Court found in *Robertshaw*, "what constitutes consent, including opt-out features and deemed consent for not opting out, has long been settled in this District."[110] In this District, the Complex Case Procedures indicate that a consensual release may be effectuated through notice and an opportunity to opt out:

> If a proposed plan seeks consensual pre- or post-petition releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties-in-interest. The ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice.[111]

In accordance with the Complex Case Procedures, the Debtors sent all Releasing Parties either a ballot or a notice that (a) informed them of the Third-Party Release (including the full text of the Third-Party Release), (b) included a box to check to indicate whether they would opt out of the Third-Party Release, and (c) informed them of the method for returning the ballot or notice.

123. In *Robertshaw*, this Court overruled a similar objection by the U.S. Trustee to third-party releases that were effectuated consensually through an opt out, as this Court found that the third-party releases "satisfy applicable law and the Procedures for Complex Cases in the

---

[109] *Robertshaw*, 662 B.R. at 322 (citing *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995)).

[110] *Id.* (noting that "[h]undreds of chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out"); *see also CJ Holding Co.*, 697 B.R. at 609 (finding that a bankruptcy court may construe silence as consent to a third-party release); Conf. Hr'g Tr. at 42, *In re Southcross Holdings, LP*, Case No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) [Docket No. 191] (finding that the debtors correctly characterized a release as consensual because debtors provided extensive notice of plan and confirmation hearing and no party objected to their inclusion in plan's release provisions).

[111] Complex Case Procedures ¶ 40.

Southern District of Texas."[112]   The U.S. Trustee does not identify any meaningful distinction between the opt-out mechanism in this case and *Robertshaw*, because there is none.  Here, as in *Robertshaw*:

> Parties in interest were provided detailed notice about the Plan, the deadline to object to plan confirmation, the voting deadline, and the opportunity to opt out of the third-party releases.  The Disclosure Statement included a detailed description about the third-party releases and the opt-out. . . .  All ballots provided claimants an opportunity to opt out.  Non-voting parties . . . received a Notice of Non-Voting Status that offered a chance to opt out too.  The ballots and the Notice of Non-Voting Status allowed parties to carefully review and consider the terms of the third-party release and the consequences of electing not to opt-out.[113]

And here, as in *Robertshaw*, the opportunity to opt out of the third-party releases appears in clear and conspicuous language throughout the solicitation materials.  In addition, the notice of the confirmation hearing published in the national editions of *The New York Times* and *USA Today* on April 23, 2024, included the following in all-caps, bold type, along with a link where any reader could obtain a copy of the plan and disclosure statement free of charge:

> **YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE THIRD-PARTY RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS SET FORTH IN ARTICLE VIII OF THE PLAN, AS YOUR RIGHTS MAY BE AFFECTED.**[114]

---

[112]   *Robertshaw*, 662 B.R. at 323.

[113]   *Id*.

[114]   Certificate of Publication; *see also In re Ultra Petrol. Corp.*, Case No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017), Docket No. 1324 at ¶ 44 ("[T]he Third Party Release is consensual as the parties in interest were provided notice of the chapter 11 proceedings, the Plan, and the deadline to object to confirmation of the Plan, and . . . were given the opportunity to opt in or opt out of the Third Party Release, and the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, and the ballots.").

Finally, as reflected in the Voting Certification, the Notice and Claims Agent received 205 opt out elections with respect to the Third-Party Release, further indicating that parties entitled to opt out understood the opt out option and had adequate notice and opportunity to exercise it.

124.    The U.S. Trustee cites non-binding case law that references state law to conclude that failure to opt out is insufficient to indicate consent.[115]   But as noted by the court in *Mallinckrodt*, and as recognized by this Court and others since *Purdue*,[116] deemed consent upon failure to act is used throughout the judicial system, including the bankruptcy system:

> The notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system.  When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them.  Within the bankruptcy system, Debtors send out bar date notices and if claimants fail to file a proof of claim by a certain time, they lose the right to assert a claim.  Additionally, if a claim objection is filed and the claimant fails to respond, the claim is disallowed.  There is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization.[117]

125.    The U.S. Trustee argues that the Court should analyze whether the Releasing Parties have consented to the release under state contract law, but does not identify which state's law should apply, referring to Texas law only "as a point of reference".[118]   This illustrates the

---

[115]   *See, e.g.*, *In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017).

[116]   In the few months since *Purdue* was decided, courts have repeatedly overruled similar objections by the U.S. Trustee to opt-out mechanisms.    *See, e.g.*, *In re FTX Trading Ltd.*, Case No. 22-11068 (Bankr. D. Del. Oct. 8, 2024) [Docket No. 26404]; *In re DRF Logistics, LLC*, Case No. 24-90447 (CML) (Bankr. S.D. Tex. Sept. 24, 2024) [Docket No. 276]; *In re Eiger BioPharmaceuticals, Inc.*,  Case No. 24-80040-SGJ11 (N.D. Tex. Sept. 5, 2024) [Docket No. 639]; *In re Gigamonster Networks, LLC*, Case No. 23-10051 (JKS) (Bankr. D. Del. Aug. 30, 2024) [Docket No. 889]; *In re Bowflex Inc.*,  Case No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 19, 2024) [Docket No. 614]; *In re Invitae Corp.*,  Case No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 9, 2024) [Docket No. 932].

[117]   *In re Mallinckrodt PLC*, 639 B.R. 837, 879 (Bankr. D. Del. 2022); *see also Robertshaw*, 662 B.R. at 323 n.120 ("The U.S. Supreme Court and the Fifth Circuit have also approved opt-outs in non-bankruptcy cases like class actions as providing consent.").

[118]   UST Objection ¶ 20.

unworkable nature of such an analytical framework, as courts would need to undertake a choice-of-law analysis as to which state's law applies to each released claim.  The U.S. Trustee's preferred state law analysis would also undermine one of the fundamental purposes of our federal bankruptcy system, which is to ensure the uniform enforceability of confirmed plans and other court orders throughout the nation.

126.    Notably, consent may still be inferred from the failure to opt out under state law contract principles.  For example, Texas courts have held that silence operates as consent when "the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction,"[119] and that "[p]rolonged silence or inaction in not asserting a known right is conduct that may amount to waiver."[120]  As noted above, the Debtors provided extensive notice to the Releasing Parties that they may be deemed to consent to the Third-Party Release if they failed to opt out, and therefore the Releasing Parties that did not opt out have consented to the Third-Party Release even under a contract law analysis under Texas law used by the U.S. Trustee as a point of reference.

127.    Accordingly, under the long-settled law in this District, the Third-Party Release is a consensual release and is therefore unaffected by *Purdue*.

---

[119]    *Union Carbide Corp. v. Jones*, Case No. 14-00574-CV, 2016 WL 1237825, at *6 (Tex. App. Mar. 29, 2016) (emphasis omitted) (quoting Restatement (Second) of Contracts § 69(1)(b) (Am. L. Inst. 1981)).

[120]    *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 66 (Tex. 2015) (quoting *Ohrt v. Union Gas Corp.*, 398 S.W.3d 315, 329 (Tex. App. 2012)); *Safeco Ins. Co. of Am. v. Clear Vision Windshield Repair, LLC*, 564 S.W.3d 913, 920 (Tex. App. 2018) ("A party's silence or inaction for a period of time long enough show an intention to yield the known right is also enough to establish waiver.").

###### ii.     The Scope of the Releases Is Narrowly and Appropriately Tailored

128.     The U.S. Trustee argues that the breadth of the definition of "Releasing Parties" under the Plan is "unusually broad," and that there is "no evidence" that the Debtors provided notice to the Releasing Parties.[121]  The U.S. Trustee is wrong on both counts.

129.     The definition of "Releasing Parties" is far from "unusually broad," as it is nearly identical to that in *Robertshaw*[122] and numerous other cases in this District.[123]  Moreover, the scope of the definition of "Releasing Parties" has no bearing on the breadth of the claims released.  As in *Robertshaw*, the scope of the released claims is "narrowly tailored to this case," as the released claims include only those that are based on or relate to, among other things, the Debtors and their estates, these chapter 11 cases, and related prepetition and postpetition claims and transactions, with a carveout for claims arising from actual fraud, willful misconduct, or gross negligence.[124] The Third-Party Release does not cover any claims that are <u>not</u> related to the Debtors and their estates, these chapter 11 cases, and related prepetition and postpetition claims and transactions, and no Releasing Party is releasing any such claims.

---

[121]   UST Objection ¶ 52.

[122]   *See First Amended Joint Plan of Liquidation of Robertshaw US Holding Corp. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* at 19, *In re Robertshaw US Holding Corp.*, Case No. 24-90052 (CML) (Bankr. S.D. Tex. July 31, 2024) [Docket No. 857].

[123]   *See, e.g.*, *In re Party City HoldCo, Inc.*, Case No. 23-90005 (DRJ) (Bankr. S.D. Tex. Sept. 6, 2023) [Docket No. 1711] (confirming plan with third-party releases with a nearly identical definition of "Releasing Parties"); *In re Nat'l CineMedia, LLC*, Case No. 23-90291 (DRJ) (Bankr. S.D. Tex. June 27, 2023) [Docket No. 457] (same); *In re Carlson Travel, Inc.*, Case No. 21-90017 (MI) (Bankr. S.D. Tex. Nov. 12, 2021) [Docket No. 106] (same, over objection by the U.S. Trustee); *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex. Mar. 2, 2019) [Docket No. 1561] (same, over objection by the Securities & Exchange Commission); *In re Ameriforge Grp., Inc.*, Case No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) [Docket No. 142] (same, over objection by the U.S. Trustee).

[124]   *See* Plan Art. I.A.176; *Robertshaw*, 662 B.R. at 324.

130.    In addition, evidence of notice to the Releasing Parties is freely and publicly available.[125]  The Debtors served opt-out forms to all applicable parties in accordance with the Initial Solicitation Order and the Supplemental Solicitation Order not just once, but twice,[126] and the Debtors also provided publication notice in not just one, but two national newspapers.[127]  There is thus ample evidence that the Debtors provided appropriate and sufficient notice of the Third-Party Release and the ability to opt out of the Third-Party Release through submission of applicable opt-out forms or by objecting to the Plan by the applicable voting deadline.

131.    Accordingly, the Debtors respectfully request the Court overrule the UST Objection.

### iii.    The Third-Party Release Satisfies Applicable Law

132.    Courts in the Fifth Circuit have held that "[c]onsensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate" the Bankruptcy Code.[128]  This standard (and analogous standards in other circuits) is the "limiting principle" that distinguishes the Third-Party Release from the college education plan hypothetical in *Smallhold*.[129]  As noted above, the Third-Party Release is consensual, and as

---

[125]    *See* Solicitation Affidavits.

[126]    *Id.*

[127]    *See* Certificate of Publication; *In re Placid Oil Co.*, 753 F.3d 151, 155 (5th Cir. 2014) (noting that "[p]ublication in a national newspaper such as the *Wall Street Journal* is sufficient" for a debtor to provide constructive notice).

[128]    *In re Wool Growers*, 371 B.R. 768, 776 (Bankr. N.D. Tex. 2007) (citing *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987)); *see also FOM Puerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 911–12 (5th Cir. 2007); Conf. Hr'g Tr. at 47, *In re Energy & Exploration Partners, Inc.*, Case No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) [Docket No. 730] (authorizing a third-party release by parties who had "not affirmatively participat[ed] in the case" where there was no evidence of bad faith and "the Debtor ha[d] otherwise satisfied procedural due process" (citing *Shoaf*, 815 F.2d at 1050)).

[129]    *See* UST Objection ¶ 26 (quoting *In re Smallhold Inc.*, No. 24-10267 (CTG), 2024 WL 4296938, at *2 (Bankr. D. Del. Sept. 25, 2024) ("[N]one of the cases that authorizes the opt-out third-party release provides any limiting principle that would distinguish the third-party release from [a plan that would require a creditor that did not opt out to make a $100 contribution to the college education fund for the children of the CEO of the debtor].")).

explained below, they are specific in language, integral to the plan, a condition of the settlements contained in the plan, and are given for consideration, and therefore meet the applicable standard in this Circuit.

133.     The language of the Third-Party Release describes the claims being released in specific detail, and therefore gave all Releasing Parties sufficient notice of the nature and types of claims being released.[130]  In addition, as described above, each of the ballots and notices sent to the Releasing Parties and other parties in interest contained a clear, conspicuous, and detailed disclosure specifying the nature and types of claims being released, and included the text of the Third-Party Release in full.

134.     The Third-Party Release is an integral part of the Plan and a condition of the settlements contained therein.  The Third-Party Release facilitated participation by the Released Parties in the chapter 11 process and formulation of the Plan, and was critical in reaching consensus to support the Plan.  The Debtors' key stakeholders insisted on the inclusion of the Third-Party Release as a condition to entering into the RSA and DIP Facility, and supporting the Plan.  The Third-Party Release was a core negotiation point and appropriately offers a measure of protection to parties that constructively participated in the Debtors' restructuring.

135.     Finally, the Third-Party Release is given for consideration, as it is given in exchange for the Released Parties' agreements to the substantial and complex settlements embodied in the Plan and the significant time and effort the Released Parties have contributed to the Debtors' restructuring.  All parties in interest benefit from the Restructuring Transactions contemplated by the Plan and the significant contributions of the Released Parties in furtherance

---

[130]   *See Robertshaw*, 662 B.R. at 324 (finding that similarly descriptive "third-party release language [was] specific enough to put releasing parties on notice of the types of claims released").

thereof, including, among others, the agreement by Consenting Creditors to equitize billions of dollars in prepetition funded debt, the capital infusion through the DIP Facility, the concessions made pursuant to the intercreditor settlements embodied in the Plan, including the UCC Settlement, the agreement to waive preference actions, and the waiver of certain potential administrative claims by Amazon.   These settlements and contributions will allow for a comprehensive and value-maximizing reorganization that will enable the Debtors to significantly reduce their funded indebtedness and emerge from bankruptcy as a going concern.

136.    Based on the foregoing, the Third-Party Release complies with controlling law, is appropriate and justified under the circumstances, and should therefore be approved.

**B.    The Sinclair Objection Should Be Overruled and the Sinclair Administrative Claims Disallowed**

137.    The Sinclair Objection is nothing more than an assertion of an alleged administrative expense claim that is not an impediment to confirmation of the Plan and should be overruled.  The Sinclair Objection does not challenge the feasibility of the Plan, or even assert or suggest that the Plan is not feasible.  It also does not raise any other objections to the Plan or confirmation.  Instead, it is yet another thinly-veiled, last-ditch attempt by Sinclair to unfairly extract value from the Debtors' estates to the detriment of all other creditors and stakeholders.

138.    The Sinclair Objection should be overruled for at least two reasons.  *First*, Sinclair has no administrative expense claim because the MSA was properly terminated as of October 31, 2024.  *Second*, even if the Court is disinclined to disallow Sinclair's asserted administrative expense claim at this time, the Sinclair Objection should be resolved through the Debtors' claims administration process included in the Plan.

### i. Sinclair Is Not Entitled to an Administrative Expense Claim

139.    Sinclair's assertion that the MSA has not been terminated is incorrect as a matter of contract interpretation.  Contrary to Sinclair's assertion, the plain language of the MSA does not require the Debtors to provide Sinclair with *written* notice of their intention to terminate the agreement.   Throughout the MSA and the MSA Amendment, the parties' notice obligations are expressly delineated and indicate, in each instance, whether a *written* notice is required to effectuate an action to be taken by a party.  Section 6 of the MSA Amendment, which governs the term of the parties' agreement, provides that DSG only needed to provide Sinclair with "at least sixty (60) days' notice of its intent to terminate. . . ."[131]  In the following paragraph of the same section, on the other hand, Sinclair's termination rights with respect to certain services provided by the Debtors to Sinclair expressly require written notice.[132]  In other words, where such notice must be delivered in writing, the MSA and the MSA Amendment impose that obligation with clear and unequivocal language.[133]  Similarly, where such notice need not be delivered in writing, the MSA and the MSA Amendment simply impose a notice obligation without any reference to a requirement to convey such notice in writing.[134]  This long-standing principle of contract interpretation—that if an agreement has particular language in one place, its omission or absence elsewhere indicates the parties' intent not to use that language—has previously been endorsed by

---

[131]   MSA Amendment § 6(a)(i).

[132]   *See* MSA Amendment § 6(a)(ii) ("Sinclair may terminate the Reverse Service Period at any time upon thirty (30)-days' written notice to the [Debtors] . . .").

[133]   *See*, *e.g.*, MSA § 4(b) (requiring the non-breaching party to "give the other party written notice of such breach" in the event of a material breach of the MSA); MSA Amendment 16(j) (requiring a party to give "written notice to the other party" of changes to its respective transition managers).

[134]   *See*, *e.g.*, MSA § 4(c) (allowing either party to terminate the MSA upon the other party's commencement of insolvency proceedings or if the other party becomes insolvent "upon notice to the other party. . . .").

courts in this District.[135]   Accordingly, Sinclair's claim should be disallowed based on the plain, unambiguous language of the MSA's terms, which should be enforced as written.[136]

140.    This clear contractual language makes plain the absurdity of Sinclair's assertion that the MSA has not yet been terminated and that MSA fees of $6 million per month continue to accrue.[137]   In its objection, Sinclair acknowledges that in August 2024 the Debtors provided notice of their intent to terminate services as of October 31, 2024, followed by written confirmation of the same on September 24, 2024.   Sinclair also acknowledges, as they must, that the Debtors and Sinclair have been in constant contact and coordination, both through written and oral communications, throughout the spring and summer regarding separation of the Debtors' business from Sinclair and the Debtors' intent to terminate Sinclair-provided MSA services by no later than October 31, 2024.   In addition, the Debtors' workplans, which were regularly shared with Sinclair, consistently included an end date for Sinclair's services of October 31, 2024.   Sinclair also has not been providing MSA services to the Debtors since October 31, which is an acknowledgement that the agreement was terminated at that time.   It is therefore disingenuous at best for Sinclair to assert

---

[135]   *See, e.g.*, *Malt Fam. Tr. v. 777 Partners LLC*, No. 2022-0652 (MTZ), 2023 WL 7476966, at *7 (Del. Ch. Nov. 13, 2023) (holding that, where contracting parties specifically reference certain language in an agreement, the absence of that language from a different provision "indicates the intentional exclusion" of that language); *In re Linn Energy, LLC*, 576 B.R. 532, 539 (Bankr. S.D. Tex. 2017) ("[I]f parties to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission." (first alteration in original) (quoting *Quadrant Structured Prods. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014))); *Gandy v. Burton*, No. CIV.A. H-12-1883, 2013 WL 2902786, at *4 (S.D. Tex. June 13, 2013) (finding that the fact that a party "[wa]s specifically defined and referred to" in one portion of an agreement, together with that party's omission from a related provision, made it "clear that [the drafter of a contract] intended thereby to exclude" the party)

[136]   *Travelers Lloyds Ins. Co. v. Pac. Emplrs. Ins. Co.*, 602 F.3d 677, 681 (5th Cir. 2010) ("If the [contract's] terms are unambiguous, the court must enforce [it] according to its plain meaning."); *Evanston Ins. Co. v. Amspec Holding Corp.*, 495 F. Supp. 3d 485, 491 (S.D. Tex. 2020) (holding that "[a] court should construe an unambiguous contract according to the plain meaning of its express wording" and that "[u]nambiguous contracts are enforced as written").

[137]   Sinclair Objection ¶ 4–5.

an entitlement to an administrative expense claim of "at least $6 million per month from November 1 through the date that the MSA is duly terminated in accordance with its terms."[138]

141.    Sinclair tries to argue that all notices must be made pursuant to the MSA's notice provision, including where the MSA does not require written notice.  Sinclair argues that "[t]ermination provisions such as those in the MSA are specifically negotiated so that the service provider can properly plan, prepare for, and implement a termination of services with minimal disruption and unnecessary costs to the service provider."[139]  But it is farcical for Sinclair to suggest it did not have the time to "properly plan, prepare for, and implement a termination of services" given that the Debtors notified Sinclair of its intention to terminate the agreement well in advance of the 60-day notice period required by Section 6 of the MSA.  And, tellingly, Sinclair never alleges, because it cannot, that it acted in any way inconsistent with a termination of the MSA on October 31, 2024.

142.    The Debtors properly provided more than 60-days' notice to Sinclair of their intention to terminate the MSA by October 31, 2024, and therefore do not owe Sinclair a service fee for November 2024 or any subsequent months.  Because Sinclair is not entitled to an administrative expense claim pursuant to the MSA or otherwise, the Court should disallow its asserted administrative expense claim and overrule the Sinclair Objection in its entirety.

---

[138]  *Id*. ¶ 8.  Sinclair's position that even a letter sent to its president and general counsel regarding the termination date does not constitute notice of the intention to terminate undercuts Sinclair's self-serving reading of the MSA, as apparently Sinclair's view is that the "notice of intent" must contain some sort of magic words under the MSA. *Id*. ¶ 6, n.6.  The fact that Sinclair even asserts that the Debtors may still be accruing fees under the MSA further demonstrates Sinclair's bad faith.

[139]  *Id*. ¶ 6.

### ii. At Most, the Sinclair Objection Should Be Resolved Through the Claims Administration Process In Accordance With the Plan

143. If Sinclair's asserted administrative expense claim survives the Confirmation Hearing, and it most assuredly should not, it is not an impediment to confirmation of the Plan. The Plan provides that all Administrative Claims against the Debtors must be filed by the Administrative Claims Bar Date, or 30 days following the Effective Date. The Plan further provides that the deadline for objecting to Administrative Claims is the first Business Day following 90 days after the Administrative Claims Bar Date. As the Sinclair Objection itself acknowledges, its asserted administrative expense claim is subject to allowance through the claims administration process and would only be paid to Sinclair "when and to the extent the Sinclair Administrative Claim is Allowed."[140]

144. The Sinclair Objection does not assert that the Debtors are unable to pay Sinclair's asserted administrative expense claim at emergence, even if such claim were to be allowed. Nor does the Sinclair Objection challenge the feasibility of the Plan, or even assert or suggest that the Plan is not feasible. Rather, Sinclair asks that the Debtors satisfy their burden to show that it will have the cash to pay administrative claims in full in cash.[141] As the Debtors will further demonstrate at the Confirmation Hearing, the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code and the Debtors will be well-capitalized following emergence, with sufficient liquidity to address any administrative expense claim that may be allowed.

145. Accordingly, the Sinclair Objection should be overruled and the Plan confirmed.

---

[140]   *Id.* ¶ 9

[141]   *Id.*

## Good Cause Exists to Waive the Stay of the Confirmation Order

146.     Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."[142] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

147.     The Debtors submit that good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.[143]  The restructuring contemplated by the Plan was vigorously negotiated among sophisticated parties and is premised on preserving value of the Debtors as a going concern.  That restructuring contemplates a series of complicated and time-consuming corporate reorganizational steps that must be taken in advance of the Effective Date, which must occur no later than December 31, 2024, per the milestone requirements of the RSA.  In addition, the Debtors believe that a swift emergence will best position them to capitalize on their go-forward strategic partnerships to maximize growth and deliver value to stakeholders on a post-emergence basis.  Given that time is of the essence and that the Debtors will need to emerge from these chapter 11 cases as soon as possible to meet that milestone, immediate effectiveness of the Confirmation Order would facilitate the Debtors' efforts to take the steps necessary to consummate the Plan by the Effective Date.

---

[142]   Fed. R. Bankr. P. 3020(e).

[143]   *See, e.g.*, *In re Energy Partners, Ltd.*, 2009 WL 2898876, at *19 (Bankr. S.D. Tex. Aug. 3, 2009) (waiving stay of confirmation order); *In re Idearc Inc.*, 423 B.R. at 158 (stay of confirmation order waived since debtors needed to consummate their chapter 11 plan before December 31, 2009).

148.    Finally, as set forth above, given the Debtors' extensive efforts to provide each of the voting parties, as well as their other stakeholders, a full measure of adequate notice, staying the Confirmation Order will not serve any due process-related ends.  Accordingly, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

[*Remainder of page intentionally left blank*]

## Conclusion

WHEREFORE, the Disclosure Statement Supplement and the Plan comply with all of the requirements of the Bankruptcy Code, and the Debtors respectfully request that this Court overrule all objections to Confirmation, including the UST Objection and the Sinclair Objection, and enter the Confirmation Order to approve the Disclosure Statement Supplement on a final basis and confirm the Plan.

| | |
|---|---|
| Dated: November 13, 2024<br>Houston, Texas | By: */s/ John F. Higgins* |

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Bryan L. Rochelle (TX Bar No. 24107979)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
brochelle@porterhedges.com

- and -

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Andrew N. Goldman (admitted *pro hac vice*)
Benjamin W. Loveland (admitted *pro hac vice*)
Lauren R. Lifland (admitted *pro hac vice*)
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
andrew.goldman@wilmerhale.com
benjamin.loveland@wilmerhale.com
lauren.lifland@wilmerhale.com

*Section 327(e) Counsel to the Debtors and Debtors in Possession*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Brian S. Hermann (admitted *pro hac vice*)
Andrew M. Parlen (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Alice Nofzinger (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
bhermann@paulweiss.com
aparlen@paulweiss.com
jgraham@paulweiss.com
anofzinger@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on November 13, 2024 , I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*<u>/s/ John F. Higgins</u>*      
John F. Higgins
